1

**KELLEY DRYE & WARREN LLP**
Ronnie Arenas (State Bar No. 309674)
350 South Grand Avenue, Suite 3800
Los Angeles, CA  90071
Telephone:   (213) 547-4900
Facsimile:    (213) 547-4701
rarenas@kelleydrye.com

2

3

4

5

**KELLEY DRYE & WARREN LLP**
William S. Gyves (pro hac vice forthcoming)
Randall L. Morrison (pro hac vice forthcoming)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone:   (212) 808-7800
Facsimile:    (212) 808-7897
wgyves@kelleydrye.com
rmorrison@kelleydrye.com

6

7

8

9

10

11

Attorneys for Petitioner
Bellridge Capital, LP

12

13

**UNITED STATES DISTRICT COURT**

14

**CENTRAL DISTRICT OF CALIFORNIA**

15

16

17

18

19

BELLRIDGE CAPITAL, LP,

Petitioner,

v.

RAMY EL-BATRAWI,

Respondent.

Case No.

*Bellridge Capital, LP v. EVmo, Inc.,*
Case No. 1:21-cv-07091-PGG Pending
in the United States District Court for
the Southern District of New York

20

21

22

23

**DECLARATION OF WILLIAM S.
GYVES IN SUPPORT OF MOTION
TO COMPEL COMPLIANCE
WITH SUBPOENA PURSUANT TO
LR 37-2 AND FRCP 45**

24

William S. Gyves, pursuant to 28 U.S.C. §1746, hereby declares as follows:

25

1.     I am a partner with the law firm of Kelley Drye & Warren LLP,

26

counsel for petitioner Bellridge Capital, LP ("Bellridge Capital").

27

2.     I respectfully submit this declaration in support of Bellridge Capital's

28

motion to compel respondent Ramy El-Batrawi's immediate compliance with a

subpoena <u>duces</u> <u>tecum</u> served in connection with an action pending in the United States District Court for the Southern District of New York.  El-Batrawi is a nonparty who, upon information and belief, resides and/or works within this District.

3.      I have personal knowledge of the facts set forth herein.  If called upon to testify, I could and would competently testify as to those matters.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of Bellridge Capital's subpoena <u>duces</u> <u>tecum</u> ("Subpoena") served upon El-Batrawi in the matter captioned <u>Bellridge Capital, LP v. EVmo, Inc., f/k/a YayYo, Inc. and Rideshare Rental, Inc.</u>, Case No. 1:21-cv-07091-PGG-SLC (S.D.N.Y) (the "Underlying Action").  The Complaint in the Underlying Action is attached as Exhibit A to the Subpoena.

5.      El-Batrawi is the founder and former Chief Executive Officer of EVmo, Inc. ("EVmo"), the defendant in the Underlying Action.

6.      On March 21, 2022, after having advised that he was authorized to do so, EVmo's counsel in the Underlying Action accepted service of the Subpoena on El-Batrawi's behalf.

7.      On April 26, 2022, EVmo's counsel advised that he no longer represented El-Batrawi in connection with the Subpoena.  He further advised that El-Batrawi had retained George B. Newhouse, Jr. as his counsel with respect to the Subpoena.

8.      When we contacted Mr. Newhouse, he stated that El-Batrawi denied that he had authorized EVmo's counsel to accept service of the Subpoena on his behalf.

9.      Mr. Newhouse nonetheless agreed to accept service of the Subpoena on El-Batrawi's behalf if Bellridge Capital agreed that service "shall be deemed effective as of today, April 27, 2022[.]"  We agreed to Mr. Newhouse's condition and effected service upon El-Batrawi -- for a second time.

10.     Attached hereto as **Exhibit 2** is a true and correct copy of our email

2

exchange on April 26, 2022 and April 27, 2022 with Mr. Newhouse.

11.     Beginning in April 2022, we were in regular contact with El-Batrawi's counsel concerning El-Batrawi's production of documents in response to the Subpoena.  Despite these good faith efforts, we were unable to secure a commitment from El-Batrawi's counsel regarding a firm schedule for the production of those documents.

12.     El-Batrawi's response to the Subpoena was due no later than May 11, 2022.  As of that date, El-Batrawi neither objected to the Subpoena nor produced any responsive documents.

13.     On June 29, 2022, pursuant to Local Rule 37-1, we emailed El-Batrawi's counsel a letter requesting a formal meet-and-confer regarding El-Batrawi's noncompliance.  A true and correct copy of the June 29, 2022 letter is attached hereto as **Exhibit 3**.

14.     As reflected in Exhibit 3, from April through June 2022, we repeatedly pressed for El-Batrawi's compliance with the Subpoena.

15.     As of July 11, 2022, El-Batrawi still had produced no responsive documents nor committed to a date certain for making such a production.

16.     We held a meet-and-confer with El-Batrawi's counsel via telephone on July 11, 2022.  At that meet-and-confer, we were not able to reach a mutually satisfactory resolution to the issue of El-Batrawi's noncompliance with the Subpoena.

17.     During the meet-and-confer, El-Batrawi's counsel stated -- as he has on multiple prior occasions since April -- that he was "making progress" in terms of collecting and reviewing documents.

18.     During the meet-and-confer, El-Batrawi's counsel represented that he would make a "substantial" production within "two weeks" (i.e., by July 25, 2022) and be "substantially completed" with that production within "two to three weeks" (i.e., by August 1, 2022).  These representations are implausible and thus

3

1   unacceptable.  Without immediate judicial intervention, I respectfully submit that
2   El-Batrawi will continue his attempts to delay or avoid his compliance with the
3   Subpoena.

4       19.    Significantly, as El-Batrawi and his counsel are aware, paper discovery
5   is scheduled to conclude in the Underlying Action on July 22, 2022.  A settlement
6   conference with Magistrate Judge Sarah L. Cave is scheduled for August 16, 2022.
7   Depositions are scheduled to proceed if the settlement conference proves
8   unsuccessful.  El-Batrawi also has been served with a subpoena compelling his
9   appearance at a deposition.

10      20.    El-Batrawi is unlikely to voluntarily fulfill his commitment to
11  substantially comply with the Subpoena by August 1, 2022 for a number of reasons.
12  First, at the meet-and-confer, El-Batrawi's counsel stated that he had culled 10,920
13  potentially responsive documents from a universe of 168,000 documents.  Counsel
14  advised that he "recently" hired one employee who he said will be solely
15  responsible for reviewing those 10,920 documents.

16      21.    During the meet-and-confer El-Batrawi's counsel declined to state if
17  this review process has even commenced.  When asked if there were any responsive
18  documents that could be produced immediately on a rolling basis, El-Batrawi's
19  counsel stated there were not.  Based on this response, the only conclusion I can
20  draw is that the review of El-Batrawi's potentially responsive documents had not yet
21  commenced as of July 11, 2022.  This is consistent with El-Batrawi's delay strategy
22  over the past several months.  I have no doubt this delay strategy will continue
23  absent judicial intervention.

24      22.    In addition, during the meet-and-confer El-Batrawi's counsel advised
25  that he plans to defer to EVmo's counsel with respect to conducting a privilege
26  review of whatever documents are pulled for potential production from the universe
27  of 10,920 documents.  EVmo has been attempting without success for months to
28  coordinate with El-Batrawi regarding this privilege review.  Asked at the meet-and-

4

confer when he expected to turn responsive documents over to EVmo's counsel for this privilege review, El-Batrawi's counsel stated that he expected to do so in "two to three weeks."

23.    If EVmo's counsel has to wait two to three weeks to even begin a privilege review of El-Batrawi's documents, El-Batrawi will not be in a position to either make a substantial production to Bellridge Capital by July 25, 2022 or substantially complete that production by August 1, 2022.  This, too, is consistent with El-Batrawi's delay strategy from the outset.

24.    Based on our inquiry into the underlying facts and circumstances, including a close review of voluminous documents produced by EVmo and certain nonparties, El-Batrawi appears to have every reason to prefer not to comply with the Subpoena.  This inquiry, as supplemented by the preliminary opinions of a forensic document examiner and a forensic computer specialist, has revealed instances in which documents central to EVmo's defense in the Underlying Action are, in fact, fabrications.  It is our expectation that the documents requested of El-Batrawi in the Subpoena will both bolster our position that EVmo's defense in the Underlying Action is based on fabricated documentation and facilitate our efforts to identify the persons responsible for those fabrications.

25.    In short, El-Batrawi's documents are of critical importance to the Underlying Action.  I respectfully submit that the only way El-Batrawi is going to ever fully comply with the Subpoena is if the Court compels him to do so.  Accordingly, on Bellridge Capital's behalf, I respectfully request that the Court enter an order directing El-Batrawi to fully comply with the Subpoena within five calendar days of the entry of that order.

1       I declare under penalty of perjury that the foregoing is true and correct.

2 Executed on this 13th day of July, 2022.

_____
William S. Gyves

DECLARATION OF WILLIAM S. GYVES RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

# EXHIBIT 1

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York ▼

| | |
|---|---|
| Bellridge Capital, LP | ) |
| *Plaintiff* | ) |
| v. | ) |
| EVmo, Inc., f/k/a YayYo, Inc. and Rideshare Rental, Inc. | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.  1:21-cv-07091-PGG

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:     Ramy El-Batrawi, c/o PDQ Pickup LLC, 433 N. Camden Drive, #600, Beverly Hills, CA 90210

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:   See Appendix A

| Place: Kelley Drye & Warren LLP<br>350 South Grand Avenue, Suite 3800<br>Los Angeles, CA 90071 | Date and Time:<br>4/5/2022 at 5:00 P.M. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ William S. Gyves |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Bellridge Capital
_____ , who issues or requests this subpoena, are:
William S. Gyves, Kelley Drye & Warren LLP, 3 World Trade Center, 175 Greenwich St., New York, New York 10007; Tel: (212) 808-7800; wgyves@kelleydrye.com

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:21-cv-07091-PGG

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# APPENDIX A

## Definitions

1.      Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York is incorporated herein by reference.

2.      "Bellridge Capital" means plaintiff Bellridge Capital, LP and any and all of its current and former officers, directors, employees, agents, representatives, predecessors, successors, parents, subsidiaries, attorneys, affiliates and assigns, and any other person acting or purporting to act on their behalf.

3.      "EVmo" means defendant EVmo, Inc., as well as Yay Yo, Inc. and Rideshare Rental, Inc., and any and all of its or their current and former officers, directors, employees, agents, representatives, predecessors, successors, parents, subsidiaries, attorneys, affiliates and assigns, and any other person acting or purporting to act on its or their behalf.

4.      "Complaint" means the Complaint (Docket No. 1) filed in this action on August 23, 2021 and attached hereto as **Exhibit A**.

5.      "Answer" means the Answer (Docket No. 38) filed in this action on February 3, 2022 and attached hereto as **Exhibit B**.

6.      "Warrant" means the Warrant to Purchase Common Stock dated March 8, 2018 (Docket No. 1-1) and attached as Exhibit A to the Complaint.

7.      "Warrant Amendment" means the Amendment to Yay Yo, Inc. Warrant to Purchase Common Stock (Docket No. 38-1) dated as of May 4, 2019 and attached as Exhibit 1 to the Answer.

8.      "Klimov" means Boris (Robert) Klimov, Bellridge Capital's Managing Partner.

9.      "El-Batrawi" means Ramy El-Batrawi, EVmo's founder and former Chief Executive Officer.

10.     "SEC" means the United States Securities and Exchange Commission.

11.      "El-Batrawi Declaration" means the "Declaration of Ramy El-Batwari" (Docket No. 28) dated December 10, 2021 and filed in this action on January 11, 2022 and attached hereto as **Exhibit C**.

12.     "You" or "Your" means El-Batrawi.

## <u>Document Requests</u>

1.      If the Warrant Amendment reflects Klimov's manual signature, the document reflecting Klimov's original manual signature for inspection and copying.

2.      If the Warrant Amendment reflects Klimov's electronic signature, a copy of that document as received by you.

3.      If You received the Warrant Amendment reflecting Klimov's signature by email, any and all documents referring, reflecting or relating to, or otherwise constituting, any such email(s).

4.      If You received the Warrant Amendment reflecting Klimov's signature by some means other than email, any and all documents referring, reflecting or relating to the conveyance of that document to You by that other means.

5.      If Klimov or any other person emailed Klimov's electronic signature to You separately from the Warrant Amendment, any and all documents referring, reflecting or relating to, or otherwise constituting any such email(s).

6.      Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications at any time between EVmo and You (or your counsel, if any)

relating in any way to the Warrant Amendment.

7.      Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications at any time between EVmo's outside counsel and You (or your counsel, if any) relating in any way to the Warrant Amendment.

8.      Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications at any time between EVmo's counsel at Carmel, Milazzo & Feil LLP and You (or your counsel, if any) relating in any way to the Warrant Amendment.

9.      Any and all documents referring, reflecting or relating to the circumstances in which Klimov signed the Warrant Amendment.

10.     Any and all documents referring, reflecting or relating to the circumstances in which You received the Warrant Amendment signed by Klimov.

11.     Any and all documents referring, reflecting or relating to the circumstances in which You located the Warrant Amendment after the commencement of this litigation, captioned Bellridge Capital, LP v. EVmo, Inc., f/k/a Yayo, Inc. and Rideshare Rental, Inc., No. 1:21-cv-07091-PGG (S.D.N.Y.), on August 23, 2021.

12.     Any and all documents referring, reflecting or relating to the circumstances in which the Warrant Amendment was first forwarded to EVmo.

13.     Any and all documents referring, reflecting or relating to the circumstances in which the Warrant Amendment was first forwarded to Withers Bergman.

14.     Any and all documents referring, reflecting or relating to, or otherwise constituting, all drafts or versions of the Warrant Amendment.

15.     Any and all documents referring, reflecting or relating to the drafting of the Warrant Amendment.

16.     Any and all documents referring, reflecting or relating to, or which otherwise are sufficient to establish, when the initial draft or version of the Warrant Amendment was first created.

17.     Any and all documents referring, reflecting or relating to, or which otherwise are sufficient to identify, the computer or computer system on which the initial draft or version of the Warrant Amendment was first created.

18.     Any and all documents referring, reflecting or relating to, or otherwise constituting, any steps taken by You to amend or modify the Warrant other than through the Warrant Amendment.

19.     Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications between EVmo (or its outside counsel) and you (or your counsel, if any) regarding the El-Batrawi Declaration.

20.     Any and all documents referring, reflecting or relating to, or which otherwise are sufficient to identify, the person(s) who drafted the El-Batrawi Declaration.

21.     Any and all drafts or versions of the El-Batrawi Declaration exchanged between You (or your counsel, if any) and EVmo (or its outside counsel).

22.     Any and all documents referring, reflecting or relating to Bellridge Capital's notice on or about May 28, 2021 of its intention to exercise its rights under the Warrant.

23.     Any and all documents referring, reflecting or relating to EVmo's evaluation of Bellridge Capital's May 28, 2021 notice of its intention to exercise its rights under the Warrant.

24.     Any and all documents referring, reflecting or relating to EVmo's response to Bellridge Capital's May 28, 2021 notice of its intention to exercise its rights under the Warrant.

25.     Any and all documents referring, reflecting or relating to any oral agreement

between EVmo and Bellridge Capital to amend or otherwise modify the Warrant.

26.      Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications between EVmo (or its outside counsel) and you (or your counsel, if any) concerning any oral agreement to amend or otherwise modify the Warrant.

27.      Any and all documents referring, reflecting or relating to the "Form of Warrant" attached as Exhibit 4.3 to EVmo's 2019 Annual Report submitted to the SEC on or about March 31, 2020 on Form 10-K.

28.      Any and all documents referring, reflecting, or relating to the circumstances in which the "Form of Warrant" came to be attached as Exhibit 4.3 to EVmo's 2019 Annual Report submitted to the SEC on or about March 31, 2020 on Form 10-K.

29.      Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications between EVmo (or its outside counsel) and you (or your counsel, if any) relating in any way to this litigation, captioned Bellridge Capital, LP v. EVmo, Inc., f/k/a Yayo, Inc. and Rideshare Rental, Inc., No. 1:21-cv-07091-PGG (S.D.N.Y.).

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BELLRIDGE CAPITAL, LP,

                                    Plaintiff,

        v.

EVMO, INC., f/k/a YayYo, Inc. and
Rideshare Rental, Inc.,

                                    Defendant.

Civil Action No.: 1:21-cv-7091

**COMPLAINT**

        Plaintiff Bellridge Capital, LP ("Bellridge Capital"), by and through its

undersigned counsel, as and for its Complaint against defendant EVmo, Inc. ("EVmo"), formerly

known as YayYo, Inc. ("YayYo") and Rideshare Rental, Inc. ("Rideshare Rental" and, together

with EVmo and YayYo, the "Company"), hereby alleges as follows:

I.      **NATURE OF THE ACTION**

        1.      This action arises out of defendant's wrongful refusal to honor Bellridge

Capital's exercise of a warrant to purchase up to 1.5 million shares of its common stock as part

of the consideration offered to induce Bellridge Capital to invest $6 million in the Company's

struggling business operation.

        2.      Bellridge Capital made this investment at a time when the Company faced

extraordinary obstacles to raising capital due to its untested business model and the reputational

cloud surrounding its founder, Ramy El-Batrawi.  Among other things, El Batrawi previously

had been sued for securities fraud by the United States Securities and Exchange Commission

("SEC") and then barred for five years from serving as an officer or director of any publicly

traded company.

3.      Despite these considerable risks, Bellridge Capital in 2018 agreed to invest the $6 million that was essential to the viability of the Company's nascent business of renting vehicles to drivers operating in the rideshare industry.  The $6 million infusion also was critical to the Company's ambitious plan to go public.

4.      To induce this investment, the Company issued to Bellridge Capital a warrant to purchase up to 1.5 million shares of its common stock at an exercise price of $4.00 per share.

5.      As a further inducement, the Company expressly agreed in the warrant to certain anti-dilution measures designed to protect Bellridge Capital's upside if the value of the Company's stock declined.  Among other things, the warrant provides that the exercise price would be adjusted downward if the Company subsequently sold shares of its common stock for less than $4.00 per share.  In the event of such a dilutive sale, the warrant provides, the exercise price would be adjusted to an amount equal to 90 percent of that lower per share price.

6.      These anti-dilution provisions were a material, bargained-for benefit of Bellridge Capital's agreement to inject badly needed capital into the Company when few other investors would even consider doing so.  Without those price protections, Bellridge Capital would not have invested $6 million in the Company.

7.      In March 2021, the Company disclosed that a year earlier it sold 1.4 million shares of common stock to an investor for $0.07 per share.  Pursuant to the plain and unambiguous terms of the warrant, this dilutive sale automatically triggered a downward adjustment to the exercise price.

8.      In May 2021, Bellridge Capital sought to exercise its rights under the warrant to purchase 1.5 million shares of the Company's common stock at an adjusted exercise price.

9.      The Company rejected Bellridge Capital's exercise of its rights under the warrant, claiming that in 2019 Bellridge Capital orally consented to the deletion of the core price protection terms.  As a result of this alleged oral modification to the warrant, the Company maintains, the $4.00 exercise price controls.

10.      The Company's claim that Bellridge Capital orally agreed to strip the critically important anti-dilution provisions from the warrant -- a position based solely on the word of El-Batrawi, its disgraced founder who has since been forced out of the Company -- is an amateurishly implausible fabrication.  Bellridge Capital did not orally agree to waive the warrant's crucial anti-dilution provisions.

11.      Moreover, pursuant to the express terms of the warrant, any such modification to the warrant is unenforceable absent Bellridge Capital's written consent.  The Company concedes that Bellridge Capital did not consent in writing to the deletion of the warrant's anti-dilution provisions.

12.      In short, EVmo's bad faith refusal to honor the anti-dilution provisions constitutes a material breach of the warrant.  As a direct result of that breach, Bellridge Capital has sustained damages in an amount exceeding $3 million.

13.      Bellridge Capital brings this action to recover its damages flowing from the Company's breach, plus its reasonable attorneys' fees and costs incurred in enforcing the plain and unambiguous terms of the warrant.

## II.   **JURISDICTION AND VENUE**

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  Defendant is a citizen of the States of Delaware and California, and plaintiff is a citizen of neither of those states.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     Venue is proper pursuant to 28 U.S.C. §1391(b)(2) and (3).  The closing on the transaction in which the Company issued the underlying warrant occurred in Manhattan.  Further, in the warrant, defendant submitted to the exclusive jurisdiction of the state and federal courts sitting in Manhattan "for the adjudication of any dispute hereunder or in connection herewith[.]"

## III.   **THE PARTIES**

### A.   **Plaintiff**

16.     Bellridge Capital is a limited partnership organized and existing under the laws of the State of Delaware.  Maintaining its principal place of business in Fort Lauderdale, Florida, Bellridge Capital is an investment firm specializing in emerging small- and mid-cap companies.

17.     Bellridge Capital LLC, a limited liability company organized and existing under the laws of the State of Florida, is the general partner of plaintiff Bellridge Capital.  Bellridge Capital LLC's sole member is Boris (Robert) Klimov, a resident of Toronto, Canada.

18.     Bay Private Equity, Inc., a Canadian corporation maintaining its principal business in Toronto, Canada, is the sole limited partner of plaintiff Bellridge Capital.

B. **Defendant**

19.     EVmo is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal place of business in Beverly Hills, California.

20.     The Company was formed in 2016 as YayYo, LLC, which thereafter was converted into a Delaware corporation.  Originally incorporated as YayYo on or about June 21, 2016, the Company changed its name to Rideshare Rental on or about September 11, 2020.  On or about March 20, 2021, the Company changed its name yet again to EVmo.

IV.     **FACTUAL BACKGROUND**

A.     **The Company's Business Operations**

21.     At all relevant times, the Company was engaged in the business of renting cars to drivers operating in the rideshare industry.

22.     Ridesharing is a service that arranges one-way transportation on short notice.  Through websites and mobile applications, rideshare companies like Uber and Lyft connect passengers seeking a one-time ride with drivers of vehicles that, unlike taxis, cannot legally be hailed on the street.

23.     Many drivers who work in the rideshare industry do not own vehicles that meet the quality and safety standards imposed by rideshare companies.  The Company is in the business of filling that void by offering qualifying vehicles for rent on a weekly, monthly or annual basis to drivers whose personal vehicles do not pass muster.

24.     The Company operates primarily through two wholly-owned subsidiaries:  Rideshare Car Rentals, LLC ("Rideshare Car Rentals") and Distinct Cars, LLC ("Distinct Cars").

25.     Through Rideshare Car Rentals, the Company provides drivers in the rideshare industry with access to an online rideshare vehicle booking platform.

26.     Through Distinct Cars, the Company maintains a fleet of passenger vehicles available for rent to drivers operating in the rideshare economy.

27.     The Company's business plan initially focused on the development of an application through which smartphone users could obtain price comparisons of and book available ridesharing and taxi services, along with select limousine and other public and private transportation services.

28.     Although the Company completed the development of this application, it was unable to roll out the application because its functionality hinged on the availability of data from major rideshare companies.  When those rideshare companies unsurprisingly declined to participate in the venture, the Company's original business model cratered.

29.     This turn of events left the Company in dire financial straits.  By the end of 2016, the Company's assets totaled just $160,675.  Its net income was -$1,017,325.  By mid-2017, the Company still had generated no revenue.  Its net loss for the first six months ended June 30, 2017 was $2,591,548.

30.     The Company's financial statement for the period ended June 30, 2017 reflected its precarious financial condition:

> The Company's ability to continue as an ongoing concern for the next twelve months is dependent on its ability to generate sufficient cash flows from operations to meet its obligations, which it has not been able to accomplish to date, and its ability to obtain additional capital financing from investors.  These factors, among others, raise substantial doubt about the ability of the Company to continue as an ongoing concern for a reasonable period of time.

31.     On August 12, 2017, the Company acknowledged the failure of its original business model and announced that it was pivoting to a plan to provide rental vehicles to rideshare drivers.

6

### B.    The Company's Founder, Ramy El-Batrawi

32.    Developing and maintaining a fleet of rental vehicles is an extremely capital intensive enterprise.  From the outset, the Company faced significant obstacles to raising that capital.  Among the most challenging of those hurdles was El-Batrawi, the Company's founder, chief executive officer and majority shareholder.

33.    In 2006, El-Batrawi and other officers, directors and associates of Genesis Intermedia, Inc. ("GENI") were named as defendants in an SEC enforcement action captioned SEC v. El-Batrawi, Case No. 2-06-cv-02247-MRP, and filed in the United States District Court for the Central District of California (the "GENI Enforcement Action").

34.    GENI at the time was a telemarketing company controlled by El-Batrawi.  El-Batrawi was GENI's majority shareholder, and served as its chief executive officer, president and chairman of the board.

35.    The GENI Enforcement Action arose out of a stock loan and manipulation scheme.  El-Batrawi and the others were alleged to have violated the antifraud provisions of the federal securities laws by scheming to manipulate the price of GENI stock.  One of El-Batrawi's co-defendants was Adnan M. Khashoggi, the international arms dealer implicated in the Iran-Contra scandal with whom El-Batrawi had a long-standing business association.

36.    The SEC alleged that El-Batrawi's scheme artificially inflated GENI's stock price by approximately 1,400 percent.

37.    The final consent judgment resolving the GENI Enforcement Action in 2010 barred El-Batrawi from serving as an officer or director of any public company for five years.

38.     The GENI Enforcement Action was not the only litigation to ensnare El-Batrawi.  In or about 2015, he was named as a defendant in a Racketeer Influenced and Corrupt Organization Act action captioned <u>Keshishyan v. El-Batrawi</u>, Case No. 2:15-cv-4354 JAK, and filed in the United States District Court for the Central District of California.  The <u>Keshishyan</u> action arose out of plaintiffs' investment in what El-Batrawi represented would be a multi-level marketing company formed to sell a diet product.

39.     In <u>Keshishyan</u>, El-Batrawi was alleged to have defrauded plaintiffs by, among other things, using subscription materials presented as the work product of Latham & Watkins LLP even though that law firm had no involvement in the transaction.

40.     Plaintiffs in <u>Keshishyan</u> further alleged that they discovered El-Batrawi's fraudulent scheme after he suffered "an apparent mental breakdown and was found wandering the streets naked and yelling, 'Kill me.'"  This incident, plaintiffs alleged, resulted in El-Batrawi's involuntary admission to a hospital "under a psychological hold."

**C.     Bellridge Capital Invests $6 Million in the Company's Struggling Business**

41.     By late 2017, the Company was in desperate need of capital to finance its plan to amass a fleet of rental cars and then market those vehicles for rent to rideshare drivers.

42.     In December 2017, Bellridge Capital made a $222,222 bridge loan to YayYo.  YayYo issued a senior secured promissory note to Bellridge Capital in the original principal amount of $222,222 (the "First Note") set to mature on March 31, 2018.

43.     The $222,222 loan was critical to the Company's business plan. The Company represented that the loan proceeds would be used as a down payment for the fleet of cars it would rent to rideshare drivers.

8

44.     As an inducement for plaintiff to extend this loan, YayYo granted Bellridge Capital a security interest in all of YayYo's assets, including a pledge of securities YayYo owned in its wholly-owned subsidiaries.

45.     Bellridge Capital also received one share of the Company's common stock for every $13.33 loaned.

46.     In early 2018, Bellridge Capital agreed to make an additional $6 million capital infusion into YayYo that was critical to the Company's drive to have its common stock listed on the Nasdaq Capital Market ("Nasdaq"). This $6 million lifeline, the Company represented, was earmarked to support the Company's development of the fleet of rental cars that would be the backbone of its operations.

**1.     The Purchase Agreement**

47.     Specifically, on March 8, 2018, YayYo entered into a Securities Purchase Agreement (the "SPA") with Bellridge Capital.

48.     Pursuant to the SPA, Bellridge Capital purchased both a $6 million promissory note and a warrant to acquire up to 1.5 million shares of the Company's common stock.

49.     The SPA at Section 9(e) provides that "[n]o provision of this Agreement may be amended other than by an instrument in writing signed by" the Company and Bellridge Capital.

**2.     The Second Note**

50.     As part of its investment in the Company, Bellridge Capital obtained a senior secured promissory note in the principal face amount of $6 million due March 8, 2023 (the "Second Note").

51.     The Second Note provided that the "prior written consent of [Bellridge Capital] shall be required for any change, waiver or amendment of this Note."

**3.     The Warrant**

52.     In a warrant dated March 8, 2018 (the "Warrant"), Bellridge Capital secured the right to purchase up to 1.5 million shares of YayYo's common stock for an aggregate purchase price of $6 million.  A true and correct copy of the Warrant is attached hereto as Exhibit A.

53.     A warrant is a security providing the holder with the right (but not the obligation) to buy the underlying stock of the issuing company at a fixed price at some future time prior to the expiration of the warrant.

54.     Pursuant to the Warrant, the Company granted to Bellridge Capital the right to purchase up to an aggregate of 1.5 million shares (the "Warrant Shares") of the Company's common stock at $4.00 per share (the "Exercise Price") at any time up to March 8, 2023 (the "Expiration Date").  See Exhibit A, §§1, 19.

55.     Given the Company's precarious financial condition and its unproven business model, Bellridge Capital negotiated for and secured a number of critical anti-dilution provisions set forth in Section 2 of the Warrant.  There, the Company agreed that the Exercise Price and number of Warrant Shares issuable upon the exercise of the Warrant were subject to adjustment under certain conditions.

56.     Pursuant to Section 2(b) of the Warrant, if the Company issued or sold any shares of common stock for a consideration per share (the "New Issuance Price") less than the Exercise Price in effect immediately prior to the issuance or sale (a "Dilution Issuance"), then the Exercise Price "shall be reduced to an amount equal to 90% of the New Issuance Price."

57.     Specifically, the Warrant provides:

10

> If and whenever on or after the Subscription Date, the Company issues or sells, or in accordance with this Section 2 is deemed to have issued or sold, any shares of Common Stock . . . for a consideration per share (the "**New Issuance Price**") less than a price equal to the Exercise Price in effect immediately prior to such issuance or sale or deemed issuance or sale (such Exercise Price then in effect is referred to herein as the "**Applicable Price**") (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance, the Exercise Price then in effect shall be reduced to an amount equal to 90% of the New Issuance Price.

Id., §2(b) (emphasis in original).

58.     In addition, Section 2(c) provides that simultaneously with any adjustment to the Exercise Price, the number of Warrant Shares that may be purchased upon the excise of the Warrant would be increased or decreased proportionally so that after the adjustment the aggregate Exercise Price payable for the adjusted number of Warrant Shares would be the same as the Exercise Price in effect immediately prior to that adjustment.

59.     Further, Section 2(f) provides that in the event the Company took any action to which the express provisions of Section 2 did not strictly apply or, if applicable, would not operate to protect Bellridge Capital from dilution, then the Company's board of directors "shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the Warrant Shares (if applicable) so as to protect" Bellridge Capital's rights.

60.     The price protections memorialized in Section 2 were material terms of Bellridge Capital's bargain with the Company.  But for those price protections, Bellridge Capital would not have invested $6 million in the Company.

61.     Significantly, the Warrant expressly prohibits any oral modification to its terms.  Section 9 of the Warrant, captioned "AMENDMENT AND WAIVER," in relevant part provides:

> [T]he provisions of this Warrant . . . may be amended and the Company may take any action herein prohibited, or omit to

11

perform any act herein required to be performed by it, only if the Company has obtained the written consent of [Bellridge Capital]. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

62.     Section 15 of the Warrant provides that if "this Warrant is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the holder otherwise takes action to collect amounts due under this Warrant or to enforce the provisions of this Warrant," then "the Company shall pay the costs incurred by the Holder for such collection, enforcement or action … including, without limitation, attorneys' fees and disbursements."

63.     The Warrant is governed by New York law.  Id., §11.

64.     In the Warrant, the Company "irrevocably submit[ted] to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith[.]"  Id.

D.     **The IPO**

65.     Notwithstanding Bellridge Capital's $6 million investment, the Company's financial condition remained dire.  As of March 26, 2018, the Company's net income was -$4.1 million.  Revenue for the three months ended March 31, 2018 was just $418,879.  For that same period, the Company operated at a net loss of $1.5 million.  That net loss reflected an increase of 150 percent over the same period in 2017.

66.     Under the circumstances, the Company desperately needed to raise capital to survive.

67.     On April 30, 2018, YayYo filed a registration statement with the SEC on Form S-1 (as amended, the "Registration Statement") for an initial public offering of up

12

to 1.65 million shares of its common stock (the "IPO"). Therein, the Company stated that it intended to have its common stock approved for listing on Nasdaq.

68.     Ultimately, the Registration Statement required no fewer than fifteen amendments before the SEC declared it effective.

69.     In the first of those amendments, filed with the SEC on Form S-1/A on June 6, 2018, the Company publicly disclosed the Warrant and attached it thereto as Exhibit 4.3. A true and correct copy of this amended Registration Statement, with Exhibit 4.3, is attached hereto as Exhibit B.

70.     On or about September 12, 2018, the Company entered into a new note payable agreement with Bellridge Capital pursuant to which YayYo repaid $4,821,810 of the original $6 million Second Note.

71.     Consistent with the terms of the Second Note, this modification was memorialized in a formal agreement. Pursuant to this written agreement, the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018 due on the earlier of November 30, 2019 or the Company's closing on an offer of its common stock of at least $3 million.

72.     As the Company proceeded in the fall of 2018 with its preparations for the IPO, Nasdaq repeatedly expressed strong reservations about listing YayYo's shares given El-Batrawi's blemished track record and the degree to which he remained in control of the Company.

73.     Upon information and belief, Nasdaq insisted that El-Batrawi resign and retain less than a ten percent stake in YayYo as a condition to the Company going public. The Company and El-Batrawi feigned their commitment to complying with those

conditions. El-Batrawi claimed to resign as the Company's chief executive officer on or about October 4, 2018.

74.     In September 2019, El-Batrawi once again represented that he was stepping away from the Company, certifying that he was resigning from all of his positions.

75.     The modifications to the terms of the Second Note were disclosed in the fourteenth amendment to the Registration Statement filed with the SEC on Form S-1/A on November 5, 2019.  The written Amendment to Note Payable Agreement, dated effective November 1, 2019 and signed by both parties, was annexed as Exhibit 10.21.1 to that amended Registration Statement.  A true and correct copy of this amended Registration Statement, with Exhibit 10.21.1, is attached hereto as Exhibit C.

76.     Significantly, unlike the modifications to the Second Note, the modifications allegedly made to the Warrant in or about November 2019 were not disclosed in any iteration of the Registration Statement.

77.     The fifteenth and final amendment to the Registration Statement was filed with the SEC on Form S-1/A on November 6, 2019.  A true and correct copy of this amended Registration Statement, with Exhibit 4.3, is attached hereto as Exhibit D.

78.     In this November 6 amendment to the Registration Statement, the Company made no reference to any modified warrant; instead, it incorporated by reference the Warrant attached to the initial June 7, 2018 amendment with all of the anti-dilution provisions intact.  See Exhibit D at II-7.

79.     The Registration Statement finally was declared effective on or about November 12, 2019.  The 1.5 million shares of common stock underlying the Warrant were registered as part of the IPO.

14

80.    On November 12, 2019, YayYo's common stock began trading on Nasdaq under the symbol "YAYO."  Upon information and belief, "yayo" is a Spanish slang term for cocaine.

81.    On November 15, 2019, the Company closed its offering of 2,625,000 common shares at $4.00 per share.

82.    Total gross proceeds from the IPO were $10.5 million.  The $1,296,018 note payable due to Bellridge Capital was paid in full from those proceeds.  In or about November 2019, the Company also repaid the $222,222 bridge loan secured by the First Note.

83.    Remarkably, two days after the IPO closed, the Company appointed El-Batrawi as its acting chief executive officer.

E.    **Post-IPO Litigation Shines a Spotlight on
Grossly Improper Conduct at the Company**

84.    The IPO was followed by a wave of litigations arising out of a pattern of deceitful misconduct by El-Batrawi, who is the linchpin in the Company's implausible assertion here that Bellridge Capital orally agreed to strip the anti-dilution provisions from the Warrant.

85.    On January 24, 2020, YayYo took the extraordinary step of seeking injunctive relief against its founder in an action captioned YayYo, Inc. v. El-Batrawi, Case No. 20 STCP00309, and commenced in the Superior Court of the State of California, County of Los Angeles.  Therein, YayYo sought to enjoin El-Batrawi's "wrongful conduct in misrepresenting his position in, association with, and authority on behalf of YayYo."

86.    YayYo alleged:

Despite leaving the Company following concerns from NASDAQ regarding his involvement in the day-today operations of YayYo in

15

September 2019, [El-Batrawi] has engaged in a continuous course of actions misrepresenting himself as affiliated with, speaking on behalf of, and authorized or empowered by YayYo. In so doing, [El-Batrawi] has purported to bind the Company to contracts, direct its employees, change its website, and even attempted to sell the Company to its competitors.

87.     YayYo asserted that El-Batrawi engaged in "wrongful acts against YayYo to disrupt and harm YayYo's business."

88.     YayYo alleged that in September 2019, El-Batrawi had "relinquished all formal and informal association with the Company following the receipt of concerns, from NASDAQ, regarding [El-Batrawi's] involvement with the Company's day-to-day operations[.]" Since that resignation in September 2019, YayYo maintained, El-Batrawi "has engaged in a continuous and escalating pattern of behavior destructive to YayYo[.]"

89.     YayYo sought an order barring El-Batrawi from holding himself out as an officer or director of the Company; purporting to take any corporate action on behalf of the Company; or selling, transferring or encumbering any of the Company's assets.

90.     In a declaration filed in support of YayYo's application for a temporary restraining order against El-Batrawi, Jonathan Rosen, the Company's new chief executive officer, stated that despite resigning as chief executive officer and promising to have no formal or informal affiliation with the Company other than his minority stake, El-Batrawi "continue[d] to operate and hold himself out as if a director or officer of YayYo, or as an otherwise authorized representative of the same."

91.     Rosen further stated that despite representations in the Registration Statement to the effect that El-Batrawi already had sold his 12,525,000 shares of YayYo stock prior to the IPO, in reality "El-Batrawi ha[d] failed and/or refused to sell his shares of stock in the Company[.]"

92.     According to Rosen, El-Batrawi engaged in a pattern of deceptive misconduct between September 2019 and January 2020 -- the same time period in which here El-Batrawi purportedly secured Bellridge Capital's oral consent to deleting the Warrant's anti-dilution provisions.

93.     El-Batrawi's misconduct, Rosen alleged, included contacting competitors, suppliers and vendors of YayYo and negotiating with them as a representative of YayYo; meeting with financiers and investment firms about investing in YayYo and claiming to represent YayYo; hiring a public relations firm for YayYo and producing and airing commercials for YayYo; attempting to hire two marketing firms for YayYo; and directing that changes be made to YayYo's website.

94.     Within days after YayYo commenced this litigation targeting El-Batrawi's improper conduct, the Company -- presumably at El-Batrawi's direction -- cleaned house.  YayYo replaced three board members and announced that Rosen had resigned as chief executive officer.  Incredibly, El-Batrawi was reinstated as the Company's chief executive officer.  YayYo at the time stated:

> Mr. Rosen informed the Board that his resignation was for "Good Reason," as that term is defined in Mr. Rosen's employment agreement with the Company dated January 10, 2020.  The Company disagrees with Mr. Rosen's characterization of the circumstances surrounding his resignation and does not believe that "Good Reason" exists for Mr. Rosen's resignation.

95.     This house cleaning was too late to deflect the attention of regulators.

96.     Nasdaq quickly took note of these allegations that, despite the Company's representations that El-Batrawi had removed himself from YayYo's day-to-day

operation as a condition to proceeding with the IPO, he continued to exercise control over those operations. Nasdaq raised its concerns directly and forcefully with the Company.

97. On February 10, 2020, the Company notified Nasdaq of its intention to "voluntarily" delist its common stock from Nasdaq. It did so after Nasdaq advised the Company that it had failed the conditions for continued listing of its common stock as set forth in Listing Rule 5250(a).

98. The Company disclosed no details regarding its noncompliance with Rule 5250(a). Rule 5250(a), however, in relevant part provides:

> Nasdaq may request any additional information or documentation, public or non-public, deemed necessary to make a determination regarding a Company's continued listing, including, but not limited to, any material provided to or received from the Commission or other Regulatory Authority. A company may be denied continued listing if it fails to provide such information within a reasonable period of time or if any communication to Nasdaq contains a material misrepresentation or omits material information necessary to make the communication to Nasdaq not misleading. The Company shall provide full and prompt responses to the requests by Nasdaq or by FINRA acting on behalf of Nasdaq for information related to unusual market activity or to events that may have a material impact on trading of its securities in Nasdaq.

99. The Company's delisting did not stem the flood of litigation flowing from El-Batrawi's deceitful conduct. On March 5, 2020, Anthony Davis, YayYo's former president, chief executive officer and director, commenced an action captioned <u>Davis v. YayYo, Inc.</u>, Case No. 20STCV09143, in the Superior Court of the State of California for the County of Los Angeles.

100. In his complaint for breach of contract and fraud, Davis alleged:

> Plaintiff Anthony Davis is an experienced, c-suite level executive that agreed to join Yayyo [sic], a ridesharing startup company, as its CEO, for a salary well below his market rate in exchange for the written promise of stock options made by Yayyo [sic] founder and then CEO Ramy El-Batrawi.

18

After only five (5) months of service and in accordance with his responsibilities under an employment agreement, Plaintiff determined that Ramy El-Batrawi could not be trusted because he regularly ignored legal counsel regarding SEC matters and flouted Board protocols and industry norms for corporate compliance. Specifically, El-Batrawi filed fraudulent and materially misleading documents with the SEC that Yayo [sic] continues to use to deny Plaintiff the compensation he is owed.

101.　Davis asserted that El-Batrawi fabricated documents:

Plaintiff is informed and believes and thereupon alleges that sometime in 2016, El- Batrawi drafted documents that contained equity/stock compensation terms that were never presented to the Board for consent or review. On December 23, 2016, El-Batrawi caused to be filed, under Davis' name and signature, and without his consent or knowledge, a document that contained the term Equity Incentive Plan (hereinafter the "Fabricated Equity Incentive Plan") that was purportedly adopted on November 29, 2016. This date was very same day Davis accepted the Davis' Offer Letter. No Board meeting was held on November 29, 2016 that addressed the Fabricated Equity Incentive Plan, or any incentive plan for that matter. El-Batrawi caused this document to be filed without the approval or knowledge of Yayyo's [sic] Board of Directors.

Davis would never have agreed to this Fabricated Equity Incentive Plan, as the expiration period was significantly too short to allow for his options to be realized, rendering the compensation terms in their respective Offer Letters illusory.

\*\*\*

The November 2016 Fabricated Equity Incentive Plan was never presented or adopted by the Board as represented in the filing with the SEC, which makes it misleading to the public and creates conflict and liabilities for Yayyo [sic] as Plaintiff is informed and believes that El-Batrawi was acting in his own interest and not in that of the company.

102.　Davis further alleged that on March 15, 2017, the Company filed a document with the SEC containing the correct information regarding his stock and equity options, but then subsequently referenced the fabricated November 2016 incentive plan.

19

103.    Davis also alleged that he notified the Company that it had filed

false statements with the SEC:

> Throughout 2018 and 2019, without the assistance of legal
> counsel, written notice was provided to Yayyo's [sic] then CEO
> Laurie DiGiovanni and El-Batrawi that certain filings (e.g., the
> Fabricated Equity Incentive Plan) with the SEC contained
> materially false statements, and that these false material
> statements, through Yayyo's [sic] current legal counsel, have been
> used to deny Plaintiff his compensation and stock options in Yayyo
> [sic] owed under his employment agreement.  To date, Yayyo [sic]
> and its current counsel continue to file and maintain positions that
> deceive the public and deny Plaintiff the compensation he is owed.

104.    On or about April 28, 2020, FirstFire Global Opportunities Fund,

LLC ("FirstFire") filed an action captioned FirstFire Global Opportunities Fund, LLC v. West

Park Capital, Inc., Case No. 1-20-CV-03327-LLS, in the United States District Court for the

Southern District of New York.  Therein, FirstFire alleged that the Registration Statement was

materially false and misleading.

105.    In FirstFire, plaintiff alleged that when the Company encountered

difficulties generating sufficient investor interest in the IPO, El-Batrawi in October or November

2019 "became materially involved in efforts to close the Offering and/or obtain additional

indications of interest for the YAYO securities, assisting and often working daily at the office of

[the underwriters] and in violation of the NASDAQ listing requirements."

106.    FirstFire also alleged that when the underwriters for the IPO were

unable to raise the $10 million required by Nasdaq to close the IPO, El-Batrawi fabricated a $1.2

million indication of interest that he knew was not bona fide.

107.    Beginning in or about July 2020, multiple putative securities class

actions were commenced against the Company on behalf of persons who purchased or otherwise

acquired stock through the IPO.

108.     In their pleadings, the investors focused on El-Batrawi's "checkered past[.]"  They alleged that the Company made a series of false and misleading statements, or omitted material information, from the Registration Statement filed in connection with the IPO.

109.     Among other things, the investors alleged that, despite his purported resignation prior the IPO, El-Batrawi continued to control the Company.

## F.     El-Batrawi Is Ousted from the Company for Good

110.     Notwithstanding these allegations of gross misconduct by El-Batrawi, the Company on February 28, 2020 reappointed him as its chief executive officer and a member of its board of directors.  His tenure would prove to be short-lived, and it did nothing to bolster the Company's prospects.

111.     For the three months ended March 31, 2020, the Company recorded a net loss of $1.76 million.  Its net loss for the year ended December 31, 2020 was $3.5 million.

112.     From January 1, 2020 through December 31, 2020, the reported closing price of the Company's common stock on the Pink Open Market fluctuated between $0.08 and $1.44 per share.

113.     On February 26, 2021, X, LLC, an entity owned and controlled by El-Batrawi, sold six million shares of the Company's common stock to Acuitas Group Holdings, LLC ("Acuitas Group").  Acuitas Group is the personal holding company of entrepreneur Terren Peizer, who The New York Times has labeled the "Zelig of Wall Street" due to his substantial investments in a wide range of industries.

114. As a result of this transaction, Acuitas Group became the largest holder of the Company's common stock and Peizer joined the Company's board as its new executive chairman.

115. As a condition to consummating this transaction, Peizer demanded that El-Batrawi resign as chief executive officer and as a director of the Company.

116. During the first three months of 2021, the Company sold 825,000 shares to Acuitas Group in connection with a settlement agreement between Acuitas Group and El-Batrawi's X, LLC.

117. In the wake of El-Batrawi's ejection from the business he founded, the Company continued to struggle. Its net loss for the three months ended March 31, 2021 was $4.4 million, a 150 percent increase compared to the same period a year earlier.

118. In its SEC Form 10-Q for the quarter ending March 31, 2021, the Company painted a grim picture:

> Since inception, our principal sources of operating funds have been proceeds from equity financings, including the sale of our Common Stock to initial investors known to management and principal shareholders of the Company. We do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. If the Company is unable to raise sufficient additional funds, it will have to execute a slower than planned growth path, reduce overhead and scale back its business plan until sufficient additional capital is raised to support further operational expansion and growth. As of March 31, 2021, the Company had $155,476 in cash. The Company generated $77,212 of cash for operating activities for the three months ended March 31, 2021. The Company is seeking to raise additional capital. If the Company is not successful in raising additional capital it will be forced to significantly scale back its business operations and it growth plans.

### G. The Company Refuses to Honor Bellridge Capital's Exercise of Its Rights Under the Warrant

119. In its Form 10-Q filed with the SEC on or about August 5, 2020, the Company disclosed that during the three months ended June 30, 2020, it sold an aggregate of 2,553,571 shares of common stock to three investors for cash proceeds of $25,000 -- or $0.0097 per share.

120. The sale of 2,553,571 shares of common stock for $25,000 constituted a Dilutive Issuance under the Warrant, which Bellridge Capital initially maintained required a downward adjustment of the Exercise Price to $0.0088, or 90 percent of the $0.0097 per share price.

121. On May 28, 2021, Bellridge Capital forwarded to EVmo a formal notice of its exercise of its rights under the Warrant ("Exercise Notice") to purchase 1.5 million shares of the Company's common stock at the adjusted Exercise Price of $0.0088. A true and correct copy of this Exercise Notice is attached hereto as Exhibit E.

122. Bellridge Capital was stunned when EVmo spurned this exercise of its rights under the Warrant. The Company advised Bellridge Capital that "[p]er Ramy [El-Batrawi] and per the signed agreement, the warrant exercise price was fixed at $4.00." To Bellridge Capital, it appeared that the Company was unaware of -- or simply ignoring -- the Warrant's anti-dilution provisions.

123. After pressing for an explanation, Bellridge Capital was gobsmacked when the Company for the first time maintained that Bellridge Capital previously had orally agreed with El-Batrawi to delete the price protections from Section 2 of the Warrant.

124. Specifically, the Company maintains that at or about the time of the IPO in November 2019, El-Batrawi secured Bellridge Capital's oral consent to delete the anti-dilution provisions from the Warrant.

125. True to his track record of deceitful conduct, El-Batrawi's account of an oral modification to the Warrant is a complete fabrication. The Company's position, based solely on El-Batrawi's account, is baseless.

126. Bellridge Capital did not agree orally to delete the Warrant's anti-dilution provisions.

127. In any event, any oral consent to such an amendment is invalid and unenforceable. The Warrant expressly provides that its terms may be amended "only if the Company has obtained the written consent" of Bellridge Capital. See Exhibit A, §9.

128. The Company concedes that Bellridge Capital did not provide written consent to the alleged modifications to the Warrant.

129. In an ill-conceived cover story designed to justify its wrongful refusal to honor Bellridge Capital's exercise of its rights under the Warrant, the Company relies upon a "Form of Warrant" buried as Exhibit 4.3 deep within its 2019 Annual Report submitted to the SEC on March 31, 2020 on Form 10-K ("2019 Annual Report"). A true and correct copy of the 2019 Annual Report, with Exhibit 4.3, is attached hereto as Exhibit F.

130. Exhibit 4.3 to the 2019 Annual Report purports to be a modified version of the Warrant. In this document, the anti-dilution provisions of the Warrant are all deleted and flagged as having been "Intentionally omitted." See Exhibit F at 6.

131.    Bellridge Capital never consented or agreed to those deletions or omissions.  Indeed, Bellridge Capital never even saw the modified "Form of Warrant" until after May 2021 when the Company rejected its attempt to exercise its rights under the Warrant.

132.    The "Form of Warrant" attached to the 2019 Annual Report was signed by El-Batrawi in or about November 2019 -- i.e. the time period in which, as detailed above, the Company and others have alleged that El-Batrawi was engaged in an extensive pattern of misconduct, including making material misrepresentations and fabricating documents.

133.    Bellridge Capital did not sign the "Form of Warrant" attached as Exhibit 4.3 to the 2019 Annual Report, nor does that "Form of Warrant" otherwise reflect Bellridge Capital's written consent to the alleged modification.

134.    The 2019 Annual Report itself makes no reference to any modifications to the Warrant.  The text of the 2019 Annual Report does not even reference the "Form of Warrant" attached as Exhibit 4.3 thereto.

135.    At pages 38-39 of the 2019 Annual Report, the Company references the Warrant but states nothing about any modifications to that instrument.

136.    The same is true of the discussions of the Warrant at pages 48, 64 and 80 of the 2019 Annual Report.  There, the Company says nothing about any modifications to the Warrant nor does it reference Exhibit 4.3.  Moreover, in the discussion of the Warrant at page 48 of the 2019 Annual Report, the Company noted the exercise price adjustments provided for in Section 2 of that instrument -- i.e., the provisions deleted from the bogus "Form of Warrant."

137.    El-Batrawi signed the 2019 Annual Statement on the Company's behalf.  Id. at 88.

138.     No mention of any modifications is included in the Company's discussion of the Warrant on Exhibit 4.1 of its Annual Report for 2020 submitted to the SEC on or about March 31, 2021 on Form 10-K ("2020 Annual Report").  A true and correct copy of the 2020 Annual Report, with Exhibit 4.1, is attached hereto as Exhibit G.

139.     Tellingly, the 2020 Annual Report incorporates by reference the legitimate Warrant attached as Exhibit 4.3 to the amended Registration Statement filed on June 7, 2018, not the fabricated "Form of Warrant" attached to the 2019 Annual Report.  See Exhibit G at 33.

140.     El-Batrawi did not sign the 2020 Annual Report on the Company's behalf; instead, it was signed by EVmo's new chief executive officer, Stephen M. Sanchez.  Id. at 35.

141.     In the end, the Company's convenient cover story of an oral modification to the Warrant simply does not hold up.  The fact is that, in or about November 2019, the Company was under intense pressure from the IPO's underwriters to strike the Warrant's anti-dilution provisions.  Those provisions, the underwriters warned the Company, would doom the IPO to failure.

142.     Working shoulder-to-shoulder with the underwriters and desperate to salvage the IPO, El-Batrawi in or about November 2019 simply claimed to have secured Bellridge Capital's oral consent to delete the anti-dilution provisions.  Incredibly given his history of deceptions and fabrications, the Company accepted -- or at least now claims to accept -- El-Batrawi's account to be true.

143.     Months after El-Batrawi concocted this ruse, the bogus "Form of Warrant" was buried deep within the 2019 Annual Report as an exhibit without any narrative disclosure of the alleged modifications to the Warrant reflected in that exhibit.

144.     Attempting to justify its refusal to honor the Warrant, the Company in June 2021 acknowledged to Bellridge Capital the pressure it was under in late 2019 to delete the anti-dilution provisions as a condition to proceeding with the IPO.

145.     Striking the Warrant's price protections, the Company advised Bellridge Capital, "was a condition to our underwriters entering into the underwriting agreement and our auditor issuing their consent.  We would not have been able to go public otherwise."

146.     There is one fatal problem with the Company's decision to cave to the underwriters' demands and claim to modify the material terms of the Warrant:  Indisputably, it never secured the required written consent of Bellridge Capital.

147.     In short, the "Form of Warrant" attached as Exhibit 4.3 to the 2019 Annual Statement is a transparent and wholly ineffective sham.

148.     Since forwarding its Exercise Notice to EVmo in May 2021, Bellridge Capital recalculated the adjusted Exercise Price based on additional disclosures the Company made in the 2020 Annual Report.

149.     In the 2020 Annual Report, the Company provided further details regarding the sales that triggered the anti-dilution provisions.  In the earliest of those three transactions on April 2, 2020, the Company reported, it sold 1,428,571 shares to ACME Auto Leasing ("ACME"), an entity that finances the Company's vehicle purchases.  Id. at 10.

150.     The Company sold those shares to ACME at $0.07 per share, for aggregate cash consideration of $100,000.  Id.

151.    This transaction with ACME constituted a Dilutive Issuance under the Warrant, effectively adjusting the Exercise Price downward to $0.063, or 90 percent of the $0.07 per share sale price.

152.    Pursuant to the plain and unambiguous terms of the Warrant, Bellridge Capital is entitled to exercise its warrant to purchase 1.5 million shares of the Company's common stock at the adjusted Exercise Price of $0.063 for total consideration of $94,500, rather than the $6 million purchase price that EVmo insists upon in reliance on the unadjusted $4.00 Exercise Price.

## COUNT I
### (Breach of Contract)

153.    Bellridge Capital repeats and realleges the facts contained in paragraphs 1-152 above as if fully set forth herein.

154.    The Warrant constitutes a valid and enforceable contract between the Company and Bellridge Capital.

155.    Bellridge Capital has fully performed all of its obligations to the Company as set forth in the Warrant.

156.    As alleged above, the Company has materially breached its obligations to Bellridge Capital under Section 2 of the Warrant.

157.    Specifically, the Company's refusal to honor the anti-dilution provisions of the Warrant constitutes a material breach that has deprived Bellridge Capital of one of the most significant bargained-for benefits of its $6 million investment.

158.    The Company's bad faith conduct in response to the Exercise Notice constitutes a material breach of the Warrant even if it is deemed not to violate the anti-dilution provisions of Section 2.  Specifically, the Company has breached Section 2(f) of the

Warrant, which provides that in the event the Company took any action to which the express terms of Section 2 did not strictly apply or, if applicable, would not operate to protect Bellridge Capital from dilution, then EVmo's board of directors "shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the Warrant Shares (if applicable) so as to protect" Bellridge Capital.

159.    The Company's insistence on the $4.00 Exercise Price under the circumstances alleged above constitutes a clear breach of Section 2(f).

160.    As a direct result of the Company's material breach of the terms of the Warrant, Bellridge Capital has sustained damages in an amount exceeding $3 million.

WHEREFORE, plaintiff Bellridge Capital, LP hereby demands judgment in its favor and against defendant EVmo, Inc. as follows:

A.    Awarding Bellridge Capital its damages flowing from the Company's breaching conduct in an amount to be proven at trial but believed to exceed $3 million;

B.    Awarding Bellridge Capital its costs of suit and attorneys' fees pursuant to Section 15 of the Warrant; and,

C.    Granting Bellridge Capital such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 23, 2021

KELLEY DRYE & WARREN LLP

By:    _/s/ William S. Gyves_         
       William S. Gyves
       Glenn T. Graham
       Robert N. Ward

3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800
Fax: (212) 808-7897
wgyves@kelleydrye.com
ggraham@kelleydrye.com
rward@kelleydrye.com

Attorneys for Plaintiff

# EXHIBIT A

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL TO THE HOLDER (IF REQUESTED BY THE COMPANY), IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. THE NUMBER OF SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 1(a) OF THIS WARRANT.

**YAYYO, INC.**

**WARRANT TO PURCHASE COMMON STOCK**

Warrant No.: W-1

Date of Issuance: March 8, 2018 ("**Issuance Date**")

Yayyo, Inc., a Delaware corporation (the "**Company**"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, BELLRIDGE CAPITAL, LP, the registered holder hereof or its permitted assigns (the "**Holder**"), is entitled, subject to the terms set forth below, to purchase from the Company, at the Exercise Price (as defined below) then in effect, upon exercise of this Warrant to Purchase Common Stock (including any Warrants to Purchase Common Stock issued in exchange, transfer or replacement hereof, the "**Warrant**"), at any time or times on or after the Issuance Date, but not after 11:59 p.m., New York time, on the Expiration Date (as defined below), 1,500,000 (subject to adjustment as provided herein) fully paid and non-assessable shares of Common Stock (as defined below) (the "**Warrant Shares**", and such number of Warrant Shares, the "**Warrant Number**"). Except as otherwise defined herein, capitalized terms in this Warrant shall have the meanings set forth in Section 19. This Warrant is one of the Warrants to Purchase Common Stock (the "**SPA Warrants**") issued pursuant to Section 1 of that certain Securities Purchase Agreement, dated as of March 8, 2018 (the "**Subscription Date**"), by and among the Company and the investors (the "**Buyers**") referred to therein, as amended from time to time (the "**Securities Purchase Agreement**").

1.    **EXERCISE OF WARRANT.**

(a)    <u>Mechanics of Exercise</u>.   Subject to the terms and conditions hereof (including, without limitation, the limitations set forth in Section 1(f)), this Warrant may be exercised by the Holder on any day on or after the Issuance Date (an "**Exercise Date**"), in whole or in part, by delivery (whether via facsimile or otherwise) of a written notice, in the form attached hereto as **Exhibit A** (the "**Exercise Notice**"), of the Holder's election to exercise this Warrant.  Within one (1) Trading Day following an exercise of this Warrant as aforesaid, the Holder shall deliver payment to the Company of an amount equal to the Exercise Price in effect on the date of such exercise multiplied by the number of Warrant Shares as to which this Warrant was so exercised (the "**Aggregate Exercise Price**") in cash or via wire transfer of immediately available funds if the Holder did not notify the Company in such Exercise Notice that such exercise was made pursuant to a Cashless Exercise (as defined in Section 1(d)).  The Holder shall not be required to deliver the original of this Warrant in order to effect an exercise hereunder.  Execution and delivery of an Exercise Notice with respect to less than all of the Warrant Shares shall have the same effect as cancellation of the original of this Warrant and issuance of a new Warrant evidencing the right to purchase the remaining number of Warrant Shares.  Execution and delivery of an Exercise Notice for all of the then-remaining Warrant Shares shall have the same effect as cancellation of the original of this Warrant after delivery of the Warrant Shares in accordance with the terms hereof.  On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by facsimile or electronic mail an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as **Exhibit B**, to the Holder and, if after the Public Company Date, the Company's transfer agent (the "**Transfer Agent**"), which confirmation shall, if after the Public Company Date, constitute an instruction to the Transfer Agent to process such Exercise Notice in accordance with the terms herein. On or before the second (2nd) Trading Day following the date on which the Company has received such Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date), the Company shall (X) if on or after the Public Company Date, provided that the Transfer Agent is participating in The Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal at Custodian system, or (Y) if either (x) prior to the Public Company Date or (y) on or after the Public Company Date if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, upon the request of the Holder, issue and deliver (via reputable overnight courier) to the address as specified in the Exercise Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled pursuant to such exercise. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of delivery of the certificates evidencing such Warrant Shares (as the case may be).  If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant submitted for exercise is greater than the number of Warrant Shares being acquired upon an exercise and upon

2

surrender of this Warrant to the Company by the Holder, then, at the request of the Holder, the Company shall as soon as practicable and in no event later than two (2) Business Days after any exercise and at its own expense, issue and deliver to the Holder (or its designee) a new Warrant (in accordance with Section 7(d)) representing the right to purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number. The Company shall pay any and all transfer, stamp, issuance and similar taxes, costs and expenses (including, without limitation, fees and expenses of the Transfer Agent) that may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant. Notwithstanding the foregoing, except in the case where an exercise of this Warrant is validly made pursuant to a Cashless Exercise), the Company's failure to deliver Warrant Shares to the Holder on or prior to the later of ((i) two (2) Trading Days after receipt of the applicable Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date) and (ii) one (1) Trading Day after the Company's receipt of the Aggregate Exercise Price (or valid notice of a Cashless Exercise (such later date, the "**Share Delivery Date**") shall not be deemed to be a breach of this Warrant. Notwithstanding anything to the contrary contained in this Warrant or the Registration Rights Agreement, after the effective date of the Registration Statement (as defined in the Registration Rights Agreement) and prior to the Holder's receipt of the notice of a Grace Period (as defined in the Registration Rights Agreement), the Company shall cause the Transfer Agent to deliver unlegended shares of Common Stock to the Holder (or its designee) in connection with any sale of Registrable Securities (as defined in the Registration Rights Agreement) with respect to which the Holder has entered into a contract for sale, and delivered a copy of the prospectus included as part of the particular Registration Statement to the extent applicable, and for which the Holder has not yet settled. From the Issuance Date through and including the Expiration Date, the Company shall maintain a transfer agent that participates in the DTC's Fast Automated Securities Transfer Program. Notwithstanding any provision of this Warrant to the contrary, at any time prior to the Listing Date, no more than the Pre-Listing Maximum Eligibility Number of Warrant Shares shall be exercisable hereunder.

(b) <u>Exercise Price</u>. For purposes of this Warrant, "**Exercise Price**" means $4.00, subject to adjustment as provided herein.

(c) <u>Company's Failure to Timely Deliver Securities</u>.

(i) <u>General</u>. The Company shall in all cases use its reasonable best efforts to comply with the delivery requirements set forth herein and shall do all things and take all actions reasonably requested by the Holder in furtherance thereof.

(ii) <u>Exercise Failures On or After the Public Company Date</u>. If on or after the Public Company Date, the Company shall fail, for any reason or for no reason, on or prior to the Share Delivery Date, either (I) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, to issue and deliver to the Holder (or its designee) a certificate for the number of Warrant Shares to which the Holder is

3

entitled and register such Warrant Shares on the Company's share register or, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, to credit the balance account of the Holder or the Holder's designee with DTC for such number of Warrant Shares to which the Holder is entitled upon the Holder's exercise of this Warrant (as the case may be) or (II) if a Registration Statement covering the resale of the Warrant Shares that are the subject of the Exercise Notice (the "**Unavailable Warrant Shares**") is not available for the resale of such Unavailable Warrant Shares and the Company fails to promptly, but in no event later than as required pursuant to the Registration Rights Agreement (x) so notify the Holder and (y) deliver the Warrant Shares electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal At Custodian system (the event described in the immediately foregoing clause (II) is hereinafter referred as a "**Notice Failure**" and together with the event described in clause (I) above, a "**Delivery Failure**"), then, in addition to all other remedies available to the Holder, (X) the Company shall pay in cash to the Holder on each day after the Share Delivery Date and during such Delivery Failure an amount equal to 2% of the product of (A) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, multiplied by (B) any trading price of the Common Stock selected by the Holder in writing as in effect at any time during the period beginning on the applicable Exercise Date and ending on the applicable Share Delivery Date, and (Y) the Holder, upon written notice to the Company, may void its Exercise Notice with respect to, and retain or have returned, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the voiding of an Exercise Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise. In addition to the foregoing, if on or after the Public Company Date and on or prior to the Share Delivery either (I) the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, the Company shall fail to issue and deliver to the Holder (or its designee) a certificate and register such shares of Common Stock on the Company's share register or, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, the Transfer Agent shall fail to credit the balance account of the Holder or the Holder's designee with DTC for the number of shares of Common Stock to which the Holder is entitled upon the Holder's exercise hereunder or pursuant to the Company's obligation pursuant to clause (ii) below or (II) a Notice Failure occurs, and if on or after such Share Delivery Date the Holder purchases (in an open market transaction or otherwise) shares of Common Stock corresponding to all or any portion of the number of shares of Common Stock issuable upon such exercise that the Holder is entitled to receive from the Company and has not received from the Company in connection with such Delivery Failure or Notice Failure, as applicable (a "**Buy-In**"), then, in addition to all other remedies available to the Holder, the Company shall, within two (2) Business Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (including, without limitation, by any other Person in respect, or on behalf, of the Holder)

4

(the "**Buy-In Price**"), at which point the Company's obligation to so issue and deliver such certificate (and to issue such shares of Common Stock) or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) (and to issue such Warrant Shares) shall terminate, or (ii) promptly honor its obligation to so issue and deliver to the Holder a certificate or certificates representing such Warrant Shares or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of Warrant Shares multiplied by (B) the lowest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date of the applicable Exercise Notice and ending on the date of such issuance and payment under this clause (ii) (the "**Buy-In Payment Amount**"). Nothing shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock (or to electronically deliver such shares of Common Stock) upon the exercise of this Warrant as required pursuant to the terms hereof. After the Public Company Date, while this Warrant is outstanding, the Company shall cause its transfer agent to participate in the DTC Fast Automated Securities Transfer Program. In addition to the foregoing rights, (i) if the Company fails to deliver the applicable number of Warrant Shares upon an exercise pursuant to Section 1 by the applicable Share Delivery Date, then the Holder shall have the right to rescind such exercise in whole or in part and retain and/or have the Company return, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an exercise shall not affect the Company's obligation to make any payments that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and (ii) if a registration statement covering the issuance or resale of the Warrant Shares that are subject to an Exercise Notice is not available for the issuance or resale, as applicable, of such Exercise Notice Warrant Shares and the Holder has submitted an Exercise Notice prior to receiving notice of the non-availability of such registration statement and the Company has not already delivered the Warrant Shares underlying such Exercise Notice electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit / Withdrawal At Custodian system, the Holder shall have the option, by delivery of notice to the Company, to (x) rescind such Exercise Notice in whole or in part and retain or have returned, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an Exercise Notice shall not affect the Company's obligation to make any payments that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and/or (y) switch some or all of such Exercise Notice from a cash exercise to a Cashless Exercise.

(d) <u>Cashless Exercise</u>. Notwithstanding anything contained herein to the contrary (other than Section 1(f) below), if at the time of exercise hereof a registration statement is not

5

effective (or the prospectus contained therein is not available for use) for the issuance of all of the Warrant Shares being exercised pursuant to the applicable Exercise Notice, but not prior to the earlier to occur of (x) such initial time the Common Stock of the Company is listed on an Eligible Market and (y) August 31, 2018, then the Holder may, in its sole discretion, exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of Warrant Shares determined according to the following formula (a "**Cashless Exercise**"):

$$\text{Net Number} = \frac{(A \times B) - (A \times C)}{D}$$

For purposes of the foregoing formula:

A= the total number of shares with respect to which this Warrant is then being exercised.

B = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders; and (ii) on or after the Public Company Date, the greater of (I) the Spot Price and (II) the quotient of (A) the sum of the VWAP of the Common Stock of each of the twenty (20) Trading Days ending at the close of business on the Principal Market immediately prior to the time of exercise as set forth in the applicable Exercise Notice, divided by (B) twenty (20).

C = the Exercise Price then in effect for the applicable Warrant Shares at the time of such exercise.

D = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders and (ii) after the Public Company Date, the Spot Price.

For purposes of Rule 144(d) promulgated under the 1933 Act, as in effect on the Subscription Date, it is intended that the Warrant Shares issued in a Cashless Exercise shall be deemed to have been acquired by the Holder, and the holding period for the Warrant Shares shall be deemed to have commenced, on the date this Warrant was originally issued pursuant to the Securities Purchase Agreement.

6

(e)     _Disputes_.  In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the number of Warrant Shares to be issued pursuant to the terms hereof, the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed and resolve such dispute in accordance with Section 13.

(f)     _Limitations on Exercises_.  From and after the Public Company Date, the Company shall not effect the exercise of any portion of this Warrant, and the Holder shall not have the right to exercise any portion of this Warrant, pursuant to the terms and conditions of this Warrant and any such exercise shall be null and void and treated as if never made, to the extent that after giving effect to such exercise, the Holder together with the other Attribution Parties collectively would beneficially own in excess of 4.99% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such exercise.  For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by the Holder and the other Attribution Parties shall include the number of shares of Common Stock held by the Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (A) exercise of the remaining, unexercised portion of this Warrant beneficially owned by the Holder or any of the other Attribution Parties and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including other SPA Warrants) beneficially owned by the Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 1(f).  For purposes of this Section 1(f), beneficial ownership shall be calculated in accordance with Section 13(d) of the 1934 Act.  For purposes of determining the number of outstanding shares of Common Stock the Holder may acquire upon the exercise of this Warrant without exceeding the Maximum Percentage, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (y) a more recent public announcement by the Company or (z) any other written notice by the Company or the Transfer Agent, if any, setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**").  If the Company receives an Exercise Notice from the Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall (i) notify the Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Exercise Notice would otherwise cause the Holder's beneficial ownership, as determined pursuant to this Section 1(f), to exceed the Maximum Percentage, the Holder must notify the Company of a reduced number of Warrant Shares to be acquired pursuant to such Exercise Notice (the number of shares by which such purchase is reduced, the "**Reduction Shares**") and (ii) as soon as reasonably practicable, the Company shall return to the Holder any exercise price paid by the Holder for the Reduction Shares.  For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing or by electronic mail to the Holder the number of shares of Common Stock then outstanding.  In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Holder and any other Attribution Party since the

7

date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to the Holder upon exercise of this Warrant results in the Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the 1934 Act), the number of shares so issued by which the Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and the Holder shall not have the power to vote or to transfer the Excess Shares. As soon as reasonably practicable after the issuance of the Excess Shares has been deemed null and void, the Company shall return to the Holder the exercise price paid by the Holder for the Excess Shares. Upon delivery of a written notice to the Company, the Holder may from time to time increase (with such increase not effective until the sixty-first (61st) day after delivery of such notice) or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to the Holder and the other Attribution Parties and not to any other holder of SPA Warrants that is not an Attribution Party of the Holder. For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Warrant in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act. No prior inability to exercise this Warrant pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of exercisability. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 1(f) to the extent necessary to correct this paragraph or any portion of this paragraph which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 1(f) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of this Warrant.

(g)     Reservation of Shares.

(i)     Required Reserve Amount. So long as this Warrant remains outstanding, the Company shall at all times keep reserved for issuance under this Warrant a number of shares of Common Stock at least equal to 200% of the maximum number of shares of Common Stock as shall be necessary to satisfy the Company's obligation to issue shares of Common Stock under the SPA Warrants then outstanding (without regard to any limitations on exercise) (the "**Required Reserve Amount**"); provided that at no time shall the number of shares of Common Stock reserved pursuant to this Section 1(g)(i) be reduced other than proportionally in connection with any exercise or redemption of SPA Warrants or such other event covered by Section 2(a) below. The Required Reserve Amount (including, without limitation, each increase in the number of shares so reserved) shall be allocated pro rata among the holders of the SPA Warrants based on number of shares of Common Stock issuable upon exercise of SPA Warrants held by each holder on the Closing Date (without regard to any limitations on exercise) or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**"). In the event

8

that a holder shall sell or otherwise transfer any of such holder's SPA Warrants, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any SPA Warrants shall be allocated to the remaining holders of SPA Warrants, pro rata based on the number of shares of Common Stock issuable upon exercise of the SPA Warrants then held by such holders (without regard to any limitations on exercise).

        (ii)    <u>Insufficient Authorized Shares</u>. If, notwithstanding Section 1(g)(i) above, and not in limitation thereof, at any time while any of the SPA Warrants remain outstanding, the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve the Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for all the SPA Warrants then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its board of directors to recommend to the stockholders that they approve such proposal. In the event that the Company is prohibited from issuing shares of Common Stock upon an exercise of this Warrant due to the failure by the Company to have sufficient shares of Common Stock available out of the authorized but unissued shares of Common Stock (such unavailable number of shares of Common Stock, the "**Authorization Failure Shares**"), in lieu of delivering such Authorization Failure Shares to the Holder, the Company shall pay cash in exchange for the cancellation of such portion of this Warrant exercisable into such Authorization Failure Shares at a price equal to the sum of (i) the product of (x) such number of Authorization Failure Shares and (y) the greatest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date the Holder delivers the applicable Exercise Notice with respect to such Authorization Failure Shares to the Company and ending on the date of such issuance and payment under this Section 1(f); and (ii) to the extent the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of Authorization Failure Shares, any Buy-In Payment Amount, brokerage commissions and other out-of-pocket expenses, if any, of the Holder incurred in connection therewith. Nothing contained in this Section 1(g) shall limit any obligations of the Company under any provision of the Securities Purchase Agreement.

2.    <u>ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES</u>. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.

(a) <u>Stock Dividends and Splits</u>.  Without limiting any provision of Section 2(b) or Section 4, if the Company, at any time on or after the Subscription Date, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in shares of Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.  Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination.  If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

(b) <u>Adjustment Upon Issuance of Shares of Common Stock</u>.  If and whenever on or after the Subscription Date, the Company issues or sells, or in accordance with this Section 2 is deemed to have issued or sold, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding any Excluded Securities issued or sold or deemed to have been issued or sold) for a consideration per share (the "**New Issuance Price**") less than a price equal to the Exercise Price in effect immediately prior to such issuance or sale or deemed issuance or sale (such Exercise Price then in effect is referred to herein as the "**Applicable Price**") (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance, the Exercise Price then in effect shall be reduced to an amount equal to 90% of the New Issuance Price.  For all purposes of the foregoing (including, without limitation, determining the adjusted Exercise Price and the New Issuance Price under this Section 2(b)), the following shall be applicable:

(i) <u>Issuance of Options</u>.  If the Company in any manner grants or sells any Options and the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Option or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 2(b)(i), the "lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion,

10

exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof and (y) the lowest exercise price set forth in such Option for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Option (or any other Person) upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Option (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or otherwise pursuant to the terms of or upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities.

(ii)     <u>Issuance of Convertible Securities</u>.  If the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share.  For the purposes of this Section 2(b)(ii), the "lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to one share of Common Stock upon the issuance or sale of the Convertible Security and upon conversion, exercise or exchange of such Convertible Security or otherwise pursuant to the terms thereof and (y) the lowest conversion price set forth in such Convertible Security for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Convertible Security (or any other Person) upon the issuance or sale of such Convertible Security plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Convertible Security (or any other Person).  Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities or otherwise pursuant to the terms thereof, and if any such issuance or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of this Warrant has been or is to be made pursuant to other provisions of this Section 2(b), except as contemplated below, no further adjustment of the Exercise Price shall be made by reason of such issuance or sale.

11

(iii)    <u>Change in Option Price or Rate of Conversion</u>.  If the purchase or exercise price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exercise or exchange of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exercisable or exchangeable for shares of Common Stock increases or decreases at any time (other than proportional changes in conversion or exercise prices, as applicable, in connection with an event referred to in Section 2(a)), the Exercise Price in effect at the time of such increase or decrease shall be adjusted to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold.  For purposes of this Section 2(b)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease.  No adjustment pursuant to this Section 2(b) shall be made if such adjustment would result in an increase of the Exercise Price then in effect.

(iv)    <u>Calculation of Consideration Received</u>.  If any Option and/or Convertible Security and/or Adjustment Right is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "**Primary Security**", and such Option and/or Convertible Security and/or Adjustment Right, the "**Secondary Securities**") together comprising one integrated transaction, (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing) the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be equal to the difference of (x) the lowest price per share for which one share of Common Stock was issued (or was deemed to be issued pursuant to Section 2(b)(i) or 2(b)(ii) above, as applicable) in such integrated transaction solely with respect to such Primary Security, minus (y) with respect to such Secondary Securities, the sum of (I) the Black Scholes Consideration Value of each such Option, if any, (II) the fair market value (as determined by the Holder in good faith) or the Black Scholes Consideration Value, as applicable, of such Adjustment Right, if any, and (III) the fair market value (as determined by the Holder) of such Convertible Security, if any, in each case, as determined on a per share basis in accordance with this Section 2(b)(iv).  If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the net amount of consideration received by the Company therefor.  If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company (for the purpose of determining the consideration paid for such Common Stock, Option or

12

Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company for such securities will be the arithmetic average of the VWAPs of such security for each of the five (5) Trading Days immediately preceding the date of receipt. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities (as the case may be). The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Holder. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five (5) Trading Days after the tenth (10th) day following such Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Holder. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company.

(v) <u>Record Date</u>. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issuance or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase (as the case may be).

(c) <u>Number of Warrant Shares</u>. Simultaneously with any adjustment to the Exercise Price pursuant to this Section 2, the number of Warrant Shares that may be purchased upon exercise of this Warrant shall be increased or decreased proportionately, so that after such adjustment the aggregate Exercise Price payable hereunder for the adjusted number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment (without regard to any limitations on exercise contained herein).

(d) <u>Holder's Right of Alternative Exercise Price Following Issuance of Certain Options or Convertible Securities</u>. In addition to and not in limitation of the other provisions of this Section 2, if the Company in any manner issues or sells or enters into any agreement to issue or sell, any Common Stock, Options or Convertible Securities (any such securities, "**Variable Price Securities**") after the Subscription Date that are issuable pursuant to such agreement or convertible into or exchangeable or exercisable for shares of Common Stock at a price which varies or may vary with the market price of the shares of Common Stock, including by way of one or more reset(s) to a fixed price, but exclusive of such formulations reflecting customary

13

anti-dilution provisions (such as share splits, share combinations, share dividends and similar transactions) (each of the formulations for such variable price being herein referred to as, the "**Variable Price**"), the Company shall provide written notice thereof via facsimile and overnight courier to the Holder on the date of such agreement and the issuance of such Convertible Securities or Options. From and after the date the Company enters into such agreement or issues any such Variable Price Securities, the Holder shall have the right, but not the obligation, in its sole discretion to substitute the Variable Price for the Exercise Price upon exercise of this Warrant by designating in the Exercise Notice delivered upon any exercise of this Warrant that solely for purposes of such exercise the Holder is relying on the Variable Price rather than the Exercise Price then in effect. The Holder's election to rely on a Variable Price for a particular exercise of this Warrant shall not obligate the Holder to rely on a Variable Price for any future exercises of this Warrant.

(e)     <u>Stock Combination Event Adjustment</u>. If at any time and from time to time on or after the Issuance Date there occurs any stock split, stock dividend, stock combination recapitalization or other similar transaction involving the Common Stock (each, a "**Stock Combination Event**", and such date thereof, the "**Stock Combination Event Date**") and the Event Market Price is less than the Exercise Price then in effect (after giving effect to the adjustment in clause 2(a) above), then on the sixteenth (16th) Trading Day immediately following such Stock Combination Event, the Exercise Price then in effect on such sixteenth (16th) Trading Day (after giving effect to the adjustment in clause 2(a) above) shall be reduced (but in no event increased) to the Event Market Price. For the avoidance of doubt, if the adjustment in the immediately preceding sentence would otherwise result in an increase in the Exercise Price hereunder, no adjustment shall be made.

(f)     <u>Other Events</u>. In the event that the Company (or any Subsidiary (as defined in the Securities Purchase Agreement)) shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect the Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 2 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's board of directors shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the number of Warrant Shares (if applicable) so as to protect the rights of the Holder, provided that no such adjustment pursuant to this Section 2(f) will increase the Exercise Price or decrease the number of Warrant Shares as otherwise determined pursuant to this Section 2, provided further that if the Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Company's board of directors and the Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding absent manifest error and whose fees and expenses shall be borne by the Company.

(g)     <u>Calculations</u>. All calculations under this Section 2 shall be made by rounding to the nearest cent or the nearest $1/100^{th}$ of a share, as applicable. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issuance or sale of Common Stock.

14

(h)     Voluntary Adjustment By Company.  The Company may at any time during the term of this Warrant, with the prior written consent of the Required Holders (as defined in the Securities Purchase Agreement), reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the board of directors of the Company.

(i)     Dollar-Value Adjustment.  At any time the Dollar Value of this Warrant is less than $6 million, the number of Warrant Shares that may be purchased upon exercise of this Warrant (without regard to any limitations on exercise set forth herein) shall automatically be increased such that, after giving effect to such increase, the Dollar Value of this Warrant equals $6 million.

3.     RIGHTS UPON DISTRIBUTION OF ASSETS.  In addition to any adjustments pursuant to Section 2 above, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property, options, evidence of indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "**Distribution**"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution (provided, however, that, on or after the Public Company Date, to the extent that the Holder's right to participate in any such Distribution would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to the extent of the Maximum Percentage (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Distribution (and beneficial ownership) to the extent of any such excess) and the portion of such Distribution shall be held in abeyance for the benefit of the Holder until such time or times, if ever, as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such Distribution (and any Distributions declared or made on such initial Distribution or on any subsequent Distribution held similarly in abeyance) to the same extent as if there had been no such limitation).

4.     PURCHASE RIGHTS; FUNDAMENTAL TRANSACTIONS.

(a)     Purchase Rights.  In addition to any adjustments pursuant to Section 2 above, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant, including without limitation, the Maximum Percentage) immediately before the

15

date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issuance or sale of such Purchase Rights (provided, however, that, on or after the Public Company Date, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to the extent of the Maximum Percentage (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Purchase Right (and beneficial ownership) to the extent of any such excess) and such Purchase Right to such extent shall be held in abeyance for the benefit of the Holder until such time or times, if ever, as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such right (and any Purchase Right granted, issued or sold on such initial Purchase Right or on any subsequent Purchase Right held similarly in abeyance) to the same extent as if there had been no such limitation).

(b)     Fundamental Transactions.  The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Warrant and the other Transaction Documents (as defined in the Securities Purchase Agreement) in accordance with the provisions of this Section 4(b) pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction, including agreements to deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant, including, without limitation, which is exercisable for a corresponding number of shares of capital stock equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such adjustments to the number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction).  Upon the consummation of each Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of the applicable Fundamental Transaction, the provisions of this Warrant and the other Transaction Documents referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Warrant and the other Transaction Documents with the same effect as if such Successor Entity had been named as the Company herein.  Upon consummation of each Fundamental Transaction, the Successor Entity shall deliver to the Holder confirmation that there shall be issued upon exercise of this Warrant at any time after the consummation of the applicable Fundamental Transaction, in lieu of the shares of Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 2(b)(i) and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of this Warrant prior to the applicable Fundamental Transaction, such shares of publicly traded common stock (or its equivalent) of the Successor Entity (including its Parent Entity) which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this

16

Warrant been exercised immediately prior to the applicable Fundamental Transaction (without regard to any limitations on the exercise of this Warrant), as adjusted in accordance with the provisions of this Warrant. Notwithstanding the foregoing, and without limiting Section 1(f) hereof, the Holder may elect, at its sole option, by delivery of written notice to the Company to waive this Section 4(b) to permit the Fundamental Transaction without the assumption of this Warrant. In addition to and not in substitution for any other rights hereunder, prior to the consummation of each Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities or other assets with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon an exercise of this Warrant at any time after the consummation of the applicable Fundamental Transaction but prior to the Expiration Date, in lieu of the shares of the Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 2(b)(i) and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of the Warrant prior to such Fundamental Transaction, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights) which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Warrant been exercised immediately prior to the applicable Fundamental Transaction (without regard to any limitations on the exercise of this Warrant). Provision made pursuant to the preceding sentence shall be in a form and substance reasonably satisfactory to the Holder.

    (c)    <u>Black Scholes Value</u>.

        (i)    <u>Fundamental Transaction Redemption</u>. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time commencing on the earliest to occur of (x) the public disclosure of any Fundamental Transaction, (y) the consummation of any Fundamental Transaction and (z) the Holder first becoming aware of any Fundamental Transaction through the date that is ninety (90) days after the public disclosure of the consummation of such Fundamental Transaction by the Company pursuant to a Current Report on Form 8-K filed with the SEC, the Company or the Successor Entity (as the case may be) shall purchase this Warrant from the Holder on the date of such request by paying to the Holder cash in an amount equal to the Black Scholes Value. Payment of such amounts shall be made by the Company (or at the Company's direction) to the Holder on or prior to the later of (x) the second (2nd) Trading Day after the date of such request and (y) the date of consummation of such Fundamental Transaction.

        (ii)    <u>Event of Default Redemption</u>. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time after the occurrence of an Event of Default (as defined in the Notes)(assuming for such purpose that the Notes remain outstanding), the Company or the Successor Entity (as the case may be) shall purchase this Warrant from the Holder on the date of such request by paying to the Holder cash in an amount equal to the Event of Default Black Scholes Value.

    (d)    <u>Application</u>. The provisions of this Section 4 shall apply similarly and equally to successive Fundamental Transactions and Corporate Events and shall be applied as if this

17

Warrant (and any such subsequent warrants) were fully exercisable and without regard to any limitations on the exercise of this Warrant (provided that the Holder shall continue to be entitled to the benefit of the Maximum Percentage, applied however with respect to shares of capital stock registered under the 1934 Act and thereafter receivable upon exercise of this Warrant (or any such other warrant)).

5.  NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation (as defined in the Securities Purchase Agreement), Bylaws (as defined in the Securities Purchase Agreement) or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issuance or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (a) shall not increase the par value of any shares of Common Stock receivable upon the exercise of this Warrant above the Exercise Price then in effect, and (b) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the exercise of this Warrant. Notwithstanding anything herein to the contrary, if after the sixty (60) calendar day anniversary of the Issuance Date, the Holder is not permitted to exercise this Warrant in full for any reason (other than pursuant to restrictions set forth in Section 1(f) hereof), the Company shall use its best efforts to promptly remedy such failure, including, without limitation, obtaining such consents or approvals as necessary to permit such exercise into shares of Common Stock.

6.  WARRANT HOLDER NOT DEEMED A STOCKHOLDER. Except as otherwise specifically provided herein, the Holder, solely in its capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in its capacity as the Holder of this Warrant, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which it is then entitled to receive upon the due exercise of this Warrant. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 6, the Company shall provide the Holder with copies of the same notices and other information given to the stockholders of the Company generally, contemporaneously with the giving thereof to the stockholders.

7.  REISSUANCE OF WARRANTS.

(a)  Transfer of Warrant. If this Warrant is to be transferred, the Holder shall surrender this Warrant to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Warrant (in accordance with Section 7(d)), registered as the Holder may request, representing the right to purchase the number of Warrant Shares being

18

transferred by the Holder and, if less than the total number of Warrant Shares then underlying this Warrant is being transferred, a new Warrant (in accordance with Section 7(d)) to the Holder representing the right to purchase the number of Warrant Shares not being transferred.

(b) <u>Lost, Stolen or Mutilated Warrant</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of this Warrant, the Company shall execute and deliver to the Holder a new Warrant (in accordance with Section 7(d)) representing the right to purchase the Warrant Shares then underlying this Warrant.

(c) <u>Exchangeable for Multiple Warrants</u>. This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Warrant or Warrants (in accordance with Section 7(d)) representing in the aggregate the right to purchase the number of Warrant Shares then underlying this Warrant, and each such new Warrant will represent the right to purchase such portion of such Warrant Shares as is designated by the Holder at the time of such surrender; provided, however, no warrants for fractional shares of Common Stock shall be given.

(d) <u>Issuance of New Warrants</u>. Whenever the Company is required to issue a new Warrant pursuant to the terms of this Warrant, such new Warrant (i) shall be of like tenor with this Warrant, (ii) shall represent, as indicated on the face of such new Warrant, the right to purchase the Warrant Shares then underlying this Warrant (or in the case of a new Warrant being issued pursuant to Section 7(a) or Section 7(c), the Warrant Shares designated by the Holder which, when added to the number of shares of Common Stock underlying the other new Warrants issued in connection with such issuance, does not exceed the number of Warrant Shares then underlying this Warrant), (iii) shall have an issuance date, as indicated on the face of such new Warrant which is the same as the Issuance Date, and (iv) shall have the same rights and conditions as this Warrant.

8. <u>NOTICES</u>. Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant (other than the issuance of shares of Common Stock upon exercise in accordance with the terms hereof), including in reasonable detail a description of such action and the reason therefor. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) immediately upon each adjustment of the Exercise Price and the number of Warrant Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s), (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the shares of Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property to holders of shares of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being

19

provided to the Holder, (iii) at least ten (10) Trading Days prior to the consummation of any Fundamental Transaction and (iv) within one (1) Business Day of the occurrence of an Event of Default (as defined in the Notes), setting forth in reasonable detail any material events with respect to such Event of Default and any efforts by the Company to cure such Event of Default. To the extent that any notice provided hereunder constitutes, or contains, material, non-public information regarding the Company or any of its Subsidiaries, the Company shall simultaneously file such notice with the SEC (as defined in the Securities Purchase Agreement) pursuant to a Current Report on Form 8-K. If the Company or any of its Subsidiaries provides material non-public information to the Holder that is not simultaneously filed in a Current Report on Form 8-K and the Holder has not agreed to receive such material non-public information, the Company hereby covenants and agrees that the Holder shall not have any duty of confidentiality to the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents with respect to, or a duty to any of the foregoing not to trade on the basis of, such material non-public information. It is expressly understood and agreed that the time of execution specified by the Holder in each Exercise Notice shall be definitive and may not be disputed or challenged by the Company.

9.      <u>AMENDMENT AND WAIVER</u>.  Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f)) may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder.  No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

10.     <u>SEVERABILITY</u>.  If any provision of this Warrant is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Warrant so long as this Warrant as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.  The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

11.     <u>GOVERNING LAW</u>.  This Warrant shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.  The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to the Company at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and

20

sufficient service of process and notice thereof. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS WARRANT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

12.     CONSTRUCTION; HEADINGS. This Warrant shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any Person as the drafter hereof. The headings of this Warrant are for convenience of reference and shall not form part of, or affect the interpretation of, this Warrant. Terms used in this Warrant but defined in the other Transaction Documents shall have the meanings ascribed to such terms on the Closing Date (as defined in the Securities Purchase Agreement) in such other Transaction Documents unless otherwise consented to in writing by the Holder.

13.     DISPUTE RESOLUTION.

(a)     Submission to Dispute Resolution.

(i)     In the case of a dispute relating to the Exercise Price, the Closing Sale Price, the Bid Price, Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or fair market value or the arithmetic calculation of the number of Warrant Shares (as the case may be) (including, without limitation, a dispute relating to the determination of any of the foregoing), the Company or the Holder (as the case may be) shall submit the dispute to the other party via facsimile (A) if by the Company, within two (2) Business Days after the occurrence of the circumstances giving rise to such dispute or (B) if by the Holder, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Company are unable to promptly resolve such dispute relating to such Exercise Price, such Closing Sale Price, such Bid Price, such Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or such fair market value or such arithmetic calculation of the number of Warrant Shares (as the case may be), at any time after the second (2nd) Business Day following such initial notice by the Company or the Holder (as the case may be) of such dispute to the Company or the Holder (as the case may be), then the Holder may, at its sole option, select an independent, reputable investment bank to resolve such dispute.

21

(ii)     The Holder and the Company shall each deliver to such investment bank (A) a copy of the initial dispute submission so delivered in accordance with the first sentence of this Section 13 and (B) written documentation supporting its position with respect to such dispute, in each case, no later than 5:00 p.m. (New York time) by the fifth (5th) Business Day immediately following the date on which the Holder selected such investment bank (the "**Dispute Submission Deadline**") (the documents referred to in the immediately preceding clauses (A) and (B) are collectively referred to herein as the "**Required Dispute Documentation**") (it being understood and agreed that if either the Holder or the Company fails to so deliver all of the Required Dispute Documentation by the Dispute Submission Deadline, then the party who fails to so submit all of the Required Dispute Documentation shall no longer be entitled to (and hereby waives its right to) deliver or submit any written documentation or other support to such investment bank with respect to such dispute and such investment bank shall resolve such dispute based solely on the Required Dispute Documentation that was delivered to such investment bank prior to the Dispute Submission Deadline). Unless otherwise agreed to in writing by both the Company and the Holder or otherwise requested by such investment bank, neither the Company nor the Holder shall be entitled to deliver or submit any written documentation or other support to such investment bank in connection with such dispute (other than the Required Dispute Documentation).

(iii)     The Company and the Holder shall cause such investment bank to determine the resolution of such dispute and notify the Company and the Holder of such resolution no later than ten (10) Business Days immediately following the Dispute Submission Deadline. The fees and expenses of such investment bank shall be borne solely by the Company, and such investment bank's resolution of such dispute shall be final and binding upon all parties absent manifest error.

(b)     Miscellaneous.  The Company expressly acknowledges and agrees that (i) this Section 13 constitutes an agreement to arbitrate between the Company and the Holder (and constitutes an arbitration agreement) under the rules then in effect under § 7501, et seq. of the New York Civil Practice Law and Rules ("**CPLR**") and that the Holder is authorized to apply for an order to compel arbitration pursuant to CPLR § 7503(a) in order to compel compliance with this Section 13, (ii) a dispute relating to the Exercise Price includes, without limitation, disputes as to (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(b), (B) the consideration per share at which an issuance or deemed issuance of Common Stock occurred, (C) whether any issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred, (iii) the terms of this Warrant and each other applicable Transaction Document shall serve as the basis for the selected investment bank's resolution of the applicable dispute, such investment bank shall be entitled (and is hereby expressly authorized) to make all findings, determinations and the like that such investment bank determines are required to be made by such investment bank in connection with its resolution of such dispute (including, without limitation, determining (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(b), (B) the consideration per share at which an issuance or deemed issuance of Common Stock occurred, (C) whether any

22

issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred) and in resolving such dispute such investment bank shall apply such findings, determinations and the like to the terms of this Warrant and any other applicable Transaction Documents, (iv) the Holder (and only the Holder), in its sole discretion, shall have the right to submit any dispute described in this Section 13 to any state or federal court sitting in The City of New York, Borough of Manhattan in lieu of utilizing the procedures set forth in this Section 13 and (v) nothing in this Section 13 shall limit the Holder from obtaining any injunctive relief or other equitable remedies (including, without limitation, with respect to any matters described in this Section 13).

14.    REMEDIES, CHARACTERIZATION, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF.  The remedies provided in this Warrant shall be cumulative and in addition to all other remedies available under this Warrant and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the right of the Holder to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Warrant.  The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein.  Amounts set forth or provided for herein with respect to payments, exercises and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate.  The Company therefore agrees that, in the event of any such breach or threatened breach, the holder of this Warrant shall be entitled, in addition to all other available remedies, to specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving actual damages and without posting a bond or other security. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Warrant (including, without limitation, compliance with Section 2 hereof). The issuance of shares and certificates for shares as contemplated hereby upon the exercise of this Warrant shall be made without charge to the Holder or such shares for any issuance tax or other costs in respect thereof, provided that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the Holder or its agent on its behalf.

15.    PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS.  If (a) this Warrant is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the holder otherwise takes action to collect amounts due under this Warrant or to enforce the provisions of this Warrant or (b) there occurs any bankruptcy, reorganization, receivership of the company or other proceedings affecting company creditors' rights and involving a claim under this Warrant, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such

bankruptcy, reorganization, receivership or other proceeding, including, without limitation, attorneys' fees and disbursements.

16.     TRANSFER.  This Warrant may be offered for sale, sold, transferred or assigned without the consent of the Company, except as may otherwise be required by Section 2(g) of the Securities Purchase Agreement.

17.     DISCLOSURE.  Upon receipt or delivery by the Company of any notice in accordance with the terms of this Warrant, from and after the Public Company Date, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-k or otherwise.  In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries.

19.     CERTAIN DEFINITIONS.  For purposes of this Warrant, the following terms shall have the following meanings:

(a)     "**1933 Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(b)     "**1934 Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(c)     "**Adjustment Right**" means any right granted with respect to any securities issued in connection with, or with respect to, any issuance or sale (or deemed issuance or sale in accordance with Section 2) of shares of Common Stock (other than rights of the type described in Section 2(b)(i) and 4 hereof) that could result in a decrease in the net consideration received by the Company in connection with, or with respect to, such securities (including, without limitation, any cash settlement rights, cash adjustment or other similar rights).

(d)     "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(e)     "**Approved Stock Plan**" means any employee benefit plan which has been approved by the board of directors of the Company prior to or subsequent to the date hereof pursuant to which shares of Common Stock and standard options to purchase Common Stock may be issued to any employee, officer or director for services provided to the Company in their capacity as such.

24

(f)    "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Section 13(d) of the 1934 Act.  For clarity, the purpose of the foregoing is to subject collectively the Holder and all other Attribution Parties to the Maximum Percentage.

(g)    "**Bid Price**" means, for any security as of the particular time of determination, the bid price for such security on the Principal Market as reported by Bloomberg as of such time of determination, or, if the Principal Market is not the principal securities exchange or trading market for such security, the bid price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg as of such time of determination, or if the foregoing does not apply, the bid price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg as of such time of determination, or, if no bid price is reported for such security by Bloomberg as of such time of determination, the average of the bid prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC) as of such time of determination.  If the Bid Price cannot be calculated for a security as of the particular time of determination on any of the foregoing bases, the Bid Price of such security as of such time of determination shall be the fair market value as mutually determined by the Company and the Holder.  If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13.  All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(h)    "**Black Scholes Consideration Value**" means (x) prior to the Public Company Date, the fair market value of the applicable Option, Convertible Security or Adjustment Right (as the case may be) as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the applicable Option, Convertible Security or Adjustment Right  (as the case may be) as of the date of issuance thereof calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the public announcement of the execution of definitive documents with respect to the issuance of such Option or Convertible Security (as the case may be), (ii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the remaining term of such Option, Convertible Security or Adjustment Right (as the case may be) as of the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be), (iii) a zero cost of borrow and (iv) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be).

25

(i)    "**Black Scholes Value**" means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(i), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the greater of (1) the highest Closing Sale Price of the Common Stock during the period beginning on the Trading Day immediately preceding the announcement of the applicable Fundamental Transaction (or the consummation of the applicable Fundamental Transaction, if earlier) and ending on the Trading Day of the Holder's request pursuant to Section 4(c)(i) and (2) the sum of the price per share being offered in cash in the applicable Fundamental Transaction (if any) plus the value of the non-cash consideration being offered in the applicable Fundamental Transaction (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(i), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(i) and (2) the remaining term of this Warrant as of the date of consummation of the applicable Fundamental Transaction or as of the date of the Holder's request pursuant to Section 4(c)(i) if such request is prior to the date of the consummation of the applicable Fundamental Transaction, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the earliest to occur of (A) the public disclosure of the applicable Fundamental Transaction, (B) the consummation of the applicable Fundamental Transaction and (C) the date on which the Holder first became aware of the applicable Fundamental Transaction.

(j)    "**Bloomberg**" means Bloomberg, L.P.

(k)    "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(l)    "**Closing Sale Price**" means, for any security as of any date, the last closing trade price for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing trade price, then the last trade price of such security prior to 4:00:00 p.m., New York time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing does not apply, the last trade price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no last trade price is reported for such security by Bloomberg, the average of the ask prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Sale Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be

resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(m) "**Common Stock**" means (i) the Company's shares of common stock, $0.000001 par value per share, and (ii) any capital stock into which such common stock shall have been changed or any share capital resulting from a reclassification of such common stock.

(n) "**Convertible Securities**" means any stock or other security (other than Options) that is at any time and under any circumstances, directly or indirectly, convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any shares of Common Stock.

(o) "**Dollar Value**" means, as of any given time, the sum of (x) the sum of each Aggregate Exercise Price of each exercise of this Warrant (assuming solely for such purpose that each such exercise was a cash exercise of this Warrant) that occurred prior to such given time and (y) the Aggregate Exercise Price of a cash exercise of the unexercised portion of this Warrant as of such given time.

(p) "**Eligible Market**" means The New York Stock Exchange, the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Select Market, the Nasdaq Global Market, the OTCQB, the OTCQX or the Principal Market.

(q) "**Event Market Price**" means, with respect to any Stock Combination Event Date, the quotient determined by dividing (x) the sum of the VWAP of the Common Stock for each of the five (5) lowest Trading Days during the twenty (20) consecutive Trading Day period ending and including the Trading Day immediately preceding the sixteenth (16th) Trading Day after such Stock Combination Event Date, divided by (y) five (5).

(r) "**Event of Default Black Scholes Value**" means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(ii), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the highest Closing Sale Price of the Common Stock during the period beginning on the date of the occurrence of the Event of Default through the date all Events of Default have been cured (assuming for such purpose that the Notes remain outstanding) or, if earlier, the Trading Day of the Holder's request pursuant to Section 4(c)(ii), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(ii), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(ii) and (2) the remaining term of this Warrant as of the date of the occurrence of such Event of Default, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following later of (x) the date of the

27

occurrence of such Event of Default and (y) the date of the public announcement of such Event of Default.

(s) "**Excluded Securities**" means (i) shares of Common Stock or standard options to purchase Common Stock issued to directors, officers or employees of the Company for services rendered to the Company in their capacity as such pursuant to an Approved Stock Plan (as defined above), provided that (A) all such issuances (taking into account the shares of Common Stock issuable upon exercise of such options) after the Subscription Date pursuant to this clause (i) do not, in the aggregate, exceed more than 5% of the Common Stock issued and outstanding immediately prior to the Subscription Date and (B) the exercise price of any such options is not lowered, none of such options are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such options are otherwise materially changed in any manner that adversely affects any of the Buyers; (ii) shares of Common Stock issued upon the conversion or exercise of Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) issued prior to the Subscription Date, provided that the conversion price of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) is not lowered, none of such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are otherwise materially changed in any manner that adversely affects any of the Buyers; and (iii) the shares of Common Stock issuable upon exercise of the SPA Warrants; provided, that the terms of the SPA Warrant are not amended, modified or changed on or after the Subscription Date (other than antidilution adjustments pursuant to the terms thereof in effect as of the Subscription Date).

(t) "**Expiration Date**" means the date that is the fifth (5th) anniversary of the Issuance Date or, if such date falls on a day other than a Trading Day or on which trading does not take place on the Principal Market (a "**Holiday**"), the next date that is not a Holiday.

(u) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such

28

purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby all such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Warrant calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other shareholders of the Company to surrender their shares of Common Stock without approval of the shareholders of the Company or (C) directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(v)     "**Group**" means a "group" as that term is used in Section 13(d) of the 1934 Act and as defined in Rule 13d-5 thereunder.

(w)     "**Listing Date**" means the earlier to occur of (x) May 31, 2018 (solely if the Company fails to use its reasonably best efforts to effect this listing of the Common Stock on an Eligible Market (other than the OTCQB or the OTCQX) on or prior thereto) or (y) the initial date any security of the Company (including, without limitation, the Common Stock) is listed on an Eligible Market (other than the OTCQB or the OTCQX).

29

(x) "**Notes**" has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all notes issued in exchange therefor or replacement thereof.

(y) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(z) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(aa) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity or a government or any department or agency thereof.

(bb) "**Pre-Listing Maximum Eligibility Number**" means 100,000 Warrant Shares (as adjusted for stock splits, stock dividends, recapitalizations and similar events).

(cc) "**Public Company Date**" means the date on which the shares of Common Stock of the Company (or its direct or indirect successor, subsidiary or parent company, whose securities are issued or issuable to holders of Common Stock), whether as a result of a public offering, merger, recapitalization, reorganization or otherwise, are registered under the 1934 Act.

(dd) "**Principal Market**" means, as of any date of determination, the Eligible Market that is the principal securities exchange market for the Common Stock as of such date of determination.

(ee) "**Registration Rights Agreement**" means that certain registration rights agreement, dated as of the Closing Date, by and among the Company and the initial holders of the Notes relating to, among other things, the registration of the resale of the Common Stock issued pursuant to the Securities Purchase Agreement and issuable upon exercise of the SPA Warrants, as may be amended from time to time.

(ff) "**SEC**" means the United States Securities and Exchange Commission or the successor thereto.

(gg) "**Spot Price**" means, with respect to any given Exercise Notice, as applicable: (A) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the date of the applicable Exercise Notice if such Exercise Notice is (1) both executed and delivered pursuant to Section 1(a) hereof on a day that is not a Trading Day or (2) both executed and delivered pursuant to Section 1(a) hereof on a Trading Day prior to the opening of "regular trading hours" (as defined in Rule 600(b)(64) of Regulation NMS promulgated under the federal securities laws) on such Trading Day, (B) the Bid Price of the Common Stock as of the time of the Holder's execution of the applicable Exercise Notice if such Exercise Notice is executed during "regular trading hours" on a Trading Day and is delivered within two (2) hours thereafter pursuant to Section 1(a) hereof, or (C) the Closing Sale Price of the Common Stock on the date

30

of the applicable Exercise Notice if the date of such Exercise Notice is a Trading Day and such Exercise Notice is both executed and delivered pursuant to Section 1(a) hereof after the close of "regular trading hours" on such Trading Day

    (hh)    "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

    (ii)    "**Successor Entity**" means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

    (jj)    "**Trading Day**" means, as applicable, (i) prior to the Public Company Date, any Business Day, and (ii) from and after the Public Company Date, (x) with respect to all price or trading volume determinations relating to the Common Stock, any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded, provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Holder or (y) with respect to all determinations other than price or trading volume determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

    (kk)    "**VWAP**" means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market (or, if the Principal Market is not the principal trading market for such security, then on the principal securities exchange or securities market on which such security is then traded) during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "HP" function (set to weighted average) or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the VWAP cannot be calculated for such security on such date on any of the foregoing bases, the VWAP of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination, recapitalization or other similar transaction during such period.

*[signature page follows]*

**IN WITNESS WHEREOF,** the Company has caused this Warrant to Purchase Common Stock to be duly executed as of the Issuance Date set out above.

**YAYYO, INC.**

By: _____
  Name: Ramy El-Batrawi
  Title: CEO

**EXHIBIT A**

## EXERCISE NOTICE

## TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS WARRANT TO PURCHASE COMMON STOCK

## YAYYO, INC.

The undersigned holder hereby elects to exercise the Warrant to Purchase Common Stock No. _____ (the "**Warrant**") of Yayyo, Inc., a Delaware corporation (the "**Company**") as specified below. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

    1.    <u>Form of Exercise Price</u>. The Holder intends that payment of the Aggregate Exercise Price shall be made as:

        ☐    a "<u>Cash Exercise</u>" with respect to _____ Warrant Shares; and/or

        ☐    a "<u>Cashless Exercise</u>" with respect to _____ Warrant Shares.

In the event that the Holder has elected a Cashless Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder hereby represents and warrants that (i) this Exercise Notice was executed by the Holder at _____ [a.m.][p.m.] on the date set forth below and (ii) if applicable, the Bid Price as of such time of execution of this Exercise Notice was $_____.

    2.    <u>Payment of Exercise Price</u>. In the event that the Holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder shall pay the Aggregate Exercise Price in the sum of $_____ to the Company in accordance with the terms of the Warrant.

    4.    <u>Delivery of Warrant Shares</u>. The Company shall deliver to Holder, or its designee or agent as specified below, _____ shares of Common Stock in accordance with the terms of the Warrant. Delivery shall be made to Holder, or for its benefit, as follows:

    ☐    Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to:     _____

           _____

           _____

☐     Check here if (x) after the Public Company Day and (y) requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant:      _____

DTC Number:      _____

Account Number:      _____

Date: _____ __, _____

_____
Name of Registered Holder


By: _____
    Name:
    Title:


Tax ID:_____

Facsimile:_____

E-mail Address:_____

**EXHIBIT B**

### ACKNOWLEDGMENT

The Company hereby acknowledges this Exercise Notice and hereby directs _____ to issue the above indicated number of shares of Common Stock from the Company and acknowledged and agreed to by _____.

**YAYYO, INC.**

By: _____
    Name:
    Title:

# EXHIBIT B

As filed with the Securities and Exchange Commission on June 6, 2018

Registration No.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM S-1/A**
**REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933**



**YayYo, Inc.**

(Exact name of registrant as specified in its charter)

| Delaware | 7371 | 81-3028414 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
**(310) 926-2643**

(Address, including zip code, and telephone number, including area code,
of registrant's principal executive offices)

**Ramy El-Batrawi**
**Chief Executive Officer**
**YayYo, Inc.**
**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
**(310) 926-2643**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

Copies to:

**Joseph Tagliaferro, Esq.**
**Elliot Weiss, Esq.**
**CKR Law LLP**
**1800 Century Park East, Fl. 14**
**Los Angeles, California 90067**
**Tel: (310) 400-0110**

Approximate date of commencement of proposed sale to the public: **From time to time after the effective date of this Registration Statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. ☒

| Title of Each Class of Securities to be Registered | Amount to be Registered **(1)** | Proposed Maximum Aggregate Offering Price Per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common stock, par value $0.000001 per share offered for Selling Securityholder | 150,000 shares | $8.00**(2)** | $1,200,000 | $149.40**(2)** |
| Selling Securityholder common stock purchase warrant | - | - | - | - |
| Common stock issuable upon exercise of Selling Securityholder warrant **(4)** | 1,500,000 shares | $4.00**(3)** | $6,000,000 | $747.00**(3)** |
| Total | 1,650,000 shares | | $7,200,000 | $896.40 |

(1) Consists of (a) 150,000 outstanding shares of the registrant's common stock, and (b) 1,500,000 shares of common stock issuable upon exercise of common stock purchase warrants. Pursuant to Rule 416 under the Securities Act of 1933, as amended, to the extent that such common stock purchase warrants provide for a change in the number of shares of common stock into which they are convertible or for which they are exercisable to prevent dilution resulting from stock splits, stock dividends, or similar transactions, this registration statement shall be deemed to cover such additional shares of common stock issuable in connection with any such provision.

(2) Estimated solely for purposes of calculating the registration fee pursuant to Rule 457(a) of the Securities Act. The shares offered hereunder may be sold by the Selling Securityholder from time to time in the open market, through privately negotiated transactions or a combination of these methods, at a fixed price of $8.00 per share until our shares of common stock are quoted on Nasdaq or the OTCQX, if at all, and thereafter at prevailing market prices at the time of sale or privately negotiated prices or a combination of these methods. Please see "*Determination of Offering Price*" below for more information.

(3) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(g) under the Securities Act. The Selling Securityholder Warrant is exercisable at a per share exercise price equal to $4.00 per share. As estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(g) under the Securities Act, the proposed maximum aggregate offering price of the representatives' Selling Securityholder Warrant is equal to $747.00.

(4) We have issued to the Selling Securityholder warrants exercisable commencing on March 8, 2018, representing approximately 90.9% of the aggregate number of shares of common stock to be registered in the offering (the "Selling Securityholder Warrant"). Resales of the Selling Securityholder Warrant are registered hereby. Resales of common stock issuable upon exercise of the Selling Securityholder Warrant are also being similarly registered hereby.

## EXPLANATORY NOTE

This Registration Statement contains a form of prospectus to be used in connection with the potential resale by certain Selling Securityholders of an aggregate of 1,650,000 shares of our common stock (the "Prospectus"), consisting of (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder Warrant held by the Selling Securityholder.

The information in this prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state or other jurisdiction where the offer or sale is not permitted.

Subject to Completion, dated June 6, 2018

**PRELIMINARY PROSPECTUS**



**YayYo, Inc.**

**1,650,000 Shares of Common stock**

This prospectus relates to the resale by the Selling Securityholder named herein of up to 1,650,000 shares of our common stock. Of the shares being offered, (a) 150,000 are issued and outstanding as of the date of this prospectus; and (b) 1,500,000 are issuable upon exercise of Selling Securityholder Warrant.

The shares offered by this prospectus may be sold by the Selling Securityholder ("Selling Securityholder") from time to time in the open market, at a fixed price of $8.00 per share until our shares of common stock are quoted on Nasdaq or the OTCQX, if at all, and thereafter at prevailing market prices at the time of sale or privately negotiated prices or a combination of these methods. The distribution of the shares by the Selling Securityholder is not subject to any underwriting agreement. We will not receive any of the proceeds from the sale of such shares. We will bear all expenses of registration incurred in connection with this offering, but all selling and other expenses incurred by the Selling Securityholder will be borne by them.

Our common stock is not listed on any stock exchange or over-the-counter market. There is currently no active trading market in our common stock. While we have applied to have our shares of common stock approved for listing on Nasdaq Capital Markets ("Nasdaq") under the symbol "YAYO," there can be no assurance that we will meet the initial listing requirements to list our common stock on Nasdaq. In the event that our application to list our common stock on Nasdaq is not approved, the Company may seek to have its common stock quoted on the OTCQX over-the-counter exchange operated by OTC Markets Group Inc. (the "OTCQX"). There can be no assurance that the common stock subject to registration and resale by the Selling Securityholder under this prospectus will be approved for listing on Nasdaq or quoted on the OTCQX or other recognized securities exchange or quotation system. For more information see the section "*Risk Factors*." Further, the shares to be registered and offered by this prospectus are not subject to or contingent upon the shares of common stock being listed on Nasdaq or the OTCQX or any other recognized securities exchange of quotation system. In the event that our application with Nasdaq is not approved we intend to consummate this offering of our common stock.

Following this offering, affiliates of certain members of our board of directors will hold a substantial amount of our issued and outstanding common stock and will control more than a majority of the voting power of our common stock. As a result of such ownership, such individual will be able to control any action requiring the general approval of our stockholders, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws and the approval of any merger or sale of substantially all of our assets. We will be a "controlled company" within the meaning of the corporate governance rules of Nasdaq. See "*Management— Controlled Company.*"

**We are an "emerging growth company" under the federal securities laws and may elect to take advantage of reduced public company reporting requirements. An investment in our securities may be considered speculative and involves a high degree of risk, including the risk of a substantial loss of your investment. See "Risk Factors" beginning on page 11 to read about the risks you should consider before buying our securities.**

You should rely only on the information contained in this prospectus and any prospectus supplement or amendment. We have not authorized anyone to provide you with different information. This prospectus may only be used where it is legal to sell these securities. The information in this prospectus is only accurate on the date of this prospectus, regardless of the time of any sale of securities.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The date of this prospectus is        , 2018

**You should rely only on the information contained in this prospectus or any prospectus supplement or amendment. We have not authorized any dealer, salesperson or other person to provide you with information that is different from, or adds to, that contained in this prospectus. If anyone provides you with different or inconsistent information, you should not rely on it. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you.**

**We are not making an offer of any securities in any jurisdiction. The Selling Securityholder are offering to sell and seeking offers to buy our common stock only in jurisdictions where offers and sales are permitted.**

**You should assume that the information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of our common stock. Our business, financial condition, results of operations and prospects may have changed since that date.**

**Table of Contents**

MARKET DATA                                                                                  5

PROSPECTUS SUMMARY                                                                           5

SUMMARY OF THE OFFERING                                                                     10

RISK FACTORS                                                                                11

SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS                                           40

USE OF PROCEEDS                                                                             40

DETERMINATION OF OFFERING PRICE                                                             40

PLAN OF DISTRIBUTION                                                                        40

MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS                                    42

CAPITALIZATION                                                                              43

DILUTION                                                                                    44

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS                      46

BUSINESS                                                                                    57

MANAGEMENT                                                                                  68

EXECUTIVE COMPENSATION                                                                      75

PRINCIPAL STOCKHOLDERS                                                                      77

SELLING STOCKHOLDERS                                                                        78

CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS                                        79

DESCRIPTION OF SECURITIES                                                                   83

SHARES ELIGIBLE FOR FUTURE SALE                                                             87

EXPERTS                                                                                     92

LEGAL MATTERS                                                                               93

WHERE YOU CAN FIND MORE INFORMATION                                                         93

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS                                                 F - 1

# MARKET DATA

Market data and certain industry data and forecasts used throughout this prospectus were obtained from internal company surveys, market research, consultant surveys, publicly available information, reports of governmental agencies and industry publications and surveys. Industry surveys, publications, consultant surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but the accuracy and completeness of such information is not guaranteed. We have not independently verified any of the data from third party sources, nor have we ascertained the underlying economic assumptions relied upon therein. Similarly, internal surveys, industry forecasts and market research, which we believe to be reliable based on our management's knowledge of the industry, have not been independently verified. Forecasts are particularly likely to be inaccurate, especially over long periods of time. In addition, we do not necessarily know what assumptions regarding general economic growth were used in preparing the forecasts we cite. Statements as to our market position are based on the most currently available data. While we are not aware of any misstatements regarding the industry data presented in this prospectus; our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this prospectus.

# PROSPECTUS SUMMARY

*This summary provides a brief overview of the key aspects of our business and our securities. The reader should read the entire prospectus carefully, especially the risks of investing in our common stock discussed under "Risk Factors." Some of the statements contained in this prospectus, including statements under "Summary" and "Risk Factors" as well as those noted in the documents incorporated herein by reference, are forward-looking statements and may involve a number of risks and uncertainties. Our actual results and future events may differ significantly based upon a number of factors. The reader should not put undue reliance on the forward-looking statements in this document, which speak only as of the date on the cover of this prospectus.*

As used in this prospectus, all references to "capital stock," "common stock," "Shares," "preferred stock," "stockholders," "shareholders" applies only to YayYo, Inc "we," "our," "us," the "Company," the "registrant," or "YayYo" refer to YayYo, Inc., a Delaware corporation. References in this prospectus to the terms "Company," "we," "our" or words of like import mean YayYo, Inc., and its direct and indirect subsidiaries, which currently consist of Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"), Savvy LLC, a Delaware limited liability company ("Savvy") and Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo"). All references in this prospectus to "years" and "fiscal years" means the twelve-month period ended December 31st.

5

## About our Company

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savvy LLC, a Delaware limited liability company ("Savvy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from the development of the Metasearch App. As of the date of this Prospectus, the Company's operating business segments include (i) an online peer-to-peer bookings platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

The Company operations are organized into two business segments across the ridesharing and transportation industry:

*Rideshare Platform*—On October 31, 2017, the Company created the wholly-owned subsidiary, Rideshare to incubate the concept of a proprietary transportation network system focused on the developing of a peer-to-peer booking platform to rent standard passenger vehicles to self-employed ridesharing drivers. The Company has now deployed and launched the Rideshare Platform on it's operating online platform, Ridesharerental.com (http://www.Ridesharerental.com). The Rideshare Platform is a proprietary peer-to-peer car-rental marketplace that connects the Company's Fleet Management vehicles, other fleet owners and selected individual car owners with Rideshare drivers seeking rental vehicles.

*Fleet Management*— On June 10, 2017, the Company formed the wholly-owned subsidiary, Distinct Cars for purposes of developing a fleet management business. The Company's Fleet Management business focuses on the maintenance of a fleet of brand new standard passenger vehicles, under lease contract with the Company, to be subsequently rented directly to drivers in the ridesharing economy. The Fleet Management business and vehicles are made commercially available through the Company's Rideshare Platform.

## Recent Developments

### YayYo, Inc. - Recent Financing Activities

As of December 31, 2017, the Company had 25,770,551 shares of common stock issued and outstanding. From January, 2018 to May 30, 2018, the Company issued (i) 39,180 shares of common stock under the Regulation A+ Offering (defined below) in exchange for cash proceeds, and (ii) 504,195 shares of restricted common stock, pursuant to following:

- 10,000 shares of restricted common stock were sold to investors for cash proceeds;
- 153,000 shares of restricted common stock were issued in connection with the issuance of notes payable;
- 332,500 shares of restricted common stock were issued for services rendered; and
- 8,695 shares of restricted common stock for payment of accounts payable.

In December 2016, we filed an offering statement pursuant to Regulation A of the Securities Act, which was qualified by the SEC on March 17, 2017. We offered up to a maximum of 6,250,000 shares of common stock on a "best efforts" basis, at a price of $8.00 per share. On March 16, 2018, we closed the Regulation A offering, after issuing 365,306 shares of common stock for proceeds of approximately $1.8 million net of offering expenses (the "Regulation A+ Offering").

In January 2018, the Company issued notes payable for $15,000 and also issued an aggregate of 1,125 shares of its common stock to these note holders as additional incentive to make the loans.

Further, in February 2018, the Company sold 22,500 shares of common stock to two investors for cash proceeds of $180,000.

During fiscal year 2017, the Company entered into vehicle leasing agreements with Acme Auto Leasing LLC (the "Lessor"). As of December 31, 2017, the Company has total lease obligations in the amount of $1,593,291 (collectively, the "Finance Lease Obligations").

On July 15, 2017, the Company and the Lessor entered into an agreement pursuant to which the Company agreed to issue additional consideration to the Lessor in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company (the "Lease Side Agreement").

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, in the original principal amount of $222,222 (the "First Note"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of the YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by the YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired.

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of Common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant") and 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Warrants expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The Company also paid $178,228 of issuance costs associated with this Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between the YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following the YayYo, Inc., receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

In accordance with the Second Note Offering, the Company has agreed to pay Aegis Capital Corp., as placement agent ("Aegis") a cash placement fee payable within 48 hours of (but only in the event of) the receipt by the Company of any proceeds from the exercise of the Warrants or options sold in the Second Note Offering equal to 8% of the aggregate cash exercise price received by the Company upon such exercise, if any (the "Placement Agent's Fee"). As additional compensation for the services to be provided by Aegis, as the placement agent and investment banker, the Company shall issue to Aegis or its designees at the Closing, warrants (the "Aegis Warrants") to purchase such number of shares of common stock of the Company ("Placement Agent Warrant Shares") equal to 8% of the aggregate number of securities placed in the Second Note Offering, plus any securities underlying any convertible securities placed in the Second Note Offering to such purchasers. The Aegis Warrants shall have the same terms, including exercise price and registration rights, as the Selling Securityholder Warrant issued to investors in the Second Note Offering. As of April 27, 2018, the Placement Agent's Fee has been deferred and is intended to be paid by the Company when and as funds are released from the Master Restricted Account to the Company, in proportion to the amount of fees.

We are party to an investors' rights agreement with the Selling Securityholder, which provides, among other things, that certain holders of our capital stock and securities have the right to demand that we file a registration statement or request that their shares of our capital stock or common stock equivalents be covered by a registration statement that we are otherwise filing under this prospectus. See the section titled "*Description of Capital Stock—Registration Rights*."

***Distinct Cars, LLC - Recent Financing Activities***

As of the date of this prospectus, Distinct Cars, LLC, as lessee, entered into a series of open-ended lease agreements and disclosure statements with Acme Auto Leasing, Inc., ("Lessor") to lease standard passenger vehicles, each with an approximate lease term of thirty-six (36) months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $373.01 per month to $621 per month (with only 9 vehicles out of approximately 150 exceeding $373.01 per month). At the end of the term of the Lease Agreement, Lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

Distinct Cars, LLC has completed a debt round of financing pursuant to which Distinct Cars raised aggregate gross proceeds in the amount of $252,667 from twenty-nine accredited investors in exchange for senior secured promissory notes issued by Distinct Cars (each a "Distinct Cars Note" and collectively, the "Distinct Cars Notes"). The maturity date under the Distinct Cars Notes is third-six (36) months from the date of issuance (the "DCN Maturity Date"). The principal amount under the Distinct Cars Notes ranges from a minimum amount of $5,000 per Distinct Cars Note up to $20,000 per Distinct Cars Note. The Distinct Cars Notes accrue interest at a rate of 8% per annum with interest due and payable upon the DCN Maturity Date. The principal amount and any unpaid and accrued interest thereunder is due and payable in twelve (12) quarterly installments commencing upon January 1, 2018. The Distinct Cars Notes are secured by a senior secured priority lien in the equity of the fleet of leased automobiles acquired under the Lease Agreements (see Lease Agreements above) subject to subordination in priority lien status to the purchase money security interest held by the lessor under the Lease Agreements. In addition to the total amount of principal and interest owing under the Distinct Cars Note, upon execution of the Distinct Cars Note and placement of funds the holder shall receive a stock grant (the "Stock Grant") of YayYo Inc., common stock (the "Parent Shares") in an amount equal to 100% of the principal sum as calculated by a price of $4.00 per share with 30% coverage. The Stock Grant is offered pursuant to Rule 506(b) of Regulation D and Section 4(a)(2) of the Securities Act of 1933.

**Risks Factors**

Our business is subject to a number of risks. You should be aware of these risks before making an investment decision. These risks are discussed more fully in the section of this prospectus titled "*Risk Factors*", which begins on page 11 of this prospectus.

**Information Regarding our Capitalization**

As of May 30, 2018, we had 26,313,926 shares of common stock issued and outstanding. Additional information regarding our issued and outstanding securities may be found in the sections of this prospectus titled "*Market for Common Equity and Related Stockholder Matters*" and "*Description of Securities*."

Unless otherwise specifically stated, information throughout this prospectus does not assume the exercise of outstanding options or warrants to purchase shares of our common stock.

## Organizational History

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savvy LLC, a Delaware limited liability company ("Savvy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

The Company was formed on June 21, 2016 under the name "*YayYo, LLC,*" which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC to the Company in exchange for common stock shares of the Company. All of the YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities upon the filing of the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware.

## Corporate Information

Our principal executive office is located at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. Our telephone number is (310) 926-2643. Our web address is www.yayyo.com. Information included on our website is not part of this prospectus.

## Implications of Being an Emerging Growth Company

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012. We will remain an emerging growth company until the earlier of (i) December 31, 2019, the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act; (ii) the last day of the fiscal year in which we have total annual gross revenues of $1 billion or more; (iii) the date on which we have issued more than $1 billion in nonconvertible debt during the previous three years; or (iv) the date on which we are deemed to be a large accelerated filer under applicable SEC rules. We expect that we will remain an emerging growth company for the foreseeable future, but cannot retain our emerging growth company status indefinitely and will no longer qualify as an emerging growth company on or before December 31, 2019. We refer to the Jumpstart Our Business Startups Act of 2012 herein as the "JOBS Act," and references herein to "emerging growth company" have the meaning associated with it in the JOBS Act. For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from specified disclosure requirements that are applicable to other public companies that are not emerging growth companies.

These exemptions include:

- being permitted to provide only two years of audited financial statements, in addition to any required unaudited interim financial statements, with correspondingly reduced "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" disclosure;

- not being required to comply with the requirement of auditor attestation of our internal controls over financial reporting;

- not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements;

- reduced disclosure obligations regarding executive compensation; and

- not being required to hold a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

For as long as we continue to be an emerging growth company, we expect that we will take advantage of the reduced disclosure obligations available to us as a result of that classification. We have taken advantage of certain of those reduced reporting burdens in this prospectus. Accordingly, the information contained herein may be different than the information you receive from other public companies in which you hold stock.

An emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. This allows an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have irrevocably elected to avail ourselves of this extended transition period and, as a result, we will not be required to adopt new or revised accounting standards on the dates on which adoption of such standards is required for other public reporting companies.

We are also a "smaller reporting company" as defined in Rule 12b-2 of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and have elected to take advantage of certain of the scaled disclosure available for smaller reporting companies.

## SUMMARY OF THE OFFERING

| | |
|---|---|
| Common stock currently outstanding | 26,313,926 shares (1) |
| Common stock offered by the Company | None |
| Common stock offered by the Selling Securityholder | Up to 1,650,000 shares (2) |
| Use of proceeds | We will not receive any of the proceeds from the sales of our common stock by the Selling Securityholder. |
| Proposed Listing | We intend to apply to have our shares of common stock approved for listing on Nasdaq under the symbol "YAYO." However, there can be no assurance that we will meet the initial listing requirements of Nasdaq to list our common stock on the Nasdaq exchange. In the event that our application to list our common stock on Nasdaq is not approved, the Company may seek to have its common stock quoted on the OTCQX over-the-counter exchange operated by OTC Markets Group Inc. (the "OTCQX"). |
| | There can be no assurance that the Company common stock sold in this Offering will be approved for listing on Nasdaq or quoted on the OTCQX or other recognized securities exchange. For more information see the section "*Risk Factors*." |
| Controlled Company | Upon the completion of this offering, Ramy El-Batrawi, our founder, chief executive officer and director, will control approximately 58.62% of the voting power of our outstanding common stock. As a result, we will be a "controlled company" under the Nasdaq corporate governance standards. Under these standards, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards. See "*Management—Controlled Company*." |
| Risk Factors | You should carefully consider the information set forth in this prospectus and, in particular, the specific factors set forth in the "*Risk Factors*" section beginning on page **** of this prospectus before deciding whether or not to invest in shares of our common stock. |

(1) As of May 30, 2018. Does not include (a) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder Warrant; and (b) 680,000 shares of our common stock issuable upon exercise of granted and vested stock options granted under our 2016 Plan.

(2) Consists of (a) 150,000 outstanding restricted shares of our common stock, and (b) 1,500,000 shares of our common stock issuable upon exercise of Selling Securityholder Warrant.

# RISK FACTORS

*Our business is subject to many risks and uncertainties, which may affect our future financial performance. If any of the events or circumstances described below occur, our business and financial performance could be adversely affected, our actual results could differ materially from our expectations, and the price of our stock could decline. The risks and uncertainties discussed below are not the only ones we face. There may be additional risks and uncertainties not currently known to us or that we currently do not believe are material that may adversely affect our business and financial performance. You should carefully consider the risks described below, together with all other information included in this prospectus including our financial statements and related notes, before making an investment decision. The statements contained in this prospectus that are not historic facts are forward-looking statements that are subject to risks and uncertainties that could cause actual results to differ materially from those set forth in or implied by forward-looking statements. If any of the following risks actually occurs, our business, financial condition or results of operations could be harmed. In that case, the trading price of our common stock could decline, and investors in our securities may lose all or part of their investment.*

**Risks Related to Our Business**

> **We are an emerging growth company with a limited operating history and limited sales to date.**

The Company is subject to all of the risks inherent in the establishment of an emerging growth company, including the absence of an operating history, and the risk that we may be unable to successfully operate our business segments. There can be no assurance that the Company will be able to successfully operate our business segments, including without limitation the Company's technologies, products and services.

The Company was incorporated on November 16, 2016 and only commenced operations thereafter. The Company was incorporated pursuant to the simultaneous filing of the Company's certificate of incorporation, as filed and stamped by the Delaware Secretary of State on November 16, 2016, and the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*", as filed and stamped on the same date by the Delaware Secretary of State pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware. Accordingly, we have limited operating history upon which to base an evaluation of our business and prospects. You must consider the risks and difficulties we face as a small operating company with limited operating history.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry towards the vehicle rental business with a focus on developing (i) an online peer-to-peer bookings platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, we have limited operating history in the vehicle rental, fleet management and transportation industry. We have generated $235,690 in revenue for fiscal year 2017.

Operating results for future periods are subject to numerous uncertainties and we cannot assure you that the Company will achieve or sustain profitability. The Company's prospects must be considered in light of the risks encountered by small operating companies with limited operating history, particularly companies in new and rapidly evolving markets. Operating results will depend upon many factors, including our success in attracting and retaining motivated and qualified personnel, our ability to establish short term credit lines or obtain financing from other sources, our ability to develop and market new products, control costs, and general economic conditions. The Company has engaged in limited operations to date, and although the Company believes that its plans to grow, expand and scale operations organically will be successful, there is no assurance that this will be the case. There can be no assurance that the Company's sales projections and marketing plans will be achieved as anticipated and planned. The Company cannot assure prospective investors that it will be able to successfully develop and market its products and services.

*We will need but may be unable to obtain additional funding on satisfactory terms, which could dilute our shareholders or impose burdensome financial restrictions on our business.*

We have relied upon cash from financing activities and in the future, we hope to rely more predominantly on revenues generated from operations to fund all of the cash requirements of our activities. However, there can be no assurance that we will be able to generate significant cash from our operating activities in the future to funds our continuing operations. Future financings may not be available on a timely basis, in sufficient amounts or on terms acceptable to us, if at all. Any debt financing or other financing of securities senior to the common stock will likely include financial and other covenants that will restrict our flexibility. Any failure to comply with these covenants would have a material adverse effect on our business, prospects, financial condition and results of operations because we could lose our existing sources of funding and impair our ability to secure new sources of funding. However, there can be no assurance that the Company will be able to generate any investor interest in its securities.

*We have incurred net losses since inception.*

For the fiscal year ended December 31, 2017, we generated a loss of approximately ($4,100,301), bringing the accumulated deficit to approximately ($5,584,010) at December 31, 2017. Increases in costs and expenses may result in a continuation of losses for the foreseeable future. There can be no assurance that we will be commercially successful.

*Issuance of common stock to fund our operations or upon the exercise of outstanding warrants and options may dilute your investment.*

We have been operating at a loss since inception and our working capital requirements continue to be significant. We have been supporting our business predominantly through the sale of debt and equity since inception. Since 2017, we have also been supporting our business through our operating cash flow from our limited operational business segments. However, to date the majority of our working capital needs have been funded through third-party capital financings. We will need additional funding for the developing of our business segments, for purposes of increasing our sales and marketing capabilities, technologies and assets, as well as for working capital requirements and other operating and general corporate purposes. Our working capital requirements depend and will continue to depend on numerous factors, including the timing of revenues, the expense involved in development of our products and services, and capital improvements. If we are unable to generate sufficient revenue and cash flow from operations, we will need to seek additional equity or debt financing to provide the capital required to maintain or expand our operations, which may have the effect of diluting our existing stockholders or restricting our ability to run our business.

There can be no assurance that we will be able to raise sufficient additional capital on acceptable terms, or at all. If such financing is not available on satisfactory terms, or is not available at all, we may be required to delay, scale back or eliminate the development of business opportunities and our operations and financial condition may be materially adversely affected. Debt financing, if obtained, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, could increase our expenses and require that our assets be provided as a security for such debt. Debt financing would also be required to be repaid regardless of our operating results. Equity financing, if obtained, could result in dilution to our then existing stockholders. As of the date of this filing, we have issued and outstanding the Selling Securityholder Warrant to purchase an aggregate of 1,500,000 underlying shares of our common stock. The Company also has reserved an aggregate of 10,000,000 shares of common stock for issuance under its 2016 Equity Incentive Plan (the "2016 Plan"). As December 31, 2017, options to purchase an aggregate of 750,000 shares of common stock have been granted and are outstanding under the 2016 Plan of which options to purchase 630,000 shares of common stock have vested and are exercisable as of December 31, 2017.

*We have outstanding debt and lease commitments, which is secured by our assets and it may make it more difficult for us to make payments on the notes and our other debt and lease obligations.*

As of December 31, 2017, we had outstanding indebtedness totaling approximately $909,889. As of December 31, 2017, we had outstanding lease obligations totaling approximately $1,593,291.

Our debt and lease commitments could have important consequences to you. For example, they could:

- make it more difficult for us to obtain additional financing in the future for our acquisitions and operations, working capital requirements, capital expenditures, debt service or other general corporate requirements;

- require us to dedicate a substantial portion of our cash flows from operations to the repayment of our debt and the interest associated with our debt rather than to other areas of our business;

- limit our operating flexibility due to financial and other restrictive covenants, including restrictions on incurring additional debt, creating liens on our properties, making acquisitions or paying dividends;

- make it more difficult for us to satisfy our obligations with respect to the notes;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- make us more vulnerable in the event of adverse economic and industry conditions or a downturn in our business.

Our ability to meet our debt service and lease obligations depends on our future financial and operating performance, which will be impacted by general economic conditions and by financial, business and other competitive factors, many of which are beyond our control. These factors could include operating difficulties, increased operating costs, competition, regulatory developments and delays in our business strategies. Our ability to meet our debt service and lease obligations may depend in significant part on the extent to which we can successfully execute our business strategy and successfully operate our business segments. We may not be able to execute our business strategy and our business operations may be materially impacted.

If our business does not generate sufficient cash flow from operations or future sufficient borrowings are not available to us under our credit agreements or from other sources we might not be able to service our debt and lease commitments, including the notes, or to fund our other liquidity needs. If we are unable to service our debt and lease commitments, due to inadequate liquidity or otherwise, we may have to delay or cancel acquisitions, sell equity securities, sell assets or restructure or refinance our debt. We might not be able to sell our equity securities, sell our assets or restructure or refinance our debt on a timely basis or on satisfactory terms or at all. In addition, the terms of our agreements with original equipment manufacturers or debt agreements may prohibit us from pursuing any of these alternatives.

*Our Rideshare Platform user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.*

We regularly review key metrics related to the operation of our Rideshare Platform business, including, but not limited to, our monthly average users, subscribers and customers to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data and have not been validated by an independent third party. Errors or inaccuracies in our metrics or data could result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of Rideshare Platform users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies.

*Our Rideshare Platform emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes do not align with the market's expectations. If that happens, our stock price may be negatively affected.*

Our Rideshare Platform business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. We believe our culture fosters this goal. Our focus on complexity and quick reactions could result in unintended outcomes or decisions that are poorly received by our users or partners. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and will thereby improve our financial performance over the long-term. These decisions may not produce the long-term benefits that we expect, in which case, our user growth and engagement, our relationships with advertisers and partners, as well as our business, operating results, and financial condition could be seriously harmed.

13

***Our Rideshare Platform and software is highly technical and may contain undetected software bugs or vulnerabilities, which could manifest in ways that could seriously harm our reputation and our business.***

Our Rideshare Platform and software is highly technical and complex. Our Rideshare Platform may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently.

We also could face claims for product liability, tort, or breach of warranty. Defending a lawsuit, regardless of its merit, is costly and may divert management's attention and seriously harm our reputation and our business. In addition, if our liability insurance coverage proves inadequate or future coverage is unavailable on acceptable terms or at all, our business could be seriously harmed.

***To carry out our business plan we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to fund planned capital expenditures will depend on our ability to generate cash in the future. This ability, to some extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We do not believe that our cash flow from operating activities and our existing capital resources, including the liquidity provided by our credit agreements and lease financing arrangements, will be sufficient to fund our planned capital expenditures. We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to fund our other liquidity needs. We may need to delay capital expenditures or seek additional equity financing. For more information see "*Management's Discussion Analysis of Financial Condition and Results of Operation—Liquidity, Capital Resources and Plan of Operations*" below.

***Our debt and other commitments expose us to a number of risks, including:***

**Cash requirements for debt and lease obligations**. A significant portion of the cash flow we generate must be used to service the interest and principal payments relating to our various financial commitments, including $909,889 of total notes payable, $552,588 of long-term debt and $1,593,291 of lease commitment obligations, as of December 31, 2017. A sustained or significant decrease in our operating cash flows could lead to an inability to meet our debt service requirements or to a failure to meet specified financial and operating covenants included in certain of our agreements. If this were to occur, it may lead to a default under one or more of our commitments. In the event of a default for this reason, or any other reason, the potential result could be the acceleration of amounts due, which could have a significant and adverse effect on us.

**Availability**. Because we finance the majority of our operating and strategic initiatives using a variety of commitments, including $909,889 in total notes payable and loan facilities, we are dependent on continued availability of these sources of funds. If these agreements are terminated or we are unable to access them because of a breach of financial or operating covenants or otherwise, we will likely be materially affected.

**Interest rate variability**. The interest rates we are charged on a substantial portion of our debt, including the Second Note payable, are variable, increasing or decreasing based on changes in certain published interest rates. Increases to such interest rates would likely result in significantly higher interest expense for us, which would negatively affect our operating results. Because many of our customers finance their vehicle purchases, increased interest rates may also decrease vehicle sales, which would negatively affect our operating results.

14

***We are a holding company and as a result rely on payments from our subsidiaries in order to meet our cash needs and service our debt. Our subsidiaries may not be able to distribute the necessary funds to us and this could adversely affect our ability to make payments on our indebtedness.***

As a holding company without independent means of generating operating revenues, YayYo, Inc., depends on dividends, distributions and other payments, from our subsidiaries to fund our obligations and to meet our cash needs. If the operating results of our subsidiaries at any given time are insufficient to make distributions to us, we would be unable to make payments on our outstanding indebtedness

***We face intense competition that may lead to downward pricing or an inability to increase prices.***

The vehicle rental and used-vehicle sale industries are highly competitive and are increasingly subject to substitution. We believe that price is one of the primary competitive factors in the vehicle rental market and that technology has enabled cost-conscious customers, including business travelers, to more easily compare rates available from rental companies. If we try to increase our pricing, our competitors, some of whom may have greater resources and better access to capital than us, may seek to compete aggressively on the basis of pricing. In addition, our competitors may reduce prices in order to, among other things, attempt to gain a competitive advantage, capture market share, or to compensate for declines in rental activity. To the extent we do not match or remain within a reasonable competitive margin of our competitors' pricing, our revenues and results of operations, financial condition, liquidity and cash flows could be materially adversely affected. If competitive pressures lead us to match any of our competitors' downward pricing and we are not able to reduce our operating costs, then our margins, results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Further, we may in the future develop and launch other products or services that may be in direct competition with the various players in the ridesharing industry, such as Uber and Lyft, and all of whom have greater resources than us. There are low barriers to entry, and we expect that competition will intensify in the future. We believe that numerous factors, including price, offerings, reliability, client base, brand name and general economic trends will affect our ability to compete successfully. Our existing and future competitors may include many large companies that have substantially greater market presence and financial, technical, marketing and other resources than we do. There can be no assurance that we will have the financial resources, technical expertise or marketing and support capabilities to compete successfully. Increased competition could result in significant competition, which in turn could result in lower revenues, which could materially adversely affect our potential profitability.

***We might incur expense to develop products that are never successfully commercialized.***

We have incurred and expect to continue to incur research and development and other expenses in connection with our products business. The potential products to which we devote resources might never be successfully developed or commercialized by us for numerous reasons. Until June 31, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" application for smartphone users that seeks to provide price comparison and bookings of available ridesharing and taxi services along with select limousine and other public and/or private transportation services ("Metasearch App").

As of the date of this prospectus, the Company has completed the development of the Metasearch App, however, its successful deployment and function is dependent on the availability of data from the major ridesharing companies (such as Uber and Lyft) known as an application programming interface ("API"). The Metasearch App has been completely developed and is only missing API access to be at full functionality. Thus far, the industry leaders, Uber and Lyft have been reluctant to provide an API to the Company for purposes of supporting the Metasearch App. Due to the API issues and foregoing technical limitations which are beyond the Company's control, the Company explored additional opportunities in the ridesharing economy space. While the Company has not completely abandoned the Metasearch App, as of the date of this prospectus, the Company has no further intentions to continue the development of the Metasearch App or to continue dedicating human resources or financial capital of the Company to the commercialization of the Metasearch App. While the Company does not intend to allocate additional corporate resources to the development of the Metasearch App, there can be no assurances that we will not incur additional expenses for the Metasearch App that has not been fully developed and/or commercialized. Such additional expenses could have a material adverse effect on our business, financial condition and prospects.

15

*We face competition that may lead to downward pricing or an inability to increase prices.*

The markets in which we operate are highly competitive and are increasingly subject to substitution. We believe that price is one of the primary competitive factors in the vehicle rental market and that the internet has enabled cost-conscious customers, including business travelers, to more easily compare rates available from rental companies. If we try to increase our pricing, our competitors, some of whom may have greater resources and better access to capital than us, may seek to compete aggressively on the basis of pricing. In addition, our competitors may reduce prices in order to attempt to gain a competitive advantage, capture market share, or to compensate for declines in rental activity. To the extent we do not match or remain within a reasonable competitive margin of our competitors' pricing, our revenues and results of operations, financial condition, liquidity and cash flows could be materially adversely affected. If competitive pressures lead us to match any of our competitors' downward pricing and we are not able to reduce our operating costs, then our margins, results of operations, financial condition, liquidity and cash flows could be materially adversely impacted.

*We face risks related to liabilities and insurance.*

Our businesses expose us to claims for personal injury, death and property damage resulting from the use of the vehicles rented by us, and for employment-related injury claims by our employees. We cannot assure you that we will not be exposed to uninsured liability potentially resulting in multiple payouts or otherwise, liabilities in respect of existing or future claims exceeding the level of our insurance, availability of sufficient capital to pay any uninsured claims or the availability of insurance with unaffiliated carriers maintained on economically reasonable terms, if at all. While we have insurance for many of these risks, we retain risk relating to certain of these perils and certain perils are not covered by our insurance.

*Regulatory issues.* We are subject to a wide variety of regulatory activities, including:

**Governmental regulations, claims and legal proceedings.** Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

**Vehicle Requirements.** Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

**Environmental regulations.** We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

**Accounting rules and regulations.** The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

**Changes in ridesharing Vehicle Requirements.** Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

*Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows.*

We are subject to a wide variety of U.S. laws and regulations and changes in the level of government regulation of our business have the potential to materially alter our business practices and materially adversely affect our financial condition, results of operations, liquidity and cash flows, including our profitability. Those changes may come about through new laws and regulations or changes in the interpretation of existing laws and regulations.

Any new, or change in existing, U.S. law and regulation with respect to optional insurance products or policies could increase our costs of compliance or make it uneconomical to offer such products, which would lead to a reduction in revenue and profitability. If customers decline to purchase supplemental liability insurance products from us as a result of any changes in these laws or otherwise, our results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Certain proposed or enacted laws and regulations with respect to the banking and finance industries, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (including risk retention requirements) and amendments to the SEC's rules relating to asset-backed securities, could restrict our access to certain financing arrangements and increase our financing costs, which could have a material adverse effect on our financial condition, results of operations, liquidity and cash flows.

*We have a significant working capital deficiency.*

As of December 31, 2017, our working capital deficit was approximately ($136,305).

*We may not be able to obtain adequate financing to continue our operations.*

We will need to raise additional funds through the issuance of equity, equity-related, or debt securities or through obtaining credit from government or financial institutions. This capital will be necessary to fund ongoing operations and continue research and development activities, including the Rideshare Platform, and our Fleet Management business. We cannot be certain that additional funds will be available to us on favorable terms when required, or at all. If we cannot raise additional funds when we need them, our financial condition, results of operations, business and prospects would be materially and adversely affected.

*We may pursue strategic transactions which could be difficult to implement, disrupt our business or change our business profile significantly.*

Any future strategic acquisition or disposition of assets or a business could involve numerous risks, including: (i) potential disruption of our ongoing business and distraction of management; (ii) difficulty integrating the acquired business or segregating assets and operations to be disposed of; (iii) exposure to unknown, contingent or other liabilities, including litigation arising in connection with the acquisition or disposition or against any business we may acquire; (iv) changing our business profile in ways that could have unintended negative consequences; and (v) the failure to achieve anticipated synergies.

17

If we enter into significant strategic transactions, the related accounting charges may affect our financial condition and results of operations, particularly in the case of an acquisition. The financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. A material disposition could require the amendment or refinancing of our outstanding indebtedness or a portion thereof.

***We rely on our management team, which has little experience working together.***

We depend on a small number of executive officers and other members of management to work effectively as a team, to execute our business strategy and operating business segments, and to manage employees and consultants. Our success will be dependent on the personal efforts of Ramy El-Batrawi, our chief executive officer and controlling shareholder, and such other key personnel. Any of our officers or employees can terminate his or her employment relationship at any time, and the loss of the services of such individuals could have a material adverse effect on our business and prospects. Further, our chief financial officers, Mr. Kevin Pickard, is a part-time employee of the Company dedicating approximately 15 hours per week to the business activities of the Company. Our management team has worked together for only a very short period of time and may not work well together as a management team.

***We have no long-term employment agreements in place with our executive officers.***

As of the date of this Prospectus we have no employment agreements or similar arrangements with our executive officers. If we fail to reach mutually satisfactory agreement with our executives, any one or more of such persons may terminate their association with the Company. The loss of any one or more of these experienced executives may have a material and adverse effect on our Company and its business prospects.

***Our business operations are dependent upon the ability of our new employees to learn their new roles.***

Until June 31, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" application for smartphone users that seeks to provide price comparison and bookings of available ridesharing and taxi services along with select limousine and other public and/or private transportation services ("Metasearch App"). On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry towards the vehicle rental business with a focus on developing the Rideshare Platform and our Fleet Management business.

In connection with the transition of our business operations, we have replaced many employees in key functions. As new employees gain experience in their roles, we could experience inefficiencies or a lack of business continuity due to loss of historical knowledge and a lack of familiarity of new employees with business processes, operating requirements, policies and procedures, some of which are new, and key information technologies and related infrastructure used in our day-to-day operations and financial reporting and we may experience additional costs as new employees learn their roles and gain necessary experience. It is important to our success that these new employees quickly adapt to and excel in their new roles. If they are unable to do so, our business and financial results could be materially adversely affected. In addition, if we were to lose the services of any one or more key employees, whether due to death, disability or termination of employment, our ability to successfully operate our business segments, financial plans, marketing and other objectives, could be significantly impaired.

***Raising additional capital by issuing additional securities may cause dilution to our current and future shareholders.***

We will need to, or desire to, raise substantial additional capital in the future. Our future capital requirements will depend on many factors, including, among others:

- Our degree of success in generating rental and servicing fees from both our Fleet Management business and the Rideshare Platform;

- The costs of establishing or acquiring sales, marketing, and distribution capabilities for our services;

18

- The extent to which we acquire or invest in businesses, products, or technologies, and other strategic relationships; and

- The costs of financing unanticipated working capital requirements and responding to competitive pressures.

If we raise additional funds by issuing equity or convertible debt securities, we will reduce the percentage of ownership of the then-existing shareholders, and the holders of those newly-issued equity or convertible debt securities may have rights, preferences, or privileges senior to those possessed by our then-existing shareholders. Additionally, future sales of a substantial number of shares of our common stock, or other equity-related securities in the public market could depress the market price of our common stock and impair our ability to raise capital through the sale of additional equity or equity-linked securities. We cannot predict the effect that future sales of our common stock, or other equity-related securities would have on the market price of our common stock at any given time.

### We are significantly influenced by our officers, directors and entities affiliated with them.

In the aggregate, ownership of the Company's shares of common stock by management and affiliated parties, assuming the sale of 1,650,000 shares of common stock owned as of record and beneficially by the Selling Securityholder to be registered under this prospectus, will represent approximately 55.96% of the issued and outstanding shares of common stock. These shareholders, if acting together, will be able to significantly influence all matters requiring approval by shareholders, including the election of directors and the approval of mergers or other business combinations transactions.

Our future performance is dependent on the ability to retain key personnel. The Company's performance is substantially dependent on the performance of senior management. The loss of the services of any of its executive officers or other key employees could have a material adverse effect on the Company's business, results of operations and financial condition.

### If our management is unable to accurately estimate future levels of rental activity and adjust the number and mix of vehicles used in our rental operations accordingly, our results of operations, financial condition, liquidity and cash flows could suffer.

Because vehicle costs typically represent our single largest expense and vehicle purchases are typically made weeks or months in advance of the expected use of the vehicle, our business is dependent upon the ability of our management to accurately estimate future levels of rental activity and consumer preferences with respect to the mix of vehicles used in our rental operations. To the extent we do not purchase sufficient numbers of vehicles, or the right types of vehicles, to meet consumer demand, we may lose revenue to our competitors. If we purchase too many vehicles, our vehicle utilization could be adversely affected and we may not be able to dispose of excess vehicles in a timely and cost-effective manner. If our management is unable to accurately estimate future levels of rental activity and determine the appropriate mix of vehicles used in our rental operations, including because of changes in the competitive environment or economic factors outside of our control, our results of operations, financial condition, liquidity and cash flows could suffer.

### We rely on third parties for important services.

We depend on third parties to provide us with services critical to our business. The failure of any of these third parties to adequately provide the needed services including, without limitation, standard passenger vehicles and vehicle leasing services, could have a material adverse effect on our business.

### Limitations of Director Liability and Indemnification of Directors and Officers and Employees.

Our Certificate of Incorporation limits the liability of directors to the maximum extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for breach of their fiduciary duties as directors, except for liability for any:

- breach of their duty of loyalty to us or our stockholders;

- act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- transactions for which the directors derived an improper personal benefit.

These limitations of liability do not apply to liabilities arising under the federal or state securities laws and do not affect the availability of equitable remedies such as injunctive relief or rescission. Our bylaws provide that we will indemnify our directors, officers and employees to the fullest extent permitted by law. Our bylaws also provide that we are obligated to advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding. We believe that these bylaw provisions are necessary to attract and retain qualified persons as directors and officers. The limitation of liability in our Certificate of Incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against directors and officers, even though an action, if successful, might provide a benefit to us and our stockholders. Our results of operations and financial condition may be harmed to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

### Risks of borrowing.

If we incur additional indebtedness, a portion of our future revenues will have to be dedicated to the payment of principal and interest on such indebtedness. Typical loan agreements also might contain restrictive covenants, which may impair our operating flexibility. Such loan agreements would also provide for default under certain circumstances, such as failure to meet certain financial covenants. A default under a loan agreement could result in the loan becoming immediately due and payable and, if unpaid, a judgment in favor of such lender which would be senior to our rights. A judgment creditor would have the right to foreclose on any of our assets resulting in a material adverse effect on our business, ability to generate revenue, operating results or financial condition.

### Unanticipated obstacles to the operations of our business segments.

Many of our potential business endeavors are capital intensive and may be subject to statutory or regulatory requirements. The Board of Directors believes that the chosen operations and strategies are achievable in light of current economic and legal conditions with the skills, background, and knowledge of our principals and advisors. The Board of Directors reserve the right to make significant modifications to our stated strategies depending on future events.

### Controlling shareholder.

As of the date of this prospectus, our founder, director and chief executive officer, Ramy El-Batrawi, owned approximately 58.62% of our outstanding common stock shares. Common stock beneficially owned by Ramy El-Batrawi are held of record by X, LLC, which is an entity that is wholly-owned and controlled by Ramy El-Batrawi, the Company's founder, Chief Executive Officer and Director. As a result, Mr. El-Batrawi will be able to control any vote of our shareholders which may be required for the foreseeable future.

### Risks of operations.

Our operating results may be volatile, difficult to predict and may fluctuate significantly in the future due to a variety of factors, many of which may be outside of our control. Due to the nature of our target market, we may be unable to accurately forecast our future revenues and operating results. There are no assurances that we can generate significant revenue or achieve profitability. We anticipate having a sizeable amount of fixed expenses, and we expect to incur losses due to the execution of our business strategy, continued development efforts and related expenses. As a result, we will need to generate significant revenues while containing costs and operating expenses if we are to achieve profitability. We cannot be certain that we will ever achieve sufficient revenue levels to achieve profitability.

*Minimal employees or infrastructure.*

We will have a small number of employees and we don't have any operational infrastructure or prior operating history. We intend to rely on our management team, our advisors, third-party consultants, outside attorneys, advisors, accountants, auditors, and other administrators. The loss of services of any of such personnel may have a material adverse effect on our business and operations and there can be no assurance that if any or all of such personnel were to become unavailable, that qualified successors can be found, on acceptable terms.

*Limitation on remedies; indemnification.*

Our Certificate of Incorporation, as amended from time to time, provides that officers, directors, employees and other agents and their affiliates shall only be liable to the Company and its shareholders for losses, judgments, liabilities and expenses that result from the fraud or other breach of fiduciary obligations. Additionally, we intend to enter into corporate indemnification agreements with each of our officers and directors consistent with industry practice. Thus, certain alleged errors or omissions might not be actionable by the Company. Our governing instruments also provide that, under the broadest circumstances allowed under law, we must indemnify its officers, directors, employees and other agents and their affiliates for losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them in connection with the Company, including liabilities under applicable securities laws.

*No dividends or return of profits.*

We have not had any profits from any operations to date. We have never declared or paid any cash dividends on our common stock. We currently intend to retain future earnings, if any, to finance the expansion of our operations. As a result, we do not anticipate paying any cash dividends in the foreseeable future.

*We may fail to respond adequately to changes in technology and customer demands.*

In recent years our industry has been characterized by rapid changes in technology and customer demands. For example, in recent years, industry participants have taken advantage of new technologies to improve vehicle utilization, decrease customer wait times and improve customer satisfaction. Our industry has also seen the entry of new competitors whose businesses and efforts continue to introduce various types of self-driving vehicles. Our ability to continually improve our current processes, products and offerings in response to changes in technology is essential in maintaining our competitive position and maintaining current levels of customer satisfaction. We may experience technical or other difficulties that could delay or prevent the development, introduction or marketing of new products or enhanced product offerings.

*Force Majeure.*

Our business is uniquely susceptible to unforeseen delays or failures that are caused by forces of nature and related circumstances. These factors are outside and beyond our control. Delay or failure may be due to any act of God, fire, war, terrorism, flood, strike, labor dispute, disaster, transportation or laboratory difficulties or any similar or dissimilar event beyond our control. We will not be held liable to any shareholder in the event of any such failure.

*We may not be able to manage our growth effectively.*

Our growth is expected to place, a significant strain on our managerial, operational and financial resources. As the number of our users, partners and other business partners grows, we must increasingly manage multiple relationships with various customers, strategic partners and other third parties. There can be no assurance that our systems, procedures or controls will be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully grow and scale our services, products and offerings. Our operating results will also depend on our ability to expand sales and marketing commensurate with the growth of our business and the ridesharing industry. If we are unable to manage growth effectively, our business, results of operations and financial condition will be adversely affected.

*Maintaining favorable brand recognition is essential to our success, and failure to do so could materially adversely affect our results of operations, financial condition, liquidity and cash flows.*

Our business is heavily dependent upon the favorable brand recognition that our "YayYo", "Distinct Cars" and "Rideshare" brand names have in the markets in which they participate. Factors affecting brand recognition are often outside our control, and our efforts to maintain or enhance favorable brand recognition, such as marketing and advertising campaigns, may not have their desired effects. In addition, it may be difficult to monitor or enforce such requirements, particularly in foreign jurisdictions and various laws may limit our ability to enforce the terms of these agreements or to terminate the agreements. Any decline in perceived favorable recognition of our brands could materially adversely affect our results of operations, financial condition, liquidity and cash flows.

*Changes in U.S., global or regional economic conditions.*

A decrease in economic activity in the United States or in other regions of the world in which we plan to operate our Fleet Management business segment, Rideshare Platform and related services could adversely affect demand, thus reducing our ability to generate revenue. A decline in economic conditions could reduce our users interest in utilizing our products and services. In addition, an increase in price levels generally, or in price levels in a particular sector such as the fuel sector, could result in a shift in consumer demand away from ridesharing services, which could also adversely affect our revenues and, at the same time, increase our costs.

In the car rental business, a decline in economic activity typically results in a decline in both business and leisure travel and, accordingly, a decline in the volume of car rental transactions. In the equipment rental business, a decline in economic activity typically results in a decline in activity in non-residential construction and other businesses in which our equipment rental customers operate and, therefore, results in a decline in the volume of equipment rental transactions. In the case of a decline in car or equipment rental activity, we may reduce rental rates to meet competitive pressures, which could have a material adverse effect on our results of operations. A decline in economic activity also may have a material adverse effect on residual values realized on the disposition of our revenue earning cars and/or equipment.

*We are a "controlled company" within the meaning of the Nasdaq listing standards and, as a result, will qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.*

Upon the completion of this offering, Ramy El-Batrawi, our founder, chief executive officer and director will continue to control a majority of the voting power of our common stock. For more information see "*Principal Stockholders*" below. As a result, we are a "controlled company" within the meaning of the Nasdaq listing standards. Under these rules, a company of which more than 50% of the voting power is held by an individual, a group or another company is a "controlled company" and may elect not to comply with certain corporate governance requirements of Nasdaq, including (1) the requirement that a majority of the board of directors consist of independent directors, (2) the requirement that we have a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and (3) the requirement that we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities. Following this offering, we intend to rely on some or all of these exemptions. Accordingly, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of Nasdaq.

**Risks Relating to Our Business and Industry.**

*If our efforts to attract prospective customers to our Fleet Management business and Rideshare Platform are not successful, or we fail to retain customers or continue attracting existing customers to our products and services, our growth prospects and revenue will be adversely affected.*

Our ability to grow our business and generate revenue depends on retaining and expanding our total customer base, increasing revenue by effectively monetizing our Rideshare Platform user base, and increasing the number of customers to our Fleet Management business. We must convince prospective customers of the benefits of our ridesharing vehicle rental services and equipment offerings and our existing users of the continuing value of our products and services, including our Rideshare Platform. Our ability to attract new users and customers, retain existing users and customers. If we fail to keep pace with competing offerings or technological advancements to the ridesharing industry or fail to offer compelling product offerings and state-of-the-art delivery for our Rideshare Platform to meet consumer demands, our ability to grow or sustain the reach of our product and service offerings, attract and retain users and customers may be adversely affected.

*We have no control over the Vehicle Registration Requirements or such other ridesharing vehicle requirements imposed by the major TNC providers, and our business may be adversely affected in the event that TNC providers restrict or limit prospective ridesharing drivers from utilizing or registering rental vehicles with the TNC.*

We rely on the major TNC businesses that drive and service the ridesharing economy, over whom we have no control, to impose the Vehicle Registration Requirements and permit prospective ridesharing drivers to utilize lease or rental vehicles, such as our product offerings, under their employment with the major TNC ridesharing services. We cannot guarantee that each major TNC business will always permit prospective ridesharing drivers to use third-party lease or rental vehicles under their employment agreement with the TNC.

Our business may be adversely affected if our ability to rent vehicles maintained under our Fleet Management business is limited, impaired or delayed because of a modification to the Vehicle Registration Requirements or any similar prohibition that prevents prospective ridesharing drivers from renting our Fleet Management vehicles or other third-party vehicle rentals for use under the terms of the prospective ridesharing drivers agreement with such TNC businesses.

***We face risks of increased costs of cars, including as a result of limited supplies of competitively priced cars.***

As of May 30, 2018, we manage a fleet of approximately 185 vehicles, all of which are under a lease contract with District Cars and financed by ACME Auto Leasing, LLC. In recent years, the average cost of new cars has increased. The Company has entered into a commercial partnership program with Penske Automotive for purposes of providing fleet management and vehicle delivery services to the Company. As of the date of this prospectus, we have financed the purchase and leasing of the Hyundai cars that we rent from ACME Auto Leasing. Under the terms of a commercial partnership program, Hyundai USA has agreed to extend fleet program competitive pricing options below manufactures suggested retail prices ("MSRP") on all Hyundai vehicles purchased through selected dealerships. We cannot assure you that we will be able to maintain membership in the Hyundai commercial partnership program or continue receiving competitive pricing options below MSRP rates on all Hyundai vehicles purchased. If Hyundai USA cancels the commercial partnership program or does not offer us competitive terms and conditions, and we are not able to purchase sufficient quantities of cars from other automobile manufacturers on competitive terms and conditions or below MSRP rates, then we may be forced to purchase cars at higher prices, or on terms less competitive, than for cars purchased by our competitors. In addition, certain car manufacturers, such as Ford, have adopted strategies to de-emphasize sales to the car rental industry which they view as less profitable due to historical sales incentive and other discount programs that tended to lower the average cost of cars for fleet purchasers such as us. Reduced or limited supplies of equipment together with increased prices are risks that we also face in our equipment rental business. We cannot offer assurance that we will be able to pass on increased costs of cars or equipment to our rental customers. Failure to pass on significant cost increases to our customers would have a material adverse impact on our results of operations and financial condition.

***Fluctuations in fuel costs or reduced supplies could harm our business.***

We could be adversely affected by limitations on fuel supplies, the imposition of mandatory allocations or rationing of fuel or significant increases in fuel prices. A severe or protracted disruption of fuel supplies or significant increases in fuel prices could have a material adverse effect on our financial condition and results of operations, either by directly interfering with our normal activities or by disrupting the air travel on which a significant portion of our car rental business relies.

***The concentration of our reservations, accounting and information technology functions at a limited number of facilities in California creates risks for us.***

We have concentrated our reservations functions for the United States in one office location in Los Angeles, California, and we have concentrated our accounting functions for the United States in one office location in Los Angeles. In addition, our major information systems are centralized in our office location in Los Angeles. A disruption of normal business at any of our principal office location in Los Angeles, California, whether as the result of localized conditions (such as a fire or explosion) or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and systems activities.

***We face risks arising from our heavy reliance on communications networks and centralized information systems.***

We rely heavily on information systems to accept reservations, process rental and sales transactions, manage our fleets of cars and equipment, account for our activities and otherwise conduct our business. We have centralized our information systems in one office location in Los Angeles, California, and we rely on communications service providers to link our systems with the business locations these systems serve. A simultaneous loss of both facilities, or a major disruption of communications between the systems and the locations they serve, could cause a loss of reservations, interfere with our ability to manage our fleet, slow rental and sales processes and otherwise materially adversely affect our ability to manage our business effectively. Our systems back-up plans, business continuity plans and insurance programs are designed to mitigate such a risk, not to eliminate it. In addition, because our systems contain information about individuals and businesses, our failure to maintain the security of the data we hold, whether the result of our own error or the malfeasance or errors of others, could harm our reputation or give rise to legal liabilities leading to lower revenues, increased costs and other material adverse effects on our results of operations.

***The misuse or theft of information we possess could harm our reputation or competitive position, adversely affect the price at which shares of our common stock trade or give rise to material liabilities.***

We possess non-public information with respect to individuals, including our customers and our current and former employees, and businesses, as well as non-public information with respect to our own affairs. The misuse or theft of that information by either our employees or third parties could result in material damage to our brand, reputation or competitive position or materially affect the price at which shares of our common stock trade. In addition, depending on the type of information involved, the nature of our relationship with the person or entity to which the information relates, the cause and the jurisdiction whose laws are applicable, that misuse or theft of information could result in governmental investigations or material civil or criminal liability. The laws that would be applicable to such a failure are rapidly evolving and becoming more burdensome.

***If we acquire any businesses in the future, they could prove difficult to integrate, disrupt our business, or have an adverse effect on our results of operations.***

We intend to pursue growth primarily through internal growth, but from time to time we may consider opportunistic acquisitions which may be significant. Any future acquisition would involve numerous risks including, without limitation:

- potential disruption of our ongoing business and distraction of management;

- difficulty integrating the acquired business; and

- exposure to unknown liabilities, including litigation against the companies we may acquire.

If we make acquisitions in the future, acquisition-related accounting charges may affect our balance sheet and results of operations. In addition, the financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. We may not be successful in addressing these risks or any other problems encountered in connection with any acquisitions.

***Our business is seasonal, and a disruption in rental activity during our peak season could materially adversely affect our results of operations.***

Certain significant components of our expenses, including real estate taxes, rent, utilities, maintenance and other facility-related expenses, the costs of operating our information systems and minimum staffing costs, are fixed in the short-run. Seasonal changes in our revenues do not alter those fixed expenses, typically resulting in higher profitability in periods when our revenues are higher and lower profitability in periods when our revenues are lower. The Company believes that the second and third quarters of the year will be stronger quarters due to their increased levels of leisure travel and construction activity. Any occurrence that disrupts rental activity during the second or third quarters could have a disproportionately material adverse effect on our liquidity and/or results of operations.

***We may be unable to maintain or establish relationships with third-party partners, ridesharing services or technology providers, which could limit the information we are able to provide to users.***

We anticipate that the demand for our products and services will be dependent on key relationships with ridesharing services and other industry providers. We will seek to develop and maintain relationships with ridesharing industry providers. For example, our former business plan involving the Metasearch App was completely abandoned by the Company on account of missing application programming interface ("API") access that was being withheld and restricted by certain ridesharing services and technology providers. Due to the fact that ridesharing industry leaders, such Uber and Lyft, have been reluctant to provide the Company with API access for purposes of supporting the Metasearch App, the Company subsequently modified its business plan and developed its operating business segments. This modification and change was primarily due to the API issue, which the Company believes to be the result of a failure to establish and maintain a pre-existing relationship with these pivotal third-party providers.

*If we do not continue to innovate and provide tools and services that are useful to travelers, we may not remain competitive, and our revenues and operating results could suffer.*

Our success depends on continued innovation to provide features, products and services that make our websites, Fleet Management business and Rideshare Platform attractive to consumers. Our competitors are constantly developing innovations in related services and features. As a result, we must continue to invest significant resources in research and development in order to continually improve our products, services and offerings. If we are unable to continue offering attractive products and services, we may be unable to attract additional users or retain our current users, which could adversely affect our business, results of operations and financial condition. Furthermore, we may develop new products or launch additional services that may require us to compete directly with other much larger more established companies in the ridesharing industry, which could, result in new or unique challenges in maintaining and operating our Fleet Management business, Rideshare Platform and maintaining key relationships in the ridesharing industry required for our operating business to properly and efficiently function.

*We rely on the performance of highly skilled personnel, including senior management and our technology professionals, and if we are unable to retain or motivate key personnel or hire, retain and motivate qualified personnel, our business would be harmed.*

We believe our success has depended, and continues to depend, on the efforts and talents of our senior management and our skilled team members. Our future success depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially adversely affect our ability to build on the efforts they have undertaken and to execute and operate our business segments, and we may not be able to find adequate replacements. We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees.

*Competition for well-qualified employees in all aspects of our business, including software engineers and other technology professionals, is intense both in the U.S. and abroad.*

Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate existing employees. Software engineers and technology professionals are key individuals in designing the code and algorithms necessary to our Rideshare Platform. Therefore, our ability to attract top talent and experienced engineers and technology professional is important to our success. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business would be adversely affected.

*Governmental regulation and associated legal uncertainties could limit our ability to expand our product offerings or enter into new markets and could require us to expend significant resources, including the attention of our management, to review and comply with such regulations.*

Elements of the ridesharing industry are currently or will be regulated by Federal, state, city and/or local governments, and our ability to provide these services is and will continue to be affected by government regulations. The implementation of unfavorable regulations or unfavorable interpretations of existing regulations by courts or regulatory bodies with respect to the ridesharing industry or "*Transportation Network Companies*" ("TNC") could require us to incur significant compliance costs, cause the development of the affected markets to become impractical and otherwise have a material adverse effect on our business, results of operations and financial condition. Moreover, in the future, we may elect to add services or products to our business plan that compete directly with ridesharing services, such as Uber and Lyft, which could expose us to additional regulations, compliance obligations and legal challenges. In addition, our business strategy involves expansion into regions around the world, many of which have different legislation, regulatory environments, tax laws and levels of political stability. Compliance with foreign legal, governmental, regulatory or tax requirements will place demands on our time and resources, and we may nonetheless experience unforeseen and potentially adverse legal, regulatory or tax consequences. It is intended that our business will assist with the processing of customer credit card transactions which would result in us receiving and storing personally identifiable information. This information is increasingly subject to legislation and regulations in numerous jurisdictions around the world. This legislation and regulation is generally intended to protect the privacy and security of personal information, including credit card information, that is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if government regulations require TNCs, and as a result, us to significantly change our business practices with respect to this type of information.

***We may not be able to adequately protect our intellectual property, which could harm the value of our brands and adversely affect our business.***

We believe that intellectual property will be critical to our success, and that we will rely on trademark, copyright and patent law, trade secret protection and confidentiality and/or license agreements to protect our proprietary rights. If we are not successful in protecting our intellectual property, it could have a material adverse effect on our business, results of operations and financial condition. While we believe that we will be issued trademarks, copyrights and other intellectual property to protect our business, there can be no assurance that our operations do not, or will not, infringe valid, enforceable third-party patents of third parties or that competitors will not devise new methods of competing with us that are not covered by our anticipated patent applications. Moreover, it is intended that we will rely on intellectual property and technology developed or licensed by third parties, and we may not be able to obtain or continue to obtain licenses and technologies from these third parties at all or on reasonable terms. Effective trademark, service mark, copyright and trade secret protection may not be available in every country in which our intended services will be provided. The laws of certain countries do not protect proprietary rights to the same extent as the laws of the U.S. and, therefore, in certain jurisdictions, we may be unable to protect our proprietary technology adequately against unauthorized third party copying or use, which could adversely affect our competitive position. We may license in the future, certain proprietary rights, such as trademarks or copyrighted material, to third parties. These licensees may take actions that might diminish the value of our proprietary rights or harm our reputation, even if we have agreements prohibiting such activity. Also, to the extent third parties are obligated to indemnify us for breaches of our intellectual property rights, these third parties may be unable to meet these obligations. Any of these events could have a material adverse effect on our business, results of operations or financial condition.

***Confidentiality agreements with employees and others may not adequately prevent disclosure of trade secrets and other proprietary information.***

We anticipate that a substantial amount of our processes and technologies will be protected by trade secret laws. In order to protect these technologies and processes, we intend to rely in part on confidentiality agreements with our employees, licensees, independent contractors and other advisors. These agreements may not effectively prevent disclosure of confidential information, including trade secrets, and may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. In addition, others may independently discover our trade secrets and proprietary information, and in such cases, we could not assert any trade secret rights against such parties. To the extent that our employees, contractors or other third parties with which we do business use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. Laws regarding trade secret rights in certain markets in which we operate may afford little or no protection to our trade secrets. The loss of trade secret protection could make it easier for third parties to compete with our products, services by copying functionality, among other things. In addition, any changes in, or unexpected interpretations of, the trade secret and other intellectual property laws in any country in which we operate may compromise our ability to enforce our trade secret and intellectual property rights. Costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights, and failure to obtain or maintain trade secret protection could adversely affect our business, revenue, reputation and competitive position.

*Our business is heavily reliant upon communications networks and centralized information technology systems and the concentration of our systems creates risks for us.*

We rely heavily on communication networks and information technology systems to accept reservations, process rental and sales transactions, manage our pricing, manage our revenue earning vehicles, manage our financing arrangements, account for our activities and otherwise conduct our business. Our reliance on these networks and systems exposes us to various risks that could cause a loss of reservations, interfere with our ability to manage our vehicles, slow rental and sales processes, adversely affect our ability to comply with our financing arrangements and otherwise materially adversely affect our ability to manage our business effectively. Our major information technology systems, reservations and accounting functions are centralized in a few locations worldwide. Any disruption, termination or substandard provision of these services, whether as the result of localized conditions (such as a fire, explosion or hacking), failure of our systems to function as designed, or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and information technology functions or by eliminating access to financing arrangements. Any disruption or poor performance of our systems could lead to lower revenues, increased costs or other material adverse effects on our results of operations, financial condition, liquidity or cash flows.

*Defects in our Rideshare Platform and its functionality and the technology powering our custom development services may adversely affect our business.*

It is anticipated that the tools, code, subroutines and processes contained within our Rideshare Platform or the technology powering our custom development services may contain defects when introduced and also when updates and new versions are released. The introduction of our Rideshare Platform or custom development services with defects or quality problems may result in adverse publicity, product returns, reduced orders, uncollectible or delayed accounts receivable, product redevelopment costs, loss of or delay in market acceptance of our products or claims by customers or others against us. Such problems or claims may have a material and adverse effect on our business, prospects, financial condition and results of operations.

*Manufacturer safety recalls could create risks to our business.*

Our Fleet Management vehicles may be subject to safety recalls by their manufacturers. The Raechel and Jacqueline Houck Safe Rental Car Act of 2015 prohibits us from renting vehicles with open federal safety recalls and to repair or address these recalls prior to renting or selling the vehicle. Any federal safety recall with respect to our vehicles would require us to decline to rent recalled vehicles until we can arrange for the steps described in the recall to be taken. If a large number of vehicles are the subject of a recall or if needed replacement parts are not in adequate supply, we may not be able to rent recalled vehicles for a significant period of time. Those types of disruptions could jeopardize our ability to fulfill existing contractual commitments or satisfy demand for our vehicles and could also result in the loss of business to our competitors. Depending on the severity of any recall, it could materially adversely affect our revenues, create customer service problems, reduce the residual value of the recalled vehicles and harm our general reputation.

*If we are unable to purchase adequate supplies of competitively priced vehicles and the cost of the vehicles we purchase increases, our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.*

The price and other terms at which we can acquire vehicles vary based on market and other conditions. For example, certain vehicle manufacturers have in the past, and may in the future, utilize strategies to de-emphasize sales to the vehicle rental industry, which can negatively impact our ability to obtain vehicles on competitive terms and conditions. Consequently, there is no guarantee that we can purchase a sufficient number of vehicles at competitive prices and on competitive terms and conditions. If we are unable to obtain an adequate supply of vehicles, or if we obtain less favorable pricing and other terms when we acquire vehicles and are unable to pass on any increased costs to our customers, then our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.

*If third parties claim that we infringe their intellectual property, it may result in costly litigation.*

We cannot assure you that third parties will not claim our current or future products or services infringe their intellectual property rights. Any such claims, with or without merit, could cause costly litigation that could consume significant management time. As the number of product and services offerings in the ridesharing industry increases and functionalities increasingly overlap, companies such as ours may become increasingly subject to infringement claims. Such claims also might require us to enter into royalty or license agreements. If required, we may not be able to obtain such royalty or license agreements or obtain them on terms acceptable to us.

***Failure to comply with federal and state privacy laws and regulations, or the expansion of current or the enactment of new privacy laws or regulations, could adversely affect our business.***

A variety of federal and state laws and regulations govern the collection, use, retention, sharing and security of consumer data. The existing privacy-related laws and regulations are evolving and subject to potentially differing interpretations. In addition, various federal, state and foreign legislative and regulatory bodies may expand current or enact new laws regarding privacy matters. Further, several states have adopted legislation that requires businesses to implement and maintain reasonable security procedures and practices to protect sensitive personal information and to provide notice to consumers in the event of a security breach. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or orders or other federal, state or international privacy or consumer protection-related laws, regulations or industry self-regulatory principles could result in claims, proceedings or actions against us by governmental entities or others or other liabilities, which could adversely affect our business. In addition, a failure or perceived failure to comply with industry standards or with our own privacy policies and practices could adversely affect our business. Federal and state governmental authorities continue to evaluate the privacy implications inherent in the use of third-party web "*cookies*" for behavioral advertising. The regulation of these cookies and other current online advertising practices could adversely affect our business.

***Our business model is entirely dependent on the continued success and viability of the ridesharing industry and "transportation network companies", and we may become subject to government regulation and legal uncertainties that could reduce demand for our products and services or increase the cost of doing business, thereby adversely affecting our ability to generate revenues.***

The past year has seen a boom in the number of ridesharing companies that allow customers to order rides on demand using apps on their smartphones. Private drivers use their personal automobiles to pick up the customers and drive them to the desired destination in exchange for a negotiated fee. The passengers then write reviews, similar to other peer-to-peer online services. Large amounts of venture capital and private equity has been invested in a handful of these new companies, which have the potential to disrupt the traditional transportation industry. However, the ridesharing marketplace has come under increased scrutiny from governments and various interested groups (such as taxi drivers, taxi companies, environmentalists, etc.) have continuously opposed the proliferation of ridesharing services in recent years. Despite opposition from many of these interested groups and governmental agencies, on September 19, 2013, the California Public Utilities Commission ("CPUC") voted unanimously to allow these ridesharing services to operate in California as a new category of business called "*transportation network companies*" ("TNC").

In California, licenses will be issued to qualifying TNCs, subject to new regulations that require drivers to undergo criminal background checks and vehicle inspections, receive driver training, follow a zero-tolerance policy on drugs and alcohol, and carry insurance policies with a minimum of $1 Million in liability coverage. Some of the companies that are expected to receive new TNC licenses include Lyft (www.lyft.me), SideCar (www.side.cr) and UberX (www.uber.com). The CPUC has responded to rapidly evolving disruptive technology and its decision will likely set an example for cities and states across the country. Its decision is also expected to preempt ongoing efforts by some California cities to regulate or ban peer-to-peer ridesharing under their authority to license taxi companies. The City of Los Angeles, however, is currently considering a possible appeal of the CPUC decision and implementing additional regulations to TNC drivers, which have been referred to as "*Bandit cabs*" by some on the City Council. Other cities across the country are also now looking at new regulations for Rideshare companies.

28

As can be gleaned from these recent events around the ridesharing industry, this new business model is not without its opponents. Some raise concerns about public safety and the potential for abuse or unintended consequences, while others question whether the new regulations require additional enforcement capability. The taxi industry, which is less than pleased to see this new competition, has criticized these ridesharing apps as operating essentially like unlicensed taxi cabs. Since the new technology uses GPS to measure the distance of a ride and the corresponding fee, the taxi industry believes that it works similarly to a taxi meter and should therefore comply with local taxi ordinances. Some of the primary concerns raised by skeptics include how liability will be allocated between the TNC and its independent contractor driver, and how the insurance industry will adapt to this new business. Proper hiring practices, training and oversight by the TNC also will be necessary to ensure public safety. The extent to which the TNCs will be inspected and the new regulations enforced is still unclear, but this will be an important means by which the public may judge the safety of this new industry. Based on the direction states and cities are heading with respect to the governance of TNCs or ridesharing services, and the ever increasing popularity and use of ridesharing services and TNCs, it is likely that a number of laws and regulations will become applicable to us or the TNCs which we rely upon for the operation of products and related services or may be adopted in the future with respect to mobile applications and/or TNCs covering issues such as: (i) liability, (ii) unionization, (iii) rules and standards for drivers, vehicles, and passenger safety, (iv) licensing and insurance requirements, and (v) environmental concerns, among others. It is difficult to predict how existing laws will be applied to our business and the new laws and regulations to which we and/or ridesharing services will likely become subject. If ridesharing services are not able to comply with these laws or regulations or if we become liable under these laws or regulations, we could be directly harmed, and we may be forced to implement new measures to sustain our operating business segments. We anticipate that scrutiny and regulation of the ridesharing industry will increase and we will be required to devote legal and other resources to addressing such regulation, either directly or indirectly. Changes to these laws intended to address these issues, including some recently proposed changes, could create uncertainty in the marketplace. Such uncertainty could reduce demand for our services or increase the cost of doing business due to increased costs of litigation or increased service or operating costs.

***We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business financial condition and results of operations.***

We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business, financial condition and results of operations. We anticipate accepting payment from our users primarily through credit card transactions and certain online payment service providers. The ability to access credit card information on a real time-basis without having to proactively reach out to the consumer each time we process an auto-renewal payment or a payment for the purchase of a premium feature on any of our dating products is critical to our success. When we or a third party experiences a data security breach involving credit card information, affected cardholders will often cancel their credit cards. In the case of a breach experienced by a third party, the more sizable the third party's customer base and the greater the number of credit card accounts impacted, the more likely it is that our users would be impacted by such a breach. To the extent our users are ever affected by such a breach experienced by us or a third party, affected users would need to be contacted to obtain new credit card information and process any pending transactions. It is likely that we would not be able to reach all affected users, and even if we could, some users' new credit card information may not be obtained and some pending transactions may not be processed, which could adversely affect our business, financial condition and results of operations. Even if our users are not directly impacted by a given data security breach, they may lose confidence in the ability of service providers to protect their personal information generally, which could cause them to stop using their credit cards online and choose alternative payment methods that are not as convenient for us or restrict our ability to process payments without significant user effort. Additionally, if we fail to adequately prevent fraudulent credit card transactions, we may face civil liability, diminished public perception of our security measures and significantly higher credit card-related costs, any of which could adversely affect our business, financial condition and results of operations. Finally, the passage or adoption of any legislation or regulation affecting the ability of service providers to periodically charge consumers for recurring membership payments may adversely affect our business, financial condition and results of operations.

***We depend upon intellectual property and proprietary rights that are vulnerable to unauthorized use.***

We rely on a combination of copyright and trademark laws, trade secrets, software security measures, license agreements and nondisclosure agreements to protect our proprietary information. Our success will depend, in part, on our ability to operate without infringing the patent or other proprietary rights of others and our ability to preserve our trade secrets and other proprietary property, including our rights in any technology licenses upon which any of our products or services are based. Our inability to preserve such rights properly or operate without infringing on such rights would have a material adverse effect on our business, results of operations and financial condition. We currently do not own any registered copyrights, patents or patent applications pending. It may be possible for unauthorized third parties to copy aspects of, or otherwise obtain and use, our proprietary information without authorization. In addition, there can be no assurance that any confidentiality agreements between us and our employees, or any license agreements with our customers, will provide meaningful protection for our proprietary information in the event of any unauthorized use or disclosure of such proprietary information.

***We may not be able to keep up with rapid technological changes.***

To remain competitive, we must continue to enhance and improve the usability, functionality, and features of our Rideshare Platform and related services. The evolving nature of the ridesharing industry, transportation network companies, telecommunications, apps, and mobile based services, which is characterized by rapid technological change, changes in user and customer requirements and preferences, frequent new product and service introductions and the emergence of new industry standards and practices, could render our existing systems, app and services obsolete. Our success will depend, in part, on our ability to develop, innovate, license or acquire leading technologies useful in our business, enhance our existing solutions, develop new solutions and technology that address the increasingly sophisticated and varied needs of our current and prospective users, and respond to technological advances and emerging industry and regulatory standards and practices in a cost-effective and timely manner. Future advances in technology may not be beneficial to, or compatible with, our business. Furthermore, we may not successfully use new technologies effectively or adapt our proprietary technology and app to user requirements or emerging industry standards on a timely basis. Our ability to remain technologically competitive may require substantial expenditures and lead time. If we are unable to adapt in a timely manner to changing market conditions or user requirements, our business, financial condition and results of operations could be seriously harmed.

***We depend on the continued growth and reliability of the internet, global positioning systems, ridesharing services and apps***.

The recent growth in the use of apps and ridesharing services may cause periods of decreased performance for many ridesharing services, internet providers, apps and related service providers. If app and ridesharing usage continues to grow rapidly, the infrastructure these services are reliant upon (i.e. the internet, global positioning systems, and telecommunications networks and devices) may not be able to support these demands and therefore performance and reliability may decline. Decreased performance with respect to some or all of these critical components of our business model has also been attributed to illegal attacks by third parties. If outages or delays occur frequently or increase in frequency, or businesses are not able to protect themselves adequately from such illegal attacks, the market for mobile apps, ridesharing services and related technologies could grow more slowly or decline, which may reduce the demand for our Rideshare Platform and related services.

***Our business is dependent upon consumers renting our Fleet Management vehicles, using our Rideshare Platform and related services and if we fail to obtain broad adoption, our business would be adversely affected.***

Our success will depend on our ability to monetize our fleet of vehicles and our Rideshare Platform, ensuring our Rideshare Platform is fully functional and reliable as intended, operate and educate consumers regarding the benefits of renting vehicles for ridesharing opportunities, and persuade them to adopt YayYo! and/or "Rideshare" as their "*go to*" ridesharing vehicle rental service provider. We do not know if our products and services will be successful over the long term and market acceptance may be hindered if our Rideshare platform doesn't function efficiently and/or our user experience isn't compelling and financially beneficial to our users. If consumers do not adopt and use our Rideshare Platform and related services, we will not be able to generate revenues and our financial condition will suffer as a result.

30

*International expansion of our business exposes us to market, regulatory, political, operational, financial and economic risks associated with doing business outside of the United States.*

Our business strategy includes eventual international expansion. Adapting our Rideshare Platform to function internationally and doing business internationally involves a number of risks, including: (i) multiple, conflicting and changing laws and regulations such as tax laws, privacy laws, export and import restrictions, employment laws, regulatory requirements and other governmental approvals, permits and licenses; (ii) obtaining regulatory approvals where required; (iii) requirements to maintain data and the processing of that data on servers located within such countries; (iv) complexities associated with managing multiple payment processing methods and multiple ridesharing service providers; (v) natural disasters, political and economic instability, including wars, terrorism, political unrest, outbreak of disease, protests, boycotts, curtailment of trade and other market restrictions; and (vi) regulatory and compliance risks that relate to maintaining accurate information and control over activities subject to regulation under the United States Foreign Corrupt Practices Act of 1977 ("FCPA"), U.K. Bribery Act of 2010 and comparable laws and regulations in other countries. Any of these factors could significantly harm our future international expansion and operations and, consequently, our ability to generate revenue and results of operations.

*Security breaches, loss of data and other disruptions could compromise sensitive information related to our business or users or prevent us from accessing critical information and expose us to liability, which could adversely affect our business and our reputation.*

In the ordinary course of our business, we and our third-party billing and collections providers and ridesharing service partners may collect and store sensitive data, including legally-protected personal information. We may also process and store and use additional third-parties to process and store, sensitive intellectual property and other proprietary business information, including that of our customers and collaborative partners. While we intend to implemented data privacy and security measures that will be compliant with applicable privacy laws and regulations, future security breaches could subject us to liability for violations of various laws, rules or regulations, civil liability, government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

*We may become a party to intellectual property litigation or administrative proceedings that could be costly and could interfere with our ability to focus on our operating business segments.*

The technology industry has been characterized by extensive litigation regarding patents, trademarks, trade secrets, and other intellectual property rights, and companies in the industry have used intellectual property litigation to gain a competitive advantage. It is possible that U.S. and foreign patents and pending patent applications or trademarks controlled by third parties may be alleged to cover our products or services, or that we may be accused of misappropriating third parties' trade secrets. Additionally, our products may include hardware and software components that we purchase from vendors and may include design components that are outside of our direct control. Our competitors, many of which have substantially greater resources and have made substantial investments in patent portfolios, trade secrets, trademarks, and competing technologies, may have applied for or obtained, or may in the future apply for or obtain, patents or trademarks that will prevent, limit or otherwise interfere with our ability to make, use, sell and/or export our products and services or to use product names. We may become a party to patent or trademark infringement or trade secret related disputes or litigation as a result of these and other third party intellectual property rights being asserted against us. The defense and prosecution of these matters are both costly and time consuming. Vendors from whom we purchase hardware or software may not indemnify us in the event that such hardware or software is accused of infringing a third party's patent or trademark or of misappropriating a third party's trade secret.

Further, if such patents, trademarks, or trade secrets are successfully asserted against us, this may harm our business and result in injunctions preventing us from selling our products, license fees, damages and the payment of attorney fees and court costs. In addition, if we are found to willfully infringe third party patents or trademarks or to have misappropriated trade secrets, we could be required to pay treble damages in addition to other penalties. Although patent, trademark, trade secret, and other intellectual property disputes in the technology industry have often been settled through licensing or similar arrangements, costs associated with such arrangements may be substantial and could include ongoing royalties. We may be unable to obtain necessary licenses on satisfactory terms, if at all. If we do not obtain necessary licenses, we may not be able to redesign our Rideshare Platform or related services in order to avoid infringement.

Additionally, in the future we may need to commence proceedings against others to enforce our patents or trademarks, if applicable, or to protect our copyrights, trade secrets or know how, trade secrets or know how, or to determine the enforceability, scope and validity of the proprietary rights of others. These proceedings would result in substantial expense to us and significant diversion of effort by our technical and management personnel. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful. We may not be able to stop a competitor from marketing and selling products that are the same or similar to our products and services or from using product or service names that are the same or similar to ours, and our business may be harmed as a result.

We may face claims from companies that incorporate open source software into their products or from open source licensors, claiming ownership of, or demanding release of, the source code, the open source software or derivative works that were developed using such software, or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to cease offering our Rideshare Platform unless and until we can re-engineer it to avoid infringement. This re-engineering process could require significant additional research and development resources, and we may not be able to complete it successfully. These risks could be difficult to eliminate or manage, and, if not addressed, could harm our business, financial condition and operating results.

***Our use of "open source" software could adversely affect our ability to offer our services and subject us to possible litigation.***

We use open source software in connection with our technology development. From time to time, companies that use open source software have faced claims challenging the use of open source software and/or compliance with open source license terms. We could be subject to suits by parties claiming ownership of what we believe to be open source software or claiming noncompliance with open source licensing terms. Some open source licenses require users who distribute software containing open source to make available all or part of such software, which in some circumstances could include valuable proprietary code of the user. We intend to monitor the use of open source software and will try to ensure that none is used in a manner that would require us to disclose our proprietary source code or that would otherwise breach the terms of an open source agreement, such use could inadvertently occur, in part because open source license terms are often ambiguous. Any requirement to disclose proprietary source code or pay damages for breach of contract could be harmful to our business, results of operations or financial condition, and could help our competitors develop products and services that are similar to or better than ours.

***No assurances of protection for proprietary rights; reliance on trade secrets.***

In certain cases, we may rely on trade secrets to protect intellectual property, proprietary technology and processes, which we have acquired, developed or may develop in the future. There can be no assurances that secrecy obligations will be honored or that others will not independently develop similar or superior products or technology. The protection of intellectual property and/or proprietary technology through claims of trade secret status has been the subject of increasing claims and litigation by various companies both in order to protect proprietary rights as well as for competitive reasons even where proprietary claims are unsubstantiated. The prosecution of proprietary claims or the defense of such claims is costly and uncertain given the uncertainty and rapid development of the principles of law pertaining to this area. We may also be subject to claims by other parties with regard to the use of intellectual property, technology information and data, which may be deemed proprietary to others.

***Our network operations may be vulnerable to hacking, viruses and other disruptions, which may make our Rideshare online platform and related services less attractive and reliable***.

Internet usage and mobile app usage could decline if any well-publicized compromise of security occurs. Hacking involves efforts to gain unauthorized access to information or systems or to cause intentional malfunctions, loss or corruption of data, software, hardware or other computer equipment. Hackers, if successful, could misappropriate proprietary information or cause disruptions in our service. We may be required to expend capital and other resources to protect our products and services and related systems upon which our products and services is reliant against hackers. There can be no assurance that any measures we may take will be effective. Security breaches could have a material adverse effect on our business. In addition, the inadvertent transmission if computer viruses or other digital problems could expose us to a material risk of loss or litigation and possible liability, as well as materially damage our reputation and decrease our user base.

***We currently have a small sales and marketing organization. If we are unable to expand our direct sales force in the U.S. to promote our services and related products, the commercial appeal and brand awareness for our products and services may be diminished.***

We currently have a small sales and marketing organization. The Company may expand the core sales and marketing team to oversee the sales and marketing of our "*YayYo!*" business.   We will incur significant additional expenses and commit significant additional management resources to expand and grow our sales force. We may not be able to build on the expansion of these capabilities despite these additional expenditures. If we elect to rely on third parties to sell our products in the U.S., we may receive less revenue than if we sold our products directly. In addition, although we would intend to diligently monitor their activities, we may have little or no control over the sales efforts of those third parties. In the event we are unable to develop and expand our own sales force or collaborate with a third party to sell our products, we may not be able to operate our products and/or services which would negatively impact our ability to generate revenue. We may not be able to enter into any marketing arrangements on favorable terms or at all. If we are unable to enter into a marketing arrangement for our products, we may not be able to develop an effective sales force to successfully operate our products and/or services. If we fail to enter into marketing arrangements for our products and are unable to develop an effective sales force, our ability to generate revenue would be limited.

## Risks Relating to Ownership of Our Securities.

***There is no active public trading market for our common stock and we cannot assure you that an active trading market will develop in the near future.***

Our common stock is not quoted in the over-the-counter markets and is not listed on any stock exchange and there is currently no active trading in our securities. While we intend to apply to have our shares of common stock approved for listing on the Nasdaq under the symbol "YAYO," there can be no assurance that we will meet the initial listing requirements of Nasdaq to list our common stock on the Nasdaq exchange. In the event that our application to list our common stock on Nasdaq is not approved, the Company may seek to have its common stock quoted on the OTCQX over-the-counter exchange operated by OTC Markets Group Inc. (the "OTCQX"). Further, in the event that we successfully meet the Nasdaq listing requirements and list our common stock on Nasdaq we cannot assure you that an active trading market for our common stock will develop in the future due to a number of factors, including the fact that we are a small company that is relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community that generate or influence sales volume, and that even if we came to the attention of such persons, they tend to be risk-averse and would be reluctant to follow an unproven company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned and viable. We cannot give you any assurance that an active public trading market for our common stock will develop or be sustained. You may not be able to liquidate your shares quickly or at the market price if trading in our common stock is not active.

***Our Offering differs significantly from an underwritten initial public offering.***

This is not an underwritten initial public offering. This listing differs from an underwritten initial public offering in several significant ways, which include, but are not limited to, the following:

- There are no underwriters. Consequently, there will be no book building process and no price at which underwriters initially sold shares to the public to help inform efficient price discovery;

- While we intend to list on the Nasdaq Capital Markets there can be no assurance that we will satisfy the listing requirements;

- Immediately following the SEC's re of this Offering, shares of our common stock will not be listed on the Nasdaq Capital Markets or any other securities exchange market;

- Immediately following the registration of this Offering by the SEC, there will be no active trading market for our common stock;

- Additionally, because there are no underwriters, there is no underwriters' option to purchase additional shares to help stabilize, maintain, or affect the public price of our common stock;

- Given that there will be no underwriters' option to purchase additional shares or otherwise underwriters in engaging in stabilizing transactions, there could be greater volatility in the public price of our common stock during the period immediately following the effective date of this prospectus; and

- We will not conduct a traditional "roadshow" with underwriters prior to the effective date of this prospectus. As a result, there may not be efficient price discovery with respect to our ordinary shares or sufficient demand among investors immediately after our listing, which could result in a more volatile public price of our shares of common stock.

Such differences from an underwritten initial public offering could result in a volatile market price for our common stock and uncertain trading volume and may adversely affect your ability to sell your common stock.

***The public price of our common stock may be volatile, and could, following a sale decline significantly and rapidly.***

As this Offering is taking place via a process that is not an underwritten initial public offering, there will be no book building process and no price at which underwriters initially sold shares to the public to help inform efficient price discovery with respect to the opening trades on securities exchange markets. Following this Offering, the public price of our common stock in the secondary market will be determined by private buy and sell transaction orders collected from broker-dealers.

While we intend to apply to have our shares of common stock approved for listing on Nasdaq under the symbol "YAYO," there can be no assurance that we will meet the initial listing requirements of Nasdaq to list our common stock on the Nasdaq exchange. In the event that our application to list our common stock on Nasdaq is not approved, the Company may seek to have its common stock quoted on the OTCQX over-the-counter exchange operated by OTC Markets Group Inc.

***We may not be able to satisfy listing requirements of Nasdaq to obtain or maintain a listing of our common stock.***

If our common stock is listed on Nasdaq or the OTCQX Market, we must meet certain financial and liquidity criteria to maintain such listing. If we violate the maintenance requirements for continued listing of our common stock, our common stock may be delisted. In addition, our board may determine that the cost of maintaining our listing on a national securities exchange outweighs the benefits of such listing. A delisting of our common stock from Nasdaq or the OTCQX Market may materially impair our stockholders' ability to buy and sell our common stock and could have an adverse effect on the market price of, and the efficiency of the trading market for, our common stock. In addition, in order to list, we will be required to, among other things, file with the SEC a post-qualification amendment to our $50,000,000 Regulation A+, tier 2, securities offering as filed on Form 1-A, as amended from time to time, and submitted and filed with the SEC (the "Offering Statement"), and then file a Form 8-A in order to register our shares of common stock under the Securities Exchange Act of 1934, as amended. Any delay or further SEC requests under the post-qualification amendment may cause a delay in the initial trading of our common stock on Nasdaq or the OTCQX Market. For all of the foregoing reasons, you may experience a delay between the closing of your purchase of shares of our common stock and the commencement of exchange trading of our common stock. In addition, the delisting of our common stock could significantly impair our ability to raise capital.

If we fail to meet the minimum requirements for listing on Nasdaq, we intend to seek to have our common stock quoted on the OTCQX. The OTCQX is not a stock exchange, and if our common stock trades on the OTCQX there may be significantly less trading volume and analyst coverage of, and significantly less investor interest in, our common stock, which may lead to lower trading prices for our common stock.

***This Offering has not been reviewed by independent professionals.***

We have not retained any independent professionals to review or comment on this prospectus or otherwise protect the interest of the investors hereunder. Although we have retained our own counsel, neither such counsel nor any other counsel has made, on behalf of the investors, any independent examination of any factual matters represented by management herein. Therefore, for purposes of making a decision to purchase our Shares, you should not rely on our counsel with respect to any matters herein described. Prospective investors are strongly urged to rely on the advice of their own legal counsel and advisors in making a determination to purchase our shares of common stock.

***There has been no public market for our common stock prior to this Offering, and an active market in which investors can resell their shares may not develop.***

Prior to this Offering, there has been no public market for our common stock. We cannot predict the extent to which an active market for our common stock will develop or be sustained after this Offering, or how the development of such a market might affect the market price of our common stock.

***Sales of our common stock under Rule 144 could reduce the price of our stock.***

In general, persons holding "*restricted securities*," must hold their shares for a period of at least six (6) months, may not sell more than one percent (1%) of the total issued and outstanding shares in any ninety (90) day period, and must resell the shares in an unsolicited brokerage transaction at the market price. However, Rule 144 will only be available for resale in the ninety (90) days after the Company files its quarterly reports on Form 10-Q and annual reports on Form 10-K. The Company may voluntarily file current reports on Form 8-K. The availability for sale of substantial amounts of common stock under Rule 144 could reduce prevailing market prices for our securities. See "*Determination of Offering Price*" below for more information.

***Our failure to maintain effective internal controls over financial reporting could have an adverse impact on us***.

We are required to establish and maintain appropriate internal controls over financial reporting. Failure to establish those controls, or any failure of those controls once established, could adversely impact our public disclosures regarding our business, financial condition or results of operations. In addition, management's assessment of internal controls over financial reporting may identify weaknesses and conditions that need to be addressed in our internal controls over financial reporting or other matters that may raise concerns for investors. Any actual or perceived weaknesses and conditions that need to be addressed in our internal control over financial reporting, disclosure of management's assessment of our internal controls over financial reporting or disclosure of our public accounting firm's attestation to or report on management's assessment of our internal controls over financial reporting may have an adverse impact on the price of our common stock.

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints and the benefit of controls must be relative to their costs. Because of the inherent limitations in all control systems, no system of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Further, controls can be circumvented by individual acts of some persons, by collusion of two or more persons, or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, a control may become inadequate because of changes in conditions or the degree of compliance with policies or procedures may deteriorate. Because of inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected.

At present, we believe that we have effective internal controls in place. However, our management, including our Chief Executive Officer, cannot guarantee that our internal controls and disclosure controls that we have in place will prevent all possible errors, mistakes or all fraud.

For example, the Company is exposed to certain limitations under our control system over financial reporting on account of our contractual commitment with our chief financial officer, Mr. Pickard, and his corporate status as a part-time executive employee of the Company, dedicating approximately no more than fifteen hours per week to the business activity and affairs of the Company. Based on the foregoing, our internal controls for financial reporting may be subject to material weakness on account of (i) customary duties and obligations of our chief financial officer and such role in our financial reporting, and (ii) limited time commitments provided by part-time executive employees.

In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we intend to expend significant resources, including legal and accounting-related costs and significant management oversight. As of the date of this prospectus, the Company intends to enter into an agreement with R.G. Alliance Group, LLC, a managerial accounting firm

("RG Alliance"), to supplement the oversight provided by our chief financial officer of the Company, Mr. Pickard. We believe that expending additional resources on accounting-related costs, such as our intended engagement with RG Alliance Group, will supplement and offset the limited resources and time commitments of our part-time chief financial officer, Mr. Pickard, subsequently maintaining, enhancing and improving the Company's effective internal controls over financial reporting.

*Our financial controls and procedures may not be sufficient to ensure timely and reliable reporting of financial information, which, as a public company, could materially harm our stock price.*

We require significant financial resources to maintain our public reporting status. We cannot assure you we will be able to maintain adequate resources to ensure that we will not have any future material weakness in our system of internal controls. The effectiveness of our controls and procedures may in the future be limited by a variety of factors including:

- faulty human judgment and simple errors, omissions or mistakes;
- fraudulent action of an individual or collusion of two or more people;
- inappropriate management override of procedures; and
- the possibility that any enhancements to controls and procedures may still not be adequate to assure timely and accurate financial information.

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Despite these controls, because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance of achieving their control objectives. Furthermore, smaller reporting companies like us face additional limitations. Smaller reporting companies employ fewer individuals and can find it difficult to employ resources for complicated transactions and effective risk management. Additionally, smaller reporting companies tend to utilize general accounting software packages that lack a rigorous set of software controls.

If we fail to have effective controls and procedures for financial reporting in place, we could be unable to provide timely and accurate financial information and be subject to investigation by the Securities and Exchange Commission (the "SEC") and civil or criminal sanctions.

***We must implement additional and expensive procedures and controls in order to grow our business and organization and to satisfy new reporting requirements, which will increase our costs and require additional management resources.***

Upon becoming a fully public reporting company, we will be required to comply with the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and the related rules and regulations of the SEC, including the requirements that we maintain disclosure controls and procedures and adequate internal control over financial reporting. In the future, if our securities are listed on a national exchange, we may also be required to comply with marketplace rules and heightened corporate governance standards. Compliance with the Sarbanes-Oxley Act and other SEC and national exchange requirements will increase our costs and require additional management resources. We recently have begun upgrading our procedures and controls and will need to continue to implement additional procedures and controls as we grow our business and organization and to satisfy new reporting requirements. If we are unable to complete the required assessment as to the adequacy of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act or if we fail to maintain internal control over financial reporting, our ability to produce timely, accurate and reliable periodic financial statements could be impaired.

If we do not maintain adequate internal control over financial reporting, investors could lose confidence in the accuracy of our periodic reports filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Additionally, our ability to obtain additional financing could be impaired or a lack of investor confidence in the reliability and accuracy of our public reporting could cause our stock price to decline.

*We do not have a full-time Chief Financial Officer and have operated without a full-time Chief Financial Officer since June 2017.*

The Company appointed a part-time chief financial officer in June 2017, pursuant to which Mr. Pickard, our current chief financial officer, has agreed to dedicate approximately fifteen (15) hours of exclusive time to matters of the Company. On June 9, 2017, Robert W. Vanech, resigned from his position as a director and full-time chief financial officer, treasurer and secretary of the Company. The Company accepted and approved the resignation of Mr. Vanech from his positions as chief financial officer, treasurer, and secretary of the Company and as a member of the Company's Board of Directors, with effect as of May 31, 2017.

In the absence of a full-time chief financial officer, we may fail to establish and maintain effective internal controls and procedures for financial reporting which could potentially result in untimely and inaccurate financial information and reporting.

*General securities investment risks.*

All investments in securities involve the risk of loss of capital. No guarantee or representation is made that an investor will receive a return of its capital. The value of our common stock can be adversely affected by a variety of factors, including development problems, regulatory issues, technical issues, commercial challenges, competition, legislation, government intervention, industry developments and trends, and general business and economic conditions.

*Our common stock could be subject to the "Penny Stock" rules of the Securities and Exchange Commission if it were publicly traded and may be difficult to sell.*

Our shares of common stock are considered to be "penny stocks" because they are not registered on a national securities exchange or listed on an automated quotation system sponsored by a registered national securities association, pursuant to Rule 3a51-1(a) under the Exchange Act. For any transaction involving a penny stock, unless exempt, the rules require that a broker or dealer approve a person's account for transactions in penny stocks and that the broker or dealer receives from the investor a written agreement to the transaction, setting forth the identity and quantity of the penny stock to be purchased. The broker or dealer must also deliver, prior to any transaction in a penny stock, a disclosure schedule prescribed by the Securities and Exchange Commission relating to the penny stock market, which sets forth the basis on which the broker or dealer made the suitability determination and that the broker or dealer received a signed, written agreement from the investor prior to the transaction. Generally, brokers may be less willing to execute transactions in securities subject to the "penny stock" rules. This may make it more difficult for investors to dispose of our common stock and cause a decline in the market value of our stock.

***The market for penny stocks has suffered in recent years from patterns of fraud and abuse***.

Stockholders should be aware that, according to SEC Release No. 34-29093, the market for penny stocks has suffered in recent years from patterns of fraud and abuse. Such patterns include:

- control of the market for the security by one or a few broker-dealers that are often related to the promoter or issuer;
- manipulation of prices through prearranged matching of purchases and sales and false and misleading press releases;
- boiler room practices involving high-pressure sales tactics and unrealistic price projections by inexperienced salespersons;
- excessive and undisclosed bid-ask differential and markups by selling broker-dealers; and
- the wholesale dumping of the same securities by promoters and broker-dealers after prices have been manipulated to a desired level, along with the resulting inevitable collapse of those prices and with consequential investor losses.

***We are an "emerging growth company" under the JOBS Act of 2012 and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our common stock less attractive to investors.***

We are an "emerging growth company", as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 (the "Securities Act") for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We are choosing to take advantage of the extended transition period for complying with new or revised accounting standards.

We will remain an "emerging growth company" for up to five years following our initial public offering, although we will lose that status sooner if our revenues exceed $1 billion, if we issue more than $1 billion in non-convertible debt in a three year period, or if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last day of our most recently completed second fiscal quarter.

***Our status as an "emerging growth company" under the JOBS Act may make it more difficult to raise capital as and when we need it.***

Because of the exemptions from various reporting requirements provided to us as an "emerging growth company" and because we will have an extended transition period for complying with new or revised financial accounting standards, we may be less attractive to investors and it may be difficult for us to raise additional capital as and when we need it. Investors may be unable to compare our business with other companies in our industry if they believe that our financial accounting is not as transparent as other companies in our industry. If we are unable to raise additional capital as and when we need it, our financial condition and results of operations may be materially and adversely affected.

***Our directors, officers and principal stockholders have significant voting power and may take actions that may not be in the best interests of our other stockholders.***

Our officers, directors and principal stockholders collectively beneficially own approximately 59.96% of our outstanding common stock. As a result, these stockholders, if they act together, will be able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. This concentration of ownership may not be in the best interests of our other stockholders.

***We have not paid dividends in the past and do not expect to pay dividends in the future, and any return on investment may be limited to the value of our stock.***

We have never paid cash dividends on our common stock and do not anticipate paying cash dividends on our common stock in the foreseeable future. We currently intend to retain any future earnings to support the development of our business and do not anticipate paying cash dividends in the foreseeable future. Our payment of any future dividends will be at the discretion of our board of directors after taking into account various factors, including, but not limited to, our financial condition, operating results, cash needs, growth plans and the terms of any credit agreements that we may be a party to at the time. In addition, our ability to pay dividends on our common stock may be limited by Delaware state law. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize a return on their investment. Investors seeking cash dividends should not purchase our common stock.

***You should consult your own independent tax advisor regarding any tax matters arising with respect to the securities offered in connection with this offering.***

Participation in this offering could result in various tax-related consequences for investors. All prospective purchasers of the resold securities are advised to consult their own independent tax advisors regarding the U.S. federal, state, local and non-U.S. tax consequences relevant to the purchase, ownership and disposition of the resold securities in their particular situations.

*IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT ANY U.S. TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE. IN ADDITION, ANY U.S. TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE "PROMOTION OR MARKETING" OF THE MATTER(S) ADDRESSED HEREIN. YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM YOUR OWN INDEPENDENT TAX ADVISOR.*

**IN ADDITION TO THE ABOVE RISKS, BUSINESSES ARE OFTEN SUBJECT TO RISKS NOT FORESEEN OR FULLY APPRECIATED BY MANAGEMENT. IN REVIEWING THIS FILING, POTENTIAL INVESTORS SHOULD KEEP IN MIND THAT OTHER POSSIBLE RISKS MAY ADVERSELY IMPACT THE COMPANY'S BUSINESS OPERATIONS AND THE VALUE OF THE COMPANY'S SECURITIES.**

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains "forward-looking statements." Forward-looking statements reflect the current view about future events. When used in this prospectus, the words "anticipate," "believe," "estimate," "expect," "future," "intend," "plan," or the negative of these terms and similar expressions, as they relate to us or our management, identify forward-looking statements. Such statements, include, but are not limited to, statements contained in this prospectus relating to our business strategy, our future operating results and liquidity and capital resources outlook. Forward-looking statements are based on our current expectations and assumptions regarding our business, the economy and other future conditions. Because forward–looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. Our actual results may differ materially from those contemplated by the forward-looking statements. They are neither statements of historical fact nor guarantees of assurance of future performance. We caution you therefore against relying on any of these forward-looking statements. Important factors that could cause actual results to differ materially from those in the forward-looking statements include, without limitation:

1. Our ability to effectively operate our business segments;

2. Our ability to manage our research, development, expansion, growth and operating expenses;

3. Our ability to evaluate and measure our business, prospects and performance metrics;

4. Our ability to compete, directly and indirectly, and succeed in the highly competitive and evolving ridesharing industry;

5. Our ability to respond and adapt to changes in technology and customer behavior;

6. Our ability to protect our intellectual property and to develop, maintain and enhance a strong brand; and

7. and other factors (including the risks contained in the section of this prospectus entitled "Risk Factors") relating to our industry, our operations and results of operations.

Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, actual results may differ significantly from those anticipated, believed, estimated, expected, intended or planned.

Factors or events that could cause our actual results to differ may emerge from time to time, and it is not possible for us to predict all of them. We cannot guarantee future results, levels of activity, performance or achievements. Except as required by applicable law, including the securities laws of the United States, we do not intend to update any of the forward-looking statements to conform these statements to actual results.

## USE OF PROCEEDS

We will not receive any proceeds from the sale of the common stock by the Selling Securityholder named in this prospectus. We will bear all expenses of registration incurred in connection with this offering, but all selling and other expenses incurred by the Selling Securityholder will be borne by them.

## DETERMINATION OF OFFERING PRICE

There currently is a no public market for our common stock. The fixed $8.00 per share offering price of our common stock was determined arbitrarily based on the last public offering price and sale of our common stock from our Regulation A+ Offering. There is no relationship whatsoever between the offering price in this prospectus and our assets, earnings, book value or any other objective criteria of value. While we have applied to have our shares of common stock approved for listing on Nasdaq Capital Markets ("Nasdaq") under the symbol "YAYO," there can be no assurance that we will meet the initial listing requirements to list our common stock on Nasdaq. In the event that our application to list our common stock on Nasdaq is not approved, the Company may seek to have its common stock quoted on the OTCQX over-the-counter quotation system operated by OTC Markets Group Inc. (the "OTCQX"), provided, however, that the shares to be registered and offered by this prospectus are not subject to or contingent upon the shares of common stock being listed on Nasdaq or the OTCQX or any other recognized securities exchange or quotation system. Therefore, the Selling Securityholder will sell at a fixed price of $8.00 per share until our shares of common stock are quoted on Nasdaq or the OTCQX, if at all, and thereafter at prevailing market prices at the time of sale or privately negotiated prices or a combination of these methods. See "*Plan of Distribution*" below for more information.

## PLAN OF DISTRIBUTION

We are registering the shares of common stock previously issued and the shares of common stock issuable upon exercise of the Selling Securityholder Warrant to permit the resale of these shares of common stock by the Selling Securityholder of the common stock and Selling Securityholder Warrant from time to time after the date of this Prospectus. We will not receive any of the proceeds from the sale by

the selling stockholders of the shares of common stock. We will bear all fees and expenses incident to our obligation to register the shares of common stock.

The Selling Securityholder may sell all or a portion of the shares of common stock held by them and offered hereby from time to time directly or through one or more underwriters, broker-dealers or agents. If the shares of common stock are sold through underwriters or broker-dealers, the Selling Securityholder will be responsible for underwriting discounts or commissions or agent's commissions. The shares of common stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale or at negotiated prices. See "*Determination of Offering Price*" above for more information. These sales may be affected in transactions, which may involve crosses or block transactions, pursuant to one or more of the following methods:

- on any national securities exchange or quotation service on which the securities may be listed or quoted at the time of sale;
- in the over-the-counter market;
- in transactions otherwise than on these exchanges or systems or in the over-the-counter market;
- through the writing or settlement of options, whether such options are listed on an options exchange or otherwise;
- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;
- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;
- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;
- an exchange distribution in accordance with the rules of the applicable exchange;
- privately negotiated transactions;
- short sales made after the date the Registration Statement is declared effective by the SEC;
- broker-dealers may agree with a selling security holder to sell a specified number of such shares at a stipulated price per share;
- a combination of any such methods of sale; and
- any other method permitted pursuant to applicable law.

The Selling Securityholder may also sell shares of common stock under Rule 144 promulgated under the Securities Act of 1933, as amended, if available, rather than under this prospectus. In addition, the Selling Securityholder may transfer the shares of common stock by other means not described in this Prospectus. If the Selling Securityholder effect such transactions by selling shares of common stock to or through underwriters, broker-dealers or agents, such underwriters, broker-dealers or agents may receive commissions in the form of discounts, concessions or commissions from the selling stockholders or commissions from purchasers of the shares of common stock for whom they may act as agent or to whom they may sell as principal (which discounts, concessions or commissions as to particular underwriters, broker-dealers or agents may be in excess of those customary in the types of transactions involved). In connection with sales of the shares of common stock or otherwise, the Selling Securityholder may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of common stock in the course of hedging in positions they assume. The Selling Securityholder may also sell shares of common stock short and deliver shares of common stock covered by this Prospectus to close out short positions and to return borrowed shares in connection with such short sales. The Selling Securityholder may also loan or pledge shares of common stock to broker-dealers that in turn may sell such shares.

The Selling Securityholder may pledge or grant a security interest in some or all of the Selling Securityholder Warrant or shares of common stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of common stock from time to time pursuant to this Prospectus or any amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act amending, if necessary, the list of Selling Securityholder to include the pledgee, transferee or other successors in interest as Selling Securityholder under this Prospectus. The Selling Securityholder also may transfer and donate the shares of common stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this Prospectus.

To the extent required by the Securities Act and the rules and regulations thereunder, the Selling Securityholder and any broker-dealer participating in the distribution of the shares of common stock may be deemed to be "underwriters" within the meaning of the Securities Act, and any commission paid, or any discounts or concessions allowed to, any such broker-dealer may be deemed to be underwriting commissions or discounts under the Securities Act. At the time a particular offering of the shares of common stock is made, a prospectus supplement, if required, will be distributed, which will set forth the aggregate amount of shares of common stock being offered and the terms of the offering, including the name or names of any broker-dealers or agents, any discounts, commissions and other terms constituting compensation from the selling stockholders and any discounts, commissions or concessions allowed or re-allowed or paid to broker-dealers.

Under the securities laws of some states, the shares of common stock may be sold in such states only through registered or licensed brokers or dealers. In addition, in some states the shares of common stock may not be sold unless such shares have been registered or qualified for sale in such state or an exemption from registration or qualification is available and is complied with.

There can be no assurance that any selling stockholder will sell any or all of the shares of common stock registered pursuant to the registration statement, of which this Prospectus forms a part.

The Selling Securityholder and any other person participating in such distribution will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including, without limitation, to the extent applicable, Regulation M of the Exchange Act, which may limit the timing of purchases and sales of any of the shares of common stock by the Selling Securityholder and any other participating person. To the extent applicable, Regulation M may also restrict the ability of any person engaged in the distribution of the shares of common stock to engage in market-making activities with respect to the shares of common stock. All of the foregoing may affect the marketability of the shares of common stock and the ability of any person or entity to engage in market-making activities with respect to the shares of common stock.

We will pay all expenses of the registration of the shares of common stock pursuant to the Registration Rights Agreement, including, without limitation, Securities and Exchange Commission filing fees and expenses of compliance with state securities or "blue sky" laws; provided, however, the Selling Securityholder will pay all underwriting discounts and selling commissions, if any. We will indemnify the Selling Securityholder against liabilities, including some liabilities under the Securities Act in accordance with the Registration Rights Agreements or the Selling Securityholder will be entitled to contribution. We may be indemnified by the Selling Securityholder against civil liabilities, including liabilities under the Securities Act that may arise from any written information furnished to us by the Selling Securityholder specifically for use in this Prospectus, in accordance with the Registration Rights Agreements or we may be entitled to contribution.

Once sold under the registration statement, of which this Prospectus forms a part, the shares of common stock will be freely tradable in the hands of persons other than our affiliates.

## MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Our common stock is not listed on any stock exchange or over-the-counter market or quotation system. There is currently no active trading market in our common stock. While we intend to apply to have our shares of common stock approved for listing on Nasdaq under the symbol "YAYO," there can be no assurance that we will meet the initial listing requirements to list our common stock on Nasdaq. In the event that our application to list our common stock on Nasdaq is not approved, the Company may seek to have its common stock quoted on the OTCQX over-the-counter exchange operated by OTC Markets Group Inc. (the "OTCQX"). There can be no assurance that the common stock subject to registration and resale by the Selling Securityholder under this prospectus will be approved for listing on Nasdaq or quoted on the OTCQX or other recognized securities exchange or quotation system. For more information see the section "*Risk Factors*."

As of the May 30, 2018, we have 26,313,926 shares of our common stock issued and outstanding held by approximately 1,164 stockholders of record.

We also have outstanding:

- The Selling Securityholder Warrant to purchase up to 1,500,000 shares of our common stock at exercise prices ranging of $4.00 per share, subject to adjustment in certain circumstances as provided therein; and

- Options granted under the 2016 Plan to purchase up to 750,000 shares of our common stock at a weighted average exercise price of $3.80 per share, subject to adjustment in certain circumstances as provided therein, of which options to purchase up to 680,000 shares of our common stock have vested and are exercisable at a weighted average exercise price of $3.71.

### Dividends

We have not declared any cash dividends since inception and we do not anticipate paying any dividends in the foreseeable future. Instead, we anticipate that all of our earnings will be used to provide working capital, to support our operations, and to finance the growth and development of our business, including potentially the acquisition of, or investment in, businesses, technologies or products that complement our existing business. The payment of dividends is within the discretion of the board of directors and will depend on our earnings, capital requirements, financial condition, prospects, applicable Delaware law, which provides that dividends are only payable out of surplus or current net profits, and other factors our board might deem relevant. There are no restrictions that currently limit our ability to pay dividends on our common stock other than those generally imposed by applicable state law.

### Securities Authorized for Issuance under Equity Compensation Plan

On November 30, 2016, the Board of Directors of the Company adopted the 2016 Equity Incentive Plan (the "2016 Plan") that governs equity awards to our employees, directors, officers, consultants and other eligible participants. Under the 2016 Plan there are 10,000,000 shares of common stock reserved for issuance.

The types of awards permitted under the 2016 Plan include qualified incentive stock options and non-qualified stock options. Each option shall be exercisable at such times and subject to such terms and conditions as the Board may specify.

The Board of Directors has the power to amend, suspend or terminate the 2016 Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of our common stock reserved for issuance pursuant to incentive awards or reduces the minimum exercise price for options or exchange of options for other incentive awards, unless such change is authorized by our stockholders within one year.

**2016 Equity Compensation Plan Information as of December 31, 2017**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | | Weighted-average exercise price of outstanding options, warrants and rights | | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|---|---|
| | (a) | | (b) | | (c) |
| Equity compensation plans approved by security holders - 2016 Plan | $ | 750,000 | $ | 3.80 | 9,250,000 |
| Total | $ | 750,000 | | | 9,250,000 |

As of December 31, 2017, options to purchase up to 750,000 shares of common stock have been granted under the 2016 Plan of which 630,000 shares of common stock are vested and exercisable. The following table summarizes information about stock options granted at December 31, 2017 under the 2016 Plan:

| | | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|---|
| Exercise Price | | Outstanding | Weighted Average Remaining contractual life (in years) | Weighted Average Exercise Price | Exercisable | Weighted Average Exercise Price |
| $ | 1.00 | 450,000 | 1.00 | 1.00 | 450,000 | 1.00 |
| $ | 8.00 | 300,000 | 3.00 | 8.00 | 180,000 | 8.00 |
| $ | — | — | — | — | — | — |
| $ | 1.00 - $8.00 | 750,000 | 1.80 | $ 3.80 | 630,000 | $ 3.71 |

## CAPITALIZATION

The following table sets forth our cash and cash equivalents and capitalization as of March 31, 2018:

43

|  | March 31, 2018 Actual |
|---|---|
| **Cash** | $ 160,490 |
| **Restricted Cash** | $ 5,821,802 |
| **Indebtedness due within one year** | $ 286,825 |
| **Total long term debt - net of current portion** | $ 2,275,670 |
| **Stockholders' equity:** | |
| Common stock, $0.000001 par value, 90,000,000 shares authorized, 26,313,926 shares outstanding | 26 |
| Preferred stock, $0.000001 par value, 10,000,000 shares authorized; 0 shares outstanding | — |
| Additional paid-in capital | 11,655,587 |
| Accumulated deficit | (7,117,470) |
| Total stockholders' equity | 4,538,143 |
| **Total capitalization** | $ 11,447,087 |

The actual number of shares of our common stock outstanding, above excludes:

- 750,000 shares of our common stock issuable upon exercise of options granted under the 2016 Plan at a weighted average exercise price of $3.80 per share, subject to adjustment in certain circumstances as provided therein, of which options to purchase up to 680,000 shares of our common stock have vested and are exercisable at a weighted average exercise price of $3.71;

- shares of common stock issuable upon exercise of the Aegis Warrants to be issued to Aegis Capital Corp., in connection with the Company's March 8, 2018 Purchase Agreement with the Selling Securityholder;

- shares of common stock issuable upon exercise of the Selling Securityholder Warrant;

- 9,250,000 shares of our common stock reserved for future issuance under our 2016 Plan as of December 31, 2017.

### DILUTION

If you invest in our common stock in this offering, your ownership interest will be diluted to the extent of the difference between the public offering price per share of our common stock and the as adjusted net tangible book value per share of our common stock immediately after this offering. Net tangible book value dilution per share to new investors represents the difference between the amount per share paid by purchasers of shares of our common stock in this offering and the as adjusted net tangible book value per share of our common stock immediately after completion of this offering.

Net tangible book value per share is determined by dividing our total tangible assets less our total liabilities by the number of shares of our common stock outstanding. Our historical net tangible value as of May 30, 2018 was approximately $4,538,000 or $0.17 per then-outstanding share of our common stock, based on 26,313,926 outstanding shares of our common stock at May 30, 2018. Net tangible book value per share equals the amount of our total tangible assets less total liabilities, divided by the total number of shares of our common stock outstanding, all as of the date specified.

After giving effect to the sale and issuance of an aggregate of 1,500,000 shares of our common stock to the Selling Securityholder upon the exercise of the Selling Securityholder Warrant, including upon full exercise of the Selling Securityholder Warrant net proceeds of $6,000,000 received by us in connection with the exercise of the Selling Securityholder Warrant.

| | | |
|---|---|---|
| Estimated public offering price per share | $ 8.00 | |
| Net tangible book value per share as of May 30, 2018 | $ 0.17 | |
| Increase in net tangible book value per share attributable to new investors in this offering | 0.21 | |
| As adjusted net tangible book value per share immediately after this offering | | 0.38 |
| Dilution in net tangible book value per share to new investors in this offering | | $ 7.62 |

Each $1.00 increase or decrease in the assumed public offering price of $8.00 per share, the offering price of our common stock under our Regulation A+ Offering, would increase or decrease, as applicable, our as adjusted net tangible book value per share to new investors by $0, and would increase or decrease, as applicable, dilution per share to new investors in this offering by $1.00, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting estimated commissions and estimated offering expenses payable by us.

After giving effect to the sale and issuance of 1,500,000 shares of our common stock to the Selling Securityholder upon the exercise of the Selling Securityholder Warrant to purchase up to an aggregate of 1,500,000 shares of our common stock, with net proceeds of $6,000,000 received by us in connection with the exercise of such Selling Securityholder Warrant. The differences between the existing stockholders and the new investors purchasing shares of our common stock in this offering from the Selling Securityholder with respect to (i) 150,000 restricted shares of our common stock and (ii) 1,500,000 underlying Warrant Shares purchased from us by the Selling Securityholder pursuant to the exercise of the Selling Securityholder Warrant, the total consideration paid or to be paid to us, which includes proceeds received from the cash received from the exercise of Selling Securityholder Warrant:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | | | Amount | | |
| | Number | Percent | (In thousands) | Percent | |
| Existing stockholders | 26,313,926 | 94.61% | $ 4,517,000 | 42.95% | $ 0.17 |
| New investors | 1,500,000 | 5.39 | 6,000,000 | 57.05 | 4.00 |
| Totals | 27,813,926 | 100.00% | $ 10,517,000 | 100.00% | 0.38 |

Except as otherwise indicated, the above discussion and tables assume no exercise of outstanding options to purchase additional shares of our common stock from us. If the options to purchase additional shares of our common stock were exercised in full, our existing stockholders would own 94.61% and our new investors would own 5.39% of the total number of shares of our common stock outstanding upon completion of this offering.

The number of shares of our common stock that will be outstanding after this offering is based on 26,313,926 shares of our common stock outstanding as of May 30, 2018 (prior to the exercise of the Selling Securityholder Warrant and subsequent issuance of the 1,500,000 Warrant Shares that will be sold by the Selling Securityholder in this offering) and excludes:

- 750,000 shares of our common stock issuable upon exercise of options granted under our 2016 Plan to purchase shares of our common stock outstanding as of December 31, 2017, with a weighted-average exercise price of $3.80 per share, of which 680,000 options are vested and exercisable as of May 30, 2018, with a weighted-average exercise price of $3.71 per share;

- 9,250,000 shares of our common stock reserved for future issuance under our 2016 Plan as of May 30, 2018.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*Certain statements made in this prospectus are "forward-looking statements" regarding the plans and objectives of management for future operations. Such statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of YayYo, Inc. ("we," "us," "our," "YayYo" or the "Company") to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. The forward-looking statements included herein are based on current expectations that involve numerous risks and uncertainties. The Company's plans and objectives are based, in part, on assumptions involving the continued expansion of business. Assumptions relating to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Company. Although the Company believes its assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate and therefore, there can be no assurance the forward-looking statements included in this prospectus will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Company or any other person that the objectives and plans of the Company will be achieved. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" and in other parts of this prospectus. Our fiscal year ends on December 31.*

**Overview**

The Company was formed on June 21, 2016 under the name "*YayYo, LLC*," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "<u>Conversion</u>"). All of the YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware.

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("<u>Distinct Cars</u>"), Savvy LLC, a Delaware limited liability company ("<u>Savvy</u>"), Rideayyo LLC, a Delaware limited liability company ("<u>Rideyayyo</u>") and Rideshare Car Rentals LLC, a Delaware limited liability company ("<u>Rideshare</u>"). The Company operations are organized and consolidated into one reporting segment which encompasses the financial results of the Company's two business segments- (i) the Fleet Management business and (ii) the Rideshare Platform.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from the development of the Metasearch App. As of the date of this Prospectus, the Company's operating business segments include (i) an online peer-to-peer bookings platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "<u>Rideshare Platform</u>"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("<u>Fleet Management</u>"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

**Initial Public Offering**

On March 16, 2018, we closed our initial public offering, pursuant to our Regulation A+ Offering under Regulation A of the Securities Act, which was qualified by the SEC on March 15, 2017. We sold a total of 365,306 shares of our common stock. We received cash proceeds of $1.8 million, net of commissions and other costs associated with the gross offering proceeds or payable by us.

**Factors Affecting Our Performance**

We believe that the growth of our business and our future success are dependent upon many factors, including our products, services and market leadership, and the success of our sales and marketing efforts, our expansion strategy, our investments for scale and growth. While each of these areas presents significant opportunities for us, they also pose important challenges that we must successfully address in order to sustain the growth of our business and improve our results of operations. The investments that we make in these areas may not result in increased revenue or the growth of our business. Accordingly, these investments may delay or otherwise impair our ability to achieve profitability. The timing of our future profitability will depend upon many variables, including the success of our growth strategies and the timing and size of investments and expenditures that we choose to undertake, as well as market growth and other factors that are not within our control. We have not yet determined when we expect to achieve profitability.

*Product and Market Leadership.* We are committed to delivering market-leading products and services in the ridesharing economy to continue to build and maintain credibility with the growing customer base. We believe we must expand our product, services and market leadership position and strength of our brand to drive further revenue growth. We intend to continue to invest in the capabilities of our business segments and marketing activities to maintain our strong position in the ridesharing economy. Our results of operations may fluctuate as we make these investments to drive increased customer adoption and usage.

*Sales and Marketing.* In order to maintain our efficient customer acquisition, we must maintain and expand our operating business segments, customer outreach and effectively generate additional sales to enterprises and customers across the United States. Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint in North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

*Expansion Strategy.* We are focused on expanding our existing customers' use of our products, services and Rideshare Platform. We believe that there is a significant opportunity to drive additional sales to existing customers, and expect to invest in sales, marketing and customer support to achieve additional revenue growth from existing customers.

*Investments for Scale.* As our business grows and as we continue our Rideshare Platform optimization efforts, we expect to realize cost savings through economies of scale. We manage our Fleet Management business segment to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment. As a result, we expect our gross margin to fluctuate from period to period.

## Results of Operations

### *Principles of consolidation*

The consolidated financial statements include the accounts of the Company, its wholly owned subsidiaries Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savvy LLC, a Delaware limited liability company ("Savvy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

## Total Revenues.

*Three months ended March 31, 2018 Compared the Three months ended March 31, 2017.*

Revenue for the three months ended March 31, 2018 was $418,879. For the three months ended March 31, 2017, the Company generated no revenue. The increase is due to us beginning to generate revenue from renting cars to Uber and Lyft drivers in August 2017.

*Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Revenue for the 2017 fiscal year was $235,690. From June 21, 2016 (inception) to December 31, 2016, the Company generated no revenue. The increase is due to us beginning to generate revenue from renting cars to Uber and Lyft drivers in August 2017.

From June 21, 2016 (inception) to December 31, 2016, the Company was a pre-revenue development stage company purposed to commercialize the ridesharing industry through the development and distribution of our planned YayYo! meta-search ridesharing mobile App. The Company generated no revenues from the Company's inception on June 21, 2016 until October 31, 2016. On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from the development of the Metasearch App. As of the date of this Prospectus, the Company's operating business segments include (i) an online peer-to-peer bookings platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management").

## Cost of Revenues.

*Three months ended March 31, 2018 Compared to the Three months ended March 31, 2017.*

Cost of revenues for the three months ended March 31, 2018 were $309,643. For the three months ended March 31, 2017, the Company continued to be a developmental stage and, in conjunction with not having any operational revenue during such period, it incurred no Cost of Goods and Services Sold. We had no cost of revenue during the three months ended March 31, 2017 since we generated no revenue. For the three months ended March 31, 2018 our cost of revenue was 74% of our revenue.

*Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Cost of revenues for the 2017 fiscal year were $213,111. From June 21, 2016 (inception) to December 31, 2016, the Company continued to be a developmental stage and, in conjunction with not having any operational revenue during such period, it incurred no Cost of Goods and Services Sold. The increase is due to the increase in revenue as noted above. We had no cost of revenue in 2016 since we generated no revenue. In 2017 our cost of revenue was 90% of our revenue.

## General and Administrative Expenses.

*Three months ended March 31, 2018 Compared to the Three months ended March 31, 2017.*

General and administrative expenses for the three months ended March 31, 2018 were $1,317,861, representing an increase of approximately 194% over the same period in 2017. For the three months ended March 31, 2017, general and administrative expenses were $448,676. The principal reasons for the increase was an increase in general overhead due to us commencing operating activities and common stock issued for services valued at $650,000.

*Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

General and administrative expenses for the 2017 fiscal year were $3,249,659, representing an increase of approximately 396% over the period from June 21, 2016 (inception) to December 31, 2016. From June 21, 2016 (inception) to December 31, 2016, general and administrative expenses were $654,651. The increase is due to stock option expense which was $1,676,476 in 2017 compared to $63,955 in 2016 and accounting for a full year of overhead expenses in 2017 as compared to only approximately six months in 2016.

**Selling and Marketing Expenses**.

*Three months ended March 31, 2018 Compared to the three months ended March 31, 2017.*

Selling and marketing expenses for the three months ended March 31, 2018 were $67,431, representing an increase of approximately 2,031% over the same period in 2017. For the three months ended March 31, 2017, selling and marketing expenses were $3,165.

*Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Selling and marketing expenses for the 2017 fiscal year were $86,098, representing a decrease of approximately 41% over the period from June 21, 2016 (inception) to December 31, 2016. From June 21, 2016 (inception) to December 31, 2016, selling and marketing expenses were $145,803. In 2017 most of the selling and marketing expenses was spent on advertising our rentals to Uber and Lyft drivers and in 2016 was spent on developing awareness of our Metasearch App which was put on hold in 2017.

**Interest expense, net**

*Three months ended March 31, 2018 Compared to the Three months ended March 31, 2017.*

Interest and financing expenses for the three months ended March 31, 2018 were $251,256. For the three months ended March 31, 2017, interest and financing expenses were $144,041. The increase is due to the increase in debt and lease obligations during the three months ended March 31, 2018 and the related amortization of debt discount on the notes payable and lease obligations.

*Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Interest and financing expenses for the 2017 fiscal year were $523,833. From June 21, 2016 (inception) to December 31, 2016, interest and financing expenses were nil. The increase is due to the increase in debt and lease obligations in 2017 and the related amortization of debt discount on the notes payable and lease obligations.

**Total Operating Expenses**

*Three months ended March 31, 2018 Compared to the Three months ended March 31, 2017.*

Total operating expenses for the three months ended March 31, 2018 were $1,391,440, representing an increase of approximately 180% over the same period in 2017. For the three months ended March 31, 2017, total operating expenses were $496,371. The increase in total operating expenses are described above.

*Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Total operating expenses for the 2017 fiscal year were $3,639,312, representing an increase of approximately 145% over the period from June 21, 2016 (inception) to December 31, 2016. From June 21, 2016 (inception) to December 31, 2016, total operating expenses were $1,483,709. The increase is due to the reasons described above.

**Net Loss**.

*Three months ended March 31, 2018 Compared to the Three months ended March 31, 2017.*

The net loss for the three months ended March 31, 2018 was ($1,533,460), representing an increase of approximately 151% over the same period in 2017. For the three months ended March 31, 2017, the net loss was ($611,769).

*Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

The net loss for the 2017 fiscal year was ($4,100,301), representing an increase of approximately 176% over the period from June 21, 2016 (inception) to December 31, 2016. From June 21, 2016 (inception) to December 31, 2016, the net loss was ($1,483,709).

## Liquidity, Capital Resources and Plan of Operations

### Current Assets, Liabilities and Working Capital

As of March 31, 2018, the Company's current assets totaled $6,085,721, current liabilities totaled $544,539, and working capital of $5,541,182.

As of December 31, 2017, the Company's current assets totaled $322,144, current liabilities totaled $458,449, and working capital was a deficit of $136,305. At December 31, 2016, the Company's current assets totaled $18,643, current liabilities totaled $255,429, and working capital was a deficit of $236,786.

Regarding current liabilities, the amounts categorized as accounts payable and accrued expenses totaled $131,453 and $180,429 as of December 31, 2017 and December 31, 2016, respectively, or an incremental decrease of approximately 27%.

### Capital Expenditures

As of March 31, 2018, the Company had capital expenditures in the amount of $2,122,086. $6,018 in computer equipment and $2,116,068 in leased vehicles.

As of December 31, 2017, the Company had capital expenditures in the amount of $2,119,246. $3,178 in computer equipment and $2,116,068 in leased vehicles, subject to adjustment. At December 31, 2017, all of the Company's leased assets were finance leased right-of-use assets and, net of accumulated depreciation in the amount of ($82,586) for fiscal year 2017, totaled $2,033,482 in net leased assets. The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. The lease terms are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms. From June 21, 2016 (inception) to December 31, 2016, the Company had no capital expenditures.

From June 21, 2016 (inception) to December 31, 2016, the Company entered into agreements with developers and other service providers, including without limitation, the Dashride, Lexicon Labs, and various other service providers, vendors and consultants that require ongoing capital expenditures by the Company, some of which are current payable owed by the Company for services previously rendered in the Company's behalf. We do not have any other contractual obligations for ongoing capital expenditures at this time. We may, however, purchase equipment and software necessary to conduct our operations on an as needed basis.

### Statement of Cash Flows

*Cash Flows from Operating Activities- Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Net cash used in operating activities for the fiscal year ended December 31, 2017 totaled ($1,852,123), which was an increase of ($476,766) or approximately 35% from the net cash used in operating activities of ($1,375,357) for the period from June 21, 2016 (inception) to December 31, 2016.

*Cash Flows from Investing Activities- Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Net cash used in investing activities for the fiscal year ended December 31, 2017 totaled ($3,178). For the period from June 21, 2016 (inception) to December 31, 2016 our net cash used in investing activities was nil.

*Cash Flows from Financing Activities- Year Ended December 31, 2017 Compared to the period from June 21, 2016 (inception) to December 31, 2016.*

Net cash provided by financing activities for the fiscal year ended December 31, 2017 totaled $2,145,396, which was an increase of $751,396 or approximately 54% from the net cash provided by financing activities of $1,394,000 for the period from June 21, 2016 (inception) to December 31, 2016.

### Current Plan of Operations

Our plan of operations is currently focused on the development of our operating business segments: (i) our Rideshare Platform offered through the Company's wholly-owned subsidiary Rideshare, and (ii) our Fleet Management business, made commercially available through the Company's wholly-owned subsidiary Distinct Cars. We expect to incur substantial expenditures in the foreseeable future for the potential operations of our business segments and ongoing internal research and development. At this time, we cannot reliably estimate the nature, timing or aggregate amount of such costs. Our Rideshare Platform will require extensive technical evaluation, potential regulatory review and approval, significant marketing efforts and substantial investment before it or any successors could provide us with any revenue. Further, we intend to continue to build our corporate and operational infrastructure and to build interest in our product and service offerings.

As noted above, the continuation of our current plan of operations requires us to raise significant additional capital immediately. If we are successful in raising capital, we believe that the Company will have sufficient cash resources to fund its plan of operations. The cash flow from our current vehicle leasing business and capital resources are sufficient for us to continue our current operations, but for us to fully execute our business plan we will require significant additional capital.

We continually evaluate our plan of operations discussed above to determine the manner in which we can most effectively utilize our limited cash resources. The timing of completion of any aspect of our plan of operations is highly dependent upon the availability of cash to implement that aspect of the plan and other factors beyond our control. There is no assurance that we will successfully obtain the required capital or revenues, or, if obtained, that the amounts will be sufficient to fund our ongoing operations. The inability to secure additional capital would have a material adverse effect on us, including the possibility that we would have to sell or forego a portion or all of our assets or cease operations. If we discontinue our operations, we will not have sufficient funds to pay any amounts to our stockholders.

Even if we raise additional capital in the near future, if our operating business segments fail to achieve anticipated financial results, our ability to raise additional capital in the future to fund our operating business segments would likely be seriously impaired. If in the future we are not able to demonstrate favorable financial results or projections from our operating business segments, we will not be able to raise the capital we need to continue our then current business operations and business activities, and we will likely not have sufficient liquidity or cash resources to continue operating.

Because our working capital requirements depend upon numerous factors there can be no assurance that our current cash resources will be sufficient to fund our operations. At present, we have no committed external sources of capital, and do not expect any significant product revenues for the foreseeable future. Thus, we will require immediate additional financing to fund future operations. There can be no assurance, however, that we will be able to obtain funds on acceptable terms, if at all.

*Credit Facilities*

As of March 31, 2018, the Company had notes payable consisting of the following: (i) $378,500 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of March 31, 2019; (ii) $281,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to December 11, 2020; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of March 31, 2018. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

As of December 31, 2017, the Company had notes payable consisting of the following: (i) $445,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of March 31, 2019; (ii) $242,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to December 11, 2020; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of March 31, 2018. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

*Bellridge Second Note Offering*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Selling Securityholder, an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased:

- a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note");

- warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant");

- 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares").

In consideration for the Second Note, Warrant Shares and Commitment Shares, the Lender paid an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below).

The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

The Company believes that as of the date of this prospectus, the Company is in compliance with all of the foregoing restricted covenants, including such additional covenants set forth under Second Note. Further, the Company believes that as of the date of this prospectus, the Company is in compliance with all affirmative covenants set forth below.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and restrictive financial covenants, including but not limited to, the following restrictive covenants:

- The Company will not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, incur or guarantee, assume or suffer to exist any indebtedness (other than (i) the Indebtedness evidenced by the Second Note and the First Note and (ii) other Permitted Indebtedness). Under the terms of the Second Note, "Permitted Indebtedness" means (i) indebtedness evidenced by the Second Note and the First Note, (ii) indebtedness secured by permitted liens or unsecured indebtedness and (iii) permitted subordinated indebtedness;

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on any of its capital stock;

- At any time a Defeasance Failure exists (defined below), the Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, permit any indebtedness of the Company or any of its subsidiaries to mature or accelerate prior to the maturity date of the Second Note. "Defeasance Failure" means, as of any given time of determination, the failure of the cash amount in the Holder Master Restricted Account to be greater than or equal to the outstanding amount. "Holder Master Restricted Account" means, solely with respect to the holder, a certain account at Umpqua Bank, or such other account as may be directed by the holder of the Second Note, from time to time, subject to a Controlled Account Agreement in favor of the holder in a form reasonably acceptable to the holder; and

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by or publicly contemplated to be conducted by the Company and each of its subsidiaries on March 8, 2018 or any business substantially related or incidental thereto. The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, modify its or their corporate structure or purpose.

For more information on the terms and conditions of the Bellridge Second Note Offering please see "*Description of Securities*."

## Contractual Obligations, Commitments and Contingencies

During fiscal year 2017, the Company entered into a series of monthly vehicle leasing agreements with Acme Auto Leasing. As of December 31, 2017, the Company has total lease obligations in the amount of $1,593,291 (collectively, the "Finance Lease Obligations"). From June 21, 2016 (inception) to December 31, 2016, our Finance Lease) our Finance Lease Obligations were nil. The Company owes monthly payments under each Lease Agreement ranging from approximately $373.01 per month to $621 per month (with only 9 vehicles out of approximately 150 exceeding $373.01 per month). At the end of the term of the Lease Agreement, Lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to and secured by a grant of a purchase money security interest on each leased vehicle.

During fiscal year 2017 and from June 21, 2016 (inception) to December 31, 2016, we leased and maintained primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210 and 6600 Sunset Blvd. Los Angeles, CA 90028, the latter being the location where the majority of our operations and staff conduct activities on a daily basis. We do not currently own any real property.

As of the date of this prospectus, we do not employ any software engineers or developers to write code for our App or otherwise create the technology upon which our App is based. Our entire development efforts and operations with respect to our App and accompanying technology is based on a commercial license agreement with a leading technology development firm (the "License Agreement"), which is the sole foundation for all of the Company's technology capabilities. In developing our App, we engaged the services of a third-party outsourced technology development firm (the "Dashride"), that is a developer of ride sharing technology platforms and, while we own the work product of the Dashride that was custom built for the Company (the "Company Work Product"), such work product is integrated with and entirely reliant upon our license to use the Dashride's proprietary technology platform (the "Licensed Technology"), in which we have no rights or ownership interest and which is necessary for our App (and the Company Work Product) to function. Moreover, we have not yet secured a source code escrow for the Company Work Product but intend to establish a source code escrow for the Company's Work Product. As a result, we are reliant upon the Dashride and the Licensed Technology for the operation and functioning of our App, and therefore our business. Any dispute with the Dashride or under the License Agreement or claims by the Dashride as to the ownership of the Company Work Product, for whatever reason and on any basis, with or without merit, would currently have a significant and material adverse impact on our business and ability to conduct operations. As of the date of this prospectus, the License Agreement has been terminated by the Company.

On September 28, 2016, we engaged the services of Lexicon Labs by entering into a product management proposal (the "Product Management Proposal"), to oversee and manage the development our App and assist with product development services in the form of (a) design and development services to provide iOS operating system capabilities for our mobile App, (b) design and development for a web registration portal for on-boarding new users, and (c) development of web administration applications to allow high level team members to be able to track user analytical information. Pursuant to the terms and conditions of the Project Management Proposal, all intellectual property rights created under the Product Management Proposal, including all right, title and interest to all code and designs, and documentation will be transferred to the Company. Pursuant to our agreement with Lexicon Labs, we have agreed to pay Lexicon Labs compensation in the form of a monthly project manager fee of $10,000, plus, following the completion of the project by Lexicon Labs, we have agreed to issue to Lexicon Labs an option to purchase up to one-percent (1%) of the issued and outstanding common stock of the Company at the time of the options exercise. On November 16, 2016, the Company adopted and ratified the terms of the Product Management Proposal and accepted the benefits of such arrangement on behalf of the Company. As of the date of this prospectus, the Company has terminated the Product Management Proposal.

*Financings and Securities Offerings*

*YayYo, Inc., Equity Offerings*

In December 2016, we filed an offering statement pursuant to Regulation A of the Securities Act, which was qualified by the SEC on March 17, 2017. We offered up to a maximum of 6,250,000 shares of common stock on a "best efforts" basis, at a price of $8.00 per share. On March 16, 2018, we closed the Regulation A offering, after issuing 365,306 shares of common stock for proceeds of approximately $1.8 million net of offering expenses (the "Regulation A+ Offering").

During the quarter ended March 31, 2018, the Company sold 49,180 shares of common stock to two investors for cash proceeds of $332,924.

During the year ended from December 31, 2017, the Company sold 371,351 shares of common stock to investors for gross cash proceeds of $2,484,199 of which 326,126 shares and $2,303,299 of cash proceeds were related to the Company's Regulation A offering. The Company incurred $814,442 of offering cost related to the sale of common stock which consisted principally of legal fees and costs associated with soliciting the sale of common stock directly to the Regulation A+ Offering investors.

During fiscal year 2017, the Company entered into a series of monthly vehicle leasing agreements with Acme Auto Leasing LLC (the "Lessor"). As of December 31, 2017, the Company has total lease obligations in the amount of $1,593,291 (collectively, the "Finance Lease Obligations").

On July 15, 2017, the Company and the Lessor entered into an agreement pursuant to which the Company agreed to issue additional consideration to the Lessor in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company (the "Lease Side Agreement").

From June 21, 2016 (inception) to December 31, 2016, the Company raised an additional $175,400 from the funds subscribed to under SAFE agreements with 28 unaffiliated investors. In addition, between December 2016 and January 17, 2016, we received subscriptions for $175,400 of our SAFE Shares from 28 investors in our Rule 506(b) private placement under Regulation D of the Securities Act, that, by their terms, automatically convert into 43,850 shares of our common stock as of the filing of this Prospectus (at a conversion price of $4.00 per share). We terminated such private placement on January 17, 2017. On March 17, 2017 our SAFE Shares were automatically converted into 43,850 shares of our common stock.

*Selling Securityholder Transactions*

In December 2017, the YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, in the original principal amount of $222,222 (the "First Note"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of the YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by the YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired.

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant") and 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Warrants expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The Company also paid $178,228 of issuance costs associated with this Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between the YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following the YayYo, Inc., receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

In accordance with the Second Note Offering, the Company has agreed to pay Aegis Capital Corp., as placement agent ("Aegis") a cash placement fee payable within 48 hours of (but only in the event of) the receipt by the Company of any proceeds from the exercise of the Warrants or options sold in the Second Note Offering equal to 8% of the aggregate cash exercise price received by the Company upon such exercise, if any  (the "Placement Agent's Fee"). As of April 27, 2018, the Placement Agent's Fee has been deferred and is intended to be paid by the Company when and as funds are released from the Master Restricted Account to the Company, in proportion to the amount of fees."

*Distinct Cars, LLC*

As of the date of this Prospectus, Distinct Cars, LLC, as lessee, entered into a series of open-ended lease agreements and disclosure statements with Acme Auto Leasing, Inc., ("Lessor") to lease standard passenger vehicles, each with an approximate lease term of thirty-six (36) months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $373.01 per month to $621 per month (with only 9 vehicles out of approximately 150 exceeding $373.01 per month). At the end of the term of the Lease Agreement, Lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

Distinct Cars, LLC has completed a debt round of financing pursuant to which Distinct Cars raised aggregate gross proceeds in the amount of $252,667 from twenty-nine accredited investors in exchange for senior secured promissory notes issued by Distinct Cars (each a "Distinct Cars Note" and collectively, the "Distinct Cars Notes"). The maturity date under the Distinct Cars Notes is third-six (36) months from the date of issuance (the "DCN Maturity Date"). The principal amount under the Distinct Cars Notes ranges from a minimum amount of $5,000 per Distinct Cars Note up to $20,000 per Distinct Cars Note. The Distinct Cars Notes accrue interest at a rate of 8% per annum with interest due and payable upon the DCN Maturity Date. The principal amount and any unpaid and accrued interest thereunder is due and payable in twelve (12) quarterly installments commencing upon January 1, 2018. The Distinct Cars Notes are secured by a senior secured priority lien in the equity of the fleet of leased automobiles acquired under the Lease Agreements (see Lease Agreements above) subject to subordination in priority lien status to the purchase money security interest held by the lessor under the Lease Agreements. In addition to the total amount of principal and interest owing under the Distinct Cars Note, upon execution of the Distinct Cars Note and placement of funds the holder shall receive a stock grant (the "Stock Grant") of YayYo Inc., common stock (the "Parent Shares") in an amount equal to 100% of the principal sum as calculated by a price of $4.00 per share with 30% coverage. The Stock Grant is offered pursuant to Rule 506(b) of Regulation D and Section 4(a)(2) of the Securities Act of 1933.

*X, LLC*

During the fiscal year ended December 31, 2017 and the periods from June 21, 2016 (inception) to December 31, 2016, X, LLC, a limited liability company owned and controlled by Ramy El-Batrawi, our controlling stockholder, Chief Executive Officer and director, issued to the Company advances of a total of $50,000 and $75,000. As of December 31, 2017, $125,000 of these loan advances were repaid in full. The loan advances were non-interest bearing and due upon demand. At December 31, 2017 and December 31, 2016, the amount due to X, LLC, as holder of the note was $0 and $75,000, respectively.

*Chase Financing, Inc.*

On January 6, 2017, the Company received $50,000 from Chase Financing, Inc., ("CFI") and issued its 10% original issue discount senior secured convertible note in the amount of $55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017, the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note"). Subsequent to the Second CFI note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of 427,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms.

Pursuant to the terms, the CFI Notes were secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and were convertible at the option of the holder into shares of our common stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our common stock during the twenty (20) trading days immediately prior to the date of conversion. In an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI notes by the Company, Ramy El-Batrawi, our founder, Chief Executive Officer, Director and control person of our principal stockholder, X, LLC (an entity wholly owned by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge Agreement with CFI (the "Guaranty and Pledge Agreement"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our common stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty & Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a common stock purchase agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our common stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of one dollar ($1.00). Under the Stock Purchase Agreement, and in addition to the 200,000 shares of common stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our common stock, held as of record and beneficially by X, LLC, equal to two percent (2%) of the number of shares of common stock issued or underlying common stock Equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial three (3) months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three (3) months. As of December 31, 2017, the CFI Notes have been repaid in full by the Company.

Since inception, our principal sources of operating funds have been proceeds from equity financing including the sale of our common stock to initial investors known to management and principal shareholders of the Company. We do not expect that our current cash on hand will fund our existing operations. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. If the Company is unable to raise sufficient additional funds, it will have to execute a slower than planned growth path, reduce overhead and scale back its business plan until sufficient additional capital is raised to support further operational expansion and growth. There can be no assurance that such a plan will be successful.

**Off-Balance Sheet Arrangements**

The Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. As of December 31, 2017, the convertible note has been repaid and there is no derivative financial instrument.

**Segment Information**

*Quantitative and Qualitative Disclosures about Market Risk*

In the ordinary course of our business, we are not exposed to market risk of the sort that may arise from changes in interest rates or foreign currency exchange rates, or that may otherwise arise from transactions in derivatives.

*Critical Accounting Policies and Estimates*

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. Preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable. In many instances, we could have reasonably used different accounting estimates and in other instances changes in the accounting estimates are reasonably likely to occur from period to period. Actual results could differ significantly from our estimates. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving our judgments and estimates.

*Revenue Recognition*

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 605, *Revenue Recognition*, only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the services have been provided, and collectability is assured.

We consider a signed contract or other similar documentation reflecting the terms and conditions under which products will be provided to be persuasive evidence of an arrangement. Collectability is assessed based on a number of factors, including payment history and the creditworthiness of a customer. If it is determined that collection is not reasonably assured, revenue is not recognized until collection becomes reasonably assured, which is generally upon receipt of cash.

*Stock-Based Compensation*

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 750,000 and 450,000 options outstanding as of December 31, 2017 and 2016, respectively. As of May 30, 2018, 680,000 options granted are vested and exercisable.

We account for stock-based compensation in accordance with the authoritative guidance on stock compensation. Under the fair value recognition provisions of this guidance, stock-based compensation is measured at the grant date based on the fair value of the award and is recognized as expense, net of estimated forfeitures, over the requisite service period, which is generally the vesting period of the respective award. As a result, we are required to estimate the amount of stock-based compensation we expect to be forfeited based on our historical experience. If actual forfeitures differ significantly from our estimates, stock-based compensation expense and our results of operations could be materially impacted.

For options granted during fiscal year 2016 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.85 and the weighted-average exercise price of such options was $1.00. No options were granted during fiscal 2016 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

For options granted during fiscal year 2017 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $7.54 and the weighted-average exercise price of such options was $8.00. No options were granted during fiscal 2017 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

The fair value of the stock options is being amortized to stock option expense over the vesting period. The Company recorded stock option expense of $1,676,476 and $63,955, respectively, during the year ended December 31, 2017 and from June 21, 2016 (inception) to December 31, 2016. As of December 31, 2017, the unamortized stock option expense was $904,468, which is expected to be recognized as an expense through December 2018.

The assumptions used in calculating the fair value of options granted using the Black-Scholes option- pricing model for options granted are as follows:

| | |
|---|---|
| Risk-free interest rate | 1.14% |
| Expected life of the options | 2.08 years |
| Expected volatility | 200% |
| Expected dividend yield | 0% |

## Contingencies

Certain conditions may exist as of the date the financial statements are issued, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company's management, in consultation with its legal counsel as appropriate, assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company, in consultation with legal counsel, evaluates the perceived merits of any legal proceedings or unasserted claims, as well as the perceived merits of the amount of relief sought or expected to be sought therein. If the assessment of a contingency indicates it is probable that a material loss has been incurred and the amount of the liability can be estimated, then the estimated liability would be accrued in the Company's financial statements. If the assessment indicates a potentially material loss contingency is not probable, but is reasonably possible, or is probable, but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss, if determinable and material, would be disclosed. Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed.

## BUSINESS

### Corporate History

The Company was formed on June 21, 2016 under the name "*YayYo, LLC*," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC, to the Company in exchange for common stock, par value $0.000001 per share, of the Company. All of the YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities upon the filing of the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware.

Our mailing address is YayYo, Inc., 433 North Camden Drive, Suite 600, Beverly Hills, California 90210 and our telephone number is (310) 926-2643. Our website address is *www.yayyo.com*. The information contained therein or accessible thereby shall not be deemed to be incorporated into this Prospectus.

## Business Overview

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savvy LLC, a Delaware limited liability company ("Savvy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"). Until June 31, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" application for smartphone users that seeks to provide price comparison and bookings of available ridesharing and taxi services along with select limousine and other public and/or private transportation services ("Metasearch App").

As of the date of this Prospectus, the Company has completed the development of the Metasearch App, however, its successful deployment and function is dependent on the availability of data from the major ridesharing companies (such as Uber and Lyft) known as an application programming interface ("API"). The Metasearch App has been completely developed and is only missing API access to be at full functionality. Thus far, the industry leaders, Uber and Lyft have been reluctant to provide an API to the Company for purposes of supporting the Metasearch App. Due to the API issues and foregoing technical limitations which are beyond the Company's control, the Company explored additional opportunities in the ridesharing economy space. While the Company has not completely abandoned the Metasearch App, as of the date of this Prospectus, the Company has no further intentions to continue the development of the Metasearch App or to continue dedicating human resources or financial capital of the Company to the commercialization of the Metasearch App.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from being an exclusive provider of transportation networks systems towards a more diversified operating company with a direct focus on the vehicle rental business and a related transportation network system. As of the date of this Prospectus, the Company's operating business segments include (i) an online peer-to-peer bookings platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

## Rideshare Rental E-Commerce Platform

On October 31, 2017, the Company created the wholly-owned subsidiary, Rideshare to incubate the concept of Rideshare Platform, a proprietary, peer-to-peer booking platform to rent standard passenger vehicles to self-employed ridesharing drivers. The Company has now deployed and launched the Rideshare Platform on the Company's e-commerce website Rideshararerental.com (http://www.Ridesharerental.com). Further, the Rideshare Platform also commercially markets the Company's own fleet of cars as well as other fleet owners and selected individual car owners. The Rideshare Platform bookings service provides all standard passenger car owners with a financial opportunity to monetize personally owned vehicles by renting them out to ridesharing economy drivers. Our business strategy with our operating Rideshare Platform is to continue developing our brand equity around becoming the premiere peer-to-peer TNC vehicle rental business for the ridesharing economy that matches the owners and/or operators of passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing economy drivers. The Company initially launched the Rideshare Platform in Los Angeles, CA and intends to launch in additional cities.

The Rideshare Platform leverages technology to connect the owners and/or operators of standard passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing drivers. The platform's functionality provides ridesharing drivers with access to certain data emitted from their respective Company rental vehicle(s) through a personal Rideshare rental dashboard. Vehicle owners can also access and manage data emitted from their personal vehicle(s) under rental to a third-party from the Rideshare Platform inventory dashboard and can further manage the other aspects of the vehicle rental transaction through the Rideshare Platform. Further, businesses renting vehicles on the Rideshare Platform can also access rental extension options through the Rideshare Platform. All transactional aspects of the rental vehicle(s) (including, but not limited to, background checks, terms, deposits and insurance costs) are run securely through the Rideshare Platform. In addition, our Rideshare website located at Ridesharerentals.com (http://www.ridesharerental.com) not only effectively monetizes Company-owned vehicle fleets, made available under our Fleet Management business, but also generates revenue by charging transactional fees to other vehicle owners and ridesharing economy drivers for all rental transactions consummated on the Rideshare Platform. The Rideshare Platform is available on desktop, iOS and Android devices. The development and functionality of our mobile applications are a material component to our business as drivers are more likely to transact via mobile devices.

Most importantly, all standard passenger vehicles made available on the Rideshare platform are fully qualified by the Company and guaranteed to meet the necessary Ridesharing Qualification Requirements imposed on ridesharing economy drivers by the private ridesharing TNCs. The Company mission seeks to put more prospective ridesharing drivers on roadways by providing ridesharing drivers with fully inspected vehicle offerings that are guaranteed to meet the Ridesharing Qualification Requirements.

Further, the Company's car liability and physical damage insurance policies ("Company Insurance Policies") cover both third-party vehicle owners as well as ridesharing drivers under rental contract. The Company Insurance Policies provide insurance on all listed Rideshare rental vehicles, provided that the Company Insurance Policy coverage is suspending during periods when the ridesharing driver under rental contract with the Company is actively operating on either the Uber or Lyft platform. During these periods when ridesharing drivers are actively operating Rideshare rental vehicles on either the Uber or Lyft platforms, coverage under the Company Insurance Policies are subordinate to the vehicle insurance coverage provided by Uber, Lyft or such other TNCs.

The Company believes that due to the development of the ridesharing economy and its anticipated growth trajectory, the commercial ridesharing economy market will reward the Company as an early entrant to the third-party vehicle rental business. Under the Rideshare Platform we intend to become the go-to booking destination and brand for ridesharing economy vehicle rentals in a TNC marketplace that connects owners and/or operators of standard passenger vehicles with ridesharing economy drivers. We believe that our product and service offerings on the Rideshare Platform will continue to be an attractive proposition for all ridesharing economy drivers either simply requiring a standard passenger vehicle to operate or otherwise struggling to qualify their personal vehicles under the Vehicle Inspection Requirements. Further, we believe that the Company will require additional capital investment to continue funding Rideshare, the Rideshare Platform or ridesharerental.com (http://www.ridesharerental.com), including technology, payments and advertising, for purposes of continuing to develop and scale the Rideshare Platform and business. Further, we believe there is an immediate opportunity and necessity to grow and scale the Rideshare Platform in new geographical territories for purposes of developing and strengthening the Company's brand and competitive advantage in the ridesharing economy vehicle rental market. For more information see "*Risk Factors*."

*Insurance Policy*

As of the date of this Prospectus, the Company together with a Managing General Underwriter ("MGU") maintains an insurance policy of behalf of the Company. Under the policy the MGU will handle all back-end insurance generation and processing through an API connection with the Company's databases. We believe that this MGU insurance policy has made it possible for us to launch our Rideshare Platform, which will also allow the Company to have other third-party fleet owners supply vehicles to drivers through our platform and have them covered under the terms of our insurance policy. Our insurance policy provides physical damage and liability coverage to all rideshare drivers and fleet owners under the Rideshare Platform. Under the terms of our policy, ridesharing drivers acquiring rental vehicles under our Rideshare Platform as well as owners of the rental vehicles are provided with an insurance ID card that lists each parties name and the vehicle VIN number. Further, customers to our Rideshare Platform pay daily (for the duration of the rental period) to become designated as a supplemental insured party under the Company's insurance policy. Under the terms of our policy, insurance coverage is valid from the date of commencement of the rental period up until the date that the vehicle is returned.

*Ambassador Referral Program*

The Company has further enhanced the monetization of the Rideshare Platform by creating and deploying the Rideshare Rental Ambassador program. Drivers renting cars from our Rideshare Platform can join the Ambassador program and refer other potential drivers and prospective customers to rent from the Rideshare Platform, providing our customers with additional income opportunities. The Company has designed and deployed a referral commissions team matrix that allows for both depth and breadth of commissionable referrals for the participating driver. As participating drivers add additional referred drivers to their down line, they progress in gaining additional levels of commission rewards. Eventually they are able to earn a free vehicle rental from Rideshare as a premium reward. This program requires that the driver continues to rent their vehicle from Rideshare in order to continue receiving commissions from other drivers' rentals under the Ambassador's down line. For further details on our Ambassador Referral Program, please visit http://www.Ridesharerental.com/company/ambassador-program-terms-conditions.

**Fleet Management Business**

On June 10, 2017, the Company formed the wholly-owned subsidiary, Distinct Cars for purposes of developing a fleet management business. The Company's Fleet Management business maintains a fleet of brand new standard passenger vehicles to be subsequently rented directly to drivers in the ridesharing economy through the Rideshare Platform. The Company's fleet of vehicles, under lease contract and maintained by Distinct Cars, as well as other third-party vehicles will be made commercially available for rental bookings on the Rideshare Platform as well as on other third-party e-commerce booking platforms and/or through strategic partnerships and relationships. The Company seeks to provide drivers in the ridesharing economy with full-service vehicle rentals and fleet contract maintenance solutions for commercial standard passenger vehicles.

The Company's material operations for the Fleet Management business are primarily conducted in the State of California. As a provider of comprehensive, integrated vehicle rental and fleet management solutions, the Fleet Management business markets and manages short and long-term vehicle rentals to ridesharing economy drivers located in Los Angeles County.

The Company is focused on operating, developing and investing in its vehicle rental business with a focus on marketing directly to the peer-to-peer car sharing and ridesharing industry professionals. The Company is capable of meeting customers' needs, including but not limited to a guaranty that all vehicles maintained under the Fleet Management business will comply with and pass the Ridesharing Qualification Requirements. Our Fleet Management product and service offering includes full-service vehicle rental(s) and contract maintenance, along with distribution center management and transportation management service. As of the date of this Prospectus, the Company's customer base is primarily ridesharing drivers located within Los Angeles County that are operating and performing driving services on behalf of a host of the private ridesharing TNCs (primarily Lyft and Uber). While our Fleet Management business is primarily concentrated within the State of California, Los Angeles County, the Company intends to aggressively expand our Fleet Management services and product offerings nationally.

In August 2017, following our announcement that we were shifting our primary corporate operations, we entered into a leasing arrangement for an initial group of twelve (12) vehicles, with the intent of testing our fleet management concept within the ridesharing industry. Following the Company's proof on concept period, we expanded our Fleet Management business in December 2017 by adding an additional 135 vehicles to our fleet of vehicles. As of the date of this Prospectus, our full-service vehicle rental and contract maintenance under our Fleet Management segment is the Company's main operating line of business and primary revenue generating business segment. As of March 19, 2018, the Company Fleet Management business manages a fleet of approximately 150 vehicles under lease contract. During fiscal year 2017, professional ridesharing drivers contracted with private ridesharing TNCs for vehicle rental periods generally ranging from less than three days to six months. The rental vehicles made commercial available to customers by the Company are configured and guaranteed to be compliant with the Vehicle Inspection Requirements imposed on ridesharing vehicles by the private ridesharing TNCs (specifically, Uber and Lyft).

60

The Company believes that customers will rent vehicles offered by our Fleet Management business in order to reduce the complexity, cost and total capital associated with vehicle ownership. Further, we believe that due to our market focus on the ridesharing industry and the additional imposition of the Ridesharing Qualification Requirements imposed on ridesharing vehicles by the dominant private ridesharing TNCs, customers will be further incentivized to rent our Fleet Management vehicles to guarantee compliance with the Ridesharing Qualification Requirements.

Under a full-service rental agreement, the Company provides and fully maintains the vehicle, which is generally specifically configured to meet the Ridesharing Qualification Requirements. The services provided under full-service rental and contract maintenance agreements generally include preventive and regular maintenance, advanced diagnostics, emergency road service, fleet services, and safety programs, through our company-operated facilities.

*Fleet Management Software*

The Company has been an early adopter of technologies to leverage the Fleet Management business. To ensure that the Company's fleet of vehicles meet and comply with the Ridesharing Qualification Requirements and transmit relevant data our customers, the Company has fit its Fleet Management vehicles with fleet management GPS solution software, providing open platform fleet management solutions to businesses of all sizes. These full-featured solutions help the Company manage their drivers and vehicles by extracting accurate and actionable intelligence from real-time and historical location trip data. The telematics solutions for fleet optimization provide our Fleet Management vehicles with fitted software analytics and data involving (i) fuel efficiency; (ii) management of vehicle maintenance and (iii) prevention of vehicle wear and tear.

**Commercial Partnership Programs**

The Company has become a member of a commercial partnership program with Hyundai USA, a subsidiary of the Hyundai Motor Group. Hyundai provides and sells its vehicles in the United States through its subsidiary Hyundai USA (collectively, "<u>Hyundai</u>").

In June of 2017, the Company joined a commercial partnership program hosted by Hyundai as a commercial partnership member for purposes of developing the Company's Fleet Management segment. Under the terms of the Hyundai partnership program, Hyundai will extend special pricing of fleet vehicles to program members to be subsequently sold to the Company through selected Hyundai dealerships. The Company believes that the Hyundai commercial fleet management program will provide the Company with competitive pricing options on all purchases for brand-new Hyundai vehicles under lease and priority status on the availability and delivery of all Hyundai vehicles to be made through selected Hyundai dealerships, including but not limited to Penske Automotive. The Company status as a commercial partnership member with Hyundai under the commercial fleet management program is a non-exclusive and non-binding arrangement between Hyundai and the Company.

The Hyundai vehicles to be purchased under the Hyundai fleet management program and delivered pursuant to the Penske Automotive fleet management program are being financed and leased to the Company by ACME Auto Leasing. Under the Company's leasing agreements with ACME Auto Leasing, the Company acquires the right to title and possession of the Hyundai vehicles under a standard three-year leasing agreement with ACME Auto Leasing, LLC, in exchange for competitive pricing under all leases, with a $1 optional residual purchase at the end of the three-year lease term. Further, in exchange for attractive pricing from ACME Auto Leasing, LLC, on all leased Hyundai vehicles the Company has granted 350,000 shares of common stock to ACME Auto Leasing, LLC, under the terms of a Side Agreement.

The Company believes that availability to the Hyundai commercial partnership program is a key relationship for the Company's continuing operations. Any termination or suspension of our membership to the Hyundai commercial partnership program may potentially result in increases to the Company's cost of revenue which may have a material impact on the Company's operating expenses. For more information please see the section entitled "*Risk Factors*."

The Company has also entered into a commercial partnership program hosted by Penske Automotive Group, Inc., ("<u>Penske Automotive</u>"). Penske Automotive is a global transportation services company that operates automotive and commercial truck dealerships principally in the United States, Canada and Western Europe, and distributes commercial vehicles, diesel engines, gas engines, power systems and related parts and services principally in Australia and New Zealand.

In June 2017, the Company became a member of a Penske Automotive commercial fleet management program, operated by Penske Automotive dealerships, for purposes of providing fleet management services to the Company. Under the Penske Automotive fleet management program, the Company has been offered certain fleet management services to be provided by Penske Automotive on all registration of vehicles bought through the dealership by the Company for purchased vehicles, including the delivery of all brand-new Hyundai vehicles to the Company. The Company membership arrangement with Penske Automotive under the commercial fleet management program is non-exclusive and non-binding and the Company intends to enter into several similar arrangements with national car dealerships in the future in order to acquire and enter into similar vehicle leasing arrangements.

## The Ridesharing Industry

At the most basic level, real-time ridesharing is a service that arranges one-time shared rides on short notice. Traditionally, ridesharing arrangements between two or more unrelated individuals for commuting purposes have been relatively inflexible, long-term arrangements. These commuting arrangements will establish reasonably fixed departure time schedules and driving responsibilities. The complexity of work and social schedules and the perceived increase in vehicle trip complexity, such as trip chaining, has made this type of commuting arrangement much less desirable. "*Real-time*" ridesharing attempts to provide added flexibility to ridesharing arrangements by allowing drivers and passengers to partake in occasional shared rides. The internet-connected, global positioning system ("GPS") enabled device automatically detects your current location, takes the home location that you have programmed in previously and searches the database for drivers traveling a similar route and willing to pick up passengers. According to Wikipedia.org, "*real-time*" ridesharing is defined as "*a single, or recurring ridesharing trip with no fixed schedule, organized on a one-time basis, with matching of participants occurring as little as a few minutes before departure or as far in advance as the evening before a trip is scheduled to take place*".

A number of TNCs located in San Francisco premiered apps for real-time ridesharing in early 2010, several TNCs were introduced that were advertising as ridesharing, but in fact dispatched commercial operators similar to a taxi service. Transportation industry experts have frequently referred to these services as "*ridesourcing*" to clarify that drivers do not share a destination with their passengers. Rather, the "*ridesourcing*" app simply outsources rides to available commercial drivers. In 2013 an agreement was reached with California Public Utilities Commission creating a new category of service called "*Transportation Network Companies*" or "*TNCs*" to cover both real-time and scheduled ridesharing companies. Transportation Network Companies have faced regulatory opposition in many other cities, including Los Angeles, Chicago, New York City, and Washington, D.C, among others.

"*Ridesharing*" has been controversial, variously criticized as lacking adequate regulation, insurance, licensure, and training. One of the main so-called ridesharing (but actually ridesourcing) firms, Uber, was banned in Berlin and a number of other European cities. Opposition may also come from taxi companies and public transit operators because they are seen as alternatives. Early real-time ridesharing projects are believed to have begun in the 1990s, but they faced obstacles such as the need to develop a user network and a convenient means of communication. Gradually the means of arranging the ride shifted from telephone to internet, email, and smartphone; and user networks were developed around major employers and universities. As of 2006, the goal of taxi-like responsiveness still generally eluded the industry; "*next day*" responsiveness was generally considered the state of the art.

The term "*ridesharing*" was starting to become a misnomer, they're a lot more like successful private cab or taxi businesses that cater to a smartphone-toting clientele and actively rival traditional cab or taxi companies and having reliable and affordable door-to-door transportation in general can help expand car-free living. Given the fast rise of smartphone adoption globally, ridesharing's success doesn't come as a surprise. But there are many reasons why customers prefer to book those services versus taxis. Among those are a clear overview of pricing prior to booking, the ease and convenience of "*one-tap*" rides, the ability to monitor and follow drivers on map displayed on the user's smartphone, the convenience of a cashless transaction, fare splitting, and feedback options. The premier and probably most well know ridesharing service, Uber, was born when its founders became annoyed that they could not get a taxi in Paris. By eliminating the antiquated taxi dispatch system through technology (call and book taxi, call to request driver's location, call when taxi doesn't arrive), the founders of Uber created an innovative technology alternative to the traditional taxi dispatch system that has been widely adopted by users worldwide. By eliminating a key piece of the supply chain and streamlining efficiencies for the users, Uber was able to completely disrupt a century-old taxi industry. In essence, Uber & Lyft are really the two companies that dominate the market and Uber so far has won across the board: access, driver experience, customer experience, brand and funding.

The growth of the ridesharing economy has resulted in increasing consumer demand for ridesharing services, provided by Transportation Network Companies ("TNCs") such as Lyft, Gett and Uber, that offer a ridesharing economy service through mobile applications.

Ridesharing apps connect people who need a ride with people who have a vehicle and time to drive - notably, not necessarily people who are licensed taxi drivers. Ridesharing TNCs like Lyft, Gett and Uber provide a smartphone app that lets consumers hail a ride, set their destination, and pay without leaving the app itself. The benefits to the consumer is ease of use, availability of rides, and sometimes lower prices than traditional taxis. Many companies require at least some sort of certification for the drivers and take a portion of the drivers' fares. Ridesharing drivers can choose when they work (though they can receive bonuses for logging a certain number of hours) and provide their own vehicles. In the United States, ridesharing companies argue that the work-when-you-want arrangement qualifies drivers as contractors, not employees. Despite legal battles and controversy over surge pricing, ridesharing companies have exploded in popularity, both in the U.S. and internationally. Early entrants in the TNC app space, like Uber and Flywheel, were founded around 2009. Overall, the industry has raised more than $10 billion in venture funding.

We believe that we have strong economic prospects by virtue of the following dynamics of the industry:

- **Continued Growth in Ridesharing Market.** The ridesharing services market has grown faster, gone to more places and has produced robust growth and consumer traffic figures since commercial introduction in approximately 2009. The pace of growth is also picking up. It has been reported that *Uber* took six (6) years before it reached a billion rides in December of 2015, but it took only six (6) months for *Uber* to get to two billion rides. In the U.S., the number of users of ridesharing services is estimated to increase from 8.2 million in 2014 to 20.4 million in 2020, producing a compounded annual growth rate ("CAGR") of approximately 13.92% over the seven-year period.

- **Globalization of Ridesharing.** In the same vein, ridesharing which started as an experiment in California has grown into a global marketplace over a short period of time. Asia has emerged as a geographical territory to drive future growth. For example, *Didi Chuang*, the Chinese ridesharing company, completed 1.43 billion rides just in 2015 and it now claims to have 250 million users in 360 Chinese cities. Ridesharing is also acquiring deep roots in both India and Malaysia, and is making advances in Europe and Latin America, despite regulatory pushback.

- **Expanding Choices.** Consumer options in ridesharing are expanding to attract an even larger audience, such as carpooling and private bus services. The expansion of consumer options has also attracted mass transit customers to more expensive luxury options. In addition, it has been reported that dominant TNC businesses are experimenting with pre-scheduled rides and multiple stops on single trip gain to meet customer needs. Our Fleet Management business and fleet of rental vehicles are designed to put more certified ridesharing vehicles on the roadways to meet the increasing consumer demand of the availability of ridesharing services.

**Regulation of the Ridesharing Industry**

In the current ridesharing marketplace, often times the TNCs (such as Uber or Lyft) generally takes the place of government in enforcing standards for drivers and vehicles, though two (2) states and the District of Columbia now have basic driver background and minimum insurance requirements in place for TNCs. Each TNC has its own regulations at the corporate level. However, in many instances, state, local or federal governments are beginning to seriously assess the ridesharing industry and it is likely that regulations and mandated standards are imminent. For more information see section "*Vehicle Registration Requirements.*"

**Our Opportunity**

The increasing demand for ridesharing services has produced an increase in demand by TNC businesses for more ridesharing drivers and vehicles on the road at any given time. The growing demographic of ridesharing drivers, as determined on a global basis, has drawn ridesharing drivers to the ridesharing marketing to perform services for a host of private TNC businesses focused on ridesharing, such as Uber and Lyft. The Company believes that private ridesharing TNC businesses are hiring more than 50,000 drivers a month to keep pace with the current commercial demand for ridesharing services.

Complicating this matter further, many potential ridesharing drivers drawn to the ridesharing market are being rejected or turned away from employment by the private ridesharing TNCs on account of the fact that many potential ridesharing driver's personal vehicles are failing to meet the Ridesharing Qualification Requirements imposed on all ridesharing vehicles by the private ridesharing TNCs. Private ridesharing TNCs impose certain vehicle safety tests and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs. Generally, the TNCs impose certain standard requirements on all ridesharing drivers and their respective vehicles (the "Driver Qualification Requirements") as well as additional vehicle safety tests, inspections and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs (the "Vehicle Qualification Requirements", together with the Driver Qualification Requirements, the "Ridesharing Qualification Requirements"). For more information see "*Ridesharing Qualification Requirements*". The Company estimates that approximately 30%-50% of potential ridesharing drivers do not own or have rights or access to a car or vehicle that will meet the Ridesharing Qualification Requirements. Further, the Company believes that this issue surrounding the Ridesharing Qualifications Requirements are exacerbating the problem and resulting in a shortfall of ridesharing drivers on the road at any given time. Private ridesharing TNCs have responded to this issue by actively pursuing programs to get eligible ridesharing drivers into qualified cars that meet the Ridesharing Qualification Requirements. The Company believes that the TNC line of business and immense capital requirements in developing a fleet management business to service the growing ridesharing industry on such a large scale will restrict the ability of the private ridesharing TNCs to dominate the ridesharing vehicle rental market. Further, despite the financial resources and scale of the dominant TNCs in the ridesharing business, the Company believes that third-party vehicle rental providers are a necessity to the growth and service of a robust ridesharing market.

*Ridesharing Qualification Requirements*

The TNCs generally impose a host of requirements on potential ridesharing driver applicants seeking employment with TNCs such as Uber and/or Lyft. For example, prior to becoming a ridesharing driver, Uber and Lyft impose similar uniform requirements on all ridesharing vehicles and drivers. Generally, the ridesharing driver must meet the following standard requirements (collectively, the "Driver Qualification Requirements"):

- The ridesharing driver must obtain a minimum age of 21 years old;
- The ridesharing driver's vehicle must be a four-door car made in year 2007 or newer (in most cities- 2002 or newer for Los Angeles, Orange County, San Francisco);
- The ridesharing driver must have in-state auto insurance with the driver's name on the policy;
- The ridesharing driver must have an in-state driver's license, licensed in the US for at least one year;
- The ridesharing driver must have in-state plates with a current registration (commercial plates are acceptable as well);
- The ridesharing driver must have a clean driving record;
- The ridesharing driver must pass on the background check;
- The ridesharing driver's vehicle must pass the Cosmetic Qualification Requirements.

For example, prior to becoming an Uber driver, the company requires all potential ridesharing drivers of UberX, UberXL and UberPlus/UberSelect to meet the following vehicle requirements:

- Access to a four-door car that is year 2007 or newer (in most cities- 2002 or newer for Los Angeles, Orange County, San Francisco);
- The vehicle is in good physical condition with no cosmetic damage;
- No marketing or commercial branding is being outwardly displayed on the vehicle;
- Passing score on the vehicle inspection.

In addition, the TNCs may impose cosmetic guidelines on all ridesharing vehicles providing ridesharing services on behalf of the private ridesharing company. Certain cosmetic features may prevent a potential ridesharing driver's vehicle from qualifying under the vehicle inspection on account of the following: (i) the vehicle includes a full-body wrap containing advertisements, or any large ads; (ii) the vehicle has holes or damage to the exterior; (iii) the vehicle has taxi decals or taxi-style paint; (iv) the vehicle has significant damage to the interior (including any torn seats, large permanent stains, strong permanent odors); (v) the vehicle has paint oxidation; or (vi) the vehicle has different colored hoods/doors; (vii) the vehicle has objectionable aftermarket modification (collectively, "Cosmetic Qualification Requirements").

In addition to the Driver Qualification Requirements, private ridesharing companies also require all potential ridesharing drivers to undergo a vehicle inspection test on all personal driver vehicles to be used by the potential ridesharing driver to perform ridesharing services on behalf of the private ridesharing company. In order to become a Uber or Lyft driver, a potential ridesharing driver's vehicle generally must pass the 19-point vehicle inspection to confirm that it meets the private ridesharing companies requirements (the "Vehicle Qualification Requirements", together with the Driver Qualification Requirements, the "Ridesharing Qualification Requirements").

A 19-point inspection is a standard vehicle inspection procedure to check a car in 19 specific areas to ensure that it conforms to safety and operational requirements. While the 19 points are the same for different companies, their procedures differ slightly. The process also varies based on the geographical location where the inspection is performed. The 19 points of the vehicle checked for inspection include headlights, tail-lights, indicator lights, stop lights, foot brakes, emergency/parking brake, steering mechanism, windshield, heat and air conditioning, front, rear and side windows, front seat adjustment mechanism, door controls (open, close, lock), horn, speedometer, body condition/ damage, muffler and exhaust system, condition or tires, interior and exterior rear-view mirrors and safety belts for driver and passengers. Any vehicle having a problem or issue with any of the inspection points will generally not pass the vehicle inspection and will be refused the opportunity to become a ridesharing driver for the private ridesharing company.

**Company Growth Strategy**

Our long-term strategy is focused on four priorities: expanding and diversifying our revenues; improving our operating effectiveness; enhancing the customer experience; and disciplined capital management.

*Expand and Diversify Revenues*—Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint in North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

*Improve Operating Effectiveness*—We are focused on generating continuous improvement across our operations, with an emphasis on building a strong safety culture, fleet management business, e-commerce bookings website, fleet availability and improving margins. We are continuing to build a highly professional and technology-enabled sales force and to optimize our sales territories to support our revenue growth objectives. We will continue to improve the effectiveness of our sales team with focused training, strong customer relationship management capabilities, and ongoing technology enhancements.

*Enhance the Customer Experience*—We seek to differentiate our business by delivering a superior customer experience through the variety and quality of the vehicles and services we offer, the ease of doing business with us and the added value we offer through services, products and technologies. Our focus on quality vehicle brands tailored to meet the Vehicle Qualification Requirements of the ridesharing industry is intended to meet the preferences of ridesharing drivers, including the expectations for reliable, safe, efficient and effective maintained vehicles. We expect to add more expertise across our team to help our customers achieve the best results for their projects. In developing and providing vehicle rental related technologies, we are focused on meeting customer expectations related to convenience and on-demand access to data and information.

*Disciplined Asset Management*—We manage our vehicle rental fleet to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment.

## Intellectual Property

We generally rely on trademark, copyright and trade secret laws and employee and third-party non-disclosure agreements to protect its intellectual property and proprietary rights. We are currently in the process of pursuing trademark protection for our name and logos in the United States. Although we believe that our pending trademark applications will be granted by the United States Patent and Trademark Office, there can be no assurance that any trademarks will be granted or that any trademark relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We own registered trademarks "*YayYo®*" and the service mark for the stylized design representing an automobile.

In the future we may rely on patents to protect our intellectual property and proprietary technology, to the extent feasible, and plans to consult with intellectual property counsel to determine what patents we may be able to file to protect its intellectual property. As of the date of this Prospectus, we have not filed any patents in the United States or any other country. Although we believe that some of our technology may be patentable, there can be no assurance that any patents will be granted or that any patent relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We believe that due to the rapid pace of technological innovation for technology, mobile and internet products, our ability to establish and maintain a position of technological leadership in the ridesharing industry depends more on the skills of its development personnel than the legal protection afforded its existing technology. For more information see the section "*Risk Factors*".

## Employees

As of the date of this Prospectus, we had approximately ten (10) full-time employees and three (3) consultants, based at our offices. None of our employees are subject to a collective bargaining agreement, and we believe that our relations with our employees generally are good.

## Regulatory

We are subject to a number of U.S. federal and state and foreign laws and regulations that involve matters central to our business. These laws and regulations may involve privacy, data protection, intellectual property, competition, consumer protection, export taxation or other subjects. Many of the laws and regulations to which we are subject are still evolving and being tested in courts and could be interpreted in ways that could harm our business. In addition, the application and interpretation of these laws and regulations often are uncertain, particularly in the new and rapidly evolving industry in which we operate. Because laws and regulations have continued to develop and evolve rapidly, it is possible that we may not be, or may not have been, compliant with each such applicable law or regulation. In addition to the foregoing, we are also subject to the following:

Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

***Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows. For additional information please see the section entitled "Risk Factors."***

## Litigation

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We have received, and may in the future continue to receive, claims from third parties asserting, among other things, infringement of their intellectual property rights. Future litigation may be necessary to defend ourselves, our partners and our customers by determining the scope, enforceability and validity of third-party proprietary rights, or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors. To date, we have not been made aware of any actual, pending or threatened litigation against the Company.

## Property

We lease and maintain our primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. We also lease and maintain executive offices at 6600 Sunset Blvd. Los Angeles, CA 90028, where the majority of our operations and staff will conduct activities on a daily basis. We do not currently own any real estate.

## MANAGEMENT

The following are our executive officers and directors and their respective ages and positions as of December 31, 2017

| Name | Position | Age | Term of Office | Approximate hours per week for part-time employees |
|------|----------|-----|----------------|----------------------------------------------------|
| **Executive Officers:** | | | | |
| Ramy El-Batrawi | Chief Executive Officer | 56 | Since February 2017 | |
| Laurie DiGionanni | Chief Operating Officer | 58 | Since August 2017 | |
| Kevin F. Pickard | Chief Financial Officer, Secretary | 54 | Since June 2017 | 15 hrs |
| | | | | |
| **Directors:** | | | | |
| Ramy El-Batrawi | Director | 56 | Since November 2016 | |
| Laurie DiGionanni | Director | 58 | Since August 2017 | |
| Kevin F. Pickard | Director | 54 | Since October 2017 | |
| Paul Richter | Director | 62 | Since October 2017 | |
| Jeffrey J. Guzy | Director | 66 | Since October 2017 | |
| Christopher Maglino | Director | 49 | Since October 2017 | |
| Harbant S. Sidhu | Director | 59 | Since October 2017 | |
| Dave Haley | Director | 64 | Since October 2017 | |
| **Key Employees:** | | | | |
| Ramy El-Batrawi | Chief Executive Officer, Director | 56 | | |

During the past five (5) years, none of the persons identified above has been involved in any bankruptcy or insolvency proceeding or convicted in a criminal proceeding, excluding traffic violations and other minor offenses. There is no arrangement or understanding between the persons described above and any other person pursuant to which the person was selected to his or her office or position.

*Ramy El-Batrawi, Founder, Chief Executive Officer & Director.* Mr. El-Batrawi is the founder, chief executive officer and director of the Company. Since 2012 Mr. El-Batrawi has been the owner and chief executive officer of Growth Strategy Investments, LLC. Prior to founding the Company, Mr. El Batrawi was a principal shareholder and chief executive officer of Global Leisure Travel, Inc., from 1998 to 2000, which was subsequently sold. From 1993 to 2001, Mr. El-Batrawi served as the chief executive officer of Genesis Intermedia, Inc. From 1994 to 2001, Mr El-Batrawi served as the President and Chairman of the Board of the Directors for Genesis Diversified Investments, Inc. Since 2015, Mr. El-Batrawi has been the managing director of X, LLC.

On April 13, 2006, Ramy Y. El Batrawi was named, along with others officers, directors and/or associates of Genesis Intermedia, Inc., as defendants in a Securities and Exchange Commission enforcement action. In the Securities and Exchange Commission ("SEC") complaint, filed in the United States District Court for the Central District of California, entitled *SEC v. Ramy El-Batrawi, et al., United States District Court for the Central District of California, Case No 2: -06-cv-02247-(MRP_(RZ)* (the "Action"). The Action alleged violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act, in connection with a stock loan and manipulation scheme. The Action alleged, among other things, that defendants had violated antifraud provisions of federal securities laws by orchestrating a scheme to manipulate the stock price of Genesis Intermedia, Inc. (GENI), a now-defunct public company that was based in Van Buys, California (the "Complaint"). On April 1, 2010, Mr. El-Batrawi settled the Action by entering into a final judgment by consent with the SEC, without admitting or denying the allegations contained in the Complaint (the "Settlement"). In connection with the voluntary Settlement of the charges set forth in the Complaint, the U.S. District Court for the Central District of California entered the consent against Mr. El-Batrawi, which, among other things, barred Mr. El-Batrawi from acting as an officer or director of a public company for a period of five (5) years following the date of entry of the final judgment by consent. See "*Involvement in Certain Legal Proceedings*" below for more information.

*Laurie DiGiovanni, Chief Operating Officer & Director.* Ms. DiGiovanni is the chief operating officer and a director of the Company. Since 2012, Ms. DiGiovanni has held marketing and operating executive positions at Beverly Hills Rent a Car and Executive Transportation pursuant to which Ms. DiGiovanni managed national corporate expansions and activation of transportation industry leading brands and was executive producer for a range of marketing campaigns at auto shows and transportation industry live events. Ms. DiGiovanni manages all business operations of the Company and its subsidiaries including driver training and the Fleet Management business segment. Ms. DiGiovanni is the founder of the Association for Finance and Insurance Professionals (AFIP), an association that has certified tens of thousands for more ethical car buying practices, and mandatory for auto industry employees and implemented in leading global automotive markets. She also played key roles in the launch of many automotive initiatives, including managing new divisions and brands for Beverly Hills Travel and Lifestyle and American Dream Classics; serving as Director of Training for CarsDirect.com; and leading marketing and customer experience campaigns for Barrett-Jackson Car Auction. Ms. DiGiovanni also has direct brand experience within the automotive industry, including project management and training positions with Toyota, Mazda, and Nissan. Ms. DiGiovanni has a Bachelor of Arts degree from California State University, Fullerton.

_Kevin F. Pickard, Chief Financial Officer, Secretary & Director_. Mr. Pickard is the chief financial officer, secretary and a director of the Company. Since 2012, Mr. Pickard has been providing management consulting services to small and medium-sized companies, included due diligence on potential acquisitions, the preparation of projections and business plans, assistance with restructuring of companies, posturing companies for initial public offerings, review and preparation of filings with the Securities and Exchange Commission. From August 1996 to July 1998, Mr. Pickard was a partner of Singer Lewak Greenbaum & Goldstein, LLP, Los Angeles, California, where he co-managed the accounting its securities industry practice group. He served as a Business Assurance Manager of PricewaterhouseCoopers, LLP (formerly, Coopers & Lybrand, LLP) in various offices from September 1987 to July 1993 and from April 1994 to August 1996, where he focused on auditing companies in insurance, high-tech and industries. Mr. Pickard holds a Bachelors of Science in Accounting and a Master of Accountancy from Brigham Young University. Mr. Pickard is currently a licensed Certified Public Accountant in North Carolina, and California.

_Paul Richter, Director_. Mr. Richter is a member of the board of directors of the Company. Since February 1, 2002 to present, Mr. Richter has been the managing partner of PW Richter Plc., a private law practice that provides legal services to clientele. Richter, a licensed attorney, has performed legal services in the areas of securities and corporate law representing public and private companies in the U.S. Mr. Richter's legal practice focuses predominantly on SEC/state securities law compliance (including public and private securities offerings and SEC filings); corporate governance law compliance; contracts; commercial transactions; regulatory dispute resolution; business start-up formation and funding; employee-employer dispute resolution; corporate compensation plans; business immigration; and compliance with FINRA, NASDAQ and The OTC Markets Group, Inc. rules and regulations. In addition, Mr. Richter has experience in cross-border transactional matters having performed U.S. legal work for companies based in Hong Kong, India, Poland, Norway, Canada, United Kingdom and U.A.E. Mr. Richter is a licensed attorney with the state bar of Virginia.

Mr. Richter has an L.L.M. in Securities Regulation from Georgetown Law Center, Washington, D.C. (1987) and a J.D. from George Mason University Law School, Arlington, Virginia (1985). He has a B.A. with honors from Knox College, Galesburg, Illinois. Mr. Richter originated and authored the first few editions of _Corporate Anti-Takeover Defenses: The Poison Pill Device_ (published by Clark Boardman Co. and then by West Publishing for 18 annual editions) and he currently updates or assists in updating the following legal publications of Thomson Reuters West that were originally authored by other persons:  _Securities Public and Private Offerings (_since 2006_); Acquisitions and Mergers in Negotiated and Contested Transactions (_since 2008_);_ and _Designing and Effective Securities and Corporate Compliance Program_, (2017-2018 edition) (Corporate Compliance Series). He authored two CLE lectures and materials on Securities Law for Access MCLE (2016).

_Jeffrey J. Guzy, Director_. Mr. Guzy serves as a director of the Company. Since 2008, Mr. Guzy has served as an independent director and chairman of the audit committee of Leatt Corporation, a public SEC reporting company. Since 2004, Mr. Guzy has managed a private business consulting practice and has served as an executive manager or consultant for business development, sales, customer service and management in the telecommunications industry, specifically, with IBM Corp., Sprint International, Bell Atlantic Video Services, Loral CyberStar and FaciliCom International. Mr. Guzy has a MBA in Strategic Planning and Management from The Wharton School of the University of Pennsylvania; a M.S. in Systems Engineering from the University of Pennsylvania and a B.S. in Electrical Engineering from Penn State University.

_Christopher Miglino, Director_. Mr. Miglino serves as a director of the Company. Mr. Miglino has long been at the nexus of consumers, brands, social and lifestyle media, cause marketing and the enlightened, sustainable business movement. Mr. Miglino is the founder and CEO of Social Reality. Since 2010, Mr. Miglino has served as the chief executive officer of Social Reality. Prior to founding Social Reality, Mr. Miglino served as the chief executive officer of Lime Ad Network, a vanguard in the green and sustainable online business arena that connected consumers and brands with a collection of more than 250 green and socially conscious businesses. From June 2004 until August 2008, Mr. Miglino was CEO of Conscious Enlightenment, where he oversaw their day to day operations in the publishing and advertising industry. From 2004 until 2008, Mr. Miglino served as a board member for Golden Bridge Yoga in Los Angeles, a studio that encompasses over 20,000 square feet of yoga spaces including a restaurant.

_Harbant S. Sidhu, Director_. Mr. Sidhu serves as a director of the Company. Mr. Sidhu is a design engineer and founder of a private aerospace manufacturing business. Since 2012, Mr. Sidhu has operated a private aerospace and defense manufacturing company, managing all aspects of the operating business. Mr. Sidhu has experience in personnel management and oversite, aerospace and defense engineering, sales, manufacturing, accounting and operational experience in the aerospace and defense manufacturing industry. Mr. Sidhu has performing unclassified contracting work in components production for Mexico's Department of Defense. Mr. Sidhu graduated as an electrical engineer in 1980 from Punjab University, India.

_David Haley, Director_. Mr. Haley serves as a director of the Company. For the past 20 years, Mr. Haley has served as the chief executive officer of American Business Insurance Services, Inc., and ABI Business Insurance Services, Inc. These insurance entities manage general underwriters for various insurance specialties, primarily involved in the public livery space, which consists of taxicabs, buses, limousines and other transportation companies across the US.

## Code of Ethics

Our Board plans to adopt a written code of business conduct and ethics ("Code") that applies to our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer or controller, or persons performing similar functions. We intend to post on our website a current copy of the Code and all disclosures that are required by law in regard to any amendments to, or waivers from, any provision of the Code.

## Controlled Company

Upon completion of this offering, Ramy El-Batrawi, our founder, chief executive officer and director will continue to control a majority of the voting power of our outstanding common stock. As a result, we will be a "controlled company" under the Nasdaq corporate governance standards. As a controlled company, exemptions under the Nasdaq standards will exempt us from certain Nasdaq corporate governance requirements, including the requirements:

- that a majority of our board of directors consists of "independent directors," as defined under the rules of the Nasdaq;

- that the compensation of our executive officers be determined, or recommended to the board of directors for determination, by majority vote of the independent directors or by a compensation committee comprised solely of independent directors; and

- that director nominees be selected, or recommended to the board of directors for selection, by majority vote of the independent directors or by a nomination committee comprised solely of independent directors.

Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of the Nasdaq corporate governance requirements. In the event that we cease to be a controlled company, we will be required to comply with these provisions within the transition periods specified in the rules of Nasdaq.

These exemptions do not modify the independence requirements for the composition of our board of directors, our audit committee or compensation committee. We expect to satisfy the independence requirement for the composition of our board of directors, audit committee and compensation committee provided under Nasdaq listing standards and SEC rules and regulations for companies completing their initial public offering. See "_Committees of the Board of Directors—Audit Committee—Compensation Committee_."

## Board Leadership Structure and Risk Oversight

The Board oversees our business and considers the risks associated with our business strategy and decisions. The Board currently implements its risk oversight function as a whole. Each of the Board committees, when established, will also provide risk oversight in respect of its areas of concentration and reports material risks to the board for further consideration.

## Board of Directors

Our business and affairs are managed under the direction of our Board. Our Board consists of eight directors, five (5) of whom qualify as "independent" under the listing standards of Nasdaq.

Directors serve until the next annual meeting and until their successors are elected and qualified. Officers are appointed to serve for one (1) year until the meeting of the Board following the annual meeting of shareholders and until their successors have been elected and qualified.

## Director Independence

We will be a "controlled company" under the rules of Nasdaq and are not required to have a majority of our board of directors consist of "independent directors," as defined under the rules of Nasdaq. If such rules change in the future or we no longer meet the definition of a controlled company under the current rules, we will adjust the composition of the boards and its committees accordingly in order to comply with such rules.

Despite our status as a "controlled company" under the rules of _Nasdaq, our board of directors are composed of a majority of "independent directors" as defined under the rules of Nasdaq. We use the definition of "*independence*" of Nasdaq to make this determination. Nasdaq Listing Rule 5605(a)(2) provides that an "*independent director*" is a person other than an officer or employee of the company or any other individual having a relationship which, in the opinion of the Company's Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. The Nasdaq listing rules provide that a director cannot be considered independent if:

- the director is, or at any time during the past three (3) years was, an employee of the company;

70

- the director or a family member of the director accepted any compensation from the company in excess of $120,000 during any period of twelve (12) consecutive months within the three (3) years preceding the independence determination (subject to certain exemptions, including, among other things, compensation for board or board committee service);

- the director or a family member of the director is a partner in, controlling shareholder of, or an executive officer of an entity to which the company made, or from which the company received, payments in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenue for that year or $200,000, whichever is greater (subject to certain exemptions;

- the director or a family member of the director is employed as an executive officer of an entity where, at any time during the past three (3) years, any of the executive officers of the company served on the compensation committee of such other entity; or

- the director or a family member of the director is a current partner of the company's outside auditor, or at any time during the past three (3) years was a partner or employee of the company's outside auditor, and who worked on the company's audit.

Under such definitions, our Board has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment and affiliations, our Board has determined that Paul Richter, Jeffrey J. Guzy, Christopher Maglino, Harbant S. Sidu and Dave Haley are all independent directors of the Company. However, our common stock is not currently quoted or listed on any national exchange or interdealer quotation system with a requirement that a majority of our Board be independent and, therefore, the Company is not subject to any director independence requirements.

## Committees of the Board of Directors

Our Board has established an audit committee and a compensation committee. Our Board has not yet adopted procedures by which stockholders may recommend nominees to the Board of Directors. The composition and responsibilities of each of the committees of our Board is described below. Members serve on these committees until their resignation or until as otherwise determined by our board of directors. As a controlled company, we will not be required to have fully independent nominating and corporate governance committees.

## Audit Committee

We have established an audit committee consisting of Harbant Sidu, Paul Richter and Jeffrey J. Guzy. In addition, our Board has determined that Mr. Guzy is an audit committee financial expert within the meaning of Item 407(d) of Regulation S-K under the Securities Act of 1933, as amended, or the Securities Act. The audit committee's duties, which are specified in our Audit Committee Charter, include, but are not limited to:

- reviewing and discussing with management and the independent auditor the annual audited financial statements, and recommending to the board whether the audited financial statements should be included in our annual disclosure report;

- discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of our financial statements;

- discussing with management major risk assessment and risk management policies;

- monitoring the independence of the independent auditor;

- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law;

- reviewing and approving all related-party transactions;

- inquiring and discussing with management our compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by our independent auditor, including the fees and terms of the services to be performed;

- appointing or replacing the independent auditor;

- determining the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies; and

- approving reimbursement of expenses incurred by our management team in identifying potential target businesses.

The audit committee is composed exclusively of "independent directors" who are "financially literate" as defined under the Nasdaq listing standards. The Nasdaq listing standards define "financially literate" as being able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement.

In addition, the Company intends to certify to Nasdaq that the committee has, and will continue to have, at least one member who has past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background that results in the individual's financial sophistication.

**Compensation Committee**

We have established a compensation committee of the board of directors to consist of Christopher Miglino and Harbant S. Sidhu, each of whom is an independent director. Each member of our compensation committee is also a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act, or Rule 16b-3, and an outside director, as defined pursuant to Section 162(m) of the Code, or Section 162(m). Mr. Miglino is the chairman of the compensation committee.

- reviews, approves and determines, or makes recommendations to our board of directors regarding, the compensation of our executive officers;
- administers our equity compensation plans;
- reviews and approves, or makes recommendations to our board of directors, regarding incentive compensation and equity compensation plans; and
- establishes and reviews general policies relating to compensation and benefits of our employees.

Our compensation committee operates under a written charter that satisfies the applicable rules and regulations of the SEC and the listing standards of the Nasdaq.

**Non-Employee Director Compensation**

In November 2017, the Company entered into two (2) separate independent director agreements with Jeffrey J. Guzy and Paul Wesley Richter, each an independent director of the Company (each a "Subject Director" and, collectively, the "Subject Directors"), pursuant to which the Company has agreed to pay each Subject Director a flat, fixed cash fee of Two Thousand Five Hundred ($2,500) Dollars for each fiscal quarter that each Subject Director serves as an independent director on the board of directors of the Company (the "Subject Director Agreements"). The first payment under Subject Director Agreements was due and payable on or before November 30, 2017 for the fourth fiscal quarter of 2017, *provided, further,* that under the terms of the Subject Director Agreements, the Company has granted a non-qualified stock option to each Subject Director purchase 20,000 shares of Company common stock for each fiscal quarter. Each option granted under the Subject Director Agreements have an exercise period of no less than five (5) years and an exercise price for the shares of common stock underlying the options to be priced based on fair market value of the securities. As of June 1, 2017, the Company and the Subject Directors have mutually agreed to defer the issuance of the option grants until September 1, 2018.

**Family Relationships**

There are no family relationships among any of our officers or directors.

**Involvement in Certain Legal Proceedings**

Except as disclosed below, to our knowledge, none of our current directors or executive officers has, during the past ten (10) years:

- been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

- had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two (2) years prior to that time;

- been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in any type of business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;

- been found by a court of competent jurisdiction in a civil action or by the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

***Securities and Exchange Commission v. Ramy Y. El-Batrawi, GenesisIntermedia, Inc., Ultimate Holdings, Ltd., Adnan M. Khashoggi, Richard J. Evangelista, Wayne Breedon, and Douglas E. Jacobson**, Civil Action No. CV-06-2247 (MRP) (C.D. Ca.).*[2]

On April 1, 2010, the Company's founder, controlling shareholder, Executive Vice President and Director, Ramy Y El-Batrawi ("El-Batrawi") settled a United States Securities and Exchange Commission ("SEC") enforcement action (originally filed in April 2006) (the "Matter") by entering into a final judgment by consent (the "Consent") with the SEC, without admitting or denying the allegations contained in the SEC's Complaint (as defined below). In connection with the voluntary settlement and resolution of the Matter, the U.S. District Court for the Central District of California (the "Court") entered the Consent against El-Batrawi, which permanently enjoins him from violating Section 17(a) of the Securities Act of 1933, as amended ("Securities Act"), and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934, as amended ("Exchange Act") and Rules 10b-5, 13b2-1, and 13b2-2 thereunder, from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13, and barring El-Batrawi from acting as an officer or director of a public company for a period of five (5) years following the date of entry of the Final Judgment. For further information and details please contact the Company.

---

[2] U.S. Securities and Exchange Commission Litigation Release No. 21475 / April 2, 2010.

***YayYo, Inc., vs. Hurst Capital LLLP, Zach Hurst, Austin Hurst, Ryan O'Connor, Scott Carl Edwards, Robert Lisiescki, Christopher John Gilbert, Joseph Andreini III, and Joseph Hoffman.***

On November 21, 2016, the Company filed a lawsuit in U.S. District Court, for the Central District of California against Hurst Capital LLLP, Zach Hurst, Austin Hurst, Ryan O'Connor, Scott Carl Edwards, Robert Lisiescki, Christopher John Gilbert, Joseph Andreini III, and Joseph Hoffman (collectively, the "Defendants"). The lawsuit alleges claims for fraud, fraudulent inducement and concealment, negligent misrepresentation, unfair business practices, intentional interference with contractual relations and prospective economic relations, and conversion, based on the Company's belief that the Defendants made fraudulent and intentionally misleading representations to induce the Company to retain their services in connection with building our website and mobile applications, failed to satisfy the terms of their engagement with the Company and attempts to charge the Company for services which was never performed or was subpar. On February 23, 2018, the Company entered into a settlement agreement and mutual release by and between Ryan O'Connor, Robert Lisiescki, Christopher John Gilbert, and Joseph Hoffman pursuant to which the parties agreed to settlement and dismiss the action and to sever, release and discharge and terminate all rights, obligations and liabilities against the Defendants.

Except as set forth above and in our discussion below in "*Certain Relationships and Related Transactions*," none of our directors or executive officers has been involved in any transactions with us or any of our directors, executive officers, affiliates or associates which are required to be disclosed pursuant to the rules and regulations of the SEC.

We are not currently a party to any legal proceedings, the adverse outcome of which, individually or in the aggregate, we believe will have a material adverse effect on our business, financial condition or operating results.

**EXECUTIVE COMPENSATION**

The following table illustrates the compensation paid by the Company to its Chief Executive Officer, its two most highly compensated executive officers other than the Chief Executive Officer who were serving as executive officers at the end of the last completed fiscal year, and up to one additional individual for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the last completed fiscal year. We refer to these individuals as the "Named Executive Officers". The disclosure is provided for the years ended December 31, 2017 and from June 21, 2016 (inception) to December 31, 2016.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Benefits ($) (4) | Option Award ($) (5) | Total ($) |
|---|---|---|---|---|---|---|
| Ramy El-Batrawi, Chief Executive Officer, Director, Former Executive Vice President | 2017 | 286,300 | — | — | — | 286,300 |
| | 2016 | 120,000(1) | — | — | — | 120,000 |
| Laurie DiGionanni, Chief Operating Officer, Director | 2017 | 120,000 | — | — | — | 120,000 |
| | 2016 | — | — | — | — | — |
| Kevin F. Pickard, Chief Financial Officer, Secretary, Director | 2017 | 16,800 | — | 1,356,703 | — | 1,373,503 |
| | 2016 | — | — | — | — | — |
| Anthony Davis, Former President, Chief Executive Officer, Director | 2017 | 20,000(2) | | | | |
| | 2016 | 15,000 | | | | — |
| Robert W. Vanech , Former Chief Financial Officer, Treasurer, Secretary, Director | 2017 | 20,000(3) | — | | | |
| | 2016 | 15,000 | — | | — | |

(1) Represents $20,000 per month paid to Mr. El-Batrawi, as executive vice president of the Company, for each of the months of August 2016 through January 2017.

(2) Executive compensation in the amount of $10,000 payable for each of the months of January and February 2017

(3) Executive compensation in the amount of $10,000 payable for each of the months of January and February 2017.

(4) Any values reported in the "Other Compensation", if applicable, column represents the aggregate grant date fair value, computed in accordance with Accounting Standards Codification ("ASC") 718 Share Based Payments, of grants of stock options to each of our named executive officers and directors.

(5) The amount included in the "Option Awards" column does not reflect compensation actually received by the Named Executive Officer but represents the compensation cost that we recognized in each year presented, determined in accordance with FASB ASC 718. On December 1, 2016, each of Mr. Davis and Mr. Vanech received non-qualified stock options expiring on December 31, 2018, entitling them to purchase 100,000 shares of Company common stock at an exercise price of $1.00 per share at any time on or after June 1, 2017. On June 9, 2017, Mr. Pickard received non-qualified stock options to purchase up to an aggregate of 300,000 shares of underlying Company common stock expiring on December 31, 2020, provided, further, that as of December 31, 2017, options to purchase an aggregate of 180,000 underlying shares of Company common stock are vested and exercisable. All such options terminate within three months of each employee ceasing to be in the continuous employment of the Company.

The following table provides information about equity awards granted to our named executive officers that were outstanding on December 31, 2017.

| Name | Number of securities underlying unexercised options (#) exercisable | | Number of securities underlying unexercised options (#) unexercisable | Equity incentive plan awards: Number of securities underlying unexercised unearned options (#) | Options Exercise Price ($) | Options Expiration Date | Number of shares or units of stock that have not vested (#) | Market value of shares of units of stock that have not vested ($) | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested (#) | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | |
| Ramy El-Batrawi | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| Laurie DiGionanni | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| Kevin F. Pickard | 180,000 | (1) | 120,000 | 120,000 | $ 8.00 | 12/31/2020 | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |

(1) Unexercised and unearned options vest in increments of 10,000 underlying shares of Company common stock per month.

**Employment Agreements**.

As of December 31, 2017, the Company has no employment agreements with any of its executive officers.

On November 29, 2016, the Company and Mr. Davis, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Davis's first three months of service and performance under his term of employment with the Company. As set forth under the employment offer, Mr. Davis was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and an additional $10,000 for service performed by Mr. Davis during the month of February 2017.

On November 29, 2016, the Company and Mr. Vanech, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Vanech first three months of service and performance under his term of employment. As set forth under the employment offer, Mr. Vanech was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and (iii) an additional $10,000 for service performed by Mr. Vanech during the month of February 2017.

**Board Compensation**

During the fiscal year ended December 31, 2017, each non-employee member of the Board of Directors was entitled to receive cash compensation for his services. For more information please see the section entitled "*Non-Employee Director Compensation*" below.

| Name | Fees earned and paid in common stock | Option Award | Other Compensation | Total |
|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Ramy El-Batrawi | $ | — | — | — | $ | — |
| Laurie DiGionanni | $ | — | — | — | $ | — |
| Kevin F. Pickard | $ | — | — | — | $ | — |
| Paul Richter | $ | — | — | — | $ | — |
| Jeffrey J. Guzy | $ | — | — | — | $ | — |
| Christopher Maglino | $ | — | — | — | $ | — |
| Harbant S. Sidhu | $ | — | — | — | $ | — |
| Dave Haley | $ | — | — | — | $ | — |

(1) The amount included in the "Option Awards" column does not reflect compensation actually received by the Named Executive Officer but represents the compensation cost that we recognized in each year presented, determined in accordance with FASB ASC 718.

## PRINCIPAL STOCKHOLDERS

The following table sets forth certain information, as of May 30, 2018, with respect to the holdings of (1) each person who is the beneficial owner of more than 5% of Company common stock, (2) each of our directors, (3) each executive officer, and (4) all of our current directors and executive officers as a group.

Beneficial ownership of the common stock is determined in accordance with the rules of the Securities and Exchange Commission (the "SEC") and includes any shares of Company common stock over which a person exercises sole or shared voting or investment power, or of which a person has a right to acquire ownership at any time within 60 days of May 30, 2018. Except as otherwise indicated, we believe that the persons named in this table have sole voting and investment power with respect to all shares of common stock held by them. Applicable percentage ownership in the following table is based on 26,313,926 shares of common stock issued and outstanding plus, for each individual, any securities that individual has the right to acquire within 60 days of May 30, 2018.

To the best of our knowledge, except as otherwise indicated, each of the persons named in the table has sole voting and investment power with respect to the shares of our common stock beneficially owned by such person, except to the extent such power may be shared with a spouse. To our knowledge, none of the shares listed below are held under a voting trust or similar agreement, except as noted. To our knowledge, there is no arrangement, including any pledge by any person of securities of the Company, the operation of which may at a subsequent date result in a change in control of the Company.

| Name and Address of Beneficial Owner | Title | Beneficially Owned* | Percent of Class |
|---|---|---|---|
| **Officers and Directors [1]** | | | |
| Ramy El-Batrawi [2] | Chief Executive Officer and Director | 15,425,000 | 58.62% |
| Laurie DiGionanni | Chief Operating Officer and Director | — | — |
| Kevin F. Pickard | Chief Financial Officer and Director | 250,000 | * |
| Jeffrey J. Guzy | Director | — | — |
| Christopher Maglino | Director | — | — |
| Paul Richter | Director | — | — |
| Harbant S. Sidhu | Director | — | — |
| Dave Haley | Director | 258,695 | * |
| **Officers and Directors as a Group (total of 8 persons)** | | **15,933,695** | **59.98%** |
| **5% Stockholders** | | | |
| X, LLC [2] | | 15,425,000 | 58.62% |
| Gray Mars Venus Trust, Arizona 2015 [3] | | 5,588,235 | 21.44% |
| Acuitas Group Holdings, LLC [4] | | 1,654,412 | 6.29% |
| Bellridge Capital, L.P. [5] | | 2,150,000 | 7.73% |

\* Less than 1%

(1) Unless otherwise indicated, the principal address of the named directors and officers of the Company is c/o Yayyo, Inc., 433 N Camden Dr., # 600 Beverly Hills, CA 90210.

(2) Common stock beneficially owned by Ramy El-Batrawi are held of record by X, LLC, which is an entity that is wholly-owned and controlled by Ramy El-Batrawi, the Company's founder, Chief Executive Officer and Director. Its address is 2635 Astral Dr., Los Angeles, CA 90046. Mr. El-Batrawi has voting and dispositive control over any securities owned of record by X, LLC.

(3) Address is 75 Avon Ave, Mill Valey, CA 94941.

(4) Acuitas Group Holdings, LLC, an entity beneficially owned and controlled by Terren Peizer. Its address is 11601 Wilshire Blvd #1100, Los Angeles, CA 90025. Mr. Peizer has voting and dispositive control over any securities owned of record by Acuitas Group Holdings, LLC.

(5) Includes the following: (i) 400,000 shares of common stock, (ii) 1,500,000 underlying shares of common stock to be acquired upon the exercise of the Selling Securityholder Warrant, and (iii) an option (exercisable at any time by Bellridge Capital, L.P.) from a non-affiliate shareholder of the Company to purchase 250,000 shares of issued and outstanding common stock of the Company from the non-affiliate shareholder. Bellridge Capital LLC ("BC LLC") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described.

## SELLING STOCKHOLDERS

The shares of common stock being offered by the Selling Securityholder are those previously issued to the Selling Securityholder and those issuable to the Selling Securityholder upon exercise of the Selling Securityholder Warrant. For additional information regarding the issuance of common stock and the Selling Securityholder Warrant, see "*Certain Relationships and Related Party Transactions*" below. We are registering shares of common stock in order to permit the Selling Securityholder to offer the shares for resale from time to time. Except for the ownership of the common stock and the Selling Securityholder Warrant issued pursuant to the Securities Purchase Agreement, the Selling Securityholder have not had any material relationship with us within the past three years.

The table below lists the Selling Securityholder and other information regarding the beneficial ownership (as determined under Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder) of the shares of common stock held by the Selling Securityholder. The second column lists the number of shares of common stock beneficially owned by the Selling Securityholder, based on their respective ownership of shares of common stock of the Company and the Selling Securityholder Warrant, as of May 30, 2018, assuming exercise of the Selling Securityholder Warrant held by each such Selling Securityholder on that date but taking account of any limitations on exercise set forth therein.

The third column lists the shares of common stock being offered by this Prospectus by the Selling Securityholder and does not take in account any limitations on exercise of the Selling Securityholder Warrant set forth therein.

In accordance with the terms of the Registration Rights Agreement with the holders of the common stock and the Selling Securityholder Warrant, this Prospectus generally covers the resale of the sum of (i) the number of shares of common stock issued in connection with the Securities Purchase Agreement and (ii) 200% of the maximum number of shares of common stock issuable upon exercise of the Selling Securityholder Warrant, in each case, determined as if the outstanding Selling Securityholder Warrant were exercised in full (without regard to any limitations on exercise contained therein) as of the trading day immediately preceding the date this registration statement was initially filed with the SEC. Because the exercise price of the Selling Securityholder Warrant may be adjusted, the number of shares that will actually be issued may be more or less than the number of shares being offered by this Prospectus. The fourth column assumes the sale of all of the shares of common stock offered by the Selling Securityholder pursuant to this Prospectus. For additional information regarding the Registration Rights Agreement, see "*Description of Securities*" below.

Under the terms of the Selling Securityholder Warrant, a Selling Securityholder may not exercise the warrants to the extent (but only to the extent) such selling stockholder or any of its affiliates would beneficially own a number of shares of our common stock which would exceed 4.99%. The number of shares in the second column reflects these limitations. The selling stockholders may sell all, some or none of their shares in this offering. See "*Plan of Distribution*."

| Name of Selling Stockholder | Number of Shares of Common Stock Owned Prior to Offering | Maximum Number of Shares of Common Stock to be Sold Pursuant to this Prospectus | Number of Shares of Common Stock Owned After Offering |
|---|---|---|---|
| Bellridge Capital, L.P. **(1)** | 2,150,000**(2)** | 1,650,000 | 500,000 |

(1) Bellridge Capital LLC ("<u>BC LLC</u>") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described.

(2) Includes the following: (i) 400,000 shares of common stock, (ii) 1,500,000 underlying shares of common stock to be acquired upon the exercise of the Selling Securityholder Warrant, and (iii) an option (exercisable at any time by Bellridge Capital, L.P.) from a non-affiliate shareholder of the Company to purchase an aggregate of 250,000 shares of issued and outstanding common stock of the Company from the non-affiliate shareholder.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In addition to the arrangements, discussed in the sections titled "*Directors, Executive Officers & Corporate Governance*" and "*Executive Compensation*" the following is a description of each transaction since June 21, 2016 and each currently proposed transaction in which:

● we have been or are to be a participant;

● the amount involved exceeded or exceeds $120,000; and

● any of our directors, executive officers or holders of more than 5% of our outstanding capital stock, or any immediate family member of, or person sharing the household with, any of these individuals or entities, had or will have a direct or indirect material interest.

*Selling Securityholder Transactions*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K, in the original principal amount of $222,222 (the "First Note"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of the YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by the YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired.

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K and "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrant") and 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Selling Securityholder Warrant expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between the YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following the YayYo, Inc., receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

We are party to an investors' rights agreement with the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K, which provides, among other things, that certain holders of our capital stock and securities have the right to demand that we file a registration statement or request that their shares of our capital stock or common stock equivalents be covered by a registration statement that we are otherwise filing under this prospectus. See the section titled "*Description of Capital Stock—Registration Rights*."

*X, LLC*

During the fiscal year ended December 31, 2017 and the periods from June 21, 2016 (inception) to December 31, 2016, X, LLC, a limited liability company owned and controlled by Ramy El-Batrawi, the controlling stockholder of the Company and Chief Executive Officer and director of the Company, issued to the Company advances of a total of $50,000 and $75,000. As of December 31, 2017, $125,000 of these loan advances were repaid in full. The loan advances were non-interest bearing and due upon demand. At December 31, 2017 and December 31, 2016, the amount due to X, LLC, as holder of the note was $0 and $75,000, respectively. At March 31, 2018 and December 31, 2017, amount due to Company's majority stockholder was $0 and $0, respectively.

During the period from June 21, 2016 (inception) to October 31, 2016, the Company paid management fees of $110,000 to X, LLC, a company that is beneficially owned and controlled by the Ramy El-Batrawi, the Company's Chief Executive Officer and controlling stockholder. During the year ended December 31, 2017 and the period from June 21, 2016 (inception) to December 31, 2016, the Company paid management fees of $286,300 and $140,000, respectively, to a company that is owned by the Company's majority stockholder. During the three months ended March 31, 2018 and 2017, the Company paid management fees of $60,000 and $35,000, respectively, to a company that is owned by the Company's majority stockholder.

On January 6, 2017, the Company received $50,000 from Chase Financing, Inc., ("CFI") and issued its 10% original issue discount senior secured convertible note in the amount of $55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017, the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note"). Subsequent to the Second CFI note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of 427,778 (the "Third CFI Note" together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms.

Pursuant to the terms, the CFI Notes were secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and were convertible at the option of the holder into shares of our common stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our common stock during the twenty (20) trading days immediately prior to the date of conversion. In an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI notes by the Company, Ramy El-Batrawi, our founder, Chief Executive Officer, director and control person of our principal stockholder, X, LLC (an entity wholly owned and controlled by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge Agreement with CFI (the "Guaranty and Pledge Agreement"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our common stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty & Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a common stock Purchase Agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our common stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of one dollar ($1.00). Under the Stock Purchase Agreement, and in addition to the 200,000 shares of common stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our common stock, held as of record and beneficially by X, LLC, equal to two percent (2%) of the number of shares of common stock issued or underlying common stock equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial three (3) months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three (3) months. As of December 31, 2017, the CFI Notes have been repaid in full by the Company.

*Lexicon Labs*

On September 28, 2016 YayYo, LLC entered into a product management proposal with Lexicon Labs (the "<u>Product Management Proposal</u>"), whereas Lexicon Labs shall use its own personnel and other assets to oversee and manage the development of our technology and to assist with product development services to the Company in the form of (a) design and development services to provide iOS operating system capabilities for our mobile app "*YayYo!*", (b) design and development for a web registration portal for on-boarding new users, and (c) development of web administration applications to allow high level team members to be able to track user analytical information. On November 16, 2016, the Company adopted and ratified the terms of the Product Management Proposal and accepted the benefits of such arrangement on behalf of the Company.

Lexicon Labs is managed by Ali Rashidifar, a former director of the Company and consultant to the Company holding the position of product manager. Under the terms of the Product Management Proposal, the Company has agreed to pay Lexicon Labs compensation in the form of a management cost in an amount equal to $10,000 (paid on a monthly basis). Since November 16, 2016 (the date of the Company's incorporation), the Company has paid Lexicon Labs $10,000 for services rendered for the month of November 2016 under the terms off the Product Management Proposal. As a manager of Lexicon Labs, the Company believes that Mr. Rashidifar will directly or indirectly benefit financially from our Product Management Proposal and it is further assumed, at this stage, that the Company will continue the engagement of Lexicon Labs for the performance of product management services under the Product Management Proposal beyond November 2017, whereby the Company anticipates that aggregate fees paid to Lexicon Labs will exceed an aggregate of $120,000 in total payments issue and received by Lexicon Labs. As of December 31, 2017, the Product Management Proposal with Lexicon Labs has been terminated.

*Independent Director Agreements*

In November 2017, the Company entered into two (2) separate independent director agreements with Jeffrey J. Guzy and Paul Wesley Richter, each an independent director of the Company (each a "Subject Director" and, collectively, the "<u>Subject Directors</u>"), pursuant to which the Company has agreed to pay each Subject Director a flat, fixed cash fee of Two Thousand Five Hundred ($2,500) Dollars for each fiscal quarter that each Subject Director serves as an independent director on the board of directors of the Company (the "<u>Subject Director Agreements</u>"). The first payment under Subject Director Agreements was due and payable on or before November 30, 2017 for the fourth fiscal quarter of 2017, *provided, further*, that under the terms of the Subject Director Agreements, the Company has granted a non-qualified stock option to each Subject Director purchase 20,000 shares of Company common stock for each fiscal quarter. Each option granted under the Subject Director Agreements have an exercise period of no less than five (5) years and an exercise price for the shares of common stock underlying the options to be priced based on fair market value of the securities. As of June 1, 2017, the Company and the Subject Directors have mutually agreed to defer the issuance of the option grants until September 1, 2018.

<u>*Incentive Agreement for Grant of Stock*</u>

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with Dave Haley, a director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies for Rideshare Car Rentals, LLC and Distinct Cars, LLC (the "<u>Special Policies</u>") in consideration for a grant of 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 8,695 shares of Company restricted common stock, at a price per share equal to $8.00, as reimbursement for the cost of Mr. Haley's monetary advances made on behalf of the Company.

*Non-Qualified Stock Option Agreement*

On June 9, 2017, the Company entered into a non-qualified stock option agreement with Kevin Pickard, our chief financial officer and director, providing for an option grant to purchase an aggregate of 300,000 shares at an exercise price of $8.00 per share. The option grant vests at a rate of 10,000 options per month following the date of the option grant. As of May 30, 2018, an aggregate of 230,000 options are vested and exercisable. The options expire December 31, 2020.

On December 1, 2016, the Company entered into a series of non-qualified stock option agreements with former executive officers and directors of the Company providing for a series of option grants to those former executive officers and directors to purchase an aggregate of 450,000 shares at an exercise price of $1.00 per share. As of May 30, 2018, an aggregate of all 450,000 options are vested and exercisable. The options expire December 31, 2018.

# DESCRIPTION OF SECURITIES

The following description of our securities is only a summary and is qualified in its entirety by reference to the actual terms and provisions of the capital stock contained in our articles of incorporation and our bylaws.

## General

The Company is authorized to issue two classes of stock. The total number of shares of stock which the Company is authorized to issue is One Hundred Million (100,000,000) shares of capital stock, consisting of Ninety-Million (90,000,000) shares of common stock, $0.000001 par value per share, and Ten Million (10,000,000) shares of preferred stock, $0.000001 par value per share.

## Common stock

The holders of our common stock are entitled to the following rights:

### Voting Rights

Each share of our common stock entitles its holder to one vote per share on all matters to be voted or consented upon by the stockholders. Holders of our common stock are not entitled to cumulative voting rights with respect to the election of directors.

### Dividend Rights

Subject to limitations under Delaware law and preferences that may apply to any shares of preferred stock that we may decide to issue in the future, holders of our common stock are entitled to receive ratably such dividends or other distributions, if any, as may be declared by our Board out of funds legally available therefor

### Liquidation Rights

In the event of the liquidation, dissolution or winding up of our business, the holders of our common stock are entitled to share ratably in the assets available for distribution after the payment of all of our debts and other liabilities, subject to the prior rights of the holders of our preferred stock.

### Other Matters

The holders of our common stock have no subscription, redemption or conversion privileges. Our common stock does not entitle its holders to preemptive rights. All of the outstanding shares of our common stock are fully paid and non-assessable. The rights, preferences and privileges of the holders of our common stock are subject to the rights of the holders of shares of any series of preferred stock which we may issue in the future.

### Preferred Stock

Our authorized preferred stock consists of 10,000,000 shares of preferred stock, par value $0.000001 per share. As of the date of this filing, 2,000,000 shares of preferred stock have been designated as Series A non-voting convertible preferred stock, none of which have been issued. Our Board has the authority to issue preferred stock in one or more classes or series and to fix the designations, powers, preferences, and rights, and the qualifications, limitations or restrictions thereof including dividend rights, dividend rates, conversion rights, voting rights, terms of redemption, redemption prices, liquidation preferences and the number of shares constituting any class or series, without further vote or action by the stockholders.

While we do not currently have any plans for the issuance of any preferred stock, the issuance of preferred stock could adversely affect the rights of the holders of common stock and, therefore, reduce the value of the common stock. It is not possible to state the actual effect of the issuance of any shares of preferred stock on the rights of holders of the common stock until the Board of Directors determines the specific rights of the holders of the preferred stock; however, these effects may include:

- Restricting dividends on the common stock;
- Diluting the voting power of the common stock;
- Impairing the liquidation rights of the common stock; or
- Delaying or preventing a change in control of the Company without further action by the stockholders.

*Warrants*

On March 8, 2018, the Company issued to the Selling Securityholder warrants to purchase a total of 1,500,000 shares of Company common stock at the exercise price of $4.00 per share, held as of record and beneficially owned by the Selling Securityholder. The shares of Company common stock underlying the Selling Securityholder Warrant is being registered under this prospectus. The Selling Securityholder Warrant expires five years from the date of issuance. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

In March 2018, the Company issued to Aegis Capital Corp., as a placement agent ("Aegis") warrants (the "Aegis Warrants") to purchase a certain number of shares of common stock of the Company ("Placement Agent Warrant Shares") equal to 8% of the aggregate number of securities placed in the Second Note Offering (or the 2018 Senior Secured Note offering), plus any securities underlying any convertible securities placed in the Second Note Offering to such purchasers. The Aegis Warrants provide the holder with the right to purchase the underlying Warrant Shares at a price of $4.00 per share. The Aegis Warrants expires five years from the date of issuance.

*Options*

*2016 Equity Incentive Plan*

On November 30, 2016, we adopted our 2016 Equity Incentive Plan (the "Plan") to reward and provide incentives to our officers, directors, employees, consultants and other eligible participants. We have set aside options to purchase up to Ten Million (10,000,000) shares of common stock for issuance under the Plan, which may be granted in the form of either incentive stock options or non-qualified stock options. Our Board of Directors administers the Plan and has the authority: (i) to select the Plan recipients, the time or times at which awards may be granted, the number of shares to be subject to each option awarded, the vesting schedule of the options and (ii) to amend the stock option Plan to reward and provide incentives to its officers, directors, employees, consultants and other eligible participants. As of the date of this prospectus, Seven Hundred Fifty Thousand (750,000) options have been granted under the Plan, of which 680,000 options are vested and exercisable. 100% of the outstanding options have been granted to former officers and directors of the Company. Subsequent to the completion of this offering, the Company expects to continue to issue options as an inducement for managerial and qualified personnel to remain with and to join the Company. As of May 30, 2018, the Company granted an aggregate of 750,000 non-qualified stock options under the plan. As of May 30, 2018, an aggregate of 680,000 non-qualified stock options are vested and exercisable.

**Restricted Stock**

As of May 30, 2018, we had issued and outstanding 7,910,344 shares of restricted common stock.

**Registration Rights**

The Selling Securityholder, a principal shareholder of the Company and the holder of the Selling Securityholder Warrant, is entitled to rights with respect to the registration of their shares beneficially owned under the Securities Act. These registration rights are set forth under the terms of the Purchase Agreement, dated March 8, 2018, and as further set forth under a registration rights agreement, dated March 8, 2018, by and between the Company and Bellridge Capital, L.P (the "Registration Rights Agreement"). For more information see "*Certain Relationships & Related Transactions*." The Registration Rights Agreements sets forth a mandatory date for registration of 1,650,000 shares of restricted common stock of the Company beneficially owned as of record by the Selling Securityholder, pursuant to which the parties agreed that as soon as practicable after the date on which the shares of Company common stock, whether as a result of a public offering, merger, recapitalization, reorganization or otherwise, are registered under the Securities Exchange Act of 1934, as amended (each a "Public Company Date"), but in no event later than thirty (30) days after a Public Company Date (the "Filing Deadline"). The Registration Rights Agreement sets forth that the Company shall use its best efforts to cause the registration statement filed on behalf of the registrable securities to become effective as soon as practicable after filing, subject to the Filing Deadline. Under this prospectus, the Company is registering the underlying shares of common stock under the Selling Securityholder Warrant and such other registrable securities in accordance with the terms of the Purchase Agreement and Registration Rights Agreement. We will pay the registration expenses (other than underwriting discounts, selling commissions and stock transfer taxes) of the holders of the shares registered pursuant to the registrations described below.

**Indebtedness.**

As of December 31, 2017, we had outstanding indebtedness, excluding capital leases, of approximately a total of $909,889, which consisted of the following: (i) $445,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of March 31, 2019; (ii) $242,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest quarterly- due and payable from dates ranging from August 9, 2020 to December 11, 2020; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of March 31, 2018. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit. Our contractual obligations and commercial commitments as of December 31, 2017 are summarized below:

*Long-term debt*—We have long-term debt obligations of $1,644,979 as of December 31, 2017.

*Cash Interest Payments*—We have cash interest payment obligations of $16,402 as of December 31, 2017.

*Capital lease obligations*—We have capital lease obligations of $1,593,291 as of December 31, 2017.

*Operating leases*—We have operating lease obligations of nil as of December 31, 2017.

### Bellridge Second Note Offering

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Selling Securityholder, an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased:

- a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note");

- warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant");

- 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares").

In consideration for the Second Note, Warrant Shares and Commitment Shares, the Lender paid an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below).

The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and restrictive financial covenants, including but not limited to, the following restrictive covenants:

- The Company will not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, incur or guarantee, assume or suffer to exist any indebtedness (other than (i) the Indebtedness evidenced by the Second Note and the First Note and (ii) other Permitted Indebtedness). Under the terms of the Second Note, "Permitted Indebtedness" means (i) indebtedness evidenced by the Second Note and the First Note, (ii) indebtedness secured by permitted liens or unsecured indebtedness and (iii) permitted subordinated indebtedness;

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on any of its capital stock;

- At any time a Defeasance Failure exists (defined below), the Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, permit any indebtedness of the Company or any of its subsidiaries to mature or accelerate prior to the maturity date of the Second Note. "Defeasance Failure" means, as of any given time of determination, the failure of the cash amount in the Holder Master Restricted Account to be greater than or equal to the outstanding amount.

"Holder Master Restricted Account" means, solely with respect to the holder, a certain account at Umpqua Bank, or such other account as may be directed by the holder of the Second Note, from time to time, subject to a Controlled Account Agreement in favor of the holder in a form reasonably acceptable to the holder; and

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by or publicly contemplated to be conducted by the Company and each of its subsidiaries on March 8, 2018 or any business substantially related or incidental thereto. The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, modify its or their corporate structure or purpose.

85

The Company believes that as of the date of this prospectus, the Company is in compliance with all of the foregoing restricted covenants, including such additional covenants set forth under Second Note. Further, the Company believes that as of the date of this prospectus, the Company is in compliance with all affirmative covenants set forth below.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and affirmative covenants, including but not limited to, the following affirmative covenants:

- The Company will establish and maintain a bank account for the holder of the Second Note (collectively, including the Holder Master Restricted Account, the "Master Restricted Accounts") which Master Restricted Account applicable to a holder of Second Note shall be subject to a deposit account control agreement in form and substance reasonably acceptable to such holder of Notes (each, a "Controlled Account Agreement"). On the issuance date of the Second Note, the Company shall have directed the Lender to deposit an aggregate of $6 million of the purchase price for the Second Note, Commitment Shares and Warrant into Master Restricted Accounts;

- Upon the occurrence of any Controlled Account Release Event (defined below), the holder of the Second Note shall, as soon as commercially practicable, but in no event later than two (2) trading days thereafter, cause the applicable Controlled Account Release Amount to be released from the Holder Master Restricted Account and deposited into an bank account specified in writing by the Company on or prior to such date (each a "Controlled Account Release"); provided, that if the Company fails to select a bank account in a writing delivered to the holder on or prior to such second trading day, the holder shall effect such Controlled Account Release as soon as commercially practicable after receipt of such bank account election from the Company. "Controlled Account Release Amount" means, with respect to any given Controlled Account Release Event, such amount of cash as specified in the applicable clause of the definition of "Controlled Account Release Event". "Controlled Account Release Event" means, as applicable, (i) the Company's receipt of a notice by the Holder electing to effect a release of cash with respect to any Restricted Principal to the Company or (ii) at any time the outstanding amount hereunder is greater than the cash amount in the Holder Master Restricted Account (such excess amount, the "Excess Collateral"), as long as no event of default has occurred and is continuing, the Company may, by delivery of written notice to the Holder, require the release of such Excess Collateral to the Company from the Holder Master Restricted Account;

- The Company grants and pledges to the holder of the Second Note a continuing security interest in any cash or other assets, from time to time, in that certain deposit account called the Holder Master Restricted Account, including any and all cash, proceeds, funds, credits, rights and other assets therein or arising therefrom, from time to time, and any additions, dividends, profits and interest in the foregoing and any replacements or substitutions therefore (collectively, the "Collateral") to secure prompt repayment of any and all amounts outstanding hereunder from time to time and to secure prompt performance by the Company of each of its covenants and duties under the transaction documents. Such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Notwithstanding any filings undertaken related to Holder's rights under the New York Uniform Commercial Code, the Holder's Lien (as defined in the Second Note) on the Collateral shall remain in effect for so long as any Restricted Principal remains outstanding. Notwithstanding the foregoing, upon any Controlled Account Release, but solely with respect to such the applicable Controlled Account Release Amount, the holder of the Second Note will automatically release any lien on such Controlled Account Release Amount. "Restricted Principal" means, as of any given date, the difference of (i) all cash amounts held in the Master Restricted Account of the Holder as of the Closing Date of the Second Note Offering and (ii) all cash amounts released from the Master Restricted Account of the holder of the Second Note to the Company (or at the Company's direction) on or prior to such given date;

- Notwithstanding anything herein to the contrary, at the option of the holder of the Second Note, the holder of the Second Note may satisfy all, or any part, of any redemption or other cash payment obligation of the Company hereunder and/or pursuant to any other transaction document (each, a "Cash Payment Obligation"), in whole or in part, at the sole option of the holder of the Second Note, from the Collateral in the Holder Master Restricted Account, including, without limitation, in connection with any redemption hereunder upon any event of default under the Second Note, or any other payment due hereunder (whether at or prior to the Maturity Date). In connection with any Cash Payment Obligation, the Company irrevocably consents to delivery by the holder of the Second Note of an instruction letter to the Controlled Account Bank to release Collateral from the Holder Master Restricted Account in an amount not to exceed such Cash Payment Obligation to the holder of the Second Note. Notwithstanding the foregoing, in the absence of any such election by the holder of the Second Note, the Company shall remain obligated to pay such Cash Payment Obligation to the holder of the Second Note without regard to any Collateral in the Holder Master Restricted Account. Upon the occurrence of any event which could reasonably be expected to result in a Cash Payment Obligation, the holder of the Second Note may, at the holder of the Second Note option, withdraw any Collateral in the Holder Master Restricted Account; provided that (x) such withdrawn amount shall not exceed such amount which the holder of the Second Note reasonably believes would be necessary to satisfy such Cash Payment Obligation, and (y) such withdrawal shall not constitute the delivery of a Redemption Notice hereunder or payment hereunder unless the holder of the Second Note specifies in writing to the Company that the holder of the Second Note has applied such Collateral in satisfaction of such Cash Payment Obligation; and

- If the Controlled Account Bank breaches any covenant or other term or condition of any Controlled Account Agreement or otherwise fails to promptly comply with the instructions of the holder of the Second Note in connection with the Collateral, the holder of the Second Note may, at its option, withdraw the Collateral from the Controlled Account Bank and hold such Collateral until such time as (x) the Company and the holder of the Second Note have agreed upon a replacement Controlled Account Bank and (y) a Controlled Account Agreement with respect to such Collateral and a new account shall have been duly executed by the Company, the holder of the Second Note and the replacement Controlled Account Bank. Notwithstanding

anything herein to the contrary, if the Company or any of its Subsidiaries receives any of the Collateral in breach of any Controlled Account Agreement (or receives notice from any holder of Notes that an amount was wired to the Company from a Master Restricted Account attributable to such holder of Notes without the proper authorization of such holder of Notes), the Company shall promptly cause such amounts to be returned to such applicable Master Restricted Account.

**Related Party Debt**

*Capital and Operating Leases*

We maintain capital leases mainly for certain vehicles maintained and under lease with Distinct Cars, LLC. We have several operating vehicle leases with Acme Auto Leasing LLC (the "Lessor") with lease terms expiring on a monthly basis. As of December 31, 2017, our total future operating lease payments amounted to $1,712,860 and the present value of minimum lease payments under our capital leases amounted to $1,593,291. As of December 31, 2017, we were committed to making lease payments of not less than $3,000,000 on our operating leases and not less than $3 million on our capital leases during 2017.

As of the date of this Offering Circular, Distinct Cars, LLC, as lessee, entered into series open-ended lease agreements and disclosure statements with Acme Auto Leasing, Inc., ("Lessor") to lease standard passenger vehicles, each with an approximate lease term of thirty-six (36) months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $373.01 per month to $621 per month (with only 9 vehicles out of the approximately 150 exceeding $373.01 per month). At the end of the term of the Lease Agreement, Lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

As of the date of this prospectus, we are indebted to certain principal stockholders of the Company for loans and advances made to our Company over the past five years in the aggregate amount of $6,222,222.

86

*2017 Senior Secured Note*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, in the original principal amount of $222,222 (the "<u>First Note</u>"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of the YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by the YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

*2018 Senior Secured Note*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "<u>Purchase Agreement</u>") with the Selling Securityholder, an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "<u>Lender</u>"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "<u>Second Note</u>"). The aggregate purchase price of the Second Note is $6,000,000 (the "<u>Second Note Offering</u>") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "<u>Collateral</u>"), to be held and maintained at Umpqua Bank (the "<u>Master Restricted Account</u>"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between the YayYo, Inc., the Lender and Umpqua Bank (the "<u>Controlled Account Agreement</u>"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Selling Securityholder Warrant and following the YayYo, Inc., receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock will be VStock Transfer, LLC.

**Listing**

We intend to apply to list our common stock on the Nasdaq under the symbol "YAYO." There can be no assurance that our application to list our shares will be approved by the Nasdaq.

**SHARES ELIGIBLE FOR FUTURE SALE**

There is not currently an established U.S. trading market for our common stock. We cannot predict the effect, if any, that market sales of shares of our common stock or the availability of shares of our common stock for sale will have on the market price of our common stock prevailing from time to time. Sales of substantial amounts of our common stock, including shares issued upon exercise of outstanding warrants, in the public market after this offering, could adversely affect market prices prevailing from time to time and could impair our ability to raise capital through the sale of our equity securities.

All of the shares of common stock and shares of common stock issuable upon exercise of warrants, when sold pursuant to this prospectus, will be freely tradable, except that any shares acquired by our affiliates, as that term is defined in Rule 144 under the Securities Act, may only be sold in compliance with the limitations described below. As of May 30, 2018, our directors and executive officers held a total of approximately 15,933,695 shares or approximately 59.98% of the common stock issued and outstanding as of that date.

As explained in the Explanatory Note to the registration statement of which this prospectus forms a part, this prospectus is to be used in connection with the potential resale by the Selling Securityholder of up to an aggregate of 1,650,000 shares of our common stock, which shares (including 1,500,000 shares issuable upon exercise of outstanding Selling Securityholder Warrant). We will not receive any of the net proceeds from the sale of shares by the Selling Securityholder. The shares of common stock being registered under this prospectus permit public resales of such shares, and the Selling Securityholder may offer the shares for resale from time to time pursuant to this prospectus. The Selling Securityholder may also sell, transfer or otherwise dispose of all or a portion of their shares in transactions exempt from the registration requirements of the Securities Act of 1933, as amended, or pursuant to another effective registration statement covering those shares.

25,885,303 shares of our outstanding common stock that are not registered under the registration statement of which this prospectus is a part and have not been registered under another registration statement will be deemed restricted securities as defined under Rule 144. Restricted shares may be sold in the public market only if registered or if they qualify for an exemption from registration promulgated under the Securities Act. Subject to the provisions of Rule 144, all of the outstanding shares of common stock that are currently restricted are available for sale in the public market under Rule 144.

For information about shares of common stock issuable upon the exercise of options and warrants, see "*Description of Securities*."

In general, under Rule 144 as currently in effect, a person, or group of persons whose shares are required to be aggregated, who is deemed to have been an affiliate at any time during the three months preceding a sale, who has beneficially owned shares that are restricted securities as defined in Rule 144 for at least six months is entitled to sell, within any three-month period commencing 90 days after the date of this prospectus, a number of shares that does not exceed 1% of the then outstanding shares of our common stock.

Sale under Rule 144 by affiliates, whether of restricted or non-restricted shares, include requirements for current public information about the Company; selling the shares pursuant to broker transactions; and limitations on the number of shares sold within a three-month period.

In addition, a person who is not deemed to have been one of our affiliates at any time during the 90 days preceding a sale and who has beneficially owned shares of our common stock for at least six months, including the holding period of any prior owner, except if the prior owner was one of our affiliates, would be entitled to sell all of their shares, provided the availability of current public information about our company. To the extent that shares were acquired from one of our affiliates, a person's holding period for the purpose of effecting a sale under Rule 144 would commence on the date the shares were acquired from the affiliate.

**Electronic Distribution**

A prospectus in electronic format may be made available on the websites maintained by Selling Securityholder, if any, participating in the offering. The Selling Securityholder may agree to allocate a number of shares of common stock to their online brokerage account holders. Internet distributions will be allocated by the Selling Securityholder to make Internet distributions on the same basis as other allocations.

**Offer Restrictions Outside the United States**

Other than in the United States, no action has been taken by us or the underwriters that would permit a public offering of the securities offered by this prospectus in any jurisdiction where action for that purpose is required. The securities offered by this prospectus may not be offered or sold, directly or indirectly, nor may this prospectus or any other offering material or advertisements in connection with the offer and sale of any such securities be distributed or published in any jurisdiction, except under circumstances that will result in compliance with the applicable rules and regulations of that jurisdiction. Persons into whose possession this prospectus comes are advised to inform themselves about and to observe any restrictions relating to the offering and the distribution of this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities offered by this prospectus in any jurisdiction in which such an offer or a solicitation is unlawful.

*European Economic Area*

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive, or the Relevant Member States, with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, or the Relevant Implementation Date, our securities will not be offered to the public in that Relevant Member State prior to the publication of a prospectus in relation to the securities that has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that, with effect from and including the Relevant Implementation Date, an offer of securities may be made to the public in that Relevant Member State at any time:

- to any legal entity that is a qualified investor as defined in the Prospectus Directive;

- to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the manager for any such offer; or

- in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3(2) of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of common shares to the public" in relation to any shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the common shares to be offered so as to enable an investor to decide to purchase or subscribe the common shares, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State. The expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in each Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

We have not authorized, and do not authorize the making of, any offer of shares through any financial intermediary on our behalf, other than offers made by the underwriters with a view to the final placement of the shares as contemplated by this prospectus. Accordingly, no purchaser of the securities, other than the underwriters, is authorized to make any further offer of the shares on our or the underwriters' behalf.

*United Kingdom*

Our securities may not be offered or sold and will not be offered or sold to any persons in the United Kingdom other than persons whose ordinary activities involve acquiring, holding, managing or disposing of investments (as principal or as agent) for the purposes of their businesses and in compliance with all applicable provisions of the Financial Services and Markets Act 2000, or FSMA, with respect to anything done in relation to our securities in, from or otherwise involving the United Kingdom.

In addition, each underwriter:

- has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of section 21 of FSMA) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act of 2000 (Financial Promotion) Order 2005 or in circumstances in which section 21 of FSMA does not apply to us; and

- has complied with and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the securities in, from or otherwise involving the United Kingdom.

*Australia*

No prospectus or other disclosure document (as defined in the Corporations Act 2001 (Cth) of Australia, or the Corporations Act) in relation to the securities has been or will be lodged with the Australian Securities & Investments Commission, or the ASIC. This document has not been lodged with ASIC and is only directed to certain categories of exempt persons. Accordingly, if you receive this document in Australia:

(1) you confirm and warrant that you are either:

(a) a "sophisticated investor" under section 708(8)(a) or (b) of the Corporations Act;

(b) a "sophisticated investor" under section 708(8)(c) or (d) of the Corporations Act and that you have provided an accountant's certificate to us which complies with the requirements of section 708(8)(c)(i) or (ii) of the Corporations Act and related regulations before the offer has been made;

(c) a person associated with us under section 708(12) of the Corporations Act; or

(d) a "professional investor" within the meaning of section 708(11)(a) or (b) of the Corporations Act, and to the extent that you are unable to confirm or warrant that you are an exempt sophisticated investor, associated person or professional investor under the Corporations Act, any offer made to you under this document is void and incapable of acceptance; and

(2) you warrant and agree that you will not offer any of the securities for resale in Australia within 12 months of those securities being issued unless any such resale offer is exempt from the requirement to issue a disclosure document under section 708 of the Corporations Act.

*Hong Kong*

The securities may not be offered or sold in Hong Kong by means of any document other than (1) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), (2) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (3) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the shares may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

*Japan*

The securities offered in this prospectus have not been and will not be registered under the Financial Instruments and Exchange Law of Japan. The securities have not been offered or sold and will not be offered or sold, directly or indirectly, in Japan or to or for the account of any resident of Japan (including any corporation or other entity organized under the laws of Japan), except (i) pursuant to an exemption from the registration requirements of the Financial Instruments and Exchange Law and (ii) in compliance with any other applicable requirements of Japanese law.

*Singapore*

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the securities may not be circulated or distributed, nor may the securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (1) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore, or the SFA, (2) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA, or (3) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to compliance with conditions set forth in the SFA.

Where the securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

- a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

- a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor, shares, notes and units of shares and notes of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the shares pursuant to an offer made under Section 275 of the SFA except:

  – to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, notes and units of shares and notes of that corporation or such rights and interest in that trust are acquired at a consideration of not less than $200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

  – where no consideration is or will be given for the transfer; or

  – where the transfer is by operation of law.

*Switzerland*

The securities may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange, or the SIX, or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the securities or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, us, or the securities have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of shares will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA, and the offer of shares has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes. The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of the shares.

*Canada*

Resale Restrictions

The distribution of our securities in Canada is being made only in the provinces of Ontario, Quebec, Alberta, British Columbia and Manitoba on a private placement basis exempt from the requirement that we prepare and file a prospectus with the securities regulatory authorities in each province where trades of common stock are made. Any resale of the common stock in Canada must be made under applicable securities laws which may vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the common stock.

Representations of Purchasers

By purchasing securities in Canada and accepting delivery of a purchase confirmation, a purchaser is representing to us and the dealer from whom the purchase confirmation is received that:

- the purchaser is entitled under applicable provincial securities laws to purchase the securities without the benefit of a prospectus qualified under those securities laws as it is an "accredited investor" as defined under National Instrument 45-106—Prospectus and Registration Exemptions;

- the purchaser is a "Canadian permitted client" as defined in National Instrument 31-103—Registration Requirements and Exemptions, or as otherwise interpreted and applied by the Canadian Securities Administrators;

- where required by law, the purchaser is purchasing as principal and not as agent;

- the purchaser has reviewed the text above under "—Resale Restrictions"; and

- the purchaser acknowledges and consents to the provision of specified information concerning the purchase of the securities to the regulatory authority that by law is entitled to collect the information, including certain personal information. For purchasers in Ontario, questions about such indirect collection of personal information should be directed to Administrative Support Clerk, Ontario Securities Commission, Suite 1903, Box 55, 20 Queen Street West, Toronto, Ontario M5H 3S8 or on (416) 593-3684.

Rights of Action—Ontario Purchasers

Under Ontario securities legislation, certain purchasers who purchase any securities offered by this prospectus during the period of distribution will have a statutory right of action for damages, or while still the owner of the securities, for rescission against us in the event that this prospectus contain a misrepresentation without regard to whether the purchaser relied on the misrepresentation. The right of action for damages is exercisable not later than the earlier of 180 days from the date the purchaser first had knowledge of the facts giving rise to the cause of action and three years from the date on which payment is made for the securities. The right of action for rescission is exercisable not later than 180 days from the date on which payment is made for the securities. If a purchaser elects to exercise the right of action for rescission, the purchaser will have no right of action for damages against us. In no case will the amount recoverable in any action exceed the price at which the securities were offered to the purchaser and if the purchaser is shown to have purchased the securities with knowledge of the misrepresentation, we will have no liability. In the case of an action for damages, we will not be liable for all or any portion of the damages that are proven to not represent the depreciation in value of the common stock as a result of the misrepresentation relied upon. These rights are in addition to, and without derogation from, any other rights or remedies available at law to an Ontario purchaser. The foregoing is a summary of the rights available to an Ontario purchaser. Ontario purchasers should refer to the complete text of the relevant statutory provisions.

## EXPERTS

AJ Robbins CPA, LLC, an independent certified public accounting firm, audited our financial statements for the years ended December 31, 2017 and the period from inception (June 21, 2016) to December 31, 2016, as set forth in report appearing herein. We have included our financial statements in this prospectus and elsewhere in the registration statement in reliance on the reports of AJ Robbins CPA, LLC, given on their authority as experts in accounting and auditing.

## LEGAL MATTERS

The validity of the securities being offered by this prospectus will be passed upon for us by CKR Law LLP, Los Angeles, California.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of our common stock offered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement, some of which is contained in exhibits to the registration statement as permitted by the rules and regulations of the SEC. For further information with respect to us and our common stock, we refer you to the registration statement, including the exhibits filed as a part of the registration statement. Statements contained in this prospectus concerning the contents of any contract or any other document is not necessarily complete. If a contract or document has been filed as an exhibit to the registration statement, please see the copy of the contract or document that has been filed. Each statement in this prospectus relating to a contract or document filed as an exhibit is qualified in all respects by the filed exhibit. You may obtain copies of this information by mail from the Public Reference Section of the SEC, 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates. You may obtain information on the operation of the public reference rooms by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet website that contains reports, proxy statements and other information about issuers, like us, that file electronically with the SEC. The address of that website is www.sec.gov.

We are subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, are required to file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information are available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. We also maintain a website at www.yayyo.com. You may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

**YAYYO, INC**
**Financial Statements**
**December 31, 2017 and 2016**

**Contents**

|  | Page |
|---|---|
| **Financial Statements:** | |
| Report of Independent Registered Public Accounting Firm | F - 2 |
| Consolidated Balance Sheets as of December 31, 2017 and December 31,2016 | F - 3 |
| Consolidated Statements of Operations for the year ended December 31, 2017 and the period from inception (June 21, 2016) to December 31, 2016 | F - 4 |
| Consolidated Statement of Stockholders' Equity for the year ended December 31, 2017 and the period from inception (June 21, 2016) to December 31, 2016 | F - 5 |
| Consolidated Statements of Cash Flows for the year ended December 31, 2017 and the period from inception (June 21, 2016) to December 31, 2016 | F - 6 |
| Notes to Consolidated Financial Statements | F - 7 |
| Condensed Consolidated Balance Sheets as of March 31, 2018 (unaudited) and December 31, 2017 | F – 20 |
| Condensed Consolidated Statements of Operations for three months ended March 31, 2018 and 2017 (unaudited) | F – 21 |
| Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2018 and 2017 (unaudited) | F – 22 |
| Notes to Condensed Consolidated Financial Statements | F - 23 |

**AJ Robbins CPA, LLC**
Certified Public Accountant

---

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and
Stockholders of Yayyo Inc.

#### Opinion on the Financial /statements

I have audited the accompanying consolidated balance sheets of Yayyo, Inc. (the "Company") as of December 31, 2016 and 2017, and the related consolidated statements of operations, changes in stockholder's equity (deficit), and cash flows for the period from June 21, 2016 (inception) to December 31, 2016 and for the year ended December 31, 2017 and the related notes (collectively referred to as the "financial statements"). In my opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Yayyo, Inc. as of December 31, 2016 and 2017, and the results of its operations and its cash flows for the period from June 21, 2016 (inception) to December 31, 2016 and for the year ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.

#### Basis for Opinion

These financial statements are the responsibility of the Company's management. My responsibility is to express an opinion on the Company's financial statements based on our audits. I am a public accounting firm registered with the Public Company Accounting Oversight Board (United Sates) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

I conducted my audits in accordance with the standards of the PCAOB. Those standards require that I plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor was I engaged to perform, an audit of its internal control over financial reporting. As part of my audits I was required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. According I express no such opinion.

My audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. My audits also included evaluation of the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. I believe that my audits provide a reasonable basis for my opinion.

*aj Rub CPA LLC*

I have served as the Company's auditor since 2016

Denver, Colorado

March 9, 2018

**aj@ajrobbins.com**
3773 Cherry Creek North Drive, Suite 575 East, Denver, Colorado 80209
(B)303-331-6190 (M)720-339-5566 (F)303-845-9078

---

F - 2

**YAYYO, INC. AND SUBSIDIARY**
**CONSOLIDATED BALANCE SHEETS**
As of December 31, 2017 and 2016

| | | 2017 | | 2016 | | Unaudited Pro Forma December 31, 2017 (See Note 13) |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash | $ | 308,738 | $ | 18,643 | $ | 308,738 |
| Restricted cash | | - | | - | | 5,821,772 |
| Prepaid expenses | | 13,406 | | - | | 13,406 |
| Total current assets | | 322,144 | | 18,643 | | 6,143,916 |
| Equipment, net | | 2,860 | | - | | 2,860 |
| Leased assets, net | | 2,033,482 | | - | | 2,033,482 |
| Deferred offering costs | | - | | 136,032 | | - |
| **TOTAL ASSETS** | $ | 2,358,486 | $ | 154,675 | $ | 8,180,258 |
| | | | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities: | | | | | | |
| Accounts payable | $ | 100,000 | $ | 180,429 | $ | 100,000 |
| Accrued expenses | | 31,453 | | - | | 31,453 |
| Advances from related party | | - | | 75,000 | | - |
| Notes payable, current (net of discount of $48,600) | | 254,511 | | - | | 254,511 |
| Finance lease obligations, current (net of discount of $482,605) | | 72,485 | | - | | 72,485 |
| Total current liabilities | | 458,449 | | 255,429 | | 458,449 |
| Notes payable, net of current portion (net of discount of $54,190) | | 552,588 | | - | | 2,268,938 |
| Finance lease obligations, net of current portion (net of discount of $363,993) | | 674,208 | | - | | 674,208 |
| **TOTAL LIABILITIES** | | 1,685,245 | | 255,429 | | 3,401,595 |
| | | | | | | |
| Commitments and contingencies | | - | | - | | - |
| | | | | | | |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | | | | | |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 25,770,551 and 25,011,000 shares issued and outstanding | | 26 | | 25 | | 26 |
| Additional paid-in capital | | 6,257,225 | | 1,382,930 | | 10,362,647 |
| Accumulated deficit | | (5,584,010) | | (1,483,709) | | (5,584,010) |
| Total stockholders' equity (deficit) | | 673,241 | | (100,754) | | 4,778,663 |
| **TOTAL LIABILITIES AND STOCKHLDERS' EQUITY (DEFICIT)** | $ | 2,358,486 | $ | 154,675 | $ | 8,180,258 |

The accompanying footnotes are an integral part of these consolidated financial statements.

**YAYYO, INC. AND SUBSIDIARY**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Year Ended December 31, 2017 and the Period From June 21, 2016 (inception) to December 31, 2016**

| | Year Ended December 31, 2017 | June 21, 2016 (inception) to December 31, 2016 |
|---|---:|---:|
| **Revenue** | $ 235,690 | $ - |
| **Cost of revenue** | 213,111 | |
| **Gross profit** | 22,579 | - |
| **Operating expenses:** | | |
| Selling and marketing expenses | 86,098 | 145,803 |
| Product development | 303,555 | 683,255 |
| General and administrative expenses | 3,249,659 | 654,651 |
| Total operating expenses | 3,639,312 | 1,483,709 |
| **Loss from operations** | (3,616,733) | (1,483,709) |
| **Other income (expense):** | | |
| Interest and financing costs | (523,833) | - |
| Change in value of derivative liability | 40,265 | - |
| Total other income (expense) | (483,568) | - |
| **Net loss** | $ (4,100,301) | $ (1,483,709) |
| **Weighted average shares outstanding :** | | |
| Basic | 25,297,066 | 21,540,904 |
| Diluted | 25,297,066 | 21,540,904 |
| **Loss per share** | | |
| Basic | $ (0.16) | $ (0.07) |
| Diluted | $ (0.16) | $ (0.07) |

The accompanying footnotes are an integral part of these consolidated financial statements.

F - 4

**YAYYO, INC. AND SUBSIDIARY**
**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY (DEFICIT)**
**For the Year Ended December 31, 2017 and the Period From June 21, 2016 (inception) to December 31, 2016**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance at June 21, 2016 (inception)** | - | $ - | $ - | $ - | $ - |
| Issuance of founder shares | 15,625,000 | 16 | (16) | | - |
| Issuance of common stock for cash | 9,386,000 | 9 | 1,318,991 | | 1,319,000 |
| Stock option expense | | | 63,955 | | 63,955 |
| Net loss | | | | (1,483,709) | (1,483,709) |
| **Balance, December 31,2016** | 25,011,000 | $ 25 | $ 1,382,930 | $ (1,483,709) | $ (100,754) |
| Issuance of common stock for cash | 371,351 | 1 | 2,484,198 | | 2,484,199 |
| Payment of offering costs | | | (814,442) | | (814,442) |
| Value of common stock of related party issued with convertible note payable | | | 99,027 | | 99,027 |
| Value of common stock issued with notes payable | 18,200 | | 91,000 | | 91,000 |
| Value of common stock issued with capital lease obligation | 350,000 | | 1,178,036 | | 1,178,036 |
| Issuance of common stock for accounts payable | 20,000 | | 160,000 | | 160,000 |
| Stock option expense | | | 1,676,476 | | 1,676,476 |
| Net loss | | | | (4,100,301) | (4,100,301) |
| **Balance, December 31, 2017** | 25,770,551 | $ 26 | $ 6,257,225 | $ (5,584,010) | $ 673,241 |

The accompanying footnotes are an integral part of these consolidated financial statements.

F - 5

**YAYYO, INC. AND SUBSIDIARY**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**For the Year Ended December 31, 2017 and the Period From June 21, 2016 (inception) to December 31, 2016**

| | Year Ended December 31, 2017 | | June 21, 2016 (inception) to December 31, 2016 | |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net loss | $ | (4,100,301) | $ | (1,483,709) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation | | 82,904 | | - |
| Stock option expense | | 1,676,476 | | 63,955 |
| Non-cash financing costs | | 39,293 | | - |
| Amoritzation of debt discounts | | 455,758 | | - |
| Change in value of derivative liability | | (40,266) | | - |
| Change in oerpting assets and liabilities: | | | | |
| Prepaid expenses | | (13,406) | | - |
| Accounts payable | | 15,966 | | 44,397 |
| Accrued expenses | | 31,453 | | - |
| Net cash used in operating activities | | (1,852,123) | | (1,375,357) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Purchase of equipment | | (3,178) | | - |
| Net cash used in investing activities | | (3,178) | | - |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Proceeds from sale of common stock | | 2,484,199 | | 1,319,000 |
| Paymnet of offering costs | | (614,805) | | - |
| Proceeds from convertible note payable | | 100,000 | | - |
| Repayment of convertible note payable | | (113,888) | | - |
| Proceeds from notes payable | | 887,667 | | - |
| Proceeds from advance from related party | | 50,000 | | 75,000 |
| Repayment of advance from related party | | (125,000) | | - |
| Repayment of finance lease obligations | | (522,777) | | - |
| Net cash provided by financing activities | | 2,145,396 | | 1,394,000 |
| | | | | |
| **NET INCREASE IN CASH** | | 290,095 | | 18,643 |
| | | | | |
| **CASH, BEGINNING OF PERIOD** | | 18,643 | | - |
| | | | | |
| **CASH, END OF PERIOD** | $ | 308,738 | $ | 18,643 |
| | | | | |
| **CASH PAID FOR:** | | | | |
| Interest | $ | 16,402 | $ | - |
| Income taxes | $ | - | $ | - |
| | | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Finance lease obligations | $ | 2,168,821 | $ | - |
| Value of equity recorded as debt discounts | $ | 1,368,063 | $ | - |

The accompanying footnotes are an integral part of these consolidated financial statements.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

**Note 1 - Organization and Basis of Presentation**

Organization and Line of Business

YayYo, Inc. ("YayYo" or the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents cars to Uber and Lyft drivers. In addition, the Company is a single sign-on metasearch app for smartphones that provide price comparison and booking of all available ride sharing and taxi services along with select limousine and public transportation services.

Basis of Presentation

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

The Company adopted the calendar year as its basis of reporting.

**Note 2 – Summary of Significant Accounting Policies**

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC, RideShare Car Rentals, LLC, RideYayYo, LLC and Savy, LLC. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash Equivalents

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at December 31, 2017, the Company believes there was no impairment of its long-lived assets.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 605, *Revenue Recognition*, only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the services have been provided, and collectability is assured.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 750,000 and 450,000 options outstanding as of December 31, 2017 and 2016, respectively.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There were 450,000 potentially dilutive securities outstanding during the period from June 21, 2016 (inception) to December 31, 2016 and 750,000 potentially dilutive options outstanding during the year ended December 31, 2017.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the year ended December 31, 2017 and from June 21, 2016 (inception) to December 31, 2016 were $86,098 and $145,803, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Developments costs for the year ended December 31, 2017 and from June 21, 2016 (inception) to December 31, 2016 were $303,555 and $683,255, respectively.

Deferred Offering Costs

Deferred offering costs are amounts incurred that are directly related to the offering of the Company's common stock. These costs will be offset against the proceeds from the Company's equity offering.

Software Development Costs

Software development costs are capitalized in accordance with FASB ASC 985-20 *Cost of Software to Be Sold, Leased, or Marketed*. Capitalization of software development costs begins upon the establishment of technological feasibility and is discontinued when the product is available for sale. The establishment of technological feasibility and the ongoing assessment for recoverability of capitalized software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenues, estimated economic life, and changes in software and hardware technologies. Capitalized software development costs are comprised primarily of direct overhead, payroll costs, and consultants' fees of individuals working directly on the development of specific software products.

Amortization of capitalized software development costs is provided on a product-by-product basis on the straight-line method over the estimated economic life of the products (not to exceed three years). Management periodically compares estimated net realizable value by product to the amount of software development costs capitalized for that product to ensure the amount capitalized is not in excess of the amount to be recovered through revenues. Any such excess of capitalized software development costs over expected net realizable value is expensed at that time.

Organizational Costs

In accordance with FASB ASC 720, organizational costs, including accounting fees, legal fees, and costs of incorporation, are expensed as incurred.

The Company intends to file U.S. federal tax returns when due. All tax periods since inception remain open to examination by the taxing jurisdictions to which the Company is subject.

Derivative Financial Instruments

The Company evaluates all of its agreements to determine if such instruments have derivatives or contain features that qualify as embedded derivatives. For derivative financial instruments that are accounted for as liabilities, the derivative instrument is initially recorded at its fair value and is then re-valued at each reporting date, with changes in the fair value reported in the statements of operations. For stock-based derivative financial instruments, the Company uses the Black-Scholes-Merton option pricing model to value the derivative instruments at inception and on subsequent valuation dates. The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is evaluated at the end of each reporting period. Derivative instrument liabilities are classified in the balance sheet as current or non-current based on whether or not net-cash settlement of the derivative instrument could be required within 12 months of the balance sheet date. During the year ended December 31, 2017, the Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. The convertible note was repaid therefore, there are no derivative financial instruments at December 31, 2017.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company uses Level 2 inputs for its valuation methodology for derivative liabilities as their fair values were determined by using the Black-Scholes-Merton pricing model based on various assumptions. The Company's derivative liabilities are adjusted to reflect fair value at each period end, with any increase or decrease in the fair value being recorded in results of operations as adjustments to fair value of derivatives.

At December 31, 2017 and December 31, 2016, the Company did not identified any liabilities that are required to be presented on the balance sheet at fair value. The derivative liability associated with the convertible notes payable were both issued and repaid during the year ended December 31, 2017; therefore, there was no derivative liability at December 31, 2017 or December 31, 2016.

Recent Accounting Pronouncements

In January 2017, the Financial Accounting Standards Board ("FASB") issued an Accounting Standards Update ("ASU") 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this update clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for interim and annual periods beginning after December 15, 2017 and should be applied prospectively on or after the effective date. The Company is in the process of evaluating the impact of this accounting standard update.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* which requires restricted cash to be presented with cash and cash equivalents on the statement of cash flows and disclosure of how the statement of cash flows reconciles to the balance sheet if restricted cash is shown separately from cash and cash equivalents on the balance sheet. ASU 2016-18 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The Company will adopt this accounting standard update beginning in the first quarter of 2018. The Company does not believe this accounting standard update will have a material impact on its financial statements.

In October 2016, the FASB issued ASU 2016-16, *Income Taxes (Topic 740): Intra-Entity Transfer of Assets Other than Inventory*, which requires the recognition of the income tax consequences of an intra-entity transfer of an asset, other than inventory, when the transfer occurs. ASU 2016-16 is effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. The Company is in the process of evaluating the impact of this accounting standard update on its financial statements.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments*. ASU 2016-15 provides guidance for targeted changes with respect to how cash receipts and cash payments are classified in the statements of cash flows, with the objective of reducing diversity in practice. ASU 2016-15 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The Company is in the process of evaluating the impact of this accounting standard update on its statements of cash flows.

In March 2016, the FASB issued ASU 2016-09, *Stock Compensation (Topic 718), Improvements to Employee Share-Based Payment Accounting*. ASU 2016-09, which amends several aspects of accounting for employee share-based payment transactions including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, and classification in the statement of cash flows. ASU 2016-09 is effective for fiscal years beginning after December 15, 2016 and interim periods within annual periods beginning after December 15, 2016, with early adoption permitted. The Company is in the process of evaluating the impact of this accounting standard update on its financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ASU 2016-02 requires lessees to recognize lease assets and lease liabilities on the balance sheet and requires expanded disclosures about leasing arrangements. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 and interim periods in fiscal years beginning after December 15, 2018, with early adoption permitted. The Company adopted this ASU for its year ended December 31, 2017.

In August 2014, the FASB issued Accounting Standards Update No. 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*, which provides guidance on determining when and how to disclose going-concern uncertainties in the financial statements. ASU 2014-15 requires management to perform interim and annual assessments of an entity's ability to continue as a going concern within one year of the date the financial statements are issued. An entity must provide certain disclosures if conditions or events raise substantial doubt about the entity's ability to continue as a going concern. ASU 2014-15 is effective for annual periods ending after December 15, 2016, and interim periods thereafter. Early adoption is permitted. The Company is currently evaluating the impact of the adoption of ASU 2014-15 on the Company's financial statements and disclosures.

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2014-09, *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under current U.S. GAAP and replace it with a principle based approach for determining revenue recognition. ASU 2014-09 will require that companies recognize revenue based on the value of transferred goods or services as they occur in the contract. The ASU also will require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. ASU 2014-09 is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted only in annual reporting periods beginning after December 15, 2016, including interim periods therein. Entities will be able to transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption. The Company is in the process of evaluating the impact of ASU 2014-09 on the Company's financial statements and disclosures.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

**Note 3 – Equipment**

At December 31, 2017 equipment consisted of the following:

|  | 2017 |
|---|---|
| Computer equipment | $ 3,178 |
|  | 3,178 |
| Less accumulated depreciation | (318) |
| Equipment, net | $ 2,860 |

Depreciation expense for equipment for the year ended December 31, 2017 was $318.

**Note 4 – Leased Assets**

At December 31, 2017 all of the Company's leased assets were finance leased right-of-use assets and consisted of the following:

|  | 2017 |
|---|---|
| Vehicles | $ 2,116,068 |
|  | 2,116,068 |
| Less accumulated depreciation | (82,586) |
| Leased assets, net | $ 2,033,482 |

The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. Depreciation expense for leased assets for the year ended December 31, 2017 was $82,586. The lease terms are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

**Note 5 – Notes Payable**

Notes payable at December 31, 2017 consisted of the following:

|  | 2017 |
|---|---|
| Note payable to investor; accrue interest at 5% per annum; due March 31, 2019; unsecured | $ 445,000 |
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 of original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to December 11, 2020; unsecured (A) | 242,667 |
| Note payable to investor; accrue interest at 6% per annum; due March 31, 2018; unsecured (B) | 222,222 |
| Total notes payable | 909,889 |
| Unamortized debt discount | (102,790) |
| Notes payable, net | 807,099 |
| Less current portion | (254,511) |
| Long-term portion | $ 552,588 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

(A) In connection with the issuance of these notes payable, the Company also issued an aggregate of 18,200 shares of its common stock to these note holders as additional incentive for the loans. The aggregate relative fair value of these shares of common stock was $91,000 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $91,000 is being amortized over the term of the notes payable. During the year ended December 31, 2017, $9,716 was charged to interest expense as amortization of the discount, with an unamortized balance of $81,284 at December 31, 2017.

(B) This note payable was issued with an original issuance discount of $22,222 which is being amortized over the term of the notes payable. During the year ended December 31, 2017, $716 was charged to interest expense as amortization of the discount, with an unamortized balance of $21,506 at December 31, 2017.

A rollforward of notes payable from December 31, 2016 to December 31, 2017 is below:

| | | |
|---|---|---:|
| Notes payable, December 31, 2016 | $ | - |
| Issued for cash | | 887,667 |
| Issued for original issue discount | | 22,222 |
| Debt discount related to notes payable | | (113,222) |
| Amortization of debt discounts | | 10,432 |
| Notes payable, December 31, 2017 | $ | 807,099 |

Future maturities of notes payable are as follows:

| Years ending December 31, | | |
|---|---|---:|
| 2018 | $ | 303,111 |
| 2019 | | 525,889 |
| 2020 | | 80,889 |
| | $ | 909,889 |

**Note 6 – Lease Obligations**

Lease obligations at December 31, 2017 consisted of the following:

| | | |
|---|---|---:|
| Lease obligations | $ | 1,593,291 |
| Unamortized debt discount | | (846,598) |
| Lease obligations, net discount | | 746,693 |
| Less current portion | | (72,485) |
| Long-term portion | $ | 674,208 |

In connection with these finance lease obligations, the Company also issued to the lessor an aggregate of 350,000 shares of its common stock as additional incentive for the lessor to enter into these lease agreements. The lessor was given 100,000 shares of common stock for the first 30 vehicle leases and an additional 250,000 shares of common stock for the next 100 vehicle leases. The aggregate relative fair value of these 350,000 shares of common stock was $1,178,036 and was recorded as a discount on the lease obligations and as additional paid in capital. The discount of $1,178,036 is being amortized over the term of the lease obligations. During the year ended December 31, 2017, $331,438 was charged to interest expense as amortization of the discount, with an unamortized balance of $846,598 at December 31, 2017.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

A roll forward of lease obligations from December 31, 2016 to December 31, 2017 is below:

| | | |
|---|---|---:|
| Lease obligations, December 31, 2016 | $ | - |
| New lease obligations | | 2,116,068 |
| Payments on lease obligations | | (522,777) |
| Debt discount related to lease obligations | | (1,178,036) |
| Amortization of debt discounts | | 331,438 |
| Lease obligations, December 31, 2017 | $ | 746,693 |

Future payments under lease obligations are as follows:

| Years ending December 31, | | |
|---|---|---:|
| 2018 | $ | 618,792 |
| 2019 | | 618,792 |
| 2020 | | 475,276 |
| Total payments | | 1,718,363 |
| Amount representing interest | | (119,569) |
| Lease obligation, net | $ | 1,593,291 |

The weighted-average remaining lease term at December 31, 2017 is 2.81 years and the weighted average discount rate is 5%.

The finance lease costs for the year ended December 31, 2017 consisted of depreciation expense of $82,586 and interest expense of $16,292.

**Note 7 – Convertible Notes Payable**

On January 6, 2017, the Company entered into a letter agreement (the "CFI Letter Agreement") with Chase Financing, Inc. ("CFI"), pursuant to which CFI agreed to provide up to $100,000 in capital to the Company through one or more loans with an aggregate principal amount of $113,888.

On January 6, 2017, the Company received $50,000 from CFI and issued its 10% original issue discount senior secured convertible note in the principal amount of $ 55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017 the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note "). Subsequent to the Second CFI Note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms of the CFI Notes.

Pursuant to the terms, the CFI Notes are secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and are convertible at the option of the holder into shares of our Common Stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our Common Stock during the twenty (20) trading days immediately prior to the date of conversion. If an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI Notes by the Company, Ramy El-Batrawi, our founder, Chief Executive Officer, Director and control person of our principal stockholder, X, LLC (an entity wholly owned by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge agreement with CFI (the "Guaranty & Pledge"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our Common Stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty & Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a Common Stock Purchase Agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our Common Stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of one dollar ($1.00). Under the Stock Purchase Agreement, and in addition to the 200,000 shares of Common Stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our Common Stock, held as of record and beneficially by X, LLC, equal to two percent (2%) of the number of shares of Common Stock issued or underlying Common Stock Equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial three (3) months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three (3) months.

The CFI Notes have been repaid by the Company.

A rollforward of the convertible note payable from December 31, 2016 to December 31, 2017 is below:

| | | |
|---|---|---:|
| Convertible notes, December 31, 2016 | $ | - |
| Issued for cash | | 100,000 |
| Issued for original issue discount | | 13,888 |
| Debt discount related to new convertible notes | | (113,888) |
| Amortization of debt discounts | | 113,888 |
| Repayment in cash | | (113,888) |
| Convertible notes, December 31, 2017 | $ | - |

**Note 8 – Derivative Liability**

The convertible notes payable discussed in Note 7 had a conversion price that can be adjusted based on the Company's stock price which results in the conversion feature being recorded as a derivative liability.

The fair value of the derivative liability was recorded and shown separately under current liabilities. However, as of December 31, 2017 the convertible note payable giving rise to the derivative liability was repaid, and as a result, the derivative liability at December 31, 2017 was $0. Changes in the fair value of the derivative liability is recorded in the statement of operations under other income (expense).

The Company uses a weighted average Black-Scholes-Merton option pricing model with the following assumptions to measure the fair value of derivative liability:

| | |
|---|---|
| Stock price | $4.00 |
| Risk free rate | 0.53% |
| Volatility | 275% |
| Conversion/ Exercise price | $4.00 |
| Dividend rate | 0% |
| Term (years) | 0.16 to 0.25 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

The following table represents the Company's derivative liability activity from December 31, 2016 to December 31, 2017:

| | |
|---|---:|
| Derivative liability balance, December 31, 2016 | $ - |
| Issuance of derivative liability during the period | 40,266 |
| Change in derivative liability during the period | (40,266) |
| Derivative liability balance, December 31, 2017 | $ - |

**Note 9 – Stockholders' Equity**

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

<u>Common Stock</u>

During the year ended from December 31, 2017, the Company sold 371,351 shares of common stock to investors for gross cash proceeds of $2,484,199 of which 326,126 shares and $2,303,299 of cash proceeds were related to the Company's Regulation A offering. The Company incurred $814,442 of offering cost related to the sale of common stock which consisted principally of legal fees and costs associated with soliciting the sale of common stock directly to the Regulation A investors.

<u>Stock Options</u>

The following is a summary of stock option activity:

| | Options Outstanding | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---:|---|---:|---|---:|---|---:|
| Outstanding, June 21, 2016 | - | | | | | | |
| Granted | 450,000 | $ | 1.00 | | | | |
| Forfeited | - | | | | | | |
| Exercised | - | | | | | | |
| Outstanding, December 31, 2016 | 450,000 | $ | 1.00 | | 2.00 | $ | - |
| Granted | 300,000 | $ | 8.00 | | | | |
| Forfeited | - | | | | | | |
| Exercised | - | | | | | | |
| Outstanding, December 31, 2017 | 750,000 | $ | 3.80 | | 1.80 | $ | 3,150,000 |
| Exercisable, December 31, 2017 | 630,000 | $ | 3.00 | | 1.57 | $ | 3,150,000 |

The exercise price for options outstanding at December 31, 2017:

| Outstanding | | | Exercisable | | |
|---|---|---|---|---|---|
| Number of Options | | Exercise Price | Number of Options | | Exercise Price |
| 450,000 | $ | 1.00 | 450,000 | $ | 1.00 |
| 300,000 | | 8.00 | 180,000 | | 8.00 |
| 750,000 | | | 630,000 | | |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

For options granted during fiscal year 2016 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.85 and the weighted-average exercise price of such options was $1.00. No options were granted during fiscal 2016 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

For options granted during fiscal year 2017 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $7.54 and the weighted-average exercise price of such options was $8.00. No options were granted during fiscal 2017 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

The fair value of the stock options is being amortized to stock option expense over the vesting period. The Company recorded stock option expense of $1,676,476 and $63,955, respectively, during the year ended December 31, 2017 and from June 21, 2016 (inception) to December 31, 2016. As of December 31, 2017, the unamortized stock option expense was $904,468, which is expected to be recognized as an expense through December 2018.

The assumptions used in calculating the fair value of options granted using the Black-Scholes option-pricing model for options granted are as follows:

| | |
|---|---|
| Risk-free interest rate | 1.14% |
| Expected life of the options | 2.08 years |
| Expected volatility | 200% |
| Expected dividend yield | 0% |

**Note 10 – Related Party Transactions**

During the year ended December 31, 2017 and the period from June 21, 2016 (inception) to December 31, 2016, the Company paid management fees of $286,300 and $140,000, respectively, to a company that is owned by the Company's majority stockholder.

During the year ended December 31, 2017 and the period from June 21, 2016 (inception) to December 31, 2016, the Company's majority stockholder advanced a total of $50,000 and $75,000 to the Company. During the year ended December 31, 2017, $125,000 of these advances were repaid. These advances are non-interest bearing and due upon demand. At December 31, 2017 and December 31, 2016, amount due to Company's majority stockholder was $0 and $75,000, respectively.

**Note 11 – Commitments and Contingencies**

On July 28, 2016, the Company entered into a client service agreement with an advertising agency. The agency is to obtain negotiate, arrange and purchase and otherwise deal with all media placements for the Company's product in television, radio and print ads. The Company is obligated to compensate the adverting agency a commission of 15% of the gross amounts charged for the television, radio and print ads.

On August 27, 2016, the Company entered into a development agreement with a software developer to develop interface software for the Company's product. The Company agreed to pay a fee of $4,860 plus $85 per hour for the software development services.

On November 1, 2016, the Company entered into an agreement with an individual to perform marketing services. The individual will receive compensation as follows:

- 5% of any investment the Company receives as a result of the individuals efforts;
- 10% of gross ad revenue achieved;
- $5,000 per month through May 2017 payable in cash; and
- $20,000 per month through May 2017 payable in equity.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

**Note 12 – Income Taxes**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A full valuation allowance is established against all net deferred tax assets as of December 31, 2017 and 2016 based on estimates of recoverability. While the Company has optimistic plans for its business strategy, it determined that such a valuation allowance was necessary given the current and expected near term losses and the uncertainty with respect to its ability to generate sufficient profits from its business model. Because of the impacts of the valuation allowance, there was no income tax expense or benefit for the year ended December 31, 2017 and for the period from June 21, 2016 (inception) to December 31, 2016.

A reconciliation of the differences between the effective and statutory income tax rates for the year ended December 31, 2017 and for the period from June 21, 2016 (inception) to December 31, 2016:

|  | 2017 | | 2017 | |
| --- | --- | --- | --- | --- |
|  | **Amount** | **Percent** | **Amount** | **Percent** |
| Federal statutory rates | $ (1,394,102) | 34.0% | $ (504,461) | 34.0% |
| State income taxes | (205,015) | 5.0% | (74,185) | 5.0% |
| Permanent differences | 823,746 | -20.1% | 32,132 | -2.2% |
| Valuation allowance against net deferred tax assets | 775,371 | -18.9% | 546,514 | -36.8% |
| Effective rate | $ - | 0.0% | $ - | 0.0% |

At December 31, 2017 and 2016, the significant components of the deferred tax assets are summarized below:

|  | **2017** | **2016** |
| --- | --- | --- |
| Deferred income tax asset |  |  |
| Net operation loss carryforwards | 1,321,885 | 546,514 |
| Total deferred income tax asset | 1,321,885 | 546,514 |
| Less: valuation allowance | (1,321,885) | (546,514) |
| Total deferred income tax asset | $ - | $ - |

The valuation allowance increased by $775,371 and $546,514 in 2017 and 2016, respectively, as a result of the Company generating additional net operating losses.

The Company has recorded as of December 31, 2017 and 2016 a valuation allowance of $1,321,885 and $546,514, respectively, as it believes that it is more likely than not that the deferred tax assets will not be realized in future years. Management has based its assessment on the Company's lack of profitable operating history.

The Company conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2017 and 2016.

The Company has net operating loss carry-forwards of approximately $3,400,000. Such amounts are subject to IRS code section 382 limitations and expire in 2031. The 2016 and 2017 tax year is still subject to audit.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2017**

**Note 13 – Subsequent Events**

In January 2018, the Company issued notes payable for $15,000 and also issued an aggregate of 1,125 shares of its common stock to these note holders as additional incentive to make the loans.

In February 2018, the Company sold 22,500 shares of common stock to two investors for cash proceeds of $180,000.

On March 8, 2018, the Company issued a note payable in the amount of $6,000,000. The note accrues interest at LIBOR plus 100 basis points and is due five years from the date of issuance. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per shares. The warrants expire five years from the date of issuance. The Company also paid $178,228 of issuance costs associated with this note. The relative fair value of the 150,000 shares of common stock was $378,916 and the relative fair value of the 1,500,000 warrants was $3,726,506 and both were recorded as a discount on the note payable and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the note payable. Below is a pro forma balance sheet as of December 31, 2017 to show the impact on the Company's balance sheet as if this transaction had occurred on December 31, 2017.

**YAYYO, INC. AND SUBSIDIARY**
**CONSOLIDATED PRO FORMA BALANCE SHEET**
**As of December 31, 2017**

| | As Presented | Adjustment | Pro Forma |
|---|---|---|---|
| **ASSETS** | | | |
| Current Assets: | | | |
| Cash | $ 308,738 | $ - | $ 308,738 |
| Restricted cash | - | 5,821,772 | 5,821,772 |
| Prepaid expenses | 13,406 | | 13,406 |
| Total current assets | 322,144 | 5,821,772 | 6,143,916 |
| Equipment, net | 2,860 | - | 2,860 |
| Leased assets, net | 2,033,482 | - | 2,033,482 |
| **TOTAL ASSETS** | $ 2,358,486 | $ 5,821,772 | $ 8,180,258 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current Liabilities: | | | |
| Accounts payable | $ 100,000 | $ - | $ 100,000 |
| Accrued expenses | 31,453 | - | 31,453 |
| Notes payable, current (net of discount of $48,600) | 254,511 | - | 254,511 |
| Finance lease obligations, current (net of discount of $482,605) | 72,485 | - | 72,485 |
| Total current liabilities | 458,449 | - | 458,449 |
| Notes payable, net of current portion (net of discount of $54,190 and $4,337,810 (pro forma)) | 552,588 | 1,716,350 | 2,268,938 |
| Finance lease obligations, net of current portion (net of discount of $363,993) | 674,208 | - | 674,208 |
| **TOTAL LIABILITIES** | 1,685,245 | 1,716,350 | 3,401,595 |
| Commitments and contingencies | - | - | - |
| **STOCKHOLDERS' EQUITY** | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | | |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 25,770,551 and 25,900,551 (pro forma) shares issued and outstanding | 26 | - | 26 |

| | | | |
|---|---|---|---|
| Additional paid-in capital | 6,257,225 | 4,105,422 | 10,362,647 |
| Accumulated deficit | (5,584,010) | - | (5,584,010) |
| Total stockholders' equity | 673,241 | 4,105,422 | 4,778,663 |
| **TOTAL LIABILITIES AND STOCKHLDERS' EQUITY** | $ 2,358,486 | $ 5,821,772 | $ 8,180,258 |

**YAYYO, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEET**

As of March 31, 2018 and December 31, 2017

| | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| | | (unaudited) | | |
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 160,490 | $ | 308,738 |
| Restricted cash | | 5,821,802 | | - |
| Prepaid expenses | | 103,429 | | 13,406 |
| Total current assets | | 6,085,721 | | 322,144 |
| Equipment, net | | 5,541 | | 2,860 |
| Leased assets, net | | 1,901,353 | | 2,033,482 |
| TOTAL ASSETS | $ | 7,992,615 | $ | 2,358,486 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| Current Liabilities: | | | | |
| Accounts payable | $ | 88,717 | $ | 100,000 |
| Accrued expenses | | 62,712 | | 31,453 |
| Advances from related party | | - | | - |
| Notes payables, current (net of discount of $29,286 and $48,600) | | 286,825 | | 254,511 |
| Finance lease obligations, current (net of discount of $434,968 and $482,605) | | 106,285 | | 72,485 |
| Total current liabilities | | 544,539 | | 458,449 |
| Notes payable, net of current portion (net of discount of $4,290,608 and $54,190) | | 2,275,670 | | 552,588 |
| Finance lease obligations, net of current portion (net of discount of $274,182 and $363,993) | | 634,263 | | 674,208 |
| TOTAL LIABILITIES | | 3,454,472 | | 1,685,245 |
| Commitments and contingencies | | - | | - |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | | | |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 26,313,926 and 25,770,551 shares issued and outstanding | | 26 | | 26 |
| Additional paid-in capital | | 11,655,587 | | 6,257,225 |
| Accumulated deficit | | (7,117,470) | | (5,584,010) |
| Total stockholders' equity (deficit) | | 4,538,143 | | 673,241 |
| TOTAL LIABILITIES AND STOCKHLDERS' EQUITY (DEFICIT) | $ | 7,992,615 | $ | 2,358,486 |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

YAYYO, INC.
CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS (unaudited)

**For the Three Months Ended March 31, 2018 and 2017**
**(unaudited)**

|  | Three Months Ended March 31, | |
|  | 2018 | 2017 |
|---|---|---|
| Revenue | $ 418,879 | $ - |
| Cost of revenue | 309,643 | |
| Gross profit | 109,236 | - |
|  |  |  |
| Operating expenses: |  |  |
| Selling and marketing expenses | 67,431 | 3,165 |
| Product development | 6,148 | 44,530 |
| General and administrative expenses | 1,317,861 | 448,676 |
| Total operating expenses | 1,391,440 | 496,371 |
| Loss from operations | (1,282,204) | (496,371) |
|  |  |  |
| **Other income (expense):** |  |  |
| Interest and financing costs | (251,256) | (144,041) |
| Change in value of derivative liability | - | 28,643 |
| Total other income (expense) | (251,256) | (115,398) |
|  |  |  |
| Net loss | $ (1,533,460) | $ (611,769) |
|  |  |  |
| Weighted average shares outstanding: |  |  |
| Basic | 25,860,790 | 25,043,877 |
| Diluted | 25,860,790 | 25,043,877 |
|  |  |  |
| Loss per share |  |  |
| Basic | $ (0.06) | $ (0.02) |
| Diluted | $ (0.06) | $ (0.02) |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

F - 21

YAYYO, INC.
**CONDENSED CONSOLIDATED STATEMENT OF CASH FLOW (unaudited)**

| | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | 2018 | | 2017 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net loss | $ | (1,533,460) | $ | (611,769) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | | 132,288 | | - |
| Stock option expense | | 226,117 | | 191,864 |
| Common stock issued for services | | 650,000 | | - |
| Non-cash financing costs | | - | | 39,293 |
| Amortization of debt discounts | | 218,619 | | 104,749 |
| Change in value of derivative liability | | - | | (28,643) |
| Change in operating assets and liabilities: | | | | |
| Prepaid expenses | | (20,749) | | (1,000) |
| Accounts payable | | (11,283) | | 98,775 |
| Accrued expenses | | 31,259 | | - |
| Net cash used in operating activities | | (307,209) | | (206,731) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Purchase of equipment | | (2,840) | | - |
| Net cash used in investing activities | | (2,840) | | - |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Proceeds from sale of common stock | | 332,924 | | 249,244 |
| Payment of offering costs | | - | | (136,032) |
| Proceeds from convertible note payable | | - | | 100,000 |
| Repayment of convertible note payable | | - | | - |
| Proceeds from notes payable | | 6,039,000 | | - |
| Repayment of note payable | | (66,500) | | - |
| Payment for debt issuance costs | | (178,228) | | - |
| Proceeds from advance from related party | | - | | 50,000 |
| Repayment of finance lease obligations | | (143,593) | | - |
| Net cash provided by financing activities | | 5,983,603 | | 263,212 |
| **NET INCREASE IN CASH AND RESTRICTED CASH** | | 5,673,554 | | 56,481 |
| **CASH AND RESTRICTED CASH, BEGINNING OF PERIOD** | | 308,738 | | 18,643 |
| **CASH AND RESTRICTED CASH, END OF PERIOD** | $ | 5,982,292 | $ | 75,124 |
| | | | | |
| **CASH PAID FOR:** | | | | |
| Interest | $ | 24,372 | $ | - |
| Income taxes | $ | - | $ | - |
| | | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Payment of accounts payable with common stock | $ | 69,274 | $ | - |
| Value of equity recorded as debt discounts | $ | 4,120,047 | $ | - |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

F - 22

**Notes to Condensed Consolidated Financial Statement**

**Note 1 - Organization and Basis of Presentation**

Organization and Line of Business

YayYo, Inc. ("YayYo" or the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents cars to Uber and Lyft drivers.

Basis of Presentation

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

The Company adopted the calendar year as its basis of reporting.

Interim financial statements

The unaudited interim financial statements included herein, presented in accordance with United States generally accepted accounting principles and stated in US dollars, have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). Certain information and footnote disclosure normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosure are adequate to make the information presented not misleading.

F - 23

These statements reflect all adjustment, consisting of normal recurring adjustments, which, in the opinion of management, are necessary for fair presentation of the information contained therein. It is suggested that these interim financial statements be read in conjunction with the financial statements of the Company for the year ended December 31, 2017 and notes thereto included in the Company's annual report on Form 1-K. The Company follows the same accounting policies in the preparation of interim report. Results of operations for the interim period are not indicative of annual results.

## Note 2 – Summary of Significant Accounting Policies

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC, RideShare Car Rentals, LLC, RideYayYo, LLC and Savy, LLC. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash Equivalents

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

Restricted Cash

The following table provides a reconciliation of cash and restricted cash reported within the consolidated balance sheet that sum to the total of the same such amounts shown in the statement of cash flows:

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Cash | $ 160,490 | $ 308,738 |
| Restricted cash (1) | 5,821,802 | - |
|  | $ 5,982,292 | $ 308,738 |

(1) In connection with a note payable agreement (See Note 5), the Company is required to maintain a cash balance in a separate bank account that secures the note payable. The funds will be released and transferred to the Company's operating cash accounts as the investor is able to exercise the 1,500,000 warrants issued in connection with the notes payable.

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| Computer equipment | 5 years |
|---|---|
| Vehicles | 5 years |

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment* , which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at March 31, 2018 and December 31, 2017, the Company believes there was no impairment of its long-lived assets.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers.*

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes* . ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation.* FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 1,500,000 warrants and 750,000 options outstanding as of March 31, 2018.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share.* Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There were 2,250,000 and 450,000 potentially dilutive securities outstanding during the three months ended March 31, 2018 and 2017, respectively.

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the three months ended March 31, 2018 and 2017were $67,431 and $3,165, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Research and developments costs for the three months ended March 31, 2018 and 2017were $6,148 and $44,530, respectively.

Software Development Costs

Software development costs are capitalized in accordance with FASB ASC 985-20 *Cost of Software to Be Sold, Leased, or Marketed* . Capitalization of software development costs begins upon the establishment of technological feasibility and is discontinued when the product is available for sale. The establishment of technological feasibility and the ongoing assessment for recoverability of capitalized software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenues, estimated economic life, and changes in software and hardware technologies. Capitalized software development costs are comprised primarily of direct overhead, payroll costs, and consultants' fees of individuals working directly on the development of specific software products.

Amortization of capitalized software development costs is provided on a product-by-product basis on the straight-line method over the estimated economic life of the products (not to exceed three years). Management periodically compares estimated net realizable value by product to the amount of software development costs capitalized for that product to ensure the amount capitalized is not in excess of the amount to be recovered through revenues. Any such excess of capitalized software development costs over expected net realizable value is expensed at that time.

Organizational Costs

In accordance with FASB ASC 720, organizational costs, including accounting fees, legal fees, and costs of incorporation, are expensed as incurred.

The Company intends to file U.S. federal tax returns when due. All tax periods since inception remain open to examination by the taxing jurisdictions to which the Company is subject.

Derivative Financial Instruments

The Company evaluates all of its agreements to determine if such instruments have derivatives or contain features that qualify as embedded derivatives. For derivative financial instruments that are accounted for as liabilities, the derivative instrument is initially recorded at its fair value and is then re-valued at each reporting date, with changes in the fair value reported in the statements of operations. For stock-based derivative financial instruments, the Company uses the Black-Scholes-Merton option pricing model to value the derivative instruments at inception and on subsequent valuation dates. The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is evaluated at the end of each reporting period. Derivative instrument liabilities are classified in the balance sheet as current or non-current based on whether or not net-cash settlement of the derivative instrument could be required within 12 months of the balance sheet date. During the year ended December 31, 2017, the Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. The convertible note was repaid therefore, there are no derivative financial instruments at March 31, 2018 and December 31, 2017.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company uses Level 2 inputs for its valuation methodology for derivative liabilities as their fair values were determined by using the Black-Scholes-Merton pricing model based on various assumptions. The Company's derivative liabilities are adjusted to reflect fair value at each period end, with any increase or decrease in the fair value being recorded in results of operations as adjustments to fair value of derivatives.

At March 31, 2018 and December 31, 2017, the Company did not identify any liabilities that are required to be presented on the balance sheet at fair value. The derivative liability associated with the convertible notes payable were both issued and repaid during the year ended December 31, 2017; therefore, there was no derivative liability at March 31, 2018 or December 31, 2017.

<u>Recent Accounting Pronouncements</u>

In January 2017, the Financial Accounting Standards Board ("FASB") issued an Accounting Standards Update ("ASU") 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business* . The amendments in this update clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for interim and annual periods beginning after December 15, 2017 and should be applied prospectively on or after the effective date. The Company is in the process of evaluating the impact of this accounting standard update.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* which requires restricted cash to be presented with cash and cash equivalents on the statement of cash flows and disclosure of how the statement of cash flows reconciles to the balance sheet if restricted cash is shown separately from cash and cash equivalents on the balance sheet. ASU 2016-18 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The Company will adopt this accounting standard update beginning in the first quarter of 2018. The Company does not believe this accounting standard update will have a material impact on its financial statements.

In October 2016, the FASB issued ASU 2016-16, *Income Taxes (Topic 740): Intra-Entity Transfer of Assets Other than Inventory*, which requires the recognition of the income tax consequences of an intra-entity transfer of an asset, other than inventory, when the transfer occurs. ASU 2016-16 is effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. The Company is in the process of evaluating the impact of this accounting standard update on its financial statements.

In August 2016, the FASB issued ASU 2016-15,  *Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments*. ASU 2016-15 provides guidance for targeted changes with respect to how cash receipts and cash payments are classified in the statements of cash flows, with the objective of reducing diversity in practice. ASU 2016-15 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The Company is in the process of evaluating the impact of this accounting standard update on its statements of cash flows.

In March 2016, the FASB issued ASU 2016-09, *Stock Compensation (Topic 718), Improvements to Employee Share-Based Payment Accounting*. ASU 2016-09, which amends several aspects of accounting for employee share-based payment transactions including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, and classification in the statement of cash flows. ASU 2016-09 is effective for fiscal years beginning after December 15, 2016 and interim periods within annual periods beginning after December 15, 2016, with early adoption permitted. The Company is in the process of evaluating the impact of this accounting standard update on its financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ASU 2016-02 requires lessees to recognize lease assets and lease liabilities on the balance sheet and requires expanded disclosures about leasing arrangements. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 and interim periods in fiscal years beginning after December 15, 2018, with early adoption permitted. The Company adopted this ASU for its year ended December 31, 2017.

In August 2014, the FASB issued Accounting Standards Update No. 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*, which provides guidance on determining when and how to disclose going-concern uncertainties in the financial statements. ASU 2014-15 requires management to perform interim and annual assessments of an entity's ability to continue as a going concern within one year of the date the financial statements are issued. An entity must provide certain disclosures if conditions or events raise substantial doubt about the entity's ability to continue as a going concern. ASU 2014-15 is effective for annual periods ending after December 15, 2016, and interim periods thereafter. Early adoption is permitted. The Company is currently evaluating the impact of the adoption of ASU 2014-15 on the Company's financial statements and disclosures.

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2014-09, *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under current U.S. GAAP and replace it with a principle-based approach for determining revenue recognition. ASU 2014-09 will require that companies recognize revenue based on the value of transferred goods or services as they occur in the contract. The ASU also will require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. ASU 2014-09 is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted only in annual reporting periods beginning after December 15, 2016, including interim periods therein. Entities will be able to transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption. The Company has evaluated the impact of ASU 2014-09 on the Company's financial statements and disclosures does not believe the impact will be material. The Company adopted this ASU beginning on January 1, 2018 and will use the prospective method of adoption.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**Note 3 – Equipment**

At March 31, 2018 and December 31, 2017 equipment consisted of the following:

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Computer equipment | $ 6,018 | $ 3,178 |
|  | 6,018 | 3,178 |
| Less accumulated depreciation | (477) | (318) |
| Equipment, net | $ 5,541 | $ 2,860 |

Depreciation expense for equipment for the three months ended March 31, 2018 and 2017 was $159 and $0, respectively.

**Note 4 – Leased Assets**

At March 31, 2018 and December 31, 2017 all of the Company's leased assets were finance leased right-of-use assets and consisted of the following:

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Vehicles | $ 2,116,068 | $ 2,116,068 |
|  | 2,116,068 | 2,116,068 |
| Less accumulated depreciation | (214,715) | (82,586) |
| Leased assets, net | $ 1,901,353 | $ 2,033,482 |

The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. Depreciation expense for leased assets for the three months ended March 31, 2018 and 2017was $132,129 and $0, respectively. The lease terms are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

**Note 5 – Notes Payable**

Notes payable at March 31, 2018 and December 31, 2017 consisted of the following:

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Note payable to investor; accrue interest at 5% per annum; due March 31, 2019; unsecured | $ 378,500 | $ 445,000 |
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 of original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to March 26, 2021; unsecured (A) | 281,667 | 242,667 |
| Note payable to investor; accrue interest at 6% per annum; due March 31, 2018; unsecured (B) | 222,222 | 222,222 |
| Note payable to investor; accrue interest at LIBOR plus 100 basis points; due March 8, 2023; secured by restricted cash balance (C) | 6,000,000 | - |
| Total notes payable | 6,882,389 | 909,889 |
| Unamortized debt discount | (4,319,894) | (102,790) |
| Notes payable, net discount | 2,562,495 | 807,099 |
| Less current portion | (286,825) | (254,511) |
| Long-term portion | $ 2,275,670 | $ 552,588 |

(A) In connection with the issuance of these notes payable, during the three months the Company also issued an aggregate of 3,000 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $14,625 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $14,625 is being amortized over the term of the notes payable. During the year ended December 31, 2017, the Company also issued an aggregate of 18,200 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $91,000 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $91,000 is being amortized over the term of the notes payable. During the three months ended March 31, 2018 and 2017, $8,054 and $0, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $87,855 at March 31, 2018.

F - 29

(B) This note payable was issued with an original issuance discount of $22,222 which is being amortized over the term of the notes payable. During the three months ended March 31, 2018 and 2017, $21,506 and $0, respectively, was charged to interest expense as amortization of the discount, with an unamortized balance of $0 at March 31, 2018.

(C) On March 8, 2018, the Company issued a note payable in the amount of $6,000,000. The note accrues interest at LIBOR plus 100 basis points and is due five years from the date of issuance. The note payable is secured by the restricted cash balance. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per shares. The warrants expire five years from the date of issuance. The Company also paid $178,228 of issuance costs associated with this note. The relative fair value of the 150,000 shares of common stock was $378,916 and the relative fair value of the 1,500,000 warrants was $3,726,506 and both were recorded as a discount on the note payable and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the note payable. During the three months ended March 31, 2018 and 2017, $51,611 and $0, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $4,232,039 at March 31, 2018.

A rollforward of notes payable from December 31, 2017 to March 31, 2018 is below:

| | | |
|---|---|---|
| Notes payable, December 31, 2017 | $ | 807,099 |
| Issued for cash | | 6,039,000 |
| Repayments | | (66,500) |
| Debt discount related to notes payable | | (4,298,275) |
| Amortization of debt discounts | | 81,171 |
| Notes payable, March 31, 2018 | $ | 2,562,495 |

**Note 6 – Lease Obligations**

Lease obligations at March 31, 2018 and December 31, 2017 consisted of the following:

| | March 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Lease obligations | $ | 1,449,698 | $ | 1,593,291 |
| Unamortized debt discount | | (709,150) | | (846,598) |
| Lease obligations, net discount | | 740,548 | | 746,693 |
| Less current portion | | (106,285) | | (72,485) |
| Long-term portion | $ | 634,263 | $ | 674,208 |

In connection with these finance lease obligations, the Company also issued to the lessor an aggregate of 350,000 shares of its common stock as additional incentive for the lessor to enter into these lease agreements. The lessor was given 100,000 shares of common stock for the first 30 vehicle leases and an additional 250,000 shares of common stock for the next 100 vehicle leases. The aggregate relative fair value of these 350,000 shares of common stock was $1,178,036 and was recorded as a discount on the lease obligations and as additional paid in capital. The discount of $1,178,036 is being amortized over the term of the lease obligations. During the three months ended March 31, 2018 and 2017, $137,448 and $0, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $709,150 at March 31, 2018.

A rollforward of lease obligations from December 31, 2017 to March 31, 2018 is below:

| | | |
|---|---|---:|
| Lease obligations, December 31, 2017 | $ | 746,693 |
| Payments on lease obligations | | (143,593) |
| Amortization of debt discounts | | 137,448 |
| Lease obligations, March 31, 2018 | $ | 740,548 |

The weighted-average remaining lease term at March 31, 2018 is 2.56 years and the weighted average discount rate is 5%.

The finance lease costs for the three months ended March 31, 2018 consisted of depreciation expense of $132,129 and interest expense of $19,212.

**Note 7 – Stockholders' Equity**

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

Common Stock

During the three months ended from March 31, 2018, the Company:

- sold 49,180 shares of common stock to investors for gross cash proceeds of $332,924;
- issued 153,000 share of common stock in connection with the issuance of notes payable;
- issued 81,250 shares of common stock for services rendered valued at $650,000. The value was determined based on the shares price for recent sales of the Company's common stock; and
- issued 8,695 for payment of accounts payable.

Stock Options

The following is a summary of stock option activity:

| | Options Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---:|---|---:|---:|---|---:|
| Outstanding, December 31, 2017 | 750,000 | $ | 3.80 | 1.80 | $ | 3,150,000 |
| Granted | - | | | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, March 31, 2018 | 750,000 | $ | 3.80 | 1.55 | $ | 3,150,000 |
| Exercisable, March 31, 2018 | 660,000 | $ | 3.00 | 1.32 | $ | 3,150,000 |

The exercise price for options outstanding at March 31, 2018:

| Outstanding | | | Exercisable | | |
|---|---|---|---|---|---|
| **Number of Options** | | **Exercise Price** | **Number of Options** | | **Exercise Price** |
| 450,000 | $ | 1.00 | 450,000 | $ | 1.00 |
| 300,000 | | 8.00 | 210,000 | | 8.00 |
| 750,000 | | | 660,000 | | |

Warrants

The following is a summary of warrant activity:

| | Warrants Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2017 | - | | | | | |
| Granted | 1,500,000 | $ | 4.00 | | | |
| Forfeited | | | | | | |
| Exercised | - | | | | | |
| Outstanding, March 31, 2018 | 1,500,000 | $ | 4.00 | 4.91 | $ | 6,000,000 |
| Exercisable, March 31, 2018 | 1,500,000 | $ | 4.00 | 4.91 | $ | 6,000,000 |

The exercise price for warrants outstanding at March 31, 2018:

| Outstanding and Exercisable | | |
|---|---|---|
| Number of Warrants | | Exercise Price |
| 1,500,000 | $ | 4.00 |
| 1,500,000 | | |

## Note 8 – Related Party Transactions

During the three months ended March 31, 2018 and 2017, the Company paid management fees of $60,000 and $35,000, respectively, to a company that is owned by the Company's majority stockholder.

During the year ended December 31, 2017and the period from June 21, 2016 (inception) to December 31, 2016, the Company's majority stockholder advanced a total of $50,000 and $75,000 to the Company. During the year ended December 31, 2017, $125,000 of these advances were repaid. These advances are non-interest bearing and due upon demand. At March 31, 2018 and December 31, 2017, amount due to Company's majority stockholder was $0 and $0, respectively.

## Note 9 – Subsequent Event

Subsequent to March 31, 2018, the Company issued 251,250 shares for services rendered.

F - 32

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized in the City of Los Angeles, State of California, on June 6, 2018.

**YAYYO, INC.**

By: */s/ Ramy El-Batrawi*

Ramy El-Batrawi
Chief Executive Officer and Director

94

## SIGNATURES AND POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Ramy El-Batrawi his true and lawful attorney-in-fact and agent, with full power of substitution and re-substitution, for such person and in his or her name, place and stead, in any and all capacities, to sign any or all further amendments or supplements (including post-effective amendments filed pursuant to Rule 462(b) of the Securities Act of 1933, as amended) to this registration statement and to file the same, with all exhibits thereto, and other documents in connection therewith, with the SEC, granting unto said attorney-in-fact and agent or either one of them full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully as to all intents and purposes as she might or could do in person, hereby ratifying and confirming all that each of said attorneys-in-fact and agents, or any of them, or his substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on June 6, 2018.

| | |
|---|---|
| */s/ Ramy El-Batrawi* | */s/ Kevin F. Pickard* |
| Ramy El-Batrawi | Kevin F. Pickard |
| Chief Executive Officer and Director | Chief Financial Officer and Director |
| | |
| */s/ Laurie DiGionanni* | */s/ Christopher Maglino* |
| Laurie DiGionanni | Christopher Maglino |
| Chief Operating Officer and Director | Director |
| | |
| */s/ Harbant S. Sidu* | */s/ Dave Haley* |
| Harbant S. Sidu | Dave Haley |
| Director | Director |

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 3.1# | Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.2 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.2# | Amended and Restated Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.4 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.3# | Bylaws of YayYo, Inc. (incorporated by reference to Exhibit 2.3 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.4* | Amended and Restated Bylaws of YayYo, Inc. |
| 3.5# | Certificate of Conversion of YayYo, LLC (incorporated by reference to Exhibit 2.1 contained in the Registrant's Form 1-A filed on December 15, 2016) |
| 3.6# | Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock (incorporated by reference to Exhibit 2.5 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 4.1# | Secured Convertible Note to Chase Financing Inc., dated January 6, 2017 (incorporated by reference to Exhibit 6.6 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 4.2# | Promissory Note with X, LLC, dated January 15, 2017 (incorporated by reference to Exhibit 6.8 contained in the Registrant's Form 1-A filed on February 3, 2017). |
| 4.3* | Warrant, dated March 8, 2018. |
| 4.4* | Senior Secured Note, dated March 8, 2018. |
| 4.5# | Form of Secured Promissory Note (incorporated by reference to Exhibit 6.14 contained in the Registrant's Form 1-U filed on March 26, 2018). |
| 4.6# | Secured Promissory Note, dated December 27, 2017 (incorporated by reference to Exhibit 6.16 contained in the Registrant's Form 1-A filed on March 26, 2018). |
| 5.1# | Opinion of CKR Law, LLP (incorporated by reference to Exhibit 12.1 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 10.1# | Form of Subscription Agreement (incorporated by reference to Exhibit 4.1 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 10.2* | Product Management Proposal. |
| 10.3* | Executive Employment Offer. |
| 10.4* | 2016 Equity Incentive Plan. |
| 10.5* | Agreement with Chase Financing Inc., dated January 1, 2017. |
| 10.6# | Limited Recourse Guaranty and Pledge with X, LLC, dated January 6, 2017 (incorporated by reference to Exhibit 6.5 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 10.7* | Common Stock Purchase Agreement, dated January 6, 2017. |
| 10.8# | Form of SAFE Agreement (incorporated by reference to Exhibit 6.9 contained in the Registrant's Form 1-A filed on February 3, 2017). |
| 10.9* | Securities Purchase Agreement, dated March 8, 2018. |

10.10#       Side Agreement, dated July 15, 2017 (incorporated by reference to Exhibit 6.13 contained in the Registrant's Form 1-A filed on March 28, 2018).

10.11*       Deposit Account Control Agreement, dated March 8, 2018.

10.12#       Security Agreement, dated December 27, 2017 (incorporated by reference to Exhibit 6.28 contained in the Registrant's Form 1-A filed on March 26, 2018).

10.13*       Registration Rights Agreement, dated March 8, 2018.

10.14*       Patent and Trademark Security Agreement, dated December 27, 2017.

10.15*       Incentive Agreement For Grant of Stock, dated April 1, 2018.

10.16*       Form of Open End Lease Agreement and Disclosure Statement.

10.17*       Non-Qualified Stock Option Agreement, dated June 9, 2017.

10.18*       Independent Director Agreement, dated November 27, 2017.

96

| 10.19* | Independent Director Agreement, dated November 8, 2017. |
| 21.1# | List of Subsidiaries of the Registrant (incorporated by reference to Exhibit 21.1 contained in the Registrant's Form S-1 filed on April 30, 2018). |
| 23.1* | Consent of AJ Robbins CPA, LLC, dated June 5, 2018. |

_____

\# Previously filed.
\* Filed herewith.

97

EX-4.3 3 s110647_ex4-3.htm EXHIBIT 4.3

**Exhibit 4.3**

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL TO THE HOLDER (IF REQUESTED BY THE COMPANY), IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. THE NUMBER OF SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 1(a) OF THIS WARRANT.

**YAYYO, INC.**

**WARRANT TO PURCHASE COMMON STOCK**

Warrant No.: W-1

Date of Issuance: March 8, 2018 ("**Issuance Date**")

Yayyo, Inc., a Delaware corporation (the "**Company**"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, BELLRIDGE CAPITAL, LP, the registered holder hereof or its permitted assigns (the "**Holder**"), is entitled, subject to the terms set forth below, to purchase from the Company, at the Exercise Price (as defined below) then in effect, upon exercise of this Warrant to Purchase Common Stock (including any Warrants to Purchase Common Stock issued in exchange, transfer or replacement hereof, the "**Warrant**"), at any time or times on or after the Issuance Date, but not after 11:59 p.m., New York time, on the Expiration Date (as defined below), 1,500,000 (subject to adjustment as provided herein) fully paid and non-assessable shares of Common Stock (as defined below) (the "**Warrant Shares**", and such number of Warrant Shares, the "**Warrant Number**"). Except as otherwise defined herein, capitalized terms in this Warrant shall have the meanings set forth in Section 19. This Warrant is one of the Warrants to Purchase Common Stock (the "**SPA Warrants**") issued pursuant to Section 1 of that certain Securities Purchase Agreement, dated as of March 8, 2018 (the "**Subscription Date**"), by and among the Company and the investors (the "**Buyers**") referred to therein, as amended from time to time (the "**Securities Purchase Agreement**").

1.       <u>EXERCISE OF WARRANT.</u>

(a)       Mechanics of Exercise. Subject to the terms and conditions hereof (including, without limitation, the limitations set forth in Section 1(f)), this Warrant may be exercised by the Holder on any day on or after the Issuance Date (an "**Exercise Date**"), in whole or in part, by delivery (whether via facsimile or otherwise) of a written notice, in the form attached hereto as **Exhibit A** (the "**Exercise Notice**"), of the Holder's election to exercise this Warrant. Within one (1) Trading Day following an exercise of this Warrant as aforesaid, the Holder shall deliver payment to the Company of an amount equal to the Exercise Price in effect on the date of such exercise multiplied by the number of Warrant Shares as to which this Warrant was so exercised (the "**Aggregate Exercise Price**") in cash or via wire transfer of immediately available funds if the Holder did not notify the Company in such Exercise Notice that such exercise was made pursuant to a Cashless Exercise (as defined in Section 1(d)). The Holder shall not be required to deliver the original of this Warrant in order to effect an exercise hereunder. Execution and delivery of an Exercise Notice with respect to less than all of the Warrant Shares shall have the same effect as cancellation of the original of this Warrant and issuance of a new Warrant evidencing the right to purchase the remaining number of Warrant Shares. Execution and delivery of an Exercise Notice for all of the then-remaining Warrant Shares shall have the same effect as cancellation of the original of this Warrant after delivery of the Warrant Shares in accordance with the terms hereof. On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by facsimile or electronic mail an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as **Exhibit B**, to the Holder and, if after the Public Company Date, the Company's transfer agent (the "**Transfer Agent**"), which confirmation shall, if after the Public Company Date, constitute an instruction to the Transfer Agent to process such Exercise Notice in accordance with the terms herein. On or before the second (2nd) Trading Day following the date on which the Company has received such Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date), the Company shall (X) if on or after the Public Company Date, provided that the Transfer Agent is participating in The Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal at Custodian system, or (Y) if either (x) prior to the Public Company Date or (y) on or after the Public Company Date if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, upon the request of the Holder, issue and deliver (via reputable overnight courier) to the address as specified in the Exercise Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled pursuant to such exercise. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of delivery of the certificates evidencing such Warrant Shares (as the case may be). If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant submitted for exercise is greater than the number of Warrant Shares being acquired upon an exercise and upon surrender of this Warrant to the Company by the Holder, then, at the request of the Holder, the Company shall as soon as practicable and in no event later than two (2) Business Days after any exercise and at its own expense, issue and deliver to the Holder (or its designee) a new Warrant (in accordance with Section 7(d)) representing the right to purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number. The Company shall pay any and all transfer, stamp, issuance and similar taxes, costs and expenses (including, without limitation, fees and expenses of the Transfer Agent) that may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant. Notwithstanding the foregoing, except in the case where an exercise of this Warrant is validly made pursuant to a Cashless Exercise), the Company's failure to deliver Warrant Shares to the Holder on or prior to the later of ((i) two (2) Trading Days after receipt of the applicable Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date) and (ii) one (1) Trading Day after the Company's receipt of the Aggregate Exercise Price (or valid notice of a Cashless Exercise (such later date, the "**Share Delivery Date**") shall not be deemed to be a breach of this Warrant. Notwithstanding anything to the contrary contained in this Warrant or the Registration Rights Agreement, after the effective date of the Registration Statement (as defined in the Registration Rights Agreement) and prior to the Holder's receipt of the notice of a Grace Period (as defined in the Registration Rights Agreement), the Company shall cause the Transfer Agent to deliver unlegended shares of Common Stock to the Holder (or its designee) in connection with any sale of Registrable Securities (as defined in the Registration Rights Agreement) with respect to which the Holder has entered into a contract for sale, and delivered a copy of the prospectus included as part of the particular Registration Statement to the extent applicable, and for which the Holder has not yet settled. From the Issuance Date through and including the Expiration Date, the Company shall maintain a transfer agent that participates in the DTC's Fast Automated Securities Transfer Program. Notwithstanding any provision of this Warrant to the contrary, at any time prior to the Listing Date, no more than the Pre-Listing Maximum Eligibility Number of Warrant Shares shall be exercisable hereunder.

(b)        Exercise Price. For purposes of this Warrant, "**Exercise Price**" means $4.00, subject to adjustment as provided herein.

(c)        Company's Failure to Timely Deliver Securities.

(i)        General. The Company shall in all cases use its reasonable best efforts to comply with the delivery requirements set forth herein and shall do all things and take all actions reasonably requested by the Holder in furtherance thereof.

(ii)        Exercise Failures On or After the Public Company Date. If on or after the Public Company Date, the Company shall fail, for any reason or for no reason, on or prior to the Share Delivery Date, either (I) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, to issue and deliver to the Holder (or its designee) a certificate for the number of Warrant Shares to which the Holder is entitled and register such Warrant Shares on the Company's share register or, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, to credit the balance account of the Holder or the Holder's designee with DTC for such number of Warrant Shares to which the Holder is entitled upon the Holder's exercise of this Warrant (as the case may be) or (II) if a Registration Statement covering the resale of the Warrant Shares that are the subject of the Exercise Notice (the "**Unavailable Warrant Shares**") is not available for the resale of such Unavailable Warrant Shares and the Company fails to promptly, but in no event later than as required pursuant to the Registration Rights Agreement (x) so notify the Holder and (y) deliver the Warrant Shares electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal At Custodian system (the event described in the immediately foregoing clause (II) is hereinafter referred as a "**Notice Failure**" and together with the event described in clause (I) above, a "**Delivery Failure**"), then, in addition to all other remedies available to the Holder, (X) the Company shall pay in cash to the Holder on each day after the Share Delivery Date and during such Delivery Failure an amount equal to 2% of the product of (A) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, multiplied by (B) any trading price of the Common Stock selected by the Holder in writing as in effect at any time during the period beginning on the applicable Exercise Date and ending on the applicable Share Delivery Date, and (Y) the Holder, upon written notice to the Company, may void its Exercise Notice with respect to, and retain or have returned, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the voiding of an Exercise Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise. In addition to the foregoing, if on or after the Public Company Date and on or prior to the Share Delivery either (I) the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, the Company shall fail to issue and deliver to the Holder (or its designee) a certificate and register such shares of Common Stock on the Company's share register or, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, the Transfer Agent shall fail to credit the balance account of the Holder or the Holder's designee with DTC for the number of shares of Common Stock to which the Holder is entitled upon the Holder's exercise hereunder or pursuant to the Company's obligation pursuant to clause (ii) below or (II) a Notice Failure occurs, and if on or after such Share Delivery Date the Holder purchases (in an open market transaction or otherwise) shares of Common Stock corresponding to all or any portion of the number of shares of Common Stock issuable upon such exercise that the Holder is entitled to receive from the Company and has not received from the Company in connection with such Delivery Failure or Notice Failure, as applicable (a "**Buy-In**"), then, in addition to all other remedies available to the Holder, the Company shall, within two (2) Business Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (including, without limitation, by any other Person in respect, or on behalf, of the Holder) (the "**Buy-In Price**"), at which point the Company's obligation to so issue and deliver such certificate (and to issue such shares of Common Stock) or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) (and to issue such Warrant Shares) shall terminate, or (ii) promptly honor its obligation to so issue and deliver to the Holder a certificate or certificates representing such Warrant Shares or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of Warrant Shares multiplied by (B) the lowest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date of the applicable Exercise Notice and ending on the date of such issuance and payment under this clause (ii) (the "**Buy-In Payment Amount**"). Nothing shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock (or

to electronically deliver such shares of Common Stock upon the exercise of this Warrant as required pursuant to the terms hereof. After the Public Company Date, while this Warrant is outstanding, the Company shall cause its transfer agent to participate in the DTC Fast Automated Securities Transfer Program. In addition to the foregoing rights, (i) if the Company fails to deliver the applicable number of Warrant Shares upon an exercise pursuant to Section 1 by the applicable Share Delivery Date, then the Holder shall have the right to rescind such exercise in whole or in part and retain and/or have the Company return, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an exercise shall not affect the Company's obligation to make any payments that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and (ii) if a registration statement covering the issuance or resale of the Warrant Shares that are subject to an Exercise Notice is not available for the issuance or resale, as applicable, of such Exercise Notice Warrant Shares and the Holder has submitted an Exercise Notice prior to receiving notice of the non-availability of such registration statement and the Company has not already delivered the Warrant Shares underlying such Exercise Notice electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit / Withdrawal At Custodian system, the Holder shall have the option, by delivery of notice to the Company, to (x) rescind such Exercise Notice in whole or in part and retain or have returned, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an Exercise Notice shall not affect the Company's obligation to make any payments that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and/or (y) switch some or all of such Exercise Notice from a cash exercise to a Cashless Exercise.

3

(d)      Cashless Exercise. Notwithstanding anything contained herein to the contrary (other than Section 1(f) below), if at the time of exercise hereof a registration statement is not effective (or the prospectus contained therein is not available for use) for the issuance of all of the Warrant Shares being exercised pursuant to the applicable Exercise Notice, but not prior to the earlier to occur of (x) such initial time the Common Stock of the Company is listed on an Eligible Market and (y) August 31, 2018, then the Holder may, in its sole discretion, exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of Warrant Shares determined according to the following formula (a "**Cashless Exercise**"):

$$\text{Net Number} = \frac{(A \times B) - (A \times C)}{D}$$

For purposes of the foregoing formula:

A= the total number of shares with respect to which this Warrant is then being exercised.

B = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders; and (ii) on or after the Public Company Date, the greater of (I) the Spot Price and (II) the quotient of (A) the sum of the VWAP of the Common Stock of each of the twenty (20) Trading Days ending at the close of business on the Principal Market immediately prior to the time of exercise as set forth in the applicable Exercise Notice, divided by (B) twenty (20).

C = the Exercise Price then in effect for the applicable Warrant Shares at the time of such exercise.

D = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders and (ii) after the Public Company Date, the Spot Price.

For purposes of Rule 144(d) promulgated under the 1933 Act, as in effect on the Subscription Date, it is intended that the Warrant Shares issued in a Cashless Exercise shall be deemed to have been acquired by the Holder, and the holding period for the Warrant Shares shall be deemed to have commenced, on the date this Warrant was originally issued pursuant to the Securities Purchase Agreement.

(e)     Disputes. In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the number of Warrant Shares to be issued pursuant to the terms hereof, the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed and resolve such dispute in accordance with Section 13.

(f)     Limitations on Exercises. From and after the Public Company Date, the Company shall not effect the exercise of any portion of this Warrant, and the Holder shall not have the right to exercise any portion of this Warrant, pursuant to the terms and conditions of this Warrant and any such exercise shall be null and void and treated as if never made, to the extent that after giving effect to such exercise, the Holder together with the other Attribution Parties collectively would beneficially own in excess of 4.99% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such exercise. For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by the Holder and the other Attribution Parties shall include the number of shares of Common Stock held by the Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (A) exercise of the remaining, unexercised portion of this Warrant beneficially owned by the Holder or any of the other Attribution Parties and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including other SPA Warrants) beneficially owned by the Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 1(f). For purposes of this Section 1(f), beneficial ownership shall be calculated in accordance with Section 13(d) of the 1934 Act. For purposes of determining the number of outstanding shares of Common Stock the Holder may acquire upon the exercise of this Warrant without exceeding the Maximum Percentage, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (y) a more recent public announcement by the Company or (z) any other written notice by the Company or the Transfer Agent, if any, setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**"). If the Company receives an Exercise Notice from the Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall (i) notify the Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Exercise Notice would otherwise cause the Holder's beneficial ownership, as determined pursuant to this Section 1(f), to exceed the Maximum Percentage, the Holder must notify the Company of a reduced number of Warrant Shares to be acquired pursuant to such Exercise Notice (the number of shares by which such purchase is reduced, the "**Reduction Shares**") and (ii) as soon as reasonably practicable, the Company shall return to the Holder any exercise price paid by the Holder for the Reduction Shares. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing or by electronic mail to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Holder and any other Attribution Party since the date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to the Holder upon exercise of this Warrant results in the Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the 1934 Act), the number of shares so issued by which the Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and the Holder shall not have the power to vote or to transfer the Excess Shares. As soon as reasonably practicable after the issuance of the Excess Shares has been deemed null and void, the Company shall return to the Holder the exercise price paid by the Holder for the Excess Shares. Upon delivery of a written notice to the Company, the Holder may from time to time increase (with such increase not effective until the sixty-first (61st) day after delivery of such notice) or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to the Holder and the other Attribution Parties and not to any other holder of SPA Warrants that is not an Attribution Party of the Holder. For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Warrant in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act. No prior inability to exercise this Warrant pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of exercisability. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 1(f) to the extent necessary to correct this paragraph or any portion of this paragraph which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 1(f) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of this Warrant.

(g)      <u>Reservation of Shares</u>.

(i)      <u>Required Reserve Amount</u>. So long as this Warrant remains outstanding, the Company shall at all times keep reserved for issuance under this Warrant a number of shares of Common Stock at least equal to 200% of the maximum number of shares of Common Stock as shall be necessary to satisfy the Company's obligation to issue shares of Common Stock under the SPA Warrants then outstanding (without regard to any limitations on exercise) (the "**Required Reserve Amount**"); provided that at no time shall the number of shares of Common Stock reserved pursuant to this Section 1(g)(i) be reduced other than proportionally in connection with any exercise or redemption of SPA Warrants or such other event covered by Section 2(a) below. The Required Reserve Amount (including, without limitation, each increase in the number of shares so reserved) shall be allocated pro rata among the holders of the SPA Warrants based on number of shares of Common Stock issuable upon exercise of SPA Warrants held by each holder on the Closing Date (without regard to any limitations on exercise) or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**"). In the event that a holder shall sell or otherwise transfer any of such holder's SPA Warrants, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any SPA Warrants shall be allocated to the remaining holders of SPA Warrants, pro rata based on the number of shares of Common Stock issuable upon exercise of the SPA Warrants then held by such holders (without regard to any limitations on exercise).

6

(ii)     <u>Insufficient Authorized Shares</u>. If, notwithstanding Section 1(g)(i) above, and not in limitation thereof, at any time while any of the SPA Warrants remain outstanding, the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve the Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for all the SPA Warrants then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its board of directors to recommend to the stockholders that they approve such proposal. In the event that the Company is prohibited from issuing shares of Common Stock upon an exercise of this Warrant due to the failure by the Company to have sufficient shares of Common Stock available out of the authorized but unissued shares of Common Stock (such unavailable number of shares of Common Stock, the "**Authorization Failure Shares**"), in lieu of delivering such Authorization Failure Shares to the Holder, the Company shall pay cash in exchange for the cancellation of such portion of this Warrant exercisable into such Authorization Failure Shares at a price equal to the sum of (i) the product of (x) such number of Authorization Failure Shares and (y) the greatest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date the Holder delivers the applicable Exercise Notice with respect to such Authorization Failure Shares to the Company and ending on the date of such issuance and payment under this Section 1(f); and (ii) to the extent the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of Authorization Failure Shares, any Buy-In Payment Amount, brokerage commissions and other out-of-pocket expenses, if any, of the Holder incurred in connection therewith. Nothing contained in this Section 1(g) shall limit any obligations of the Company under any provision of the Securities Purchase Agreement.

2.       <u>ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES</u>. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.

      (a)     <u>Stock Dividends and Splits</u>. Without limiting any provision of Section 2(b) or Section 4, if the Company, at any time on or after the Subscription Date, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in shares of Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

      (b)     <u>Adjustment Upon Issuance of Shares of Common Stock</u>. If and whenever on or after the Subscription Date, the Company issues or sells, or in accordance with this Section 2 is deemed to have issued or sold, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding any Excluded Securities issued or sold or deemed to have been issued or sold) for a consideration per share (the "**New Issuance Price**") less than a price equal to the Exercise Price in effect immediately prior to such issuance or sale or deemed issuance or sale (such Exercise Price then in effect is referred to herein as the "**Applicable Price**") (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance, the Exercise Price then in effect shall be reduced to an amount equal to 90% of the New Issuance Price. For all purposes of the foregoing (including, without limitation, determining the adjusted Exercise Price and the New Issuance Price under this Section 2(b)), the following shall be applicable:

8

(i)      <u>Issuance of Options</u>. If the Company in any manner grants or sells any Options and the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Option or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 2(b)(i), the "lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof and (y) the lowest exercise price set forth in such Option for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Option (or any other Person) upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Option (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or otherwise pursuant to the terms of or upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities.

(ii)      <u>Issuance of Convertible Securities</u>. If the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 2(b)(ii), the "lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to one share of Common Stock upon the issuance or sale of the Convertible Security and upon conversion, exercise or exchange of such Convertible Security or otherwise pursuant to the terms thereof and (y) the lowest conversion price set forth in such Convertible Security for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Convertible Security (or any other Person) upon the issuance or sale of such Convertible Security plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Convertible Security (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities or otherwise pursuant to the terms thereof, and if any such issuance or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of this Warrant has been or is to be made pursuant to other provisions of this Section 2(b), except as contemplated below, no further adjustment of the Exercise Price shall be made by reason of such issuance or sale.

9

(iii)    <u>Change in Option Price or Rate of Conversion</u>. If the purchase or exercise price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exercise or exchange of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exercisable or exchangeable for shares of Common Stock increases or decreases at any time (other than proportional changes in conversion or exercise prices, as applicable, in connection with an event referred to in Section 2(a)), the Exercise Price in effect at the time of such increase or decrease shall be adjusted to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 2(b)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 2(b) shall be made if such adjustment would result in an increase of the Exercise Price then in effect.

(iv)    <u>Calculation of Consideration Received</u>. If any Option and/or Convertible Security and/or Adjustment Right is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "**Primary Security**", and such Option and/or Convertible Security and/or Adjustment Right, the "**Secondary Securities**"), together comprising one integrated transaction, (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing) the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be equal to the difference of (x) the lowest price per share for which one share of Common Stock was issued (or was deemed to be issued pursuant to Section 2(b)(i) or 2(b)(ii) above, as applicable) in such integrated transaction solely with respect to such Primary Security, minus (y) with respect to such Secondary Securities, the sum of (I) the Black Scholes Consideration Value of each such Option, if any, (II) the fair market value (as determined by the Holder in good faith) or the Black Scholes Consideration Value, as applicable, of such Adjustment Right, if any, and (III) the fair market value (as determined by the Holder) of such Convertible Security, if any, in each case, as determined on a per share basis in accordance with this Section 2(b)(iv). If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the net amount of consideration received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company for such securities will be the arithmetic average of the VWAPs of such security for each of the five (5) Trading Days immediately preceding the date of receipt. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities (as the case may be). The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Holder. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five (5) Trading Days after the tenth (10th) day following such Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Holder. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company.

(v) <u>Record Date</u>. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issuance or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase (as the case may be).

(c) <u>Number of Warrant Shares</u>. Simultaneously with any adjustment to the Exercise Price pursuant to this Section 2, the number of Warrant Shares that may be purchased upon exercise of this Warrant shall be increased or decreased proportionately, so that after such adjustment the aggregate Exercise Price payable hereunder for the adjusted number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment (without regard to any limitations on exercise contained herein).

(d) <u>Holder's Right of Alternative Exercise Price Following Issuance of Certain Options or Convertible Securities</u>. In addition to and not in limitation of the other provisions of this Section 2, if the Company in any manner issues or sells or enters into any agreement to issue or sell, any Common Stock, Options or Convertible Securities (any such securities, "**Variable Price Securities**") after the Subscription Date that are issuable pursuant to such agreement or convertible into or exchangeable or exercisable for shares of Common Stock at a price which varies or may vary with the market price of the shares of Common Stock, including by way of one or more reset(s) to a fixed price, but exclusive of such formulations reflecting customary anti-dilution provisions (such as share splits, share combinations, share dividends and similar transactions) (each of the formulations for such variable price being herein referred to as, the "**Variable Price**"), the Company shall provide written notice thereof via facsimile and overnight courier to the Holder on the date of such agreement and the issuance of such Convertible Securities or Options. From and after the date the Company enters into such agreement or issues any such Variable Price Securities, the Holder shall have the right, but not the obligation, in its sole discretion to substitute the Variable Price for the Exercise Price upon exercise of this Warrant by designating in the Exercise Notice delivered upon any exercise of this Warrant that solely for purposes of such exercise the Holder is relying on the Variable Price rather than the Exercise Price then in effect. The Holder's election to rely on a Variable Price for a particular exercise of this Warrant shall not obligate the Holder to rely on a Variable Price for any future exercises of this Warrant.

11

(e)    <u>Stock Combination Event Adjustment</u>. If at any time and from time to time on or after the Issuance Date there occurs any stock split, stock dividend, stock combination recapitalization or other similar transaction involving the Common Stock (each, a "**Stock Combination Event**", and such date thereof, the "**Stock Combination Event Date**") and the Event Market Price is less than the Exercise Price then in effect (after giving effect to the adjustment in clause 2(a) above), then on the sixteenth (16th) Trading Day immediately following such Stock Combination Event, the Exercise Price then in effect on such sixteenth (16th) Trading Day (after giving effect to the adjustment in clause 2(a) above) shall be reduced (but in no event increased) to the Event Market Price. For the avoidance of doubt, if the adjustment in the immediately preceding sentence would otherwise result in an increase in the Exercise Price hereunder, no adjustment shall be made.

(f)    <u>Other Events</u>. In the event that the Company (or any Subsidiary (as defined in the Securities Purchase Agreement)) shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect the Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 2 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's board of directors shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the number of Warrant Shares (if applicable) so as to protect the rights of the Holder, provided that no such adjustment pursuant to this Section 2(f) will increase the Exercise Price or decrease the number of Warrant Shares as otherwise determined pursuant to this Section 2, provided further that if the Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Company's board of directors and the Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding absent manifest error and whose fees and expenses shall be borne by the Company.

(g)    <u>Calculations</u>. All calculations under this Section 2 shall be made by rounding to the nearest cent or the nearest $1/100^{th}$ of a share, as applicable. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issuance or sale of Common Stock.

12

(h)    <u>Voluntary Adjustment By Company</u>. The Company may at any time during the term of this Warrant, with the prior written consent of the Required Holders (as defined in the Securities Purchase Agreement), reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the board of directors of the Company.

(i)    <u>Dollar-Value Adjustment</u>. At any time the Dollar Value of this Warrant is less than $6 million, the number of Warrant Shares that may be purchased upon exercise of this Warrant (without regard to any limitations on exercise set forth herein) shall automatically be increased such that, after giving effect to such increase, the Dollar Value of this Warrant equals $6 million.

3.    <u>RIGHTS UPON DISTRIBUTION OF ASSETS</u>. In addition to any adjustments pursuant to Section 2 above, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property, options, evidence of indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "**Distribution**"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution (provided, however, that, on or after the Public Company Date, to the extent that the Holder's right to participate in any such Distribution would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to the extent of the Maximum Percentage (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Distribution (and beneficial ownership) to the extent of any such excess) and the portion of such Distribution shall be held in abeyance for the benefit of the Holder until such time or times, if ever, as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such Distribution (and any Distributions declared or made on such initial Distribution or on any subsequent Distribution held similarly in abeyance) to the same extent as if there had been no such limitation).

4.    <u>PURCHASE RIGHTS; FUNDAMENTAL TRANSACTIONS</u>.

(a)    <u>Purchase Rights</u>. In addition to any adjustments pursuant to Section 2 above, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issuance or sale of such Purchase Rights (provided, however, that, on or after the Public Company Date, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to the extent of the Maximum Percentage (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Purchase Right (and beneficial ownership) to the extent of any such excess) and such Purchase Right to such extent shall be held in abeyance for the benefit of the Holder until such time or times, if ever, as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such right (and any Purchase Right granted, issued or sold on such initial Purchase Right or on any subsequent Purchase Right held similarly in abeyance) to the same extent as if there had been no such limitation).

(b) <u>Fundamental Transactions</u>. The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Warrant and the other Transaction Documents (as defined in the Securities Purchase Agreement) in accordance with the provisions of this Section 4(b) pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction, including agreements to deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant, including, without limitation, which is exercisable for a corresponding number of shares of capital stock equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such adjustments to the number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction). Upon the consummation of each Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of the applicable Fundamental Transaction, the provisions of this Warrant and the other Transaction Documents referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Warrant and the other Transaction Documents with the same effect as if such Successor Entity had been named as the Company herein. Upon consummation of each Fundamental Transaction, the Successor Entity shall deliver to the Holder confirmation that there shall be issued upon exercise of this Warrant at any time after the consummation of the applicable Fundamental Transaction, in lieu of the shares of Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 2(b)(i) and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of this Warrant prior to the applicable Fundamental Transaction, such shares of publicly traded common stock (or its equivalent) of the Successor Entity (including its Parent Entity) which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Warrant been exercised immediately prior to the applicable Fundamental Transaction (without regard to any limitations on the exercise of this Warrant), as adjusted in accordance with the provisions of this Warrant. Notwithstanding the foregoing, and without limiting Section 1(f) hereof, the Holder may elect, at its sole option, by delivery of written notice to the Company to waive this Section 4(b) to permit the Fundamental Transaction without the assumption of this Warrant. In addition to and not in substitution for any other rights hereunder, prior to the consummation of each Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities or other assets with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon an exercise of this Warrant at any time after the consummation of the applicable Fundamental Transaction but prior to the Expiration Date, in lieu of the shares of the Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 2(b)(i) and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of the Warrant prior to such Fundamental Transaction, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights) which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Warrant been exercised immediately prior to the applicable Fundamental Transaction (without regard to any limitations on the exercise of this Warrant). Provision made pursuant to the preceding sentence shall be in a form and substance reasonably satisfactory to the Holder.

(c)  Black Scholes Value.

(i)  Fundamental Transaction Redemption. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time commencing on the earliest to occur of (x) the public disclosure of any Fundamental Transaction, (y) the consummation of any Fundamental Transaction and (z) the Holder first becoming aware of any Fundamental Transaction through the date that is ninety (90) days after the public disclosure of the consummation of such Fundamental Transaction by the Company pursuant to a Current Report on Form 8-K filed with the SEC, the Company or the Successor Entity (as the case may be) shall purchase this Warrant from the Holder on the date of such request by paying to the Holder cash in an amount equal to the Black Scholes Value. Payment of such amounts shall be made by the Company (or at the Company's direction) to the Holder on or prior to the later of (x) the second (2nd) Trading Day after the date of such request and (y) the date of consummation of such Fundamental Transaction.

(ii)  Event of Default Redemption. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time after the occurrence of an Event of Default (as defined in the Notes)(assuming for such purpose that the Notes remain outstanding), the Company or the Successor Entity (as the case may be) shall purchase this Warrant from the Holder on the date of such request by paying to the Holder cash in an amount equal to the Event of Default Black Scholes Value.

(d)    Application. The provisions of this Section 4 shall apply similarly and equally to successive Fundamental Transactions and Corporate Events and shall be applied as if this Warrant (and any such subsequent warrants) were fully exercisable and without regard to any limitations on the exercise of this Warrant (provided that the Holder shall continue to be entitled to the benefit of the Maximum Percentage, applied however with respect to shares of capital stock registered under the 1934 Act and thereafter receivable upon exercise of this Warrant (or any such other warrant)).

5.    NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation (as defined in the Securities Purchase Agreement), Bylaws (as defined in the Securities Purchase Agreement) or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issuance or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (a) shall not increase the par value of any shares of Common Stock receivable upon the exercise of this Warrant above the Exercise Price then in effect, and (b) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the exercise of this Warrant. Notwithstanding anything herein to the contrary, if after the sixty (60) calendar day anniversary of the Issuance Date, the Holder is not permitted to exercise this Warrant in full for any reason (other than pursuant to restrictions set forth in Section 1(f) hereof), the Company shall use its best efforts to promptly remedy such failure, including, without limitation, obtaining such consents or approvals as necessary to permit such exercise into shares of Common Stock.

6.    WARRANT HOLDER NOT DEEMED A STOCKHOLDER. Except as otherwise specifically provided herein, the Holder, solely in its capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in its capacity as the Holder of this Warrant, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which it is then entitled to receive upon the due exercise of this Warrant. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 6, the Company shall provide the Holder with copies of the same notices and other information given to the stockholders of the Company generally, contemporaneously with the giving thereof to the stockholders.

7.    REISSUANCE OF WARRANTS.

(a)    Transfer of Warrant. If this Warrant is to be transferred, the Holder shall surrender this Warrant to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Warrant (in accordance with Section 7(d)), registered as the Holder may request, representing the right to purchase the number of Warrant Shares being transferred by the Holder and, if less than the total number of Warrant Shares then underlying this Warrant is being transferred, a new Warrant (in accordance with Section 7(d)) to the Holder representing the right to purchase the number of Warrant Shares not being transferred.

(b) <u>Lost, Stolen or Mutilated Warrant</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of this Warrant, the Company shall execute and deliver to the Holder a new Warrant (in accordance with Section 7(d)) representing the right to purchase the Warrant Shares then underlying this Warrant.

(c) <u>Exchangeable for Multiple Warrants</u>. This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Warrant or Warrants (in accordance with Section 7(d)) representing in the aggregate the right to purchase the number of Warrant Shares then underlying this Warrant, and each such new Warrant will represent the right to purchase such portion of such Warrant Shares as is designated by the Holder at the time of such surrender; provided, however, no warrants for fractional shares of Common Stock shall be given.

(d) <u>Issuance of New Warrants</u>. Whenever the Company is required to issue a new Warrant pursuant to the terms of this Warrant, such new Warrant (i) shall be of like tenor with this Warrant, (ii) shall represent, as indicated on the face of such new Warrant, the right to purchase the Warrant Shares then underlying this Warrant (or in the case of a new Warrant being issued pursuant to Section 7(a) or Section 7(c), the Warrant Shares designated by the Holder which, when added to the number of shares of Common Stock underlying the other new Warrants issued in connection with such issuance, does not exceed the number of Warrant Shares then underlying this Warrant), (iii) shall have an issuance date, as indicated on the face of such new Warrant which is the same as the Issuance Date, and (iv) shall have the same rights and conditions as this Warrant.

8. <u>NOTICES</u>. Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant (other than the issuance of shares of Common Stock upon exercise in accordance with the terms hereof), including in reasonable detail a description of such action and the reason therefor. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) immediately upon each adjustment of the Exercise Price and the number of Warrant Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s), (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the shares of Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property to holders of shares of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder, (iii) at least ten (10) Trading Days prior to the consummation of any Fundamental Transaction and (iv) within one (1) Business Day of the occurrence of an Event of Default (as defined in the Notes), setting forth in reasonable detail any material events with respect to such Event of Default and any efforts by the Company to cure such Event of Default. To the extent that any notice provided hereunder constitutes, or contains, material, non-public information regarding the Company or any of its Subsidiaries, the Company shall simultaneously file such notice with the SEC (as defined in the Securities Purchase Agreement) pursuant to a Current Report on Form 8-K. If the Company or any of its Subsidiaries provides material non-public information to the Holder that is not simultaneously filed in a Current Report on Form 8-K and the Holder has not agreed to receive such material non-public information, the Company hereby covenants and agrees that the Holder shall not have any duty of confidentiality to the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents with respect to, or a duty to any of the foregoing not to trade on the basis of, such material non-public information. It is expressly understood and agreed that the time of execution specified by the Holder in each Exercise Notice shall be definitive and may not be disputed or challenged by the Company.

17

9.    <u>AMENDMENT AND WAIVER</u>. Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f)) may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

10.    <u>SEVERABILITY</u>. If any provision of this Warrant is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Warrant so long as this Warrant as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

11.  <u>GOVERNING LAW</u>. This Warrant shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to the Company at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS WARRANT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

12.  <u>CONSTRUCTION; HEADINGS</u>. This Warrant shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any Person as the drafter hereof. The headings of this Warrant are for convenience of reference and shall not form part of, or affect the interpretation of, this Warrant. Terms used in this Warrant but defined in the other Transaction Documents shall have the meanings ascribed to such terms on the Closing Date (as defined in the Securities Purchase Agreement) in such other Transaction Documents unless otherwise consented to in writing by the Holder.

13.  <u>DISPUTE RESOLUTION</u>.

(a)  <u>Submission to Dispute Resolution</u>.

(i)  In the case of a dispute relating to the Exercise Price, the Closing Sale Price, the Bid Price, Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or fair market value or the arithmetic calculation of the number of Warrant Shares (as the case may be) (including, without limitation, a dispute relating to the determination of any of the foregoing), the Company or the Holder (as the case may be) shall submit the dispute to the other party via facsimile (A) if by the Company, within two (2) Business Days after the occurrence of the circumstances giving rise to such dispute or (B) if by the Holder, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Company are unable to promptly resolve such dispute relating to such Exercise Price, such Closing Sale Price, such Bid Price, such Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or such fair market value or such arithmetic calculation of the number of Warrant Shares (as the case may be), at any time after the second (2nd) Business Day following such initial notice by the Company or the Holder (as the case may be) of such dispute to the Company or the Holder (as the case may be), then the Holder may, at its sole option, select an independent, reputable investment bank to resolve such dispute.

19

(ii)     The Holder and the Company shall each deliver to such investment bank (A) a copy of the initial dispute submission so delivered in accordance with the first sentence this Section 13 and (B) written documentation supporting its position with respect to such dispute, in each case, no later than 5:00 p.m. (New York time) by the fifth (5th) Business Day immediately following the date on which the Holder selected such investment bank (the "**Dispute Submission Deadline**") (the documents referred to in the immediately preceding clauses (A) and (B) are collectively referred to herein as the "**Required Dispute Documentation**") (it being understood and agreed that if either the Holder or the Company fails to so deliver all of the Required Dispute Documentation by the Dispute Submission Deadline, then the party who fails to so submit all of the Required Dispute Documentation shall no longer be entitled to (and hereby waives its right to) deliver or submit any written documentation or other support to such investment bank with respect to such dispute and such investment bank shall resolve such dispute based solely on the Required Dispute Documentation that was delivered to such investment bank prior to the Dispute Submission Deadline). Unless otherwise agreed to in writing by both the Company and the Holder or otherwise requested by such investment bank, neither the Company nor the Holder shall be entitled to deliver or submit any written documentation or other support to such investment bank in connection with such dispute (other than the Required Dispute Documentation).

(iii)     The Company and the Holder shall cause such investment bank to determine the resolution of such dispute and notify the Company and the Holder of such resolution no later than ten (10) Business Days immediately following the Dispute Submission Deadline. The fees and expenses of such investment bank shall be borne solely by the Company, and such investment bank's resolution of such dispute shall be final and binding upon all parties absent manifest error.

(b)     <u>Miscellaneous</u>. The Company expressly acknowledges and agrees that (i) this Section 13 constitutes an agreement to arbitrate between the Company and the Holder (and constitutes an arbitration agreement) under the rules then in effect under § 7501, et seq. of the New York Civil Practice Law and Rules ("**CPLR**") and that the Holder is authorized to apply for an order to compel arbitration pursuant to CPLR § 7503(a) in order to compel compliance with this Section 13, (ii) a dispute relating to the Exercise Price includes, without limitation, disputes as to (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(b), (B) the consideration per share at which an issuance or deemed issuance or sale of Common Stock occurred, (C) whether any issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred, (iii) the terms of this Warrant and each other applicable Transaction Document shall serve as the basis for the selected investment bank's resolution of the applicable dispute, such investment bank shall be entitled (and is hereby expressly authorized) to make all findings, determinations and the like that such investment bank determines are required to be made by such investment bank in connection with its resolution of such dispute (including, without limitation, determining (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(b), (B) the consideration per share at which an issuance or deemed issuance of Common Stock occurred, (C) whether any issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred) and in resolving such dispute such investment bank shall apply such findings, determinations and the like to the terms of this Warrant and any other applicable Transaction Documents, (iv) the Holder (and only the Holder), in its sole discretion, shall have the right to submit any dispute described in this Section 13 to any state or federal court sitting in The City of New York, Borough of Manhattan in lieu of utilizing the procedures set forth in this Section 13 and (v) nothing in this Section 13 shall limit the Holder from obtaining any injunctive relief or other equitable remedies (including, without limitation, with respect to any matters described in this Section 13).

14.    <u>REMEDIES, CHARACTERIZATION, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Warrant shall be cumulative and in addition to all other remedies available under this Warrant and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the right of the Holder to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Warrant. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, exercises and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holder of this Warrant shall be entitled, in addition to all other available remedies, to specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving actual damages and without posting a bond or other security. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Warrant (including, without limitation, compliance with Section 2 hereof). The issuance of shares and certificates for shares as contemplated hereby upon the exercise of this Warrant shall be made without charge to the Holder or such shares for any issuance tax or other costs in respect thereof, provided that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the Holder or its agent on its behalf.

15.    <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>. If (a) this Warrant is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the holder otherwise takes action to collect amounts due under this Warrant or to enforce the provisions of this Warrant or (b) there occurs any bankruptcy, reorganization, receivership of the company or other proceedings affecting company creditors' rights and involving a claim under this Warrant, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, without limitation, attorneys' fees and disbursements.

21

16.     <u>TRANSFER</u>. This Warrant may be offered for sale, sold, transferred or assigned without the consent of the Company, except as may otherwise be required by Section 2(g) of the Securities Purchase Agreement.

17.     <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Warrant, from and after the Public Company Date, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-k or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries.

19.     <u>CERTAIN DEFINITIONS</u>. For purposes of this Warrant, the following terms shall have the following meanings:

(a)     "**1933 Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(b)     "**1934 Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(c)     "**Adjustment Right**" means any right granted with respect to any securities issued in connection with, or with respect to, any issuance or sale (or deemed issuance or sale in accordance with Section 2) of shares of Common Stock (other than rights of the type described in Section 2(b)(i) and 4 hereof) that could result in a decrease in the net consideration received by the Company in connection with, or with respect to, such securities (including, without limitation, any cash settlement rights, cash adjustment or other similar rights).

(d)     "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(e)     "**Approved Stock Plan**" means any employee benefit plan which has been approved by the board of directors of the Company prior to or subsequent to the date hereof pursuant to which shares of Common Stock and standard options to purchase Common Stock may be issued to any employee, officer or director for services provided to the Company in their capacity as such.

22

(f)        "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Section 13(d) of the 1934 Act. For clarity, the purpose of the foregoing is to subject collectively the Holder and all other Attribution Parties to the Maximum Percentage.

(g)        "**Bid Price**" means, for any security as of the particular time of determination, the bid price for such security on the Principal Market as reported by Bloomberg as of such time of determination, or, if the Principal Market is not the principal securities exchange or trading market for such security, the bid price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg as of such time of determination, or if the foregoing does not apply, the bid price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg as of such time of determination, or, if no bid price is reported for such security by Bloomberg as of such time of determination, the average of the bid prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC) as of such time of determination. If the Bid Price cannot be calculated for a security as of such particular time of determination on any of the foregoing bases, the Bid Price of such security as of such time of determination shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(h)        "**Black Scholes Consideration Value**" means (x) prior to the Public Company Date, the fair market value of the applicable Option, Convertible Security or Adjustment Right (as the case may be) as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the applicable Option, Convertible Security or Adjustment Right (as the case may be) as of the date of issuance thereof calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the public announcement of the execution of definitive documents with respect to the issuance of such Option or Convertible Security (as the case may be), (ii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the remaining term of such Option, Convertible Security or Adjustment Right (as the case may be) as of the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be), (iii) a zero cost of borrow and (iv) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be).

(i)        "**Black Scholes Value**" means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(i), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the greater of (1) the highest Closing Sale Price of the Common Stock during the period beginning on the Trading Day immediately preceding the announcement of the applicable Fundamental Transaction (or the consummation of the applicable Fundamental Transaction, if earlier) and ending on the Trading Day of the Holder's request pursuant to Section 4(c)(i) and (2) the sum of the price per share being offered in cash in the applicable Fundamental Transaction (if any) plus the value of the non-cash consideration being offered in the applicable Fundamental Transaction (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(i), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(i) and (2) the remaining term of this Warrant as of the date of consummation of the applicable Fundamental Transaction or as of the date of the Holder's request pursuant to Section 4(c)(i) if such request is prior to the date of the consummation of the applicable Fundamental Transaction, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the earliest to occur of (A) the public disclosure of the applicable Fundamental Transaction, (B) the consummation of the applicable Fundamental Transaction and (C) the date on which the Holder first became aware of the applicable Fundamental Transaction.

(j)        "**Bloomberg**" means Bloomberg, L.P.

(k)        "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(l)        "**Closing Sale Price**" means, for any security as of any date, the last closing trade price for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing trade price, then the last trade price of such security prior to 4:00:00 p.m., New York time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing does not apply, the last trade price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no last trade price is reported for such security by Bloomberg, the average of the ask prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Sale Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(m)    "**Common Stock**" means (i) the Company's shares of common stock, $0.000001 par value per share, and (ii) any capital stock into which such common stock shall have been changed or any share capital resulting from a reclassification of such common stock.

(n)    "**Convertible Securities**" means any stock or other security (other than Options) that is at any time and under any circumstances, directly or indirectly, convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any shares of Common Stock.

(o)    "**Dollar Value**" means, as of any given time, the sum of (x) the sum of each Aggregate Exercise Price of each exercise of this Warrant (assuming solely for such purpose that each such exercise was a cash exercise of this Warrant) that occurred prior to such given time and (y) the Aggregate Exercise Price of a cash exercise of the unexercised portion of this Warrant as of such given time.

(p)    "**Eligible Market**" means The New York Stock Exchange, the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Select Market, the Nasdaq Global Market, the OTCQB, the OTCQX or the Principal Market.

(q)    "**Event Market Price**" means, with respect to any Stock Combination Event Date, the quotient determined by dividing (x) the sum of the VWAP of the Common Stock for each of the five (5) lowest Trading Days during the twenty (20) consecutive Trading Day period ending and including the Trading Day immediately preceding the sixteenth (16th) Trading Day after such Stock Combination Event Date, divided by (y) five (5).

(r)    "**Event of Default Black Scholes Value**" means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(ii), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the highest Closing Sale Price of the Common Stock during the period beginning on the date of the occurrence of the Event of Default through the date all Events of Default have been cured (assuming for such purpose that the Notes remain outstanding) or, if earlier, the Trading Day of the Holder's request pursuant to Section 4(c)(ii), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(ii), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(ii) and (2) the remaining term of this Warrant as of the date of the occurrence of such Event of Default, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following later of (x) the date of the occurrence of such Event of Default and (y) the date of the public announcement of such Event of Default.

(s)      "**Excluded Securities**" means (i) shares of Common Stock or standard options to purchase Common Stock issued to directors, officers or employees of the Company for services rendered to the Company in their capacity as such pursuant to an Approved Stock Plan (as defined above), provided that (A) all such issuances (taking into account the shares of Common Stock issuable upon exercise of such options) after the Subscription Date pursuant to this clause (i) do not, in the aggregate, exceed more than 5% of the Common Stock issued and outstanding immediately prior to the Subscription Date and (B) the exercise price of any such options is not lowered, none of such options are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such options are otherwise materially changed in any manner that adversely affects any of the Buyers; (ii) shares of Common Stock issued upon the conversion or exercise of Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) issued prior to the Subscription Date, provided that the conversion price of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) is not lowered, none of such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are otherwise materially changed in any manner that adversely affects any of the Buyers; and (iii) the shares of Common Stock issuable upon exercise of the SPA Warrants; provided, that the terms of the SPA Warrant are not amended, modified or changed on or after the Subscription Date (other than antidilution adjustments pursuant to the terms thereof in effect as of the Subscription Date).

(t)      "**Expiration Date**" means the date that is the fifth (5th) anniversary of the Issuance Date or, if such date falls on a day other than a Trading Day or on which trading does not take place on the Principal Market (a "**Holiday**"), the next date that is not a Holiday.

(u)        "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby all such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Warrant calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other shareholders of the Company to surrender their shares of Common Stock without approval of the shareholders of the Company or (C) directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(v)        "**Group**" means a "group" as that term is used in Section 13(d) of the 1934 Act and as defined in Rule 13d-5 thereunder.

(w)        "**Listing Date**" means the earlier to occur of (x) May 31, 2018 (solely if the Company fails to use its reasonably best efforts to effect this listing of the Common Stock on an Eligible Market (other than the OTCQB or the OTCQX) on or prior thereto) or (y) the initial date any security of the Company (including, without limitation, the Common Stock) is listed on an Eligible Market (other than the OTCQB or the OTCQX).

(x)   "**Notes**" has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all notes issued in exchange therefor or replacement thereof.

(y)   "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(z)   "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(aa)   "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity or a government or any department or agency thereof.

(bb)   "**Pre-Listing Maximum Eligibility Number**" means 100,000 Warrant Shares (as adjusted for stock splits, stock dividends, recapitalizations and similar events).

(cc)   "**Public Company Date**" means the date on which the shares of Common Stock of the Company (or its direct or indirect successor, subsidiary or parent company, whose securities are issued or issuable to holders of Common Stock), whether as a result of a public offering, merger, recapitalization, reorganization or otherwise, are registered under the 1934 Act.

(dd)   "**Principal Market**" means, as of any date of determination, the Eligible Market that is the principal securities exchange market for the Common Stock as of such date of determination.

(ee)   "**Registration Rights Agreement**" means that certain registration rights agreement, dated as of the Closing Date, by and among the Company and the initial holders of the Notes relating to, among other things, the registration of the resale of the Common Stock issued pursuant to the Securities Purchase Agreement and issuable upon exercise of the SPA Warrants, as may be amended from time to time.

(ff)   "**SEC**" means the United States Securities and Exchange Commission or the successor thereto.

(gg)   "**Spot Price**" means, with respect to any given Exercise Notice, as applicable: (A) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the date of the applicable Exercise Notice if such Exercise Notice is (1) both executed and delivered pursuant to Section 1(a) hereof on a day that is not a Trading Day or (2) both executed and delivered pursuant to Section 1(a) hereof on a Trading Day prior to the opening of "regular trading hours" (as defined in Rule 600(b)(64) of Regulation NMS promulgated under the federal securities laws) on such Trading Day, (B) the Bid Price of the Common Stock as of the time of the Holder's execution of the applicable Exercise Notice if such Exercise Notice is executed during "regular trading hours" on a Trading Day and is delivered within two (2) hours thereafter pursuant to Section 1(a) hereof, or (C) the Closing Sale Price of the Common Stock on the date of the applicable Exercise Notice if the date of such Exercise Notice is a Trading Day and such Exercise Notice is both executed and delivered pursuant to Section 1(a) hereof after the close of "regular trading hours" on such Trading Day

(hh)    **"Subject Entity"** means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(ii)    **"Successor Entity"** means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(jj)    **"Trading Day"** means, as applicable, (i) prior to the Public Company Date, any Business Day, and (ii) from and after the Public Company Date, (x) with respect to all price or trading volume determinations relating to the Common Stock, any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded, provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Holder or (y) with respect to all determinations other than price or trading volume determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

(kk)    **"VWAP"** means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market (or, if the Principal Market is not the principal trading market for such security, then on the principal securities exchange or securities market on which such security is then traded) during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "HP" function (set to weighted average) or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the VWAP cannot be calculated for such security on such date on any of the foregoing bases, the VWAP of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination, recapitalization or other similar transaction during such period.

[*signature page follows*]

29

**IN WITNESS WHEREOF,** the Company has caused this Warrant to Purchase Common Stock to be duly executed as of the Issuance Date set out above.

**YAYYO, INC.**

By: /s/ Ramy El-Batrawi
      **Name:** Ramy El-Batrawi
      **Title:** CEO

EXHIBIT A

**EXERCISE NOTICE**

**TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS
WARRANT TO PURCHASE COMMON STOCK**

**YAYYO, INC.**

The undersigned holder hereby elects to exercise the Warrant to Purchase Common Stock No. _____ (the "**Warrant**") of Yayyo, Inc., a Delaware corporation (the "**Company**") as specified below. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1.     <u>Form of Exercise Price</u>. The Holder intends that payment of the Aggregate Exercise Price shall be made as:

☐     a "<u>Cash Exercise</u>" with respect to _____ Warrant Shares; and/or

☐     a "<u>Cashless Exercise</u>" with respect to _____ Warrant Shares.

In the event that the Holder has elected a Cashless Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder hereby represents and warrants that (i) this Exercise Notice was executed by the Holder at _____ [a.m.][p.m.] on the date set forth below and (ii) if applicable, the Bid Price as of such time of execution of this Exercise Notice was $_____.

2.     <u>Payment of Exercise Price</u>. In the event that the Holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder shall pay the Aggregate Exercise Price in the sum of $_____ to the Company in accordance with the terms of the Warrant.

4.     <u>Delivery of Warrant Shares</u>. The Company shall deliver to Holder, or its designee or agent as specified below, _____ shares of Common Stock in accordance with the terms of the Warrant. Delivery shall be made to Holder, or for its benefit, as follows:

☐     Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to:     _____

_____

_____

_____

☐ Check here if (x) after the Public Company Day and (y) requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant: _____

DTC Number: _____

Account Number: _____

Date: _____ __, _____

_____
Name of Registered Holder

By: _____
  Name:
  Title:

Tax ID: _____

Facsimile: _____

E-mail Address: _____

**EXHIBIT B**

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Exercise Notice and hereby directs _____ to issue the above indicated number of shares of Common Stock from the Company and acknowledged and agreed to by _____.

**YAYYO, INC.**

By: _____
      Name:
      Title:

# EXHIBIT C

S-1/A 1 forms-1a.htm

As filed with the Securities and Exchange Commission on November 5, 2019

Registration No. 333-224549

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM S-1/A**
**(Amendment #14)**
**REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933**



**YayYo, Inc.**

(Exact name of registrant as specified in its charter)

| Delaware | 7371 | 81-3028414 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
**(310) 926-2643**

(Address, including zip code, and telephone number, including area code,
of registrant's principal executive offices)

**Jonathan Rosen**
**Chief Executive Officer**
**YayYo, Inc.**
**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
**(310) 926-2643**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

Copies to:

| | |
|---|---|
| **Peter DiChiara, Esq.** | **Richard A. Friedman, Esq.** |
| **Ross Carmel, Esq.** | **Nazia Khan, Esq.** |
| **Carmel, Milazzo & DiChiara LLP** | **Sheppard, Mullin, Richter &** |
| **55 West 39th Street, 18th Floor** | **Hampton LLP** |
| **New York, New York 10018** | |
| **Telephone: (212) 658-0458** | **30 Rockefeller Plaza, 39th Floor** |
| | **New York, NY 10112** |
| | **Telephone: (212) 653-8700** |

Approximate date of commencement of proposed sale to the public: **As soon as practicable after the effective date of this Registration Statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. ☐

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission acting pursuant to said Section 8(a), may determine.**

**EXPLANATORY NOTE**

This Registration Statement contains two forms of prospectuses: one to be used in connection with the initial public offering of 2,875,000 shares of our common stock (including shares of common stock which may be issued on exercise of a 45-day option granted to the underwriters to cover over-allotments, if any) through the underwriters named on the cover page of this prospectus (the "IPO Prospectus") and one to be used in connection with the potential resale by certain selling stockholders of an aggregate amount up to 1,650,000 shares of our common stock (the "Selling Stockholder Prospectus"), consisting of up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding common stock purchase warrants. The IPO Prospectus and the Selling Stockholder Prospectus will be identical in all respects except for the alternate pages for the Selling Stockholder Prospectus included herein which are labeled "Alternate Pages for Selling Stockholder Prospectus."

The Selling Stockholder Prospectus is substantively identical to the IPO Prospectus, except for the following principal points:

- they contain different outside and inside front covers;
- they contain different Offering sections in the Prospectus Summary section;
- they contain different Use of Proceeds sections;
- the Capitalization section is deleted from the Selling Stockholder Prospectus;
- the Dilution section is deleted from the Selling Stockholder Prospectus;
- a Selling Stockholder section is included in the Selling Stockholder Prospectus;
- the Underwriting section from the IPO Prospectus is deleted from the Selling Stockholder Prospectus and a Plan of Distribution is inserted in its place; and
- the Legal Matters section in the Selling Stockholder Prospectus deletes the reference to counsel for the underwriters.

We have included in this Registration Statement, after the financial statements, a set of alternate pages to reflect the foregoing differences of the Selling Stockholder Prospectus as compared to the Prospectus.

**The sales of our securities registered in the Prospectus and the shares of our common stock registered in the Selling Stockholder Prospectus may result in two offerings taking place concurrently, which could affect the price and liquidity of, and demand for, our securities. This risk and other risks are included in "Risk Factors" beginning on page 7 of the IPO Prospectus.**

*The information in this prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state or other jurisdiction where the offer or sale is not permitted.*

**Subject to Completion, dated November 5, 2019**

**PROSPECTUS**



## YAYYO, INC.

**2,500,000 Shares of Common Stock**

This is an initial public offering of shares of common stock of YayYo, Inc. We are offering 2,500,000 shares of our common stock.

Prior to this primary offering, there has been no public market for our common stock. The public offering price of the shares will be $4.00. We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering.

We intend to use the proceeds from this primary offering for the acquisition of passenger vehicles made available for rent and for general corporate purposes, including working capital and sales and marketing activities. See "*Use of Proceeds*."

**Investing in our common stock involves a high degree of risk. See "*Risk Factors*" beginning on page 7 of this prospectus for a discussion of information that should be considered in connection with an investment in our common stock.**

**Neither the Securities and Exchange Commission ("SEC") nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

We are an "emerging growth company" as that term is used in the Jumpstart Our Business Startups Act of 2012, and we have elected to comply with certain reduced public company reporting requirements.

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions (1)(2) | $ | $ |
| Proceeds, before expenses, to us | $ | $ |

(1) Represents underwriting discount and commissions equal to 8% per share (or $0.32 per share), which is the underwriting discount we have agreed to pay on all investors in this Offering introduced by the underwriters.

(2) Does not include a non-accountable expense allowance equal to 1% of the gross proceeds of this offering, payable the underwriters, or the reimbursement of certain expenses of the underwriters. See "*Underwriting*" beginning on page 84 of this prospectus for additional information regarding underwriting compensation.

In addition to the underwriting discounts listed above and the non-accountable expense allowance described in the footnote, we have agreed to issue upon the closing of this offering to Aegis Capital Corp., as representative of the underwriters, warrants that will expire on the fifth anniversary of the effective date of this registration statement entitling the representative to purchase 5% of the number of shares of common stock sold in this offering (excluding shares of common stock sold to cover over-allotments, if any). The registration statement of which this prospectus is a part also covers the underwriters' warrants and the common shares issuable upon the exercise thereof. For additional information regarding our arrangement with the underwriters, please see "*Underwriting*" beginning on page 84.

We have granted the representative an option, exercisable for 45 days from the date of this prospectus, to purchase up to an additional 375,000 common shares on the same terms as the other shares being purchased by the underwriters from us.

The underwriters expect to deliver the shares against payment in New York, New York on          , 2019.

**Prospectus dated          , 2019**

**Aegis Capital Corp.**                    **WestPark Capital, Inc.**

**Table of Contents**

ABOUT THIS PROSPECTUS                                                                              1
MARKET DATA                                                                                        1
PROSPECTUS SUMMARY                                                                                 2
SUMMARY OF THE OFFERING                                                                            6
RISK FACTORS                                                                                       7
SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS                                                 36
USE OF PROCEEDS                                                                                   36
MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS                                          37
CAPITALIZATION                                                                                    38
DILUTION                                                                                          39
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS             41
BUSINESS                                                                                          53
MANAGEMENT                                                                                        64
EXECUTIVE COMPENSATION                                                                            71
PRINCIPAL STOCKHOLDERS                                                                            73
CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS                                              74
DESCRIPTION OF SECURITIES                                                                         78
UNDERWRITING                                                                                      84
EXPERTS                                                                                           88
LEGAL MATTERS                                                                                     89
WHERE YOU CAN FIND MORE INFORMATION                                                               89
INDEX TO FINANCIAL STATEMENTS                                                                    F - 1

Through and including          , 2019 (the 25th day after the date of this prospectus), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriter and with respect to their unsold allotments or subscriptions.

You should rely only on the information contained in this prospectus or any prospectus supplement or amendment. Neither we, nor the underwriters, have authorized any other person to provide you with information that is different from, or adds to, that contained in this prospectus. If anyone provides you with different or inconsistent information, you should not rely on it. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. The selling stockholders are offering to sell and seeking offers to buy our common stock only in jurisdictions where offers and sales are permitted. You should assume that the information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of our common stock. Our business, financial condition, results of operations and prospects may have changed since that date. We are not making an offer of any securities in any jurisdiction in which such offer is unlawful.

## ABOUT THIS PROSPECTUS

Throughout this prospectus, unless otherwise designated or the context suggests otherwise,

- all references to the "Company," the "registrant," "YayYo," "we," "our," or "us" in this prospectus mean YayYo, Inc.;

- an initial public offering price of our common stock of $4.00 per share;

- all references to the "primary offering" refer to the offering contemplated by the IPO Prospectus;

- "year" or "fiscal year" mean the year ending December 31st; and

- all dollar or $ references when used in this prospectus refer to United States dollars;

Concurrent with the primary offering, the Company is registering shares of common stock in connection with the potential resale by certain selling stockholders of an aggregate amount up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding common stock purchase warrants. Please read the risk factors, including the risk factor titled "***Sales of our common stock in the primary offering will be taking place concurrently with common stock registered by selling stockholders which might affect the price, demand, and liquidity of our common stock***" on page 29.

## MARKET DATA

Market data and certain industry data and forecasts used throughout this prospectus were obtained from internal company surveys, market research, consultant surveys, publicly available information, reports of governmental agencies and industry publications and surveys. Industry surveys, publications, consultant surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but the accuracy and completeness of such information is not guaranteed. We have not independently verified any of the data from third party sources, nor have we ascertained the underlying economic assumptions relied upon therein. Similarly, internal surveys, industry forecasts and market research, which we believe to be reliable based on our management's knowledge of the industry, have not been independently verified. Forecasts are particularly likely to be inaccurate, especially over long periods of time. In addition, we do not necessarily know what assumptions regarding general economic growth were used in preparing the forecasts we cite. Statements as to our market position are based on the most currently available data. While we are not aware of any misstatements regarding the industry data presented in this prospectus, our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "*Risk Factors*" in this prospectus.

1

# PROSPECTUS SUMMARY

*This summary provides a brief overview of the key aspects of our business and our securities. The reader should read the entire prospectus carefully, especially the risks of investing in our common stock discussed under "Risk Factors." Some of the statements contained in this prospectus, including statements under "Summary" and "Risk Factors" as well as those noted in the documents incorporated herein by reference, are forward-looking statements and may involve a number of risks and uncertainties. Our actual results and future events may differ significantly based upon a number of factors. The reader should not put undue reliance on the forward-looking statements in this document, which speak only as of the date on the cover of this prospectus.*

As used in this prospectus, all references to "capital stock," "common stock," "Shares," "preferred stock," "stockholders," "shareholders" applies only to YayYo, Inc. and "we," "our," "us," the "Company," the "registrant," or "YayYo" refer to YayYo, Inc., a Delaware corporation. References in this prospectus to the terms "Company," "we," "our" or words of like import mean YayYo, Inc. and its direct and indirect subsidiaries, which currently consist of Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"), Savy LLC, a Delaware limited liability company ("Savy") and Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo").

## About our Company

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

On August 12, 2017, we announced we were shifting our primary focus in the transportation/ridesharing industry from the development of the Metasearch App. We have no intention of continuing this business direction. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through Rideshare (the "Rideshare Platform"), and (ii) the leasing of a fleet of standard passenger vehicles to be made commercially available for rent through Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicle and services to drivers in the ridesharing economy.

The Company operations are organized into two business segments across the ridesharing and transportation industry:

*Rideshare Platform*—On October 31, 2017, the Company created the wholly-owned subsidiary, Rideshare, to incubate the concept of a proprietary transportation network system focused on the developing of a Rideshare marketplace booking platform to rent standard passenger vehicles to self-employed ridesharing drivers. The Company has now deployed and launched the Rideshare Platform on its operating online platform, located at *www.Ridesharerental.com*. The Rideshare Platform is a proprietary car-rental marketplace that connects the Company's Fleet Management vehicles, other fleet owners and selected individual car owners with Rideshare drivers seeking rental vehicles.

*Fleet Management*—On June 10, 2017, the Company formed the wholly-owned subsidiary, Distinct Cars, for purposes of developing a fleet management business. The Fleet Management business focuses on the maintenance of a fleet of brand new standard passenger vehicles, under lease contract with the Company, to be subsequently rented directly to drivers in the ridesharing economy. The Fleet Management business and vehicles are made commercially available through the Company's Rideshare Platform.

## Recent Developments

### *YayYo, Inc. - Recent Financing Activities*

As of October 31, 2019, the Company had 26,802,976 shares of common stock issued and outstanding. From January 2018 to June 30, 2019, the Company issued (i) 46,330 shares of common stock under the Regulation A+ Offering (defined below) in exchange for cash proceeds, and (ii) 986,095 shares of restricted common stock, pursuant to following:

- 155,850 shares of restricted common stock were issued in connection with the issuance of notes payable;

- 432,500 shares of restricted common stock were issued for services;

- 99,245 shares of restricted common stock were issued for payment of accounts payable and accrued expenses; and

- 298,500 shares of restricted common stock were issued for a capital lease obligation.

No shares of common stock have been issued since June 30, 2019.

2

As of October 31, 2019, with the issuances above, we had 26,802,976 shares of common stock issued and outstanding.

In December 2016, we filed an offering statement pursuant to Regulation A of the Securities Act, which was qualified by the SEC on March 17, 2017. We offered up to a maximum of 6,250,000 shares of common stock on a "best efforts" basis, at a price of $8.00 per share. On March 16, 2018, we closed the Regulation A offering, after issuing 365,306 shares of common stock for proceeds of approximately $1.8 million net of offering expenses (the "Regulation A+ Offering").

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares, of our common stock (the "Warrant Shares"), with an exercise price of $4.00 per share (the "Warrants" or the "Selling Securityholder Warrant") and 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Warrants expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

YayYo, Inc.'s obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

Further, in 2018, the Company issued notes payable and also issued an aggregate of 5,850 shares of its common stock to the note holders as additional incentive to make the loans.

In February 2018, the Company issued 81,250 shares of its common stock to two individuals for services rendered. In May 2018, the Company issued 1,250 shares of its common stock to a company for services.

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with David Haley, a former director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies (the "Special Policies") for Rideshare and Distinct Cars, in consideration for 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 14,945 shares of Company restricted common stock, at a price per share equal to $8.00, as reimbursement for the cost of Mr. Haley's monetary advances made on behalf of the Company. 258,695 shares of Company restricted common stock was issued on April 1, 2018 and 6,250 shares of Company restricted common stock was issued on October 8, 2018.

In July 2018, the Company issued a consultant 100,000 shares of common stock for an agreement to provide services. The Company entered into an agreement with the consultant to cancel the shares in November 2018.

During fiscal year 2017, the Company entered into vehicle leasing agreements with Acme Auto Leasing LLC (the "Lessor") and issued additional consideration the Lessor in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company. On December 2017, July 2018 and November 2018, the Company issued the Lessor an additional 250,000, 91,500 and 207,000 shares of common stock, respectively, under similar arrangements in connection with lease arrangements.

As of June 30, 2019, December 31, 2018 and December 31, 2017, the Company has total lease obligations in the amount of $3,221,785, $3,790,147 and $1,593,291, respectively, (collectively, the "Finance Lease Obligations").

On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

### *Distinct Cars, LLC - Recent Financing Activities*

As of the date of this prospectus, Distinct Cars, as lessee, entered into a series of open-ended lease agreements and disclosure statements with Lessor to lease standard passenger vehicles, each with an approximate lease term of 30 to 36 months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

Distinct Cars has completed a debt round of financing pursuant to which Distinct Cars raised aggregate gross proceeds in the amount of $319,667 from 38 accredited investors in exchange for senior secured promissory notes issued by Distinct Cars (each a "Distinct Cars Note" and collectively, the "Distinct Cars Notes"). The maturity date under the Distinct Cars Notes is 36 months from the date of issuance (the "DCN Maturity Date") ranging from August 9, 2020 to May 23, 2021. The principal amount under the Distinct Cars Notes ranges from a minimum amount of $5,000 per Distinct Cars Note up to $20,000 per Distinct Cars Note. The Distinct Cars Notes accrue interest at a rate of 8% per annum with interest due and payable upon the DCN Maturity Date. The principal amount and any unpaid and accrued interest thereunder is due and payable in twelve quarterly installments commencing upon January 1, 2018. The Distinct Cars Notes are secured by a senior secured priority lien in the equity of the fleet of leased automobiles acquired under the Lease Agreements described above subject to subordination in priority lien status to the purchase money security interest held by the lessor under the Lease Agreements. In addition to the total amount of principal and interest owing under the Distinct Cars Note, upon execution of the Distinct Cars Note and placement of funds the holder received a stock grant (the "Stock Grant") of YayYo Inc., common stock (the "Parent Shares") in an amount equal to 100% of the principal sum as calculated by a price of $4.00 per share with 30% coverage.

### Risk Factors

Our business is subject to a number of risks. You should be aware of these risks before making an investment decision. These risks are discussed more fully in the section of this prospectus titled "*Risk Factors*", which begins on page 7 of this prospectus.

### Information Regarding our Capitalization

As of October 31, 2019, we had 26,802,976 shares of common stock issued and outstanding. Additional information regarding our issued and outstanding securities may be found in the sections of this prospectus titled "*Market for Common Equity and Related Stockholder Matters*" and "*Description of Securities*."

Unless otherwise specifically stated, information throughout this prospectus does not assume the exercise of outstanding options or warrants to purchase shares of our common stock.

## Organizational History

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company, Savy LLC, a Delaware limited liability company, Rideyayyo LLC, a Delaware limited liability company and Rideshare Car Rentals LLC, a Delaware limited liability company.

The Company was formed on June 21, 2016 under the name "YayYo, LLC," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC to the Company in exchange for common stock of the Company. All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities upon the filing of the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware.

## Corporate Information

Our principal executive office is located at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. Our telephone number is (310) 926-2643. Our web address is *www.yayyo.com*. Information included on our website is not part of this prospectus.

## Implications of Being an Emerging Growth Company

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). We will remain an emerging growth company until the earlier of (i) the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act; (ii) the last day of the fiscal year in which we have total annual gross revenues of $1.07 billion or more; (iii) the date on which we have issued more than $1 billion in nonconvertible debt during the previous three years; or (iv) the date on which we are deemed to be a large accelerated filer under applicable SEC rules. We expect that we will remain an emerging growth company for the foreseeable future, but cannot retain our emerging growth company status indefinitely and will no longer qualify as an emerging growth company on or before the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act. For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from specified disclosure requirements that are applicable to other public companies that are not emerging growth companies.

These exemptions include:

- being permitted to provide only two years of audited financial statements, in addition to any required unaudited interim financial statements, with correspondingly reduced "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" disclosure;

- not being required to comply with the requirement of auditor attestation of our internal controls over financial reporting;

- not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements;

- reduced disclosure obligations regarding executive compensation; and

- not being required to hold a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

We have taken advantage of certain reduced reporting requirements in this prospectus. Accordingly, the information contained herein may be different than the information you receive from other public companies in which you hold stock.

An emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. This allows an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have irrevocably elected to avail ourselves of this extended transition period and, as a result, we will not be required to adopt new or revised accounting standards on the dates on which adoption of such standards is required for other public reporting companies.

We are also a "smaller reporting company" as defined in Rule 12b-2 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and have elected to take advantage of certain of the scaled disclosure available for smaller reporting companies.

## SUMMARY OF THE OFFERING

| | |
|---|---|
| Common stock offered by us | 2,500,000 shares. |
| Common stock outstanding prior to the primary offering (1) | 26,802,976 shares common stock |
| Common stock to be outstanding after the primary offering (1) | 29,302,976 shares (29,677,976) shares if the underwriters exercise their option to purchase additional shares in full). |
| Over-allotment option of common stock offered by us | The underwriters have a 45-day option to purchase up to 375,000 additional shares of common stock. |
| Use of Proceeds | We currently intend to use the net proceeds to us from this primary offering to purchase vehicles to add to our fleet of passenger vehicles made available for rent through our wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital and sales and marketing activities. See the section of this prospectus titled "*Use of Proceeds*" beginning on page 36. |
| Proposed Listing | We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering. |
| Underwriters' warrants | Upon the closing of this offering, we have agreed to issue to Aegis Capital Corp., as representative of the underwriters, warrants that will expire on the fifth anniversary of the effective date of this registration statement entitling the representative to purchase 5% of the number of shares of common stock sold in this offering (excluding shares of common stock sold to cover over-allotments, if any). The registration statement of which this prospectus is a part also covers the underwriters' warrants and the common shares issuable upon the exercise thereof. For additional information regarding our arrangement with the underwriters, please see "*Underwriting*." |
| Lock-up agreements | Our executive officers, directors, and stockholders, have agreed with the underwriters not to sell, transfer or dispose of any shares or similar securities for certain periods of time following the closing of this offering. For additional information regarding our arrangement with the underwriters, please see "*Underwriting*." |
| Sale of Founder's Shares and Voting Trust | As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, agreed to sell 12,525,000 of its 15,425,000 shares of common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration under the Securities Act to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. As a result of the sale, X, LLC's beneficial ownership shall be reduced to 9.9% of the shares outstanding after the completion of this Offering. We will not receive any proceeds from the sale of the Private Shares. If the offering contemplated by this registration |

statement is not consummated by January 31, 2020, the parties have agreed to unwind the sale of the Private Shares transaction in compliance with applicable law. Mr. El-Batrawi has also entered into a Voting Trust Agreement (the "<u>Trust</u>") pursuant to which the voting power of all of his remaining 2,900,000 shares of common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

| | |
|---|---|
| Risk Factors | You should carefully consider the information set forth in this prospectus and, in particular, the specific factors set forth in the "*Risk Factors*" section beginning on page 7 of this prospectus before deciding whether or not to invest in shares of our common stock. |

(1) As of October 31, 2019. Does not include (a) 1,500,000 shares of our common stock issuable upon exercise of common stock purchase warrants; and (b) 300,000 shares of our common stock issuable upon exercise of granted and vested stock options granted under our 2016 Equity Incentive Plan.

## RISK FACTORS

*Our business is subject to many risks and uncertainties, which may affect our future financial performance. If any of the events or circumstances described below occur, our business and financial performance could be adversely affected, our actual results could differ materially from our expectations, and the price of our stock could decline. The risks and uncertainties discussed below are not the only ones we face. There may be additional risks and uncertainties not currently known to us or that we currently do not believe are material that may adversely affect our business and financial performance. You should carefully consider the risks described below, together with all other information included in this prospectus including our financial statements and related notes, before making an investment decision. The statements contained in this prospectus that are not historic facts are forward-looking statements that are subject to risks and uncertainties that could cause actual results to differ materially from those set forth in or implied by forward-looking statements. If any of the following risks actually occurs, our business, financial condition or results of operations could be harmed. In that case, the trading price of our common stock could decline, and investors in our securities may lose all or part of their investment.*

**Risks Related to Our Business**

*We are an emerging growth company with a limited operating history and limited sales to date.*

The Company is subject to all of the risks inherent in the establishment of an emerging growth company, including the absence of an operating history, and the risk that we may be unable to successfully operate our business segments. There can be no assurance that the Company will be able to successfully operate our business segments, including without limitation the Company's technologies, products and services.

The Company was incorporated on November 16, 2016 and only commenced operations thereafter. The Company was incorporated pursuant to the simultaneous filing of the Company's certificate of incorporation, as filed and stamped by the Delaware Secretary of State on November 16, 2016, and the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*", as filed and stamped on the same date by the Delaware Secretary of State pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware. Accordingly, we have limited operating history upon which to base an evaluation of our business and prospects. You must consider the risks and difficulties we face as a small operating company with limited operating history.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry towards the vehicle rental business with a focus on developing (i) an online rideshare marketplace booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, we have limited operating history in the vehicle rental, fleet management and transportation industry. We generated $3,289,478 in revenue for fiscal year 2018.

Operating results for future periods are subject to numerous uncertainties and we cannot assure you that the Company will achieve or sustain profitability. The Company's prospects must be considered in light of the risks encountered by small operating companies with limited operating history, particularly companies in new and rapidly evolving markets. Operating results will depend upon many factors, including our success in attracting and retaining motivated and qualified personnel, our ability to establish short term credit lines or obtain financing from other sources, our ability to develop and market new products, control costs, and general economic conditions. The Company has engaged in limited operations to date, and although the Company believes that its plans to grow, expand and scale operations organically will be successful, there is no assurance that this will be the case. There can be no assurance that the Company's sales projections and marketing plans will be achieved as anticipated and planned. The Company cannot assure prospective investors that it will be able to successfully develop and market its products and services which may have a material adverse effect on our business.

*We will need but may be unable to obtain additional funding on satisfactory terms, which could dilute our shareholders or impose burdensome financial restrictions on our business.*

We have relied upon cash from financing activities and in the future, we hope to rely predominantly on revenues generated from operations to fund all of the cash requirements of our activities; however, we do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. Future financings may not be available on a timely basis, in sufficient amounts or on terms acceptable to us, if at all. Any debt financing or other financing of securities senior to the common stock will likely include financial and other covenants that will restrict our flexibility. Any failure to comply with these covenants would have a material adverse effect on our business, prospects, financial condition and results of operations because we could lose our existing sources of funding and impair our ability to secure new sources of funding.

*We have incurred net losses since inception.*

For the six month period ended June 30, 2019, we generated a loss of $996,915 and had an accumulated deficit of $22,238,609. For the fiscal year ended December 31, 2018, we generated a loss of $13,189,122 and had an accumulated deficit of $21,241,694. For the fiscal year ended December 31, 2017, we generated a loss of $6,568,863 and had an accumulated deficit of $8,052,572. Increases in costs and expenses may result in a continuation of losses for the foreseeable future. There can be no assurance that we will be commercially successful.

*We have significant working capital requirements and issuance of common stock or the exercise of outstanding warrants and options to meet these working capital requirements and fund our operations may dilute your investment.*

We have been operating at a loss since inception and our working capital requirements continue to be significant. As of December 31, 2017, and 2018, and June 30, 2019 our working capital deficit was $618,910, $5,007,729 and $5,641,266, respectively. We have been supporting our business predominantly through the sale of debt and equity since inception. Since 2017, we have also been supporting our business through our operating cash flow from our limited operational business segments. However, to date the majority of our working capital needs have been funded through third-party capital financings. We will need additional funding to develop our business segments, to increase our sales and marketing capabilities, technologies and assets, as well as for working capital requirements and other operating and general corporate purposes. Our working capital requirements depend and will continue to depend on numerous factors, including the timing of revenues, the expense involved in development of our products and services, and capital improvements. If we are unable to generate sufficient revenue and cash flow from operations, we will need to seek additional equity or debt financing to provide the capital required to maintain or expand our operations, which may have the effect of diluting our existing stockholders or restricting our ability to run our business.

There can be no assurance that we will be able to raise sufficient additional capital on acceptable terms, or at all. If such financing is not available on satisfactory terms, or is not available at all, we may be required to delay, scale back or eliminate the development of business opportunities and our operations and financial condition may be materially adversely affected. Debt financing, if obtained, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, could increase our expenses and require that our assets be provided as a security for such debt. Debt financing would also be required to be repaid regardless of our operating results. Equity financing, if obtained, could result in dilution to our then existing stockholders. As of the date of this filing, we have issued and outstanding the Selling Securityholder Warrant to purchase an aggregate of 1,500,000 shares of our common stock. We have also reserved an aggregate of 10,000,000 shares of common stock for issuance under our 2016 Equity Incentive Plan (the "2016 Plan"). As of June 30, 2019, we have options to purchase an aggregate of 300,000 shares of our common stock outstanding pursuant to our 2016 Plan.

*We have outstanding debt and lease commitments, which are secured by our assets and it may make it more difficult for us to make payments on our other debt and lease obligations.*

As of June 30, 2019, December 31, 2018 and December 31, 2017, we had outstanding indebtedness totaling $3,233,087, $2,690,181 and $909,889, respectively. As of June 30, 2019, December 31, 2018 and December 31, 2017, we had outstanding lease obligations totaling $3,221,785, $3,790,147 and $1,593,291, respectively.

Our debt and lease commitments could have important consequences to you. For example, they could:

- make it more difficult for us to obtain additional financing in the future for our acquisitions and operations, working capital requirements, capital expenditures, debt service or other general corporate requirements;

- require us to dedicate a substantial portion of our cash flows from operations to the repayment of our debt and the interest associated with our debt rather than to other areas of our business;

- limit our operating flexibility due to financial and other restrictive covenants, including restrictions on incurring additional debt, creating liens on our properties, making acquisitions or paying dividends;

- make it more difficult for us to satisfy our obligations with respect to our notes;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- make us more vulnerable in the event of adverse economic and industry conditions or a downturn in our business.

Our ability to meet our debt service and lease obligations depends on our future financial and operating performance, which will be impacted by general economic conditions and by financial, business and other competitive factors, many of which are beyond our control. These factors could include operating difficulties, increased operating costs, competition, regulatory developments and delays in our business strategies. Our ability to meet our debt service and lease obligations may depend in significant part on the extent to which we can successfully execute our business strategy and successfully operate our business segments. We may not be able to execute our business strategy and our business operations may be materially impacted.

Typical loan agreements also might contain restrictive covenants, which may impair our operating flexibility. Such loan agreements would also provide for default under certain circumstances, such as failure to meet certain financial covenants. A default under a loan agreement could result in the loan becoming immediately due and payable and, if unpaid, a judgment in favor of such lender which would be senior to our rights. A judgment creditor would have the right to foreclose on any of our assets resulting in a material adverse effect on our business, ability to generate revenue, operating results or financial condition.

If our business does not generate sufficient cash flow from operations or future sufficient borrowings are not available to us under our credit agreements or from other sources, we might not be able to service our debt and lease commitments, including the notes, or to fund our other liquidity needs. If we are unable to service our debt and lease commitments, due to inadequate liquidity or otherwise, we may have to delay or cancel potential acquisitions, sell equity securities, sell assets or restructure or refinance our debt. We might not be able to sell our equity securities, sell our assets or restructure or refinance our debt on a timely basis or on satisfactory terms or at all. In addition, the terms of our agreements with original equipment manufacturers or debt agreements may prohibit us from pursuing any of these alternatives.

***Our Rideshare Platform user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review key metrics related to the operation of our Rideshare Platform business, including, but not limited to, our monthly average users, subscribers and customers to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data and have not been validated by an independent third party. Errors or inaccuracies in our metrics or data could result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of Rideshare Platform users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies.

***Our Rideshare Platform emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes do not align with the market's expectations. If that happens, our stock price may be negatively affected.***

Our Rideshare Platform business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. Our focus on complexity and quick reactions could result in unintended outcomes or decisions that are poorly received by our users or partners. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and will thereby improve our financial performance over the long-term. These decisions may not produce the long-term benefits that we expect, in which case, our user growth and engagement, our

relationships with advertisers and partners, as well as our business, operating results, and financial condition could be seriously harmed.

9

***Our Rideshare Platform and software is highly technical and may contain undetected software bugs or vulnerabilities, which could manifest in ways that could seriously harm our reputation and our business.***

Our Rideshare Platform and software is highly technical and complex. Our Rideshare Platform may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently.

We also could face claims for product liability, tort, or breach of warranty. Defending a lawsuit, regardless of its merit, is costly and may divert management's attention and seriously harm our reputation and our business. In addition, if our liability insurance coverage proves inadequate or future coverage is unavailable on acceptable terms or at all, our business could be seriously harmed.

***To carry out our business plan we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to fund planned capital expenditures will depend on our ability to generate cash in the future. This ability, to some extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We do not believe that our cash flow from operating activities and our existing capital resources, including the liquidity provided by our credit agreements and lease financing arrangements, will be sufficient to fund our planned capital expenditures. We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to fund our other liquidity needs. We may need to delay capital expenditures or seek additional equity financing. For more information see "*Management's Discussion Analysis of Financial Condition and Results of Operation—Liquidity, Capital Resources and Plan of Operations*" below.

***Our debt and other commitments expose us to a number of risks, including cash requirements for debt and lease obligations, availability and interest rate variability, each of which could hamper our growth and profitability.***

A significant portion of the cash flow we generate must be used to service the interest and principal payments relating to our various financial commitments, including $3,233,087 of total notes payable of which $0 is long-term, and $3,221,785 of lease commitment obligations of which $1,559,309 is long-term, as of June 30, 2019. A sustained or significant decrease in our operating cash flows could lead to an inability to meet our debt service requirements or to a failure to meet specified financial and operating covenants included in certain of our agreements. If this were to occur, it may lead to a default under one or more of our commitments. In the event of a default for this reason, or any other reason, the potential result could be the acceleration of amounts due, which could have a significant and adverse effect on us.

Because we finance the majority of our operating and strategic initiatives using a variety of commitments, including $6,454,872 in total notes payable and loan facilities, we are dependent on continued availability of these sources of funds. If these agreements are terminated or we are unable to access them because of a breach of financial or operating covenants or otherwise, we will likely be materially affected.

The interest rates we are charged on a substantial portion of our debt, including the Second Note payable, are variable, increasing or decreasing based on changes in certain published interest rates. Increases to such interest rates would likely result in significantly higher interest expense for us, which would negatively affect our operating results. Because many of our customers finance their vehicle purchases, increased interest rates may also decrease vehicle sales, which would negatively affect our operating results.

10

***We are a holding company and as a result rely on payments from our subsidiaries in order to meet our cash needs and service our debt. Our subsidiaries may not be able to distribute the necessary funds to us and this could adversely affect our ability to make payments on our indebtedness.***

As a holding company without independent means of generating operating revenues, YayYo, Inc., depends on dividends, distributions and other payments, from our subsidiaries to fund our obligations and to meet our cash needs. If the operating results of our subsidiaries at any given time are insufficient to make distributions to us, we would be unable to make payments on our outstanding indebtedness

***We face intense competition that may lead to downward pricing or an inability to increase prices.***

The vehicle rental and used-vehicle sale industries are highly competitive and are increasingly subject to substitution. While price is not the only competitive factor, we believe price is one of the primary competitive factors in the vehicle rental market and that technology has enabled cost-conscious customers, including business travelers, to more easily compare rates available from rental companies. In addition, our competitors may reduce prices in order to, among other things, attempt to gain a competitive advantage, capture market share, or to compensate for declines in rental activity. To the extent we do not match or remain within a reasonable competitive margin of our competitors' pricing, our revenues and results of operations, financial condition, liquidity and cash flows could be materially adversely affected. If competitive pressures lead us to match any of our competitors' downward pricing and we are not able to reduce our operating costs, then our margins, results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Further, we may in the future develop and launch other products or services that may be in direct competition with the various players in the ridesharing industry, such as Uber and Lyft, and all of whom have greater resources than us. There are low barriers to entry, and we expect that competition will intensify in the future. We believe that numerous factors, including price, offerings, reliability, client base, brand name and general economic trends will affect our ability to compete successfully. Our existing and future competitors may include many large companies that have substantially greater market presence and financial, technical, marketing and other resources than we do. There can be no assurance that we will have the financial resources, technical expertise or marketing and support capabilities to compete successfully. Increased competition could result in significant competition, which in turn could result in lower revenues, which could materially adversely affect our potential profitability.

***We might incur expenses to develop products that are never successfully commercialized.***

We have incurred and expect to continue to incur research and development and other expenses in connection with our products business. The potential products to which we devote resources might never be successfully developed or commercialized by us for numerous reasons. Until June 30, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" (the "Metasearch App").

As of the date of this prospectus, the Company has completed the development of the Metasearch App; however, it has no further intention to continue the development or marketing of the Metasearch App. While the Company does not intend to allocate additional corporate resources to the development of the Metasearch App, there can be no assurances that we will not incur additional expenses for the Metasearch App that has not been fully developed and/or commercialized. Such additional expenses could have a material adverse effect on our business, financial condition and prospects.

11

***We face risks related to uninsured liabilities or future claims that exceed our insurance limits.***

Our businesses expose us to claims for personal injury, death and property damage resulting from the use of the vehicles rented by us, and for employment-related injury claims by our employees. We purchase insurance to cover us for these claims. We cannot assure you, however, that we will not be exposed to uninsured liability potentially resulting in multiple payouts or otherwise, liabilities in respect of existing or future claims exceeding the level of our insurance, availability of sufficient capital to pay any uninsured claims or the availability of insurance with unaffiliated carriers maintained on economically reasonable terms, if at all. While we have insurance for many of these risks, we retain risk relating to certain of these perils and certain perils are not covered by our insurance.

We are subject to a wide variety of regulatory burdens related to our operations and while management believes that the chosen operations and strategies are achievable in light of current economic and legal conditions, changes in the following regulatory areas may require management to make significant modifications to our stated strategies depending on future events.

**Governmental regulations, claims and legal proceedings.** Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

**Vehicle Requirements.** Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

**Environmental regulations.** We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

**Accounting rules and regulations.** The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

***Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, fuel costs, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows.***

We are subject to a wide variety of U.S. laws and regulations and changes in the level of government regulation of our business have the potential to materially alter our business practices and materially adversely affect our financial condition, results of operations, liquidity and cash flows, including our profitability. Those changes may come about through new laws and regulations or changes in the interpretation of existing laws and regulations.

Any new, or change in existing, U.S. law and regulation with respect to optional insurance products or policies could increase our costs of compliance or make it uneconomical to offer such products, which would lead to a reduction in revenue and profitability. If customers decline to purchase supplemental liability insurance products from us as a result of any changes in these laws or otherwise, our results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Certain proposed or enacted laws and regulations with respect to the banking and finance industries, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (including risk retention requirements) and amendments to the SEC's rules relating to asset-backed securities, could restrict our access to certain financing arrangements and increase our financing costs, which could have a material adverse effect on our financial condition, results of operations, liquidity and cash flows.

***We rely on third-party insurance policies to insure auto-related risks. If insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business, which could adversely affect our business, financial condition and results of operations.***

We procure third-party insurance policies which provide coverage for both owners and drivers on our platform. If the amount of one or more auto-related claims were to exceed our applicable aggregate coverage limits, we may bear the excess liability. Insurance providers have raised premiums and deductibles for many businesses and may do so in the future. As a result, our insurance and claims expense could increase. Our business, financial condition and results of operations could be adversely affected if (i) cost per claim, premiums or the number of claims significantly exceeds our historical experience and coverage limits, (ii) we experience a claim in excess of coverage limits, (iii) our insurance providers fail to pay insurance claims, or (iv) we experience a claim for which coverage is not provided.

***Our actual losses may exceed our insurance reserves, which could adversely affect our financial condition and results of operations.***

We establish insurance reserves for claims incurred but not yet paid and claims incurred but not yet reported and any related estimable expenses, and we periodically evaluate and, as necessary, adjust our insurance reserves as our experience develops or new information is learned. We employ various predictive modeling and actuarial techniques and make numerous assumptions based on limited historical experience and industry statistics to estimate our insurance reserves. Estimating the number and severity of claims, as well as related judgment or settlement amounts, is inherently difficult, subjective, and speculative. A number of external factors can affect the actual losses incurred for any given claim, including the length of time the claim remains open, fluctuations in healthcare costs, legislative and regulatory developments and judicial developments. Additionally, we may encounter in the future, instances of insurance fraud, which could increase our actual insurance-related costs. For any of the foregoing reasons, our actual losses for claims and related expenses may deviate, individually or in the aggregate, from the insurance reserves reflected in our consolidated financial statements. If we determine that our estimated insurance reserves are inadequate, we may be required to increase such reserves at the time of the determination, which could result in an increase to our net loss in the period in which the deficiency is determined and negatively impact our financial condition and results of operations.

***We may not be able to obtain adequate financing to continue our operations.***

We will need to raise additional funds through the issuance of equity, equity-related, or debt securities or through obtaining credit from government or financial institutions. This capital will be necessary to fund ongoing operations and continue research and development activities, including the Rideshare Platform, and our Fleet Management business. We cannot be certain that additional funds will be available to us on favorable terms when required, or at all. If we cannot raise additional funds when we need them, our financial condition, results of operations, business and prospects would be materially and adversely affected.

***We may pursue strategic transactions which could be difficult to implement, disrupt our business or change our business profile significantly.***

Any future strategic acquisition or disposition of assets or a business could involve numerous risks, including: (i) potential disruption of our ongoing business and distraction of management; (ii) difficulty integrating the acquired business or segregating assets and operations to be disposed of; (iii) exposure to unknown, contingent or other liabilities, including litigation arising in connection with the acquisition or disposition or against any business we may acquire; (iv) changing our business profile in ways that could have unintended negative consequences; and (v) the failure to achieve anticipated synergies.

If we enter into significant strategic transactions, the related accounting charges may affect our financial condition and results of operations, particularly in the case of an acquisition. The financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. A material disposition could require the amendment or refinancing of our outstanding indebtedness or a portion thereof.

### We rely on our management team, which has little experience working together.

We depend on a small number of executive officers and other members of management to work effectively as a team, to execute our business strategy and operating business segments, and to manage employees and consultants. Our success will be dependent on the personal efforts of our Chief Executive Officer, our directors and such other key personnel. Any of our officers or employees can terminate his or her employment relationship at any time, and the loss of the services of such individuals could have a material adverse effect on our business and prospects. Mr. El-Batrawi, the founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The Nasdaq Capital Market. Our management team has only worked together for only a very short period of time and may not work well together as a management team.

### We have no long-term employment agreements in place with our executive officers.

As of the date of this Prospectus we have no employment agreements or similar arrangements with our executive officers. If we fail to reach mutually satisfactory agreement with our executives, any one or more of such persons may terminate their association with the Company. The loss of any one or more of these experienced executives may have a material and adverse effect on our Company and its business prospects. The Company has entered into an oral agreement with its Chief Executive Officer, Jonathan Rosen, for an annual salary of $300,000, retroactive to his start date of February 1, 2019. The Company also agreed to issue a restricted stock grant of 500,000 shares of common stock with one-third of the restricted shares vesting upon the closing of the Company's initial public offering with the remainder vesting ratably each month over the twenty-four months following the initial public offering.

### Our business operations are dependent upon the ability of our new employees to learn their new roles.

Until June 30, 2017, we were focused on the development and commercialization of the Metasearch App. On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry towards the vehicle rental business with a focus on developing the Rideshare Platform and our Fleet Management business.

In connection with the transition of our business operations, we have replaced many employees in key functions. As new employees gain experience in their roles, we could experience inefficiencies or a lack of business continuity due to loss of historical knowledge and a lack of familiarity of new employees with business processes, operating requirements, policies and procedures, some of which are new, and key information technologies and related infrastructure used in our day-to-day operations and financial reporting and we may experience additional costs as new employees learn their roles and gain necessary experience. It is important to our success that these new employees quickly adapt to and excel in their new roles. If they are unable to do so, our business and financial results could be materially adversely affected. In addition, if we were to lose the services of any one or more key employees, whether due to death, disability or termination of employment, our ability to successfully operate our business segments, financial plans, marketing and other objectives, could be significantly impaired.

### Raising additional capital by issuing additional securities may cause dilution to our current and future shareholders.

We will need to, or desire to, raise substantial additional capital in the future. Our future capital requirements will depend on many factors, including, among others:

- Our degree of success in generating rental and servicing fees from both our Fleet Management business and the Rideshare Platform;

- The costs of establishing or acquiring sales, marketing, and distribution capabilities for our services;

14

- The extent to which we acquire or invest in businesses, products, or technologies, and other strategic relationships; and

- The costs of financing unanticipated working capital requirements and responding to competitive pressures.

If we raise additional funds by issuing equity or convertible debt securities, we will reduce the percentage of ownership of the then-existing shareholders, and the holders of those newly-issued equity or convertible debt securities may have rights, preferences, or privileges senior to those possessed by our then-existing shareholders. Additionally, future sales of a substantial number of shares of our common stock, or other equity-related securities in the public market could depress the market price of our common stock and impair our ability to raise capital through the sale of additional equity or equity-linked securities. We cannot predict the effect that future sales of our common stock, or other equity-related securities would have on the market price of our common stock at any given time.

***If our management is unable to accurately estimate future levels of rental activity and adjust the number and mix of vehicles used in our rental operations, our results of operations, financial condition, liquidity and cash flows could suffer.***

Because vehicle costs typically represent our single largest expense and vehicle purchases are typically made weeks or months in advance of the expected use of the vehicle, our business is dependent upon the ability of our management to accurately estimate future levels of rental activity and consumer preferences with respect to the mix of vehicles used in our rental operations. To the extent we do not purchase sufficient numbers of vehicles, or the right types of vehicles, to meet consumer demand, we may lose revenue to our competitors. If we purchase too many vehicles, our vehicle utilization could be adversely affected and we may not be able to dispose of excess vehicles in a timely and cost-effective manner. If our management is unable to accurately estimate future levels of rental activity and determine the appropriate mix of vehicles used in our rental operations, including because of changes in the competitive environment or economic factors outside of our control, our results of operations, financial condition, liquidity and cash flows could suffer.

***Our corporate governance documents provide that we will indemnify our directors, officers and employees to the fullest extent permitted by law which may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties.***

Our Certificate of Incorporation limits the liability of directors to the maximum extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for breach of their fiduciary duties as directors, except for liability for any:

- breach of their duty of loyalty to us or our stockholders;

15

- act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- transactions for which the directors derived an improper personal benefit.

These limitations of liability do not apply to liabilities arising under the federal or state securities laws and do not affect the availability of equitable remedies such as injunctive relief or rescission. Our bylaws provide that we will indemnify our directors, officers and employees to the fullest extent permitted by law. Our bylaws also provide that we are obligated to advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding. We believe that these bylaw provisions are necessary to attract and retain qualified persons as directors and officers. The limitation of liability in our Certificate of Incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against directors and officers, even though an action, if successful, might provide a benefit to us and our stockholders. Our results of operations and financial condition may be harmed to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

***Concentrating voting control will limit or preclude our stockholders' ability to influence corporate matters, including the election of directors, any merger, consolidation or other major corporate transaction requiring stockholder approval, which may negatively impact your liquidity and/or your gain on your investment.***

Mr. El-Batrawi has entered into a Voting Trust Agreement (the "<u>Trust</u>") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. The Trust shall be irrevocable, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of Nasdaq, or (b) the date upon which the Company is not listed on a security exchange controlled by Nasdaq.

As of the date of this prospectus, the Gray Mars Venus Trust, of which John Gray is the beneficial owner, owns approximately 38.5% of our outstanding shares of common stock. Taking into account the effect of the Trust on voting power, the Gray Mars Venus Trust will control, after this offering approximately 35.2% of the Company's voting stock and have a significant ability to influence corporate matters, including the election of directors, any merger, consolidation or other major corporate transaction requiring stockholder approval, which may negatively impact your liquidity and/or your gain on your investment.

In addition to the stock controlled by John Gray, five other individuals or entities will own 39.5% of our common stock after the completion of this offering, which further concentrates the influence on corporate matters among a few shareholders.

As a result, these stockholders, if they act together, will be able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. This concentration of ownership may not be in the best interests of our other stockholders.

*Negative press involving our founder and former Chief Executive Officer and former director may harm the reputation of the Company.*

Mr. El-Batrawi is our founder and he served as our Chief Executive Officer from the incorporation of the Company until October 4, 2018, Acting Chief Executive Officer from November 17, 2018 to February 1, 2019 and as our director from November 2016 until September 2019. Since 2012, Mr. El-Batrawi has been the owner and Chief Executive Officer of Growth Strategy Investments, LLC and, since 2015, Mr. El-Batrawi has been the managing director of X, LLC, both of which are management companies. On April 13, 2006, Ramy Y. El Batrawi was named, along with others officers, directors and/or associates of Genesis Intermedia, Inc., as defendants in a Securities and Exchange Commission enforcement action. In the Securities and Exchange Commission ("SEC") complaint, filed in the United States District Court for the Central District of California, entitled *SEC v. Ramy El-Batrawi, et al., United States District Court for the Central District of California, Case No 2: -06-cv-02247-(MRP_(RZ)* (the "Action"). The Action alleged violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act, in connection with a stock loan and manipulation scheme. The Action alleged, among other things, that defendants had violated antifraud provisions of federal securities laws by orchestrating a scheme to manipulate the stock price of Genesis Intermedia, Inc. (GENI), a now-defunct public company that was based in Van Nuys, California (the "Complaint"). On April 1, 2010, Mr. El-Batrawi settled the Action by entering into a final judgment by consent with the SEC, without admitting or denying the allegations contained in the Complaint (the "Settlement"). In connection with the voluntary Settlement of the charges set forth in the Complaint, the U.S. District Court for the Central District of California entered the consent against Mr. El-Batrawi, which, among other things, barred Mr. El-Batrawi from acting as an officer or director of a public company for a period of five years following the date of entry of the final judgment by consent. Any negative press stories about Mr. El-Batrawi may harm the reputation of the Company and damage our business prospects.

*We may fail to respond adequately to changes in technology and customer demands.*

In recent years our industry has been characterized by rapid changes in technology and customer demands. For example, in recent years, industry participants have taken advantage of new technologies to improve vehicle utilization, decrease customer wait times and improve customer satisfaction. Our industry has also seen the entry of new competitors whose businesses and efforts continue to introduce various types of self-driving vehicles. Our ability to continually improve our current processes, products and offerings in response to changes in technology is essential in maintaining our competitive position and maintaining current levels of customer satisfaction. We may experience technical or other difficulties that could delay or prevent the development, introduction or marketing of new products or enhanced product offerings.

*User engagement and growth depends on software and device updates beyond our control.*

Our mobile application and websites are currently available on multiple operating systems, including iOS and Android, across multiple different manufacturers, including Motorola, LG, Apple and Samsung and on thousands of devices. Changes to the device infrastructure or software updates on such devices could render our platform and services useless or inoperable and require users to utilize our website rather than our mobile application which may result in decreased user engagement. Any decrease in user engagement may devalue our value proposition to customers who may no longer continue to do business with us which may have a material adverse effect on business, financial conditions and results of operation.

*Defects in our mobile application may adversely affect our business.*

Tools, code, subroutines and processes contained within our mobile application may contain defects when updates and new versions are released. Our introduction of a mobile application with defects or quality problems may result in adverse publicity, uncollectible or delayed accounts receivable, product redevelopment costs, loss of or delay in market acceptance of our services or claims by customers or others against us. Such problems or claims may have a material and adverse effect on our business, prospects, financial condition and results of operations.

*We may not be able to manage our growth effectively.*

Our growth is expected to place, a significant strain on our managerial, operational and financial resources. As the number of our users, partners and other business partners grows, we must increasingly manage multiple relationships with various customers, strategic partners and other third parties. There can be no assurance that our systems, procedures or controls will be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully grow and scale our services, products and offerings. Our operating results will also depend on our ability to expand sales and marketing commensurate with the growth of our business and the ridesharing industry. If we are unable to manage growth effectively, our business, results of operations and financial condition will be adversely affected.

*Maintaining favorable brand recognition is essential to our success, and failure to do so could materially adversely affect our results of operations, financial condition, liquidity and cash flows.*

Our business is heavily dependent upon the favorable brand recognition that our "YayYo", "Distinct Cars" and "Rideshare" brand names have in the markets in which they participate. Factors affecting brand recognition are often outside our control, and our efforts to maintain or enhance favorable brand recognition, such as marketing and advertising campaigns, may not have their desired effects. In addition, it may be difficult to monitor or enforce such requirements, particularly in foreign jurisdictions and various laws may limit our ability to enforce the terms of these agreements or to terminate the agreements. Any decline in perceived favorable recognition of our brands could materially adversely affect our results of operations, financial condition, liquidity and cash flows.

*Changes in U.S., global or regional economic conditions*.

A current decrease in economic activity in the United States or, depending on future operations, in other regions of the world in which we plan to operate our Fleet Management business segment, Rideshare Platform and related services could adversely affect demand, thus reducing our ability to generate revenue. A decline in economic conditions could reduce our users' interest in utilizing our products and services. In addition, an increase in price levels generally, or in price levels in a particular sector such as the fuel sector, could result in a shift in consumer demand away from ridesharing services, which could also adversely affect our revenues and, at the same time, increase our costs.

**Risks Relating to Our Business and Industry.**

*If our efforts to attract prospective customers to our Fleet Management business and Rideshare Platform are not successful, or we fail to retain customers or continue attracting existing customers to our products and services, our growth prospects and revenue will be adversely affected.*

Our ability to grow our business and generate revenue depends on retaining and expanding our total customer base, increasing revenue by effectively monetizing our Rideshare Platform user base, and increasing the number of customers to our Fleet Management business. We must convince prospective customers of the benefits of our ridesharing vehicle rental services and equipment offerings and our existing users of the continuing value of our products and services, including our Rideshare Platform. Our ability to attract new users and customers, retain existing users and customers. If we fail to keep pace with competing offerings or technological advancements to the ridesharing industry or fail to offer compelling product offerings and state-of-the-art delivery for our Rideshare Platform to meet consumer demands, our ability to grow or sustain the reach of our product and service offerings, attract and retain users and customers may be adversely affected.

*We have no control over the Vehicle Registration Requirements or such other ridesharing vehicle requirements imposed by the major Transportation Network Company ("TNC") providers, and our business may be adversely affected in the event that TNC providers restrict or limit prospective ridesharing drivers from utilizing or registering rental vehicles with the TNC.*

We rely on the major TNC businesses that drive and service the ridesharing economy, over whom we have no control, to impose the Vehicle Registration Requirements and permit prospective ridesharing drivers to utilize lease or rental vehicles, such as our product offerings, under their employment with the major TNC ridesharing services. We cannot guarantee that each major TNC business will always permit prospective ridesharing drivers to use third-party lease or rental vehicles under their employment agreement with the TNC.

18

Our business may be adversely affected if our ability to rent vehicles maintained under our Fleet Management business is limited, impaired or delayed because of a modification to the Vehicle Registration Requirements or any similar prohibition that prevents prospective ridesharing drivers from renting our Fleet Management vehicles or other third-party vehicle rentals for use under the terms of the prospective ridesharing drivers agreement with such TNC businesses.

***We face risks of increased costs of cars, including as a result of limited supplies of competitively priced cars.***

As of June 30, 2019, and December 31, 2018, we have a fleet of approximately 347 and 360 vehicles, respectively, all of which are under a lease contract with District Cars and financed by ACME Auto Leasing, LLC. In addition, under our booking platform we manage approximately 50 vehicles. In recent years, the average cost of new cars has increased. As of the date of this prospectus, we have financed the purchase and leasing of the Hyundai cars that we rent from ACME Auto Leasing. Under the terms of a commercial partnership program, Hyundai USA has agreed to extend fleet program competitive pricing options below manufactures' suggested retail prices ("MSRP") on all Hyundai vehicles purchased through selected dealerships. We cannot assure you that we will be able to maintain membership in the Hyundai commercial partnership program or continue receiving competitive pricing options below MSRP rates on all Hyundai vehicles purchased. If Hyundai USA cancels the commercial partnership program or does not offer us competitive terms and conditions, and we are not able to purchase sufficient quantities of cars from other automobile manufacturers on competitive terms and conditions or below MSRP rates, then we may be forced to purchase cars at higher prices, or on terms less competitive, than for cars purchased by our competitors. In addition, certain car manufacturers, such as Ford, have adopted strategies to de-emphasize sales to the car rental industry which they view as less profitable due to historical sales incentive and other discount programs that tended to lower the average cost of cars for fleet purchasers such as us. Reduced or limited supplies of equipment together with increased prices are risks that we also face in our equipment rental business. We cannot offer assurance that we will be able to pass on increased costs of cars or equipment to our rental customers. Failure to pass on significant cost increases to our customers would have a material adverse impact on our results of operations and financial condition.

***Fluctuations in fuel costs or reduced supplies could harm our business.***

We could be adversely affected by limitations on fuel supplies, the imposition of mandatory allocations or rationing of fuel or significant increases in fuel prices. A severe or protracted disruption of fuel supplies or significant increases in fuel prices could have a material adverse effect on our financial condition and results of operations, either by directly interfering with our normal activities or by disrupting the air travel on which a significant portion of our car rental business relies.

***The concentration of our reservations, accounting and information technology functions at a limited number of facilities in California creates risks for us.***

We have concentrated our reservations functions for the United States in one office location in Los Angeles, California, and we have concentrated our accounting functions for the United States in one office location in Los Angeles. In addition, our major information systems are centralized in our office location in Los Angeles. A disruption of normal business at any of our principal office location in Los Angeles, California, whether as the result of localized conditions (such as a fire or explosion) or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and systems activities.

***We face risks arising from our heavy reliance on communications networks and centralized information systems.***

We rely heavily on information systems to accept reservations, process rental and sales transactions, manage our fleets of cars and equipment, account for our activities and otherwise conduct our business. We have centralized our information systems in one office location in Los Angeles, California, and we rely on communications service providers to link our systems with the business locations these systems serve. A simultaneous loss of both facilities, or a major disruption of communications between the systems and the locations they serve, could cause a loss of reservations, interfere with our ability to manage our fleet, slow rental and sales processes and otherwise materially adversely affect our ability to manage our business effectively. Our systems back-up plans, business continuity plans and insurance programs are designed to mitigate such a risk, not to eliminate it. In addition, because our systems contain information about individuals and businesses, our failure to maintain the security of the data we hold, whether the result of our own error or the malfeasance or errors of others, could harm our reputation or give rise to legal liabilities leading to lower revenues, increased costs and other material adverse effects on our results of operations.

***The misuse or theft of information we possess could harm our reputation or competitive position, adversely affect the price at which shares of our common stock trade or give rise to material liabilities.***

We possess non-public information with respect to individuals, including our customers and our current and former employees, and businesses, as well as non-public information with respect to our own affairs. The misuse or theft of that information by either our employees or third parties could result in material damage to our brand, reputation or competitive position or materially affect the price at which shares of our common stock trade. In addition, depending on the type of information involved, the nature of our relationship with the person or entity to which the information relates, the cause and the jurisdiction whose laws are applicable, that misuse or theft of information could result in governmental investigations or material civil or criminal liability. The laws that would be applicable to such a failure are rapidly evolving and becoming more burdensome.

***If we acquire any businesses in the future, they could prove difficult to integrate, disrupt our business, or have an adverse effect on our results of operations.***

We intend to pursue growth primarily through internal growth, but from time to time we may consider opportunistic acquisitions which may be significant. Any future acquisition would involve numerous risks including, without limitation:

- potential disruption of our ongoing business and distraction of management;

- difficulty integrating the acquired business; and

- exposure to unknown liabilities, including litigation against the companies we may acquire.

If we make acquisitions in the future, acquisition-related accounting charges may affect our balance sheet and results of operations. In addition, the financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. We may not be successful in addressing these risks or any other problems encountered in connection with any acquisitions.

***Our business is cyclical, and a disruption in rental activity could materially adversely affect our results of operations.***

In the car rental business, a decline in economic activity typically results in a decline in both business and leisure travel and, accordingly, a decline in the volume of car rental transactions. In the equipment rental business, a decline in economic activity typically results in a decline in activity in non-residential construction and other businesses in which our equipment rental customers operate and, therefore, results in a decline in the volume of equipment rental transactions. In the case of a decline in car or equipment rental activity, we may reduce rental rates to meet competitive pressures, which could have a material adverse effect on our results of operations. A decline in economic activity also may have a material adverse effect on residual values realized on the disposition of our revenue earning cars and/or equipment.

Certain significant components of our expenses, including real estate taxes, rent, utilities, maintenance and other facility-related expenses, the costs of operating our information systems and minimum staffing costs, are fixed in the short-run. Cyclical changes in our revenues do not alter those fixed expenses, typically resulting in higher profitability in periods when our revenues are higher and lower profitability in periods when our revenues are lower. The Company believes that the second and third quarters of the year will be stronger quarters due to their increased levels of leisure travel and construction activity. Any occurrence that disrupts rental activity during the second or third quarters could have a disproportionately material adverse effect on our liquidity and/or results of operations.

***We may be unable to maintain or establish relationships with third-party partners, ridesharing services or technology providers, which could limit the information we are able to provide to users.***

We anticipate that the demand for our products and services will be dependent on key relationships with ridesharing services, auto manufacturers, fleet providers and other industry providers. We will seek to develop and maintain relationships with these companies. Failure to continue to develop and/or maintain these relationships, and/or a failure for these relationships to yield benefit would have an adverse effect on our business.

***We rely on the performance of highly skilled personnel, including senior management and our technology professionals, and if we are unable to retain or motivate key personnel or hire, retain and motivate qualified personnel, our business would be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our senior management and our skilled team members. Our future success depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially adversely affect our ability to build on the efforts they have undertaken and to execute and operate our business segments, and we may not be able to find adequate replacements. We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees.

***Competition for well-qualified employees in all aspects of our business, including software engineers and other technology professionals, is intense both in the U.S. and abroad.***

Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate existing employees. Software engineers and technology professionals are key individuals in designing the code and algorithms necessary to our Rideshare Platform. Therefore, our ability to attract top talent and experienced engineers and technology professional is important to our success. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business would be adversely affected.

***We rely on non-employee third parties for important services which may impact steady growth if third parties to provide important services cannot be retained.***

We will have a small number of employees and we do not have any operational infrastructure or prior operating history. We intend to rely on our management team, our advisors, third-party consultants, outside attorneys, advisors, accountants, auditors, and other administrators. The loss of services of any of such personnel may have a material adverse effect on our business and operations and there can be no assurance that if any or all of such personnel were to become unavailable, that qualified successors can be found, on acceptable terms.

We depend on third parties to provide us with services critical to our business including, equipment manufacturers that provide us with standard passenger vehicles and vehicle leasing services at competitive prices. While we believe that there is sufficient supply in the market, the failure of any of these third parties to adequately provide the needed services could have a material adverse effect on our business.

***Governmental regulation and associated legal uncertainties could limit our ability to expand our product offerings or enter into new markets and could require us to expend significant resources, including the attention of our management, to review and comply with such regulations.***

Elements of the ridesharing industry are currently or will be regulated by Federal, state, city and/or local governments, and our ability to provide these services is and will continue to be affected by government regulations. The implementation of unfavorable regulations or unfavorable interpretations of existing regulations by courts or regulatory bodies with respect to the ridesharing industry or "*Transportation Network Companies*" ("TNC") could require us to incur significant compliance costs, cause the development of the affected markets to become impractical and otherwise have a material adverse effect on our business, results of operations and financial condition. Moreover, in the future, we may elect to add services or products to our business plan that compete directly with ridesharing services, such as Uber and Lyft, which could expose us to additional regulations, compliance obligations and legal challenges. In addition, our business strategy involves expansion into regions around the world, many of which have different legislation, regulatory environments, tax laws and levels of political stability. Compliance with foreign legal, governmental, regulatory or tax requirements will place demands on our time and resources, and we may nonetheless experience unforeseen and potentially adverse legal, regulatory or tax consequences. It is intended that our business will assist with the processing of customer credit card transactions which would result in us receiving and storing personally identifiable information. This information is increasingly subject to legislation and regulations in numerous jurisdictions around the world. This legislation and regulation is generally intended to protect the privacy and security of personal information, including credit card information, that is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if government regulations require TNCs, and as a result, us to significantly change our business practices with respect to this type of information.

***We may not be able to adequately protect our intellectual property, which could harm the value of our brands and adversely affect our business.***

We believe that intellectual property will be critical to our success, and that we will rely on trademark, copyright and patent law, trade secret protection and confidentiality and/or license agreements to protect our proprietary rights. If we are not successful in protecting our intellectual property, it could have a material adverse effect on our business, results of operations and financial condition. While we believe that we will be issued trademarks, copyrights and other intellectual property to protect our business, there can be no assurance that our operations do not, or will not, infringe valid, enforceable third-party patents of third parties or that competitors will not devise new methods of competing with us that are not covered by our anticipated patent applications. Moreover, it is intended that we will rely on intellectual property and technology developed or licensed by third parties, and we may not be able to obtain or continue to obtain licenses and technologies from these third parties at all or on reasonable terms. Effective trademark, service mark, copyright and trade secret protection may not be available in every country in which our intended services will be provided. The laws of certain countries do not protect proprietary rights to the same extent as the laws of the U.S. and, therefore, in certain jurisdictions, we may be unable to protect our proprietary technology adequately against unauthorized third party copying or use, which could adversely affect our competitive position. We may license in the future, certain proprietary rights, such as trademarks or copyrighted material, to third parties. These licensees may take actions that might diminish the value of our proprietary rights or harm our reputation, even if we have agreements prohibiting such activity. Also, to the extent third parties are obligated to indemnify us for breaches of our intellectual property rights, these third parties may be unable to meet these obligations. Any of these events could have a material adverse effect on our business, results of operations or financial condition.

***Confidentiality agreements with employees and others may not adequately prevent disclosure of trade secrets and other proprietary information.***

We anticipate that a substantial amount of our processes and technologies will be protected by trade secret laws. In order to protect these technologies and processes, we intend to rely in part on confidentiality agreements with our employees, licensees, independent contractors and other advisors. These agreements may not effectively prevent disclosure of confidential information, including trade secrets, and may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. In addition, others may independently discover our trade secrets and proprietary information, and in such cases, we could not assert any trade secret rights against such parties. To the extent that our employees, contractors or other third parties with which we do business use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. Laws regarding trade secret rights in certain markets in which we operate may afford little or no protection to our trade secrets. The loss of trade secret protection could make it easier for third parties to compete with our products, services by copying functionality, among other things. In addition, any changes in, or unexpected interpretations of, the trade secret and other intellectual property laws in any country in which we operate may compromise our ability to enforce our trade secret and intellectual property rights. Costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights, and failure to obtain or maintain trade secret protection could adversely affect our business, revenue, reputation and competitive position.

***Our business is heavily reliant upon communications networks and centralized information technology systems and the concentration of our systems creates risks for us.***

We rely heavily on communication networks and information technology systems to accept reservations, process rental and sales transactions, manage our pricing, manage our revenue earning vehicles, manage our financing arrangements, account for our activities and otherwise conduct our business. Our reliance on these networks and systems exposes us to various risks that could cause a loss of reservations, interfere with our ability to manage our vehicles, slow rental and sales processes, adversely affect our ability to comply with our financing arrangements and otherwise materially adversely affect our ability to manage our business effectively. Our major information technology systems, reservations and accounting functions are centralized in a few locations worldwide. Any disruption, termination or substandard provision of these services, whether as the result of localized conditions (such as a fire, explosion or hacking), failure of our systems to function as designed, or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and information technology functions or by eliminating access to our financing arrangements. Any disruption or poor performance of our systems could lead to lower revenues, increased costs or other material adverse effects on our results of operations, financial condition, liquidity or cash flows.

***Defects in our Rideshare Platform and its functionality and the technology powering our custom development services may adversely affect our business.***

It is anticipated that the tools, code, subroutines and processes contained within our Rideshare Platform or the technology powering our custom development services may contain defects when introduced and also when updates and new versions are released. The introduction of our Rideshare Platform or custom development services with defects or quality problems may result in adverse publicity, product returns, reduced orders, uncollectible or delayed accounts receivable, product redevelopment costs, loss of or delay in market acceptance of our products or claims by customers or others against us. Such problems or claims may have a material and adverse effect on our business, prospects, financial condition and results of operations.

***Manufacturer safety recalls could create risks to our business.***

Our Fleet Management vehicles may be subject to safety recalls by their manufacturers. The Raechel and Jacqueline Houck Safe Rental Car Act of 2015 prohibits us from renting vehicles with open federal safety recalls and to repair or address these recalls prior to renting or selling the vehicle. Any federal safety recall with respect to our vehicles would require us to decline to rent recalled vehicles until we can arrange for the steps described in the recall to be taken. If a large number of vehicles are the subject of a recall or if needed replacement parts are not in adequate supply, we may not be able to rent recalled vehicles for a significant period of time. Those types of disruptions could jeopardize our ability to fulfill existing contractual commitments or satisfy demand for our vehicles and could also result in the loss of business to our competitors. Depending on the severity of any recall, it could materially adversely affect our revenues, create customer service problems, reduce the residual value of the recalled vehicles and harm our general reputation.

***If we are unable to purchase adequate supplies of competitively priced vehicles and the cost of the vehicles we purchase increases, our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.***

The price and other terms at which we can acquire vehicles vary based on market and other conditions. For example, certain vehicle manufacturers have in the past, and may in the future, utilize strategies to de-emphasize sales to the vehicle rental industry, which can negatively impact our ability to obtain vehicles on competitive terms and conditions. Consequently, there is no guarantee that we can purchase a sufficient number of vehicles at competitive prices and on competitive terms and conditions. If we are unable to obtain an adequate supply of vehicles, or if we obtain less favorable pricing and other terms when we acquire vehicles and are unable to pass on any increased costs to our customers, then our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.

***If third parties claim that we infringe their intellectual property, it may result in costly litigation.***

We cannot assure you that third parties will not claim our current or future products or services infringe their intellectual property rights. Any such claims, with or without merit, could cause costly litigation that could consume significant management time. As the number of product and services offerings in the ridesharing industry increases and functionalities increasingly overlap, companies such as ours may become increasingly subject to infringement claims. Such claims also might require us to enter into royalty or license agreements. If required, we may not be able to obtain such royalty or license agreements or obtain them on terms acceptable to us.

***Failure to comply with federal and state privacy laws and regulations, or the expansion of current or the enactment of new privacy laws or regulations, could adversely affect our business.***

A variety of federal and state laws and regulations govern the collection, use, retention, sharing and security of consumer data. The existing privacy-related laws and regulations are evolving and subject to potentially differing interpretations. In addition, various federal, state and foreign legislative and regulatory bodies may expand current or enact new laws regarding privacy matters. Further, several states have adopted legislation that requires businesses to implement and maintain reasonable security procedures and practices to protect sensitive personal information and to provide notice to consumers in the event of a security breach. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or orders or other federal, state or international privacy or consumer protection-related laws, regulations or industry self-regulatory principles could result in claims, proceedings or actions against us by governmental entities or others or other liabilities, which could adversely affect our business. In addition, a failure or perceived failure to comply with industry standards or with our own privacy policies and practices could adversely affect our business. Federal and state governmental authorities continue to evaluate the privacy implications inherent in the use of third-party web "*cookies*" for behavioral advertising. The regulation of these cookies and other current online advertising practices could adversely affect our business.

***Our business model is entirely dependent on the continued success and viability of the ridesharing industry and "transportation network companies", and we may become subject to government regulation and legal uncertainties that could reduce demand for our products and services or increase the cost of doing business, thereby adversely affecting our ability to generate revenues.***

The past year has seen a boom in the number of ridesharing companies that allow customers to order rides on demand using apps on their smartphones. Private drivers use their personal automobiles to pick up the customers and drive them to the desired destination in exchange for a negotiated fee. The passengers then write reviews, similar to other peer-to-peer online services. Large amounts of venture capital and private equity has been invested in a handful of these new companies, which have the potential to disrupt the traditional transportation industry. However, the ridesharing marketplace has come under increased scrutiny from governments and various interested groups (such as taxi drivers, taxi companies, environmentalists, etc.) have continuously opposed the proliferation of ridesharing services in recent years. Despite opposition from many of these interested groups and governmental agencies, on September 19, 2013, the California Public Utilities Commission ("CPUC") voted unanimously to allow these ridesharing services to operate in California as a new category of business called "*transportation network companies*" ("TNC").

In California, licenses will be issued to qualifying TNCs, subject to new regulations that require drivers to undergo criminal background checks and vehicle inspections, receive driver training, follow a zero-tolerance policy on drugs and alcohol, and carry insurance policies with a minimum of $1 million in liability coverage. Some of the companies that are expected to receive new TNC licenses include Lyft (*www.lyft.me*), SideCar (*www.side.cr*) and UberX (*www.uber.com*). The CPUC has responded to rapidly evolving disruptive technology and its decision will likely set an example for cities and states across the country. Its decision is also expected to preempt ongoing efforts by some California cities to regulate or ban peer-to-peer ridesharing under their authority to license taxi companies. The City of Los Angeles, however, is currently considering a possible appeal of the CPUC decision and implementing additional regulations to TNC drivers, which have been referred to as "*Bandit cabs*" by some on the City Council. Other cities across the country are also now looking at new regulations for Rideshare companies.

24

As can be gleaned from these recent events around the ridesharing industry, this new business model is not without its opponents. Some raise concerns about public safety and the potential for abuse or unintended consequences, while others question whether the new regulations require additional enforcement capability. The taxi industry, which is less than pleased to see this new competition, has criticized these ridesharing apps as operating essentially like unlicensed taxi cabs. Since the new technology uses GPS to measure the distance of a ride and the corresponding fee, the taxi industry believes that it works similarly to a taxi meter and should therefore comply with local taxi ordinances. Some of the primary concerns raised by skeptics include how liability will be allocated between the TNC and its independent contractor driver, and how the insurance industry will adapt to this new business. Proper hiring practices, training and oversight by the TNC also will be necessary to ensure public safety. The extent to which the TNCs will be inspected and the new regulations enforced is still unclear, but this will be an important means by which the public may judge the safety of this new industry. Based on the direction states and cities are heading with respect to the governance of TNCs or ridesharing services, and the ever increasing popularity and use of ridesharing services and TNCs, it is likely that a number of laws and regulations will become applicable to us or the TNCs which we rely upon for the operation of products and related services or may be adopted in the future with respect to mobile applications and/or TNCs covering issues such as: (i) liability, (ii) unionization, (iii) rules and standards for drivers, vehicles, and passenger safety, (iv) licensing and insurance requirements, and (v) environmental concerns, among others. It is difficult to predict how existing laws will be applied to our business and the new laws and regulations to which we and/or ridesharing services will likely become subject. If ridesharing services are not able to comply with these laws or regulations or if we become liable under these laws or regulations, we could be directly harmed, and we may be forced to implement new measures to sustain our operating business segments. We anticipate that scrutiny and regulation of the ridesharing industry will increase and we will be required to devote legal and other resources to addressing such regulation, either directly or indirectly. Changes to these laws intended to address these issues, including some recently proposed changes, could create uncertainty in the marketplace. Such uncertainty could reduce demand for our services or increase the cost of doing business due to increased costs of litigation or increased service or operating costs.

***We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business financial condition and results of operations.***

We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business, financial condition and results of operations. We anticipate accepting payment from our users primarily through credit card transactions and certain online payment service providers. The ability to access credit card information on a real time-basis without having to proactively reach out to the consumer each time we process an auto-renewal payment or a payment for the purchase of a premium feature on any of our dating products is critical to our success. When we or a third party experiences a data security breach involving credit card information, affected cardholders will often cancel their credit cards. In the case of a breach experienced by a third party, the more sizable the third party's customer base and the greater the number of credit card accounts impacted, the more likely it is that our users would be impacted by such a breach. To the extent our users are ever affected by such a breach experienced by us or a third party, affected users would need to be contacted to obtain new credit card information and process any pending transactions. It is likely that we would not be able to reach all affected users, and even if we could, some users' new credit card information may not be obtained and some pending transactions may not be processed, which could adversely affect our business, financial condition and results of operations. Even if our users are not directly impacted by a given data security breach, they may lose confidence in the ability of service providers to protect their personal information generally, which could cause them to stop using their credit cards online and choose alternative payment methods that are not as convenient for us or restrict our ability to process payments without significant user effort. Additionally, if we fail to adequately prevent fraudulent credit card transactions, we may face civil liability, diminished public perception of our security measures and significantly higher credit card-related costs, any of which could adversely affect our business, financial condition and results of operations. Finally, the passage or adoption of any legislation or regulation affecting the ability of service providers to periodically charge consumers for recurring membership payments may adversely affect our business, financial condition and results of operations.

***We depend upon intellectual property and proprietary rights that are vulnerable to unauthorized use.***

We rely on a combination of copyright and trademark laws, trade secrets, software security measures, license agreements and nondisclosure agreements to protect our proprietary information. Our success will depend, in part, on our ability to operate without infringing the patent or other proprietary rights of others and our ability to preserve our trade secrets and other proprietary property, including our rights in any technology licenses upon which any of our products or services are based. Our inability to preserve such rights properly or operate without infringing on such rights would have a material adverse effect on our business, results of operations and financial condition. We currently do not own any registered copyrights, patents or patent applications pending. It may be possible for unauthorized third parties to copy aspects of, or otherwise obtain and use, our proprietary information without authorization. In addition, there can be no assurance that any confidentiality agreements between us and our employees, or any license agreements with

our customers, will provide meaningful protection for our proprietary information in the event of any unauthorized use or disclosure of such proprietary information.

***We may not be able to keep up with rapid technological changes.***

To remain competitive, we must continue to enhance and improve the usability, functionality, and features of our Rideshare Platform and related services. The evolving nature of the ridesharing industry, transportation network companies, telecommunications, apps, and mobile based services, which is characterized by rapid technological change, changes in user and customer requirements and preferences, frequent new product and service introductions and the emergence of new industry standards and practices, could render our existing systems, app and services obsolete. Our success will depend, in part, on our ability to develop, innovate, license or acquire leading technologies useful in our business, enhance our existing solutions, develop new solutions and technology that address the increasingly sophisticated and varied needs of our current and prospective users, and respond to technological advances and emerging industry and regulatory standards and practices in a cost-effective and timely manner. Future advances in technology may not be beneficial to, or compatible with, our business. Furthermore, we may not successfully use new technologies effectively or adapt our proprietary technology and app to user requirements or emerging industry standards on a timely basis. Our ability to remain technologically competitive may require substantial expenditures and lead time. If we are unable to adapt in a timely manner to changing market conditions or user requirements, our business, financial condition and results of operations could be seriously harmed.

***We depend on the continued growth and reliability of the internet, global positioning systems, ridesharing services and apps.***

The recent growth in the use of apps and ridesharing services may cause periods of decreased performance for many ridesharing services, internet providers, apps and related service providers. If app and ridesharing usage continues to grow rapidly, the infrastructure these services are reliant upon (i.e. the internet, global positioning systems, and telecommunications networks and devices) may not be able to support these demands and therefore performance and reliability may decline. Decreased performance with respect to some or all of these critical components of our business model has also been attributed to illegal attacks by third parties. If outages or delays occur frequently or increase in frequency, or businesses are not able to protect themselves adequately from such illegal attacks, the market for mobile apps, ridesharing services and related technologies could grow more slowly or decline, which may reduce the demand for our Rideshare Platform and related services.

***Our business is dependent upon consumers renting our Fleet Management vehicles, using our Rideshare Platform and related services and if we fail to obtain broad adoption, our business would be adversely affected.***

Our success will depend on our ability to monetize our fleet of vehicles and our Rideshare Platform, ensuring our Rideshare Platform is fully functional and reliable as intended, operate and educate consumers regarding the benefits of renting vehicles for ridesharing opportunities, and persuade them to adopt YayYo! and/or "Rideshare" as their "*go to*" ridesharing vehicle rental service provider. We do not know if our products and services will be successful over the long term and market acceptance may be hindered if our Rideshare platform does not function efficiently and/or our user experience is not compelling and financially beneficial to our users. If consumers do not adopt and use our Rideshare Platform and related services, we will not be able to generate revenues and our financial condition will suffer as a result.

26

*International expansion of our business exposes us to market, regulatory, political, operational, financial and economic risks associated with doing business outside of the United States.*

Our business strategy includes eventual international expansion. Adapting our Rideshare Platform to function internationally and doing business internationally involves a number of risks, including: (i) multiple, conflicting and changing laws and regulations such as tax laws, privacy laws, export and import restrictions, employment laws, regulatory requirements and other governmental approvals, permits and licenses; (ii) obtaining regulatory approvals where required; (iii) requirements to maintain data and the processing of that data on servers located within such countries; (iv) complexities associated with managing multiple payment processing methods and multiple ridesharing service providers; (v) natural disasters, political and economic instability, including wars, terrorism, political unrest, outbreak of disease, protests, boycotts, curtailment of trade and other market restrictions; and (vi) regulatory and compliance risks that relate to maintaining accurate information and control over activities subject to regulation under the United States Foreign Corrupt Practices Act of 1977 ("FCPA"), U.K. Bribery Act of 2010 and comparable laws and regulations in other countries. Any of these factors could significantly harm our future international expansion and operations and, consequently, our ability to generate revenue and results of operations.

*Security breaches, loss of data and other disruptions could compromise sensitive information related to our business or users or prevent us from accessing critical information and expose us to liability, which could adversely affect our business and our reputation.*

In the ordinary course of our business, we and our third-party billing and collections providers and ridesharing service partners may collect and store sensitive data, including legally-protected personal information. We may also process and store and use additional third-parties to process and store, sensitive intellectual property and other proprietary business information, including that of our customers and collaborative partners. While we intend to implemented data privacy and security measures that will be compliant with applicable privacy laws and regulations, future security breaches could subject us to liability for violations of various laws, rules or regulations, civil liability, government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

*We may become a party to intellectual property litigation or administrative proceedings that could be costly and could interfere with our ability to focus on our operating business segments.*

The technology industry has been characterized by extensive litigation regarding patents, trademarks, trade secrets, and other intellectual property rights, and companies in the industry have used intellectual property litigation to gain a competitive advantage. It is possible that U.S. and foreign patents and pending patent applications or trademarks controlled by third parties may be alleged to cover our products or services, or that we may be accused of misappropriating third parties' trade secrets. Additionally, our products may include hardware and software components that we purchase from vendors and may include design components that are outside of our direct control. Our competitors, many of which have substantially greater resources and have made substantial investments in patent portfolios, trade secrets, trademarks, and competing technologies, may have applied for or obtained, or may in the future apply for or obtain, patents or trademarks that will prevent, limit or otherwise interfere with our ability to make, use, sell and/or export our products and services or to use product names. We may become a party to patent or trademark infringement or trade secret related disputes or litigation as a result of these and other third party intellectual property rights being asserted against us. The defense and prosecution of these matters are both costly and time consuming. Vendors from whom we purchase hardware or software may not indemnify us in the event that such hardware or software is accused of infringing a third party's patent or trademark or of misappropriating a third party's trade secret.

Further, if such patents, trademarks, or trade secrets are successfully asserted against us, this may harm our business and result in injunctions preventing us from selling our products, license fees, damages and the payment of attorney fees and court costs. In addition, if we are found to willfully infringe third party patents or trademarks or to have misappropriated trade secrets, we could be required to pay treble damages in addition to other penalties. Although patent, trademark, trade secret, and other intellectual property disputes in the technology industry have often been settled through licensing or similar arrangements, costs associated with such arrangements may be substantial and could include ongoing royalties. We may be unable to obtain necessary licenses on satisfactory terms, if at all. If we do not obtain necessary licenses, we may not be able to redesign our Rideshare Platform or related services in order to avoid infringement.

Additionally, in the future we may need to commence proceedings against others to enforce our patents or trademarks, if applicable, or to protect our copyrights, trade secrets or know how, trade secrets or know how, or to determine the enforceability, scope and validity of the proprietary rights of others. These proceedings would result in substantial expense to us and significant diversion of effort by our technical and management personnel. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful. We may not be able to stop a competitor from marketing and selling products that are the same or similar to our products and services or from using product or service names that are the same or similar to ours, and our business may be harmed as a result.

We may face claims from companies that incorporate open source software into their products or from open source licensors, claiming ownership of, or demanding release of, the source code, the open source software or derivative works that were developed using such software, or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to cease offering our Rideshare Platform unless and until we can re-engineer it to avoid infringement. This re-engineering process could require significant additional research and development resources, and we may not be able to complete it successfully. These risks could be difficult to eliminate or manage, and, if not addressed, could harm our business, financial condition and operating results.

**_Our use of "open source" software could adversely affect our ability to offer our services and subject us to possible litigation._**

We use open source software in connection with our technology development. From time to time, companies that use open source software have faced claims challenging the use of open source software and/or compliance with open source license terms. We could be subject to suits by parties claiming ownership of what we believe to be open source software or claiming noncompliance with open source licensing terms. Some open source licenses require users who distribute software containing open source to make available all or part of such software, which in some circumstances could include valuable proprietary code of the user. We intend to monitor the use of open source software and will try to ensure that none is used in a manner that would require us to disclose our proprietary source code or that would otherwise breach the terms of an open source agreement, such use could inadvertently occur, in part because open source license terms are often ambiguous. Any requirement to disclose proprietary source code or pay damages for breach of contract could be harmful to our business, results of operations or financial condition, and could help our competitors develop products and services that are similar to or better than ours.

**_No assurances of protection for proprietary rights; reliance on trade secrets._**

In certain cases, we may rely on trade secrets to protect intellectual property, proprietary technology and processes, which we have acquired, developed or may develop in the future. There can be no assurances that secrecy obligations will be honored or that others will not independently develop similar or superior products or technology. The protection of intellectual property and/or proprietary technology through claims of trade secret status has been the subject of increasing claims and litigation by various companies both in order to protect proprietary rights as well as for competitive reasons even where proprietary claims are unsubstantiated. The prosecution of proprietary claims or the defense of such claims is costly and uncertain given the uncertainty and rapid development of the principles of law pertaining to this area. We may also be subject to claims by other parties with regard to the use of intellectual property, technology information and data, which may be deemed proprietary to others.

**_Our network operations may be vulnerable to hacking, viruses and other disruptions, which may make our Rideshare online platform and related services less attractive and reliable_**.

Internet usage and mobile app usage could decline if any well-publicized compromise of security occurs. Hacking involves efforts to gain unauthorized access to information or systems or to cause intentional malfunctions, loss or corruption of data, software, hardware or other computer equipment. Hackers, if successful, could misappropriate proprietary information or cause disruptions in our service. We may be required to expend capital and other resources to protect our products and services and related systems upon which our products and services is reliant against hackers. There can be no assurance that any measures we may take will be effective. Security breaches could have a material adverse effect on our business. In addition, the inadvertent transmission if computer viruses or other digital problems could expose us to a material risk of loss or litigation and possible liability, as well as materially damage our reputation and decrease our user base.

***We currently have a small sales and marketing organization. If we are unable to expand our direct sales force in the U.S. to promote our services and related products, the commercial appeal and brand awareness for our products and services may be diminished.***

We currently have a small sales and marketing organization. The Company may expand the core sales and marketing team to oversee the sales and marketing of our "*YayYo!*" business. We will incur significant additional expenses and commit significant additional management resources to expand and grow our sales force. We may not be able to build on the expansion of these capabilities despite these additional expenditures. If we elect to rely on third parties to sell our products in the U.S., we may receive less revenue than if we sold our products directly. In addition, although we would intend to diligently monitor their activities, we may have little or no control over the sales efforts of those third parties. In the event we are unable to develop and expand our own sales force or collaborate with a third party to sell our products, we may not be able to operate our products and/or services which would negatively impact our ability to generate revenue. We may not be able to enter into any marketing arrangements on favorable terms or at all. If we are unable to enter into a marketing arrangement for our products, we may not be able to develop an effective sales force to successfully operate our products and/or services. If we fail to enter into marketing arrangements for our products and are unable to develop an effective sales force, our ability to generate revenue would be limited.

***We currently serve a segment of the Rideshare driver market that is large and valuable, but has less than average credit and commercial financial performance. We cannot predict the future performance of this market segment.***

Rideshare drivers are frequently unemployed, underemployed or otherwise financially challenged, which is one reason they are attracted to the rideshare business. We believe these drivers are critical to the rideshare ecosystem, that their numbers will grow, and they still perform financially to a degree that we can benefit. However, there can be no assurance that they will grow or maintain their percentage of the driver population, and that they will perform fiscally in a way that the company needs to generate a profit. Should they decrease in numbers or percentage of the driver population, or should we be unable to manage their successful payments for our cars, services, repairs or other charges, we may not be able to operate at a level of profit acceptable to the Company.

**Risks Relating to Ownership of Our Securities.**

***There is no active public trading market for our common stock and we cannot assure you that an active trading market will develop in the near future.***

Our common stock is not quoted in the over-the-counter markets and is not listed on any stock exchange and there is currently no active trading in our securities. We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering. We cannot assure you that an active trading market for our common stock will develop in the future due to a number of factors, including the fact that we are a small company that is relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community that generate or influence sales volume, and that even if we came to the attention of such persons, they tend to be risk-averse and would be reluctant to follow an unproven company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned and viable. We cannot give you any assurance that an active public trading market for our common stock will develop or be sustained. You may not be able to liquidate your shares quickly or at the market price if trading in our common stock is not active.

***Sales of our common stock in the primary offering will be taking place concurrently with common stock registered by selling stockholders which might affect the price, demand, and liquidity of our common stock.***

We are registering shares of common stock to certain security holders concurrently with the primary offering which include the potential resale by certain selling stockholders of an aggregate amount up to 1,650,000 shares of our common stock, consisting of up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder. Sales by these selling stockholders may reduce the price of our common stock, demand for the shares sold in the offering and, as a result, the liquidity of your investment.

***The public price of our common stock may be volatile, and could, following a sale decline significantly and rapidly.***

The initial public offering price for the shares will be determined by negotiations between us and the underwriters and may not be indicative of prices that will prevail in the open market following this primary offering. The market price of our common stock may decline below the initial offering price, and you may not be able to sell your shares of our common stock at or above the price you paid in the primary offering, or at all. Following this Offering, the public price of our common stock in the secondary market will be determined by private buy and sell transaction orders collected from broker-dealers.

***We may not be able to satisfy listing requirements of Nasdaq to maintain a listing of our common stock.***

If our common stock is listed on Nasdaq, we must meet certain financial and liquidity criteria to maintain such listing. If we violate the maintenance requirements for continued listing of our common stock, our common stock may be delisted. In addition, our board may determine that the cost of maintaining our listing on a national securities exchange outweighs the benefits of such listing. A delisting of our common stock from Nasdaq may materially impair our stockholders' ability to buy and sell our common stock and could have an adverse effect on the market price of, and the efficiency of the trading market for, our common stock. In addition, the delisting of our common stock could significantly impair our ability to raise capital.

***This Offering has not been reviewed by independent professionals.***

We have not retained any independent professionals to review or comment on this prospectus or otherwise protect the interest of the investors hereunder. Although we have retained our own counsel, neither such counsel nor any other counsel has made, on behalf of the investors, any independent examination of any factual matters represented by management herein. Therefore, for purposes of making a decision to purchase our Shares, you should not rely on our counsel with respect to any matters herein described. Prospective investors are strongly urged to rely on the advice of their own legal counsel and advisors in making a determination to purchase our shares of common stock.

***There has been no public market for our common stock prior to this Offering, and an active market in which investors can resell their shares may not develop.***

Prior to this Offering, there has been no public market for our common stock. All investments in securities involve the risk of loss of capital. No guarantee or representation is made that an investor will receive a return of its capital. The value of our common stock can be adversely affected by a variety of factors, including development problems, regulatory issues, technical issues, commercial challenges, competition, legislation, government intervention, industry developments and trends, and general business and economic conditions. We cannot predict the extent to which an active market for our common stock will develop or be sustained after this Offering, or how the development of such a market might affect the market price of our common stock.

***Sales of our common stock under our resale registration statement and under Rule 144 could reduce the price of our stock.***

An aggregate of 25,067,786 of our outstanding shares of common stock are subject to lock-up agreements. An additional 339,125 of our outstanding shares of common stock "restricted securities" and are subject to restrictions on transfer. In general, persons holding "restricted securities," must hold their shares for a period of at least six months, may not sell more than 1% of the total issued and outstanding shares in any 90-day period, and must resell the shares in an unsolicited brokerage transaction at the market price. Shares shall be locked up as follows: (i) 2,900,000 shares of common stock held by X, LLC, 10,325,000 shares of common stock held by Gray Mars Venus Trust, Arizona 2015, 2,844,945 shares of common stock controlled by David Haley, 2,758,824 shares of common stock held by James Malackowiski, 2,018,750 shares of common stock held by John O'Hurley and 1,654,412 shares held by Acuitas Group Holdings, LLC for six months; (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding warrants held by Bellridge Capital, L.P. for 60 days; (iii) 400,000 shares of common stock held by Bellridge Capital, L.P. for 30 days and (iv) an additional 2,165,855 shares of common stock held by other stockholders for periods ranging from 47 days to six months; provided, however, certain shares may not be subject to a lock up period in the event that such shares are sold at certain minimum prices (see "Shares Eligible for Future – Lock-Up Agreements"). However, Rule 144 will only be available for resale in the 90 days after the Company becomes subject to the ongoing SEC reporting requirements. The Company may voluntarily file current reports on Form 8-K. The availability for sale of substantial amounts of common stock under Rule 144 could reduce prevailing market prices for our securities. The registration statement to which this Prospectus relates also registers the potential resale by certain selling stockholders of an aggregate amount up to 1,650,000 shares of our common stock consisting of up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder Warrant, which shares shall be subject to a lock up for 60 days.

***Our failure to maintain effective internal controls over financial reporting could have an adverse impact on us.***

We are required to establish and maintain appropriate internal controls over financial reporting. Failure to establish those controls, or any failure of those controls once established, could adversely impact our public disclosures regarding our business, financial condition or results of operations. In addition, management's assessment of internal controls over financial reporting may identify weaknesses and conditions that need to be addressed in our internal controls over financial reporting or other matters that may raise concerns for investors. Any actual or perceived weaknesses and conditions that need to be addressed in our internal control over financial reporting, disclosure of management's assessment of our internal controls over financial reporting or disclosure of our public accounting firm's attestation to or report on management's assessment of our internal controls over financial reporting may have an adverse impact on the price of our common stock.

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints and the benefit of controls must be relative to their costs. Because of the inherent limitations in all control systems, no system of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Further, controls can be circumvented by individual acts of some persons, by collusion of two or more persons, or by management override of the controls. The design of any system of controls is also based in part upon certain

assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, a control may become inadequate because of changes in conditions or the degree of compliance with policies or procedures may deteriorate. Because of inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected.

31

At present, we believe that we have effective internal controls in place. However, our management, including our Chief Executive Officer, cannot guarantee that our internal controls and disclosure controls that we have in place will prevent all possible errors, mistakes or all fraud.

***Our financial controls and procedures may not be sufficient to ensure timely and reliable reporting of financial information, which, as a public company, could materially harm our stock price.***

We require significant financial resources to maintain our public reporting status. We cannot assure you we will be able to maintain adequate resources to ensure that we will not have any future material weakness in our system of internal controls. The effectiveness of our controls and procedures may in the future be limited by a variety of factors including:

- faulty human judgment and simple errors, omissions or mistakes;
- fraudulent action of an individual or collusion of two or more people;
- inappropriate management override of procedures; and
- the possibility that any enhancements to controls and procedures may still not be adequate to assure timely and accurate financial information.

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Despite these controls, because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance of achieving their control objectives. Furthermore, smaller reporting companies like us face additional limitations. Smaller reporting companies employ fewer individuals and can find it difficult to employ resources for complicated transactions and effective risk management. Additionally, smaller reporting companies tend to utilize general accounting software packages that lack a rigorous set of software controls.

If we fail to have effective controls and procedures for financial reporting in place, we could be unable to provide timely and accurate financial information and be subject to investigation by the Securities and Exchange Commission and civil or criminal sanctions.

***We must implement additional and expensive procedures and controls in order to grow our business and organization and to satisfy new reporting requirements, which will increase our costs and require additional management resources.***

Upon becoming a fully public reporting company, we will be required to comply with the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and the related rules and regulations of the SEC, including the requirements that we maintain disclosure controls and procedures and adequate internal control over financial reporting. In the future, if our securities are listed on a national exchange, we may also be required to comply with marketplace rules and heightened corporate governance standards. Compliance with the Sarbanes-Oxley Act and other SEC and national exchange requirements will increase our costs and require additional management resources. We recently have begun upgrading our procedures and controls and will need to continue to implement additional procedures and controls as we grow our business and organization and to satisfy new reporting requirements. If we are unable to complete the required assessment as to the adequacy of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act or if we fail to maintain internal control over financial reporting, our ability to produce timely, accurate and reliable periodic financial statements could be impaired.

If we do not maintain adequate internal control over financial reporting, investors could lose confidence in the accuracy of our periodic reports filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Additionally, our ability to obtain additional financing could be impaired or a lack of investor confidence in the reliability and accuracy of our public reporting could cause our stock price to decline.

***We are an "emerging growth company" under the JOBS Act of 2012 and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our common stock less attractive to investors.***

We are an "emerging growth company", as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 (the "Securities Act") for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We are choosing to take advantage of the extended transition period for complying with new or revised accounting standards.

We will remain an "emerging growth company" until the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act, although we will lose that status sooner if our revenues exceed $1.07 billion, if we issue more than $1 billion in non-convertible debt in a three year period, or if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last day of our most recently completed second fiscal quarter.

***Our status as an "emerging growth company" under the JOBS Act may make it more difficult to raise capital as and when we need it.***

Because of the exemptions from various reporting requirements provided to us as an "emerging growth company" and because we will have an extended transition period for complying with new or revised financial accounting standards, we may be less attractive to investors and it may be difficult for us to raise additional capital as and when we need it. Investors may be unable to compare our business with other companies in our industry if they believe that our financial accounting is not as transparent as other companies in our industry. If we are unable to raise additional capital as and when we need it, our financial condition and results of operations may be materially and adversely affected.

34

***We have not paid dividends in the past and do not expect to pay dividends in the future, and any return on investment may be limited to the value of our stock.***

We have never paid cash dividends on our common stock and do not anticipate paying cash dividends on our common stock in the foreseeable future. We currently intend to retain any future earnings to support the development of our business and do not anticipate paying cash dividends in the foreseeable future. Our payment of any future dividends will be at the discretion of our board of directors after taking into account various factors, including, but not limited to, our financial condition, operating results, cash needs, growth plans and the terms of any credit agreements that we may be a party to at the time. In addition, our ability to pay dividends on our common stock may be limited by Delaware state law. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize a return on their investment. Investors seeking cash dividends should not purchase our common stock.

***Our Amended and Restated Bylaws provide that a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) will be the sole and exclusive forum for certain disputes which could limit stockholders' ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers or employees.***

Our Amended and Restated Bylaws provide that unless the Company consents in writing to the selection of an alternative forum, a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for claims with respect to (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim against the Company or any director or officer or other employee of the Company arising pursuant to any provision of the Delaware General Corporation Law or the Certificate of Incorporation or the Amended and Restated Bylaws of the Company (in each case, as they may be amended from time to time), or (iv) any action asserting a claim against the Company or any director or officer or other employee of the Company governed by the internal affairs doctrine. This exclusive forum provision would not apply to suits brought to enforce any liability or duty created by the Securities Act or the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. To the extent that any such claims may be based upon federal law claims, Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder.

This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company or its directors, officers, other employees or agents, which may discourage such lawsuits against the Company and its directors, officers, other employees and agents. Alternatively, if a court were to find the choice of forum provision contained in our Amended and Restated Bylaws to be inapplicable or unenforceable in an action, the Company may incur additional costs associated with resolving such action in other jurisdictions, which could have a material adverse effect on the Company's business, results of operations, and financial condition.

***You should consult your own independent tax advisor regarding any tax matters arising with respect to the securities offered in connection with this offering.***

Participation in this offering could result in various tax-related consequences for investors. All prospective purchasers of the resold securities are advised to consult their own independent tax advisors regarding the U.S. federal, state, local and non-U.S. tax consequences relevant to the purchase, ownership and disposition of the resold securities in their particular situations.

*IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT ANY U.S. TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE. IN ADDITION, ANY U.S. TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE "PROMOTION OR MARKETING" OF THE MATTER(S) ADDRESSED HEREIN. YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM YOUR OWN INDEPENDENT TAX ADVISOR.*

**IN ADDITION TO THE ABOVE RISKS, BUSINESSES ARE OFTEN SUBJECT TO RISKS NOT FORESEEN OR FULLY APPRECIATED BY MANAGEMENT. IN REVIEWING THIS FILING, POTENTIAL INVESTORS SHOULD KEEP IN MIND THAT OTHER POSSIBLE RISKS MAY ADVERSELY IMPACT THE COMPANY'S BUSINESS OPERATIONS AND THE VALUE OF THE COMPANY'S SECURITIES.**

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains "forward-looking statements." Forward-looking statements reflect the current view about future events. When used in this prospectus, the words "anticipate," "believe," "estimate," "expect," "future," "intend," "plan," or the negative of these terms and similar expressions, as they relate to us or our management, identify forward-looking statements. Such statements, include, but are not limited to, statements contained in this prospectus relating to our business strategy, our future operating results and liquidity and capital resources outlook. Forward-looking statements are based on our current expectations and assumptions regarding our business, the economy and other future conditions. Because forward–looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. Our actual results may differ materially from those contemplated by the forward-looking statements. They are neither statements of historical fact nor guarantees of assurance of future performance. We caution you therefore against relying on any of these forward-looking statements. Important factors that could cause actual results to differ materially from those in the forward-looking statements include, without limitation:

1. Our ability to effectively operate our business segments;

2. Our ability to manage our research, development, expansion, growth and operating expenses;

3. Our ability to evaluate and measure our business, prospects and performance metrics;

4. Our ability to compete, directly and indirectly, and succeed in the highly competitive and evolving ridesharing industry;

5. Our ability to respond and adapt to changes in technology and customer behavior;

6. Our ability to protect our intellectual property and to develop, maintain and enhance a strong brand; and

7. other factors (including the risks contained in the section of this prospectus entitled "*Risk Factors*") relating to our industry, our operations and results of operations.

Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, actual results may differ significantly from those anticipated, believed, estimated, expected, intended or planned.

Factors or events that could cause our actual results to differ may emerge from time to time, and it is not possible for us to predict all of them. We cannot guarantee future results, levels of activity, performance or achievements. Except as required by applicable law, including the securities laws of the United States, we do not intend to update any of the forward-looking statements to conform these statements to actual results.

## USE OF PROCEEDS

We estimate that we will receive net proceeds of approximately $8,900,000 (or approximately $10,265,000 if the underwriters' option to purchase additional shares is exercised in full) from the sale of the common stock offered by us in this primary offering, based on public offering price of $4.00 per share, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

An increase or decrease of 100,000 shares of common stock offered by us, as set forth on the cover page of this prospectus, would increase or decrease net proceeds to us from this primary offering by $364,000, based on a public offering price of $4.00 per share, and after deducting the estimated underwriting discounts and commissions.

The principal purposes of this primary offering are to increase our capitalization and financial flexibility, increase our visibility in the marketplace and create a public market for our common stock. As of the date of this prospectus, we cannot specify with certainty all of the particular uses for the net proceeds to us from this primary offering. However, we currently intend to use the net proceeds to us from this primary offering to add to our fleet of passenger vehicles made available for rent through the Company's wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital, sales and marketing activities. We may also use a portion of the net proceeds for the acquisition of, or investment in, technologies, solutions or businesses that complement our business, although we have no present commitments or agreements to enter into any acquisitions or investments.

We will retain broad discretion in the allocation of the net proceeds from this primary offering and could utilize the proceeds in ways that do not necessarily improve our results of operations or enhance the value of our common stock.

The table below sets forth the manner in which we expect to use the net proceeds we receive from this primary offering. All amounts included in the table below are estimates.

| Description | | Amount |
|---|---|---|
| Purchase of Passenger Vehicles Made Available for Rent | $ | 5,000,000 |
| Repayment of Notes Payable | | 2,400,000 |
| Sales and Marketing | $ | 750,000 |
| Working Capital and General Corporate Purposes | $ | 750,000 |
| Total | $ | 8,900,000 |

The foregoing information is an estimate based on our current business plan. We may find it necessary or advisable to re-allocate portions of the net proceeds reserved for one category to another, and we will have broad discretion in doing so. Pending these uses, we intend to invest the net proceeds of this primary offering in a money market or other interest-bearing account.

## MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Our common stock is not listed on any stock exchange or over-the-counter market or quotation system. There is currently no active trading market in our common stock. We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering. For more information see the section "*Risk Factors*."

As of October 31, 2019, we have 26,802,976 shares of our common stock issued and outstanding held by approximately 1,148 stockholders of record.

We also have outstanding:

- The Selling Securityholder Warrant to purchase up to 1,500,000 shares of our common stock at an exercise price of $4.00 per share, subject to adjustment in certain circumstances as provided therein; and

- Options granted under the 2016 Plan to purchase up to 300,000 shares of our common stock at a weighted average exercise price of $8.00 per share, subject to adjustment in certain circumstances as provided therein, of which options to purchase up to 300,000 shares of our common stock have vested and are exercisable at a weighted average exercise price of $8.00.

**Dividends**

We have not declared any cash dividends since inception and we do not anticipate paying any dividends in the foreseeable future. Instead, we anticipate that all of our earnings will be used to provide working capital, to support our operations, and to finance the growth and development of our business, including potentially the acquisition of, or investment in, businesses, technologies or products that complement our existing business. The payment of dividends is within the discretion of the board of directors and will depend on our earnings, capital requirements, financial condition, prospects, applicable Delaware law, which provides that dividends are only payable out of surplus or current net profits, and other factors our board might deem relevant. There are no restrictions that currently limit our ability to pay dividends on our common stock other than those generally imposed by applicable state law.

**Securities Authorized for Issuance under Equity Compensation Plan**

On November 30, 2016, the Board of Directors of the Company adopted the 2016 Equity Incentive Plan (the "2016 Plan") that governs equity awards to our employees, directors, officers, consultants and other eligible participants. Under the 2016 Plan there are 10,000,000 shares of common stock reserved for issuance.

The types of awards permitted under the 2016 Plan include qualified incentive stock options and non-qualified stock options. Each option shall be exercisable at such times and subject to such terms and conditions as the Board may specify.

The Board of Directors has the power to amend, suspend or terminate the 2016 Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of our common stock reserved for issuance pursuant to incentive awards or reduces the minimum exercise price for options or exchange of options for other incentive awards, unless such change is authorized by our stockholders within one year.

**2016 Equity Compensation Plan Information as of December 31, 2018**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | | Weighted-average exercise price of outstanding options, warrants and rights | | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|---|---|
| | (a) | | (b) | | (c) |
| Equity compensation plans approved by security holders - 2016 Plan | $ | 300,000 | $ | 8.00 | 9,250,000 |
| Total | $ | 300,000 | $ | 8.00 | 9,250,000 |

As of December 31, 2018, options to purchase up to 750,000 shares of common stock have been granted under the 2016 Plan (450,000 expired in 2018) of which 300,000 shares of common stock are vested and exercisable. The following table summarizes information about stock options granted at December 31, 2018 under the 2016 Plan:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price | Outstanding | Weighted Average Remaining contractual life (in years) | Weighted Average Exercise Price | Exercisable | Weighted Average Exercise Price |
| $ 8.00 | 300,000 | 1.50 | 8.00 | 300,000 | 8.00 |

## CAPITALIZATION

The following table sets forth our consolidated capitalization, as of June 30, 2019, and on a pro forma basis giving effect to the sale of 2,500,000 shares of common stock by us in this offering at a public offering price of $4.00 per share after deducting the underwriting discounts and commissions and estimated offering expenses payable by us.

You should read the following table in conjunction with "*Use of Proceeds,*" "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and our financial statements and related notes included in this prospectus. The following table sets forth our cash and cash equivalents and capitalization as of June 30, 2019:

38

| | Actual | As Adjusted (1) |
|---|---|---|
| **Cash** | $ 34,381 | $ 6,536,141 |
| **Indebtedness due within one year** | $ 4,895,563 | $ 2,497,323 |
| **Total long term debt – net of current portion** | $ 1,559,309 | $ 1,559,309 |
| **Stockholders' equity:** | | |
| Common stock, $0.000001 par value, 90,000,000 shares authorized, 26,802,976 shares outstanding actual, 29,302,976 shares outstanding as adjusted | 27 | 29 |
| Preferred stock, $0.000001 par value, 10,000,000 shares authorized; 0 shares outstanding | — | — |
| Additional paid-in capital | 19,867,551 | 28,767,549 |
| Accumulated deficit | (22,238,609) | (22,238,609) |
| Total stockholders' equity | (2,371,031) | 6,528,969 |
| **Total capitalization** | $ 4,083,841 | $ 10,585,601 |

(1) Does not include: (a) shares issuable upon the exercise of the underwriter's option to purchase up to 375,000 additional shares of common stock; (b) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder Warrant; and (c) 300,000 shares of our common stock issuable upon exercise of granted and vested stock options granted under our 2016 Plan. Includes the repayment of $1,518,240 of notes payable.

## DILUTION

Purchasers of our common stock in this offering will experience an immediate and substantial dilution in the as adjusted net tangible book value of their shares of common stock. Dilution in as adjusted net tangible book value represents the difference between the public offering price per share and the as adjusted net tangible book value per share of our common stock immediately after the offering.

The historical net tangible book value of our common stock as of June 30, 2019 was $(2,371,031) or $(0.09) per share. Historical net tangible book value per share of common stock represents our total tangible assets (total assets less intangible assets) less total liabilities divided by the number of shares of common stock outstanding as of that date. On a pro forma basis, after giving effect to the sale of 2,500,000 shares in this offering at an initial public offering price of $4.00 per share for net proceeds of approximately $8.9 million, as if such offering had occurred at the end of June 30, 2019, our pro forma net tangible book value as of June 30, 2019 would have been approximately $6,528,969, or approximately $0.22 per share of our common stock. This represents an immediate increase in as adjusted pro forma, net tangible book value per share of $0.31 to the existing stockholders and an immediate dilution in as adjusted pro forma net tangible book value per share of $3.78 to new investors who purchase shares in the offering. The following table illustrates this per share dilution to new investors:

| | | |
|---|---|---|
| Public offering price per share | $ | 4.00 |
|   Historical net tangible book value per share as of June 30, 2019 | $ | (0.09) |
|   Increase in as adjusted pro forma net tangible book value per share attributable to the offering | | 0.31 |
|   Pro forma net tangible book value (deficit) per share as of June 30, 2019 | | 0.22 |
| Dilution in net tangible book value per share to new investors | $ | 3.78 |

After completion of this offering, our existing stockholders would own approximately 91.5% and our new investors would own approximately 8.5% of the total number of shares of our common stock outstanding after this offering, and before sales of any of the shares by the Selling Shareholders.

Sales of 150,000 shares of common stock by the Selling Shareholders in the offering covered by a separate prospectus (calculated using $4.00 per share price listed on the cover page of this prospectus and excluding the exercise of the warrants held the selling shareholders) will reduce the number of shares of common stock held by existing stockholders to approximately 91.0% of the total shares of common stock outstanding after this offering, and will increase the shares held by new investors to approximately 9.0% of the total shares of common stock outstanding after this offering.

To the extent that outstanding options or warrants are exercised and outstanding convertible notes are converted into common stock, you will experience further dilution. In addition, we may choose to raise additional capital due to market conditions or strategic considerations even if we believe we have sufficient funds for our current or future operating plans. To the extent that additional capital is raised through the sale of equity or convertible debt securities, the issuance of these securities may result in further dilution to our stockholders.

The following table summarizes, on an as adjusted basis as of June 30, 2019, the differences between the number of shares of common stock purchased from us, the total consideration and the average price per share paid by existing stockholders and by investors participating in this offering, after deducting estimated underwriting discounts and commissions and estimated offering expenses, at a public offering price of $4.00 as shown on the cover page of this prospectus.

**Capitalization Table**

| | Shares Purchased | | Total Consideration | | Per Share | |
|---|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | | |
| Existing stockholders | 26,802,976 | 91.47% | $(2,371,031) | (36.32)% | $ | (0.09) |
| New Investors | 2,500,000 | 8.53% | 8,900,000 | 136.32% | $ | 3.56 |
| | 29,302,976 | 100.00% | $ 6,528,969 | 100.00% | $ | 0.22 |

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Certain statements made in this prospectus are "forward-looking statements" regarding the plans and objectives of management for future operations. Such statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of the "Company" to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. The forward-looking statements included herein are based on current expectations that involve numerous risks and uncertainties. The Company's plans and objectives are based, in part, on assumptions involving the continued expansion of business. Assumptions relating to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Company. Although the Company believes its assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate and therefore, there can be no assurance the forward-looking statements included in this prospectus will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Company or any other person that the objectives and plans of the Company will be achieved. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" and in other parts of this prospectus. Our fiscal year ends on December 31.*

**Overview**

The Company was formed on June 21, 2016 under the name "*YayYo, LLC*," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities. The Company now operates as a "C" corporation formed under the laws of the State of Delaware.

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"). The Company operations are organized and consolidated into one reporting segment which encompasses the financial results of the Company's two business segments- (i) the Fleet Management business and (ii) the Rideshare Platform.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry away from the development of the Metasearch App. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

41

**Initial Public Offering**

On March 16, 2018, we closed our Regulation A+ offering under Regulation A of the Securities Act, which was qualified by the SEC on March 15, 2017. We sold a total of 365,306 shares of our common stock. We received cash proceeds of $1.8 million, net of commissions and other costs associated with the gross offering proceeds or payable by us.

**Factors Affecting Our Performance**

We believe that the growth of our business and our future success are dependent upon many factors, including our products, services and market leadership, and the success of our sales and marketing efforts, our expansion strategy, our investments for scale and growth. While each of these areas presents significant opportunities for us, they also pose important challenges that we must successfully address in order to sustain the growth of our business and improve our results of operations. The investments that we make in these areas may not result in increased revenue or the growth of our business. Accordingly, these investments may delay or otherwise impair our ability to achieve profitability. The timing of our future profitability will depend upon many variables, including the success of our growth strategies and the timing and size of investments and expenditures that we choose to undertake, as well as market growth and other factors that are not within our control. We have not yet determined when we expect to achieve profitability.

***Product and Market Leadership.*** We are committed to delivering market-leading products and services in the ridesharing economy to continue to build and maintain credibility with the growing customer base. We believe we must expand our product, services and market leadership position and strength of our brand to drive further revenue growth. We intend to continue to invest in the capabilities of our business segments and marketing activities to maintain our strong position in the ridesharing economy. Our results of operations may fluctuate as we make these investments to drive increased customer adoption and usage.

***Sales and Marketing.*** In order to maintain our efficient customer acquisition, we must maintain and expand our operating business segments, customer outreach and effectively generate additional sales to enterprises and customers across the United States. Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint in North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

***Expansion Strategy.*** We are focused on expanding our existing customers' use of our products, services and Rideshare Platform. We believe that there is a significant opportunity to drive additional sales to existing customers, and expect to invest in sales, marketing and customer support to achieve additional revenue growth from existing customers. We believe that the large numbers of drivers and fleet operators that we do and will do business with, create a "Network Effect" that enables us to scale the business, increase diversification and revenue and expand our strength as a potential market leader.

***Investments for Scale.*** As our business grows and as we continue our Rideshare Platform optimization efforts, we expect to realize cost savings through economies of scale. We manage our Fleet Management business segment to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment. As a result, we expect our gross margin to fluctuate from period to period.

**Results of Operations**

*Principles of consolidation*

The consolidated financial statements include the accounts of the Company, its wholly owned subsidiaries Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

**Total Revenues**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Revenue for the six months ended June 30, 2019 was $3,475,518, an increase of $2,438,103 or 235.0% compared to revenue for the six months ended June 30, 2018 of $1,037,415. The increase is due to us increasing our rental fleet over the comparable periods. During the six months ended June 30, 2019, the average weekly rental income per vehicle placed in service was $341 compared to $270 for the same period in 2018.

*Year Ended December 31, 2018 Compared to Year Ended December 31, 2017.*

Revenue for the 2018 fiscal year was $3,289,478. Revenue for the 2017 fiscal year was $235,690. The increase is due to us beginning to generate revenue from renting cars to Uber and Lyft drivers in August 2017. During the year ended December 31, 2018, the average weekly rental income per vehicle placed in service was $302 compared to $173 for the year ended December 31, 2017.

From June 21, 2016 (inception) to December 31, 2016, the Company was a pre-revenue development stage company purposed to commercialize the ridesharing industry through the development and distribution of our planned meta-search ridesharing mobile App. The Company generated no revenues from the Company's inception on June 21, 2016 until October 31, 2016. On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from the development of the Metasearch App. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management").

**Cost of Revenues**.

The principal components of costs of revenue are depreciation of the vehicles, vehicle insurance and maintenance.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Cost of revenues for the six months ended June 30, 2019 were $2,044,241, an increase of $1,316,617 or 181.9% compared to cost of revenues for the six months ended June 30, 2018 of $727,624. The increase is due to the increase in revenue as noted above. For the six months ended June 30, 2019 and 2018 our cost of revenue was 59% and 70% of our revenue, respectively.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Cost of revenues for the 2018 fiscal year were $2,374,397. Cost of revenues for the 2017 fiscal year were $213,111. The increase is due to the increase in revenue as noted above. In 2018 and 2017 our cost of revenue was 72% and 90% of our revenue, respectively.

**General and Administrative Expenses**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

General and administrative expenses for the six months ended June 30, 2019 were $1,460,811, representing a decrease of $2,512,104 or approximately 63.2% over the six months ended June 30, 2018 of $3,972,915. The decrease is principally due to lower stock compensation expense of $3,112,234 for 2018 compared to $0 for 2019 offset by higher payroll costs as we hired additional personnel for our expanding operations and higher occupancy costs.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

General and administrative expenses for the 2018 fiscal year were $6,584,251, representing an increase of $3,334,592 or approximately 102.6% over the 2017 fiscal year of $3,249,659. The increase is principally due to stock-based compensation for the 2018 fiscal year was $4,364,468 compared to $1,676,476 for the 2017 fiscal year and higher payroll costs as we hired additional personnel for our expanding operations and higher occupancy costs.

**Selling and Marketing Expenses**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Selling and marketing expenses for the six months ended June 30, 2019 were $102,606, representing an increase of $11,111 or approximately 12.1% over the same period in 2018. Selling and marketing expenses were $91,495 for the six months ended June 30, 2018. The increase is due to an increase in advertising our rentals to Uber and Lyft drivers.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Selling and marketing expenses for the 2018 fiscal year were $482,811, representing an increase of $396,713 or approximately 460.8% over the same period in 2017. Selling and marketing expenses were $86,098 for the 2017 fiscal year. In 2018 most of the selling and marketing expenses was spent on advertising our rentals to Uber and Lyft drivers.

**Impairment of leased assets**

Impairment of leased assets for the 2018 fiscal year was $2,388,000 compared to $2,800,000 for the 2017 fiscal year. The value of the leased assets was initially determined as the sum of the lease liability plus the up-front consideration of 298,500 and 350,000 shares of the Company's common stock (valued at $2,388,000 and $2,800,000) paid to the lessor during 2018 and 2017, respectively. There was no impairment of leased assets in the six months ended June 30, 2019 and 2018.

**Loss on the settlement of debt**

Loss on the settlement of debt for the six months ended June 30, 2019 was $252,900 as compared to $0 for the same period in 2018. During the months ended June 30, 2019, we settled outstanding debt of $421,500 with 84,300 shares of common stock valued at $674,000. There was no loss on the settlement of debt for the years ended December 31, 2018 and 2017.

**Interest expense, net**

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Interest and financing expenses for the six months ended June 30, 2019 were $611,875 compared to $380,872 for the same period in 2018. The increase in interest expense and financing costs is due to more interest bearing obligations outstanding during the six months ended June 30, 2019 period as compared to the same period in 2018.

*Year ended December 31, 2018 Compared to the Year ended December 31, 2017.*

Interest and financing expenses for the year ended December 31, 2018 were $4,639,442 compared to $192,395 for the same period in 2017. The significant increase in interest expense and financing costs is a result of amortization of debt discount. In September 2018, the Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of

$117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

44

**Total Operating Expenses**

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Total operating expenses for the six months ended June 30, 2019 were $1,816,317, representing a decrease of $2,257,792 or approximately 55.4% over the same period in 2018. For the six months ended June 30, 2018, total operating expenses were $4,074,109. The decrease is due to the reasons described above.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Total operating expenses for the 2018 fiscal year were $9,464,761, representing an increase of $3,025,449 or approximately 47.0% over the same period in 2017. For the 2017 fiscal year, total operating expenses were $6,439,312. The increase is due to the reasons described above.

**Net Loss**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

The net loss for the six months ended June 30, 2019 was $996,915, representing a decrease of $3,148,275 or approximately 76.0% over the same period in 2018. For the six months ended June 30, 2018, the net loss was $4,145,190.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

The net loss for the 2018 fiscal year was $13,189,122, representing an increase of $6,620,259 or approximately 100.8% over the same period in 2017. For the 2017 fiscal year, the net loss was $6,568,863.

**Liquidity, Capital Resources and Plan of Operations**

*Current Assets, Liabilities and Working Capital*

At June 30, 2019, the Company's current assets totaled $245,093, current liabilities totaled $5,886,359, and working capital was a deficit of $5,641,266. At December 31, 2018, the Company's current assets totaled $386,344, current liabilities totaled $5,394,073, and working capital was a deficit of $5,007,729. As of December 31, 2017, the Company's current assets totaled $322,144, current liabilities totaled $941,054, and working capital was a deficit of $618,910.

Regarding current liabilities, the amounts categorized as accounts payable and accrued expenses totaled $1,043,210 and $1,213,452 as of June 30, 2019 and December 31, 2018, respectively, a decrease of $170,242 or approximately 14%. Regarding current liabilities, the amounts categorized as accounts payable and accrued expenses totaled $1,213,452 and $131,453 as of December 31, 2018 and December 31, 2017, respectively, an increase of $1,081,999 or approximately 823%.

*Capital Expenditures*

During the six months ended June 30, 2019, the Company had capital expenditures of $510,136 in leased vehicles. At June 30, 2019, all of the Company's leased assets were finance leased right-of-use assets and, net of accumulated depreciation in the amount of $1,067,878 for the six months ended June 30, 2019, totaled $4,758,110 in net leased assets. The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. The lease terms are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

During the year ended December 31, 2018, the Company had capital expenditures in the amount of $3,703,514. $2,840 in computer equipment and $3,700,674 in leased vehicles. At December 31, 2018, all of the Company's leased assets were finance leased right-of-use assets and, net of accumulated depreciation in the amount of $546,632 for fiscal year 2018, totaled $5,115,117 in net leased assets.

During the year ended of December 31, 2017, the Company had capital expenditures in the amount of $2,119,246. $3,178 in computer equipment and $2,116,068 in leased vehicles, subject to adjustment. At December 31, 2017, all of the Company's leased assets were finance leased right-of-use assets and, net of accumulated depreciation in the amount of $82,586 for fiscal year 2017, totaled $2,033,482 in net leased assets.

**Statement of Cash Flows**

*Cash Flows from Operating Activities – Six Months Ended June 30, 2019 Compared to the Six Months Ended June 30, 2018.*

Net cash used in operating activities for the six months ended June 30, 2019 totaled $60,370, which was a decrease of $427,246 or approximately 88% from the net cash used in operating activities of $487,616 for the same period in 2018.

*Cash Flows from Operating Activities - Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Net cash used in operating activities for the fiscal year ended December 31, 2018 totaled $424,156, which was a decrease of $1,427,967 or approximately 77% from the net cash used in operating activities of $1,852,123 for the same period in 2017.

45

*Cash Flows from Investing Activities - Six Months Ended June 30, 2019 Compared to the Six Months Ended June 30, 2018.*

Net cash used in investing activities for the six months ended June 30, 2019 totaled $0, which was a decrease of $2,840 or 100% from the net cash used in investing activities of $2,840 for the same period in 2018.

*Cash Flows from Investing Activities - Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Net cash used in investing activities for the fiscal year ended December 31, 2017 totaled $2,840, which was a decrease of $338 or approximately 11% from the net cash used in investing activities of $3,178 for the same period in 2017.

*Cash Flows from Financing Activities - Six Months Ended June 30, 2019 Compared to the Six Months Ended June 30, 2018.*

Net cash used in financing activities for the six months ended June 30, 2019 totaled $182,693, which was a decrease of $6,550,915 from the net cash provided by financing activities of $6,318,222 for the same period in 2018.

*Cash Flows from Financing Activities - Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Net cash provided by financing activities for the fiscal year ended December 31, 2018 totaled $395,702, which was a decrease of $1,749,694 or approximately 82% from the net cash provided by financing activities of $2,145,396 for the same period in 2017.

### Current Plan of Operations

Our plan of operations is currently focused on the development of our operating business segments: (i) our Rideshare Platform offered through the Company's wholly-owned subsidiary Rideshare, and (ii) our Fleet Management business, made commercially available through the Company's wholly-owned subsidiary Distinct Cars. We expect to incur substantial expenditures in the foreseeable future for the potential operations of our business segments and ongoing internal research and development. At this time, we cannot reliably estimate the nature, timing or aggregate amount of such costs. Our Rideshare Platform will require extensive technical evaluation, potential regulatory review and approval, significant marketing efforts and substantial investment before it or any successors could provide us with any revenue. Further, we intend to continue to build our corporate and operational infrastructure and to build interest in our product and service offerings.

As noted above, the continuation of our current plan of operations requires us to raise significant additional capital immediately. If we are successful in raising capital, we believe that the Company will have sufficient cash resources to fund its plan of operations. The cash flow from our current vehicle leasing business and capital resources are sufficient for us to continue our current operations, but for us to fully execute our business plan we will require significant additional capital.

We continually evaluate our plan of operations discussed above to determine the manner in which we can most effectively utilize our limited cash resources. The timing of completion of any aspect of our plan of operations is highly dependent upon the availability of cash to implement that aspect of the plan and other factors beyond our control. There is no assurance that we will successfully obtain the required capital or revenues, or, if obtained, that the amounts will be sufficient to fund our ongoing operations. The inability to secure additional capital would have a material adverse effect on us, including the possibility that we would have to sell or forego a portion or all of our assets or cease operations. If we discontinue our operations, we will not have sufficient funds to pay any amounts to our stockholders.

Even if we raise additional capital in the near future, if our operating business segments fail to achieve anticipated financial results, our ability to raise additional capital in the future to fund our operating business segments would likely be seriously impaired. If in the future we are not able to demonstrate favorable financial results or projections from our operating business segments, we will not be able to raise the capital we need to continue our then current business operations and business activities, and we will likely not have sufficient liquidity or cash resources to continue operating.

Because our working capital requirements depend upon numerous factors there can be no assurance that our current cash resources will be sufficient to fund our operations. At present, we have no committed external sources of capital, and do not expect any significant product revenues for the foreseeable future. Thus, we will require immediate additional financing to fund future operations. There can be no assurance, however, that we will be able to obtain funds on acceptable terms, if at all.

*Credit Facilities*

As of December 31, 2018, the Company had notes payable consisting of the following: (i) $790,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of August 31, 2019; (ii) $319,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to May 23, 2021; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of August 31, 2019, as subsequently amended to November 30, 2019; (iv) $1,296,018 in a secured note payable due the earlier of August 31, 2019, as subsequently amended to November 30, 2019, or the closing of an offering of at least $3,000,000 and (v) $62,274 in unsecured notes payable/line of credit to a merchant banks, accruing interest at 15%. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

As of December 31, 2017, the Company had notes payable consisting of the following: (i) $445,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of August 31, 2019; (ii) $242,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to December 11, 2020; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of August 31, 2019, as subsequently amended to November 30, 2019. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

*Bellridge Second Note Offering*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Bellridge Capital, L.P. (the "Selling Securityholder"), an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased:

- a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note");

- warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant"); and

- 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares").

In consideration for the Second Note, Warrant Shares and Commitment Shares, the Lender paid an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below).

The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note. The Second Note was repaid/rolled into a secured note payable in September 2018.

The Company believes that as of the date of this prospectus, the Company is in compliance with all of the foregoing restricted covenants, including such additional covenants set forth under Second Note. Further, the Company believes that as of the date of this prospectus, the Company is in compliance with all affirmative covenants set forth below.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and restrictive financial covenants, including, but not limited to, the following restrictive covenants:

- The Company will not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, incur or guarantee, assume or suffer to exist any indebtedness (other than (i) the Indebtedness evidenced by the Second Note and the First Note and (ii) other Permitted Indebtedness). Under the terms of the Second Note, "Permitted

Indebtedness" means (i) indebtedness evidenced by the Second Note and the First Note, (ii) indebtedness secured by permitted liens or unsecured indebtedness and (iii) permitted subordinated indebtedness;

47

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on any of its capital stock;

- At any time a Defeasance Failure exists (defined below), the Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, permit any indebtedness of the Company or any of its subsidiaries to mature or accelerate prior to the maturity date of the Second Note. "Defeasance Failure" means, as of any given time of determination, the failure of the cash amount in the Holder Master Restricted Account to be greater than or equal to the outstanding amount. "Holder Master Restricted Account" means, solely with respect to the holder, a certain account at Umpqua Bank, or such other account as may be directed by the holder of the Second Note, from time to time, subject to a Controlled Account Agreement in favor of the holder in a form reasonably acceptable to the holder; and

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by or publicly contemplated to be conducted by the Company and each of its subsidiaries on March 8, 2018 or any business substantially related or incidental thereto. The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, modify its or their corporate structure or purpose.

For more information on the terms and conditions of the Bellridge Second Note Offering please see "*Description of Securities*."

## Contractual Obligations, Commitments and Contingencies

During fiscal year 2017 and 2018 and the six months ended June 30, 2019, the Company entered into a series of monthly vehicle leasing agreements with Acme Auto Leasing. As of June 30, 2019, December 31, 2018 and December 31, 2017, the Company has total lease obligations in the amount of $3,221,785, $3,790,147 and $1,593,291, respectively, (collectively, the "Finance Lease Obligations"). The Company owes monthly payments under each Lease Agreement ranging from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to and secured by a grant of a purchase money security interest on each leased vehicle.

During fiscal year 2018 and 2017, we leased and maintained primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210 and 6600 Sunset Blvd., Los Angeles, CA 90028, the latter being the location where the majority of our operations and staff conduct activities on a daily basis. We do not currently own any real property.

*Financings and Securities Offerings*

*YayYo, Inc., Equity Offerings*

In December 2016, we filed an offering statement pursuant to Regulation A of the Securities Act, which was qualified by the SEC on March 17, 2017. We offered up to a maximum of 6,250,000 shares of common stock on a "best efforts" basis, at a price of $8.00 per share. On March 16, 2018, we closed the Regulation A offering, after issuing 365,306 shares of common stock for proceeds of approximately $1.8 million net of offering expenses (the "Regulation A+ Offering").

During the year ended December 31, 2018, the Company sold 46,330 shares of common stock to two investors for cash proceeds of $307,924.

During the year ended from December 31, 2017, the Company sold 371,351 shares of common stock to investors for gross cash proceeds of $2,484,199 of which 326,126 shares and $2,303,299 of cash proceeds were related to the Company's Regulation A offering. The Company incurred $814,442 of offering cost related to the sale of common stock which consisted principally of legal fees and costs associated with soliciting the sale of common stock directly to the Regulation A+ Offering investors.

During fiscal year 2017 and 2018 and the six months ended June 30, 2019, the Company entered into a series of monthly vehicle leasing agreements with Acme Auto Leasing LLC (the "Lessor"). As of June 30, 2019, December 31, 2018 and December 31, 2017, the Company has total lease obligations in the amount of $3,221,785, $3,790,147 and $1,593,291, respectively (collectively, the "Finance Lease Obligations").

On July 15, 2017, the Company and the Lessor entered into an agreement pursuant to which the Company agreed to issue additional consideration to the Lessor in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company (the "Lease Side Agreement").

From June 21, 2016 (inception) to December 31, 2016, the Company raised an additional $175,400 from the funds subscribed to under SAFE agreements with 28 unaffiliated investors. In addition, between December 2016 and January 17, 2016, we received subscriptions for $175,400 of our SAFE Shares from 28 investors in our Rule 506(b) private placement under Regulation D of the Securities Act, that, by their terms, automatically convert into 43,850 shares of our common stock as of the filing of this Prospectus (at a conversion price of $4.00 per share). We terminated such private placement on January 17, 2017. On March 17, 2017 our SAFE Shares were automatically converted into 43,850 shares of our common stock.

*Selling Securityholder Transactions*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, in the original principal amount of $222,222 (the "First Note"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired.

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares of common stock, with an exercise price of $4.00 per share and 150,000 commitment shares of common stock, of the Company (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Warrants expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The Company also paid $178,228 of issuance costs associated with this Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

*Distinct Cars, LLC*

As of the date of this Prospectus, Distinct Cars, LLC, as lessee, entered into a series of open-ended lease agreements and disclosure statements with Acme Auto Leasing, Inc., ("Lessor") to lease standard passenger vehicles, each with an approximate lease term of 30 to 36 months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

Distinct Cars, LLC has completed a debt round of financing pursuant to which Distinct Cars raised aggregate gross proceeds in the amount of $319,667 from 38 accredited investors in exchange for senior secured promissory notes issued by Distinct Cars (each a "Distinct Cars Note" and collectively, the "Distinct Cars Notes"). The maturity date under the Distinct Cars Notes is 36 months from the date of issuance (the "DCN Maturity Date") ranging from August 9, 2020 to May 23, 2021. The principal amount under the Distinct Cars Notes ranges from a minimum amount of $5,000 per Distinct Cars Note up to $20,000 per Distinct Cars Note. The Distinct Cars Notes accrue interest at a rate of 8% per annum with interest due and payable upon the DCN Maturity Date. The principal amount and any unpaid and accrued interest thereunder is due and payable in twelve quarterly installments commencing upon January 1, 2018. The Distinct Cars Notes are secured by a senior secured priority lien in the equity of the fleet of leased automobiles acquired under the Lease Agreements described above subject to subordination in priority lien status to the purchase money security interest held by the lessor under the Lease Agreements. In addition to the total amount of principal and interest owing under the Distinct Cars Note, upon execution of the Distinct Cars Note and placement of funds the holder received a stock grant (the "Stock Grant") of YayYo Inc., common stock (the "Parent Shares") in an amount equal to 100% of the principal sum as calculated by a price of $4.00 per share with 30% coverage. The Stock Grant is offered pursuant to Rule 506(b) of Regulation D and Section 4(a)(2) of the Securities Act of 1933.

*X, LLC*

During the fiscal year ended December 31, 2017 and the periods from June 21, 2016 (inception) to December 31, 2016, X, LLC, a limited liability company owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, issued to the Company advances of a total of $50,000 and $75,000. As of December 31, 2017, $125,000 of these loan advances were repaid in full. The loan advances were non-interest bearing and due upon demand. At December 31, 2017 and December 31, 2016, the amount due to X, LLC, as holder of the note was $0 and $75,000, respectively.

*Chase Financing, Inc.*

On January 6, 2017, the Company received $50,000 from Chase Financing, Inc., ("CFI") and issued its 10% original issue discount senior secured convertible note in the amount of $55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017, the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note"). Subsequent to the Second CFI note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms.

Pursuant to the terms, the CFI Notes were secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and were convertible at the option of the holder into shares of our common stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our common stock during the 20 trading days immediately prior to the date of conversion. In an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI notes by the Company, Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, and X, LLC (an entity wholly owned by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge Agreement with CFI (the "Guaranty and Pledge Agreement"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our common stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty and Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a common stock purchase agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our common stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of $1.00. Under the Stock Purchase Agreement, and in addition to the 200,000 shares of common stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our common stock, held as of record and beneficially by X, LLC, equal to 2% of the number of shares of common stock issued or underlying common stock Equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial three months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three months. As of December 31, 2017, the CFI Notes have been repaid in full by the Company.

Since inception, our principal sources of operating funds have been proceeds from equity financing including the sale of our common stock to initial investors known to management and principal shareholders of the Company. We do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. If the Company is unable to raise sufficient additional funds, it will have to execute a slower than planned growth path, reduce overhead and scale back its business plan until sufficient additional capital is raised to support further operational expansion and growth. As of December 31, 2018, the Company has $277,444 in cash. The Company used $424,156 of cash for operating activities for the year ended December 31, 2018. With the addition of approximately 50 new vehicles during the last half of 2018, the Company believes that based on its current operations, it will have sufficient cash available for current operations through at least December 2019.

**Off-Balance Sheet Arrangements**

The Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. As of December 31, 2017, the convertible note has been repaid and there is no derivative financial instrument.

**Segment Information**

*Quantitative and Qualitative Disclosures about Market Risk*

In the ordinary course of our business, we are not exposed to market risk of the sort that may arise from changes in interest rates or foreign currency exchange rates, or that may otherwise arise from transactions in derivatives.

*Critical Accounting Policies and Estimates*

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. Preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable. In many instances, we could have reasonably used different accounting estimates and in other instances changes in the accounting estimates are reasonably likely to occur from period to period. Actual results could differ significantly from our estimates. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving our judgments and estimates.

*Revenue Recognition*

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

We consider a signed contract or other similar documentation reflecting the terms and conditions under which products will be provided to be persuasive evidence of an arrangement. Collectability is assessed based on a number of factors, including payment history and the creditworthiness of a customer. If it is determined that collection is not reasonably assured, revenue is not recognized until collection becomes reasonably assured, which is generally upon receipt of cash.

*Stock-Based Compensation*

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees.

52

We account for stock-based compensation in accordance with the authoritative guidance on stock compensation. Under the fair value recognition provisions of this guidance, stock-based compensation is measured at the grant date based on the fair value of the award and is recognized as expense, net of estimated forfeitures, over the requisite service period, which is generally the vesting period of the respective award. As a result, we are required to estimate the amount of stock-based compensation we expect to be forfeited based on our historical experience. If actual forfeitures differ significantly from our estimates, stock-based compensation expense and our results of operations could be materially impacted.

For options granted during fiscal year 2016 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.85 and the weighted-average exercise price of such options was $1.00. No options were granted during fiscal 2016 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

For options granted during fiscal year 2017 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $7.54 and the weighted-average exercise price of such options was $8.00. No options were granted during fiscal 2017 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

The fair value of the stock options is being amortized to stock option expense over the vesting period. The Company recorded stock option expense of $904,468 and $1,676,476, respectively, during the year ended December 31, 2018 and the year ended December 31, 2017. As of December 31, 2018, the unamortized stock option expense was $0.

The assumptions used in calculating the fair value of options granted using the Black-Scholes option- pricing model for options granted are as follows:

| | |
|---|---|
| Risk-free interest rate | 1.14% |
| Expected life of the options | 2.08 years |
| Expected volatility | 200% |
| Expected dividend yield | 0% |

## Contingencies

Certain conditions may exist as of the date the financial statements are issued, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company's management, in consultation with its legal counsel as appropriate, assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company, in consultation with legal counsel, evaluates the perceived merits of any legal proceedings or unasserted claims, as well as the perceived merits of the amount of relief sought or expected to be sought therein. If the assessment of a contingency indicates it is probable that a material loss has been incurred and the amount of the liability can be estimated, then the estimated liability would be accrued in the Company's financial statements. If the assessment indicates a potentially material loss contingency is not probable, but is reasonably possible, or is probable, but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss, if determinable and material, would be disclosed. Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed.

## BUSINESS

## Corporate History

The Company was formed on June 21, 2016 under the name "*YayYo, LLC,*" which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC, to the Company in exchange for common stock, par value $0.000001 per share, of the Company. All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities upon the filing of the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "C" corporation formed under the laws of the State of Delaware.

Our mailing address is YayYo, Inc., 433 North Camden Drive, Suite 600, Beverly Hills, California 90210 and our telephone number is (310) 926-2643. Our website address is *www.yayyo.com*. The information contained therein or accessible thereby shall not be deemed to be incorporated into this Prospectus.

## Business Overview

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"). Until June 30, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" application for smartphone users that seeks to provide price comparison and bookings of available ridesharing and taxi services along with select limousine and other public and/or private transportation services ("Metasearch App").

As of the date of this Prospectus, the Company had completed the development of the Rideshare marketplace Metasearch App. Due to partner limitations and other rationale, the Company has no further intention to continue the development or marketing of the Metasearch App.

On August 12, 2017, we announced that we were shifting our corporate focus in the transportation/ridesharing industry from being an exclusive provider of transportation networks systems towards a more diversified operating company with a direct focus on the vehicle rental business and a related transportation network. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicle to drivers in the ridesharing economy.

## Rideshare Rental E-Commerce Platform

On October 31, 2017, the Company created the wholly-owned subsidiary, Rideshare to incubate the concept of Rideshare Platform, a proprietary, rideshare vehicle booking platform to rent standard passenger vehicles to self-employed ridesharing drivers. The Company has now deployed and launched the Rideshare Platform on the Company's e-commerce website. Further, the Rideshare Platform also commercially markets the Company's own fleet of cars as well as other fleet owners and selected individual car owners. The Rideshare Platform bookings service provides all standard passenger car owners with a financial opportunity to monetize personally owned vehicles by renting them out to ridesharing economy drivers. Our business strategy with our operating Rideshare Platform is to continue developing our brand around becoming the TNC vehicle rental network for the ridesharing economy that matches the owners and/or operators of passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing economy drivers. The Company initially launched the Rideshare Platform in Los Angeles, CA and has since launched in three additional cities.

54

The Rideshare Platform leverages technology to connect the owners and/or operators of standard passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing drivers. The platform's functionality provides ridesharing drivers with access to certain data emitted from their respective Company rental vehicle(s) through a personal Rideshare rental dashboard. Vehicle owners can also access and manage data emitted from their personal vehicle(s) under rental to a third-party from the Rideshare Platform inventory dashboard and can further manage the other aspects of the vehicle rental transaction through the Rideshare Platform. Further, customers renting vehicles on the Rideshare Platform can also access rental extension options through the Rideshare Platform. All transactional aspects of the rental vehicle(s) (including, but not limited to, background checks, terms, deposits and insurance costs) are run securely through the Rideshare Platform. In addition, our Rideshare website located at *www.ridesharerental.com* not only effectively monetizes Company-owned vehicle fleets, made available under our Fleet Management business, but also generates revenue by charging transactional fees to other vehicle owners and ridesharing economy drivers for all rental transactions consummated on the Rideshare Platform. The Rideshare Platform is available on desktop, iOS and Android devices. The development and functionality of our mobile applications are a material component to our business as drivers are more likely to transact via mobile devices.

Most importantly, all standard passenger vehicles made available on the Rideshare platform are fully qualified by the Company and guaranteed to meet the necessary Ridesharing Qualification Requirements imposed on ridesharing economy drivers by the private ridesharing TNCs. The Company mission seeks to put more prospective ridesharing drivers on roadways by providing ridesharing drivers with fully inspected vehicle offerings that are guaranteed to meet the Ridesharing Qualification Requirements.

Further, the Company's car liability and physical damage insurance policies ("Company Insurance Policies") cover both third-party vehicle owners as well as ridesharing drivers under rental contract. The Company Insurance Policies provide insurance on all listed Rideshare rental vehicles, provided that the Company Insurance Policy coverage is suspending during periods when the ridesharing driver under rental contract with the Company is actively operating on either the Uber or Lyft platform. During these periods when ridesharing drivers are actively operating Rideshare rental vehicles on either the Uber or Lyft platforms, coverage under the Company Insurance Policies are subordinate to the vehicle insurance coverage provided by Uber, Lyft or such other TNCs.

The Company believes that due to the development of the ridesharing economy and its anticipated growth trajectory, the commercial ridesharing economy market will reward the Company as an early entrant to the third-party vehicle rental business. Under the Rideshare Platform we intend to become the go-to booking destination and brand for ridesharing economy vehicle rentals in a TNC marketplace that connects owners and/or operators of standard passenger vehicles with ridesharing economy drivers. We believe that our product and service offerings on the Rideshare Platform will continue to be an attractive proposition for all ridesharing economy drivers either simply requiring a standard passenger vehicle to operate or otherwise struggling to qualify their personal vehicles under the Vehicle Inspection Requirements. Further, we believe that the Company will require additional capital investment to continue funding Rideshare, the Rideshare Platform or *www.ridesharerental.com*, including technology, payments and advertising, for purposes of continuing to develop and scale the Rideshare Platform and business. Further, we believe there is an immediate opportunity and necessity to grow and scale the Rideshare Platform in new geographical territories for purposes of developing and strengthening the Company's brand and competitive advantage in the ridesharing economy vehicle rental market. For more information see "*Risk Factors*."

*Insurance Policy*

As of the date of this Prospectus, the Company together with a Managing General Underwriter ("MGU") maintains an insurance policy on behalf of the Company. Under the policy the MGU will handle all back-end insurance generation and processing through an API connection with the Company's databases. We believe that this MGU insurance policy has made it possible for us to launch our Rideshare Platform, which will also allow the Company to have other third-party fleet owners supply vehicles to drivers through our platform and have them covered under the terms of our insurance policy. Our insurance policy provides physical damage and liability coverage to all rideshare drivers and fleet owners under the Rideshare Platform. Under the terms of our policy, ridesharing drivers acquiring rental vehicles under our Rideshare Platform as well as owners of the rental vehicles are provided with an insurance ID card that lists each parties name and the vehicle VIN number. Further, customers to our Rideshare Platform pay daily (for the duration of the rental period) to become designated as a supplemental insured party under the Company's insurance policy. Under the terms of our policy, insurance coverage is valid from the date of commencement of the rental period up until the date that the vehicle is returned.

*Ambassador Referral Program*

The Company has further enhanced the monetization of the Rideshare Platform by creating and deploying the Rideshare Rental Ambassador program. Drivers renting cars from our Rideshare Platform can join the Ambassador program and refer other potential drivers and prospective customers to rent from the Rideshare Platform, providing our customers with additional income opportunities. The Company has designed and deployed a referral commissions team matrix that allows for both depth and breadth of commissionable referrals for the participating driver. As participating drivers add additional referred drivers to their down line, they progress in gaining additional levels of commission rewards. Eventually they are able to earn a free vehicle rental from Rideshare as a premium reward. This program requires that the driver continues to rent their vehicle from Rideshare in order to continue receiving commissions from other drivers' rentals under the Ambassador's down line. For further details on our Ambassador Referral Program, please visit *www.Ridesharerental.com/company/ambassador-program-terms-conditions*.

**Fleet Management Business**

On June 10, 2017, the Company formed the wholly-owned subsidiary, Distinct Cars, for purposes of developing a fleet management business. The Company's Fleet Management business maintains a fleet of brand new standard passenger vehicles to be subsequently rented directly to drivers in the ridesharing economy through the Rideshare Platform. The Company's fleet of vehicles, under lease contract and maintained by Distinct Cars, as well as other third-party vehicles will be made commercially available for rental bookings on the Rideshare Platform as well as on other third-party e-commerce booking platforms and/or through strategic partnerships and relationships. The Company seeks to provide drivers in the ridesharing economy with full-service vehicle rentals and fleet contract maintenance solutions for commercial standard passenger vehicles.

The Company's material operations for the Fleet Management business are primarily conducted in the State of California. As a provider of comprehensive, integrated vehicle rental and fleet management solutions, the Fleet Management business markets and manages short and long-term vehicle rentals to ridesharing economy drivers located in Los Angeles County.

The Company is focused on operating, developing and investing in its vehicle rental business with a focus on marketing directly to the peer-to-peer car sharing and ridesharing industry professionals. The Company is capable of meeting customers' needs, including, but not limited to a guaranty that all vehicles maintained under the Fleet Management business will comply with and pass the Ridesharing Qualification Requirements. Our Fleet Management product and service offering includes full-service vehicle rental(s) and contract maintenance, along with distribution center management and transportation management service. As of the date of this Prospectus, the Company's customer base is primarily ridesharing drivers located within Los Angeles County that are operating and performing driving services on behalf of a host of the private ridesharing TNCs (primarily Lyft and Uber). While our Fleet Management business is primarily concentrated within the State of California, Los Angeles County, the Company intends to expand our Fleet Management services and product offerings nationally.

In August 2017, following our announcement that we were shifting our primary corporate operations, we entered into a leasing arrangement for an initial group of twelve vehicles, with the intent of testing our fleet management concept within the ridesharing industry. Following the Company's proof on concept period, we expanded our Fleet Management business in December 2017 by adding an additional 135 vehicles to our fleet of vehicles. As of the date of this Prospectus, our full-service vehicle rental and contract maintenance under our Fleet Management segment is the Company's main operating line of business and primary revenue generating business segment. As of June 30, 2019, the Company Fleet Management business manages a fleet of approximately 347 vehicles under lease contract. During fiscal year 2017, professional ridesharing drivers contracted with private ridesharing TNCs for vehicle rental periods generally ranging from less than three days to six months. The rental vehicles made commercial available to customers by the Company are configured and guaranteed to be compliant with the Vehicle Inspection Requirements imposed on ridesharing vehicles by the private ridesharing TNCs (specifically, Uber and Lyft).

56

The Company believes that customers will rent vehicles offered by our Fleet Management business in order to reduce the complexity, cost and total capital associated with vehicle ownership. Further, we believe that due to our market focus on the ridesharing industry and the additional imposition of the Ridesharing Qualification Requirements imposed on ridesharing vehicles by the dominant private ridesharing TNCs, customers will be further incentivized to rent our Fleet Management vehicles to guarantee compliance with the Ridesharing Qualification Requirements.

Under a full-service rental agreement, the Company provides and fully maintains the vehicle, which is generally specifically configured to meet the Ridesharing Qualification Requirements.

*Fleet Management Software*

The Company has been an early adopter of technologies to leverage the Fleet Management business. To ensure that the Company's fleet of vehicles meet and comply with the Ridesharing Qualification Requirements and transmit relevant data our customers, the Company has fit its Fleet Management vehicles with fleet management GPS solution software, providing open platform fleet management solutions to businesses of all sizes. These full-featured solutions help the Company manage their drivers and vehicles by extracting accurate and actionable intelligence from real-time and historical location trip data. The telematics solutions for fleet optimization provide our Fleet Management vehicles with fitted software analytics and data involving (i) fuel efficiency; (ii) management of vehicle maintenance and (iii) prevention of vehicle wear and tear.

**Commercial Partnership Programs**

The Company has become a member of a commercial partnership program with Hyundai USA, a subsidiary of the Hyundai Motor Group. Hyundai provides and sells its vehicles in the United States through its subsidiary Hyundai USA (collectively, "Hyundai").

In June of 2017, the Company joined a commercial partnership program hosted by Hyundai as a commercial partnership member for purposes of developing the Company's Fleet Management segment. Under the terms of the Hyundai partnership program, Hyundai will extend special pricing of fleet vehicles to program members to be subsequently sold to the Company through selected Hyundai dealerships. The Company believes that the Hyundai commercial fleet management program will provide the Company with competitive pricing options on all purchases for brand-new Hyundai vehicles under lease and priority status on the availability and delivery of all Hyundai vehicles to be made through selected Hyundai dealerships. The Company's status as a commercial partnership member with Hyundai under the commercial fleet management program is a non-exclusive and non-binding arrangement between Hyundai and the Company.

The Hyundai vehicles to be purchased under the Hyundai fleet management program and delivered through dealerships are being financed and leased to the Company by ACME Auto Leasing. Under the Company's leasing agreements with ACME Auto Leasing, the Company acquires the right to title and possession of the Hyundai vehicles under a standard three-year leasing agreement with ACME Auto Leasing, LLC, in exchange for competitive pricing under all leases, with a $1 optional residual purchase at the end of the three-year lease term. Further, in exchange for attractive pricing from ACME Auto Leasing, LLC, on all leased Hyundai vehicles the Company has granted 350,000 shares of common stock to ACME Auto Leasing, LLC, under the terms of a Side Agreement.

The Company believes that availability of the Hyundai commercial partnership program is a key relationship for the Company's continuing operations. Any termination or suspension of our membership to the Hyundai commercial partnership program may potentially result in increases to the Company's cost of revenue which may have a material impact on the Company's operating expenses. For more information please see the section entitled "*Risk Factors*."

**The Ridesharing Industry**

At the most basic level, real-time ridesharing is a service that arranges one-time shared rides on short notice. Traditionally, ridesharing arrangements between two or more unrelated individuals for commuting purposes have been relatively inflexible, long-term arrangements. These commuting arrangements will establish reasonably fixed departure time schedules and driving responsibilities. The complexity of work and social schedules and the perceived increase in vehicle trip complexity, such as trip chaining, has made this type of commuting arrangement much less desirable. "*Real-time*" ridesharing attempts to provide added flexibility to ridesharing arrangements by allowing drivers and passengers to partake in occasional shared rides. The internet-connected, global positioning system ("GPS") enabled device automatically detects your current location, takes the home location that you have programmed in previously and searches the database for drivers traveling a similar route and willing to pick up passengers. According to Wikipedia.org, "*real-time*" ridesharing is defined as "*a single, or recurring ridesharing trip with no fixed schedule, organized on a one-time basis, with matching of participants occurring as little as a few minutes before departure or as far in advance as the evening before a trip is scheduled to take place*".

A number of TNCs located in San Francisco premiered apps for real-time ridesharing in early 2010. Several TNCs were introduced that were advertising as ridesharing, but in fact dispatched commercial operators similar to a taxi service. Transportation industry experts have frequently referred to these services as "*ridesourcing*" to clarify that drivers do not share a destination with their passengers. Rather, the "*ridesourcing*" app simply outsources rides to available commercial drivers. In 2013 an agreement was reached with California Public Utilities Commission creating a new category of service called "*Transportation Network Companies*" or "*TNCs*" to cover both real-time and scheduled ridesharing companies. Transportation Network Companies have faced regulatory opposition in many other cities, including Los Angeles, Chicago, New York City, and Washington, D.C, among others.

"*Ridesharing*" has been controversial, variously criticized as lacking adequate regulation, insurance, licensure, and training. One of the main so-called ridesharing (but actually ridesourcing) firms, Uber, was banned in Berlin and a number of other European cities. Opposition may also come from taxi companies and public transit operators because they are seen as alternatives. Early real-time ridesharing projects are believed to have begun in the 1990s, but they faced obstacles such as the need to develop a user network and a convenient means of communication. Gradually the means of arranging the ride shifted from telephone to internet, email, and smartphone; and user networks were developed around major employers and universities. As of 2006, the goal of taxi-like responsiveness still generally eluded the industry; "*next day*" responsiveness was generally considered the state of the art.

The term "*ridesharing*" was starting to become a misnomer, they are a lot more like successful private cab or taxi businesses that cater to a smartphone-toting clientele and actively rival traditional cab or taxi companies and having reliable and affordable door-to-door transportation in general can help expand car-free living. Given the fast rise of smartphone adoption globally, ridesharing's success doesn't come as a surprise. But there are many reasons why customers prefer to book those services versus taxis. Among those are a clear overview of pricing prior to booking, the ease and convenience of "*one-tap*" rides, the ability to monitor and follow drivers on map displayed on the user's smartphone, the convenience of a cashless transaction, fare splitting, and feedback options. The premier and probably most well know ridesharing service, Uber, was born when its founders became annoyed that they could not get a taxi in Paris. By eliminating the antiquated taxi dispatch system through technology (call and book taxi, call to request driver's location, call when taxi doesn't arrive), the founders of Uber created an innovative technology alternative to the traditional taxi dispatch system that has been widely adopted by users worldwide. By eliminating a key piece of the supply chain and streamlining efficiencies for the users, Uber was able to completely disrupt a century-old taxi industry. In essence, Uber and Lyft are really the two companies that dominate the market and Uber so far has won across the board: access, driver experience, customer experience, brand and funding.

58

The growth of the ridesharing economy has resulted in increasing consumer demand for ridesharing services, provided by Transportation Network Companies ("TNCs") such as Lyft, Gett and Uber, that offer a ridesharing economy service through mobile applications.

Ridesharing apps connect people who need a ride with people who have a vehicle and time to drive - notably, not necessarily people who are licensed taxi drivers. Ridesharing TNCs like Lyft, Gett and Uber provide a smartphone app that lets consumers hail a ride, set their destination, and pay without leaving the app itself. The benefits to the consumer is ease of use, availability of rides, and sometimes lower prices than traditional taxis. Many companies require at least some sort of certification for the drivers and take a portion of the drivers' fares. Ridesharing drivers can choose when they work (though they can receive bonuses for logging a certain number of hours) and provide their own vehicles. In the United States, ridesharing companies argue that the work-when-you-want arrangement qualifies drivers as contractors, not employees. Despite legal battles and controversy over surge pricing, ridesharing companies have exploded in popularity, both in the U.S. and internationally. Early entrants in the TNC app space, like Uber and Flywheel, were founded around 2009. Overall, the industry has raised more than $10 billion in venture funding.

We believe that we have strong economic prospects by virtue of the following dynamics of the industry:

- **Continued Growth in Ridesharing Market.** The ridesharing services market has grown faster, gone to more places and has produced robust growth and consumer traffic figures since commercial introduction in approximately 2009. The pace of growth is also picking up. It has been reported that *Uber* took six years before it reached a billion rides in December of 2015, but it took only six months for *Uber* to get to two billion rides. In the U.S., the number of users of ridesharing services is estimated to increase from 8.2 million in 2014 to 20.4 million in 2020, producing a compounded annual growth rate of approximately 13.92% over the seven-year period.

- **Globalization of Ridesharing**. In the same vein, ridesharing which started as an experiment in California has grown into a global marketplace over a short period of time. Asia has emerged as a geographical territory to drive future growth. For example, *Didi Chuang*, the Chinese ridesharing company, completed 1.43 billion rides just in 2015 and it now claims to have 250 million users in 360 Chinese cities. Ridesharing is also acquiring deep roots in both India and Malaysia, and is making advances in Europe and Latin America, despite regulatory pushback.

- **Expanding Choices**. Consumer options in ridesharing are expanding to attract an even larger audience, such as carpooling and private bus services. The expansion of consumer options has also attracted mass transit customers to more expensive luxury options. In addition, it has been reported that dominant TNC businesses are experimenting with pre-scheduled rides and multiple stops on single trip gain to meet customer needs. Our Fleet Management business and fleet of rental vehicles are designed to put more certified ridesharing vehicles on the roadways to meet the increasing consumer demand of the availability of ridesharing services.

## Regulation of the Ridesharing Industry

In the current ridesharing marketplace, often times the TNCs (such as Uber or Lyft) generally takes the place of government in enforcing standards for drivers and vehicles, though all states and the District of Columbia now have basic driver background and minimum insurance requirements in place for TNCs. Each TNC has its own regulations at the corporate level. However, in many instances, state, local or federal governments are beginning to seriously assess the ridesharing industry and it is likely that regulations and mandated standards are imminent. For more information see section "*Vehicle Registration Requirements*."

## Our Opportunity

The increasing demand for ridesharing services has produced an increase in demand by TNC businesses for more ridesharing drivers and vehicles on the road at any given time. The growing demographic of ridesharing drivers, as determined on a global basis, has drawn ridesharing drivers to the ridesharing marketing to perform services for a host of private TNC businesses focused on ridesharing, such as Uber and Lyft.

Complicating this matter further, many potential ridesharing drivers drawn to the ridesharing market are being rejected or turned away from employment by the private ridesharing TNCs on account of the fact that the driver's personal vehicles fail to meet the Ridesharing Qualification Requirements imposed on all ridesharing vehicles by the private ridesharing TNCs. Private ridesharing TNCs impose certain vehicle safety tests and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs. Generally, the TNCs impose certain standard requirements on all ridesharing drivers and their respective vehicles (the "Driver Qualification Requirements") as well as additional vehicle safety tests, inspections and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs (the "Vehicle Qualification Requirements", together with the Driver Qualification Requirements, the "Ridesharing Qualification Requirements"). For more information see "Ridesharing Qualification Requirements". According to an Uber spokesperson, 10%-15% who sign up to be drivers are qualified, but do not have the right kind of car and are unable to buy one due to bad credit. Further, the Company believes that this is resulting in a shortfall of ridesharing drivers on the road at any given time. Private ridesharing TNCs have responded to this issue by actively pursuing programs to get eligible ridesharing drivers into qualified cars that meet the Ridesharing Qualification Requirements. The Company believes that the TNC line of business and immense capital requirements in developing a fleet management business to service the growing ridesharing industry on such a large scale will restrict the ability of the private ridesharing TNCs to dominate the ridesharing vehicle rental market. Further, despite the financial resources and scale of the dominant TNCs in the ridesharing business, the Company believes that third-party vehicle rental providers are a necessity to the growth and service of a robust ridesharing market.

*Ridesharing Qualification Requirements*

The TNCs generally impose a host of requirements on potential ridesharing driver applicants seeking employment with TNCs such as Uber and/or Lyft. For example, prior to becoming a ridesharing driver, Uber and Lyft impose similar uniform requirements on all ridesharing vehicles and drivers. Generally, the ridesharing driver must meet the following standard "Driver Qualification Requirements":

- The ridesharing driver must obtain a minimum age of 21 years old;
- The ridesharing driver's vehicle must be a four-door car made in year 2007 or newer (in most cities- 2002 or newer for Los Angeles, Orange County, San Francisco);
- The ridesharing driver must have in-state auto insurance with the driver's name on the policy;
- The ridesharing driver must have an in-state driver's license, licensed in the US for at least one year;
- The ridesharing driver must have in-state plates with a current registration (commercial plates are acceptable as well);
- The ridesharing driver must have a clean driving record;
- The ridesharing driver must pass on the background check; and
- The ridesharing driver's vehicle must pass the Cosmetic Qualification Requirements (as defined herein).

In addition, the TNCs may impose cosmetic guidelines on all ridesharing vehicles providing ridesharing services on behalf of the private ridesharing company. Certain cosmetic features may prevent a potential ridesharing driver's vehicle from qualifying under the vehicle inspection on account of the following: (i) the vehicle includes a full-body wrap containing advertisements, or any large ads; (ii) the vehicle has holes or damage to the exterior; (iii) the vehicle has taxi decals or taxi-style paint; (iv) the vehicle has significant damage to the interior (including any torn seats, large permanent stains, strong permanent odors); (v) the vehicle has paint oxidation; or (vi) the vehicle has different colored hoods/doors; (vii) the vehicle has objectionable aftermarket modification (collectively, "Cosmetic Qualification Requirements").

In addition to the Driver Qualification Requirements, private ridesharing companies also require all potential ridesharing drivers to undergo a vehicle inspection test on all personal driver vehicles to be used by the potential ridesharing driver to perform ridesharing services on behalf of the private ridesharing company. In order to become a Uber or Lyft driver, a potential ridesharing driver's vehicle generally must pass the 19-point vehicle inspection to confirm that it meets the private ridesharing companies requirements.

A 19-point inspection is a standard vehicle inspection procedure to check a car in 19 specific areas to ensure that it conforms to safety and operational requirements. While the 19 points are the same for different companies, their procedures differ slightly. The process also varies based on the geographical location where the inspection is performed. The 19 points of the vehicle checked for inspection include headlights, tail-lights, indicator lights, stop lights, foot brakes, emergency/parking brake, steering mechanism, windshield, heat and air conditioning, front, rear and side windows, front seat adjustment mechanism, door controls (open, close, lock), horn, speedometer, body condition/ damage, muffler and exhaust system, condition or tires, interior and exterior rear-view mirrors and safety belts for driver and passengers. Any vehicle having a problem or issue with any of the inspection points will generally not pass the vehicle inspection and will be refused the opportunity to become a ridesharing driver for the private ridesharing company.

**Company Growth Strategy**

Our long-term strategy is focused on four priorities: expanding and diversifying our revenues; improving our operating effectiveness; enhancing the customer experience; and disciplined capital management.

*Expand and Diversify Revenues* —Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint from Los Angeles, throughout California and then to the rest of North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

*Improve Operating Effectiveness*—We are focused on generating continuous improvement across our operations, with an emphasis on building a strong safety culture, fleet management business, e-commerce bookings website, fleet availability and improving margins. We are continuing to build a highly professional and technology-enabled sales force and to optimize our sales territories to support our revenue growth objectives. We will continue to improve the effectiveness of our sales team with focused training, strong customer relationship management capabilities, and ongoing technology enhancements.

*Enhance the Customer Experience*—We seek to differentiate our business by delivering a superior customer experience through the variety and quality of the vehicles and services we offer, the ease of doing business with us and the added value we offer through services, products and technologies. Our focus on quality vehicle brands tailored to meet the Vehicle Qualification Requirements of the ridesharing industry is intended to meet the preferences of ridesharing drivers, including the expectations for reliable, safe, efficient and effective maintained vehicles. We expect to add more expertise across our team to help our customers achieve the best results for their projects. In developing and providing vehicle rental related technologies, we are focused on meeting customer expectations related to convenience and on-demand access to data and information.

*Disciplined Asset Management*—We manage our vehicle rental fleet to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment.

**Intellectual Property**

We generally rely on trademark, copyright and trade secret laws and employee and third-party non-disclosure agreements to protect its intellectual property and proprietary rights. We are currently in the process of pursuing trademark protection for our name and logos in the United States. Although we believe that our pending trademark applications will be granted by the United States Patent and Trademark Office, there can be no assurance that any trademarks will be granted or that any trademark relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We own registered trademarks "*YayYo®*" and the service mark for the stylized design representing an automobile.

In the future we may rely on patents to protect our intellectual property and proprietary technology, to the extent feasible, and plans to consult with intellectual property counsel to determine what patents we may be able to file to protect its intellectual property. As of the date of this Prospectus, we have not filed any patents in the United States or any other country. Although we believe that some of our technology may be patentable, there can be no assurance that any patents will be granted or that any patent relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We believe that due to the rapid pace of technological innovation for technology, mobile and internet products, our ability to establish and maintain a position of technological leadership in the ridesharing industry depends more on the skills of its development personnel than the legal protection afforded its existing technology. For more information see the section "*Risk Factors*".

**Employees**

As of the date of this Prospectus, we have approximately 21 full-time employees and 3 consultants, based at our offices. None of our employees are subject to a collective bargaining agreement, and we believe that our relations with our employees generally are good.

**Regulatory**

We are subject to a number of U.S. federal and state and foreign laws and regulations that involve matters central to our business. These laws and regulations may involve privacy, data protection, intellectual property, competition, consumer protection, export taxation or other subjects. Many of the laws and regulations to which we are subject are still evolving and being tested in courts and could be interpreted in ways that could harm our business. In addition, the application and interpretation of these laws and regulations often are uncertain, particularly in the new and rapidly evolving industry in which we operate. Because laws and regulations have continued to develop and evolve rapidly, it is possible that we may not be, or may not have been, compliant with each such applicable law or regulation. In addition to the foregoing, we are also subject to the following:

Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

***Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows. For additional information please see the section entitled "Risk Factors."***

## Litigation

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We have received, and may in the future continue to receive, claims from third parties asserting, among other things, infringement of their intellectual property rights. Future litigation may be necessary to defend ourselves, our partners and our customers by determining the scope, enforceability and validity of third-party proprietary rights, or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors. To date, we have not been made aware of any actual, pending or threatened litigation against the Company.

## Property

We lease and maintain our primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. We also lease and maintain executive offices at 6600 Sunset Blvd., Los Angeles, CA 90028, where the majority of our operations and staff will conduct activities on a daily basis. We do not currently own any real estate.

## MANAGEMENT

The following are our executive officers and directors and their respective ages and positions as of October 31, 2019.

| Name | Position | Age | Tenure with Company |
|------|----------|-----|---------------------|
| **Executive Officers:** | | | |
| Jonathan Rosen | Chief Executive Officer | 59 | Since February 2019 |
| Kevin F. Pickard | Chief Financial Officer, Secretary | 55 | Since June 2017 |
| Laurie DiGiovanni | Chief Operating Officer | 59 | Since May 2016 |
| | | | |
| **Directors:** | | | |
| Kevin F. Pickard | Director | 55 | Since October 2017 |
| Jeffrey J. Guzy | Director | 68 | Since October 2017 |
| Christopher Miglino | Director | 50 | Since October 2017 |
| Harbant S. Sidhu | Director | 61 | Since October 2017 |
| Paul Richter | Director | 64 | Since July 2019 |

During the past five (5) years, none of the persons identified above has been involved in any bankruptcy or insolvency proceeding or convicted in a criminal proceeding, excluding traffic violations and other minor offenses. There is no arrangement or understanding between the persons described above and any other person pursuant to which the person was selected to his or her office or position.

_Jonathan Rosen, Chief Executive Officer_. Mr. Rosen is the Chief Executive Officer of the Company. Mr. Rosen has more than 25 years' experience serving as an executive driving revenue, operations and marketing for leading public and private companies. For the past 15 years, Mr. Rosen has focused on automotive, software and media markets at both successful startups and global companies. He held the founding Chief Marketing and Chief Revenue Officer positions at Involvesoft, a leading SaaS software company (2017-2018), where he was brought in by the company's venture bankers to launch the entity and raise capital. Mr. Rosen held multiple interim executive and advisory positions to numerous early-stage companies similar to YayYo. His experience over the last five years includes interim executive or consulting roles at WeWork (2017-2018), Beachbody (2015-2016), Ziff Davis/J2 Equities (2015), iInside and Opus Research (2014-2015) and others. Prior to that he held executive roles at companies including Autobytel, Webvisible, and America Online. At AOL, he served as the Executive Director of Strategy, where he shepherded high-value acquisitions and partnerships including Advertising.com; and architected their first traffic acquisition programs. Rosen served as Senior Vice President for Autobytel – one of the largest automotive search and online properties where he led business development, ad networks and advertising sales and operations. Early in his career, Mr. Rosen held senior management roles in the computer storage industry and was the founding President of iProspect; now the world's largest search marketing agency and a subsidiary of Dentsu.

_Laurie DiGiovanni, Chief Operating Officer_. Ms. DiGiovanni is the Chief Operating Officer of the Company. She has served as Chief Operating Officer since May 2016. In addition, Ms. DiGiovanni served as Chief Executive Officer of the Company from October 4, 2018 to November 17, 2018. Since 2012, Ms. DiGiovanni has held marketing and operating executive positions at Beverly Hills Rent a Car and Executive Transportation pursuant to which Ms. DiGiovanni managed national corporate expansions and activation of transportation industry leading brands and was executive producer for a range of marketing campaigns at auto shows and transportation industry live events. Ms. DiGiovanni manages all business operations of the Company and its subsidiaries including driver training and the Fleet Management business segment. Ms. DiGiovanni is the founder of the Association for Finance and Insurance Professionals (AFIP), an association that has certified tens of thousands for more ethical car buying practices, and mandatory for auto industry employees and implemented in leading global automotive markets. She also played key roles in the launch of many automotive initiatives, including managing new divisions and brands for Beverly Hills Travel and Lifestyle and American Dream Classics; serving as Director of Training for CarsDirect.com; and leading marketing and customer experience campaigns for Barrett-Jackson Car Auction. Ms. DiGiovanni also has direct brand experience within the automotive industry, including project management and training positions with Toyota, Mazda, and Nissan. Ms. DiGiovanni has a Bachelor of Arts degree from California State University, Fullerton.

_Kevin F. Pickard, Chief Financial Officer, Secretary and Director_. Mr. Pickard is the chief financial officer, secretary and a director of the Company and has worked with the Company since October 2017. Since 2000, Mr. Pickard has been providing management consulting services through Pickard & Company, CPAs to small and medium-sized companies, included due diligence on potential acquisitions, the preparation of projections and business plans, assistance with restructuring of companies, posturing companies for initial public offerings, review and preparation of filings with the Securities and Exchange Commission. Prior to 2000, Mr. Pickard was a partner of Singer Lewak Greenbaum & Goldstein, LLP, Los Angeles, California, where he co-managed the accounting its securities industry practice group. Mr. Pickard also worked at PricewaterhouseCoopers, LLP (formerly, Coopers & Lybrand, LLP) where he focused on auditing companies in insurance, high-tech and industries. Mr. Pickard holds a Bachelor's of Science in Accounting and a Master of Accountancy from Brigham Young University. Mr. Pickard is currently a licensed Certified Public Accountant in North Carolina, and California. Mr. Pickard's experience in accounting and finance qualify him for a position on our board of directors.

_Jeffrey J. Guzy, Director_. Mr. Guzy serves as a business development consultant and entrepreneur in Arlington, Virginia. Mr. Guzy is currently working with CoJax Oil and Gas Corporation and PrecyseTech. Prior to that, Mr. Guzy served, from October 2007 to August 2010 as the President of Leatt Corp. and has remained a director of that public company since April 2007. Mr. Guzy has an MBA in Strategic Planning and Management from The Wharton School of the University of Pennsylvania; a M.S. in Systems Engineering from the University of Pennsylvania; a B.S. in Electrical Engineering from Penn State University; and a Certificate in Theology from Georgetown University. Mr. Guzy has served as an executive manager or consultant for business development, sales, customer service and management in the telecommunications industry, specifically, with IBM Corp., Sprint International, Bell Atlantic Video Services, Loral CyberStar and FaciliCom International. Mr. Guzy has also started his own telecommunications company providing Internet services in Western Africa. He serves as an independent director and chairman of the audit committee of Capstone Companies, Inc., a public corporation. Mr. Guzy's financial background, as well as his ability to serve as our audit committee financial expert, qualifies him to serve as a member of our board of directors.

_Christopher Miglino, Director_. Mr. Miglino serves as a director of the Company. Mr. Miglino has long been at the nexus of consumers, brands, social and lifestyle media, cause marketing and the enlightened, sustainable business movement. Mr. Miglino is the founder and CEO of Social Reality. Since 2010, Mr. Miglino has served as the Chief Executive Officer of Social Reality. Prior to founding Social Reality, Mr. Miglino served as the Chief Executive Officer of Lime Ad Network, a vanguard in the green and sustainable online business arena that connected consumers and brands with a collection of more than 250 green and socially conscious businesses. From June 2004 until August 2008, Mr. Miglino was CEO of Conscious Enlightenment, where he oversaw their day to day operations in the publishing and advertising industry. From 2004 until 2008, Mr. Miglino served as a board member for Golden Bridge Yoga in Los Angeles, a studio that encompasses over 20,000 square feet of yoga spaces including a restaurant. Mr. Miglino's extensive knowledge of marketing, advertising and social media make him valuable as a member of our board of directors.

65

_Harbant S. Sidhu, Director_. Mr. Sidhu serves as a director of the Company. Mr. Sidhu is a design engineer and founder of Advanced Tek Group, Inc. (formerly Magnaspec, Inc.), a private aerospace manufacturing business. Since 2012, Mr. Sidhu has operated Advanced Tek Group, Inc., managing all aspects of the operating business. Mr. Sidhu has experience in personnel management and oversite, aerospace and defense engineering, sales, manufacturing, accounting and operational experience in the aerospace and defense manufacturing industry. Mr. Sidhu has performed unclassified contracting work in components production for Mexico's Department of Defense. Mr. Sidhu graduated as an electrical engineer in 1980 from Punjab University, India. Mr. Sidhu's experience in human resources coupled with his business experience qualifies him to serve on our board of directors.

_Paul Richter, Director._ Mr. Richter is a member of the board of directors of the Company since July 2019. In addition, he previously served as a director of the Company from October 2017 to November 2018. Since 1986, Mr. Richter, a licensed attorney, has performed legal services in the areas of securities and corporate law representing public and private companies in the U.S. Mr. Richter's legal practice focuses predominantly on SEC/state securities law compliance (including public and private securities offerings and SEC filings); corporate governance law compliance; contracts; commercial transactions; regulatory dispute resolution; business start-up formation and funding; employee-employer dispute resolution; corporate compensation plans; business immigration; and compliance with FINRA, NASDAQ and The OTC Markets Group, Inc. rules and regulations. In addition, Mr. Richter has experience in cross-border transactional matters having performed U.S. legal work for companies based in Hong Kong, India, Poland, Norway, Canada, United Kingdom and U.A.E. Mr. Richter is a licensed attorney with the state bar of Virginia.

Mr. Richter has an L.L.M. in Securities Regulation from Georgetown Law Center, Washington, D.C. (1987) and a J.D. from George Mason University Law School, Arlington, Virginia (1985). He has a B.A. with honors from Knox College, Galesburg, Illinois. Mr. Richter originated and authored the first few editions of _Corporate Anti-Takeover Defenses: The Poison Pill Device_ (published by Clark Boardman Co. and then by West Publishing for 18 annual editions) and he currently updates or assists in updating the following legal publications of Thomson Reuters West that were originally authored by other persons: _Securities Public and Private Offerings (_since 2006_); Acquisitions and Mergers in Negotiated and Contested Transactions (_since 2008_); and Designing and Effective Securities and Corporate Compliance Program_, (2017-2018 edition) (Corporate Compliance Series). He authored two CLE lectures and materials on Securities Law for Access MCLE (2016). Mr. Richter's experience in corporate and securities law matters coupled with his international experience qualifies him to serve on our board of directors.

**Code of Ethics**

Our Board plans to adopt a written code of business conduct and ethics ("Code") that applies to our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer or controller, or persons performing similar functions. We intend to post on our website a current copy of the Code and all disclosures that are required by law in regard to any amendments to, or waivers from, any provision of the Code.

**Voting Trust**

Mr. El-Batrawi has entered into a Voting Trust Agreement pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters, other than certain extraordinary matters, presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. Mr. El-Batrawi's entrance into the Voting Trust Agreement is a condition for the Company's approval for listing on The Nasdaq Capital Market.

The Trust shall be irrevocable, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of Nasdaq, or (b) the date upon which the Company is not listed on a security exchange controlled by Nasdaq.

The trustee, initially one of our directors, Harbant S. Sidhu, shall have discretion to vote the Trust's shares on all extraordinary matters which shall include any merger, consolidation, business combination, share exchange, restructuring, recapitalization or acquisition involving the Company or any similar transaction or the sale, lease, exchange, pledge, mortgage or transfer of all or a material portion of the Company's assets.

**Board Leadership Structure and Risk Oversight**

The Board oversees our business and considers the risks associated with our business strategy and decisions. The Board currently implements its risk oversight function as a whole. Each of the Board committees, as set forth below, will also provide risk oversight in respect of its areas of concentration and reports material risks to the board for further consideration.

**Board of Directors**

Our business and affairs are managed under the direction of our Board. Our Board consists of five directors, three of whom qualify as "independent" under the listing standards of Nasdaq.

Directors serve until the next annual meeting and until their successors are elected and qualified. Officers are appointed to serve for one year until the meeting of the Board following the annual meeting of shareholders and until their successors have been elected and qualified.

**Director Independence**

Our board of directors are composed of a majority of "independent directors" as defined under the rules of Nasdaq. We use the definition of "*independence*" of Nasdaq to make this determination. Nasdaq Listing Rule 5605(a)(2) provides that an "*independent director*" is a person other than an officer or employee of the company or any other individual having a relationship which, in the opinion of the Company's Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. The Nasdaq listing rules provide that a director cannot be considered independent if:

- the director is, or at any time during the past three (3) years was, an employee of the company;

- the director or a family member of the director accepted any compensation from the company in excess of $120,000 during any period of twelve (12) consecutive months within the three (3) years preceding the independence determination (subject to certain exemptions, including, among other things, compensation for board or board committee service);

- the director or a family member of the director is a partner in, controlling shareholder of, or an executive officer of an entity to which the company made, or from which the company received, payments in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenue for that year or $200,000, whichever is greater (subject to certain exemptions);

- the director or a family member of the director is employed as an executive officer of an entity where, at any time during the past three (3) years, any of the executive officers of the company served on the compensation committee of such other entity; or

- the director or a family member of the director is a current partner of the company's outside auditor, or at any time during the past three (3) years was a partner or employee of the company's outside auditor, and who worked on the company's audit.

Under such definitions, our Board has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment and affiliations, our Board has determined that Jeffrey J. Guzy, Christopher Miglino, Paul Richter and Harbant S. Sidhu are all independent directors of the Company. However, our common stock is not currently quoted or listed on any national exchange or interdealer quotation system with a requirement that a majority of our Board be independent and, therefore, the Company is not subject to any director independence requirements.

## Committees of the Board of Directors

Our Board has established an audit committee and a compensation committee. Our Board has not yet adopted procedures by which stockholders may recommend nominees to the Board of Directors. The composition and responsibilities of each of the committees of our Board is described below. Members serve on these committees until their resignation or until as otherwise determined by our board of directors.

## Audit Committee

We have established an audit committee consisting of Harbant Sidhu, Paul Richter and Jeffrey J. Guzy. In addition, our Board has determined that Mr. Guzy is an audit committee financial expert within the meaning of Item 407(d) of Regulation S-K under the Securities Act of 1933, as amended, or the Securities Act. The audit committee's duties, which are specified in our Audit Committee Charter, include, but are not limited to:

- reviewing and discussing with management and the independent auditor the annual audited financial statements, and recommending to the board whether the audited financial statements should be included in our annual disclosure report;
- discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of our financial statements;
- discussing with management major risk assessment and risk management policies;
- monitoring the independence of the independent auditor;
- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law;
- reviewing and approving all related-party transactions;
- inquiring and discussing with management our compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by our independent auditor, including the fees and terms of the services to be performed;
- appointing or replacing the independent auditor;
- determining the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;
- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies; and
- approving reimbursement of expenses incurred by our management team in identifying potential target businesses.

The audit committee is composed exclusively of "independent directors" who are "financially literate" as defined under the Nasdaq listing standards. The Nasdaq listing standards define "financially literate" as being able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement.

In addition, the Company intends to certify to Nasdaq that the committee has, and will continue to have, at least one member who has past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background that results in the individual's financial sophistication.

**Compensation Committee**

We have established a compensation committee of the board of directors to consist of Christopher Miglino and Harbant S. Sidhu, each of whom is an independent director. Each member of our compensation committee is also a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act, or Rule 16b-3, and an outside director, as defined pursuant to Section 162(m) of the Code, or Section 162(m). Mr. Miglino is the chairman of the compensation committee. The compensation committee's duties, which are specified in our Compensation Committee Charter, include, but are not limited to:

- reviews, approves and determines, or makes recommendations to our board of directors regarding, the compensation of our executive officers;
- administers our equity compensation plans;
- reviews and approves, or makes recommendations to our board of directors, regarding incentive compensation and equity compensation plans; and
- establishes and reviews general policies relating to compensation and benefits of our employees.

**Non-Employee Director Compensation**

In November 2017, the Company entered into two separate independent director agreements with Jeffrey J. Guzy and director Paul Wesley Richter, each an independent director of the Company (each a "Subject Director" and, collectively, the "Subject Directors"), pursuant to which the Company has agreed to pay each Subject Director a flat, fixed cash fee of $2,500 for each fiscal quarter that each Subject Director serves as an independent director on the board of directors of the Company (the "Subject Director Agreements"). The first payment under Subject Director Agreements was due and payable on or before November 30, 2017 for the fourth fiscal quarter of 2017.

68

**Family Relationships**

There are no family relationships among any of our officers or directors.

**Involvement in Certain Legal Proceedings**

Except as disclosed below, to our knowledge, none of our current directors or executive officers has, during the past ten (10) years:

- been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

- had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two (2) years prior to that time;

- been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in any type of business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;

- been found by a court of competent jurisdiction in a civil action or by the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

69

*YayYo, Inc., vs. Hurst Capital LLLP, Zach Hurst, Austin Hurst, Ryan O'Connor, Scott Carl Edwards, Robert Lisiescki, Christopher John Gilbert, Joseph Andreini III, and Joseph Hoffman.*

On November 21, 2016, the Company filed a lawsuit in U.S. District Court, for the Central District of California against Hurst Capital LLLP, Zach Hurst, Austin Hurst, Ryan O'Connor, Scott Carl Edwards, Robert Lisiescki, Christopher John Gilbert, Joseph Andreini III, and Joseph Hoffman (collectively, the "Defendants"). The lawsuit alleges claims for fraud, fraudulent inducement and concealment, negligent misrepresentation, unfair business practices, intentional interference with contractual relations and prospective economic relations, and conversion, based on the Company's belief that the Defendants made fraudulent and intentionally misleading representations to induce the Company to retain their services in connection with building our website and mobile applications, failed to satisfy the terms of their engagement with the Company and attempts to charge the Company for services which was never performed or was subpar. On February 23, 2018, the Company entered into a settlement agreement and mutual release by and between Ryan O'Connor, Robert Lisiescki, Christopher John Gilbert, and Joseph Hoffman pursuant to which the parties agreed to settlement and dismiss the action and to sever, release and discharge and terminate all rights, obligations and liabilities against the Defendants.

Except as set forth above and in our discussion below in "*Certain Relationships and Related Transactions*," none of our directors or executive officers has been involved in any transactions with us or any of our directors, executive officers, affiliates or associates which are required to be disclosed pursuant to the rules and regulations of the SEC.

We are not currently a party to any legal proceedings, the adverse outcome of which, individually or in the aggregate, we believe will have a material adverse effect on our business, financial condition or operating results.

70

**EXECUTIVE COMPENSATION**

The following table illustrates the compensation paid by the Company to its Chief Executive Officer, its two most highly compensated executive officers other than the Chief Executive Officer who were serving as executive officers at the end of the last completed fiscal year, and up to one additional individual for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the last completed fiscal year. We refer to these individuals as the "Named Executive Officers". The disclosure is provided for the years ended December 31, 2018 and December 31, 2017.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Benefits ($) **(4)** | Option Award ($) **(5)** | Total ($) |
|---|---|---|---|---|---|---|
| Laurie DiGiovanni, Former Chief Executive Officer and Chief Operating Officer, Former Director (1) | 2018 | 120,000 | — | — | — | 120,000 |
| | 2017 | 120,000 | — | — | — | 120,000 |
| Kevin F. Pickard, Chief Financial Officer, Secretary, Director | 2018 | 66,000 | — | 904,468 | — | 970,468 |
| | 2017 | 16,800 | — | 1,356,703 | — | 1,373,503 |
| Ramy El-Batrawi, Former Chief Executive Officer, Former Director (6) | 2018 | 205,000 | — | — | — | 205,000 |
| | 2017 | 286,300 | — | — | — | 286,300 |
| Anthony Davis, Former President, Chief Executive Officer, Director | 2018 | - | — | — | — | — |
| | 2017 | 20,000(2) | — | — | — | 20,000 |
| Robert W. Vanech, Former Chief Financial Officer, Treasurer, Secretary, Director | 2018 | - | — | — | — | — |
| | 2017 | 20,000(3) | — | — | — | 20,000 |

(1) Ms. DiGiovanni has served as Chief Operating Officer since May 2016. Ms. DiGiovanni served as Chief Executive Officer from October 4, 2018 to November 17, 2018.

(2) Executive compensation in the amount of $10,000 payable for each of the months of January and February 2017.

(3) Executive compensation in the amount of $10,000 payable for each of the months of January and February 2017.

(4) Any values reported in the "Other Compensation", if applicable, column represents the aggregate grant date fair value, computed in accordance with Accounting Standards Codification ("ASC") 718 Share Based Payments, of grants of stock options to each of our named executive officers and directors.

(5) The amount included in the "Option Awards" column does not reflect compensation actually received by the Named Executive Officer but represents the compensation cost that we recognized in each year presented, determined in accordance with FASB ASC 718. On December 1, 2016, each of Mr. Davis and Mr. Vanech received non-qualified stock options expiring on December 31, 2018, entitling them to purchase 100,000 shares of Company common stock at an exercise price of $1.00 per share at any time on or after June 1, 2017. On June 9, 2017, Mr. Pickard received non-qualified stock options to purchase up to an aggregate of 300,000 shares of underlying Company common stock expiring on December 31, 2020, provided, further, that as of December 31, 2018, options to purchase an aggregate of 300,000 underlying shares of Company common stock are vested and exercisable. All such options terminate within three months of each employee ceasing to be in the continuous employment of the Company.

(6) On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company upon the appointment of Jonathan Rosen as Chief Executive Officer. Mr. El-Batrawi resigned as our director effective as of September 1, 2019.

The following table provides information about equity awards granted to our named executive officers that were outstanding on December 31, 2018.

| Name | Number of securities underlying unexercised options (#) exercisable | | Number of securities underlying unexercised options (#) unexercisable | Equity incentive plan awards: Number of securities underlying unexercised unearned options (#) | Options Exercise Price ($) | Options Expiration Date | Number of shares or units of stock that have not vested (#) | Market value of shares of units of stock that have not vested ($) | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested (#) | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | |
| Ramy El-Batrawi (1) | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| Laurie DiGiovanni (2) | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| Kevin F. Pickard | 300,000 | | — | — | $ 8.00 | 12/31/2020 | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |

(1) On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company upon the appointment of Jonathan Rosen as Chief Executive Officer. In addition, Mr. El-Batrawi resigned as our director effective as of September 1, 2019.

(2) Ms. DiGiovanni has served as Chief Operating Officer since May 2016. Ms. DiGiovanni served as Chief Executive Officer from October 4, 2018 to November 17, 2018.

**Employment Agreements**.

As of December 31, 2018, the Company had no employment agreements with any of its named executive officers. The Company has entered into an oral agreement with its Chief Executive Officer, Jonathan Rosen, for an annual salary of $300,000, retroactive to his start date of February 1, 2019. The Company also agreed to issue a restricted share grant of 500,000 shares of common stock with one-third of the restricted shares vesting upon the closing of the Company's initial public offering with the remainder vesting ratably each month over the twenty-four months following the initial public offering.

On November 29, 2016, the Company and Mr. Davis, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Davis's first three months of service and performance under his term of employment with the Company. As set forth under the employment offer, Mr. Davis was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and an additional $10,000 for service performed by Mr. Davis during the month of February 2017.

On November 29, 2016, the Company and Mr. Vanech, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Vanech first three months of service and performance under his term of employment. As set forth under the employment offer, Mr. Vanech was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and (iii) an additional $10,000 for service performed by Mr. Vanech during the month of February 2017.

**Board Compensation**

During the fiscal year ended December 31, 2018, Jeffrey J. Guzy and director Paul Wesley Richter received $7,500 in cash for board service fees. For more information please see the section entitled "*Non-Employee Director Compensation*" above.

**PRINCIPAL STOCKHOLDERS**

The following table sets forth certain information, as of October 31, 2019, with respect to the holdings of (1) each person who is the beneficial owner of more than 5% of Company common stock, (2) each of our directors, (3) each executive officer, and (4) all of our current directors and executive officers as a group.

Beneficial ownership of the common stock is determined in accordance with the rules of the Securities and Exchange Commission (the "SEC") and includes any shares of Company common stock over which a person exercises sole or shared voting or investment power, or of which a person has a right to acquire ownership at any time within 60 days of October 31, 2019. Except as otherwise indicated, we believe that the persons named in this table have sole voting and investment power with respect to all shares of common stock held by them. Applicable percentage ownership in the following table is based on 26,802,976 shares of common stock issued and outstanding before the offering, and 29,302,976 after the offering assuming a common stock offering of 2,500,000 shares (excluding 375,000 shares which may be sold upon exercise of the underwriters' over-allotment option), plus, for each individual, any securities that individual has the right to acquire within 60 days of October 31, 2019.

To the best of our knowledge, except as otherwise indicated, each of the persons named in the table has sole voting and investment power with respect to the shares of our common stock beneficially owned by such person, except to the extent such power may be shared with a spouse. To our knowledge, none of the shares listed below are held under a voting trust or similar agreement, except as noted. To our knowledge, there is no arrangement, including any pledge by any person of securities of the Company, the operation of which may at a subsequent date result in a change in control of the Company.

| Name and Address of Beneficial Owner | Title | Beneficially Owned | Percent of Class Before Offering | Percent of Class After Offering |
|---|---|---|---|---|
| **Officers and Directors** [1] | | | | |
| Jonathan Rosen | Chief Executive Officer | — | — | — |
| Kevin F. Pickard [2] | Chief Financial Officer and Director | 300,000 | 1.1% | 1.0% |
| Laurie DiGiovanni | Chief Operating Officer | — | — | — |
| Jeffrey J. Guzy | Director | — | — | — |
| Christopher Miglino | Director | — | — | — |
| Harbant S. Sidhu | Director | — | — | — |
| Paul Richter | Director | — | — | — |
| **Officers and Directors as a Group (total of 7 persons)** | | **300,000** | **1.1%** | **1.0%** |
| **5% Stockholders** | | | | |
| X, LLC [3] [5] | | 2,900,000 | 10.8% | 9.9% |
| Gray Mars Venus Trust, Arizona 2015[4] [5] | | 10,325,000 | 38.5% | 35.2% |
| Bellridge Capital, L.P. [5] [6] | | 2,400,000 | 8.5% | 7.8% |
| David Haley [5] [7] | | 2,844,945 | 10.6% | 9.7% |
| James Malackowski [5] [8] | | 2,758,824 | 10.3% | 9.4% |
| John O'Hurley [5] [9] | | 2,018,750 | 7.5% | 6.9% |
| Acuitas Group Holdings, LLC [5] [10] | | 1,654,412 | 6.2% | 5.7% |

* Less than 1%

(1) Unless otherwise indicated, the principal address of the named directors and officers of the Company is c/o YayYo, Inc., 433 N Camden Dr., # 600 Beverly Hills, CA, 90210.

(2) Includes non-qualified stock option to purchase up to an aggregate of 300,000 shares of common stock.

(3) Common stock beneficially owned by Ramy El-Batrawi are held of record by X, LLC, which is an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and director. Its address is 2635 Astral Dr., Los Angeles, CA 90046. Mr. El-Batrawi has voting and dispositive control over any securities owned of record by X, LLC. Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

(4) Gray Mars Venus Trust, Arizona 2015, an entity beneficially owned and controlled by John Gray. Its address is 75 Avon Ave, Mill Valley, CA 94941.

(5) As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, agreed to sell 12,525,000 of its 15,425,000 shares of the Company's common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration under the Securities Act to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. X, LLC transferred all rights of ownership to the purchasers. The purchasers shall be entitled to receive all dividends and distributions, shall have the power to exercise all voting rights and may sell or pledge the Private Shares. The Private Shares, however, shall not be electronically transferred to the purchasers' account until the pricing of this public offering.

(6) Includes the following: (i) 650,000 shares of common stock, (ii) 1,500,000 underlying shares of common stock to be acquired upon the exercise of the Selling Securityholder Warrant, and (iii) an option (exercisable at any time by Bellridge Capital, L.P.) from a non-affiliate shareholder of the Company to purchase 250,000 shares of issued and outstanding common stock of the Company from the non-affiliate shareholder. Bellridge Capital LLC ("BC LLC") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described. Bellridge Capital. L.P.'s address is 515 E. Las Olas Boulevard, #120A, Fort Lauderdale, FL 33301.

(7) The address of the stockholder is 32107 W Lindero Canyon Dr., #120, Westlake Village, CA 91361. Includes 80,000 shares of common stock owned by American Business Insurance Services, Inc. Mr. Haley is the Chief Executive Officer of American Business Insurance Services, Inc. and in such capacity has the right to vote and dispose of the securities held by such entity.

(8) The address of the stockholder is 330 W. Wellington Ave., Chicago, IL 60605.

(9) The address of the stockholder is 1710 Monte Cielo Ct., Beverly Hills, CA 90210.

(10) Acuitas Group Holdings, LLC, an entity beneficially owned and controlled by Terren Peizer. Its address is 11601 Wilshire Blvd #1100, Los Angeles, CA 90025. Mr. Peizer has voting and dispositive control over any securities owned of record by Acuitas Group Holdings, LLC.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In addition to the arrangements, discussed in the sections titled "*Directors, Executive Officers and Corporate Governance*" and "*Executive Compensation*" the following is a description of each transaction since June 21, 2016 and each currently proposed transaction in which:

- we have been or are to be a participant;

- the amount involved exceeded or exceeds the lesser of $120,000 or one percent of our total assets at the end of our last two completed fiscal years; and

- any of our directors, executive officers or holders of more than 5% of our outstanding capital stock, or any immediate family member of, or person sharing the household with, any of these individuals or entities, had or will have a direct or indirect material interest.

*Selling Securityholder Transactions*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K, in the original principal amount of $222,222 (the "<u>First Note</u>"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of YayYo, Inc. (including a pledge of securities, owned as of record and beneficially by YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired.

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "<u>Purchase Agreement</u>") with the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K and "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "<u>Lender</u>"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "<u>Second Note</u>") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares of common stock (the "Warrant Shares"), with an exercise price of $4.00 per share (the "<u>Warrant</u>") and 150,000 commitment shares of common stock (the "<u>Commitment Shares</u>") for an aggregate purchase price of $6,000,000 (the "<u>Second Note Offering</u>") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Selling Securityholder Warrant expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "<u>Collateral</u>"), to be held and maintained at Umpqua Bank (the "<u>Master Restricted Account</u>"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "<u>Controlled Account Agreement</u>"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

We are party to an investors' rights agreement with the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K, which provides, among other things, that certain holders of our capital stock and securities have the right to demand that we file a registration statement or request that their shares of our capital stock or common stock equivalents be covered by a registration statement that we are otherwise filing under this prospectus. See the section titled "*Description of Securities— Registration Rights.*"

*X, LLC*

During the fiscal year ended December 31, 2017 and the periods from June 21, 2016 (inception) to December 31, 2016, X, LLC, a limited liability company owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, issued to the Company advances of a total of $50,000 and $75,000, respectively. As of December 31, 2017, $125,000 of these loan advances were repaid in full. The loan advances were non-interest bearing and due upon demand. At December 31, 2018 and December 31, 2017, there was no balance owed under the note.

During the period from June 21, 2016 (inception) to October 31, 2016, the Company paid management fees of $110,000 to X, LLC, a company that is beneficially owned and controlled by Ramy El-Batrawi. During the year ended December 31, 2018 and December 31, 2017, the Company paid management fees of $205,000 and $286,300, respectively, to a company that is owned by the Company's majority stockholder.

On January 6, 2017, the Company received $50,000 from Chase Financing, Inc., ("CFI") and issued its 10% original issue discount senior secured convertible note in the amount of $55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017, the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note"). Subsequent to the Second CFI note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms.

Pursuant to the terms, the CFI Notes were secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and were convertible at the option of the holder into shares of our common stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our common stock during the 20 trading days immediately prior to the date of conversion. In an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI notes by the Company, Ramy El-Batrawi and X, LLC (an entity wholly owned and controlled by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge Agreement with CFI (the "Guaranty and Pledge Agreement"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our common stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty and Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a common stock Purchase Agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our common stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of $1.00. Under the Stock Purchase Agreement, and in addition to the 200,000 shares of common stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our common stock, held as of record and beneficially by X, LLC, equal to 2% of the number of shares of common stock issued or underlying common stock equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three months. As of December 31, 2017, the CFI Notes have been repaid in full by the Company.

*Lexicon Labs*

On September 28, 2016, YayYo, LLC entered into a product management proposal with Lexicon Labs (the "Product Management Proposal"), whereas Lexicon Labs shall use its own personnel and other assets to oversee and manage the development of our technology and to assist with product development services to the Company in the form of (a) design and development services to provide iOS operating system capabilities for our mobile app "*YayYo!*", (b) design and development for a web registration portal for on-boarding new users, and (c) development of web administration applications to allow high level team members to be able to track user analytical information. On November 16, 2016, the Company adopted and ratified the terms of the Product Management Proposal and accepted the benefits of such arrangement on behalf of the Company.

Lexicon Labs is managed by Ali Rashidifar, a former director of the Company and consultant to the Company holding the position of product manager. Under the terms of the Product Management Proposal, the Company has agreed to pay Lexicon Labs compensation in the form of a management cost in an amount equal to $10,000 (paid on a monthly basis). Since November 16, 2016 (the date of the Company's incorporation), the Company has paid Lexicon Labs $10,000 for services rendered for the month of November 2016 under the terms off the Product Management Proposal. As a manager of Lexicon Labs, the Company believes that Mr. Rashidifar will directly or indirectly benefit financially from our Product Management Proposal and it is further assumed, at this stage, that the Company will continue the engagement of Lexicon Labs for the performance of product management services under the Product Management Proposal beyond November 2017, whereby the Company anticipates that aggregate fees paid to Lexicon Labs will exceed an aggregate of $120,000 in total payments issue and received by Lexicon Labs. As of December 31, 2017, the Product Management Proposal with Lexicon Labs has been terminated.

*Independent Director Agreements*

In November 2017, the Company entered into two separate independent director agreements with Jeffrey J. Guzy and Paul Wesley Richter, a director of the Company (each a "Subject Director" and, collectively, the "Subject Directors"), pursuant to which the Company has agreed to pay each Subject Director a flat, fixed cash fee of $2,500 for each fiscal quarter that each Subject Director serves as an independent director on the board of directors of the Company (the "Subject Director Agreements"). The first payment under Subject Director Agreements was due and payable on or before November 30, 2017 for the fourth fiscal quarter of 2017.

Loan from Stockholder

On September 17, 2017 the Company entered into a promissory note with John Gray, the control person for Gray Mars Venus Trust, Arizona 2015, for $390,000. The largest balances for the year ended December 31, 2018 and December 31, 2017, respectively, were $986,200 and $445,000. The current balance of the promissory note is $880,000. The promissory note accrues interest at a rate of 5%. The Company accrued but did not pay $7,463 and $4,051 of interest for the years ended December 31, 2018 and 2017, respectively.

Incentive Agreement for Grant of Stock

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with David Haley, a former director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies for Rideshare Car Rentals, LLC and Distinct Cars, LLC (the "Special Policies") in consideration for a grant of 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 14,945 shares of Company restricted common stock, at a price per share equal to $8.00, as reimbursement for the cost of Mr. Haley's monetary advances made on behalf of the Company. In March 2019, the Company issued American Business Insurance Services, Inc. 80,000 shares of common stock in connection the settlement of $400,000 of debt related to insurance policies. Mr. Haley is the Chief Executive Officer of American Business Insurance Services, Inc. 258,695 shares of Company restricted common stock was issued on April 1, 2018 and 6,250 shares of Company restricted common stock was issued on October 8, 2018.

*Social Reality, Inc.*

During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc. The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

*Non-Qualified Stock Option Agreement*

On June 9, 2017, the Company entered into a non-qualified stock option agreement with Kevin Pickard, our Chief Financial Officer and director, providing for an option grant to purchase an aggregate of 300,000 shares at an exercise price of $8.00 per share. The option grant vests at a rate of 10,000 options per month following the date of the option grant. As of December 31, 2018, an aggregate of 300,000 options are vested and exercisable. The options expire December 31, 2020.

On December 1, 2016, the Company entered into a series of non-qualified stock option agreements with former executive officers and directors of the Company providing for a series of option grants to those former executive officers and directors to purchase an aggregate of 450,000 shares at an exercise price of $1.00 per share. The options expired December 31, 2018.

77

## DESCRIPTION OF SECURITIES

The following description of our securities is only a summary and is qualified in its entirety by reference to the actual terms and provisions of the capital stock contained in our certificate of incorporation and our bylaws.

### General

The Company is authorized to issue two classes of stock. The total number of shares of stock which the Company is authorized to issue is 100,000,000 shares of capital stock, consisting of 90,000,000 shares of common stock, $0.000001 par value per share, and 10,000,000 shares of preferred stock, $0.000001 par value per share.

### Common stock

The holders of our common stock are entitled to the following rights:

#### *Voting Rights*

Each share of our common stock entitles its holder to one vote per share on all matters to be voted or consented upon by the stockholders. Holders of our common stock are not entitled to cumulative voting rights with respect to the election of directors.

#### *Dividend Rights*

Subject to limitations under Delaware law and preferences that may apply to any shares of preferred stock that we may decide to issue in the future, holders of our common stock are entitled to receive ratably such dividends or other distributions, if any, as may be declared by our Board out of funds legally available therefor.

#### *Liquidation Rights*

In the event of the liquidation, dissolution or winding up of our business, the holders of our common stock are entitled to share ratably in the assets available for distribution after the payment of all of our debts and other liabilities, subject to the prior rights of the holders of our preferred stock.

#### *Other Matters*

The holders of our common stock have no subscription, redemption or conversion privileges. Our common stock does not entitle its holders to preemptive rights. All of the outstanding shares of our common stock are fully paid and non-assessable. The rights, preferences and privileges of the holders of our common stock are subject to the rights of the holders of shares of any series of preferred stock which we may issue in the future.

#### *Preferred Stock*

Our authorized preferred stock consists of 10,000,000 shares of preferred stock, par value $0.000001 per share. As of the date of this filing, 2,000,000 shares of preferred stock have been designated as Series A non-voting convertible preferred stock, none of which have been issued. Our Board has the authority to issue preferred stock in one or more classes or series and to fix the designations, powers, preferences, and rights, and the qualifications, limitations or restrictions thereof including dividend rights, dividend rates, conversion rights, voting rights, terms of redemption, redemption prices, liquidation preferences and the number of shares constituting any class or series, without further vote or action by the stockholders.

78

While we do not currently have any plans for the issuance of any preferred stock, the issuance of preferred stock could adversely affect the rights of the holders of common stock and, therefore, reduce the value of the common stock. It is not possible to state the actual effect of the issuance of any shares of preferred stock on the rights of holders of the common stock until the Board of Directors determines the specific rights of the holders of the preferred stock; however, these effects may include:

- Restricting dividends on the common stock;
- Diluting the voting power of the common stock;
- Impairing the liquidation rights of the common stock; or
- Delaying or preventing a change in control of the Company without further action by the stockholders.

### *Warrants*

On March 8, 2018, the Company issued to the Selling Securityholder warrants to purchase a total of 1,500,000 shares of Company common stock at the exercise price of $4.00 per share. The shares of Company common stock underlying the Selling Securityholder Warrant are being registered under this prospectus. The Selling Securityholder Warrant expires five years from the date of issuance. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

In March 2018, the Company issued to Aegis Capital Corp., as a placement agent ("Aegis") warrants (the "Aegis Warrants") to purchase a certain number of shares of common stock of the Company ("Placement Agent Warrant Shares") equal to 8% of the aggregate number of securities placed in the Second Note Offering (or the 2018 Senior Secured Note offering), plus any securities underlying any convertible securities placed in the Second Note Offering to such purchasers. The Aegis Warrants provide the holder with the right to purchase the underlying Warrant Shares at a price of $4.00 per share. The Aegis Warrants expires five years from the date of issuance.

### *Options*

### *2016 Equity Incentive Plan*

On November 30, 2016, we adopted our 2016 Equity Incentive Plan (the "Plan") to reward and provide incentives to our officers, directors, employees, consultants and other eligible participants. We have set aside options to purchase up to 10,000,000 shares of common stock for issuance under the Plan, which may be granted in the form of either incentive stock options or non-qualified stock options. Our Board of Directors administers the Plan and has the authority: (i) to select the Plan recipients, the time or times at which awards may be granted, the number of shares to be subject to each option awarded, the vesting schedule of the options and (ii) to amend the stock option Plan to reward and provide incentives to its officers, directors, employees, consultants and other eligible participants. As of the date of this prospectus, 750,000 options have been granted under the Plan, of which 720,000 are vested and exercisable. 100% of the outstanding options have been granted to former officers and directors of the Company. Subsequent to the completion of this offering, the Company expects to continue to issue options as an inducement for managerial and qualified personnel to remain with and to join the Company. As of December 31, 2018, the Company granted an aggregate of 750,000 (450,000 expired in 2018) non-qualified stock options under the plan. As of June 30, 2019, an aggregate of 300,000 non-qualified stock options are vested and exercisable.

### Restricted Stock

As of June 30, 2019, we had issued and outstanding 1,413,820 shares of restricted common stock, of which 924,695 shares are subject to lock-up agreements described elsewhere in this prospectus.

### Registration Rights

The Selling Securityholder, a principal shareholder of the Company and the holder of the Selling Securityholder Warrant, is entitled to rights with respect to the registration of their shares beneficially owned under the Securities Act. These registration rights are set forth under the terms of the Purchase Agreement, dated March 8, 2018, and as further set forth under a registration rights agreement, dated March 8, 2018, by and between the Company and Bellridge Capital, L.P. (the "Registration Rights Agreement"). For more information see "*Certain Relationships and Related Transactions*." The Registration Rights Agreement sets forth a mandatory date for registration of 1,650,000 shares of restricted common stock of the Company beneficially owned as of record by the Selling Securityholder, pursuant to which the parties agreed that as soon as practicable after the date on which the shares of Company common stock, whether as a result of a public offering, merger, recapitalization, reorganization or otherwise, are registered under the Securities Exchange Act of 1934, as amended (each a "Public Company Date"), but in no event later than thirty (30) days after a Public Company Date (the "Filing Deadline"). The Registration Rights Agreement sets forth that the Company shall use its best efforts to cause the

registration statement filed on behalf of the registrable securities to become effective as soon as practicable after filing, subject to the Filing Deadline. Under this prospectus, the Company is registering the underlying shares of common stock under the Selling Securityholder Warrant and such other registrable securities in accordance with the terms of the Purchase Agreement and Registration Rights Agreement. We will pay the registration expenses (other than underwriting discounts, selling commissions and stock transfer taxes) of the holders of the shares registered pursuant to the registrations described below.

**Indebtedness**

As of December 31, 2018, we had outstanding indebtedness, excluding capital leases, of approximately a total of $2,690,181, which consisted of the following: (i) $790,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of August 31, 2019; (ii) $319,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to December 11, 2020; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of August 31, 2019, as subsequently amended to November 30, 2019; (iv) $1,296,018 in a secured note payable due the earlier of August 31, 2019, as subsequently amended to November 30, 2019, as amended, or the closing of an offering of at least $3,000,000 and (v) $62,274 in unsecured notes payable/line of credit to a merchant banks, accruing interest at 15%. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

Our contractual obligations and commercial commitments as of December 31, 2018 are summarized below:

*Long-term debt*—We have long-term debt obligations of nil as of December 31, 2018.

*Capital lease obligations*—We have capital lease obligations of $3,790,147 as of December 31, 2018.

Operating leases—We have operating lease obligations of nil as of December 31, 2018.

### *Bellridge Second Note Offering*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Selling Securityholder, an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased:

- a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note");

- warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant");

- 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares").

In consideration for the Second Note, Warrant Shares and Commitment Shares, the Lender paid an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below).

The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and restrictive financial covenants, including but not limited to, the following restrictive covenants:

- The Company will not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, incur or guarantee, assume or suffer to exist any indebtedness (other than (i) the Indebtedness evidenced by the Second Note and the First Note and (ii) other Permitted Indebtedness). Under the terms of the Second Note, "Permitted Indebtedness" means (i) indebtedness evidenced by the Second Note and the First Note, (ii) indebtedness secured by permitted liens or unsecured indebtedness and (iii) permitted subordinated indebtedness;

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on any of its capital stock;

- At any time a Defeasance Failure exists (defined below), the Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, permit any indebtedness of the Company or any of its subsidiaries to mature or accelerate prior to the maturity date of the Second Note. "<u>Defeasance Failure</u>" means, as of any given time of determination, the failure of the cash amount in the Holder Master Restricted Account to be greater than or equal to the outstanding amount. "<u>Holder Master Restricted Account</u>" means, solely with respect to the holder, a certain account at Umpqua Bank, or such other account as may be directed by the holder of the Second Note, from time to time, subject to a Controlled Account Agreement in favor of the holder in a form reasonably acceptable to the holder; and

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by or publicly contemplated to be conducted by the Company and each of its subsidiaries on March 8, 2018 or any business substantially related or incidental thereto. The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, modify its or their corporate structure or purpose.

The Company believes that as of the date of this prospectus, the Company is in compliance with all of the foregoing restricted covenants, including such additional covenants set forth under Second Note. Further, the Company believes that as of the date of this prospectus, the Company is in compliance with all affirmative covenants set forth below.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and affirmative covenants, including but not limited to, the following affirmative covenants:

- The Company will establish and maintain a bank account for the holder of the Second Note (collectively, including the Holder Master Restricted Account, the "Master Restricted Accounts") which Master Restricted Account applicable to a holder of Second Note shall be subject to a deposit account control agreement in form and substance reasonably acceptable to such holder of Notes (each, a "Controlled Account Agreement"). On the issuance date of the Second Note, the Company shall have directed the Lender to deposit an aggregate of $6 million of the purchase price for the Second Note, Commitment Shares and Warrant into Master Restricted Accounts;

- Upon the occurrence of any Controlled Account Release Event (defined below), the holder of the Second Note shall, as soon as commercially practicable, but in no event later than two trading days thereafter, cause the applicable Controlled Account Release Amount to be released from the Holder Master Restricted Account and deposited into an bank account specified in writing by the Company on or prior to such date (each a "Controlled Account Release"); provided, that if the Company fails to select a bank account in a writing delivered to the holder on or prior to such second trading day, the holder shall effect such Controlled Account Release as soon as commercially practicable after receipt of such bank account election from the Company. "Controlled Account Release Amount" means, with respect to any given Controlled Account Release Event, such amount of cash as specified in the applicable clause of the definition of "Controlled Account Release Event". "Controlled Account Release Event" means, as applicable, (i) the Company's receipt of a notice by the Holder electing to effect a release of cash with respect to any Restricted Principal to the Company or (ii) at any time the outstanding amount hereunder is greater than the cash amount in the Holder Master Restricted Account (such excess amount, the "Excess Collateral"), as long as no event of default has occurred and is continuing, the Company may, by delivery of written notice to the Holder, require the release of such Excess Collateral to the Company from the Holder Master Restricted Account;

- The Company grants and pledges to the holder of the Second Note a continuing security interest in any cash or other assets, from time to time, in that certain deposit account called the Holder Master Restricted Account, including any and all cash, proceeds, funds, credits, rights and other assets therein or arising therefrom, from time to time, and any additions, dividends, profits and interest in the foregoing and any replacements or substitutions therefore (collectively, the "Collateral") to secure prompt repayment of any and all amounts outstanding hereunder from time to time and to secure prompt performance by the Company of each of its covenants and duties under the transaction documents. Such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Notwithstanding any filings undertaken related to Holder's rights under the New York Uniform Commercial Code, the Holder's Lien (as defined in the Second Note) on the Collateral shall remain in effect for so long as any Restricted Principal remains outstanding. Notwithstanding the foregoing, upon any Controlled Account Release, but solely with respect to such the applicable Controlled Account Release Amount, the holder of the Second Note will automatically release any lien on such Controlled Account Release Amount. "Restricted Principal" means, as of any given date, the difference of (i) all cash amounts held in the Master Restricted Account of the Holder as of the Closing Date of the Second Note Offering and (ii) all cash amounts released from the Master Restricted Account of the holder of the Second Note to the Company (or at the Company's direction) on or prior to such given date;

- Notwithstanding anything herein to the contrary, at the option of the holder of the Second Note, the holder of the Second Note may satisfy all, or any part, of any redemption or other cash payment obligation of the Company hereunder and/or pursuant to any other transaction document (each, a "Cash Payment Obligation"), in whole or in part, at the sole option of the holder of the Second Note, from the Collateral in the Holder Master Restricted Account, including, without limitation, in connection with any redemption hereunder upon any event of default under the Second Note, or any other payment due hereunder (whether at or prior to the Maturity Date). In connection with any Cash Payment Obligation, the Company irrevocably consents to delivery by the holder of the Second Note of an instruction letter to the Controlled Account Bank to release Collateral from the Holder Master Restricted Account in an amount not to exceed such Cash Payment Obligation to the holder of the Second Note. Notwithstanding the foregoing, in the absence of any such election by the holder of the Second Note, the Company shall remain obligated to pay such Cash Payment Obligation to the holder of the Second Note without regard to any Collateral in the Holder Master Restricted Account. Upon the occurrence of any event which could reasonably be expected to result in a Cash Payment Obligation, the holder of the Second Note may, at the holder of the Second Note option, withdraw any Collateral in the Holder Master Restricted Account; provided that (x) such withdrawn amount shall not exceed such amount which the holder of the Second Note reasonably believes would be necessary to satisfy such Cash Payment Obligation, and (y) such withdrawal shall not constitute the delivery of a Redemption Notice hereunder or payment hereunder unless the holder of the Second Note specifies in writing to the Company that the holder of the Second Note has applied such Collateral in satisfaction of such Cash Payment Obligation; and

- If the Controlled Account Bank breaches any covenant or other term or condition of any Controlled Account Agreement or otherwise fails to promptly comply with the instructions of the holder of the Second Note in connection with the Collateral, the holder of the Second Note may, at its option, withdraw the Collateral from the Controlled Account Bank and hold such Collateral until such time as (x) the Company and the holder of the Second Note have agreed upon a replacement Controlled Account Bank and (y) a Controlled Account Agreement with respect to such Collateral and a new account shall have been duly executed by the Company, the holder of the Second Note and the replacement Controlled Account Bank. Notwithstanding anything herein to the contrary, if the Company or any of its Subsidiaries receives any of the Collateral in breach of any Controlled Account Agreement (or receives notice from any holder of Notes that an amount was wired to the Company from a Master Restricted Account attributable to such holder of Notes without the proper authorization of such holder of Notes), the Company shall promptly cause such amounts to be returned to such applicable Master Restricted Account.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019, as amended, or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

**Related Party Debt**

*Capital and Operating Leases*

We maintain capital leases mainly for certain vehicles maintained and under lease with Distinct Cars, LLC. We have several operating vehicle leases with Acme Auto Leasing LLC (the "Lessor") with lease terms expiring on a monthly basis. As of December 31, 2018, our total future operating lease payments amounted to $4,084,152 and the present value of minimum lease payments under our capital leases amounted to $3,790,147.

As of the date of this prospectus, Distinct Cars, LLC, as lessee, entered into series open-ended lease agreements and disclosure statements with the Lessor to lease standard passenger vehicles, each with an approximate lease term of thirty (30) to thirty-six (36) months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, Lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

As of the date of this prospectus, we are indebted to certain principal stockholders of the Company for loans and advances made to our Company over the past five years in the aggregate amount of $1,518,240.

*2017 Senior Secured Note*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, in the original principal amount of $222,222 (the "<u>First Note</u>"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

*2018 Senior Secured Note*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "<u>Purchase Agreement</u>") with the Selling Securityholder, an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "<u>Lender</u>"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "<u>Second Note</u>"). The aggregate purchase price of the Second Note is $6,000,000 (the "<u>Second Note Offering</u>") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "<u>Collateral</u>"), to be held and maintained at Umpqua Bank (the "<u>Master Restricted Account</u>"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "<u>Controlled Account Agreement</u>"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Selling Securityholder Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019, as amended, or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

**Exclusive forum for adjudication of disputes provision which limits the forum to the Delaware Court of Chancery for certain actions against the Company**

Our Amended and Restated Bylaws provide that, unless we consent in writing to the selection of an alternative forum, a state court in the State of Delaware (or, if that court does not have jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the DGCL or the Certificate of Incorporation or these Bylaws (in each case, as they may be amended from time to time), or (d) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation governed by the internal affairs doctrine. This exclusive forum provision may limit the ability of our stockholders to bring a claim in a judicial forum that such stockholders find favorable for disputes with us or our directors or officers, which may discourage lawsuits against us or our directors or officers.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock will be VStock Transfer, LLC.

**Listing**

We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering.

## SHARES ELIGIBLE FOR FUTURE SALE

There is not currently an established U.S. trading market for our common stock. We cannot predict the effect, if any, that market sales of shares of our common stock or the availability of shares of our common stock for sale will have on the market price of our common stock prevailing from time to time. Sales of substantial amounts of our common stock, including shares issued upon exercise of outstanding warrants, in the public market after this offering, could adversely affect market prices prevailing from time to time and could impair our ability to raise capital through the sale of our equity securities.

Upon the completion of the sale of 2,500,000 shares of our common stock in our primary offering, a total of 29,302,976 shares of our common stock will be outstanding. This number excludes any issuance of an aggregate of additional shares of common stock that could occur in connection with the conversion of our outstanding convertible promissory notes, options and warrants.

All of the shares of common stock and shares of common stock issuable upon exercise of warrants, when sold pursuant to this prospectus, will be freely tradable, except that any shares acquired by our affiliates, as that term is defined in Rule 144 under the Securities Act, may only be sold in compliance with the limitations described below. As of October 31, 2019, our directors and executive officers did not own any of our common stock.

82

As explained in the Explanatory Note to the registration statement of which this prospectus forms a part, this prospectus is to be used in connection with the potential resale by the Selling Securityholder of up to an aggregate of 1,650,000 shares of our common stock, which shares (including 1,500,000 shares issuable upon exercise of outstanding Selling Securityholder Warrant). We will not receive any of the net proceeds from the sale of shares by the Selling Securityholder; however, we may receive proceeds if the Selling Securityholder Warrant is exercised for cash. The shares of common stock being registered under this prospectus permit public resales of such shares, and the Selling Securityholder may offer the shares for resale from time to time pursuant to this prospectus. The Selling Securityholder may also sell, transfer or otherwise dispose of all or a portion of their shares in transactions exempt from the registration requirements of the Securities Act of 1933, as amended, or pursuant to another effective registration statement covering those shares.

25,885,303 shares of our outstanding common stock that are not registered under the registration statement of which this prospectus is a part and have not been registered under another registration statement will be deemed restricted securities as defined under Rule 144. Restricted shares may be sold in the public market only if registered or if they qualify for an exemption from registration promulgated under the Securities Act. Subject to the provisions of Rule 144, all of the outstanding shares of common stock that are currently restricted are available for sale in the public market under Rule 144.

For information about shares of common stock issuable upon the exercise of options and warrants, see "*Description of Securities.*"

In general, under Rule 144 as currently in effect, a person, or group of persons whose shares are required to be aggregated, who is deemed to have been an affiliate at any time during the three months preceding a sale, who has beneficially owned shares that are restricted securities as defined in Rule 144 for at least six months is entitled to sell, within any three-month period commencing 90 days after the date of this prospectus, a number of shares that does not exceed 1% of the then outstanding shares of our common stock.

Sale under Rule 144 by affiliates, whether of restricted or non-restricted shares, include requirements for current public information about the Company; selling the shares pursuant to broker transactions; and limitations on the number of shares sold within a three-month period.

In addition, a person who is not deemed to have been one of our affiliates at any time during the 90 days preceding a sale and who has beneficially owned shares of our common stock for at least six months, including the holding period of any prior owner, except if the prior owner was one of our affiliates, would be entitled to sell all of their shares, provided the availability of current public information about our company. To the extent that shares were acquired from one of our affiliates, a person's holding period for the purpose of effecting a sale under Rule 144 would commence on the date the shares were acquired from the affiliate.

**Lock-Up Agreements**

Our officers, directors affiliates and certain existing stockholders have agreed, subject to certain exceptions, not to offer, issue, sell, contract to sell, encumber, grant any option for the sale of or otherwise dispose of any shares of our common stock or other securities convertible into or exercisable or exchangeable for shares of our common stock without the prior written consent of the Representative (as defined herein). An aggregate of 25,067,786 of our outstanding shares of common stock shall be subject to lock-up agreements as follows: (i) 2,900,000 shares of common stock held by X, LLC, 10,325,000 shares of common stock held by Gray Mars Venus Trust, Arizona 2015, 2,844,945 shares of common stock controlled by David Haley, 2,758,824 shares of common stock held by James Malackowiski, 2,018,750 shares of common stock held by John O'Hurley and 1,654,412 shares held by Acuitas Group Holdings, LLC for six months; (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding warrants held by Bellridge Capital, L.P. for 60 days; (iii) 400,000 shares of common stock held by Bellridge Capital, L.P. for 30 days and (iv) an additional 2,165,855 shares of common stock held by other stockholders for periods ranging from 47 days to six months.

Except for Acuitas Group Holdings, LLC, with respect to the stockholders locking up their shares of common stock for a period of 180 or 120 days, the lock-up restriction shall not apply to their shares to the extent that such shares are sold for a price per share of no less than $6.00. The 400,000 shares of common stock held by Bellridge Capital, L.P. which are being locked up for 30 days shall not be subject to the lock-up to the extent that such shares are sold for a price per share of no less than $6.00. One additional stockholder is locking up his shares as follows: (i) 150,000 shares shall be locked up until the earlier of (x) 47 after the closing of this offering and (y) such time that the Company's closing price on The Nasdaq Capital Market is $5.00 per share, and (ii) the balance of such shares (the "Additional Shares") that are being locked up shall be locked up for a period of 180 days; provided, however, that the lock-up restriction shall not apply to the Additional Shares to the extent that such Additional Shares are sold for a price per share of no less than $6.00. Lastly, one other stockholder is locking up his shares as follows: initially 100% of such stockholders shares shall be locked up; provided, however, commencing 47 days after the closing of this offering, only 90% of such shares shall continue to be subject to such lock up. Furthermore, the 90% of such shares that shall be locked-up shall not be subject to the lock-up to the extent that such shares are sold for a price per share of no less than $6.00.

**Sale of Founder's Shares and Voting Trust**

As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, agreed to sell 12,525,000 of its 15,425,000 shares of common stock.  The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)).  The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months.  As a result of the sale, X, LLC's beneficial ownership shall be reduced to 9.9% of the shares outstanding after the completion of this Offering. We will not receive any proceeds from the sale of the Private Shares. If the offering contemplated by this registration statement is not consummated by January 31, 2020, the parties have agreed to unwind the sale of the Private Shares transaction in compliance with applicable law. Mr. El-Batrawi has also entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his remaining 2,900,000 shares of common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

**Electronic Distribution**

A prospectus in electronic format may be made available on the websites maintained by Selling Securityholder, if any, participating in the offering. The Selling Securityholder may agree to allocate a number of shares of common stock to their online brokerage account holders. Internet distributions will be allocated by the Selling Securityholder to make Internet distributions on the same basis as other allocations.

# UNDERWRITING

Aegis Capital Corp. is acting as the lead managing underwriter and as representative of the underwriters (the "Representative"). Subject to the terms and conditions of an underwriting agreement between us and the Representative, we have agreed to sell to each underwriter named below, and each underwriter named below has severally agreed to purchase, at the public offering price, less the underwriting discounts set forth on the cover page of this prospectus, the number of shares of common stock listed next to its name in the following table:

| Underwriter | Number of shares of common stock |
| --- | --- |
| Aegis Capital Corp. | |
| WestPark Capital, Inc. | |
| **Total** | |

The underwriters are committed to purchase all the shares of common stock offered by this prospectus, if they purchase any shares of common stock. The underwriting agreement also provides that if an underwriter defaults, the purchase commitments of non-defaulting underwriters may be increased, or the offering may be terminated. The underwriters are not obligated to purchase the shares of common stock covered by the underwriters' option to purchase additional shares of common stock described below. The underwriters are offering the shares of common stock, subject to prior sale, when, as and if issued to and accepted by them, subject to approval of legal matters by their counsel, and other conditions contained in the underwriting agreement, such as the receipt by the underwriters of officer's certificates and legal opinions. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

## Over-allotment Option

We have granted the representative of the underwriters, an option exercisable, for up to 45 days after the date of the underwriting agreement, to purchase up to shares of common stock at the public offering price listed on the cover page of this prospectus, less underwriting discounts. The underwriters may exercise this option solely to cover over-allotments, if any, made in connection with this offering. To the extent the option is exercised, and the conditions of the underwriting agreement are satisfied, we will be obligated to sell to the underwriters, and the underwriters will be obligated to purchase, these additional shares of common stock.

## Discounts and Commissions

We have agreed to pay the underwriters a cash fee equal to 8.0% of the aggregate gross proceeds.

The Representative has advised us that the underwriters propose to offer the shares directly to the public at the public offering price set forth on the cover of this prospectus. In addition, the Representative may offer some of the shares to other securities dealers at such price less a concession of up to $[ ] per share. After the offering to the public, the offering price and other selling terms may be changed by the Representative without changing the Company's proceeds from the underwriters' purchase of the shares.

The following table shows the public offering price, underwriting discounts and proceeds, before expenses, to us. The information assumes either no exercise or full exercise by the underwriters of their over-allotment option. The underwriting discounts are equal to the public offering price per share less the amount per share the underwriters pay us for the shares.

| | Per Share of Common Stock | Total without Over-allotment Option | Total Over-allotment Option |
|---|---|---|---|
| Public offering price | $ | $ | $ |
| Underwriting discounts | $ | $ | $ |
| Proceeds, before expenses, to us | $ | $ | $ |
| | $ | $ | $ |

We have agreed to pay the Representative a non-accountable expense allowance of 1% of the gross proceeds of the offering. We estimate that the total expenses, but excluding underwriting discounts and commissions and the 1% non-accountable expense allowances, will be approximately $100,000, all of which are payable by us. This figure includes expense reimbursements we have agreed to pay the Representative for reimbursement of its expenses related to the offering up to a maximum aggregate expense allowance of $125,000, for which we have paid a $50,000 advance, which will be returned to us to the extent not offset by actual expenses.

**Underwriters' Warrants**

As additional compensation to the underwriters, upon consummation of this offering, we will issue to the underwriters or their designees warrants to purchase an aggregate number of shares of our common stock equal to 5% of the number of shares of common stock issued in this offering (excluding shares of common stock sold to cover over-allotments, if any), at an exercise price per share equal to 125% of the initial public offering price (the "Underwriters' Warrants"). The Underwriters' Warrants and the underlying shares of common stock will not be exercised exercise, sold, transferred, assigned, or hypothecated or be the subject of any hedging, short sale, derivative, put, or call transaction that would result in the effective economic disposition of the Underwriters' Warrants by any person for a period of 180 days from the effective date of the registration statement (the "Effective Date") for this offering in accordance with FINRA Rule 5110. The Underwriters' Warrants will be exercisable, in whole or in part, commencing one year from the Effective Date and will expire on the fifth anniversary of the Effective Date of the registration statement for this offering. In addition, we have granted the underwriters a one-time demand registration right and unlimited "piggyback" registration rights with respect to the underlying shares. The piggyback registration right will not be greater than seven years from the effective date of the offering in compliance with FINRA Rule 5110(f)(2)(G)(v).

**Determination of Offering Price**

Before this offering, there has been no public market for our common stock. Accordingly, the public offering price will be negotiated between us and the Representative. Among the factors to be considered in these negotiations are:

- the prospects for our Company and the industry in which we operate;
- our past and present financial and operating performance;
- financial and operating information and market valuations of publicly traded companies engaged in activities similar to ours;
- the prevailing conditions of United States securities markets at the time of this offering; and
- other factors deemed relevant.

**Lock-Up Agreements**

We and each of our officers, directors affiliates and certain existing stockholders have agreed, subject to certain exceptions, not to offer, issue, sell, contract to sell, encumber, grant any option for the sale of or otherwise dispose of any shares of our common stock or other securities convertible into or exercisable or exchangeable for shares of our common stock without the prior written consent of the Representative. An aggregate of 25,067,786 of our outstanding shares of common stock shall be subject to lock-up agreements as follows: (i) 2,900,000 shares of common stock held by X, LLC, 10,325,000 shares of common stock held by Gray Mars Venus Trust, Arizona 2015, 2,844,945 shares of common stock controlled by David Haley, 2,758,824 shares of common stock held by James Malackowiski, 2,018,750 shares of common stock held by John O'Hurley and 1,654,412 shares held by Acuitas Group Holdings, LLC for six months; (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding warrants held by Bellridge Capital, L.P. for 60 days; (iii) 400,000 shares of common stock held by Bellridge Capital, L.P. for 30 days and (iv) an additional 2,165,855 shares of common stock held by other stockholders for periods ranging from 47 days to six months; provided, however, certain shares may not be subject to a lock up period in the event that such shares are sold at certain minimum prices (see "Shares Eligible for Future – Lock-Up Agreements").

The Representative may in its sole discretion and at any time without notice release some or all of the shares subject to lock-up agreements prior to the expiration of the lock-up period. When determining whether or not to release shares from the lock-up agreements, the Representative will consider, among other factors, the security holder's reasons for requesting the release, the number of shares for which the release is being requested and market conditions at the time.

Pursuant to the underwriting agreement, we have also agreed, for a period of 180 days from the date of the offering, that we will not, subject to specified exempt issuances, offer, pledge, issue, sell, contract to sell, purchase, contract to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock; or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of common stock or such other securities, in cash or otherwise; or (iii) file any registration statement with the SEC relating to the offering of any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock.

**Right of First Refusal**

According to the terms of the underwriting agreement, the Representative shall have the right of first refusal for a period of twelve months after the closing of this offering to act as sole book-running manager for all future public equity offerings by us, or any successor to or subsidiary of our company, during such period.

**Indemnification**

We have agreed to indemnify the underwriters against specified liabilities, including liabilities under the Securities Act, and to contribute to payments the underwriters may be required to make in respect thereof.

**Electronic Offer, Sale and Distribution of Shares**

A prospectus in electronic format may be made available on a website maintained by the Representative and may also be made available on a website maintained by other underwriters. The underwriters may agree to allocate a number of shares to underwriters for sale to their online brokerage account holders. Internet distributions will be allocated by the Representative to underwriters that may make Internet distributions on the same basis as other allocations. In connection with the offering, the underwriters or syndicate members may distribute prospectuses electronically. No forms of electronic prospectus other than prospectuses that are printable as Adobe® PDF will be used in connection with this offering.

The underwriters have informed us that they do not expect to confirm sales of shares offered by this prospectus to accounts over which they exercise discretionary authority.

Other than the prospectus in electronic format, the information on any underwriter's website and any information contained in any other website maintained by an underwriter is not part of the prospectus or the registration statement of which this prospectus forms a part, has not been approved and/or endorsed by us or any underwriter in its capacity as underwriter and should not be relied upon by investors.

**Price Stabilization, Short Positions and Penalty Bids**

In connection with this offering, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of our common stock. Specifically, the underwriters may over-allot in connection with this offering by selling more shares than are set forth on the cover page of this prospectus. This creates a short position in our common stock for its own account. The short position may be either a covered short position or a naked short position. In a covered short position, the number of shares of common stock over-allotted by the underwriters is not greater than the number of shares of common stock that they may purchase in the over-allotment option. In a naked short position, the number of shares of common stock involved is greater than the number of shares of common stock in the over-allotment option. To close out a short position, the underwriters may elect to exercise all or part of the over-allotment option. The underwriters may also elect to stabilize the price of our common stock or reduce any short position by bidding for, and purchasing, common stock in the open market.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter or dealer repays selling concessions allowed to it for distributing a security in this offering because the underwriter repurchases that security in stabilizing or short covering transactions.

Finally, the underwriters may bid for, and purchase, shares of our common stock in market making transactions, including "passive" market making transactions as described below.

These activities may stabilize or maintain the market price of our common stock at a price that is higher than the price that might otherwise exist in the absence of these activities. The underwriters are not required to engage in these activities, and may discontinue any of these activities at any time without notice.

In connection with this offering, the underwriters and selling group members, if any, or their affiliates may engage in passive market making transactions in our common stock immediately prior to the commencement of sales in this offering, in accordance with Rule 103 of Regulation M under the Exchange Act. Rule 103 generally provides that:

a passive market maker may not effect transactions or display bids for our common stock in excess of the highest independent bid price by persons who are not passive market makers:

- net purchases by a passive market maker on each day are generally limited to 30% of the passive market maker's average daily trading volume in our common stock during a specified two-month prior period or 200 shares, whichever is greater, and must be discontinued when that limit is reached; and
- passive market making bids must be identified as such.

## Certain Relationships

Certain of the underwriters and their affiliates have provided and may in the future provide various investment banking, commercial banking and other financial services for us and our affiliates for which they have or may in the future receive customary fees, however, except for the right of first refusal disclosed in this prospectus, we have no present arrangements with any of the underwriters for any further services.

## Offer Restrictions Outside the United States

Other than in the United States, no action has been taken by us or the underwriters that would permit a public offering of the securities offered by this prospectus in any jurisdiction where action for that purpose is required. The securities offered by this prospectus may not be offered or sold, directly or indirectly, nor may this prospectus or any other offering material or advertisements in connection with the offer and sale of any such securities be distributed or published in any jurisdiction, except under circumstances that will result in compliance with the applicable rules and regulations of that jurisdiction. Persons into whose possession this prospectus comes are advised to inform themselves about and to observe any restrictions relating to the offering and the distribution of this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities offered by this prospectus in any jurisdiction in which such an offer or a solicitation is unlawful.

87

## EXPERTS

AJ Robbins CPA, LLC, an independent certified public accounting firm, audited our financial statements for the years ended December 31, 2018 and 2017. We have included our financial statements in this prospectus and elsewhere in the registration statement in reliance on the reports of AJ Robbins CPA, LLC, given on their authority as experts in accounting and auditing.

## LEGAL MATTERS

Certain legal matters with respect to the validity of the securities being offered by this prospectus will be passed upon by Carmel, Milazzo & DiChiara LLP, New York, New York. Sheppard, Mullin, Richter & Hampton LLP, New York, New York, is acting as counsel for the underwriters with respect to the primary offering.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of our common stock offered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement, some of which is contained in exhibits to the registration statement as permitted by the rules and regulations of the SEC. For further information with respect to us and our common stock, we refer you to the registration statement, including the exhibits filed as a part of the registration statement. Statements contained in this prospectus concerning the contents of any contract or any other document is not necessarily complete. If a contract or document has been filed as an exhibit to the registration statement, please see the copy of the contract or document that has been filed. Each statement in this prospectus relating to a contract or document filed as an exhibit is qualified in all respects by the filed exhibit. You may obtain copies of this information by mail from the Public Reference Section of the SEC, 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates. You may obtain information on the operation of the public reference rooms by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet website that contains reports, proxy statements and other information about issuers, like us, that file electronically with the SEC. The address of that website is *www.sec.gov*.

We are subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, are required to file periodic reports, proxy statements and other document with the SEC. These periodic reports, proxy statements and other information are available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. We also maintain a website at *www.yayyo.com*. You may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

89

# INDEX TO FINANCIAL STATEMENTS

**YAYYO, INC**
**Financial Statements**
**December 31, 2018 and 2017**

### Contents

| | Page |
|---|---|
| **Financial Statements:** | |
| Report of Independent Registered Public Accounting Firm | F - 2 |
| Consolidated Balance Sheets as of December 31, 2018 and December 31, 2017 | F - 3 |
| Consolidated Statements of Operations for the year ended December 31, 2018 and 2017 | F - 4 |
| Consolidated Statement of Stockholders' Equity for the year ended December 31, 2018 and 2017 | F - 5 |
| Consolidated Statements of Cash Flows for the year ended December 31, 2018 and 2017 | F - 6 |
| Notes to Consolidated Financial Statements | F - 7 |
| Condensed Consolidated Balance Sheets as of June 30, 2019 (unaudited) and December 31, 2018 | F - 21 |
| Condensed Consolidated Statements of Operations for the six months ended June 30, 2019 and 2018 (unaudited) | F - 22 |
| Condensed Consolidated Statements of Stockholders' Equity (Deficit) for the six months ended June 30, 2019 and 2018 (unaudited) | F - 23 |
| Condensed Consolidated Statements of Cash Flows for the six months ended June 30, 2019 and 2018 (unaudited) | F - 24 |
| Notes to Condensed Consolidated Financial Statements | F - 25 |

F-1

**AJ Robbins CPA, LLC**
Certified Public Accountant

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and
Stockholders of Yayyo Inc.

### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Yayyo, Inc. (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, changes in stockholders' equity (deficit), and cash flows for each of the years in the two years then ended and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Yayyo, Inc. as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the years in the two years then ended, in conformity with accounting principles generally accepted in the United States of America.

### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United Sates) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we were required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. According we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluation of the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

### Emphasis of Matter

As discussed in Note 13 to the financial statements, the 2017 financial statements have been restated to correct a misstatement. Our opinion is not modified with respect to this matter.

We have served as the Company's auditor since 2016
Denver, Colorado
March 22, 2019

**aj@ajrobbins.com**
400 South Colorado Blvd, Suite 870, Denver, Colorado 80246
(B)303-537-5898 (M)720-339-5566 (F)303-586-6261

**YAYYO, INC.**
**CONSOLIDATED BALANCE SHEETS**
**As of December 31, 2018 and 2017**

| | | 2018 | | 2017 |
|---|---|---|---|---|
| | | | | **(restated)** |
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 277,444 | $ | 308,738 |
| Accounts receivable | | - | | - |
| Prepaid expenses | | 108,900 | | 13,406 |
| Total current assets | | 386,344 | | 322,144 |
| | | | | |
| Equipment, net | | 5,092 | | 2,860 |
| Leased assets, net | | 5,115,117 | | 2,033,482 |
| Deferred offering costs | | 66,500 | | - |
| **TOTAL ASSETS** | $ | 5,573,053 | $ | 2,358,486 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| Current Liabilities: | | | | |
| Accounts payable (including $334,471 in 2018 to related party) | $ | 719,386 | $ | 100,000 |
| Accrued expenses | | 494,066 | | 31,453 |
| Notes payables, current (net of discount of $72,211 and $48,600) | | 2,617,970 | | 254,511 |
| Finance lease obligations, current | | 1,562,651 | | 555,090 |
| Total current liabilities | | 5,394,073 | | 941,054 |
| | | | | |
| Notes payable, net of current portion (net of discount of $54,190) | | - | | 552,588 |
| Finance lease obligations, net of current portion | | 2,227,496 | | 1,038,201 |
| **TOTAL LIABILITIES** | | 7,621,569 | | 2,531,843 |
| | | | | |
| Commitments and contingencies | | - | | - |
| | | | | |
| **STOCKHOLDERS' DEFICIT** | | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | | | |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 26,718,676 and 25,770,551 shares issued and outstanding | | 27 | | 26 |
| Additional paid-in capital | | 19,193,151 | | 7,879,189 |
| Accumulated deficit | | (21,241,694) | | (8,052,572) |
| Total stockholders' deficit | | (2,048,516) | | (173,357) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $ | 5,573,053 | $ | 2,358,486 |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-3

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Year Ended December 31, 2018 and 2017**

|  |  | 2018 |  | 2017 |
|---|---|---|---|---|
|  |  |  |  | **(restated)** |
| **Revenue** | $ | 3,289,478 | $ | 235,690 |
| **Cost of revenue** |  | 2,374,397 |  | 213,111 |
| **Gross profit** |  | 915,081 |  | 22,579 |
| **Operating expenses:** |  |  |  |  |
| Selling and marketing expenses |  | 482,811 |  | 86,098 |
| Product development |  | 9,699 |  | 303,555 |
| General and administrative expenses |  | 6,584,251 |  | 3,249,659 |
| Impairment of leased assets |  | 2,388,000 |  | 2,800,000 |
| Total operating expenses |  | 9,464,761 |  | 6,439,312 |
| **Loss from operations** |  | (8,549,680) |  | (6,416,733) |
| **Other income (expense):** |  |  |  |  |
| Interest and financing costs |  | (4,639,442) |  | (192,395) |
| Change in value of derivative liability |  | - |  | 40,265 |
| Total other income (expense) |  | (4,639,442) |  | (152,130) |
| **Net loss** | $ | (13,189,122) | $ | (6,568,863) |
| **Weighted average shares outstanding:** |  |  |  |  |
| Basic |  | 26,321,137 |  | 25,297,066 |
| Diluted |  | 26,321,137 |  | 25,297,066 |
| **Loss per share** |  |  |  |  |
| Basic | $ | (0.50) | $ | (0.26) |
| Diluted | $ | (0.50) | $ | (0.26) |

The accompanying footnotes are an integral part of these consolidated financial statements.

**YAYYO, INC.**
**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY (DEFICIT)**
**For the Year Ended December 31, 2018 and 2017**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Deficit | Deficit |
| **Balance, December 31,2016** | 25,011,000 | $ 25 | $ 1,382,930 | $ (1,483,709) | $ (100,754) |
| Issuance of common stock for cash | 371,351 | 1 | 2,484,198 | | 2,484,199 |
| Payment of offering costs | | | (814,442) | | (814,442) |
| Value of common stock of related party issued with convertible note payable | | | 99,027 | | 99,027 |
| Value of common stock issued with notes payable | 18,200 | | 91,000 | | 91,000 |
| Value of common stock issued with capital lease obligation | 350,000 | | 2,800,000 | | 2,800,000 |
| Issuance of common stock for accounts payable | 20,000 | | 160,000 | | 160,000 |
| Stock option expense | | | 1,676,476 | | 1,676,476 |
| Net loss | | | | (6,568,863) | (6,568,863) |
| **Balance, December 31, 2017** | 25,770,551 | 26 | 7,879,189 | (8,052,572) | (173,357) |
| Issuance of common stock for cash | 46,330 | | 307,924 | | 307,924 |
| Value of common stock issued with notes payable | 155,850 | | 407,791 | | 407,791 |
| Value of warrants issued with notes payable | | | 3,726,506 | | 3,726,506 |
| Value of common stock issued with capital lease obligation | 298,500 | | 2,388,000 | | 2,388,000 |
| Issuance of common stock for services | 432,500 | 1 | 3,459,999 | | 3,460,000 |
| Issuance of common stock for accounts payable | 14,945 | | 119,274 | | 119,274 |
| Stock option expense | | | 904,468 | | 904,468 |
| Net loss | | | | (13,189,122) | (13,189,122) |
| **Balance, December 31, 2018** | 26,718,676 | $ 27 | $ 19,193,151 | $ (21,241,694) | $ (2,048,516) |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-5

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
For the Year Ended December 31, 2018 and 2017

| | | 2018 | 2017 |
|---|---|---|---|
| | | | (restated) |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $ | (13,189,122) | (6,568,863) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | | 500,622 | 82,904 |
| Stock option expense | | 904,468 | 1,676,476 |
| Common stock issued for services | | 3,460,000 | - |
| Non-cash financing costs | | - | 39,293 |
| Amortization of debt discounts | | 4,460,931 | 124,320 |
| Change in value of derivative liability | | - | (40,266) |
| Gain on disposal of assets | | (17,360) | - |
| Impairment of leased assets | | 2,388,000 | 2,800,000 |
| Accounts receivable | | - | - |
| Prepaid expenses | | (95,494) | (13,406) |
| Accounts payable | | 673,836 | 15,966 |
| Accrued expenses | | 489,963 | 31,453 |
| Net cash used in operating activities | | (424,156) | (1,852,123) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Purchase of equipment | | (2,840) | (3,178) |
| Deposit for leased vehicles | | - | - |
| Net cash used in investing activities | | (2,840) | (3,178) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from sale of common stock | | 307,924 | 2,484,199 |
| Payment of offering costs | | - | (614,805) |
| Proceeds from convertible note payable | | - | 100,000 |
| Repayment of convertible note payable | | - | (113,888) |
| Proceeds from notes payable | | 7,746,378 | 887,667 |
| Repayment of note payable | | (6,111,263) | - |
| Payment for debt issuance costs | | (178,228) | - |
| Proceeds from advance from related party | | - | 50,000 |
| Repayment of advance from related party | | - | (125,000) |
| Repayment of finance lease obligations | | (1,369,109) | (522,777) |
| Net cash provided by financing activities | | 395,702 | 2,145,396 |
| **NET INCREASE (DECREASE) IN CASH** | | (31,294) | 290,095 |
| **CASH, BEGINNING OF PERIOD** | | 308,738 | 18,643 |
| **CASH, END OF PERIOD** | $ | 277,444 | $ 308,738 |
| | | | |
| **CASH PAID FOR:** | | | |
| Interest | $ | 139,825 | $ 16,402 |
| Income taxes | $ | - | $ - |
| | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | |
| Payment of accounts payable with common stock | $ | 119,274 | $ - |
| Value of equity recorded as debt discounts | $ | 4,134,297 | $ 1,368,063 |
| Finance lease obligations | $ | 3,700,674 | $ 2,116,068 |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-6

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 1 - Organization and Basis of Presentation**

<u>Organization and Line of Business</u>

YayYo, Inc. ("YayYo" or the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents cars to Uber and Lyft drivers.

<u>Basis of Presentation</u>

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

**Note 2 – Summary of Significant Accounting Policies**

<u>Principles of Consolidation</u>

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC, RideShare Car Rentals, LLC, RideYayYo, LLC and Savy, LLC. All significant intercompany transactions and balances have been eliminated.

<u>Use of Estimates</u>

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

<u>Cash Equivalents</u>

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

<u>Equipment</u>

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at December 31, 2018 and 2017, the Company took an impairment charge against its leased assets for $2,388,000 and $2,800,000, respectively.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 1,500,000 warrants and 300,000 options outstanding as of December 31, 2018.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There were 1,800,000 and 750,000 potentially dilutive securities outstanding at December 31, 2018 and 2017, respectively.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the years ended December 31, 2018 and 2017 were $482,811 and $86,098, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Research and developments costs for the years ended December 31, 2018 and 2017 were $9,699 and $303,555, respectively.

Deferred Offering Costs

Deferred offering costs are amounts incurred that are directly related to the offering of the Company's common stock. These costs will be offset against the proceeds from the Company's equity offering.

Software Development Costs

Software development costs are capitalized in accordance with FASB ASC 985-20 *Cost of Software to Be Sold, Leased, or Marketed*. Capitalization of software development costs begins upon the establishment of technological feasibility and is discontinued when the product is available for sale. The establishment of technological feasibility and the ongoing assessment for recoverability of capitalized software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenues, estimated economic life, and changes in software and hardware technologies. Capitalized software development costs are comprised primarily of direct overhead, payroll costs, and consultants' fees of individuals working directly on the development of specific software products.

Amortization of capitalized software development costs is provided on a product-by-product basis on the straight-line method over the estimated economic life of the products (not to exceed three years). Management periodically compares estimated net realizable value by product to the amount of software development costs capitalized for that product to ensure the amount capitalized is not in excess of the amount to be recovered through revenues. Any such excess of capitalized software development costs over expected net realizable value is expensed at that time.

Organizational Costs

In accordance with FASB ASC 720, organizational costs, including accounting fees, legal fees, and costs of incorporation, are expensed as incurred.

Derivative Financial Instruments

The Company evaluates all of its agreements to determine if such instruments have derivatives or contain features that qualify as embedded derivatives. For derivative financial instruments that are accounted for as liabilities, the derivative instrument is initially recorded at its fair value and is then re-valued at each reporting date, with changes in the fair value reported in the statements of operations. For stock-based derivative financial instruments, the Company uses the Black-Scholes-Merton option pricing model to value the derivative instruments at inception and on subsequent valuation dates. The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is evaluated at the end of each reporting period. Derivative instrument liabilities are classified in the balance sheet as current or non-current based on whether or not net-cash settlement of the derivative instrument could be required within 12 months of the balance sheet date. During the year ended December 31, 2017, the Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. The convertible note was repaid therefore, there are no derivative financial instruments at December 31, 2018 and 2017.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company uses Level 2 inputs for its valuation methodology for derivative liabilities as their fair values were determined by using the Black-Scholes-Merton pricing model based on various assumptions. The Company's derivative liabilities are adjusted to reflect fair value at each period end, with any increase or decrease in the fair value being recorded in results of operations as adjustments to fair value of derivatives.

At December 31, 2018 and 2017, the Company did not identify any liabilities that are required to be presented on the balance sheet at fair value. The derivative liability associated with the convertible notes payable were both issued and repaid during the year ended December 31, 2017; therefore, there was no derivative liability at December 31, 2018 or December 31, 2017.

Recent Accounting Pronouncements

In June 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") ASU 2018-07, *Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for share-based payments granted to nonemployees for goods and services and aligns most of the guidance on such payments to nonemployees with the requirements for share-based payments granted to employees. ASU 2018-07 is effective on January 1, 2019. Early adoption is permitted. The Company is in the process of evaluating the impact of this ASU on its financial statements.

In January 2017, the FASB issued ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this update clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for interim and annual periods beginning after December 15, 2017 and should be applied prospectively on or after the effective date. The adoption of this ASU did not have an impact on its financial statements.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash*, which requires restricted cash to be presented with cash and cash equivalents on the statement of cash flows and disclosure of how the statement of cash flows reconciles to the balance sheet if restricted cash is shown separately from cash and cash equivalents on the balance sheet. ASU 2016-18 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In October 2016, the FASB issued ASU 2016-16, *Income Taxes (Topic 740): Intra-Entity Transfer of Assets Other than Inventory*, which requires the recognition of the income tax consequences of an intra-entity transfer of an asset, other than inventory, when the transfer occurs. ASU 2016-16 is effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. The Company is in the process of evaluating the impact of this ASU on its financial statements.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments*. ASU 2016-15 provides guidance for targeted changes with respect to how cash receipts and cash payments are classified in the statements of cash flows, with the objective of reducing diversity in practice. ASU 2016-15 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ASU 2016-02 requires lessees to recognize lease assets and lease liabilities on the balance sheet and requires expanded disclosures about leasing arrangements. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 and interim periods in fiscal years beginning after December 15, 2018, with early adoption permitted. The Company adopted this ASU for its year ended December 31, 2017.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under current U.S. GAAP and replace it with a principle-based approach for determining revenue recognition. ASU 2014-09 will require that companies recognize revenue based on the value of transferred goods or services as they occur in the contract. The ASU also will require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. ASU 2014-09 is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted only in annual reporting periods beginning after December 15, 2016, including interim periods therein. Entities will be able to transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption. The Company adopted this ASU beginning on January 1, 2018 and used the modified retrospective method of adoption. The adoption of this ASU did not have a material impact on the Company's financial statements and disclosures.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 3 – Equipment**

At December 31, 2018 and 2017 equipment consisted of the following:

|  | 2018 | 2017 |
|---|---|---|
| Computer equipment | $ 6,046 | $ 3,178 |
|  | 6,046 | 3,178 |
| Less accumulated depreciation | (954) | (318) |
| Equipment, net | $ 5,092 | $ 2,860 |

Depreciation expense for equipment for the years ended December 31, 2018 and 2017 was $636 and $318, respectively.

**Note 4 – Leased Assets**

At December 31, 2018 and 2017 all of the Company's leased assets were finance leased right-of-use assets and consisted of the following:

|  | 2018 | 2017 |
|---|---|---|
| Vehicles | $ 5,661,749 | $ 2,116,068 |
|  | 5,661,749 | 2,116,068 |
| Less accumulated depreciation | (546,632) | (82,586) |
| Leased assets, net | $ 5,115,117 | $ 2,033,482 |

The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. The value of the leased assets was initially determined as the sum of the lease liability plus the up-front consideration of 298,500 shares of the Company's common stock (valued at $2,388,000) paid to the lessor in 2018 and 350,000 shares of the Company's common stock (valued at $2,800,000) paid to the lessor in 2017. During the years ended December 31, 2018 and 2017, the Company determined that the carrying value of the leased assets was impaired and took an impairment charge of $2,388,000 and $2,800,000, respectively, to reduce the carrying value of the leased assets to fair value. Amortization expense for leased assets for the years ended December 31, 2018 and 2017 was $499,986 and $82,586, respectively. The lease terms are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

**Note 5 – Notes Payable**

Notes payable at December 31, 2018 and 2017 consisted of the following:

|  | 2018 | 2017 |
|---|---|---|
| Note payable to stockholder; accrue interest at 5% per annum; due March 31, 2019; unsecured | $ 790,000 | $ 445,000 |
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 of original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to March 26, 2021; unsecured (A) | 319,667 | 242,667 |
| Note payable to investor; accrue interest at 6% per annum; due March 31, 2018; unsecured (B) | 222,222 | 222,222 |
| Note payable to investor; original issue discount of $117,828; due the earlier of July 31, 2019 or closing of an offering of at least $3,000,000; secured by assets of the Company (C) | 1,296,018 | - |

| | | | |
|---|---|---|---|
| Note payable to merchant bank; accrues interest at 15% per annum; daily payments of $813 | | 37,308 | - |
| | | | |
| Line of credit; $65,000 limit; accrues interest at 15% per annum; weekly payments of $3,038 | | 24,966 | - |
| Total notes payable | | 2,690,181 | 909,889 |
| Unamortized debt discount | | (72,211) | (102,790) |
| Notes payable, net discount | | 2,617,970 | 807,099 |
| Less current portion | | (2,617,970) | (254,511) |
| Long-term portion | $ | - | $ 552,588 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

(A) In connection with the issuance of these notes payable, during the year ended December 31, 2018, the Company also issued an aggregate of 5,850 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $28,875 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $28,875 is being amortized over the term of the notes payable. During the year ended December 31, 2017, the Company also issued an aggregate of 18,200 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $91,000 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $91,000 is being amortized over the term of the notes payable. During the years ended December 31, 2018 and 2017, $37,949 and $0, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $72,211 at December 31, 2018.

(B) This note payable was issued with an original issuance discount of $22,222 which is being amortized over the term of the notes payable. During the years ended December 31, 2018 and 2017, $21,506 and $0, respectively, was charged to interest expense as amortization of the discount, with an unamortized balance of $0 at December 31, 2018.

(C) On March 8, 2018, the Company issued a note payable for $6,000,000. The note accrues interest at LIBOR plus 100 basis points and is due five years from the date of issuance. The note payable is secured by the restricted cash balance. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per shares. The warrants expire five years from the date of issuance. The Company also paid $178,228 of issuance costs associated with this note. The relative fair value of the 150,000 shares of common stock was $378,916 and the relative fair value of the 1,500,000 warrants was $3,726,506 and both were recorded as a discount on the note payable and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the note payable. On September 12, 2018, the Company entered into a new note payable agreement with this investor whereby, the Company repaid $4,821,810 of the original $6,000,000 note payable and with the balance of $1,178,190 plus an original issue discount of $117,828 being rolled into the September 12, 2018 note payable for $1,296,018. The original issue discount of $117,828 is being amortized to interest expense over the term of the new note payable. As a result of the $6,000,000 note payable being repaid in September 2018, the Company amortized to interest expense the remaining debt discount associated with the note payable of $4,018,560. During the years ended December 31, 2018 and 2017, $4,401,477 and $0, respectively, was charged to interest expense as amortization of the debt discounts associated with the notes payable to this investor, with an unamortized balance of $0 at December 31, 2018.

A rollforward of notes payable from December 31, 2016 to December 31, 2018 is below:

| | | |
|---|---|---:|
| Notes payable, December 31, 2016 | $ | 0 |
| Issued for cash | | 887,667 |
| Issued for original issue discount | | 22,222 |
| Debt discount related to notes payable | | (113,222) |
| Amortization of debt discounts | | 10,432 |
| Notes payable, December 31, 2017 | $ | 807,099 |
| Issued for cash | | 7,746,378 |
| Repayments | | (6,111,263) |
| Accrued interest converted to note payable | | 27,350 |
| Debt discount related to notes payable | | (4,312,525) |
| Amortization of debt discounts | | 4,460,931 |
| Notes payable, December 31, 2018 | $ | 2,617,970 |

**Note 6 – Lease Obligations**

Lease obligations at December 31, 2018 and 2017 consisted of the following:

| | | 2018 | | 2017 |
|---|---|---:|---|---:|
| Lease obligations | $ | 3,790,147 | $ | 1,593,291 |
| Less current portion | | (1,562,651) | | (555,090) |

| Long-term portion | $ | 2,227,496 | $ | 1,038,201 |

In connection with these finance lease obligations, during the years ended December 31, 2018, the Company also issued to the lessor 298,500 shares of its common stock as additional incentive for the lessor to enter into additional lease agreements. The fair value of these 298,500 shares of common stock was $2,388,000 and was recorded as an up-front lease payment. The fair value of the common stock was based on sales of the Company's common stock to third parties. Increasing the value of the leased vehicles for the value of the 298,500 shares of common stock resulted in the carrying amount of the vehicles exceeding the fair value of the vehicles. Accordingly, the Company has taken an impairment charge of $2,388,000 during the years ended December 31, 2018 to reduce the carrying value of the vehicles to fair value.

F-13

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

A rollforward of lease obligations from December 31, 2016 to December 31, 2018 is below:

| | | |
|---|---|---:|
| Lease obligations, December 31, 2016 | $ | - |
| New lease obligations | | 2,116,068 |
| Payments on lease obligations | | (522,777) |
| Lease obligations, December 31, 2017 | $ | 1,593,291 |
| New lease obligations | | 3,700,674 |
| Disposal of leased vehicles | | (134,709) |
| Payments on lease obligations | | (1,369,109) |
| Lease obligations, December 31, 2018 | $ | 3,790,147 |

Future payments under lease obligations are as follows:

| Years ending December 31, | | |
|---|---|---:|
| 2019 | $ | 1,747,166 |
| 2020 | | 1,637,780 |
| 2021 | | 699,206 |
| Total payments | | 4,084,152 |
| Amount representing interest | | (294,005) |
| Lease obligation, net | $ | 3,790,147 |

The weighted-average remaining lease term at December 31, 2018 is 2.17 years and the weighted average discount rate is 5%.

The finance lease costs for the year ended December 31, 2018 consisted of amortization expense of $499,986 and interest expense of $117,858. The finance lease costs for the year ended December 31, 2017 consisted of amortization expense of $82,586 and interest expense of $16,292.

**Note 7 – Convertible Notes Payable**

On January 6, 2017, the Company entered into a letter agreement (the "CFI Letter Agreement") with Chase Financing, Inc. ("CFI"), pursuant to which CFI agreed to provide up to $100,000 in capital to the Company through one or more loans with an aggregate principal amount of $113,888.

On January 6, 2017, the Company received $50,000 from CFI and issued its 10% original issue discount senior secured convertible note in the principal amount of $ 55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017 the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note "). Subsequent to the Second CFI Note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms of the CFI Notes.

Pursuant to the terms, the CFI Notes are secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and are convertible at the option of the holder into shares of our Common Stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our Common Stock during the twenty (20) trading days immediately prior to the date of conversion. If an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI Notes by the Company, Ramy El-Batrawi, our founder, former Chief Executive Officer and former Director, entered into a Limited Recourse Guaranty and Pledge agreement with CFI (the "Guaranty & Pledge"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our Common Stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty & Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a Common Stock Purchase Agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our Common Stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of one dollar ($1.00). Under the Stock Purchase Agreement, and in addition to the 200,000 shares of Common Stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our Common Stock, held as of record and beneficially by X, LLC, equal to two percent (2%) of the number of shares of Common Stock issued or underlying Common Stock Equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial three (3) months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three (3) months.

The CFI Notes have been repaid by the Company.

A rollforward of the convertible note payable from December 31, 2016 to December 31, 2017 is below:

| | |
|---|---:|
| Convertible notes, December 31, 2016 | $ - |
| Issued for cash | 100,000 |
| Issued for original issue discount | 13,888 |
| Debt discount related to new convertible notes | (113,888) |
| Amortization of debt discounts | 113,888 |
| Repayment in cash | (113,888) |
| Convertible notes, December 31, 2017 | $ - |

**Note 8 – Derivative Liability**

The convertible notes payable discussed in Note 7 had a conversion price that can be adjusted based on the Company's stock price which results in the conversion feature being recorded as a derivative liability.

The fair value of the derivative liability was recorded and shown separately under current liabilities. However, as of December 31, 2017 the convertible note payable giving rise to the derivative liability was repaid, and as a result, the derivative liability at December 31, 2017 was $0. Changes in the fair value of the derivative liability is recorded in the statement of operations under other income (expense).

The Company uses a weighted average Black-Scholes-Merton option pricing model with the following assumptions to measure the fair value of derivative liability:

| | |
|---|---|
| Stock price | $4.00 |
| Risk free rate | 0.53% |
| Volatility | 275% |
| Conversion/ Exercise price | $4.00 |
| Dividend rate | 0% |
| Term (years) | 0.16 to 0.25 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

The following table represents the Company's derivative liability activity from December 31, 2016 to December 31, 2017:

| | |
|---|---:|
| Derivative liability balance, December 31, 2016 | $ - |
| Issuance of derivative liability during the period | 40,266 |
| Change in derivative liability during the period | (40,266) |
| Derivative liability balance, December 31, 2017 | $ - |

## Note 9 – Stockholders' Equity

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

Common Stock

During the years ended from December 31, 2018, the Company:

- sold 46,330 shares of common stock to investors for gross cash proceeds of $307,924;

- issued 155,850 shares of common stock in connection with the issuance of notes payable;

- issued 298,500 shares of common stock in connection with lease obligations;

- issued 432,500 shares of common stock for services rendered valued at $3,460,000. The value was determined based on the shares price for recent sales of the Company's common stock; and

- issued 14,945 shares of common stock for payment of accounts payable of $119,274.

During the year ended from December 31, 2017, the Company:

- sold 371,351 shares of common stock to investors for gross cash proceeds of $2,484,199 of which 326,126 shares and $2,303,299 of cash proceeds were related to the Company's Regulation A offering. The Company incurred $814,442 of offering cost related to the sale of common stock which consisted principally of legal fees and costs associated with soliciting the sale of common stock directly to the Regulation A investors;

- issued 18,200 shares of common stock in connection with the issuance of notes payable;

- issued 350,000 shares of common stock in connection with lease obligations;

- issued 432,500 shares of common stock for services rendered valued at $3,460,000. The value was determined based on the shares price for recent sales of the Company's common stock; and

- issued 20,000 shares of common stock for payment of accounts payable of $160,000.

Stock Options

The following is a summary of stock option activity:

| | Options Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | Aggregate Intrinsic Value |
|---|---:|---:|---:|---:|
| Outstanding, December 31, 2016 | 450,000 | $ 1.00 | 2.00 | $ - |

| | | | | | | |
|---|---|---|---|---|---|---|
| Granted | 300,000 | $ | 8.00 | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2017 | 750,000 | $ | 3.80 | 1.80 | $ | 3,150,000 |
| | | | | | | |
| Granted | - | | | | | |
| Forfeited | (450,000) | | 1.00 | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2018 | 300,000 | $ | 8.00 | 2.00 | $ | |
| Exercisable, December 31, 2018 | 300,000 | $ | 8.00 | 2.00 | $ | |

The exercise price for options outstanding at December 31, 2018:

| Outstanding | | Exercisable | |
|---|---|---|---|
| Number of Options | Exercise Price | Number of Options | Exercise Price |
| 300,000 $ | 8.00 $ | 300,000 | 8.00 |
| 300,000 | | 300,000 | |

F-16

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Warrants

The following is a summary of warrant activity:

| | Warrants Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding, December 31, 2017 | - | | | |
| Granted | 1,500,000 | $ 4.00 | | |
| Forfeited | - | | | |
| Exercised | - | | | |
| Outstanding, December 31, 2018 | 1,500,000 | $ 4.00 | 4.44 | $ 6,000,000 |
| Exercisable, December 31, 2018 | 1,500,000 | $ 4.00 | 4.44 | $ 6,000,000 |

The exercise price for warrants outstanding at December 31, 2018:

| Outstanding and Exercisable | |
|---|---|
| Number of Warrants | Exercise Price |
| 1,500,000 | $ 4.00 |
| 1,500,000 | |

**Note 10 – Related Party Transactions**

During the years ended December 31, 2018 and 2017, the Company paid management fees of $205,000 and $286,300, respectively, to a company that is owned by the Company's majority stockholder.

During the year ended December 31, 2017 and the period from June 21, 2016 (inception) to December 31, 2016, the Company's majority stockholder advanced a total of $50,000 and $75,000 to the Company. During the year ended December 31, 2017, $125,000 of these advances were repaid. These advances are non-interest bearing and due upon demand.

During the years ended December 31, 2018 and 2017, the Company expensed $334,471 and $0, respectively, in advertising expense from a company whose CEO is also a director of the Company. At December 31, 2018 and 2017, $334,471 and $0, respectively, was owed to this company and is included in accounts payable in the accompanying consolidated balance sheets.

At December 31, 2018 and 2017, the Company had a note payable to a stockholder for $790,000 and $445,000, respectively.

**Note 11 – Commitments and Contingencies**

The Company is party to certain legal proceedings from time to time incidental to the conduct of its business. These proceedings could result in fines, penalties, compensatory or treble damages or non-monetary relief. The nature of legal proceedings is such that the Company cannot assure the outcome of any particular matter, and an unfavorable ruling or development could have a materially adverse effect on our consolidated financial position, results of operations and cash flows in the period in which a ruling or settlement occurs. However, based on information available to the Company's management to date, the Company's management does not expect that the outcome of any matter pending against the Company is likely to have a materially adverse effect on the Company's consolidated financial position as of December 31, 2018, results of operations, cash flows or liquidity of the Company.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 12 – Income Taxes**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A full valuation allowance is established against all net deferred tax assets as of December 31, 2018 and 2017 based on estimates of recoverability. While the Company has optimistic plans for its business strategy, it determined that such a valuation allowance was necessary given the current and expected near term losses and the uncertainty with respect to its ability to generate sufficient profits from its business model. Because of the impacts of the valuation allowance, there was no income tax expense or benefit for the years ended December 31, 2018 and 2017.

A reconciliation of the differences between the effective and statutory income tax rates for the years ended December 31, 2018 and 2017:

|  | 2018 | | 2017 | |
|---|---|---|---|---|
|  | **Amount** | **Percent** | **Amount** | **Percent** |
| Federal statutory rates | $ (2,769,716) | 21.0% | $ (2,233,413) | 34.0% |
| State income taxes | (923,239) | 7.0% | (328,443) | 5.0% |
| Permanent differences | 3,144,503 | -23.8% | 1,786,485 | -27.2% |
| Valuation allowance against net deferred tax assets | 548,452 | -4.2% | 775,371 | -11.8% |
| Effective rate | $ - | 0.0% | $ - | 0.0% |

At December 31, 2018 and 2017, the significant components of the deferred tax assets are summarized below:

|  | **2018** | **2017** |
|---|---|---|
| Deferred income tax asset |  |  |
| Net operation loss carryforwards | 1,497,497 | 1,321,885 |
| Total deferred income tax asset | 1,497,497 | 1,321,885 |
| Less: valuation allowance | (1,497,497) | (1,321,885) |
| Total deferred income tax asset | $ - | $ - |

The valuation allowance increased by $175,612 in 2018 of which $548,452 was a result of the Company generating additional net operating losses offset by $372,840 as a result of the change in the corporate tax rate from 34% to 21%. The valuation allowance increased by $775,371 in 2017 as a result of the Company generating additional net operating losses.

The Company has recorded as of December 31, 2018 and 2017 a valuation allowance of $1,497,497 and $1,321,885, respectively, as it believes that it is more likely than not that the deferred tax assets will not be realized in future years. Management has based its assessment on the Company's lack of profitable operating history.

The Company conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2018 and 2017.

The Company has net operating loss carry-forwards of approximately $5,350,000. Such amounts are subject to IRS code section 382 limitations and expire in 2031. The 2016, 2017 and 2018 tax year is still subject to audit.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 13 – Restatement of Previously Issued Financial Statements**

In connection finance lease obligations as discussed in Note 6, the Company issued the lessor an aggregate of 350,000 shares of its common stock as additional incentive for the lessor to enter into the lease agreements. The Company originally accounted for the issuance of the 350,000 shares of common stock as a debt discount to the lease obligation by recording the relative fair value of the common stock as a debt discount that would be amortized to interest expense over the term of the lease obligations. The Company has restated its previously issued financial statements to record the fair value of the 350,000 shares of common stock as an up-front lease payment; and therefore included in the value of the leased vehicles. Increasing the value of the leased vehicles for the value of the 350,000 shares of common stock resulted in the carrying amount of the vehicles exceeding the fair value of the vehicles. Accordingly, the Company has taken an impairment charge of $2,800,000 to reduce the carrying value of the vehicles to fair value. The adjustments to the previously issued financial statements reflect the following:

a. removal of the debt discount from the financing lease obligation
b. removal of the amortization of the debt discount to interest expense
c. record the impairment of the leased vehicles

**Consolidated Balance Sheet**
**As of December 31, 2017**

|  | Previously Filed | | Adjustment | | As Restated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash | $ 308,738 | $ | — | $ | 308,738 |
| Prepaid expenses | 13,406 | | — | | 13,406 |
| Total current assets | 322,144 | | — | | 322,144 |
| Equipment, net | 2,860 | | — | | 2,860 |
| Leased assets, net | 2,033,482 | | — | | 2,033,482 |
| **TOTAL ASSETS** | $ 2,358,486 | $ | — | $ | 2,358,486 |
| | | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Current Liabilities: | | | | | |
| Accounts payable | $ 100,000 | $ | — | $ | 100,000 |
| Accrued expenses | 31,453 | | — | | 31,453 |
| Notes payable, current (net of discount of $48,600) | 254,511 | | — | | 254,511 |
| Finance lease obligations, current | 72,485 | | 482,605 | a | 555,090 |
| Total current liabilities | 458,449 | | 482,605 | | 941,054 |
| Notes payable, net of current portion (net of discount of $54,190) | 552,588 | | — | | 552,588 |
| Finance lease obligations, net of current portion | 674,208 | | 363,993 | a | 1,038,201 |
| **TOTAL LIABILITIES** | 1,685,245 | | 846,598 | | 2,531,843 |
| | | | | | |
| Commitments and contingencies | — | | — | | — |
| | | | | | |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Preferred stock | — | | — | | — |
| Common stock | 26 | | — | | 26 |
| Additional paid-in capital | 6,257,225 | | 1,621,964 | a,c | 7,879,189 |
| Accumulated deficit | (5,584,010) | | (2,468,562) | b,c | (8,052,572) |
| Total stockholders' equity (deficit) | 673,241 | | (846,598) | | (173,357) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | $ 2,358,486 | $ | — | $ | 2,358,486 |

**Consolidated Statement of Operations**
**For the Year Ended December 31, 2017**

| | Previously Filed | Adjustment | | As Restated |
|---|---|---|---|---|
| Revenue | $ 235,690 | $ — | | $ 235,690 |
| Cost of revenue | 213,111 | — | | 213,111 |
| **Gross profit** | 22,579 | — | | 22,579 |
| | | | | |
| **Operating expenses:** | | | | |
| Selling and marketing expenses | 86,098 | — | | 86,098 |
| Product development | 303,555 | — | | 303,555 |
| General and administrative expenses | 3,249,659 | — | | 3,249,659 |
| Impairment of leased assets | — | 2,800,000 | c | 2,800,000 |
| Total operating expenses | 3,639,312 | 2,800,000 | | 6,439,312 |
| **Loss from operations** | (3,616,733) | (2,800,000) | | (6,416,733) |
| | | | | |
| **Other income (expense):** | | | | |
| Interest and financing costs | (523,833) | 331,438 | b | (192,395) |
| Change in value of derivative liability | 40,265 | — | | 40,265 |
| Total other income (expense) | (483,568) | 331,438 | | (152,130) |
| **Net loss** | $ (4,100,301) | $ (2,468,562) | | $ (6,568,863) |
| | | | | |
| **Weighted average shares outstanding :** | | | | |
| Basic | 25,297,066 | — | | 25,297,066 |
| Diluted | 25,297,066 | — | | 25,297,066 |
| **Loss per share** | | | | |
| Basic | $ (0.16) | $ (0.10) | | $ (0.26) |
| Diluted | $ (0.16) | $ (0.10) | | $ (0.26) |

F-19

YAYYO, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For Year Ended December 31, 2018 and 2017

**Consolidated Statement of Cash Flows**
**For the Year Ended December 31, 2017**

| | Previously Filed | Adjustment | As Restated |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $ (4,100,301) | $ (2,468,562) | $ (6,568,863) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation | 82,904 | — | 82,904 |
| Stock option expense | 1,676,476 | — | 1,676,476 |
| Non-cash financing costs | 39,293 | — | 39,293 |
| Amortization of debt discounts | 455,758 | (331,438) b | 124,320 |
| Impairment of leased assets | — | 2,800,000 c | 2,800,000 |
| Change in value of derivative liability | (40,266) | — | (40,266) |
| Change in operating assets and liabilities: | | — | |
| Prepaid expenses | (13,406) | — | (13,406) |
| Accounts payable | 15,966 | — | 15,966 |
| Accrued expenses | 31,453 | — | 31,453 |
| Net cash used in operating activities | (1,852,123) | — | (1,852,123) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Purchase of equipment | (3,178) | — | (3,178) |
| Net cash used in investing activities | (3,178) | — | (3,178) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from sale of common stock | 2,484,199 | — | 2,484,199 |
| Payment of offering costs | (614,805) | — | (614,805) |
| Proceeds from convertible note payable | 100,000 | — | 100,000 |
| Repayment of convertible note payable | (113,888) | — | (113,888) |
| Proceeds from notes payable | 887,667 | — | 887,667 |
| Proceeds from advance from related party | 50,000 | — | 50,000 |
| Repayment of advance from related party | (125,000) | — | (125,000) |
| Repayment of finance lease obligations | (522,777) | — | (522,777) |
| Net cash provided by financing activities | 2,145,396 | — | 2,145,396 |
| | | | |
| **NET INCREASE IN CASH** | 290,095 | — | 290,095 |
| **CASH, BEGINNING OF PERIOD** | 18,643 | — | 18,643 |
| **CASH, END OF PERIOD** | $ 308,738 | $ — | $ 308,738 |
| | | | |
| **CASH PAID FOR:** | | | |
| Interest | $ 16,402 | $ — | $ 16,402 |
| Income taxes | $ — | $ — | $ — |
| | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | |
| Finance lease obligations | $ 2,116,068 | $ — | $ 2,116,068 |
| Value of equity recorded as debt discounts | $ 1,368,063 | (1,178,036) a | $ 190,027 |

**YAYYO, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
As of June 30, 2019 and December 31, 2018

| | | (unaudited) June 30, 2019 | | December 31, 2018 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 34,381 | $ | 277,444 |
| Accounts receivable | | 65,115 | | - |
| Prepaid expenses | | 145,597 | | 108,900 |
| Total current assets | | 245,093 | | 386,344 |
| Equipment, net | | 4,934 | | 5,092 |
| Leased assets, net | | 4,758,110 | | 5,115,117 |
| Deferred offering costs | | 66,500 | | 66,500 |
| **TOTAL ASSETS** | $ | 5,074,637 | $ | 5,573,053 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| Current Liabilities: | | | | |
| Accounts payable (including $387,978 and 334,471, respectively to related party) | $ | 504,801 | $ | 719,386 |
| Accrued expenses | | 538,409 | | 494,066 |
| Notes payables, current (net of discount of $52,414 and $72,211) | | 3,180,673 | | 2,617,970 |
| Finance lease obligations, current | | 1,662,476 | | 1,562,651 |
| Total current liabilities | | 5,886,359 | | 5,394,073 |
| Finance lease obligations, net of current portion | | 1,559,309 | | 2,227,496 |
| **TOTAL LIABILITIES** | | 7,445,668 | | 7,621,569 |
| | | | | |
| Commitments and contingencies | | - | | - |
| | | | | |
| **STOCKHOLDERS' DEFICIT** | | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | | | |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 26,802,976 and 26,718,676 shares issued and outstanding | | 27 | | 27 |
| Additional paid-in capital | | 19,867,551 | | 19,193,151 |
| Accumulated deficit | | (22,238,609) | | (21,241,694) |
| Total stockholders' deficit | | (2,371,031) | | (2,048,516) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $ | 5,074,637 | $ | 5,573,053 |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

**YAYYO, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

| | Six months ended June 30, | |
| --- | --- | --- |
| | **2019** | **2018** |
| **Revenue** | $ 3,475,518 | $ 1,037,415 |
| **Cost of revenue** | 2,044,241 | 727,624 |
| **Gross profit** | 1,431,277 | 309,791 |
| **Operating expenses:** | | |
| Selling and marketing expenses | 102,606 | 91,495 |
| Product development | - | 9,699 |
| General and administrative expenses | 1,460,811 | 3,972,915 |
| Loss on the settlement of debt | 252,900 | - |
| Total operating expenses | 1,816,317 | 4,074,109 |
| **Loss from operations** | (385,040) | (3,764,318) |
| **Other income (expense):** | | |
| Interest and financing costs | (611,875) | (380,872) |
| Total other income (expense) | (611,875) | (380,872) |
| **Net loss** | $ (996,915) | $ (4,145,190) |
| **Weighted average shares outstanding:** | | |
| Basic | 26,760,318 | 26,086,952 |
| Diluted | 26,760,318 | 26,086,952 |
| **Loss per share** | | |
| Basic | $ (0.04) | $ (0.16) |
| Diluted | $ (0.04) | $ (0.16) |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

**YAYYO, INC.**
**CONDENSED CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY (DEFICIT)**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance, December 31, 2018** | 26,718,676 | 27 | 19,193,151 | (21,241,694) | (2,048,516) |
| Issuance of common stock for accounts payable and accrued expenses | 84,300 | | 674,400 | | 674,400 |
| Net loss | | | | (996,915) | (996,915) |
| **Balance, June 30, 2019** | 26,802,976 | $ 27 | $ 19,867,551 | $ (22,238,609) | $ (2,371,031) |
| | | | | | |
| **Balance, December 31, 2017** | 25,770,551 | 26 | 7,879,189 | (8,052,572) | (173,357) |
| Issuance of common stock for cash | 46,330 | | 307,924 | | 307,924 |
| Value of common stock issued with notes payable | 155,850 | | 407,791 | | 407,791 |
| Value of warrants issued with notes payable | | | 3,726,506 | | 3,726,506 |
| Issuance of common stock for services | 332,500 | | 2,660,000 | | 2,660,000 |
| Issuance of common stock for accounts payable | 8,695 | | 69,274 | | 69,274 |
| Stock option expense | | | 452,234 | | 452,234 |
| Net loss | | | | (4,145,190) | (4,145,190) |
| **Balance, June 30, 2018** | 26,313,929 | $ 26 | $ 15,502,918 | $ (12,197,762) | $ 3,305,182 |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

F-23

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

| | Six months ended June 30, | |
| --- | --- | --- |
| | **2019** | **2018** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (996,915) | $ (4,145,190) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 514,402 | 186,061 |
| Stock option expense | - | 452,234 |
| Common stock issued for services | - | 2,660,000 |
| Amortization of debt discounts | 19,797 | 304,419 |
| Gain on disposal of assets | - | (11,302) |
| Loss on the settlement of debt | 252,900 | - |
| Accounts receivable | (65,115) | - |
| Prepaid expenses | (36,697) | 12,859 |
| Accounts payable | (214,585) | 40,142 |
| Accrued expenses | 465,843 | 13,161 |
| Net cash used in operating activities | (60,370) | (487,616) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of equipment | - | (2,840) |
| Net cash used in investing activities | - | (2,840) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from sale of common stock | - | 307,924 |
| Proceeds from notes payable | 1,051,330 | 6,645,000 |
| Repayment of note payable | (508,394) | (122,744) |
| Payment for debt issuance costs | - | (178,228) |
| Repayment of finance lease obligations | (725,599) | (333,730) |
| Net cash provided by (used in) financing activities | (182,693) | 6,318,222 |
| | | |
| **NET INCREASE (DECREASE) IN CASH** | (243,063) | 5,827,766 |
| **CASH, BEGINNING OF PERIOD** | 277,444 | 308,738 |
| **CASH, END OF PERIOD** | $ 34,381 | $ 6,136,504 |
| | | |
| **CASH PAID FOR:** | | |
| Interest | $ 564,961 | $ 24,372 |
| Income taxes | $ - | $ - |
| | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| Payment of accounts payable/accrued expenses with common stock | $ 421,500 | $ 69,274 |
| Value of equity recorded as debt discounts | $ - | $ 4,134,297 |
| Finance lease obligations | $ 510,136 | $ 659,539 |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 1 - Organization and Basis of Presentation**

Organization and Line of Business

YayYo, Inc. ("YayYo" or the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents cars to Uber and Lyft drivers.

Basis of Presentation

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

Interim financial statements

The unaudited interim financial statements included herein, presented in accordance with United States generally accepted accounting principles and stated in US dollars, have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). Certain information and footnote disclosure normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosure are adequate to make the information presented not misleading.

These statements reflect all adjustment, consisting of normal recurring adjustments, which, in the opinion of management, are necessary for fair presentation of the information contained therein. It is suggested that these interim financial statements be read in conjunction with the financial statements of the Company for the year ended December 31, 2018 and notes thereto included in the Company's annual report on Form 1-K. The Company follows the same accounting policies in the preparation of interim report. Results of operations for the interim period are not indicative of annual results.

**Note 2 – Summary of Significant Accounting Policies**

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC, RideShare Car Rentals, LLC, RideYayYo, LLC and Savy, LLC. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash Equivalents

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at June 30, 2019, the Company determined that no impairment charge was necessary.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 1,500,000 warrants and 300,000 options outstanding as of June 30, 2019.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase

common stock at the average market price during the period. There were 1,800,000 potentially dilutive securities outstanding at June 30, 2019.

F- 26

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the six months ended June 30, 2019 and 2018 were $102,606 and $91,495, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Research and developments costs for the six months ended June 30, 2019 and 2018 were $0 and $9,699, respectively.

Deferred Offering Costs

Deferred offering costs are amounts incurred that are directly related to the offering of the Company's common stock. These costs will be offset against the proceeds from the Company's equity offering.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company uses Level 2 inputs for its valuation methodology for derivative liabilities as their fair values were determined by using the Black-Scholes-Merton pricing model based on various assumptions. The Company's derivative liabilities are adjusted to reflect fair value at each period end, with any increase or decrease in the fair value being recorded in results of operations as adjustments to fair value of derivatives.

At June 30, 2019 and December 31, 2018, the Company did not identify any liabilities that are required to be presented on the balance sheet at fair value.

Recent Accounting Pronouncements

In June 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") ASU 2018-07, *Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for share-based payments granted to nonemployees for goods and services and aligns most of the guidance on such payments to nonemployees with the requirements for share-based payments granted to employees. ASU 2018-07 is effective on January 1, 2019. Early adoption is permitted. The adoption of this ASU did not have an impact on its financial statements.

F- 27

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

In January 2017, the FASB issued ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this update clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for interim and annual periods beginning after December 15, 2017 and should be applied prospectively on or after the effective date. The adoption of this ASU did not have an impact on its financial statements.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* which requires restricted cash to be presented with cash and cash equivalents on the statement of cash flows and disclosure of how the statement of cash flows reconciles to the balance sheet if restricted cash is shown separately from cash and cash equivalents on the balance sheet. ASU 2016-18 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In October 2016, the FASB issued ASU 2016-16, *Income Taxes (Topic 740): Intra-Entity Transfer of Assets Other than Inventory*, which requires the recognition of the income tax consequences of an intra-entity transfer of an asset, other than inventory, when the transfer occurs. ASU 2016-16 is effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments*. ASU 2016-15 provides guidance for targeted changes with respect to how cash receipts and cash payments are classified in the statements of cash flows, with the objective of reducing diversity in practice. ASU 2016-15 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ASU 2016-02 requires lessees to recognize lease assets and lease liabilities on the balance sheet and requires expanded disclosures about leasing arrangements. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 and interim periods in fiscal years beginning after December 15, 2018, with early adoption permitted. The Company adopted this ASU for its year ended December 31, 2017.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under current U.S. GAAP and replace it with a principle-based approach for determining revenue recognition. ASU 2014-09 will require that companies recognize revenue based on the value of transferred goods or services as they occur in the contract. The ASU also will require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. ASU 2014-09 is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted only in annual reporting periods beginning after December 15, 2016, including interim periods therein. Entities will be able to transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption. The Company adopted this ASU beginning on January 1, 2018 and used the modified retrospective method of adoption. The adoption of this ASU did not have a material impact on the Company's financial statements and disclosures.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 3 – Equipment**

At June 30, 2019 and December 31, 2018 equipment consisted of the following:

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Computer equipment | $ 6,046 | $ 6,046 |
|  | 6,046 | 6,046 |
| Less accumulated depreciation | (1,112) | (954) |
| Equipment, net | $ 4,934 | $ 5,092 |

Depreciation expense for equipment for the six months ended June 30, 2019 and 2018 was $158 and $318, respectively.

**Note 4 – Leased Assets**

At June 30, 2019 and December 31, 2018 all of the Company's leased assets were finance leased right-of-use assets and consisted of the following:

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Vehicles | $ 5,825,988 | $ 5,661,749 |
|  | 5,825,988 | 5,661,749 |
| Less accumulated depreciation | (1,067,878) | (546,632) |
| Leased assets, net | $ 4,758,110 | $ 5,115,117 |

The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. Depreciation expense for leased assets for the six months ended June 30, 2019 and 2018 was $514,244 and $185,743, respectively. The lease terms are generally for 30 to 36 months and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 5 – Notes Payable**

Notes payable at June 30, 2019 and December 31, 2018 consisted of the following:

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Note payable to stockholder; accrue interest at 5% per annum; due December 31, 2019, as amended; unsecured | $ 880,000 | $ 790,000 |
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to March 26, 2021; unsecured (A) | 319,667 | 319,667 |
| Note payable to investor; accrue interest at 6% per annum; due November 30, 2019, as amended; unsecured (B) | 222,222 | 222,222 |
| Note payable to investor; original issue discount of $117,828; due the earlier of November 30, 2019, as amended, or closing of a public offering; secured by assets of the Company (C) | 1,296,018 | 1,296,018 |
| Note payable to merchant bank; accrues interest at 15% per annum; daily payments of $813 | - | 37,308 |
| Line of credit; $65,000 limit; accrues interest at 15% per annum; weekly payments of $3,038 | - | 24,966 |
| Note payable to merchant bank; accrues interest at 127% per annum; 28 weekly payments of $7,446 | 66,924 | - |
| Note payable to merchant bank; accrues interest at 79% per annum; 26 weekly payments of $1,401 | 69,752 | - |
| Note payable to merchant bank; accrues interest at 128 per annum; 130 daily payments of $1,558 | 101,273 | - |
| Note payable to merchant bank; accrues interest at 150% per annum; 120 daily payments of $1,159 | 34,690 | - |
| Note payable to merchant bank; accrues interest at 87% per annum; 160 daily payments of $2,016 | 76,548 | - |
| Note payable to merchant bank; accrues interest at 138% per annum; 125 daily payments of $1,644 | 165,993 | - |
| Total notes payable | 3,233,087 | 2,690,181 |
| Unamortized debt discount | (52,414) | (72,211) |
| Notes payable, net discount | 3,180,673 | 2,617,970 |
| Less current portion | (3,180,673) | (2,617,970) |
| Long-term portion | $ - | $ - |

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

(A) In connection with the issuance of these notes payable in 2018 and 2017, the Company also issued an aggregate of 24,050 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $119,875 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $119,875 is being amortized over the term of the notes payable. During the six months ended June 30, 2019 and 2018, $19,797 and $17,824, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $52,414 at June 30, 2019.

(B) This note payable was issued with an original issuance discount of $22,222 which is being amortized over the term of the notes payable. During the six months ended June 30, 2019 and 2018, $0 and $21,506, respectively, was charged to interest expense as amortization of the discount, with an unamortized balance of $0 at June 30, 2019.

(C) On March 8, 2018, the Company issued a note payable for $6,000,000. The note accrues interest at LIBOR plus 100 basis points and is due five years from the date of issuance. The note payable is secured by the restricted cash balance. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per shares. The warrants expire five years from the date of issuance. The Company also paid $178,228 of issuance costs associated with this note. The relative fair value of the 150,000 shares of common stock was $378,916 and the relative fair value of the 1,500,000 warrants was $3,726,506 and both were recorded as a discount on the note payable and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the note payable. On September 12, 2018, the Company entered into a new note payable agreement with this investor whereby, the Company repaid $4,821,810 of the original $6,000,000 note payable and with the balance of $1,178,190 plus an original issue discount of $117,828 being rolled into the September 12, 2018 note payable for $1,296,018. The original issue discount of $117,828 is being amortized to interest expense over the term of the new note payable. As a result of the $6,000,000 note payable being repaid in September 2018, the Company amortized to interest expense the remaining debt discount associated with the note payable of $4,018,560. During the six months ended June 30, 2019 and 2018, $0 and $265,089, respectively, was charged to interest expense as amortization of the debt discounts associated with the notes payable to this investor, with an unamortized balance of $0 at June 30, 2019.

A rollforward of notes payable from December 31, 2018 to June 30, 2019 is below:

| | | |
|---|---|---:|
| Notes payable, December 31, 2018 | $ | 2,617,970 |
| Issued for cash | | 1,051,330 |
| Repayments | | (508,394) |
| Amortization of debt discounts | | 19,797 |
| Notes payable, June 30, 2019 | $ | 3,180,673 |

F- 31

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 6 – Lease Obligations**

Lease obligations at June 30, 2019 and December 31, 2018 consisted of the following:

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Lease obligations | $ 3,221,785 | $ 3,790,147 |
| Less current portion | (1,662,476) | (1,562,651) |
| Long-term portion | $ 1,559,309 | $ 2,227,496 |

A rollforward of lease obligations from December 31, 2018 to June 30, 2019 is below:

| | |
|---|---|
| Lease obligations, December 31, 2018 | $ 3,790,147 |
| New lease obligations | 510,136 |
| Disposal of leased vehicles | (352,899) |
| Payments on lease obligations | (725,599) |
| Lease obligations, June 30, 2019 | $ 3,221,785 |

The weighted-average remaining lease term at June 30, 2019 is 1.71 years and the weighted average discount rate is 5%.

The finance lease costs for the six months ended June 30, 2019 and 2018 consisted of depreciation expense of $514,244 and $170,059, respectively and interest expense of $114,221 and $41,758, respectively.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 7 – Stockholders' Equity**

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

<u>Common Stock</u>

During the six months ended June 30, 2019, the Company issued 84,300 shares of common stock to vendors in satisfaction of $421,500 of accounts payable and accrued expenses. The 84,300 shares were valued at $674,000; therefore the Company took a charge to earnings of $252,900 related to the settlement of debt during the six months ended June 30, 2019.

<u>Stock Options</u>

The following is a summary of stock option activity:

|  | Options Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | 300,000 | $ | 8.00 | 2.00 | $ | - |
| Granted | - | | | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, June 30, 2019 | 300,000 | $ | 8.00 | 1.50 | $ | - |
| Exercisable, June 30, 2019 | 300,000 | $ | 8.00 | 1.50 | $ | - |

The exercise price for options outstanding at June 30, 2019:

| Outstanding | | | Exercisable | |
|---|---|---|---|---|
| **Number of Options** | **Exercise Price** | | **Number of Options** | **Exercise Price** |
| 300,000 | $ | 8.00 | 300,000 | 8.00 |
| 300,000 | | | 300,000 | |

The following is a summary of warrant activity:

|  | Warrants Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | 1,500,000 | $ | 4.00 | 4.44 | $ | 6,000,000 |
| Granted | - | | | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, June 30, 2019 | 1,500,000 | $ | 4.00 | 3.94 | $ | 6,000,000 |
| Exercisable, June 30, 2019 | 1,500,000 | $ | 4.00 | 3.94 | $ | 6,000,000 |

The exercise price for warrants outstanding at June 30, 2019:

| Outstanding and Exercisable | |
|---|---|
| **Number of Warrants** | **Exercise Price** |

| | |
|---|---|
| 1,500,000 | $4.00 |
| 1,500,000 | |

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 8 – Related Party Transactions**

During the six months ended June 30, 2018, the Company paid management fees of $120,000, to a company that is owned by the Company's former Chief Executive Officer and director. Beginning on February 1, 2019, the Company entered into a consulting agreement with this individual and paid $132,000 under the consulting agreement. The consulting agreement was terminated effective September 1, 2019.

During the six months ended June 30, 2019 and 2018, the Company expensed $53,507 and $0, respectively, in advertising expense from a company whose CEO is also a director of the Company. At June 30, 2019 and December 31, 2018, $387,978 and $334,471, respectively, was owed to this company and is included in accounts payable in the accompanying consolidated balance sheets.

At June 30, 2019 and December 31, 2018, the Company had a note payable to a stockholder for $880,000 and $790,000, respectively.

**Note 9 – Commitments and Contingencies**

The Company is party to certain legal proceedings from time to time incidental to the conduct of its business. These proceedings could result in fines, penalties, compensatory or treble damages or non-monetary relief. The nature of legal proceedings is such that the Company cannot assure the outcome of any particular matter, and an unfavorable ruling or development could have a materially adverse effect on our consolidated financial position, results of operations and cash flows in the period in which a ruling or settlement occurs. However, based on information available to the Company's management to date, the Company's management does not expect that the outcome of any matter pending against the Company is likely to have a materially adverse effect on the Company's consolidated financial position as of June 30, 2019, results of operations, cash flows or liquidity of the Company.

F- 34

———————

Through and including, 2019, (the 25th day after the date of this prospectus), all dealers effecting transactions in the Common Stock, whether or not participating in this offering, may be required to deliver a prospectus. This delivery requirement is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.

**2,500,000 Shares**



**YayYo, Inc.**

———————

**PROSPECTUS**

———————

# Aegis Capital Corp.　　　　WestPark Capital, Inc.

**, 2019**

**Part II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 13. Other Expenses of Issuance and Distribution.**

The following table indicates the expenses to be incurred in connection with the offering described in this registration statement, other than underwriting discounts and commissions, all of which will be paid by us. All amounts are estimated except the Securities and Exchange Commission registration fee and the Financial Industry Regulatory Authority, Inc., or FINRA filing.

|  | Amount |
|---|---|
| Securities and Exchange Commission registration fee | $ 2,281 |
| FINRA filing fee | 3,323 |
| NASDAQ listing fee | 75,000 |
| Accountants' fees and expenses | 21,500 |
| Legal fees and expenses | 50,000 |
| Printing and engraving expenses | 5,000 |
| Miscellaneous | 15,000 |
| Total expenses | $ 172,104 |

**Item 14. Indemnification of Directors and Officers.**

Section 102 of the General Company Law of the State of Delaware ("DGCL") permits a Company to eliminate the personal liability of directors of a Company to the Company or its stockholders for monetary damages for a breach of fiduciary duty as a director, except where the director breached his duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of Delaware corporate law or obtained an improper personal benefit. Our amended and restated certificate of incorporation provides that no director of the Company shall be personally liable to it or its stockholders for monetary damages for any breach of fiduciary duty as a director, notwithstanding any provision of law imposing such liability, except to the extent that the DGCL prohibits the elimination or limitation of liability of directors for breaches of fiduciary duty.

Section 145 of the DGCL provides that a Company has the power to indemnify a director, officer, employee, or agent of the Company, or a person serving at the request of the Company for another Company, partnership, joint venture, trust or other enterprise in related capacities against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with an action, suit or proceeding to which he was or is a party or is threatened to be made a party to any threatened, ending or completed action, suit or proceeding by reason of such position, if such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, in any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful, except that, in the case of actions brought by or in the right of the Company, no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been adjudged to be liable to the Company unless and only to the extent that the Court of Chancery or other adjudicating court determines that, despite the adjudication of liability but in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

II-1

Our amended and restated certificate of incorporation provides that we will indemnify to the fullest extent permitted from time to time by the DGCL or any other applicable laws as presently or hereafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including, without limitation, an action by or in the right of the Company, by reason of his acting as a director or officer of the Company or any of its subsidiaries (and the Company, in the discretion of the Board of Directors, may so indemnify a person by reason of the fact that he is or was an employee or agent of the Company or any of its subsidiaries or is or was serving at the request of the Company in any other capacity for or on behalf of the Company) against any liability or expense actually and reasonably incurred by such person in respect thereof; *provided, however*, the Company shall be required to indemnify an officer or director in connection with an action, suit or proceeding (or part thereof) initiated by such person only if (i) such action, suit or proceeding (or part thereof) was authorized by the Board of Directors and (ii) the indemnification does not relate to any liability arising under Section 16(b) of the Exchange Act, as amended, or any rules or regulations promulgated thereunder. Such indemnification is not exclusive of any other right to indemnification provided by law or otherwise.

If a claim is not paid in full by the Company, the claimant may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where any undertaking required by the By-laws of the Company has been tendered to the Company) that the claimant has not met the standards of conduct which make it permissible under the DGCL for the Company to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Company. Neither the failure of the Company (including its Board of Directors, legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Company (including its Board of Directors, legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct. Indemnification shall include payment by the Company of expenses in defending an action or proceeding in advance of the final disposition of such action or proceeding upon receipt of an undertaking by the person indemnified to repay such payment if it is ultimately determined that such person is not entitled to indemnification.

In any underwriting agreement we enter into in connection with the sale of common stock being registered hereby, the underwriters will agree to indemnify, under certain conditions, us, our directors, our officers and persons who control us within the meaning of the Securities Act of 1933, as amended, or the Securities Act, against certain liabilities.

**Item 15. Recent Sales of Unregistered Securities.** Set forth below is information regarding shares of common stock issued by us since the Company's inception on June 21, 2016.

(a) Issuance of Capital Stock.

On June 21, 2016 the Company issued 15,625,000 shares of common stock to our Founder, Ramy El-Batrawi, for no cost. Ramy El-Batrawi is an accredited investor for purposes of Rule 501 of Regulation D.

During the period from inception to December 31, 2016, the Company issued 9,386,000 shares of common stock to accredited investors for $1,319,900.

During the quarter ended March 31, 2017, the Company issued 45,225 to accredited investors for $180,900.

On July 15, 2017, the Company entered into an agreement pursuant to which the Company agreed to issue additional consideration to Acme Auto Leasing (the "Lessor") in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company. On December 15, 2017, the Company issued the Lessor an additional 250,000 under a similar arrangement.

On December 20, 2017, the Company issued 20,000 shares of common stock to an attorney in exchange for the payment of legal services.

In the fourth quarter of 2017, the Company, in connection with the issuance of notes payable to investors, the Company issued an aggregate of 18,200 shares of common stock as additional incentive to make the loans.

In the first quarter of 2018, the Company, in connection with the issuance of notes payable to investors, the Company issued an aggregate of 3,000 shares of common stock as additional incentive to make the loans.

On February 21, 2018, the Company issued 81,250 shares of common stock to two accredited investors in exchange for services.

On March 8, 2018, the Company issued a note payable in the amount of $6,000,000. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per share.

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with David Haley, a former director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies for Rideshare Car Rentals, LLC and Distinct Cars, LLC (the "Special Policies") in consideration for a grant of 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 14,945 shares of Company restricted common stock. 258,695 shares of Company restricted common stock was issued on April 1, 2018 and 6,250 shares of Company restricted common stock was issued on October 8, 2018.

In April 2018, the Company, in connection with the issuance of notes payable to three investors, issued an aggregate of 2,250 shares of common stock as additional incentive to make the loans.

In May 2018, the Company issued an accredited investor 1,250 shares of common stock for services.

In May 2018, the Company, in connection with the issuance of notes payable to one investor, issued an aggregate of 600 shares of common stock as additional incentive to make the loans.

In July 2018, the Company issued a consultant 100,000 shares of common stock for an agreement to provide services. The Company entered into an agreement with the consultant to cancel the shares in November 2018.

In July 2018, the Company issued the Lessor 91,500 shares of common stock in connection with a lease arrangement.

In November 2018, the Company issued the Lessor 207,000 shares of common stock in connection with a lease arrangement.

In March 2019, the Company issued American Business Insurance Services, Inc. 80,000 shares of common stock in connection the settlement of $400,000 of debt. Mr. Haley, a former director of the Company, is the Chief Executive Officer of American Business Insurance Services, Inc.

In June 2019, the Company issued RG Alliance 4,300 shares of common stock in connection the settlement of $21,500 of debt.

The offers, sales and issuances of securities listed above were deemed exempt from registration under Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder in that the issuance of securities were made to accredited investors and did not involve a public offering. The recipients of such securities in each of these transactions represented their intention to acquire the securities for investment purposes only and not with a view to or for sale in connection with any distribution thereof.

(b) Warrants.

As discussed above, on March 8, 2018, the Company issued a note payable in the amount of $6,000,000. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per share.

The warrant listed above was deemed exempt from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder in that the issuance of securities were made to accredited investors and did not involve a public offering. The recipient of such securities represented its intention to acquire the securities for investment purposes only and not with a view to or for sale in connection with any distribution thereof.

(c) Option Grants.

During the year ended December 31, 2016, the Company issued 450,000 options. For options granted during fiscal year 2016 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.85 and the weighted-average exercise price of such options was $1.00. No options were granted during fiscal 2016 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

During the year ended December 31, 2016, the Company issued 300,000 options. For options granted during fiscal year 2017 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $7.54 and the weighted-average exercise price of such options was $8.00. No options were granted during fiscal 2017 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

The option described above were deemed exempt from registration in reliance on Section 4(a)(2) of the Securities Act or Rule 701 promulgated thereunder as transactions pursuant to benefit plans and contracts relating to compensation as provided under Rule 701. The recipients of such securities were our employees, directors or bona fide consultants and received the securities under our stock option plans.

(d) Issuance of Notes.

The Company has issued the following notes:

- Unsecured note payable for $390,000 to an investor that accrues interest at 5% per annum.
- Unsecured notes payable for $319,667 to 38 individual investors that accrue interest at 8% per annum.
- Unsecured note payable to investor for 222,222 that accrues interest at 6% per annum.

The notes were deemed exempt from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder in that the issuance of securities to accredited investors and did not involve a public offering.

II-4

**Item 16. Exhibits and Financial Statement Schedules.**

(a) ***Exhibits***: Reference is made to the Exhibit Index following the signature pages hereto, which Exhibit Index is hereby incorporated into this Item.

(b) ***Financial Statement Schedules***: All schedules are omitted because the required information is inapplicable or the information is presented in the financial statements and the related notes.

**Item 17. Undertakings.**

The undersigned registrant hereby undertakes:

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by section 10(a)(3) of the Securities Act of 1933, as amended (the "Securities Act");

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Securities and Exchange Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement; provided, however, that paragraphs (1)(i), (1)(ii) and (1)(iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Securities and Exchange Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining liability under the Securities Act to any purchaser:

(A) Each prospectus filed by the registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement; and

(B) Each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(5) That for the purpose of determining liability of the registrant under the Securities Act to any purchaser in the initial distribution of securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to any charter provision, by law or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized in the City of Los Angeles, State of California, on November 5, 2019.

**YAYYO, INC.**

By:*/s/ Jonathan Rosen*

Jonathan Rosen
Chief Executive Officer (Principal Executive Officer)

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on November 5, 2019.

| | |
|---|---|
| */s/ Harbant S. Sidhu* | */s/ Kevin Pickard* |
| Harbant S. Sidhu | Kevin Pickard |
| Director | Director and Chief Financial Officer |
| | Principal Financial Officer and Accounting Officer |

*/s/ Jeffrey Guzy*

Jeffrey Guzy
Director

EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 1.1# | Form of Underwriting Agreement (incorporated by reference to Exhibit 1.1 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 3.1# | Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.2 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.2# | Amended and Restated Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.4 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.3# | Bylaws of YayYo, Inc. (incorporated by reference to Exhibit 2.3 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.4# | Amended and Restated Bylaws of YayYo, Inc. (incorporated by reference to Exhibit 3.4 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 3.5# | Certificate of Conversion of YayYo, LLC (incorporated by reference to Exhibit 2.1 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.6# | Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock (incorporated by reference to Exhibit 2.5 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 4.1# | Secured Convertible Note to Chase Financing Inc., dated January 6, 2017 (incorporated by reference to Exhibit 6.6 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 4.2# | Promissory Note with X, LLC, dated January 15, 2017 (incorporated by reference to Exhibit 6.8 contained in the Registrant's Form 1-A filed on February 3, 2017). |
| 4.3# | Warrant, dated March 8, 2018 (incorporated by reference to Exhibit 4.3 contained in the Registrant's Form S-1/A filed on June 7, 2018). |

| 4.4# | Senior Secured Note, dated March 8, 2018 (incorporated by reference to Exhibit 4.4 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
|------|---|
| 4.5# | Form of Secured Promissory Note (incorporated by reference to Exhibit 6.14 contained in the Registrant's Form 1-U filed on March 26, 2018). |
| 4.6# | Secured Promissory Note, dated December 27, 2017 (incorporated by reference to Exhibit 6.16 contained in the Registrant's Form 1-A filed on March 26, 2018). |
| 4.7# | Form of Underwriter Warrant (incorporated by reference to Exhibit 4.7 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 5.1# | Opinion of Counsel to Registrant |
| 10.1# | Form of Subscription Agreement (incorporated by reference to Exhibit 4.1 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 10.2# | Product Management Proposal (incorporated by reference to Exhibit 10.2 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.3#+ | Executive Employment Offer (incorporated by reference to Exhibit 10.3 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.4#+ | 2016 Equity Incentive Plan (incorporated by reference to Exhibit 10.4 contained in the Registrant's Form S-1/A filed on June 7, 2018). |

II-7

| 10.5# | Agreement with Chase Financing Inc., dated January 1, 2017 (incorporated by reference to Exhibit 10.5 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
|---|---|
| 10.6# | Limited Recourse Guaranty and Pledge with X, LLC, dated January 6, 2017 (incorporated by reference to Exhibit 6.5 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 10.7# | Common Stock Purchase Agreement, dated January 6, 2017 (incorporated by reference to Exhibit 10.7 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.8# | Form of SAFE Agreement (incorporated by reference to Exhibit 6.9 contained in the Registrant's Form 1-A filed on February 3, 2017). |
| 10.9# | Securities Purchase Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.9 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.10# | Side Agreement, dated July 15, 2017 (incorporated by reference to Exhibit 6.13 contained in the Registrant's Form 1-A filed on March 28, 2018). |
| 10.11# | Deposit Account Control Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.11 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.12# | Security Agreement, dated December 27, 2017 (incorporated by reference to Exhibit 6.28 contained in the Registrant's Form 1-A filed on March 26, 2018). |
| 10.13# | Registration Rights Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.13 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.14# | Patent and Trademark Security Agreement, dated December 27, 2017 (incorporated by reference to Exhibit 10.14 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.15#+ | Incentive Agreement For Grant of Stock, dated April 1, 2018 (incorporated by reference to Exhibit 10.15 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.16# | Form of Open End Lease Agreement and Disclosure Statement (incorporated by reference to Exhibit 10.16 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.17#+ | Non-Qualified Stock Option Agreement, dated June 9, 2017 (incorporated by reference to Exhibit 10.17 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.18# | Independent Director Agreement, dated November 27, 2017 (incorporated by reference to Exhibit 10.18 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.19# | Independent Director Agreement, dated November 8, 2017 (incorporated by reference to Exhibit 10.19 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.20# | Voting Trust Agreement, dated October 11, 2018, by and among YayYo, Inc., X, LLC, and each Trustee |
| 10.21 | Amendment and Exchange Agreement with Note, dated September 12, 2018 (incorporated by reference to Exhibit 10.21 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 10.21.1* | Amendment to Note Payable Agreement. |
| 10.22# | Consulting Agreement with Ramy El-Batrawi, dated February 1, 2019 (incorporated by reference to Exhibit 10.22 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 10.23* | Promissory Note to Stockholder |
| 21.1# | List of Subsidiaries of the Registrant (incorporated by reference to Exhibit 21.1 contained in the Registrant's Form S-1 |

filed on April 30, 2018).

23.1*    Consent of AJ Robbins CPA, LLC, dated November 5, 2019.

23.2#    Consent of Counsel to Registrant (included in Exhibit 5.1).

24.1#    Power of Attorney

* Filed herewith.
# Previously filed.
+ Indicates a management contract or any compensatory plan, contract or arrangement.

II-8

**ALTERNATE PAGES FOR SELLING STOCKHOLDER PROSPECTUS**

The information in this prospectus is not complete and may be changed. The selling stockholders named in this prospectus may not sell these securities until the registration statement filed with the Securities and Exchange Commission is declared effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state or other jurisdiction where the offer or sale is not permitted.

**Subject to Completion, dated November 5, 2019**

**PROSPECTUS**



**YAYYO, INC.**

**1,650,000 Shares of Common Stock**

The selling stockholders plan to sell an aggregate of up to (a) 150,000 outstanding shares of the registrant's common stock, and (b) 1,500,000 shares of common stock issuable upon exercise of common stock purchase warrants.

The selling stockholders must sell their shares at a fixed price per share of $4.00, which is the per share price of the shares being offered in the IPO, until such time our shares are listed on a national securities exchange or quoted on the OTCBB, OTCQX or OTCQB marketplaces. Thereafter, the shares offered by this prospectus may be sold by the selling stockholders from time to time in the open market, through privately negotiated transactions or a combination of these methods, at market prices prevailing at the time of sale or at negotiated prices. By separate prospectus (the "IPO Prospectus"), we have registered an aggregate of shares of our common stock which we are offering for sale to the public through our underwriters, excluding any shares issuable upon the underwriters' over-allotment option.

We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering.

The distribution of the shares by the selling stockholders is not subject to any underwriting agreement. We will not receive any proceeds from the sale of the shares by the selling stockholders; however, we may receive proceeds if the Selling Securityholder Warrant is exercised for cash. We will bear all expenses of registration incurred in connection with this offering, but all selling and other expenses incurred by the selling stockholders will be borne by them.

**We are an "emerging growth company" under the federal securities laws and have elected to be subject to reduced public company reporting requirements. An investment in our common stock may be considered speculative and involves a high degree of risk, including the risk of a substantial loss of your investment. See "Risk Factors" beginning on page 7 to read about the risks you should consider before buying shares of our common stock. An investment in our common stock is not suitable for all investors. See "Risk Factors-Risks Relating to Ownership of Our Securities."**

Sales of the shares of our common stock registered in this prospectus and the IPO Prospectus will result in two offerings taking place concurrently which might affect price, demand, and liquidity.

You should rely only on the information contained in this prospectus and any prospectus supplement or amendment. We have not authorized anyone to provide you with different information. This prospectus may only be used where it is legal to sell these securities. The information in this prospectus is only accurate on the date of this prospectus, regardless of the time of any sale of securities.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS**

**PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The date of this prospectus is                    , 2019

## EXPLANATORY NOTE

Concurrent with this offering, the Company is registering shares of common stock in connection with a public offering of 2,500,000 shares of our common stock through the underwriters (excluding 375,000 shares which may be sold upon exercise of the underwriters' over-allotment option). Sales by stockholders that purchased shares in our common stock from the underwritten offering may reduce the price of our common stock, demand for our shares and, as a result, the liquidity of your investment.

## SELLING STOCKHOLDERS

The shares of common stock being offered by the Selling Securityholder are those previously issued to the Selling Securityholder and those issuable to the Selling Securityholder upon exercise of the Selling Securityholder Warrant. For additional information regarding the issuance of common stock and the Selling Securityholder Warrant, see "*Certain Relationships and Related Party Transactions*" below. We are registering shares of common stock in order to permit the Selling Securityholder to offer the shares for resale from time to time. Except for the ownership of the common stock and the Selling Securityholder Warrant issued pursuant to the Securities Purchase Agreement, the Selling Securityholder have not had any material relationship with us within the past three years.

The table below lists the Selling Securityholder and other information regarding the beneficial ownership (as determined under Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder) of the shares of common stock held by the Selling Securityholder. The second column lists the number of shares of common stock beneficially owned by the Selling Securityholder, based on their respective ownership of shares of common stock of the Company and the Selling Securityholder Warrant, as of October 31, 2019, assuming exercise of the Selling Securityholder Warrant held by each such Selling Securityholder on that date but taking account of any limitations on exercise set forth therein.

The third column lists the shares of common stock being offered by this Prospectus by the Selling Securityholder and does not take in account any limitations on exercise of the Selling Securityholder Warrant set forth therein.

In accordance with the terms of the Registration Rights Agreement with the holders of the common stock and the Selling Securityholder Warrant, this Prospectus generally covers the resale of the sum of (i) the number of shares of common stock issued in connection with the Securities Purchase Agreement and (ii) 200% of the maximum number of shares of common stock issuable upon exercise of the Selling Securityholder Warrant, in each case, determined as if the outstanding Selling Securityholder Warrant were exercised in full (without regard to any limitations on exercise contained therein) as of the trading day immediately preceding the date this registration statement was initially filed with the SEC. Because the exercise price of the Selling Securityholder Warrant may be adjusted, the number of shares that will actually be issued may be more or less than the number of shares being offered by this Prospectus. The fourth column assumes the sale of all of the shares of common stock offered by the Selling Securityholder pursuant to this Prospectus. For additional information regarding the Registration Rights Agreement, see "*Description of Securities*" below.

Under the terms of the Selling Securityholder Warrant, a Selling Securityholder may not exercise the warrants to the extent (but only to the extent) such selling stockholder or any of its affiliates would beneficially own a number of shares of our common stock which would exceed 4.99%. The number of shares in the second column reflects these limitations. The selling stockholders may sell all, some or none of their shares in this offering. See "*Plan of Distribution*."

| Name of Selling Stockholder | Number of Shares of Common Stock Owned Prior to Offering | Maximum Number of Shares of Common Stock to be Sold Pursuant to this Prospectus | Number of Shares of Common Stock Owned After Offering | Percentage Ownership After Offering |
|---|---|---|---|---|
| Bellridge Capital, L.P. [(1)] | 2,400,000[(2)] | 1,650,000 | 750,000 | 2.6% |

(1) Bellridge Capital LLC ("BC LLC") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described.

(2)  Includes the following: (i) 650,000 shares of common stock, (ii) 1,500,000 underlying shares of common stock to be acquired upon the exercise of the Selling Securityholder Warrant, and (iii) an option (exercisable at any time by Bellridge Capital, L.P.) from a non-affiliate shareholder of the Company to purchase an aggregate of 250,000 shares of issued and outstanding common stock of the Company from the non-affiliate shareholder.

## PLAN OF DISTRIBUTION

The selling stockholders may, from time to time, sell any or all of their shares of our common stock on any stock exchange, market or trading facility on which the shares are traded or in private transactions. If the shares of our common stock are sold through underwriters, the selling stockholders will be responsible for underwriting discounts or commissions or agent's commissions. The shares of common stock may be sold in one or more transactions at a price of $4.00 per share until our shares are listed on The Nasdaq Capital Market and thereafter at prevailing market prices or privately negotiated prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale or at negotiated prices. The selling stockholders may use any one or more of the following methods when selling shares:

- any national securities exchange or quotation service on which the securities may be listed or quoted at the time of sale;

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- transactions other than on these exchanges or systems or in the over-the-counter market;

- through the writing of options, whether such options are listed on an options exchange or otherwise;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- short sales;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act, if available, rather than under this prospectus. In general, a person who has beneficially owned restricted shares of our common stock for at least six months, in the event we have been a reporting company under the Exchange Act for at least 90 days, would be entitled to sell such securities, provided that such person is not deemed to be an affiliate of ours at the time of sale or to have been an affiliate of ours at any time during the three months preceding the sale.

The selling stockholders may also engage in short sales against the box, puts and calls and other transactions in our securities or derivatives of our securities and may sell or deliver shares in connection with these trades.

Broker-dealers engaged by the selling stockholders may arrange for other broker-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated. The selling stockholders do not expect these commissions and discounts to exceed what is customary in the types of transactions involved. Any profits on the resale of shares of our common stock by a broker-dealer acting as principal might be deemed to be underwriting discounts or commissions under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, attributable to the sale of shares will be borne by a selling stockholder. The selling stockholders may agree to indemnify any agent, dealer or broker-dealer that participates in transactions involving sales of the shares if liabilities are imposed on that person under the Securities Act.

In connection with the sale of the shares of our common stock or otherwise, the selling stockholders may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of our common stock in the course of hedging in positions they assume. The selling stockholders may also sell shares of our common stock short and deliver shares of our common stock covered by this prospectus to close out short positions and to return borrowed shares in connection with such short sales. The selling stockholders may also loan or pledge shares of our common stock to broker-dealers that in turn may sell such shares.

The selling stockholders may from time to time pledge or grant a security interest in some or all of the shares of our common stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of our common stock from time to time under this prospectus after we have filed an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

The selling stockholders also may transfer the shares of our common stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus and may sell the shares of our common stock from time to time under this prospectus after we have filed an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act amending the list of selling stockholders to include the pledgees, transferees or other successors in interest as selling stockholders under this prospectus. The selling stockholders also may transfer and donate the shares of our common stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be an "Underwriter" within the meaning of the Securities Act in connection with such sales. In such event, any commissions paid, or any discounts or concessions allowed to, such broker-dealers or agents and any profit realized on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. At the time a particular offering of the shares of our common stock is made, a prospectus supplement, if required, will be distributed which will set forth the aggregate amount of shares of our common stock being offered and the terms of the offering, including the name or names of any broker-dealers or agents, any discounts, commissions and other terms constituting compensation from the selling stockholders and any discounts, commissions or concessions allowed or re-allowed or paid to broker-dealers. Under the securities laws of some states, the shares of common stock may be sold in such states only through registered or licensed brokers or dealers. In addition, in some states the shares of our common stock may not be sold unless such shares have been registered or qualified for sale in such state or an exemption from registration or qualification is available and is complied with. There can be no assurance that any selling stockholder will sell any or all of the shares of our common stock registered pursuant to the registration statement, of which this prospectus forms a part.

Each selling stockholder has informed us that it does not have any agreement or understanding, directly or indirectly, with any person to distribute our common stock. None of the selling stockholders who are affiliates of broker-dealers, other than the initial purchasers in private transactions, purchased the shares of common stock outside of the ordinary course of business or, at the time of the purchase of the common stock, had any agreements, plans or understandings, directly or indirectly, with any person to distribute the securities.

We are required to pay all fees and expenses incident to the registration of the shares of common stock. Except as provided for indemnification of the selling stockholders, we are not obligated to pay any of the expenses of any attorney or other advisor engaged by a selling stockholder. We have agreed to indemnify the selling stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

If we are notified by any selling stockholder that any material arrangement has been entered into with a broker-dealer for the sale of shares of common stock, we will file a post-effective amendment to the registration statement. If the selling stockholders use this prospectus for any sale of the shares of our common stock, they will be subject to the prospectus delivery requirements of the Securities Act.

The anti-manipulation rules of Regulation M under the Exchange Act may apply to sales of our common stock and activities of the selling stockholders, which may limit the timing of purchases and sales of any of the shares of common stock by the selling stockholders and any other participating person. Regulation M may also restrict the ability of any person engaged in the distribution of the shares of common stock to engage in passive market-making activities with respect to the shares of common stock. Passive market making involves transactions in which a market maker acts as both our underwriter and as a purchaser of our common stock in the secondary market. All of the foregoing may affect the marketability of the shares of common stock and the ability of any person or entity to engage in market-making activities with respect to the shares of common stock.

Once sold under the registration statement, of which this prospectus forms a part, the shares of common stock will be freely tradable in the hands of persons other than our affiliates.

## USE OF PROCEEDS

We will not receive proceeds from sales of our common stock made under this prospectus; however, if we receive proceeds from the cash exercise of the Selling Securityholder Warrant, such proceeds will be used for working capital and general corporate purposes.

## DETERMINATION OF OFFERING PRICE

There currently is no public market for our common stock. The shares of common stock may be sold in one or more transactions at a price of $4.00 per share until our shares are listed on The Nasdaq Capital Market and thereafter at prevailing market prices or privately negotiated prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale or at negotiated prices. See "Plan of Distribution" above for more information.

## LEGAL MATTERS

Certain legal matters with respect to the validity of the securities being offered by this prospectus will be passed upon by Carmel, Milazzo & DiChiara LLP, New York, New York.

EX-10.21.1 2 ex10-21_1.htm

## **AMENDMENT TO NOTE PAYABLE AGREEMENT**

This Amendment, dated as of November 1, 2019 (this "Amendment"), made and entered into by and between YayYo, Inc., a Delaware corporation with its principal office located at 433 N. Camden Drive, Suite 600, Beverly Hills, California 90210 (hereinafter referred to as the "Company") and Bellridge Capital, LLC located at 515 E. Las Olas Boulevard, Suite 120A, Fort Lauderdale, Florida 33301 (hereinafter referred to as "Bellridge"), with reference to the following:

**WHEREAS**, prior to the date hereof the Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000 and entered into a new note payable agreement whereby it repaid $4,821,810 of the original $6,000,000 note payable and left a remaining balance of $1,178,190, plus an original issue discount of $117,828 for a note payable for $1,296,018. This note payable was due the earlier of October 31, 2019 or the closing of an offering of at least $3,000,000. (the "Maturity Date");

**WHEREAS**, the Company and Bellridge have determined that it is necessary, desirable, and in the best interest of the Company and Bellridge to amend the Note as set forth in this Amendment; and

**NOW THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements herein contained, the Company and Bellridge hereby agree as follows:

1. Definitions. Capitalized terms used and not defined in this Amendment shall have the respective meanings assigned to them in the Note.

2. Effective Date. This Amendment is effective as of November 1, 2019 (the "Effective Date"), and all references to the Note from and after such time will be deemed to be references to the Note as amended hereby.

3. Amendments to the Note: In consideration of good and valuable consideration, as of Effective Date, the Maturity Date shall be extended to the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000.

4. The headings in this Amendment are for reference only and do not affect the interpretation of this Amendment.

5. Except as set forth in this Amendment, the Note is unaffected and shall continue in full force and effect in accordance with its terms. If there is conflict between this Amendment and the Note or any earlier amendment, the terms of this Amendment will prevail.

6. This Amendment shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to the choice of law principles thereof. Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the courts of the State of Delaware for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Amendment and the transactions contemplated hereby. Service of process in connection with any such suit, action or proceeding may be served on each party hereto anywhere in the world by the same methods as are specified for the giving of notices under this Amendment. Each of the parties hereto irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. Each party hereto irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

7. This Amendment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument. A signature to this Amendment transmitted electronically shall have the same authority, effect, and enforceability as an original signature.

8. If any term, provision, covenant or restriction of this Amendment or applicable to this Amendment is held by a court of competent jurisdiction or other authority to be invalid, null and void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Amendment shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

IN WITNESS WHEREOF, the undersigned have caused this Amendment to the Note to be duly executed as of the date first above written.

**YAYYO, INC.**

By: _____
Name: Jonathan Rosen
Title:   Chief Executive Officer

**BELLRIDGE CAPITAL, LLC**

By: _____
Name: Robert Klimov
Title:   Managing Partner

# EXHIBIT D

S-1/A 1 forms-1a.htm

As filed with the Securities and Exchange Commission on November 6, 2019

Registration No. 333-224549

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM S-1/A**
**(Amendment #15)**
**REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933**



**YⱭⱯYⱷ, Iɴc.**

(Exact name of registrant as specified in its charter)

| Delaware | 7371 | 81-3028414 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
**(310) 926-2643**

(Address, including zip code, and telephone number, including area code,
of registrant's principal executive offices)

**Jonathan Rosen**
**Chief Executive Officer**
**YayYo, Inc.**
**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
**(310) 926-2643**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

Copies to:

| | |
|---|---|
| **Peter DiChiara, Esq.** | **Richard A. Friedman, Esq.** |
| **Ross Carmel, Esq.** | **Nazia Khan, Esq.** |
| **Carmel, Milazzo & DiChiara LLP** | **Sheppard, Mullin, Richter &** |
| **55 West 39th Street, 18th Floor** | **Hampton LLP** |
| **New York, New York 10018** | **30 Rockefeller Plaza, 39th Floor** |
| **Telephone: (212) 658-0458** | **New York, NY 10112** |
| | **Telephone: (212) 653-8700** |

Approximate date of commencement of proposed sale to the public: **As soon as practicable after the effective date of this Registration Statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. ☐

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission acting pursuant to said Section 8(a), may determine.**

**EXPLANATORY NOTE**

This Registration Statement contains two forms of prospectuses: one to be used in connection with the initial public offering of 2,875,000 shares of our common stock (including shares of common stock which may be issued on exercise of a 45-day option granted to the underwriters to cover over-allotments, if any) through the underwriters named on the cover page of this prospectus (the "IPO Prospectus") and one to be used in connection with the potential resale by certain selling stockholders of an aggregate amount up to 1,650,000 shares of our common stock (the "Selling Stockholder Prospectus"), consisting of up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding common stock purchase warrants. The IPO Prospectus and the Selling Stockholder Prospectus will be identical in all respects except for the alternate pages for the Selling Stockholder Prospectus included herein which are labeled "Alternate Pages for Selling Stockholder Prospectus."

The Selling Stockholder Prospectus is substantively identical to the IPO Prospectus, except for the following principal points:

- they contain different outside and inside front covers;
- they contain different Offering sections in the Prospectus Summary section;
- they contain different Use of Proceeds sections;
- the Capitalization section is deleted from the Selling Stockholder Prospectus;
- the Dilution section is deleted from the Selling Stockholder Prospectus;
- a Selling Stockholder section is included in the Selling Stockholder Prospectus;
- the Underwriting section from the IPO Prospectus is deleted from the Selling Stockholder Prospectus and a Plan of Distribution is inserted in its place; and
- the Legal Matters section in the Selling Stockholder Prospectus deletes the reference to counsel for the underwriters.

We have included in this Registration Statement, after the financial statements, a set of alternate pages to reflect the foregoing differences of the Selling Stockholder Prospectus as compared to the Prospectus.

**The sales of our securities registered in the Prospectus and the shares of our common stock registered in the Selling Stockholder Prospectus may result in two offerings taking place concurrently, which could affect the price and liquidity of, and demand for, our securities. This risk and other risks are included in "Risk Factors" beginning on page 7 of the IPO Prospectus.**

*The information in this prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state or other jurisdiction where the offer or sale is not permitted.*

**Subject to Completion, dated November 6, 2019**

**PROSPECTUS**



# YAYYO, INC.

**2,500,000 Shares of Common Stock**

This is an initial public offering of shares of common stock of YayYo, Inc. We are offering 2,500,000 shares of our common stock.

Prior to this primary offering, there has been no public market for our common stock. The public offering price of the shares will be $4.00. We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering.

We intend to use the proceeds from this primary offering for the acquisition of passenger vehicles made available for rent and for general corporate purposes, including working capital and sales and marketing activities. See "*Use of Proceeds.*"

**Investing in our common stock involves a high degree of risk. See "*Risk Factors*" beginning on page 7 of this prospectus for a discussion of information that should be considered in connection with an investment in our common stock.**

**Neither the Securities and Exchange Commission ("<u>SEC</u>") nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

We are an "emerging growth company" as that term is used in the Jumpstart Our Business Startups Act of 2012, and we have elected to comply with certain reduced public company reporting requirements.

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions (1)(2) | $ | $ |
| Proceeds, before expenses, to us | $ | $ |

(1) Represents underwriting discount and commissions equal to 8% per share (or $0.32 per share), which is the underwriting discount we have agreed to pay on all investors in this Offering introduced by the underwriters.

(2) Does not include a non-accountable expense allowance equal to 1% of the gross proceeds of this offering, payable the underwriters, or the reimbursement of certain expenses of the underwriters. See "*Underwriting*" beginning on page 84 of this prospectus for additional information regarding underwriting compensation.

In addition to the underwriting discounts listed above and the non-accountable expense allowance described in the footnote, we have agreed to issue upon the closing of this offering to Aegis Capital Corp., as representative of the underwriters, warrants that will expire on the fifth anniversary of the effective date of this registration statement entitling the representative to purchase 5% of the number of shares of common stock sold in this offering (excluding shares of common stock sold to cover over-allotments, if any). The registration statement of which this prospectus is a part also covers the underwriters' warrants and the common shares issuable upon the exercise thereof. For additional information regarding our arrangement with the underwriters, please see "*Underwriting*" beginning on page 84.

We have granted the representative an option, exercisable for 45 days from the date of this prospectus, to purchase up to an additional 375,000 common shares on the same terms as the other shares being purchased by the underwriters from us.

The underwriters expect to deliver the shares against payment in New York, New York on         , 2019.

**Prospectus dated        , 2019**

**Aegis Capital Corp.**                    **WestPark Capital, Inc.**

**Table of Contents**

ABOUT THIS PROSPECTUS                                                                           1
MARKET DATA                                                                                      1
PROSPECTUS SUMMARY                                                                               2
SUMMARY OF THE OFFERING                                                                          6
RISK FACTORS                                                                                     7
SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS                                               36
USE OF PROCEEDS                                                                                 36
MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS                                        37
CAPITALIZATION                                                                                  38
DILUTION                                                                                        39
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS           41
BUSINESS                                                                                        53
MANAGEMENT                                                                                      64
EXECUTIVE COMPENSATION                                                                          71
PRINCIPAL STOCKHOLDERS                                                                          73
CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS                                            74
DESCRIPTION OF SECURITIES                                                                       78
UNDERWRITING                                                                                    84
EXPERTS                                                                                         88
LEGAL MATTERS                                                                                   89
WHERE YOU CAN FIND MORE INFORMATION                                                             89
INDEX TO FINANCIAL STATEMENTS                                                                  F - 1

Through and including          , 2019 (the 25th day after the date of this prospectus), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriter and with respect to their unsold allotments or subscriptions.

You should rely only on the information contained in this prospectus or any prospectus supplement or amendment. Neither we, nor the underwriters, have authorized any other person to provide you with information that is different from, or adds to, that contained in this prospectus. If anyone provides you with different or inconsistent information, you should not rely on it. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. The selling stockholders are offering to sell and seeking offers to buy our common stock only in jurisdictions where offers and sales are permitted. You should assume that the information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of our common stock. Our business, financial condition, results of operations and prospects may have changed since that date. We are not making an offer of any securities in any jurisdiction in which such offer is unlawful.

### ABOUT THIS PROSPECTUS

Throughout this prospectus, unless otherwise designated or the context suggests otherwise,

- all references to the "Company," the "registrant," "YayYo," "we," "our," or "us" in this prospectus mean YayYo, Inc.;

- an initial public offering price of our common stock of $4.00 per share;

- all references to the "primary offering" refer to the offering contemplated by the IPO Prospectus;

- "year" or "fiscal year" mean the year ending December 31st; and

- all dollar or $ references when used in this prospectus refer to United States dollars;

Concurrent with the primary offering, the Company is registering shares of common stock in connection with the potential resale by certain selling stockholders of an aggregate amount up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding common stock purchase warrants. Please read the risk factors, including the risk factor titled "***Sales of our common stock in the primary offering will be taking place concurrently with common stock registered by selling stockholders which might affect the price, demand, and liquidity of our common stock***" on page 29.

### MARKET DATA

Market data and certain industry data and forecasts used throughout this prospectus were obtained from internal company surveys, market research, consultant surveys, publicly available information, reports of governmental agencies and industry publications and surveys. Industry surveys, publications, consultant surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but the accuracy and completeness of such information is not guaranteed. We have not independently verified any of the data from third party sources, nor have we ascertained the underlying economic assumptions relied upon therein. Similarly, internal surveys, industry forecasts and market research, which we believe to be reliable based on our management's knowledge of the industry, have not been independently verified. Forecasts are particularly likely to be inaccurate, especially over long periods of time. In addition, we do not necessarily know what assumptions regarding general economic growth were used in preparing the forecasts we cite. Statements as to our market position are based on the most currently available data. While we are not aware of any misstatements regarding the industry data presented in this prospectus, our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "*Risk Factors*" in this prospectus.

1

# PROSPECTUS SUMMARY

*This summary provides a brief overview of the key aspects of our business and our securities. The reader should read the entire prospectus carefully, especially the risks of investing in our common stock discussed under "Risk Factors." Some of the statements contained in this prospectus, including statements under "Summary" and "Risk Factors" as well as those noted in the documents incorporated herein by reference, are forward-looking statements and may involve a number of risks and uncertainties. Our actual results and future events may differ significantly based upon a number of factors. The reader should not put undue reliance on the forward-looking statements in this document, which speak only as of the date on the cover of this prospectus.*

As used in this prospectus, all references to "capital stock," "common stock," "Shares," "preferred stock," "stockholders," "shareholders" applies only to YayYo, Inc. and "we," "our," "us," the "Company," the "registrant," or "YayYo" refer to YayYo, Inc., a Delaware corporation. References in this prospectus to the terms "Company," "we," "our" or words of like import mean YayYo, Inc. and its direct and indirect subsidiaries, which currently consist of Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"), Savy LLC, a Delaware limited liability company ("Savy") and Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo").

## About our Company

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

On August 12, 2017, we announced we were shifting our primary focus in the transportation/ridesharing industry from the development of the Metasearch App. We have no intention of continuing this business direction. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through Rideshare (the "Rideshare Platform"), and (ii) the leasing of a fleet of standard passenger vehicles to be made commercially available for rent through Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicle and services to drivers in the ridesharing economy.

The Company operations are organized into two business segments across the ridesharing and transportation industry:

*Rideshare Platform*—On October 31, 2017, the Company created the wholly-owned subsidiary, Rideshare, to incubate the concept of a proprietary transportation network system focused on the developing of a Rideshare marketplace booking platform to rent standard passenger vehicles to self-employed ridesharing drivers. The Company has now deployed and launched the Rideshare Platform on its operating online platform, located at *www.Ridesharerental.com*. The Rideshare Platform is a proprietary car-rental marketplace that connects the Company's Fleet Management vehicles, other fleet owners and selected individual car owners with Rideshare drivers seeking rental vehicles.

*Fleet Management*—On June 10, 2017, the Company formed the wholly-owned subsidiary, Distinct Cars, for purposes of developing a fleet management business. The Fleet Management business focuses on the maintenance of a fleet of brand new standard passenger vehicles, under lease contract with the Company, to be subsequently rented directly to drivers in the ridesharing economy. The Fleet Management business and vehicles are made commercially available through the Company's Rideshare Platform.

## Recent Developments

### YayYo, Inc. - Recent Financing Activities

As of October 31, 2019, the Company had 26,802,976 shares of common stock issued and outstanding. From January 2018 to June 30, 2019, the Company issued (i) 46,330 shares of common stock under the Regulation A+ Offering (defined below) in exchange for cash proceeds, and (ii) 986,095 shares of restricted common stock, pursuant to following:

- 155,850 shares of restricted common stock were issued in connection with the issuance of notes payable;

- 432,500 shares of restricted common stock were issued for services;

- 99,245 shares of restricted common stock were issued for payment of accounts payable and accrued expenses; and

- 298,500 shares of restricted common stock were issued for a capital lease obligation.

No shares of common stock have been issued since June 30, 2019.

As of October 31, 2019, with the issuances above, we had 26,802,976 shares of common stock issued and outstanding.

In December 2016, we filed an offering statement pursuant to Regulation A of the Securities Act, which was qualified by the SEC on March 17, 2017. We offered up to a maximum of 6,250,000 shares of common stock on a "best efforts" basis, at a price of $8.00 per share. On March 16, 2018, we closed the Regulation A offering, after issuing 365,306 shares of common stock for proceeds of approximately $1.8 million net of offering expenses (the "Regulation A+ Offering").

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares, of our common stock (the "Warrant Shares"), with an exercise price of $4.00 per share (the "Warrants" or the "Selling Securityholder Warrant") and 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Warrants expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

YayYo, Inc.'s obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

Further, in 2018, the Company issued notes payable and also issued an aggregate of 5,850 shares of its common stock to the note holders as additional incentive to make the loans.

In February 2018, the Company issued 81,250 shares of its common stock to two individuals for services rendered. In May 2018, the Company issued 1,250 shares of its common stock to a company for services.

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with David Haley, a former director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies (the "Special Policies") for Rideshare and Distinct Cars, in consideration for 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 14,945 shares of Company restricted common stock, at a price per share equal to $8.00, as reimbursement for the cost of Mr. Haley's monetary advances made on behalf of the Company. 258,695 shares of Company restricted common stock was issued on April 1, 2018 and 6,250 shares of Company restricted common stock was issued on October 8, 2018.

In July 2018, the Company issued a consultant 100,000 shares of common stock for an agreement to provide services. The Company entered into an agreement with the consultant to cancel the shares in November 2018.

During fiscal year 2017, the Company entered into vehicle leasing agreements with Acme Auto Leasing LLC (the "Lessor") and issued additional consideration the Lessor in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company. On December 2017, July 2018 and November 2018, the Company issued the Lessor an additional 250,000, 91,500 and 207,000 shares of common stock, respectively, under similar arrangements in connection with lease arrangements.

As of June 30, 2019, December 31, 2018 and December 31, 2017, the Company has total lease obligations in the amount of $3,221,785, $3,790,147 and $1,593,291, respectively, (collectively, the "Finance Lease Obligations").

On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

### *Distinct Cars, LLC - Recent Financing Activities*

As of the date of this prospectus, Distinct Cars, as lessee, entered into a series of open-ended lease agreements and disclosure statements with Lessor to lease standard passenger vehicles, each with an approximate lease term of 30 to 36 months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

Distinct Cars has completed a debt round of financing pursuant to which Distinct Cars raised aggregate gross proceeds in the amount of $319,667 from 38 accredited investors in exchange for senior secured promissory notes issued by Distinct Cars (each a "Distinct Cars Note" and collectively, the "Distinct Cars Notes"). The maturity date under the Distinct Cars Notes is 36 months from the date of issuance (the "DCN Maturity Date") ranging from August 9, 2020 to May 23, 2021. The principal amount under the Distinct Cars Notes ranges from a minimum amount of $5,000 per Distinct Cars Note up to $20,000 per Distinct Cars Note. The Distinct Cars Notes accrue interest at a rate of 8% per annum with interest due and payable upon the DCN Maturity Date. The principal amount and any unpaid and accrued interest thereunder is due and payable in twelve quarterly installments commencing upon January 1, 2018. The Distinct Cars Notes are secured by a senior secured priority lien in the equity of the fleet of leased automobiles acquired under the Lease Agreements described above subject to subordination in priority lien status to the purchase money security interest held by the lessor under the Lease Agreements. In addition to the total amount of principal and interest owing under the Distinct Cars Note, upon execution of the Distinct Cars Note and placement of funds the holder received a stock grant (the "Stock Grant") of YayYo Inc., common stock (the "Parent Shares") in an amount equal to 100% of the principal sum as calculated by a price of $4.00 per share with 30% coverage.

### Risk Factors

Our business is subject to a number of risks. You should be aware of these risks before making an investment decision. These risks are discussed more fully in the section of this prospectus titled "*Risk Factors*", which begins on page 7 of this prospectus.

### Information Regarding our Capitalization

As of October 31, 2019, we had 26,802,976 shares of common stock issued and outstanding. Additional information regarding our issued and outstanding securities may be found in the sections of this prospectus titled "*Market for Common Equity and Related Stockholder Matters*" and "*Description of Securities*."

Unless otherwise specifically stated, information throughout this prospectus does not assume the exercise of outstanding options or warrants to purchase shares of our common stock.

**Organizational History**

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company, Savy LLC, a Delaware limited liability company, Rideyayyo LLC, a Delaware limited liability company and Rideshare Car Rentals LLC, a Delaware limited liability company.

The Company was formed on June 21, 2016 under the name "YayYo, LLC," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC to the Company in exchange for common stock of the Company. All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities upon the filing of the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware.

**Corporate Information**

Our principal executive office is located at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. Our telephone number is (310) 926-2643. Our web address is *www.yayyo.com*. Information included on our website is not part of this prospectus.

**Implications of Being an Emerging Growth Company**

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). We will remain an emerging growth company until the earlier of (i) the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act; (ii) the last day of the fiscal year in which we have total annual gross revenues of $1.07 billion or more; (iii) the date on which we have issued more than $1 billion in nonconvertible debt during the previous three years; or (iv) the date on which we are deemed to be a large accelerated filer under applicable SEC rules. We expect that we will remain an emerging growth company for the foreseeable future, but cannot retain our emerging growth company status indefinitely and will no longer qualify as an emerging growth company on or before the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act. For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from specified disclosure requirements that are applicable to other public companies that are not emerging growth companies.

These exemptions include:

- being permitted to provide only two years of audited financial statements, in addition to any required unaudited interim financial statements, with correspondingly reduced "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" disclosure;

- not being required to comply with the requirement of auditor attestation of our internal controls over financial reporting;

- not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements;

- reduced disclosure obligations regarding executive compensation; and

- not being required to hold a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

We have taken advantage of certain reduced reporting requirements in this prospectus. Accordingly, the information contained herein may be different than the information you receive from other public companies in which you hold stock.

An emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. This allows an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have irrevocably elected to avail ourselves of this extended transition period and, as a result, we will not be required to adopt new or revised accounting standards on the dates on which adoption of such standards is required for other public reporting companies.

We are also a "smaller reporting company" as defined in Rule 12b-2 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and have elected to take advantage of certain of the scaled disclosure available for smaller reporting companies.

## SUMMARY OF THE OFFERING

| | |
|---|---|
| Common stock offered by us | 2,500,000 shares. |
| Common stock outstanding prior to the primary offering (1) | 26,802,976 shares common stock |
| Common stock to be outstanding after the primary offering (1) | 29,302,976 shares (29,677,976) shares if the underwriters exercise their option to purchase additional shares in full). |
| Over-allotment option of common stock offered by us | The underwriters have a 45-day option to purchase up to 375,000 additional shares of common stock. |
| Use of Proceeds | We currently intend to use the net proceeds to us from this primary offering to purchase vehicles to add to our fleet of passenger vehicles made available for rent through our wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital and sales and marketing activities. See the section of this prospectus titled "*Use of Proceeds*" beginning on page 36. |
| Proposed Listing | We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering. |
| Underwriters' warrants | Upon the closing of this offering, we have agreed to issue to Aegis Capital Corp., as representative of the underwriters, warrants that will expire on the fifth anniversary of the effective date of this registration statement entitling the representative to purchase 5% of the number of shares of common stock sold in this offering (excluding shares of common stock sold to cover over-allotments, if any). The registration statement of which this prospectus is a part also covers the underwriters' warrants and the common shares issuable upon the exercise thereof. For additional information regarding our arrangement with the underwriters, please see "*Underwriting*." |
| Lock-up agreements | Our executive officers, directors, and stockholders, have agreed with the underwriters not to sell, transfer or dispose of any shares or similar securities for certain periods of time following the closing of this offering. For additional information regarding our arrangement with the underwriters, please see "*Underwriting*." |
| Sale of Founder's Shares and Voting Trust | As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, agreed to sell 12,525,000 of its 15,425,000 shares of common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration under the Securities Act to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. As a result of the sale, X, LLC's beneficial ownership shall be reduced to 9.9% of the shares outstanding after the completion of this Offering. We will not receive any proceeds from the sale of the Private Shares. If the offering contemplated by this registration |

statement is not consummated by January 31, 2020, the parties have agreed to unwind the sale of the Private Shares transaction in compliance with applicable law. Mr. El-Batrawi has also entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his remaining 2,900,000 shares of common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

Risk Factors

You should carefully consider the information set forth in this prospectus and, in particular, the specific factors set forth in the "*Risk Factors*" section beginning on page 7 of this prospectus before deciding whether or not to invest in shares of our common stock.

(1) As of October 31, 2019. Does not include (a) 1,500,000 shares of our common stock issuable upon exercise of common stock purchase warrants; and (b) 300,000 shares of our common stock issuable upon exercise of granted and vested stock options granted under our 2016 Equity Incentive Plan.

6

# RISK FACTORS

*Our business is subject to many risks and uncertainties, which may affect our future financial performance. If any of the events or circumstances described below occur, our business and financial performance could be adversely affected, our actual results could differ materially from our expectations, and the price of our stock could decline. The risks and uncertainties discussed below are not the only ones we face. There may be additional risks and uncertainties not currently known to us or that we currently do not believe are material that may adversely affect our business and financial performance. You should carefully consider the risks described below, together with all other information included in this prospectus including our financial statements and related notes, before making an investment decision. The statements contained in this prospectus that are not historic facts are forward-looking statements that are subject to risks and uncertainties that could cause actual results to differ materially from those set forth in or implied by forward-looking statements. If any of the following risks actually occurs, our business, financial condition or results of operations could be harmed. In that case, the trading price of our common stock could decline, and investors in our securities may lose all or part of their investment.*

## Risks Related to Our Business

### *We are an emerging growth company with a limited operating history and limited sales to date.*

The Company is subject to all of the risks inherent in the establishment of an emerging growth company, including the absence of an operating history, and the risk that we may be unable to successfully operate our business segments. There can be no assurance that the Company will be able to successfully operate our business segments, including without limitation the Company's technologies, products and services.

The Company was incorporated on November 16, 2016 and only commenced operations thereafter. The Company was incorporated pursuant to the simultaneous filing of the Company's certificate of incorporation, as filed and stamped by the Delaware Secretary of State on November 16, 2016, and the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*", as filed and stamped on the same date by the Delaware Secretary of State pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "*C*" corporation formed under the laws of the State of Delaware. Accordingly, we have limited operating history upon which to base an evaluation of our business and prospects. You must consider the risks and difficulties we face as a small operating company with limited operating history.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry towards the vehicle rental business with a focus on developing (i) an online rideshare marketplace booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, we have limited operating history in the vehicle rental, fleet management and transportation industry. We generated $3,289,478 in revenue for fiscal year 2018.

Operating results for future periods are subject to numerous uncertainties and we cannot assure you that the Company will achieve or sustain profitability. The Company's prospects must be considered in light of the risks encountered by small operating companies with limited operating history, particularly companies in new and rapidly evolving markets. Operating results will depend upon many factors, including our success in attracting and retaining motivated and qualified personnel, our ability to establish short term credit lines or obtain financing from other sources, our ability to develop and market new products, control costs, and general economic conditions. The Company has engaged in limited operations to date, and although the Company believes that its plans to grow, expand and scale operations organically will be successful, there is no assurance that this will be the case. There can be no assurance that the Company's sales projections and marketing plans will be achieved as anticipated and planned. The Company cannot assure prospective investors that it will be able to successfully develop and market its products and services which may have a material adverse effect on our business.

***We will need but may be unable to obtain additional funding on satisfactory terms, which could dilute our shareholders or impose burdensome financial restrictions on our business.***

We have relied upon cash from financing activities and in the future, we hope to rely predominantly on revenues generated from operations to fund all of the cash requirements of our activities; however, we do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. Future financings may not be available on a timely basis, in sufficient amounts or on terms acceptable to us, if at all. Any debt financing or other financing of securities senior to the common stock will likely include financial and other covenants that will restrict our flexibility. Any failure to comply with these covenants would have a material adverse effect on our business, prospects, financial condition and results of operations because we could lose our existing sources of funding and impair our ability to secure new sources of funding.

***We have incurred net losses since inception.***

For the six month period ended June 30, 2019, we generated a loss of $996,915 and had an accumulated deficit of $22,238,609. For the fiscal year ended December 31, 2018, we generated a loss of $13,189,122 and had an accumulated deficit of $21,241,694. For the fiscal year ended December 31, 2017, we generated a loss of $6,568,863 and had an accumulated deficit of $8,052,572. Increases in costs and expenses may result in a continuation of losses for the foreseeable future. There can be no assurance that we will be commercially successful.

***We have significant working capital requirements and issuance of common stock or the exercise of outstanding warrants and options to meet these working capital requirements and fund our operations may dilute your investment.***

We have been operating at a loss since inception and our working capital requirements continue to be significant. As of December 31, 2017, and 2018, and June 30, 2019 our working capital deficit was $618,910, $5,007,729 and $5,641,266, respectively. We have been supporting our business predominantly through the sale of debt and equity since inception. Since 2017, we have also been supporting our business through our operating cash flow from our limited operational business segments. However, to date the majority of our working capital needs have been funded through third-party capital financings. We will need additional funding to develop our business segments, to increase our sales and marketing capabilities, technologies and assets, as well as for working capital requirements and other operating and general corporate purposes. Our working capital requirements depend and will continue to depend on numerous factors, including the timing of revenues, the expense involved in development of our products and services, and capital improvements. If we are unable to generate sufficient revenue and cash flow from operations, we will need to seek additional equity or debt financing to provide the capital required to maintain or expand our operations, which may have the effect of diluting our existing stockholders or restricting our ability to run our business.

There can be no assurance that we will be able to raise sufficient additional capital on acceptable terms, or at all. If such financing is not available on satisfactory terms, or is not available at all, we may be required to delay, scale back or eliminate the development of business opportunities and our operations and financial condition may be materially adversely affected. Debt financing, if obtained, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, could increase our expenses and require that our assets be provided as a security for such debt. Debt financing would also be required to be repaid regardless of our operating results. Equity financing, if obtained, could result in dilution to our then existing stockholders. As of the date of this filing, we have issued and outstanding the Selling Securityholder Warrant to purchase an aggregate of 1,500,000 shares of our common stock. We have also reserved an aggregate of 10,000,000 shares of common stock for issuance under our 2016 Equity Incentive Plan (the "2016 Plan"). As of June 30, 2019, we have options to purchase an aggregate of 300,000 shares of our common stock outstanding pursuant to our 2016 Plan.

***We have outstanding debt and lease commitments, which are secured by our assets and it may make it more difficult for us to make payments on our other debt and lease obligations.***

As of June 30, 2019, December 31, 2018 and December 31, 2017, we had outstanding indebtedness totaling $3,233,087, $2,690,181 and $909,889, respectively. As of June 30, 2019, December 31, 2018 and December 31, 2017, we had outstanding lease obligations totaling $3,221,785, $3,790,147 and $1,593,291, respectively.

Our debt and lease commitments could have important consequences to you. For example, they could:

- make it more difficult for us to obtain additional financing in the future for our acquisitions and operations, working capital requirements, capital expenditures, debt service or other general corporate requirements;

- require us to dedicate a substantial portion of our cash flows from operations to the repayment of our debt and the interest associated with our debt rather than to other areas of our business;

- limit our operating flexibility due to financial and other restrictive covenants, including restrictions on incurring additional debt, creating liens on our properties, making acquisitions or paying dividends;

- make it more difficult for us to satisfy our obligations with respect to our notes;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- make us more vulnerable in the event of adverse economic and industry conditions or a downturn in our business.

Our ability to meet our debt service and lease obligations depends on our future financial and operating performance, which will be impacted by general economic conditions and by financial, business and other competitive factors, many of which are beyond our control. These factors could include operating difficulties, increased operating costs, competition, regulatory developments and delays in our business strategies. Our ability to meet our debt service and lease obligations may depend in significant part on the extent to which we can successfully execute our business strategy and successfully operate our business segments. We may not be able to execute our business strategy and our business operations may be materially impacted.

Typical loan agreements also might contain restrictive covenants, which may impair our operating flexibility. Such loan agreements would also provide for default under certain circumstances, such as failure to meet certain financial covenants. A default under a loan agreement could result in the loan becoming immediately due and payable and, if unpaid, a judgment in favor of such lender which would be senior to our rights. A judgment creditor would have the right to foreclose on any of our assets resulting in a material adverse effect on our business, ability to generate revenue, operating results or financial condition.

If our business does not generate sufficient cash flow from operations or future sufficient borrowings are not available to us under our credit agreements or from other sources, we might not be able to service our debt and lease commitments, including the notes, or to fund our other liquidity needs. If we are unable to service our debt and lease commitments, due to inadequate liquidity or otherwise, we may have to delay or cancel potential acquisitions, sell equity securities, sell assets or restructure or refinance our debt. We might not be able to sell our equity securities, sell our assets or restructure or refinance our debt on a timely basis or on satisfactory terms or at all. In addition, the terms of our agreements with original equipment manufacturers or debt agreements may prohibit us from pursuing any of these alternatives.

***Our Rideshare Platform user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review key metrics related to the operation of our Rideshare Platform business, including, but not limited to, our monthly average users, subscribers and customers to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data and have not been validated by an independent third party. Errors or inaccuracies in our metrics or data could result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of Rideshare Platform users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies.

***Our Rideshare Platform emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes do not align with the market's expectations. If that happens, our stock price may be negatively affected.***

Our Rideshare Platform business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. Our focus on complexity and quick reactions could result in unintended outcomes or decisions that are poorly received by our users or partners. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and will thereby improve our financial performance over the long-term. These decisions may not produce the long-term benefits that we expect, in which case, our user growth and engagement, our

relationships with advertisers and partners, as well as our business, operating results, and financial condition could be seriously harmed.

9

***Our Rideshare Platform and software is highly technical and may contain undetected software bugs or vulnerabilities, which could manifest in ways that could seriously harm our reputation and our business.***

Our Rideshare Platform and software is highly technical and complex. Our Rideshare Platform may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently.

We also could face claims for product liability, tort, or breach of warranty. Defending a lawsuit, regardless of its merit, is costly and may divert management's attention and seriously harm our reputation and our business. In addition, if our liability insurance coverage proves inadequate or future coverage is unavailable on acceptable terms or at all, our business could be seriously harmed.

***To carry out our business plan we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to fund planned capital expenditures will depend on our ability to generate cash in the future. This ability, to some extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We do not believe that our cash flow from operating activities and our existing capital resources, including the liquidity provided by our credit agreements and lease financing arrangements, will be sufficient to fund our planned capital expenditures. We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to fund our other liquidity needs. We may need to delay capital expenditures or seek additional equity financing. For more information see "*Management's Discussion Analysis of Financial Condition and Results of Operation—Liquidity, Capital Resources and Plan of Operations*" below.

***Our debt and other commitments expose us to a number of risks, including cash requirements for debt and lease obligations, availability and interest rate variability, each of which could hamper our growth and profitability.***

A significant portion of the cash flow we generate must be used to service the interest and principal payments relating to our various financial commitments, including $3,233,087 of total notes payable of which $0 is long-term, and $3,221,785 of lease commitment obligations of which $1,559,309 is long-term, as of June 30, 2019. A sustained or significant decrease in our operating cash flows could lead to an inability to meet our debt service requirements or to a failure to meet specified financial and operating covenants included in certain of our agreements. If this were to occur, it may lead to a default under one or more of our commitments. In the event of a default for this reason, or any other reason, the potential result could be the acceleration of amounts due, which could have a significant and adverse effect on us.

Because we finance the majority of our operating and strategic initiatives using a variety of commitments, including $6,454,872 in total notes payable and loan facilities, we are dependent on continued availability of these sources of funds. If these agreements are terminated or we are unable to access them because of a breach of financial or operating covenants or otherwise, we will likely be materially affected.

The interest rates we are charged on a substantial portion of our debt, including the Second Note payable, are variable, increasing or decreasing based on changes in certain published interest rates. Increases to such interest rates would likely result in significantly higher interest expense for us, which would negatively affect our operating results. Because many of our customers finance their vehicle purchases, increased interest rates may also decrease vehicle sales, which would negatively affect our operating results.

***We are a holding company and as a result rely on payments from our subsidiaries in order to meet our cash needs and service our debt. Our subsidiaries may not be able to distribute the necessary funds to us and this could adversely affect our ability to make payments on our indebtedness.***

As a holding company without independent means of generating operating revenues, YayYo, Inc., depends on dividends, distributions and other payments, from our subsidiaries to fund our obligations and to meet our cash needs. If the operating results of our subsidiaries at any given time are insufficient to make distributions to us, we would be unable to make payments on our outstanding indebtedness

***We face intense competition that may lead to downward pricing or an inability to increase prices.***

The vehicle rental and used-vehicle sale industries are highly competitive and are increasingly subject to substitution. While price is not the only competitive factor, we believe price is one of the primary competitive factors in the vehicle rental market and that technology has enabled cost-conscious customers, including business travelers, to more easily compare rates available from rental companies. In addition, our competitors may reduce prices in order to, among other things, attempt to gain a competitive advantage, capture market share, or to compensate for declines in rental activity. To the extent we do not match or remain within a reasonable competitive margin of our competitors' pricing, our revenues and results of operations, financial condition, liquidity and cash flows could be materially adversely affected. If competitive pressures lead us to match any of our competitors' downward pricing and we are not able to reduce our operating costs, then our margins, results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Further, we may in the future develop and launch other products or services that may be in direct competition with the various players in the ridesharing industry, such as Uber and Lyft, and all of whom have greater resources than us. There are low barriers to entry, and we expect that competition will intensify in the future. We believe that numerous factors, including price, offerings, reliability, client base, brand name and general economic trends will affect our ability to compete successfully. Our existing and future competitors may include many large companies that have substantially greater market presence and financial, technical, marketing and other resources than we do. There can be no assurance that we will have the financial resources, technical expertise or marketing and support capabilities to compete successfully. Increased competition could result in significant competition, which in turn could result in lower revenues, which could materially adversely affect our potential profitability.

***We might incur expenses to develop products that are never successfully commercialized.***

We have incurred and expect to continue to incur research and development and other expenses in connection with our products business. The potential products to which we devote resources might never be successfully developed or commercialized by us for numerous reasons. Until June 30, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" (the "Metasearch App").

As of the date of this prospectus, the Company has completed the development of the Metasearch App; however, it has no further intention to continue the development or marketing of the Metasearch App. While the Company does not intend to allocate additional corporate resources to the development of the Metasearch App, there can be no assurances that we will not incur additional expenses for the Metasearch App that has not been fully developed and/or commercialized. Such additional expenses could have a material adverse effect on our business, financial condition and prospects.

11

***We face risks related to uninsured liabilities or future claims that exceed our insurance limits.***

Our businesses expose us to claims for personal injury, death and property damage resulting from the use of the vehicles rented by us, and for employment-related injury claims by our employees. We purchase insurance to cover us for these claims. We cannot assure you, however, that we will not be exposed to uninsured liability potentially resulting in multiple payouts or otherwise, liabilities in respect of existing or future claims exceeding the level of our insurance, availability of sufficient capital to pay any uninsured claims or the availability of insurance with unaffiliated carriers maintained on economically reasonable terms, if at all. While we have insurance for many of these risks, we retain risk relating to certain of these perils and certain perils are not covered by our insurance.

We are subject to a wide variety of regulatory burdens related to our operations and while management believes that the chosen operations and strategies are achievable in light of current economic and legal conditions, changes in the following regulatory areas may require management to make significant modifications to our stated strategies depending on future events.

**Governmental regulations, claims and legal proceedings.** Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

**Vehicle Requirements.** Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

**Environmental regulations.** We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

**Accounting rules and regulations.** The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

*Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, fuel costs, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows.*

We are subject to a wide variety of U.S. laws and regulations and changes in the level of government regulation of our business have the potential to materially alter our business practices and materially adversely affect our financial condition, results of operations, liquidity and cash flows, including our profitability. Those changes may come about through new laws and regulations or changes in the interpretation of existing laws and regulations.

Any new, or change in existing, U.S. law and regulation with respect to optional insurance products or policies could increase our costs of compliance or make it uneconomical to offer such products, which would lead to a reduction in revenue and profitability. If customers decline to purchase supplemental liability insurance products from us as a result of any changes in these laws or otherwise, our results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Certain proposed or enacted laws and regulations with respect to the banking and finance industries, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (including risk retention requirements) and amendments to the SEC's rules relating to asset-backed securities, could restrict our access to certain financing arrangements and increase our financing costs, which could have a material adverse effect on our financial condition, results of operations, liquidity and cash flows.

*We rely on third-party insurance policies to insure auto-related risks. If insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business, which could adversely affect our business, financial condition and results of operations.*

We procure third-party insurance policies which provide coverage for both owners and drivers on our platform. If the amount of one or more auto-related claims were to exceed our applicable aggregate coverage limits, we may bear the excess liability. Insurance providers have raised premiums and deductibles for many businesses and may do so in the future. As a result, our insurance and claims expense could increase. Our business, financial condition and results of operations could be adversely affected if (i) cost per claim, premiums or the number of claims significantly exceeds our historical experience and coverage limits, (ii) we experience a claim in excess of coverage limits, (iii) our insurance providers fail to pay insurance claims, or (iv) we experience a claim for which coverage is not provided.

*Our actual losses may exceed our insurance reserves, which could adversely affect our financial condition and results of operations.*

We establish insurance reserves for claims incurred but not yet paid and claims incurred but not yet reported and any related estimable expenses, and we periodically evaluate and, as necessary, adjust our insurance reserves as our experience develops or new information is learned. We employ various predictive modeling and actuarial techniques and make numerous assumptions based on limited historical experience and industry statistics to estimate our insurance reserves. Estimating the number and severity of claims, as well as related judgment or settlement amounts, is inherently difficult, subjective, and speculative. A number of external factors can affect the actual losses incurred for any given claim, including the length of time the claim remains open, fluctuations in healthcare costs, legislative and regulatory developments and judicial developments. Additionally, we may encounter in the future, instances of insurance fraud, which could increase our actual insurance-related costs. For any of the foregoing reasons, our actual losses for claims and related expenses may deviate, individually or in the aggregate, from the insurance reserves reflected in our consolidated financial statements. If we determine that our estimated insurance reserves are inadequate, we may be required to increase such reserves at the time of the determination, which could result in an increase to our net loss in the period in which the deficiency is determined and negatively impact our financial condition and results of operations.

*We may not be able to obtain adequate financing to continue our operations.*

We will need to raise additional funds through the issuance of equity, equity-related, or debt securities or through obtaining credit from government or financial institutions. This capital will be necessary to fund ongoing research and continue research and development activities, including the Rideshare Platform, and our Fleet Management business. We cannot be certain that additional funds will be available to us on favorable terms when required, or at all. If we cannot raise additional funds when we need them, our financial condition, results of operations, business and prospects would be materially and adversely affected.

***We may pursue strategic transactions which could be difficult to implement, disrupt our business or change our business profile significantly.***

Any future strategic acquisition or disposition of assets or a business could involve numerous risks, including: (i) potential disruption of our ongoing business and distraction of management; (ii) difficulty integrating the acquired business or segregating assets and operations to be disposed of; (iii) exposure to unknown, contingent or other liabilities, including litigation arising in connection with the acquisition or disposition or against any business we may acquire; (iv) changing our business profile in ways that could have unintended negative consequences; and (v) the failure to achieve anticipated synergies.

13

If we enter into significant strategic transactions, the related accounting charges may affect our financial condition and results of operations, particularly in the case of an acquisition. The financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. A material disposition could require the amendment or refinancing of our outstanding indebtedness or a portion thereof.

### We rely on our management team, which has little experience working together.

We depend on a small number of executive officers and other members of management to work effectively as a team, to execute our business strategy and operating business segments, and to manage employees and consultants. Our success will be dependent on the personal efforts of our Chief Executive Officer, our directors and such other key personnel. Any of our officers or employees can terminate his or her employment relationship at any time, and the loss of the services of such individuals could have a material adverse effect on our business and prospects. Mr. El-Batrawi, the founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The Nasdaq Capital Market. Our management team has only worked together for only a very short period of time and may not work well together as a management team.

### We have no long-term employment agreements in place with our executive officers.

As of the date of this Prospectus we have no employment agreements or similar arrangements with our executive officers. If we fail to reach mutually satisfactory agreement with our executives, any one or more of such persons may terminate their association with the Company. The loss of any one or more of these experienced executives may have a material and adverse effect on our Company and its business prospects. The Company has entered into an oral agreement with its Chief Executive Officer, Jonathan Rosen, for an annual salary of $300,000, retroactive to his start date of February 1, 2019. The Company also agreed to issue a restricted stock grant of 500,000 shares of common stock with one-third of the restricted shares vesting upon the closing of the Company's initial public offering with the remainder vesting ratably each month over the twenty-four months following the initial public offering.

### Our business operations are dependent upon the ability of our new employees to learn their new roles.

Until June 30, 2017, we were focused on the development and commercialization of the Metasearch App. On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry towards the vehicle rental business with a focus on developing the Rideshare Platform and our Fleet Management business.

In connection with the transition of our business operations, we have replaced many employees in key functions. As new employees gain experience in their roles, we could experience inefficiencies or a lack of business continuity due to loss of historical knowledge and a lack of familiarity of new employees with business processes, operating requirements, policies and procedures, some of which are new, and key information technologies and related infrastructure used in our day-to-day operations and financial reporting and we may experience additional costs as new employees learn their roles and gain necessary experience. It is important to our success that these new employees quickly adapt to and excel in their new roles. If they are unable to do so, our business and financial results could be materially adversely affected. In addition, if we were to lose the services of any one or more key employees, whether due to death, disability or termination of employment, our ability to successfully operate our business segments, financial plans, marketing and other objectives, could be significantly impaired.

### Raising additional capital by issuing additional securities may cause dilution to our current and future shareholders.

We will need to, or desire to, raise substantial additional capital in the future. Our future capital requirements will depend on many factors, including, among others:

- Our degree of success in generating rental and servicing fees from both our Fleet Management business and the Rideshare Platform;

- The costs of establishing or acquiring sales, marketing, and distribution capabilities for our services;

14

- The extent to which we acquire or invest in businesses, products, or technologies, and other strategic relationships; and

- The costs of financing unanticipated working capital requirements and responding to competitive pressures.

If we raise additional funds by issuing equity or convertible debt securities, we will reduce the percentage of ownership of the then-existing shareholders, and the holders of those newly-issued equity or convertible debt securities may have rights, preferences, or privileges senior to those possessed by our then-existing shareholders. Additionally, future sales of a substantial number of shares of our common stock, or other equity-related securities in the public market could depress the market price of our common stock and impair our ability to raise capital through the sale of additional equity or equity-linked securities. We cannot predict the effect that future sales of our common stock, or other equity-related securities would have on the market price of our common stock at any given time.

***If our management is unable to accurately estimate future levels of rental activity and adjust the number and mix of vehicles used in our rental operations, our results of operations, financial condition, liquidity and cash flows could suffer.***

Because vehicle costs typically represent our single largest expense and vehicle purchases are typically made weeks or months in advance of the expected use of the vehicle, our business is dependent upon the ability of our management to accurately estimate future levels of rental activity and consumer preferences with respect to the mix of vehicles used in our rental operations. To the extent we do not purchase sufficient numbers of vehicles, or the right types of vehicles, to meet consumer demand, we may lose revenue to our competitors. If we purchase too many vehicles, our vehicle utilization could be adversely affected and we may not be able to dispose of excess vehicles in a timely and cost-effective manner. If our management is unable to accurately estimate future levels of rental activity and determine the appropriate mix of vehicles used in our rental operations, including because of changes in the competitive environment or economic factors outside of our control, our results of operations, financial condition, liquidity and cash flows could suffer.

***Our corporate governance documents provide that we will indemnify our directors, officers and employees to the fullest extent permitted by law which may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties.***

Our Certificate of Incorporation limits the liability of directors to the maximum extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for breach of their fiduciary duties as directors, except for liability for any:

- breach of their duty of loyalty to us or our stockholders;

15

- act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- transactions for which the directors derived an improper personal benefit.

These limitations of liability do not apply to liabilities arising under the federal or state securities laws and do not affect the availability of equitable remedies such as injunctive relief or rescission. Our bylaws provide that we will indemnify our directors, officers and employees to the fullest extent permitted by law. Our bylaws also provide that we are obligated to advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding. We believe that these bylaw provisions are necessary to attract and retain qualified persons as directors and officers. The limitation of liability in our Certificate of Incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against directors and officers, even though an action, if successful, might provide a benefit to us and our stockholders. Our results of operations and financial condition may be harmed to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

***Concentrating voting control will limit or preclude our stockholders' ability to influence corporate matters, including the election of directors, any merger, consolidation or other major corporate transaction requiring stockholder approval, which may negatively impact your liquidity and/or your gain on your investment.***

Mr. El-Batrawi has entered into a Voting Trust Agreement (the "<u>Trust</u>") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. The Trust shall be irrevocable, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of Nasdaq, or (b) the date upon which the Company is not listed on a security exchange controlled by Nasdaq.

As of the date of this prospectus, the Gray Mars Venus Trust, of which John Gray is the beneficial owner, owns approximately 38.5% of our outstanding shares of common stock. Taking into account the effect of the Trust on voting power, the Gray Mars Venus Trust will control, after this offering approximately 35.2% of the Company's voting stock and have a significant ability to influence corporate matters, including the election of directors, any merger, consolidation or other major corporate transaction requiring stockholder approval, which may negatively impact your liquidity and/or your gain on your investment.

In addition to the stock controlled by John Gray, five other individuals or entities will own 39.5% of our common stock after the completion of this offering, which further concentrates the influence on corporate matters among a few shareholders.

As a result, these stockholders, if they act together, will be able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. This concentration of ownership may not be in the best interests of our other stockholders.

16

*Negative press involving our founder and former Chief Executive Officer and former director may harm the reputation of the Company.*

Mr. El-Batrawi is our founder and he served as our Chief Executive Officer from the incorporation of the Company until October 4, 2018, Acting Chief Executive Officer from November 17, 2018 to February 1, 2019 and as our director from November 2016 until September 2019. Since 2012, Mr. El-Batrawi has been the owner and Chief Executive Officer of Growth Strategy Investments, LLC and, since 2015, Mr. El-Batrawi has been the managing director of X, LLC, both of which are management companies. On April 13, 2006, Ramy Y. El Batrawi was named, along with others officers, directors and/or associates of Genesis Intermedia, Inc., as defendants in a Securities and Exchange Commission enforcement action. In the Securities and Exchange Commission ("SEC") complaint, filed in the United States District Court for the Central District of California, entitled *SEC v. Ramy El-Batrawi, et al., United States District Court for the Central District of California, Case No 2: -06-cv-02247-(MRP_(RZ)* (the "Action"). The Action alleged violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act, in connection with a stock loan and manipulation scheme. The Action alleged, among other things, that defendants had violated antifraud provisions of federal securities laws by orchestrating a scheme to manipulate the stock price of Genesis Intermedia, Inc. (GENI), a now-defunct public company that was based in Van Nuys, California (the "Complaint"). On April 1, 2010, Mr. El-Batrawi settled the Action by entering into a final judgment by consent with the SEC, without admitting or denying the allegations contained in the Complaint (the "Settlement"). In connection with the voluntary Settlement of the charges set forth in the Complaint, the U.S. District Court for the Central District of California entered the consent against Mr. El-Batrawi, which, among other things, barred Mr. El-Batrawi from acting as an officer or director of a public company for a period of five years following the date of entry of the final judgment by consent. Any negative press stories about Mr. El-Batrawi may harm the reputation of the Company and damage our business prospects.

*We may fail to respond adequately to changes in technology and customer demands.*

In recent years our industry has been characterized by rapid changes in technology and customer demands. For example, in recent years, industry participants have taken advantage of new technologies to improve vehicle utilization, decrease customer wait times and improve customer satisfaction. Our industry has also seen the entry of new competitors whose businesses and efforts continue to introduce various types of self-driving vehicles. Our ability to continually improve our current processes, products and offerings in response to changes in technology is essential in maintaining our competitive position and maintaining current levels of customer satisfaction. We may experience technical or other difficulties that could delay or prevent the development, introduction or marketing of new products or enhanced product offerings.

*User engagement and growth depends on software and device updates beyond our control.*

Our mobile application and websites are currently available on multiple operating systems, including iOS and Android, across multiple different manufacturers, including Motorola, LG, Apple and Samsung and on thousands of devices. Changes to the device infrastructure or software updates on such devices could render our platform and services useless or inoperable and require users to utilize our website rather than our mobile application which may result in decreased user engagement. Any decrease in user engagement may devalue our value proposition to customers who may no longer continue to do business with us which may have a material adverse effect on business, financial conditions and results of operation.

*Defects in our mobile application may adversely affect our business.*

Tools, code, subroutines and processes contained within our mobile application may contain defects when updates and new versions are released. Our introduction of a mobile application with defects or quality problems may result in adverse publicity, uncollectible or delayed accounts receivable, product redevelopment costs, loss of or delay in market acceptance of our services or claims by customers or others against us. Such problems or claims may have a material and adverse effect on our business, prospects, financial condition and results of operations.

*We may not be able to manage our growth effectively.*

Our growth is expected to place, a significant strain on our managerial, operational and financial resources. As the number of our users, partners and other business partners grows, we must increasingly manage multiple relationships with various customers, strategic partners and other third parties. There can be no assurance that our systems, procedures or controls will be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully grow and scale our services, products and offerings. Our operating results will also depend on our ability to expand sales and marketing commensurate with the growth of our business and the ridesharing industry. If we are unable to manage growth effectively, our business, results of operations and financial condition will be adversely affected.

*Maintaining favorable brand recognition is essential to our success, and failure to do so could materially adversely affect our results of operations, financial condition, liquidity and cash flows.*

Our business is heavily dependent upon the favorable brand recognition that our "YayYo", "Distinct Cars" and "Rideshare" brand names have in the markets in which they participate. Factors affecting brand recognition are often outside our control, and our efforts to maintain or enhance favorable brand recognition, such as marketing and advertising campaigns, may not have their desired effects. In addition, it may be difficult to monitor or enforce such requirements, particularly in foreign jurisdictions and various laws may limit our ability to enforce the terms of these agreements or to terminate the agreements. Any decline in perceived favorable recognition of our brands could materially adversely affect our results of operations, financial condition, liquidity and cash flows.

*Changes in U.S., global or regional economic conditions*.

A current decrease in economic activity in the United States or, depending on future operations, in other regions of the world in which we plan to operate our Fleet Management business segment, Rideshare Platform and related services could adversely affect demand, thus reducing our ability to generate revenue. A decline in economic conditions could reduce our users' interest in utilizing our products and services. In addition, an increase in price levels generally, or in price levels in a particular sector such as the fuel sector, could result in a shift in consumer demand away from ridesharing services, which could also adversely affect our revenues and, at the same time, increase our costs.

**Risks Relating to Our Business and Industry.**

*If our efforts to attract prospective customers to our Fleet Management business and Rideshare Platform are not successful, or we fail to retain customers or continue attracting existing customers to our products and services, our growth prospects and revenue will be adversely affected.*

Our ability to grow our business and generate revenue depends on retaining and expanding our total customer base, increasing revenue by effectively monetizing our Rideshare Platform user base, and increasing the number of customers to our Fleet Management business. We must convince prospective customers of the benefits of our ridesharing vehicle rental services and equipment offerings and our existing users of the continuing value of our products and services, including our Rideshare Platform. Our ability to attract new users and customers, retain existing users and customers. If we fail to keep pace with competing offerings or technological advancements to the ridesharing industry or fail to offer compelling product offerings and state-of-the-art delivery for our Rideshare Platform to meet consumer demands, our ability to grow or sustain the reach of our product and service offerings, attract and retain users and customers may be adversely affected.

*We have no control over the Vehicle Registration Requirements or such other ridesharing vehicle requirements imposed by the major Transportation Network Company ("TNC") providers, and our business may be adversely affected in the event that TNC providers restrict or limit prospective ridesharing drivers from utilizing or registering rental vehicles with the TNC.*

We rely on the major TNC businesses that drive and service the ridesharing economy, over whom we have no control, to impose the Vehicle Registration Requirements and permit prospective ridesharing drivers to utilize lease or rental vehicles, such as our product offerings, under their employment with the major TNC ridesharing services. We cannot guarantee that each major TNC business will always permit prospective ridesharing drivers to use third-party lease or rental vehicles under their employment agreement with the TNC.

18

Our business may be adversely affected if our ability to rent vehicles maintained under our Fleet Management business is limited, impaired or delayed because of a modification to the Vehicle Registration Requirements or any similar prohibition that prevents prospective ridesharing drivers from renting our Fleet Management vehicles or other third-party vehicle rentals for use under the terms of the prospective ridesharing drivers agreement with such TNC businesses.

### *We face risks of increased costs of cars, including as a result of limited supplies of competitively priced cars.*

As of June 30, 2019, and December 31, 2018, we have a fleet of approximately 347 and 360 vehicles, respectively, all of which are under a lease contract with District Cars and financed by ACME Auto Leasing, LLC. In addition, under our booking platform we manage approximately 50 vehicles. In recent years, the average cost of new cars has increased. As of the date of this prospectus, we have financed the purchase and leasing of the Hyundai cars that we rent from ACME Auto Leasing. Under the terms of a commercial partnership program, Hyundai USA has agreed to extend fleet program competitive pricing options below manufactures' suggested retail prices ("MSRP") on all Hyundai vehicles purchased through selected dealerships. We cannot assure you that we will be able to maintain membership in the Hyundai commercial partnership program or continue receiving competitive pricing options below MSRP rates on all Hyundai vehicles purchased. If Hyundai USA cancels the commercial partnership program or does not offer us competitive terms and conditions, and we are not able to purchase sufficient quantities of cars from other automobile manufacturers on competitive terms and conditions or below MSRP rates, then we may be forced to purchase cars at higher prices, or on terms less competitive, than for cars purchased by our competitors. In addition, certain car manufacturers, such as Ford, have adopted strategies to de-emphasize sales to the car rental industry which they view as less profitable due to historical sales incentive and other discount programs that tended to lower the average cost of cars for fleet purchasers such as us. Reduced or limited supplies of equipment together with increased prices are risks that we also face in our equipment rental business. We cannot offer assurance that we will be able to pass on increased costs of cars or equipment to our rental customers. Failure to pass on significant cost increases to our customers would have a material adverse impact on our results of operations and financial condition.

### *Fluctuations in fuel costs or reduced supplies could harm our business.*

We could be adversely affected by limitations on fuel supplies, the imposition of mandatory allocations or rationing of fuel or significant increases in fuel prices. A severe or protracted disruption of fuel supplies or significant increases in fuel prices could have a material adverse effect on our financial condition and results of operations, either by directly interfering with our normal activities or by disrupting the air travel on which a significant portion of our car rental business relies.

### *The concentration of our reservations, accounting and information technology functions at a limited number of facilities in California creates risks for us.*

We have concentrated our reservations functions for the United States in one office location in Los Angeles, California, and we have concentrated our accounting functions for the United States in one office location in Los Angeles. In addition, our major information systems are centralized in our office location in Los Angeles. A disruption of normal business at any of our principal office location in Los Angeles, California, whether as the result of localized conditions (such as a fire or explosion) or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and systems activities.

### *We face risks arising from our heavy reliance on communications networks and centralized information systems.*

We rely heavily on information systems to accept reservations, process rental and sales transactions, manage our fleets of cars and equipment, account for our activities and otherwise conduct our business. We have centralized our information systems in one office location in Los Angeles, California, and we rely on communications service providers to link our systems with the business locations these systems serve. A simultaneous loss of both facilities, or a major disruption of communications between the systems and the locations they serve, could cause a loss of reservations, interfere with our ability to manage our fleet, slow rental and sales processes and otherwise materially adversely affect our ability to manage our business effectively. Our systems back-up plans, business continuity plans and insurance programs are designed to mitigate such a risk, not to eliminate it. In addition, because our systems contain information about individuals and businesses, our failure to maintain the security of the data we hold, whether the result of our own error or the malfeasance or errors of others, could harm our reputation or give rise to legal liabilities leading to lower revenues, increased costs and other material adverse effects on our results of operations.

***The misuse or theft of information we possess could harm our reputation or competitive position, adversely affect the price at which shares of our common stock trade or give rise to material liabilities.***

We possess non-public information with respect to individuals, including our customers and our current and former employees, and businesses, as well as non-public information with respect to our own affairs. The misuse or theft of that information by either our employees or third parties could result in material damage to our brand, reputation or competitive position or materially affect the price at which shares of our common stock trade. In addition, depending on the type of information involved, the nature of our relationship with the person or entity to which the information relates, the cause and the jurisdiction whose laws are applicable, that misuse or theft of information could result in governmental investigations or material civil or criminal liability. The laws that would be applicable to such a failure are rapidly evolving and becoming more burdensome.

***If we acquire any businesses in the future, they could prove difficult to integrate, disrupt our business, or have an adverse effect on our results of operations.***

We intend to pursue growth primarily through internal growth, but from time to time we may consider opportunistic acquisitions which may be significant. Any future acquisition would involve numerous risks including, without limitation:

- potential disruption of our ongoing business and distraction of management;

- difficulty integrating the acquired business; and

- exposure to unknown liabilities, including litigation against the companies we may acquire.

If we make acquisitions in the future, acquisition-related accounting charges may affect our balance sheet and results of operations. In addition, the financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. We may not be successful in addressing these risks or any other problems encountered in connection with any acquisitions.

***Our business is cyclical, and a disruption in rental activity could materially adversely affect our results of operations.***

In the car rental business, a decline in economic activity typically results in a decline in both business and leisure travel and, accordingly, a decline in the volume of car rental transactions. In the equipment rental business, a decline in economic activity typically results in a decline in activity in non-residential construction and other businesses in which our equipment rental customers operate and, therefore, results in a decline in the volume of equipment rental transactions. In the case of a decline in car or equipment rental activity, we may reduce rental rates to meet competitive pressures, which could have a material adverse effect on our results of operations. A decline in economic activity also may have a material adverse effect on residual values realized on the disposition of our revenue earning cars and/or equipment.

Certain significant components of our expenses, including real estate taxes, rent, utilities, maintenance and other facility-related expenses, the costs of operating our information systems and minimum staffing costs, are fixed in the short-run. Cyclical changes in our revenues do not alter those fixed expenses, typically resulting in higher profitability in periods when our revenues are higher and lower profitability in periods when our revenues are lower. The Company believes that the second and third quarters of the year will be stronger quarters due to their increased levels of leisure travel and construction activity. Any occurrence that disrupts rental activity during the second or third quarters could have a disproportionately material adverse effect on our liquidity and/or results of operations.

***We may be unable to maintain or establish relationships with third-party partners, ridesharing services or technology providers, which could limit the information we are able to provide to users.***

We anticipate that the demand for our products and services will be dependent on key relationships with ridesharing services, auto manufacturers, fleet providers and other industry providers. We will seek to develop and maintain relationships with these companies. Failure to continue to develop and/or maintain these relationships, and/or a failure for these relationships to yield benefit would have an adverse effect on our business.

***We rely on the performance of highly skilled personnel, including senior management and our technology professionals, and if we are unable to retain or motivate key personnel or hire, retain and motivate qualified personnel, our business would be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our senior management and our skilled team members. Our future success depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially adversely affect our ability to build on the efforts they have undertaken and to execute and operate our business segments, and we may not be able to find adequate replacements. We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees.

***Competition for well-qualified employees in all aspects of our business, including software engineers and other technology professionals, is intense both in the U.S. and abroad.***

Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate existing employees. Software engineers and technology professionals are key individuals in designing the code and algorithms necessary to our Rideshare Platform. Therefore, our ability to attract top talent and experienced engineers and technology professional is important to our success. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business would be adversely affected.

***We rely on non-employee third parties for important services which may impact steady growth if third parties to provide important services cannot be retained.***

We will have a small number of employees and we do not have any operational infrastructure or prior operating history. We intend to rely on our management team, our advisors, third-party consultants, outside attorneys, advisors, accountants, auditors, and other administrators. The loss of services of any of such personnel may have a material adverse effect on our business and operations and there can be no assurance that if any or all of such personnel were to become unavailable, that qualified successors can be found, on acceptable terms.

We depend on third parties to provide us with services critical to our business including, equipment manufacturers that provide us with standard passenger vehicles and vehicle leasing services at competitive prices. While we believe that there is sufficient supply in the market, the failure of any of these third parties to adequately provide the needed services could have a material adverse effect on our business.

***Governmental regulation and associated legal uncertainties could limit our ability to expand our product offerings or enter into new markets and could require us to expend significant resources, including the attention of our management, to review and comply with such regulations.***

Elements of the ridesharing industry are currently or will be regulated by Federal, state, city and/or local governments, and our ability to provide these services is and will continue to be affected by government regulations. The implementation of unfavorable regulations or unfavorable interpretations of existing regulations by courts or regulatory bodies with respect to the ridesharing industry or "*Transportation Network Companies*" ("TNC") could require us to incur significant compliance costs, cause the development of the affected markets to become impractical and otherwise have a material adverse effect on our business, results of operations and financial condition. Moreover, in the future, we may elect to add services or products to our business plan that compete directly with ridesharing services, such as Uber and Lyft, which could expose us to additional regulations, compliance obligations and legal challenges. In addition, our business strategy involves expansion into regions around the world, many of which have different legislation, regulatory environments, tax laws and levels of political stability. Compliance with foreign legal, governmental, regulatory or tax requirements will place demands on our time and resources, and we may nonetheless experience unforeseen and potentially adverse legal, regulatory or tax consequences. It is intended that our business will assist with the processing of customer credit card transactions which would result in us receiving and storing personally identifiable information. This information is increasingly subject to legislation and regulations in numerous jurisdictions around the world. This legislation and regulation is generally intended to protect the privacy and security of personal information, including credit card information, that is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if government regulations require TNCs, and as a result, us to significantly change our business practices with respect to this type of information.

**We may not be able to adequately protect our intellectual property, which could harm the value of our brands and adversely affect our business.**

We believe that intellectual property will be critical to our success, and that we will rely on trademark, copyright and patent law, trade secret protection and confidentiality and/or license agreements to protect our proprietary rights. If we are not successful in protecting our intellectual property, it could have a material adverse effect on our business, results of operations and financial condition. While we believe that we will be issued trademarks, copyrights and other intellectual property to protect our business, there can be no assurance that our operations do not, or will not, infringe valid, enforceable third-party patents of third parties or that competitors will not devise new methods of competing with us that are not covered by our anticipated patent applications. Moreover, it is intended that we will rely on intellectual property and technology developed or licensed by third parties, and we may not be able to obtain or continue to obtain licenses and technologies from these third parties at all or on reasonable terms. Effective trademark, service mark, copyright and trade secret protection may not be available in every country in which our intended services will be provided. The laws of certain countries do not protect proprietary rights to the same extent as the laws of the U.S. and, therefore, in certain jurisdictions, we may be unable to protect our proprietary technology adequately against unauthorized third party copying or use, which could adversely affect our competitive position. We may license in the future, certain proprietary rights, such as trademarks or copyrighted material, to third parties. These licensees may take actions that might diminish the value of our proprietary rights or harm our reputation, even if we have agreements prohibiting such activity. Also, to the extent third parties are obligated to indemnify us for breaches of our intellectual property rights, these third parties may be unable to meet these obligations. Any of these events could have a material adverse effect on our business, results of operations or financial condition.

**Confidentiality agreements with employees and others may not adequately prevent disclosure of trade secrets and other proprietary information.**

We anticipate that a substantial amount of our processes and technologies will be protected by trade secret laws. In order to protect these technologies and processes, we intend to rely in part on confidentiality agreements with our employees, licensees, independent contractors and other advisors. These agreements may not effectively prevent disclosure of confidential information, including trade secrets, and may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. In addition, others may independently discover our trade secrets and proprietary information, and in such cases, we could not assert any trade secret rights against such parties. To the extent that our employees, contractors or other third parties with which we do business use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. Laws regarding trade secret rights in certain markets in which we operate may afford little or no protection to our trade secrets. The loss of trade secret protection could make it easier for third parties to compete with our products, services by copying functionality, among other things. In addition, any changes in, or unexpected interpretations of, the trade secret and other intellectual property laws in any country in which we operate may compromise our ability to enforce our trade secret and intellectual property rights. Costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights, and failure to obtain or maintain trade secret protection could adversely affect our business, revenue, reputation and competitive position.

*Our business is heavily reliant upon communications networks and centralized information technology systems and the concentration of our systems creates risks for us.*

We rely heavily on communication networks and information technology systems to accept reservations, process rental and sales transactions, manage our pricing, manage our revenue earning vehicles, manage our financing arrangements, account for our activities and otherwise conduct our business. Our reliance on these networks and systems exposes us to various risks that could cause a loss of reservations, interfere with our ability to manage our vehicles, slow rental and sales processes, adversely affect our ability to comply with our financing arrangements and otherwise materially adversely affect our ability to manage our business effectively. Our major information technology systems, reservations and accounting functions are centralized in a few locations worldwide. Any disruption, termination or substandard provision of these services, whether as the result of localized conditions (such as a fire, explosion or hacking), failure of our systems to function as designed, or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and information technology functions or by eliminating access to our financing arrangements. Any disruption or poor performance of our systems could lead to lower revenues, increased costs or other material adverse effects on our results of operations, financial condition, liquidity or cash flows.

*Defects in our Rideshare Platform and its functionality and the technology powering our custom development services may adversely affect our business.*

It is anticipated that the tools, code, subroutines and processes contained within our Rideshare Platform or the technology powering our custom development services may contain defects when introduced and also when updates and new versions are released. The introduction of our Rideshare Platform or custom development services with defects or quality problems may result in adverse publicity, product returns, reduced orders, uncollectible or delayed accounts receivable, product redevelopment costs, loss of or delay in market acceptance of our products or claims by customers or others against us. Such problems or claims may have a material and adverse effect on our business, prospects, financial condition and results of operations.

*Manufacturer safety recalls could create risks to our business.*

Our Fleet Management vehicles may be subject to safety recalls by their manufacturers. The Raechel and Jacqueline Houck Safe Rental Car Act of 2015 prohibits us from renting vehicles with open federal safety recalls and to repair or address these recalls prior to renting or selling the vehicle. Any federal safety recall with respect to our vehicles would require us to decline to rent recalled vehicles until we can arrange for the steps described in the recall to be taken. If a large number of vehicles are the subject of a recall or if needed replacement parts are not in adequate supply, we may not be able to rent recalled vehicles for a significant period of time. Those types of disruptions could jeopardize our ability to fulfill existing contractual commitments or satisfy demand for our vehicles and could also result in the loss of business to our competitors. Depending on the severity of any recall, it could materially adversely affect our revenues, create customer service problems, reduce the residual value of the recalled vehicles and harm our general reputation.

*If we are unable to purchase adequate supplies of competitively priced vehicles and the cost of the vehicles we purchase increases, our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.*

The price and other terms at which we can acquire vehicles vary based on market and other conditions. For example, certain vehicle manufacturers have in the past, and may in the future, utilize strategies to de-emphasize sales to the vehicle rental industry, which can negatively impact our ability to obtain vehicles on competitive terms and conditions. Consequently, there is no guarantee that we can purchase a sufficient number of vehicles at competitive prices and on competitive terms and conditions. If we are unable to obtain an adequate supply of vehicles, or if we obtain less favorable pricing and other terms when we acquire vehicles and are unable to pass on any increased costs to our customers, then our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.

*If third parties claim that we infringe their intellectual property, it may result in costly litigation.*

We cannot assure you that third parties will not claim our current or future products or services infringe their intellectual property rights. Any such claims, with or without merit, could cause costly litigation that could consume significant management time. As the number of product and services offerings in the ridesharing industry increases and functionalities increasingly overlap, companies such as ours may become increasingly subject to infringement claims. Such claims also might require us to enter into royalty or license agreements. If required, we may not be able to obtain such royalty or license agreements or obtain them on terms acceptable to us.

***Failure to comply with federal and state privacy laws and regulations, or the expansion of current or the enactment of new privacy laws or regulations, could adversely affect our business.***

A variety of federal and state laws and regulations govern the collection, use, retention, sharing and security of consumer data. The existing privacy-related laws and regulations are evolving and subject to potentially differing interpretations. In addition, various federal, state and foreign legislative and regulatory bodies may expand current or enact new laws regarding privacy matters. Further, several states have adopted legislation that requires businesses to implement and maintain reasonable security procedures and practices to protect sensitive personal information and to provide notice to consumers in the event of a security breach. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or orders or other federal, state or international privacy or consumer protection-related laws, regulations or industry self-regulatory principles could result in claims, proceedings or actions against us by governmental entities or others or other liabilities, which could adversely affect our business. In addition, a failure or perceived failure to comply with industry standards or with our own privacy policies and practices could adversely affect our business. Federal and state governmental authorities continue to evaluate the privacy implications inherent in the use of third-party web "*cookies*" for behavioral advertising. The regulation of these cookies and other current online advertising practices could adversely affect our business.

***Our business model is entirely dependent on the continued success and viability of the ridesharing industry and "transportation network companies", and we may become subject to government regulation and legal uncertainties that could reduce demand for our products and services or increase the cost of doing business, thereby adversely affecting our ability to generate revenues.***

The past year has seen a boom in the number of ridesharing companies that allow customers to order rides on demand using apps on their smartphones. Private drivers use their personal automobiles to pick up the customers and drive them to the desired destination in exchange for a negotiated fee. The passengers then write reviews, similar to other peer-to-peer online services. Large amounts of venture capital and private equity has been invested in a handful of these new companies, which have the potential to disrupt the traditional transportation industry. However, the ridesharing marketplace has come under increased scrutiny from governments and various interested groups (such as taxi drivers, taxi companies, environmentalists, etc.) have continuously opposed the proliferation of ridesharing services in recent years. Despite opposition from many of these interested groups and governmental agencies, on September 19, 2013, the California Public Utilities Commission ("CPUC") voted unanimously to allow these ridesharing services to operate in California as a new category of business called "*transportation network companies*" ("TNC").

In California, licenses will be issued to qualifying TNCs, subject to new regulations that require drivers to undergo criminal background checks and vehicle inspections, receive driver training, follow a zero-tolerance policy on drugs and alcohol, and carry insurance policies with a minimum of $1 million in liability coverage. Some of the companies that are expected to receive new TNC licenses include Lyft (*www.lyft.me*), SideCar (*www.side.cr*) and UberX (*www.uber.com*). The CPUC has responded to rapidly evolving disruptive technology and its decision will likely set an example for cities and states across the country. Its decision is also expected to preempt ongoing efforts by some California cities to regulate or ban peer-to-peer ridesharing under their authority to license taxi companies. The City of Los Angeles, however, is currently considering a possible appeal of the CPUC decision and implementing additional regulations to TNC drivers, which have been referred to as "*Bandit cabs*" by some on the City Council. Other cities across the country are also now looking at new regulations for Rideshare companies.

24

As can be gleaned from these recent events around the ridesharing industry, this new business model is not without its opponents. Some raise concerns about public safety and the potential for abuse or unintended consequences, while others question whether the new regulations require additional enforcement capability. The taxi industry, which is less than pleased to see this new competition, has criticized these ridesharing apps as operating essentially like unlicensed taxi cabs. Since the new technology uses GPS to measure the distance of a ride and the corresponding fee, the taxi industry believes that it works similarly to a taxi meter and should therefore comply with local taxi ordinances. Some of the primary concerns raised by skeptics include how liability will be allocated between the TNC and its independent contractor driver, and how the insurance industry will adapt to this new business. Proper hiring practices, training and oversight by the TNC also will be necessary to ensure public safety. The extent to which the TNCs will be inspected and the new regulations enforced is still unclear, but this will be an important means by which the public may judge the safety of this new industry. Based on the direction states and cities are heading with respect to the governance of TNCs or ridesharing services, and the ever increasing popularity and use of ridesharing services and TNCs, it is likely that a number of laws and regulations will become applicable to us or the TNCs which we rely upon for the operation of products and related services or may be adopted in the future with respect to mobile applications and/or TNCs covering issues such as: (i) liability, (ii) unionization, (iii) rules and standards for drivers, vehicles, and passenger safety, (iv) licensing and insurance requirements, and (v) environmental concerns, among others. It is difficult to predict how existing laws will be applied to our business and the new laws and regulations to which we and/or ridesharing services will likely become subject. If ridesharing services are not able to comply with these laws or regulations or if we become liable under these laws or regulations, we could be directly harmed, and we may be forced to implement new measures to sustain our operating business segments. We anticipate that scrutiny and regulation of the ridesharing industry will increase and we will be required to devote legal and other resources to addressing such regulation, either directly or indirectly. Changes to these laws intended to address these issues, including some recently proposed changes, could create uncertainty in the marketplace. Such uncertainty could reduce demand for our services or increase the cost of doing business due to increased costs of litigation or increased service or operating costs.

***We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business financial condition and results of operations.***

We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business, financial condition and results of operations. We anticipate accepting payment from our users primarily through credit card transactions and certain online payment service providers. The ability to access credit card information on a real time-basis without having to proactively reach out to the consumer each time we process an auto-renewal payment or a payment for the purchase of a premium feature on any of our dating products is critical to our success. When we or a third party experiences a data security breach involving credit card information, affected cardholders will often cancel their credit cards. In the case of a breach experienced by a third party, the more sizable the third party's customer base and the greater the number of credit card accounts impacted, the more likely it is that our users would be impacted by such a breach. To the extent our users are ever affected by such a breach experienced by us or a third party, affected users would need to be contacted to obtain new credit card information and process any pending transactions. It is likely that we would not be able to reach all affected users, and even if we could, some users' new credit card information may not be obtained and some pending transactions may not be processed, which could adversely affect our business, financial condition and results of operations. Even if our users are not directly impacted by a given data security breach, they may lose confidence in the ability of service providers to protect their personal information generally, which could cause them to stop using their credit cards online and choose alternative payment methods that are not as convenient for us or restrict our ability to process payments without significant user effort. Additionally, if we fail to adequately prevent fraudulent credit card transactions, we may face civil liability, diminished public perception of our security measures and significantly higher credit card-related costs, any of which could adversely affect our business, financial condition and results of operations. Finally, the passage or adoption of any legislation or regulation affecting the ability of service providers to periodically charge consumers for recurring membership payments may adversely affect our business, financial condition and results of operations.

***We depend upon intellectual property and proprietary rights that are vulnerable to unauthorized use.***

We rely on a combination of copyright and trademark laws, trade secrets, software security measures, license agreements and nondisclosure agreements to protect our proprietary information. Our success will depend, in part, on our ability to operate without infringing the patent or other proprietary rights of others and our ability to preserve our trade secrets and other proprietary property, including our rights in any technology licenses upon which any of our products or services are based. Our inability to preserve such rights properly or operate without infringing on such rights would have a material adverse effect on our business, results of operations and financial condition. We currently do not own any registered copyrights, patents or patent applications pending. It may be possible for unauthorized third parties to copy aspects of, or otherwise obtain and use, our proprietary information without authorization. In addition, there can be no assurance that any confidentiality agreements between us and our employees, or any license agreements with

our customers, will provide meaningful protection for our proprietary information in the event of any unauthorized use or disclosure of such proprietary information.

25

***We may not be able to keep up with rapid technological changes.***

To remain competitive, we must continue to enhance and improve the usability, functionality, and features of our Rideshare Platform and related services. The evolving nature of the ridesharing industry, transportation network companies, telecommunications, apps, and mobile based services, which is characterized by rapid technological change, changes in user and customer requirements and preferences, frequent new product and service introductions and the emergence of new industry standards and practices, could render our existing systems, app and services obsolete. Our success will depend, in part, on our ability to develop, innovate, license or acquire leading technologies useful in our business, enhance our existing solutions, develop new solutions and technology that address the increasingly sophisticated and varied needs of our current and prospective users, and respond to technological advances and emerging industry and regulatory standards and practices in a cost-effective and timely manner. Future advances in technology may not be beneficial to, or compatible with, our business. Furthermore, we may not successfully use new technologies effectively or adapt our proprietary technology and app to user requirements or emerging industry standards on a timely basis. Our ability to remain technologically competitive may require substantial expenditures and lead time. If we are unable to adapt in a timely manner to changing market conditions or user requirements, our business, financial condition and results of operations could be seriously harmed.

***We depend on the continued growth and reliability of the internet, global positioning systems, ridesharing services and apps.***

The recent growth in the use of apps and ridesharing services may cause periods of decreased performance for many ridesharing services, internet providers, apps and related service providers. If app and ridesharing usage continues to grow rapidly, the infrastructure these services are reliant upon (i.e. the internet, global positioning systems, and telecommunications networks and devices) may not be able to support these demands and therefore performance and reliability may decline. Decreased performance with respect to some or all of these critical components of our business model has also been attributed to illegal attacks by third parties. If outages or delays occur frequently or increase in frequency, or businesses are not able to protect themselves adequately from such illegal attacks, the market for mobile apps, ridesharing services and related technologies could grow more slowly or decline, which may reduce the demand for our Rideshare Platform and related services.

***Our business is dependent upon consumers renting our Fleet Management vehicles, using our Rideshare Platform and related services and if we fail to obtain broad adoption, our business would be adversely affected.***

Our success will depend on our ability to monetize our fleet of vehicles and our Rideshare Platform, ensuring our Rideshare Platform is fully functional and reliable as intended, operate and educate consumers regarding the benefits of renting vehicles for ridesharing opportunities, and persuade them to adopt YayYo! and/or "Rideshare" as their "*go to*" ridesharing vehicle rental service provider. We do not know if our products and services will be successful over the long term and market acceptance may be hindered if our Rideshare platform does not function efficiently and/or our user experience is not compelling and financially beneficial to our users. If consumers do not adopt and use our Rideshare Platform and related services, we will not be able to generate revenues and our financial condition will suffer as a result.

26

***International expansion of our business exposes us to market, regulatory, political, operational, financial and economic risks associated with doing business outside of the United States.***

Our business strategy includes eventual international expansion. Adapting our Rideshare Platform to function internationally and doing business internationally involves a number of risks, including: (i) multiple, conflicting and changing laws and regulations such as tax laws, privacy laws, export and import restrictions, employment laws, regulatory requirements and other governmental approvals, permits and licenses; (ii) obtaining regulatory approvals where required; (iii) requirements to maintain data and the processing of that data on servers located within such countries; (iv) complexities associated with managing multiple payment processing methods and multiple ridesharing service providers; (v) natural disasters, political and economic instability, including wars, terrorism, political unrest, outbreak of disease, protests, boycotts, curtailment of trade and other market restrictions; and (vi) regulatory and compliance risks that relate to maintaining accurate information and control over activities subject to regulation under the United States Foreign Corrupt Practices Act of 1977 ("FCPA"), U.K. Bribery Act of 2010 and comparable laws and regulations in other countries. Any of these factors could significantly harm our future international expansion and operations and, consequently, our ability to generate revenue and results of operations.

***Security breaches, loss of data and other disruptions could compromise sensitive information related to our business or users or prevent us from accessing critical information and expose us to liability, which could adversely affect our business and our reputation.***

In the ordinary course of our business, we and our third-party billing and collections providers and ridesharing service partners may collect and store sensitive data, including legally-protected personal information. We may also process and store and use additional third-parties to process and store, sensitive intellectual property and other proprietary business information, including that of our customers and collaborative partners. While we intend to implemented data privacy and security measures that will be compliant with applicable privacy laws and regulations, future security breaches could subject us to liability for violations of various laws, rules or regulations, civil liability, government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

***We may become a party to intellectual property litigation or administrative proceedings that could be costly and could interfere with our ability to focus on our operating business segments.***

The technology industry has been characterized by extensive litigation regarding patents, trademarks, trade secrets, and other intellectual property rights, and companies in the industry have used intellectual property litigation to gain a competitive advantage. It is possible that U.S. and foreign patents and pending patent applications or trademarks controlled by third parties may be alleged to cover our products or services, or that we may be accused of misappropriating third parties' trade secrets. Additionally, our products may include hardware and software components that we purchase from vendors and may include design components that are outside of our direct control. Our competitors, many of which have substantially greater resources and have made substantial investments in patent portfolios, trade secrets, trademarks, and competing technologies, may have applied for or obtained, or may in the future apply for or obtain, patents or trademarks that will prevent, limit or otherwise interfere with our ability to make, use, sell and/or export our products and services or to use product names. We may become a party to patent or trademark infringement or trade secret related disputes or litigation as a result of these and other third party intellectual property rights being asserted against us. The defense and prosecution of these matters are both costly and time consuming. Vendors from whom we purchase hardware or software may not indemnify us in the event that such hardware or software is accused of infringing a third party's patent or trademark or of misappropriating a third party's trade secret.

Further, if such patents, trademarks, or trade secrets are successfully asserted against us, this may harm our business and result in injunctions preventing us from selling our products, license fees, damages and the payment of attorney fees and court costs. In addition, if we are found to willfully infringe third party patents or trademarks or to have misappropriated trade secrets, we could be required to pay treble damages in addition to other penalties. Although patent, trademark, trade secret, and other intellectual property disputes in the technology industry have often been settled through licensing or similar arrangements, costs associated with such arrangements may be substantial and could include ongoing royalties. We may be unable to obtain necessary licenses on satisfactory terms, if at all. If we do not obtain necessary licenses, we may not be able to redesign our Rideshare Platform or related services in order to avoid infringement.

Additionally, in the future we may need to commence proceedings against others to enforce our patents or trademarks, if applicable, or to protect our copyrights, trade secrets or know how, trade secrets or know how, or to determine the enforceability, scope and validity of the proprietary rights of others. These proceedings would result in substantial expense to us and significant diversion of effort by our technical and management personnel. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful. We may not be able to stop a competitor from marketing and selling products that are the same or similar to our products and services or from using product or service names that are the same or similar to ours, and our business may be harmed as a result.

We may face claims from companies that incorporate open source software into their products or from open source licensors, claiming ownership of, or demanding release of, the source code, the open source software or derivative works that were developed using such software, or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to cease offering our Rideshare Platform unless and until we can re-engineer it to avoid infringement. This re-engineering process could require significant additional research and development resources, and we may not be able to complete it successfully. These risks could be difficult to eliminate or manage, and, if not addressed, could harm our business, financial condition and operating results.

***Our use of "open source" software could adversely affect our ability to offer our services and subject us to possible litigation.***

We use open source software in connection with our technology development. From time to time, companies that use open source software have faced claims challenging the use of open source software and/or compliance with open source license terms. We could be subject to suits by parties claiming ownership of what we believe to be open source software or claiming noncompliance with open source licensing terms. Some open source licenses require users who distribute software containing open source to make available all or part of such software, which in some circumstances could include valuable proprietary code of the user. We intend to monitor the use of open source software and will try to ensure that none is used in a manner that would require us to disclose our proprietary source code or that would otherwise breach the terms of an open source agreement, such use could inadvertently occur, in part because open source license terms are often ambiguous. Any requirement to disclose proprietary source code or pay damages for breach of contract could be harmful to our business, results of operations or financial condition, and could help our competitors develop products and services that are similar to or better than ours.

***No assurances of protection for proprietary rights; reliance on trade secrets.***

In certain cases, we may rely on trade secrets to protect intellectual property, proprietary technology and processes, which we have acquired, developed or may develop in the future. There can be no assurances that secrecy obligations will be honored or that others will not independently develop similar or superior products or technology. The protection of intellectual property and/or proprietary technology through claims of trade secret status has been the subject of increasing claims and litigation by various companies both in order to protect proprietary rights as well as for competitive reasons even where proprietary claims are unsubstantiated. The prosecution of proprietary claims or the defense of such claims is costly and uncertain given the uncertainty and rapid development of the principles of law pertaining to this area. We may also be subject to claims by other parties with regard to the use of intellectual property, technology information and data, which may be deemed proprietary to others.

***Our network operations may be vulnerable to hacking, viruses and other disruptions, which may make our Rideshare online platform and related services less attractive and reliable***.

Internet usage and mobile app usage could decline if any well-publicized compromise of security occurs. Hacking involves efforts to gain unauthorized access to information or systems or to cause intentional malfunctions, loss or corruption of data, software, hardware or other computer equipment. Hackers, if successful, could misappropriate proprietary information or cause disruptions in our service. We may be required to expend capital and other resources to protect our products and services and related systems upon which our products and services is reliant against hackers. There can be no assurance that any measures we may take will be effective. Security breaches could have a material adverse effect on our business. In addition, the inadvertent transmission if computer viruses or other digital problems could expose us to a material risk of loss or litigation and possible liability, as well as materially damage our reputation and decrease our user base.

*We currently have a small sales and marketing organization. If we are unable to expand our direct sales force in the U.S. to promote our services and related products, the commercial appeal and brand awareness for our products and services may be diminished.*

We currently have a small sales and marketing organization. The Company may expand the core sales and marketing team to oversee the sales and marketing of our "*YayYo!*" business. We will incur significant additional expenses and commit significant additional management resources to expand and grow our sales force. We may not be able to build on the expansion of these capabilities despite these additional expenditures. If we elect to rely on third parties to sell our products in the U.S., we may receive less revenue than if we sold our products directly. In addition, although we would intend to diligently monitor their activities, we may have little or no control over the sales efforts of those third parties. In the event we are unable to develop and expand our own sales force or collaborate with a third party to sell our products, we may not be able to operate our products and/or services which would negatively impact our ability to generate revenue. We may not be able to enter into any marketing arrangements on favorable terms or at all. If we are unable to enter into a marketing arrangement for our products, we may not be able to develop an effective sales force to successfully operate our products and/or services. If we fail to enter into marketing arrangements for our products and are unable to develop an effective sales force, our ability to generate revenue would be limited.

*We currently serve a segment of the Rideshare driver market that is large and valuable, but has less than average credit and commercial financial performance. We cannot predict the future performance of this market segment.*

Rideshare drivers are frequently unemployed, underemployed or otherwise financially challenged, which is one reason they are attracted to the rideshare business. We believe these drivers are critical to the rideshare ecosystem, that their numbers will grow, and they still perform financially to a degree that we can benefit. However, there can be no assurance that they will grow or maintain their percentage of the driver population, and that they will perform fiscally in a way that the company needs to generate a profit. Should they decrease in numbers or percentage of the driver population, or should we be unable to manage their successful payments for our cars, services, repairs or other charges, we may not be able to operate at a level of profit acceptable to the Company.

**Risks Relating to Ownership of Our Securities.**

*There is no active public trading market for our common stock and we cannot assure you that an active trading market will develop in the near future.*

Our common stock is not quoted in the over-the-counter markets and is not listed on any stock exchange and there is currently no active trading in our securities. We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering. We cannot assure you that an active trading market for our common stock will develop in the future due to a number of factors, including the fact that we are a small company that is relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community that generate or influence sales volume, and that even if we came to the attention of such persons, they tend to be risk-averse and would be reluctant to follow an unproven company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned and viable. We cannot give you any assurance that an active public trading market for our common stock will develop or be sustained. You may not be able to liquidate your shares quickly or at the market price if trading in our common stock is not active.

*Sales of our common stock in the primary offering will be taking place concurrently with common stock registered by selling stockholders which might affect the price, demand, and liquidity of our common stock.*

We are registering shares of common stock to certain security holders concurrently with the primary offering which include the potential resale by certain selling stockholders of an aggregate amount up to 1,650,000 shares of our common stock, consisting of up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder. Sales by these selling stockholders may reduce the price of our common stock, demand for the shares sold in the offering and, as a result, the liquidity of your investment.

***The public price of our common stock may be volatile, and could, following a sale decline significantly and rapidly.***

The initial public offering price for the shares will be determined by negotiations between us and the underwriters and may not be indicative of prices that will prevail in the open market following this primary offering. The market price of our common stock may decline below the initial offering price, and you may not be able to sell your shares of our common stock at or above the price you paid in the primary offering, or at all. Following this Offering, the public price of our common stock in the secondary market will be determined by private buy and sell transaction orders collected from broker-dealers.

***We may not be able to satisfy listing requirements of Nasdaq to maintain a listing of our common stock.***

If our common stock is listed on Nasdaq, we must meet certain financial and liquidity criteria to maintain such listing. If we violate the maintenance requirements for continued listing of our common stock, our common stock may be delisted. In addition, our board may determine that the cost of maintaining our listing on a national securities exchange outweighs the benefits of such listing. A delisting of our common stock from Nasdaq may materially impair our stockholders' ability to buy and sell our common stock and could have an adverse effect on the market price of, and the efficiency of the trading market for, our common stock. In addition, the delisting of our common stock could significantly impair our ability to raise capital.

***This Offering has not been reviewed by independent professionals.***

We have not retained any independent professionals to review or comment on this prospectus or otherwise protect the interest of the investors hereunder. Although we have retained our own counsel, neither such counsel nor any other counsel has made, on behalf of the investors, any independent examination of any factual matters represented by management herein. Therefore, for purposes of making a decision to purchase our Shares, you should not rely on our counsel with respect to any matters herein described. Prospective investors are strongly urged to rely on the advice of their own legal counsel and advisors in making a determination to purchase our shares of common stock.

***There has been no public market for our common stock prior to this Offering, and an active market in which investors can resell their shares may not develop.***

Prior to this Offering, there has been no public market for our common stock. All investments in securities involve the risk of loss of capital. No guarantee or representation is made that an investor will receive a return of its capital. The value of our common stock can be adversely affected by a variety of factors, including development problems, regulatory issues, technical issues, commercial challenges, competition, legislation, government intervention, industry developments and trends, and general business and economic conditions. We cannot predict the extent to which an active market for our common stock will develop or be sustained after this Offering, or how the development of such a market might affect the market price of our common stock.

***Sales of our common stock under our resale registration statement and under Rule 144 could reduce the price of our stock.***

An aggregate of 25,067,786 of our outstanding shares of common stock are subject to lock-up agreements. An additional 339,125 of our outstanding shares of common stock "restricted securities" are subject to restrictions on transfer. In general, persons holding "restricted securities," must hold their shares for a period of at least six months, may not sell more than 1% of the total issued and outstanding shares in any 90-day period, and must resell the shares in an unsolicited brokerage transaction at the market price. Shares shall be locked up as follows: (i) 2,900,000 shares of common stock held by X, LLC, 10,325,000 shares of common stock held by Gray Mars Venus Trust, Arizona 2015, 2,844,945 shares of common stock controlled by David Haley, 2,758,824 shares of common stock held by James Malackowiski, 2,018,750 shares of common stock held by John O'Hurley and 1,654,412 shares held by Acuitas Group Holdings, LLC for six months; (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding warrants held by Bellridge Capital, L.P. for 60 days; (iii) 400,000 shares of common stock held by Bellridge Capital, L.P. for 30 days and (iv) an additional 2,165,855 shares of common stock held by other stockholders for periods ranging from 47 days to six months; provided, however, certain shares may not be subject to a lock up period in the event that such shares are sold at certain minimum prices (see "Shares Eligible for Future – Lock-Up Agreements"). However, Rule 144 will only be available for resale in the 90 days after the Company becomes subject to the ongoing SEC reporting requirements. The Company may voluntarily file current reports on Form 8-K. The availability for sale of substantial amounts of common stock under Rule 144 could reduce prevailing market prices for our securities. The registration statement to which this Prospectus relates also registers the potential resale by certain selling stockholders of an aggregate amount up to 1,650,000 shares of our common stock consisting of up to (i) 150,000 shares of our common stock and (ii) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder Warrant, which shares shall be subject to a lock up for 60 days.

***Our failure to maintain effective internal controls over financial reporting could have an adverse impact on us.***

We are required to establish and maintain appropriate internal controls over financial reporting. Failure to establish those controls, or any failure of those controls once established, could adversely impact our public disclosures regarding our business, financial condition or results of operations. In addition, management's assessment of internal controls over financial reporting may identify weaknesses and conditions that need to be addressed in our internal controls over financial reporting or other matters that may raise concerns for investors. Any actual or perceived weaknesses and conditions that need to be addressed in our internal control over financial reporting, disclosure of management's assessment of our internal controls over financial reporting or disclosure of our public accounting firm's attestation to or report on management's assessment of our internal controls over financial reporting may have an adverse impact on the price of our common stock.

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints and the benefit of controls must be relative to their costs. Because of the inherent limitations in all control systems, no system of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Further, controls can be circumvented by individual acts of some persons, by collusion of two or more persons, or by management override of the controls. The design of any system of controls is also based in part upon certain

assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, a control may become inadequate because of changes in conditions or the degree of compliance with policies or procedures may deteriorate. Because of inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected.

31

At present, we believe that we have effective internal controls in place. However, our management, including our Chief Executive Officer, cannot guarantee that our internal controls and disclosure controls that we have in place will prevent all possible errors, mistakes or all fraud.

***Our financial controls and procedures may not be sufficient to ensure timely and reliable reporting of financial information, which, as a public company, could materially harm our stock price.***

We require significant financial resources to maintain our public reporting status. We cannot assure you we will be able to maintain adequate resources to ensure that we will not have any future material weakness in our system of internal controls. The effectiveness of our controls and procedures may in the future be limited by a variety of factors including:

- faulty human judgment and simple errors, omissions or mistakes;
- fraudulent action of an individual or collusion of two or more people;
- inappropriate management override of procedures; and
- the possibility that any enhancements to controls and procedures may still not be adequate to assure timely and accurate financial information.

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Despite these controls, because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance of achieving their control objectives. Furthermore, smaller reporting companies like us face additional limitations. Smaller reporting companies employ fewer individuals and can find it difficult to employ resources for complicated transactions and effective risk management. Additionally, smaller reporting companies tend to utilize general accounting software packages that lack a rigorous set of software controls.

If we fail to have effective controls and procedures for financial reporting in place, we could be unable to provide timely and accurate financial information and be subject to investigation by the Securities and Exchange Commission and civil or criminal sanctions.

**_We must implement additional and expensive procedures and controls in order to grow our business and organization and to satisfy new reporting requirements, which will increase our costs and require additional management resources._**

Upon becoming a fully public reporting company, we will be required to comply with the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and the related rules and regulations of the SEC, including the requirements that we maintain disclosure controls and procedures and adequate internal control over financial reporting. In the future, if our securities are listed on a national exchange, we may also be required to comply with marketplace rules and heightened corporate governance standards. Compliance with the Sarbanes-Oxley Act and other SEC and national exchange requirements will increase our costs and require additional management resources. We recently have begun upgrading our procedures and controls and will need to continue to implement additional procedures and controls as we grow our business and organization and to satisfy new reporting requirements. If we are unable to complete the required assessment as to the adequacy of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act or if we fail to maintain internal control over financial reporting, our ability to produce timely, accurate and reliable periodic financial statements could be impaired.

If we do not maintain adequate internal control over financial reporting, investors could lose confidence in the accuracy of our periodic reports filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Additionally, our ability to obtain additional financing could be impaired or a lack of investor confidence in the reliability and accuracy of our public reporting could cause our stock price to decline.

***We are an "emerging growth company" under the JOBS Act of 2012 and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our common stock less attractive to investors.***

We are an "emerging growth company", as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 (the "Securities Act") for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We are choosing to take advantage of the extended transition period for complying with new or revised accounting standards.

We will remain an "emerging growth company" until the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act, although we will lose that status sooner if our revenues exceed $1.07 billion, if we issue more than $1 billion in non-convertible debt in a three year period, or if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last day of our most recently completed second fiscal quarter.

***Our status as an "emerging growth company" under the JOBS Act may make it more difficult to raise capital as and when we need it.***

Because of the exemptions from various reporting requirements provided to us as an "emerging growth company" and because we will have an extended transition period for complying with new or revised financial accounting standards, we may be less attractive to investors and it may be difficult for us to raise additional capital as and when we need it. Investors may be unable to compare our business with other companies in our industry if they believe that our financial accounting is not as transparent as other companies in our industry. If we are unable to raise additional capital as and when we need it, our financial condition and results of operations may be materially and adversely affected.

34

*We have not paid dividends in the past and do not expect to pay dividends in the future, and any return on investment may be limited to the value of our stock.*

We have never paid cash dividends on our common stock and do not anticipate paying cash dividends on our common stock in the foreseeable future. We currently intend to retain any future earnings to support the development of our business and do not anticipate paying cash dividends in the foreseeable future. Our payment of any future dividends will be at the discretion of our board of directors after taking into account various factors, including, but not limited to, our financial condition, operating results, cash needs, growth plans and the terms of any credit agreements that we may be a party to at the time. In addition, our ability to pay dividends on our common stock may be limited by Delaware state law. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize a return on their investment. Investors seeking cash dividends should not purchase our common stock.

*Our Amended and Restated Bylaws provide that a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) will be the sole and exclusive forum for certain disputes which could limit stockholders' ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers or employees.*

Our Amended and Restated Bylaws provide that unless the Company consents in writing to the selection of an alternative forum, a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for claims with respect to (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim against the Company or any director or officer or other employee of the Company arising pursuant to any provision of the Delaware General Corporation Law or the Certificate of Incorporation or the Amended and Restated Bylaws of the Company (in each case, as they may be amended from time to time), or (iv) any action asserting a claim against the Company or any director or officer or other employee of the Company governed by the internal affairs doctrine. This exclusive forum provision would not apply to suits brought to enforce any liability or duty created by the Securities Act or the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. To the extent that any such claims may be based upon federal law claims, Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder.

This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company or its directors, officers, other employees or agents, which may discourage such lawsuits against the Company and its directors, officers, other employees and agents. Alternatively, if a court were to find the choice of forum provision contained in our Amended and Restated Bylaws to be inapplicable or unenforceable in an action, the Company may incur additional costs associated with resolving such action in other jurisdictions, which could have a material adverse effect on the Company's business, results of operations, and financial condition.

*You should consult your own independent tax advisor regarding any tax matters arising with respect to the securities offered in connection with this offering.*

Participation in this offering could result in various tax-related consequences for investors. All prospective purchasers of the resold securities are advised to consult their own independent tax advisors regarding the U.S. federal, state, local and non-U.S. tax consequences relevant to the purchase, ownership and disposition of the resold securities in their particular situations.

*IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT ANY U.S. TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE. IN ADDITION, ANY U.S. TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE "PROMOTION OR MARKETING" OF THE MATTER(S) ADDRESSED HEREIN. YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM YOUR OWN INDEPENDENT TAX ADVISOR.*

**IN ADDITION TO THE ABOVE RISKS, BUSINESSES ARE OFTEN SUBJECT TO RISKS NOT FORESEEN OR FULLY APPRECIATED BY MANAGEMENT. IN REVIEWING THIS FILING, POTENTIAL INVESTORS SHOULD KEEP IN MIND THAT OTHER POSSIBLE RISKS MAY ADVERSELY IMPACT THE COMPANY'S BUSINESS OPERATIONS AND THE VALUE OF THE COMPANY'S SECURITIES.**

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains "forward-looking statements." Forward-looking statements reflect the current view about future events. When used in this prospectus, the words "anticipate," "believe," "estimate," "expect," "future," "intend," "plan," or the negative of these terms and similar expressions, as they relate to us or our management, identify forward-looking statements. Such statements, include, but are not limited to, statements contained in this prospectus relating to our business strategy, our future operating results and liquidity and capital resources outlook. Forward-looking statements are based on our current expectations and assumptions regarding our business, the economy and other future conditions. Because forward–looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. Our actual results may differ materially from those contemplated by the forward-looking statements. They are neither statements of historical fact nor guarantees of assurance of future performance. We caution you therefore against relying on any of these forward-looking statements. Important factors that could cause actual results to differ materially from those in the forward-looking statements include, without limitation:

1.  Our ability to effectively operate our business segments;

2.  Our ability to manage our research, development, expansion, growth and operating expenses;

3.  Our ability to evaluate and measure our business, prospects and performance metrics;

4.  Our ability to compete, directly and indirectly, and succeed in the highly competitive and evolving ridesharing industry;

5.  Our ability to respond and adapt to changes in technology and customer behavior;

6.  Our ability to protect our intellectual property and to develop, maintain and enhance a strong brand; and

7.  other factors (including the risks contained in the section of this prospectus entitled "*Risk Factors*") relating to our industry, our operations and results of operations.

Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, actual results may differ significantly from those anticipated, believed, estimated, expected, intended or planned.

Factors or events that could cause our actual results to differ may emerge from time to time, and it is not possible for us to predict all of them. We cannot guarantee future results, levels of activity, performance or achievements. Except as required by applicable law, including the securities laws of the United States, we do not intend to update any of the forward-looking statements to conform these statements to actual results.

## USE OF PROCEEDS

We estimate that we will receive net proceeds of approximately $8,900,000 (or approximately $10,265,000 if the underwriters' option to purchase additional shares is exercised in full) from the sale of the common stock offered by us in this primary offering, based on public offering price of $4.00 per share, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

An increase or decrease of 100,000 shares of common stock offered by us, as set forth on the cover page of this prospectus, would increase or decrease net proceeds to us from this primary offering by $364,000, based on a public offering price of $4.00 per share, and after deducting the estimated underwriting discounts and commissions.

The principal purposes of this primary offering are to increase our capitalization and financial flexibility, increase our visibility in the marketplace and create a public market for our common stock. As of the date of this prospectus, we cannot specify with certainty all of the particular uses for the net proceeds to us from this primary offering. However, we currently intend to use the net proceeds to us from this primary offering to add to our fleet of passenger vehicles made available for rent through the Company's wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital, sales and marketing activities. We may also use a portion of the net proceeds for the acquisition of, or investment in, technologies, solutions or businesses that complement our business, although we have no present commitments or agreements to enter into any acquisitions or investments.

We will retain broad discretion in the allocation of the net proceeds from this primary offering and could utilize the proceeds in ways that do not necessarily improve our results of operations or enhance the value of our common stock.

The table below sets forth the manner in which we expect to use the net proceeds we receive from this primary offering. All amounts included in the table below are estimates.

| Description | | Amount |
|---|---|---|
| Purchase of Passenger Vehicles Made Available for Rent | $ | 5,000,000 |
| Repayment of Notes Payable | | 2,400,000 |
| Sales and Marketing | $ | 750,000 |
| Working Capital and General Corporate Purposes | $ | 750,000 |
| Total | $ | 8,900,000 |

The foregoing information is an estimate based on our current business plan. We may find it necessary or advisable to re-allocate portions of the net proceeds reserved for one category to another, and we will have broad discretion in doing so. Pending these uses, we intend to invest the net proceeds of this primary offering in a money market or other interest-bearing account.

36

## MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Our common stock is not listed on any stock exchange or over-the-counter market or quotation system. There is currently no active trading market in our common stock. We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering. For more information see the section "*Risk Factors*."

As of October 31, 2019, we have 26,802,976 shares of our common stock issued and outstanding held by approximately 1,148 stockholders of record.

We also have outstanding:

- The Selling Securityholder Warrant to purchase up to 1,500,000 shares of our common stock at an exercise price of $4.00 per share, subject to adjustment in certain circumstances as provided therein; and

- Options granted under the 2016 Plan to purchase up to 300,000 shares of our common stock at a weighted average exercise price of $8.00 per share, subject to adjustment in certain circumstances as provided therein, of which options to purchase up to 300,000 shares of our common stock have vested and are exercisable at a weighted average exercise price of $8.00.

### Dividends

We have not declared any cash dividends since inception and we do not anticipate paying any dividends in the foreseeable future. Instead, we anticipate that all of our earnings will be used to provide working capital, to support our operations, and to finance the growth and development of our business, including potentially the acquisition of, or investment in, businesses, technologies or products that complement our existing business. The payment of dividends is within the discretion of the board of directors and will depend on our earnings, capital requirements, financial condition, prospects, applicable Delaware law, which provides that dividends are only payable out of surplus or current net profits, and other factors our board might deem relevant. There are no restrictions that currently limit our ability to pay dividends on our common stock other than those generally imposed by applicable state law.

### Securities Authorized for Issuance under Equity Compensation Plan

On November 30, 2016, the Board of Directors of the Company adopted the 2016 Equity Incentive Plan (the "2016 Plan") that governs equity awards to our employees, directors, officers, consultants and other eligible participants. Under the 2016 Plan there are 10,000,000 shares of common stock reserved for issuance.

The types of awards permitted under the 2016 Plan include qualified incentive stock options and non-qualified stock options. Each option shall be exercisable at such times and subject to such terms and conditions as the Board may specify.

The Board of Directors has the power to amend, suspend or terminate the 2016 Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of our common stock reserved for issuance pursuant to incentive awards or reduces the minimum exercise price for options or exchange of options for other incentive awards, unless such change is authorized by our stockholders within one year.

**2016 Equity Compensation Plan Information as of December 31, 2018**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | | Weighted-average exercise price of outstanding options, warrants and rights | | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|---|---|
| | (a) | | (b) | | (c) |
| Equity compensation plans approved by security holders - 2016 Plan | $ | 300,000 | $ | 8.00 | 9,250,000 |
| Total | $ | 300,000 | $ | 8.00 | 9,250,000 |

As of December 31, 2018, options to purchase up to 750,000 shares of common stock have been granted under the 2016 Plan (450,000 expired in 2018) of which 300,000 shares of common stock are vested and exercisable. The following table summarizes information about stock options granted at December 31, 2018 under the 2016 Plan:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price | Outstanding | Weighted Average Remaining contractual life (in years) | Weighted Average Exercise Price | Exercisable | Weighted Average Exercise Price |
| $ 8.00 | 300,000 | 1.50 | 8.00 | 300,000 | 8.00 |

## CAPITALIZATION

The following table sets forth our consolidated capitalization, as of June 30, 2019, and on a pro forma basis giving effect to the sale of 2,500,000 shares of common stock by us in this offering at a public offering price of $4.00 per share after deducting the underwriting discounts and commissions and estimated offering expenses payable by us.

You should read the following table in conjunction with "*Use of Proceeds,*" "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and our financial statements and related notes included in this prospectus. The following table sets forth our cash and cash equivalents and capitalization as of June 30, 2019:

38

|  | Actual | As Adjusted (1) |
|---|---|---|
| **Cash** | $ 34,381 | $ 6,536,141 |
| **Indebtedness due within one year** | $ 4,895,563 | $ 2,497,323 |
| **Total long term debt – net of current portion** | $ 1,559,309 | $ 1,559,309 |
| **Stockholders' equity:** | | |
| Common stock, $0.000001 par value, 90,000,000 shares authorized, 26,802,976 shares outstanding actual, 29,302,976 shares outstanding as adjusted | 27 | 29 |
| Preferred stock, $0.000001 par value, 10,000,000 shares authorized; 0 shares outstanding | — | — |
| Additional paid-in capital | 19,867,551 | 28,767,549 |
| Accumulated deficit | (22,238,609) | (22,238,609) |
| Total stockholders' equity | (2,371,031) | 6,528,969 |
| **Total capitalization** | $ 4,083,841 | $ 10,585,601 |

(1) Does not include: (a) shares issuable upon the exercise of the underwriter's option to purchase up to 375,000 additional shares of common stock; (b) 1,500,000 shares of our common stock issuable upon exercise of outstanding Selling Securityholder Warrant; and (c) 300,000 shares of our common stock issuable upon exercise of granted and vested stock options granted under our 2016 Plan. Includes the repayment of $1,518,240 of notes payable.

## DILUTION

Purchasers of our common stock in this offering will experience an immediate and substantial dilution in the as adjusted net tangible book value of their shares of common stock. Dilution in as adjusted net tangible book value represents the difference between the public offering price per share and the as adjusted net tangible book value per share of our common stock immediately after the offering.

The historical net tangible book value of our common stock as of June 30, 2019 was $(2,371,031) or $(0.09) per share. Historical net tangible book value per share of common stock represents our total tangible assets (total assets less intangible assets) less total liabilities divided by the number of shares of common stock outstanding as of that date. On a pro forma basis, after giving effect to the sale of 2,500,000 shares in this offering at an initial public offering price of $4.00 per share for net proceeds of approximately $8.9 million, as if such offering had occurred at the end of June 30, 2019, our pro forma net tangible book value as of June 30, 2019 would have been approximately $6,528,969, or approximately $0.22 per share of our common stock. This represents an immediate increase in as adjusted pro forma, net tangible book value per share of $0.31 to the existing stockholders and an immediate dilution in as adjusted pro forma net tangible book value per share of $3.78 to new investors who purchase shares in the offering. The following table illustrates this per share dilution to new investors:

| | | |
|---|---|---:|
| Public offering price per share | $ | 4.00 |
| Historical net tangible book value per share as of June 30, 2019 | $ | (0.09) |
| Increase in as adjusted pro forma net tangible book value per share attributable to the offering | | 0.31 |
| Pro forma net tangible book value (deficit) per share as of June 30, 2019 | | 0.22 |
| Dilution in net tangible book value per share to new investors | $ | 3.78 |

After completion of this offering, our existing stockholders would own approximately 91.5% and our new investors would own approximately 8.5% of the total number of shares of our common stock outstanding after this offering, and before sales of any of the shares by the Selling Shareholders.

Sales of 150,000 shares of common stock by the Selling Shareholders in the offering covered by a separate prospectus (calculated using $4.00 per share price listed on the cover page of this prospectus and excluding the exercise of the warrants held the selling shareholders) will reduce the number of shares of common stock held by existing stockholders to approximately 91.0% of the total shares of common stock outstanding after this offering, and will increase the shares held by new investors to approximately 9.0% of the total shares of common stock outstanding after this offering.

To the extent that outstanding options or warrants are exercised and outstanding convertible notes are converted into common stock, you will experience further dilution. In addition, we may choose to raise additional capital due to market conditions or strategic considerations even if we believe we have sufficient funds for our current or future operating plans. To the extent that additional capital is raised through the sale of equity or convertible debt securities, the issuance of these securities may result in further dilution to our stockholders.

The following table summarizes, on an as adjusted basis as of June 30, 2019, the differences between the number of shares of common stock purchased from us, the total consideration and the average price per share paid by existing stockholders and by investors participating in this offering, after deducting estimated underwriting discounts and commissions and estimated offering expenses, at a public offering price of $4.00 as shown on the cover page of this prospectus.

**Capitalization Table**

| | Shares Purchased | | Total Consideration | | Per Share | |
|---|---:|---:|---:|---:|---:|---:|
| | **Number** | **Percent** | **Amount** | **Percent** | | |
| Existing stockholders | 26,802,976 | 91.47% | $(2,371,031) | (36.32)% | $ | (0.09) |
| New Investors | 2,500,000 | 8.53% | 8,900,000 | 136.32% | $ | 3.56 |
| | 29,302,976 | 100.00% | $ 6,528,969 | 100.00% | $ | 0.22 |

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Certain statements made in this prospectus are "forward-looking statements" regarding the plans and objectives of management for future operations. Such statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of the "Company" to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. The forward-looking statements included herein are based on current expectations that involve numerous risks and uncertainties. The Company's plans and objectives are based, in part, on assumptions involving the continued expansion of business. Assumptions relating to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Company. Although the Company believes its assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate and therefore, there can be no assurance the forward-looking statements included in this prospectus will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Company or any other person that the objectives and plans of the Company will be achieved. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" and in other parts of this prospectus. Our fiscal year ends on December 31.*

**Overview**

The Company was formed on June 21, 2016 under the name "*YayYo, LLC*," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities. The Company now operates as a "C" corporation formed under the laws of the State of Delaware.

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"). The Company operations are organized and consolidated into one reporting segment which encompasses the financial results of the Company's two business segments- (i) the Fleet Management business and (ii) the Rideshare Platform.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry away from the development of the Metasearch App. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

41

**Initial Public Offering**

On March 16, 2018, we closed our Regulation A+ offering under Regulation A of the Securities Act, which was qualified by the SEC on March 15, 2017. We sold a total of 365,306 shares of our common stock. We received cash proceeds of $1.8 million, net of commissions and other costs associated with the gross offering proceeds or payable by us.

**Factors Affecting Our Performance**

We believe that the growth of our business and our future success are dependent upon many factors, including our products, services and market leadership, and the success of our sales and marketing efforts, our expansion strategy, our investments for scale and growth. While each of these areas presents significant opportunities for us, they also pose important challenges that we must successfully address in order to sustain the growth of our business and improve our results of operations. The investments that we make in these areas may not result in increased revenue or the growth of our business. Accordingly, these investments may delay or otherwise impair our ability to achieve profitability. The timing of our future profitability will depend upon many variables, including the success of our growth strategies and the timing and size of investments and expenditures that we choose to undertake, as well as market growth and other factors that are not within our control. We have not yet determined when we expect to achieve profitability.

***Product and Market Leadership.*** We are committed to delivering market-leading products and services in the ridesharing economy to continue to build and maintain credibility with the growing customer base. We believe we must expand our product, services and market leadership position and strength of our brand to drive further revenue growth. We intend to continue to invest in the capabilities of our business segments and marketing activities to maintain our strong position in the ridesharing economy. Our results of operations may fluctuate as we make these investments to drive increased customer adoption and usage.

***Sales and Marketing.*** In order to maintain our efficient customer acquisition, we must maintain and expand our operating business segments, customer outreach and effectively generate additional sales to enterprises and customers across the United States. Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint in North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

***Expansion Strategy.*** We are focused on expanding our existing customers' use of our products, services and Rideshare Platform. We believe that there is a significant opportunity to drive additional sales to existing customers, and expect to invest in sales, marketing and customer support to achieve additional revenue growth from existing customers. We believe that the large numbers of drivers and fleet operators that we do and will do business with, create a "Network Effect" that enables us to scale the business, increase diversification and revenue and expand our strength as a potential market leader.

***Investments for Scale.*** As our business grows and as we continue our Rideshare Platform optimization efforts, we expect to realize cost savings through economies of scale. We manage our Fleet Management business segment to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment. As a result, we expect our gross margin to fluctuate from period to period.

**Results of Operations**

***Principles of consolidation***

The consolidated financial statements include the accounts of the Company, its wholly owned subsidiaries Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

**Total Revenues**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Revenue for the six months ended June 30, 2019 was $3,475,518, an increase of $2,438,103 or 235.0% compared to revenue for the six months ended June 30, 2018 of $1,037,415. The increase is due to us increasing our rental fleet over the comparable periods. During the six months ended June 30, 2019, the average weekly rental income per vehicle placed in service was $341 compared to $270 for the same period in 2018.

*Year Ended December 31, 2018 Compared to Year Ended December 31, 2017.*

Revenue for the 2018 fiscal year was $3,289,478. Revenue for the 2017 fiscal year was $235,690. The increase is due to us beginning to generate revenue from renting cars to Uber and Lyft drivers in August 2017. During the year ended December 31, 2018, the average weekly rental income per vehicle placed in service was $302 compared to $173 for the year ended December 31, 2017.

From June 21, 2016 (inception) to December 31, 2016, the Company was a pre-revenue development stage company purposed to commercialize the ridesharing industry through the development and distribution of our planned meta-search ridesharing mobile App. The Company generated no revenues from the Company's inception on June 21, 2016 until October 31, 2016. On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from the development of the Metasearch App. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management").

**Cost of Revenues**.

The principal components of costs of revenue are depreciation of the vehicles, vehicle insurance and maintenance.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Cost of revenues for the six months ended June 30, 2019 were $2,044,241, an increase of $1,316,617 or 181.9% compared to cost of revenues for the six months ended June 30, 2018 of $727,624. The increase is due to the increase in revenue as noted above. For the six months ended June 30, 2019 and 2018 our cost of revenue was 59% and 70% of our revenue, respectively.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Cost of revenues for the 2018 fiscal year were $2,374,397. Cost of revenues for the 2017 fiscal year were $213,111. The increase is due to the increase in revenue as noted above. In 2018 and 2017 our cost of revenue was 72% and 90% of our revenue, respectively.

43

**General and Administrative Expenses**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

General and administrative expenses for the six months ended June 30, 2019 were $1,460,811, representing a decrease of $2,512,104 or approximately 63.2% over the six months ended June 30, 2018 of $3,972,915. The decrease is principally due to lower stock compensation expense of $3,112,234 for 2018 compared to $0 for 2019 offset by higher payroll costs as we hired additional personnel for our expanding operations and higher occupancy costs.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

General and administrative expenses for the 2018 fiscal year were $6,584,251, representing an increase of $3,334,592 or approximately 102.6% over the 2017 fiscal year of $3,249,659. The increase is principally due to stock-based compensation for the 2018 fiscal year was $4,364,468 compared to $1,676,476 for the 2017 fiscal year and higher payroll costs as we hired additional personnel for our expanding operations and higher occupancy costs.

**Selling and Marketing Expenses**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Selling and marketing expenses for the six months ended June 30, 2019 were $102,606, representing an increase of $11,111 or approximately 12.1% over the same period in 2018. Selling and marketing expenses were $91,495 for the six months ended June 30, 2018. The increase is due to an increase in advertising our rentals to Uber and Lyft drivers.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Selling and marketing expenses for the 2018 fiscal year were $482,811, representing an increase of $396,713 or approximately 460.8% over the same period in 2017. Selling and marketing expenses were $86,098 for the 2017 fiscal year. In 2018 most of the selling and marketing expenses was spent on advertising our rentals to Uber and Lyft drivers.

**Impairment of leased assets**

Impairment of leased assets for the 2018 fiscal year was $2,388,000 compared to $2,800,000 for the 2017 fiscal year. The value of the leased assets was initially determined as the sum of the lease liability plus the up-front consideration of 298,500 and 350,000 shares of the Company's common stock (valued at $2,388,000 and $2,800,000) paid to the lessor during 2018 and 2017, respectively. There was no impairment of leased assets in the six months ended June 30, 2019 and 2018.

**Loss on the settlement of debt**

Loss on the settlement of debt for the six months ended June 30, 2019 was $252,900 as compared to $0 for the same period in 2018. During the months ended June 30, 2019, we settled outstanding debt of $421,500 with 84,300 shares of common stock valued at $674,000. There was no loss on the settlement of debt for the years ended December 31, 2018 and 2017.

**Interest expense, net**

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Interest and financing expenses for the six months ended June 30, 2019 were $611,875 compared to $380,872 for the same period in 2018. The increase in interest expense and financing costs is due to more interest bearing obligations outstanding during the six months ended June 30, 2019 period as compared to the same period in 2018.

*Year ended December 31, 2018 Compared to the Year ended December 31, 2017.*

Interest and financing expenses for the year ended December 31, 2018 were $4,639,442 compared to $192,395 for the same period in 2017. The significant increase in interest expense and financing costs is a result of amortization of debt discount. In September 2018, the Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of

$117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

44

**Total Operating Expenses**

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

Total operating expenses for the six months ended June 30, 2019 were $1,816,317, representing a decrease of $2,257,792 or approximately 55.4% over the same period in 2018. For the six months ended June 30, 2018, total operating expenses were $4,074,109. The decrease is due to the reasons described above.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Total operating expenses for the 2018 fiscal year were $9,464,761, representing an increase of $3,025,449 or approximately 47.0% over the same period in 2017. For the 2017 fiscal year, total operating expenses were $6,439,312. The increase is due to the reasons described above.

**Net Loss**.

*Six Months Ended June 30, 2019 Compared to Six Months Ended June 30, 2018.*

The net loss for the six months ended June 30, 2019 was $996,915, representing a decrease of $3,148,275 or approximately 76.0% over the same period in 2018. For the six months ended June 30, 2018, the net loss was $4,145,190.

*Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

The net loss for the 2018 fiscal year was $13,189,122, representing an increase of $6,620,259 or approximately 100.8% over the same period in 2017. For the 2017 fiscal year, the net loss was $6,568,863.

**Liquidity, Capital Resources and Plan of Operations**

*Current Assets, Liabilities and Working Capital*

At June 30, 2019, the Company's current assets totaled $245,093, current liabilities totaled $5,886,359, and working capital was a deficit of $5,641,266. At December 31, 2018, the Company's current assets totaled $386,344, current liabilities totaled $5,394,073, and working capital was a deficit of $5,007,729. As of December 31, 2017, the Company's current assets totaled $322,144, current liabilities totaled $941,054, and working capital was a deficit of $618,910.

Regarding current liabilities, the amounts categorized as accounts payable and accrued expenses totaled $1,043,210 and $1,213,452 as of June 30, 2019 and December 31, 2018, respectively, a decrease of $170,242 or approximately 14%. Regarding current liabilities, the amounts categorized as accounts payable and accrued expenses totaled $1,213,452 and $131,453 as of December 31, 2018 and December 31, 2017, respectively, an increase of $1,081,999 or approximately 823%.

*Capital Expenditures*

During the six months ended June 30, 2019, the Company had capital expenditures of $510,136 in leased vehicles. At June 30, 2019, all of the Company's leased assets were finance leased right-of-use assets and, net of accumulated depreciation in the amount of $1,067,878 for the six months ended June 30, 2019, totaled $4,758,110 in net leased assets. The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. The lease terms are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

During the year ended December 31, 2018, the Company had capital expenditures in the amount of $3,703,514. $2,840 in computer equipment and $3,700,674 in leased vehicles. At December 31, 2018, all of the Company's leased assets were finance leased right-of-use assets and, net of accumulated depreciation in the amount of $546,632 for fiscal year 2018, totaled $5,115,117 in net leased assets.

During the year ended of December 31, 2017, the Company had capital expenditures in the amount of $2,119,246. $3,178 in computer equipment and $2,116,068 in leased vehicles, subject to adjustment. At December 31, 2017, all of the Company's leased assets were finance leased right-of-use assets and, net of accumulated depreciation in the amount of $82,586 for fiscal year 2017, totaled $2,033,482 in net leased assets.

***Statement of Cash Flows***

*Cash Flows from Operating Activities – Six Months Ended June 30, 2019 Compared to the Six Months Ended June 30, 2018.*

      Net cash used in operating activities for the six months ended June 30, 2019 totaled $60,370, which was a decrease of $427,246 or approximately 88% from the net cash used in operating activities of $487,616 for the same period in 2018.

*Cash Flows from Operating Activities - Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

      Net cash used in operating activities for the fiscal year ended December 31, 2018 totaled $424,156, which was a decrease of $1,427,967 or approximately 77% from the net cash used in operating activities of $1,852,123 for the same period in 2017.

*Cash Flows from Investing Activities - Six Months Ended June 30, 2019 Compared to the Six Months Ended June 30, 2018.*

Net cash used in investing activities for the six months ended June 30, 2019 totaled $0, which was a decrease of $2,840 or 100% from the net cash used in investing activities of $2,840 for the same period in 2018.

*Cash Flows from Investing Activities - Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Net cash used in investing activities for the fiscal year ended December 31, 2017 totaled $2,840, which was a decrease of $338 or approximately 11% from the net cash used in investing activities of $3,178 for the same period in 2017.

*Cash Flows from Financing Activities - Six Months Ended June 30, 2019 Compared to the Six Months Ended June 30, 2018.*

Net cash used in financing activities for the six months ended June 30, 2019 totaled $182,693, which was a decrease of $6,550,915 from the net cash provided by financing activities of $6,318,222 for the same period in 2018.

*Cash Flows from Financing Activities - Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017.*

Net cash provided by financing activities for the fiscal year ended December 31, 2018 totaled $395,702, which was a decrease of $1,749,694 or approximately 82% from the net cash provided by financing activities of $2,145,396 for the same period in 2017.

### Current Plan of Operations

Our plan of operations is currently focused on the development of our operating business segments: (i) our Rideshare Platform offered through the Company's wholly-owned subsidiary Rideshare, and (ii) our Fleet Management business, made commercially available through the Company's wholly-owned subsidiary Distinct Cars. We expect to incur substantial expenditures in the foreseeable future for the potential operations of our business segments and ongoing internal research and development. At this time, we cannot reliably estimate the nature, timing or aggregate amount of such costs. Our Rideshare Platform will require extensive technical evaluation, potential regulatory review and approval, significant marketing efforts and substantial investment before it or any successors could provide us with any revenue. Further, we intend to continue to build our corporate and operational infrastructure and to build interest in our product and service offerings.

As noted above, the continuation of our current plan of operations requires us to raise significant additional capital immediately. If we are successful in raising capital, we believe that the Company will have sufficient cash resources to fund its plan of operations. The cash flow from our current vehicle leasing business and capital resources are sufficient for us to continue our current operations, but for us to fully execute our business plan we will require significant additional capital.

We continually evaluate our plan of operations discussed above to determine the manner in which we can most effectively utilize our limited cash resources. The timing of completion of any aspect of our plan of operations is highly dependent upon the availability of cash to implement that aspect of the plan and other factors beyond our control. There is no assurance that we will successfully obtain the required capital or revenues, or, if obtained, that the amounts will be sufficient to fund our ongoing operations. The inability to secure additional capital would have a material adverse effect on us, including the possibility that we would have to sell or forego a portion or all of our assets or cease operations. If we discontinue our operations, we will not have sufficient funds to pay any amounts to our stockholders.

Even if we raise additional capital in the near future, if our operating business segments fail to achieve anticipated financial results, our ability to raise additional capital in the future to fund our operating business segments would likely be seriously impaired. If in the future we are not able to demonstrate favorable financial results or projections from our operating business segments, we will not be able to raise the capital we need to continue our then current business operations and business activities, and we will likely not have sufficient liquidity or cash resources to continue operating.

Because our working capital requirements depend upon numerous factors there can be no assurance that our current cash resources will be sufficient to fund our operations. At present, we have no committed external sources of capital, and do not expect any significant product revenues for the foreseeable future. Thus, we will require immediate additional financing to fund future operations. There can be no assurance, however, that we will be able to obtain funds on acceptable terms, if at all.

*Credit Facilities*

As of December 31, 2018, the Company had notes payable consisting of the following: (i) $790,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of August 31, 2019; (ii) $319,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to May 23, 2021; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of August 31, 2019, as subsequently amended to October 31, 2019; (iv) $1,296,018 in a secured note payable due the earlier of August 31, 2019, as subsequently amended to October 31, 2019, or the closing of an offering of at least $3,000,000 and (v) $62,274 in unsecured notes payable/line of credit to a merchant banks, accruing interest at 15%. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

On November 1, 2019, the Company, extended three notes payable as each of the three notes payable were due and payable on October 31, 2019. The interest rates and other material terms, other than the due dates, for all three notes payable were not amended by the extensions. As a result of the extensions, (i) two notes payable totaling $1,518,240 (the $222,222 note payable and the $1,296,018 note payable) are due November 30, 2019 and (ii) the note payable to an investor, with a current balance of $880,000, is due on December 31, 2019.

As of December 31, 2017, the Company had notes payable consisting of the following: (i) $445,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of March 31, 2019, as subsequently amended to November 30, 2019 as described above; (ii) $242,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to December 11, 2020; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of August 31, 2019, as subsequently amended to November 30, 2019 as described above. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

*Bellridge Second Note Offering*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Bellridge Capital, L.P. (the "Selling Securityholder"), an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased:

- a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note");

- warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant"); and

- 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares").

In consideration for the Second Note, Warrant Shares and Commitment Shares, the Lender paid an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below).

The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note. The Second Note was repaid/rolled into a secured note payable in September 2018.

The Company believes that as of the date of this prospectus, the Company is in compliance with all of the foregoing restricted covenants, including such additional covenants set forth under Second Note. Further, the Company believes that as of the date of this prospectus, the Company is in compliance with all affirmative covenants set forth below.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and restrictive financial covenants, including, but not limited to, the following restrictive covenants:

- The Company will not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, incur or guarantee, assume or suffer to exist any indebtedness (other than (i) the Indebtedness evidenced by the Second Note and the First Note and (ii) other Permitted Indebtedness). Under the terms of the Second Note, "<u>Permitted Indebtedness</u>" means (i) indebtedness evidenced by the Second Note and the First Note, (ii) indebtedness secured by permitted liens or unsecured indebtedness and (iii) permitted subordinated indebtedness;

47

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on any of its capital stock;

- At any time a Defeasance Failure exists (defined below), the Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, permit any indebtedness of the Company or any of its subsidiaries to mature or accelerate prior to the maturity date of the Second Note. "Defeasance Failure" means, as of any given time of determination, the failure of the cash amount in the Holder Master Restricted Account to be greater than or equal to the outstanding amount. "Holder Master Restricted Account" means, solely with respect to the holder, a certain account at Umpqua Bank, or such other account as may be directed by the holder of the Second Note, from time to time, subject to a Controlled Account Agreement in favor of the holder in a form reasonably acceptable to the holder; and

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by or publicly contemplated to be conducted by the Company and each of its subsidiaries on March 8, 2018 or any business substantially related or incidental thereto. The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, modify its or their corporate structure or purpose.

For more information on the terms and conditions of the Bellridge Second Note Offering please see "*Description of Securities*."

## Contractual Obligations, Commitments and Contingencies

During fiscal year 2017 and 2018 and the six months ended June 30, 2019, the Company entered into a series of monthly vehicle leasing agreements with Acme Auto Leasing. As of June 30, 2019, December 31, 2018 and December 31, 2017, the Company has total lease obligations in the amount of $3,221,785, $3,790,147 and $1,593,291, respectively, (collectively, the "Finance Lease Obligations"). The Company owes monthly payments under each Lease Agreement ranging from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to and secured by a grant of a purchase money security interest on each leased vehicle.

During fiscal year 2018 and 2017, we leased and maintained primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210 and 6600 Sunset Blvd., Los Angeles, CA 90028, the latter being the location where the majority of our operations and staff conduct activities on a daily basis. We do not currently own any real property.

### *Financings and Securities Offerings*

#### *YayYo, Inc., Equity Offerings*

In December 2016, we filed an offering statement pursuant to Regulation A of the Securities Act, which was qualified by the SEC on March 17, 2017. We offered up to a maximum of 6,250,000 shares of common stock on a "best efforts" basis, at a price of $8.00 per share. On March 16, 2018, we closed the Regulation A offering, after issuing 365,306 shares of common stock for proceeds of approximately $1.8 million net of offering expenses (the "Regulation A+ Offering").

During the year ended December 31, 2018, the Company sold 46,330 shares of common stock to two investors for cash proceeds of $307,924.

During the year ended from December 31, 2017, the Company sold 371,351 shares of common stock to investors for gross cash proceeds of $2,484,199 of which 326,126 shares and $2,303,299 of cash proceeds were related to the Company's Regulation A offering. The Company incurred $814,442 of offering cost related to the sale of common stock which consisted principally of legal fees and costs associated with soliciting the sale of common stock directly to the Regulation A+ Offering investors.

During fiscal year 2017 and 2018 and the six months ended June 30, 2019, the Company entered into a series of monthly vehicle leasing agreements with Acme Auto Leasing LLC (the "Lessor"). As of June 30, 2019, December 31, 2018 and December 31, 2017, the Company has total lease obligations in the amount of $3,221,785, $3,790,147 and $1,593,291, respectively (collectively, the "Finance Lease Obligations").

On July 15, 2017, the Company and the Lessor entered into an agreement pursuant to which the Company agreed to issue additional consideration to the Lessor in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company (the "Lease Side Agreement").

From June 21, 2016 (inception) to December 31, 2016, the Company raised an additional $175,400 from the funds subscribed to under SAFE agreements with 28 unaffiliated investors. In addition, between December 2016 and January 17, 2016, we received subscriptions for $175,400 of our SAFE Shares from 28 investors in our Rule 506(b) private placement under Regulation D of the Securities Act, that, by their terms, automatically convert into 43,850 shares of our common stock as of the filing of this Prospectus (at a conversion price of $4.00 per share). We terminated such private placement on January 17, 2017. On March 17, 2017 our SAFE Shares were automatically converted into 43,850 shares of our common stock.

#### *Selling Securityholder Transactions*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, in the original principal amount of $222,222 (the "First Note"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired.

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares of common stock, with an exercise price of $4.00 per share and 150,000 commitment shares of common stock, of the Company (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Warrants expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The Company also paid $178,228 of issuance costs associated with this Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

*Distinct Cars, LLC*

As of the date of this Prospectus, Distinct Cars, LLC, as lessee, entered into a series of open-ended lease agreements and disclosure statements with Acme Auto Leasing, Inc., ("Lessor") to lease standard passenger vehicles, each with an approximate lease term of 30 to 36 months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

Distinct Cars, LLC has completed a debt round of financing pursuant to which Distinct Cars raised aggregate gross proceeds in the amount of $319,667 from 38 accredited investors in exchange for senior secured promissory notes issued by Distinct Cars (each a "Distinct Cars Note" and collectively, the "Distinct Cars Notes"). The maturity date under the Distinct Cars Notes is 36 months from the date of issuance (the "DCN Maturity Date") ranging from August 9, 2020 to May 23, 2021. The principal amount under the Distinct Cars Notes ranges from a minimum amount of $5,000 per Distinct Cars Note up to $20,000 per Distinct Cars Note. The Distinct Cars Notes accrue interest at a rate of 8% per annum with interest due and payable upon the DCN Maturity Date. The principal amount and any unpaid and accrued interest thereunder is due and payable in twelve quarterly installments commencing upon January 1, 2018. The Distinct Cars Notes are secured by a senior secured priority lien in the equity of the fleet of leased automobiles acquired under the Lease Agreements described above subject to subordination in priority lien status to the purchase money security interest held by the lessor under the Lease Agreements. In addition to the total amount of principal and interest owing under the Distinct Cars Note, upon execution of the Distinct Cars Note and placement of funds the holder received a stock grant (the "Stock Grant") of YayYo Inc., common stock (the "Parent Shares") in an amount equal to 100% of the principal sum as calculated by a price of $4.00 per share with 30% coverage. The Stock Grant is offered pursuant to Rule 506(b) of Regulation D and Section 4(a)(2) of the Securities Act of 1933.

*X, LLC*

During the fiscal year ended December 31, 2017 and the periods from June 21, 2016 (inception) to December 31, 2016, X, LLC, a limited liability company owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, issued to the Company advances of a total of $50,000 and $75,000. As of December 31, 2017, $125,000 of these loan advances were repaid in full. The loan advances were non-interest bearing and due upon demand. At December 31, 2017 and December 31, 2016, the amount due to X, LLC, as holder of the note was $0 and $75,000, respectively.

*Chase Financing, Inc.*

On January 6, 2017, the Company received $50,000 from Chase Financing, Inc., ("CFI") and issued its 10% original issue discount senior secured convertible note in the amount of $55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017, the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note"). Subsequent to the Second CFI note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms.

Pursuant to the terms, the CFI Notes were secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and were convertible at the option of the holder into shares of our common stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our common stock during the 20 trading days immediately prior to the date of conversion. In an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI notes by the Company, Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, and X, LLC (an entity wholly owned by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge Agreement with CFI (the "Guaranty and Pledge Agreement"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our common stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty and Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a common stock purchase agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our common stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of $1.00. Under the Stock Purchase Agreement, and in addition to the 200,000 shares of common stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our common stock, held as of record and beneficially by X, LLC, equal to 2% of the number of shares of common stock issued or underlying common stock Equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial three months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three months. As of December 31, 2017, the CFI Notes have been repaid in full by the Company.

Since inception, our principal sources of operating funds have been proceeds from equity financing including the sale of our common stock to initial investors known to management and principal shareholders of the Company. We do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. If the Company is unable to raise sufficient additional funds, it will have to execute a slower than planned growth path, reduce overhead and scale back its business plan until sufficient additional capital is raised to support further operational expansion and growth. As of December 31, 2018, the Company has $277,444 in cash. The Company used $424,156 of cash for operating activities for the year ended December 31, 2018. With the addition of approximately 50 new vehicles during the last half of 2018, the Company believes that based on its current operations, it will have sufficient cash available for current operations through at least December 2019.

## Off-Balance Sheet Arrangements

The Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. As of December 31, 2017, the convertible note has been repaid and there is no derivative financial instrument.

## Segment Information

### Quantitative and Qualitative Disclosures about Market Risk

In the ordinary course of our business, we are not exposed to market risk of the sort that may arise from changes in interest rates or foreign currency exchange rates, or that may otherwise arise from transactions in derivatives.

### Critical Accounting Policies and Estimates

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. Preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable. In many instances, we could have reasonably used different accounting estimates and in other instances changes in the accounting estimates are reasonably likely to occur from period to period. Actual results could differ significantly from our estimates. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving our judgments and estimates.

### Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

We consider a signed contract or other similar documentation reflecting the terms and conditions under which products will be provided to be persuasive evidence of an arrangement. Collectability is assessed based on a number of factors, including payment history and the creditworthiness of a customer. If it is determined that collection is not reasonably assured, revenue is not recognized until collection becomes reasonably assured, which is generally upon receipt of cash.

### Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees.

We account for stock-based compensation in accordance with the authoritative guidance on stock compensation. Under the fair value recognition provisions of this guidance, stock-based compensation is measured at the grant date based on the fair value of the award and is recognized as expense, net of estimated forfeitures, over the requisite service period, which is generally the vesting period of the respective award. As a result, we are required to estimate the amount of stock-based compensation we expect to be forfeited based on our historical experience. If actual forfeitures differ significantly from our estimates, stock-based compensation expense and our results of operations could be materially impacted.

For options granted during fiscal year 2016 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.85 and the weighted-average exercise price of such options was $1.00. No options were granted during fiscal 2016 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

For options granted during fiscal year 2017 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $7.54 and the weighted-average exercise price of such options was $8.00. No options were granted during fiscal 2017 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

The fair value of the stock options is being amortized to stock option expense over the vesting period. The Company recorded stock option expense of $904,468 and $1,676,476, respectively, during the year ended December 31, 2018 and the year ended December 31, 2017. As of December 31, 2018, the unamortized stock option expense was $0.

The assumptions used in calculating the fair value of options granted using the Black-Scholes option-pricing model for options granted are as follows:

| | |
|---|---|
| Risk-free interest rate | 1.14% |
| Expected life of the options | 2.08 years |
| Expected volatility | 200% |
| Expected dividend yield | 0% |

## Contingencies

Certain conditions may exist as of the date the financial statements are issued, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company's management, in consultation with its legal counsel as appropriate, assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company, in consultation with legal counsel, evaluates the perceived merits of any legal proceedings or unasserted claims, as well as the perceived merits of the amount of relief sought or expected to be sought therein. If the assessment of a contingency indicates it is probable that a material loss has been incurred and the amount of the liability can be estimated, then the estimated liability would be accrued in the Company's financial statements. If the assessment indicates a potentially material loss contingency is not probable, but is reasonably possible, or is probable, but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss, if determinable and material, would be disclosed. Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed.

## BUSINESS

## Corporate History

The Company was formed on June 21, 2016 under the name "*YayYo, LLC*," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC, to the Company in exchange for common stock, par value $0.000001 per share, of the Company. All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities upon the filing of the "*Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation*" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "C" corporation formed under the laws of the State of Delaware.

Our mailing address is YayYo, Inc., 433 North Camden Drive, Suite 600, Beverly Hills, California 90210 and our telephone number is (310) 926-2643. Our website address is *www.yayyo.com*. The information contained therein or accessible thereby shall not be deemed to be incorporated into this Prospectus.

## Business Overview

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"), Savy LLC, a Delaware limited liability company ("Savy"), Rideyayyo LLC, a Delaware limited liability company ("Rideyayyo") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"). Until June 30, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" application for smartphone users that seeks to provide price comparison and bookings of available ridesharing and taxi services along with select limousine and other public and/or private transportation services ("Metasearch App").

As of the date of this Prospectus, the Company had completed the development of the Rideshare marketplace Metasearch App. Due to partner limitations and other rationale, the Company has no further intention to continue the development or marketing of the Metasearch App.

On August 12, 2017, we announced that we were shifting our corporate focus in the transportation/ridesharing industry from being an exclusive provider of transportation networks systems towards a more diversified operating company with a direct focus on the vehicle rental business and a related transportation network. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicle to drivers in the ridesharing economy.

## Rideshare Rental E-Commerce Platform

On October 31, 2017, the Company created the wholly-owned subsidiary, Rideshare to incubate the concept of Rideshare Platform, a proprietary, rideshare vehicle booking platform to rent standard passenger vehicles to self-employed ridesharing drivers. The Company has now deployed and launched the Rideshare Platform on the Company's e-commerce website. Further, the Rideshare Platform also commercially markets the Company's own fleet of cars as well as other fleet owners and selected individual car owners. The Rideshare Platform bookings service provides all standard passenger car owners with a financial opportunity to monetize personally owned vehicles by renting them out to ridesharing economy drivers. Our business strategy with our operating Rideshare Platform is to continue developing our brand around becoming the TNC vehicle rental network for the ridesharing economy that matches the owners and/or operators of passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing economy drivers. The Company initially launched the Rideshare Platform in Los Angeles, CA and has since launched in three additional cities.

The Rideshare Platform leverages technology to connect the owners and/or operators of standard passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing drivers. The platform's functionality provides ridesharing drivers with access to certain data emitted from their respective Company rental vehicle(s) through a personal Rideshare rental dashboard. Vehicle owners can also access and manage data emitted from their personal vehicle(s) under rental to a third-party from the Rideshare Platform inventory dashboard and can further manage the other aspects of the vehicle rental transaction through the Rideshare Platform. Further, customers renting vehicles on the Rideshare Platform can also access rental extension options through the Rideshare Platform. All transactional aspects of the rental vehicle(s) (including, but not limited to, background checks, terms, deposits and insurance costs) are run securely through the Rideshare Platform. In addition, our Rideshare website located at *www.rideshareental.com* not only effectively monetizes Company-owned vehicle fleets, made available under our Fleet Management business, but also generates revenue by charging transactional fees to other vehicle owners and ridesharing economy drivers for all rental transactions consummated on the Rideshare Platform. The Rideshare Platform is available on desktop, iOS and Android devices. The development and functionality of our mobile applications are a material component to our business as drivers are more likely to transact via mobile devices.

Most importantly, all standard passenger vehicles made available on the Rideshare platform are fully qualified by the Company and guaranteed to meet the necessary Ridesharing Qualification Requirements imposed on ridesharing economy drivers by the private ridesharing TNCs. The Company mission seeks to put more prospective ridesharing drivers on roadways by providing ridesharing drivers with fully inspected vehicle offerings that are guaranteed to meet the Ridesharing Qualification Requirements.

Further, the Company's car liability and physical damage insurance policies ("Company Insurance Policies") cover both third-party vehicle owners as well as ridesharing drivers under rental contract. The Company Insurance Policies provide insurance on all listed Rideshare rental vehicles, provided that the Company Insurance Policy coverage is suspending during periods when the ridesharing driver under rental contract with the Company is actively operating on either the Uber or Lyft platform. During these periods when ridesharing drivers are actively operating Rideshare rental vehicles on either the Uber or Lyft platforms, coverage under the Company Insurance Policies are subordinate to the vehicle insurance coverage provided by Uber, Lyft or such other TNCs.

The Company believes that due to the development of the ridesharing economy and its anticipated growth trajectory, the commercial ridesharing economy market will reward the Company as an early entrant to the third-party vehicle rental business. Under the Rideshare Platform we intend to become the go-to booking destination and brand for ridesharing economy vehicle rentals in a TNC marketplace that connects owners and/or operators of standard passenger vehicles with ridesharing economy drivers. We believe that our product and service offerings on the Rideshare Platform will continue to be an attractive proposition for all ridesharing economy drivers either simply requiring a standard passenger vehicle to operate or otherwise struggling to qualify their personal vehicles under the Vehicle Inspection Requirements. Further, we believe that the Company will require additional capital investment to continue funding Rideshare, the Rideshare Platform or *www.rideshareental.com*, including technology, payments and advertising, for purposes of continuing to develop and scale the Rideshare Platform and business. Further, we believe there is an immediate opportunity and necessity to grow and scale the Rideshare Platform in new geographical territories for purposes of developing and strengthening the Company's brand and competitive advantage in the ridesharing economy vehicle rental market. For more information see "*Risk Factors*."

*Insurance Policy*

As of the date of this Prospectus, the Company together with a Managing General Underwriter ("MGU") maintains an insurance policy on behalf of the Company. Under the policy the MGU will handle all back-end insurance generation and processing through an API connection with the Company's databases. We believe that this MGU insurance policy has made it possible for us to launch our Rideshare Platform, which will also allow the Company to have other third-party fleet owners supply vehicles to drivers through our platform and have them covered under the terms of our insurance policy. Our insurance policy provides physical damage and liability coverage to all rideshare drivers and fleet owners under the Rideshare Platform. Under the terms of our policy, ridesharing drivers acquiring rental vehicles under our Rideshare Platform as well as owners of the rental vehicles are provided with an insurance ID card that lists each parties name and the vehicle VIN number. Further, customers to our Rideshare Platform pay daily (for the duration of the rental period) to become designated as a supplemental insured party under the Company's insurance policy. Under the terms of our policy, insurance coverage is valid from the date of commencement of the rental period up until the date that the vehicle is returned.

*Ambassador Referral Program*

The Company has further enhanced the monetization of the Rideshare Platform by creating and deploying the Rideshare Rental Ambassador program. Drivers renting cars from our Rideshare Platform can join the Ambassador program and refer other potential drivers and prospective customers to rent from the Rideshare Platform, providing our customers with additional income opportunities. The Company has designed and deployed a referral commissions team matrix that allows for both depth and breadth of commissionable referrals for the participating driver. As participating drivers add additional referred drivers to their down line, they progress in gaining additional levels of commission rewards. Eventually they are able to earn a free vehicle rental from Rideshare as a premium reward. This program requires that the driver continues to rent their vehicle from Rideshare in order to continue receiving commissions from other drivers' rentals under the Ambassador's down line. For further details on our Ambassador Referral Program, please visit *www.Ridesharerental.com/company/ambassador-program-terms-conditions*.

**Fleet Management Business**

On June 10, 2017, the Company formed the wholly-owned subsidiary, Distinct Cars, for purposes of developing a fleet management business. The Company's Fleet Management business maintains a fleet of brand new standard passenger vehicles to be subsequently rented directly to drivers in the ridesharing economy through the Rideshare Platform. The Company's fleet of vehicles, under lease contract and maintained by Distinct Cars, as well as other third-party vehicles will be made commercially available for rental bookings on the Rideshare Platform as well as on other third-party e-commerce booking platforms and/or through strategic partnerships and relationships. The Company seeks to provide drivers in the ridesharing economy with full-service vehicle rentals and fleet contract maintenance solutions for commercial standard passenger vehicles.

The Company's material operations for the Fleet Management business are primarily conducted in the State of California. As a provider of comprehensive, integrated vehicle rental and fleet management solutions, the Fleet Management business markets and manages short and long-term vehicle rentals to ridesharing economy drivers located in Los Angeles County.

The Company is focused on operating, developing and investing in its vehicle rental business with a focus on marketing directly to the peer-to-peer car sharing and ridesharing industry professionals. The Company is capable of meeting customers' needs, including, but not limited to a guaranty that all vehicles maintained under the Fleet Management business will comply with and pass the Ridesharing Qualification Requirements. Our Fleet Management product and service offering includes full-service vehicle rental(s) and contract maintenance, along with distribution center management and transportation management service. As of the date of this Prospectus, the Company's customer base is primarily ridesharing drivers located within Los Angeles County that are operating and performing driving services on behalf of a host of the private ridesharing TNCs (primarily Lyft and Uber). While our Fleet Management business is primarily concentrated within the State of California, Los Angeles County, the Company intends to expand our Fleet Management services and product offerings nationally.

In August 2017, following our announcement that we were shifting our primary corporate operations, we entered into a leasing arrangement for an initial group of twelve vehicles, with the intent of testing our fleet management concept within the ridesharing industry. Following the Company's proof on concept period, we expanded our Fleet Management business in December 2017 by adding an additional 135 vehicles to our fleet of vehicles. As of the date of this Prospectus, our full-service vehicle rental and contract maintenance under our Fleet Management segment is the Company's main operating line of business and primary revenue generating business segment. As of June 30, 2019, the Company Fleet Management business manages a fleet of approximately 347 vehicles under lease contract. During fiscal year 2017, professional ridesharing drivers contracted with private ridesharing TNCs for vehicle rental periods generally ranging from less than three days to six months. The rental vehicles made commercial available to customers by the Company are configured and guaranteed to be compliant with the Vehicle Inspection Requirements imposed on ridesharing vehicles by the private ridesharing TNCs (specifically, Uber and Lyft).

The Company believes that customers will rent vehicles offered by our Fleet Management business in order to reduce the complexity, cost and total capital associated with vehicle ownership. Further, we believe that due to our market focus on the ridesharing industry and the additional imposition of the Ridesharing Qualification Requirements imposed on ridesharing vehicles by the dominant private ridesharing TNCs, customers will be further incentivized to rent our Fleet Management vehicles to guarantee compliance with the Ridesharing Qualification Requirements.

Under a full-service rental agreement, the Company provides and fully maintains the vehicle, which is generally specifically configured to meet the Ridesharing Qualification Requirements.

*Fleet Management Software*

The Company has been an early adopter of technologies to leverage the Fleet Management business. To ensure that the Company's fleet of vehicles meet and comply with the Ridesharing Qualification Requirements and transmit relevant data our customers, the Company has fit its Fleet Management vehicles with fleet management GPS solution software, providing open platform fleet management solutions to businesses of all sizes. These full-featured solutions help the Company manage their drivers and vehicles by extracting accurate and actionable intelligence from real-time and historical location trip data. The telematics solutions for fleet optimization provide our Fleet Management vehicles with fitted software analytics and data involving (i) fuel efficiency; (ii) management of vehicle maintenance and (iii) prevention of vehicle wear and tear.

**Commercial Partnership Programs**

The Company has become a member of a commercial partnership program with Hyundai USA, a subsidiary of the Hyundai Motor Group. Hyundai provides and sells its vehicles in the United States through its subsidiary Hyundai USA (collectively, "Hyundai").

In June of 2017, the Company joined a commercial partnership program hosted by Hyundai as a commercial partnership member for purposes of developing the Company's Fleet Management segment. Under the terms of the Hyundai partnership program, Hyundai will extend special pricing of fleet vehicles to program members to be subsequently sold to the Company through selected Hyundai dealerships. The Company believes that the Hyundai commercial fleet management program will provide the Company with competitive pricing options on all purchases for brand-new Hyundai vehicles under lease and priority status on the availability and delivery of all Hyundai vehicles to be made through selected Hyundai dealerships. The Company's status as a commercial partnership member with Hyundai under the commercial fleet management program is a non-exclusive and non-binding arrangement between Hyundai and the Company.

The Hyundai vehicles to be purchased under the Hyundai fleet management program and delivered through dealerships are being financed and leased to the Company by ACME Auto Leasing. Under the Company's leasing agreements with ACME Auto Leasing, the Company acquires the right to title and possession of the Hyundai vehicles under a standard three-year leasing agreement with ACME Auto Leasing, LLC, in exchange for competitive pricing under all leases, with a $1 optional residual purchase at the end of the three-year lease term. Further, in exchange for attractive pricing from ACME Auto Leasing, LLC, on all leased Hyundai vehicles the Company has granted 350,000 shares of common stock to ACME Auto Leasing, LLC, under the terms of a Side Agreement.

The Company believes that availability of the Hyundai commercial partnership program is a key relationship for the Company's continuing operations. Any termination or suspension of our membership to the Hyundai commercial partnership program may potentially result in increases to the Company's cost of revenue which may have a material impact on the Company's operating expenses. For more information please see the section entitled "*Risk Factors*."

**The Ridesharing Industry**

At the most basic level, real-time ridesharing is a service that arranges one-time shared rides on short notice. Traditionally, ridesharing arrangements between two or more unrelated individuals for commuting purposes have been relatively inflexible, long-term arrangements. These commuting arrangements will establish reasonably fixed departure time schedules and driving responsibilities. The complexity of work and social schedules and the perceived increase in vehicle trip complexity, such as trip chaining, has made this type of commuting arrangement much less desirable. "*Real-time*" ridesharing attempts to provide added flexibility to ridesharing arrangements by allowing drivers and passengers to partake in occasional shared rides. The internet-connected, global positioning system ("GPS") enabled device automatically detects your current location, takes the home location that you have programmed in previously and searches the database for drivers traveling a similar route and willing to pick up passengers. According to Wikipedia.org, "*real-time*" ridesharing is defined as "*a single, or recurring ridesharing trip with no fixed schedule, organized on a one-time basis, with matching of participants occurring as little as a few minutes before departure or as far in advance as the evening before a trip is scheduled to take place*".

A number of TNCs located in San Francisco premiered apps for real-time ridesharing in early 2010. Several TNCs were introduced that were advertising as ridesharing, but in fact dispatched commercial operators similar to a taxi service. Transportation industry experts have frequently referred to these services as "*ridesourcing*" to clarify that drivers do not share a destination with their passengers. Rather, the "*ridesourcing*" app simply outsources rides to available commercial drivers. In 2013 an agreement was reached with California Public Utilities Commission creating a new category of service called "*Transportation Network Companies*" or "*TNCs*" to cover both real-time and scheduled ridesharing companies. Transportation Network Companies have faced regulatory opposition in many other cities, including Los Angeles, Chicago, New York City, and Washington, D.C, among others.

"*Ridesharing*" has been controversial, variously criticized as lacking adequate regulation, insurance, licensure, and training. One of the main so-called ridesharing (but actually ridesourcing) firms, Uber, was banned in Berlin and a number of other European cities. Opposition may also come from taxi companies and public transit operators because they are seen as alternatives. Early real-time ridesharing projects are believed to have begun in the 1990s, but they faced obstacles such as the need to develop a user network and a convenient means of communication. Gradually the means of arranging the ride shifted from telephone to internet, email, and smartphone; and user networks were developed around major employers and universities. As of 2006, the goal of taxi-like responsiveness still generally eluded the industry; "*next day*" responsiveness was generally considered the state of the art.

The term "*ridesharing*" was starting to become a misnomer, they are a lot more like successful private cab or taxi businesses that cater to a smartphone-toting clientele and actively rival traditional cab or taxi companies and having reliable and affordable door-to-door transportation in general can help expand car-free living. Given the fast rise of smartphone adoption globally, ridesharing's success doesn't come as a surprise. But there are many reasons why customers prefer to book those services versus taxis. Among those are a clear overview of pricing prior to booking, the ease and convenience of "*one-tap*" rides, the ability to monitor and follow drivers on map displayed on the user's smartphone, the convenience of a cashless transaction, fare splitting, and feedback options. The premier and probably most well know ridesharing service, Uber, was born when its founders became annoyed that they could not get a taxi in Paris. By eliminating the antiquated taxi dispatch system through technology (call and book taxi, call to request driver's location, call when taxi doesn't arrive), the founders of Uber created an innovative technology alternative to the traditional taxi dispatch system that has been widely adopted by users worldwide. By eliminating a key piece of the supply chain and streamlining efficiencies for the users, Uber was able to completely disrupt a century-old taxi industry. In essence, Uber and Lyft are really the two companies that dominate the market and Uber so far has won across the board: access, driver experience, customer experience, brand and funding.

58

The growth of the ridesharing economy has resulted in increasing consumer demand for ridesharing services, provided by Transportation Network Companies ("TNCs") such as Lyft, Gett and Uber, that offer a ridesharing economy service through mobile applications.

Ridesharing apps connect people who need a ride with people who have a vehicle and time to drive - notably, not necessarily people who are licensed taxi drivers. Ridesharing TNCs like Lyft, Gett and Uber provide a smartphone app that lets consumers hail a ride, set their destination, and pay without leaving the app itself. The benefits to the consumer is ease of use, availability of rides, and sometimes lower prices than traditional taxis. Many companies require at least some sort of certification for the drivers and take a portion of the drivers' fares. Ridesharing drivers can choose when they work (though they can receive bonuses for logging a certain number of hours) and provide their own vehicles. In the United States, ridesharing companies argue that the work-when-you-want arrangement qualifies drivers as contractors, not employees. Despite legal battles and controversy over surge pricing, ridesharing companies have exploded in popularity, both in the U.S. and internationally. Early entrants in the TNC app space, like Uber and Flywheel, were founded around 2009. Overall, the industry has raised more than $10 billion in venture funding.

We believe that we have strong economic prospects by virtue of the following dynamics of the industry:

- **_Continued Growth in Ridesharing Market._** The ridesharing services market has grown faster, gone to more places and has produced robust growth and consumer traffic figures since commercial introduction in approximately 2009. The pace of growth is also picking up. It has been reported that _Uber_ took six years before it reached a billion rides in December of 2015, but it took only six months for _Uber_ to get to two billion rides. In the U.S., the number of users of ridesharing services is estimated to increase from 8.2 million in 2014 to 20.4 million in 2020, producing a compounded annual growth rate of approximately 13.92% over the seven-year period.

- **_Globalization of Ridesharing_**. In the same vein, ridesharing which started as an experiment in California has grown into a global marketplace over a short period of time. Asia has emerged as a geographical territory to drive future growth. For example, _Didi Chuang_, the Chinese ridesharing company, completed 1.43 billion rides just in 2015 and it now claims to have 250 million users in 360 Chinese cities. Ridesharing is also acquiring deep roots in both India and Malaysia, and is making advances in Europe and Latin America, despite regulatory pushback.

- **_Expanding Choices_**. Consumer options in ridesharing are expanding to attract an even larger audience, such as carpooling and private bus services. The expansion of consumer options has also attracted mass transit customers to more expensive luxury options. In addition, it has been reported that dominant TNC businesses are experimenting with pre-scheduled rides and multiple stops on single trip gain to meet customer needs. Our Fleet Management business and fleet of rental vehicles are designed to put more certified ridesharing vehicles on the roadways to meet the increasing consumer demand of the availability of ridesharing services.

## Regulation of the Ridesharing Industry

In the current ridesharing marketplace, often times the TNCs (such as Uber or Lyft) generally takes the place of government in enforcing standards for drivers and vehicles, though all states and the District of Columbia now have basic driver background and minimum insurance requirements in place for TNCs. Each TNC has its own regulations at the corporate level. However, in many instances, state, local or federal governments are beginning to seriously assess the ridesharing industry and it is likely that regulations and mandated standards are imminent. For more information see section "_Vehicle Registration Requirements_."

## Our Opportunity

The increasing demand for ridesharing services has produced an increase in demand by TNC businesses for more ridesharing drivers and vehicles on the road at any given time. The growing demographic of ridesharing drivers, as determined on a global basis, has drawn ridesharing drivers to the ridesharing marketing to perform services for a host of private TNC businesses focused on ridesharing, such as Uber and Lyft.

Complicating this matter further, many potential ridesharing drivers drawn to the ridesharing market are being rejected or turned away from employment by the private ridesharing TNCs on account of the fact that the driver's personal vehicles fail to meet the Ridesharing Qualification Requirements imposed on all ridesharing vehicles by the private ridesharing TNCs. Private ridesharing TNCs impose certain vehicle safety tests and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs. Generally, the TNCs impose certain standard requirements on all ridesharing drivers and their respective vehicles (the "<u>Driver Qualification Requirements</u>") as well as additional vehicle safety tests, inspections and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs (the "<u>Vehicle Qualification Requirements</u>", together with the Driver Qualification Requirements, the "<u>Ridesharing Qualification Requirements</u>"). For more information see *"Ridesharing Qualification Requirements"*. According to an Uber spokesperson, 10%-15% who sign up to be drivers are qualified, but do not have the right kind of car and are unable to buy one due to bad credit. Further, the Company believes that this is resulting in a shortfall of ridesharing drivers on the road at any given time. Private ridesharing TNCs have responded to this issue by actively pursuing programs to get eligible ridesharing drivers into qualified cars that meet the Ridesharing Qualification Requirements. The Company believes that the TNC line of business and immense capital requirements in developing a fleet management business to service the growing ridesharing industry on such a large scale will restrict the ability of the private ridesharing TNCs to dominate the ridesharing vehicle rental market. Further, despite the financial resources and scale of the dominant TNCs in the ridesharing business, the Company believes that third-party vehicle rental providers are a necessity to the growth and service of a robust ridesharing market.

*Ridesharing Qualification Requirements*

The TNCs generally impose a host of requirements on potential ridesharing driver applicants seeking employment with TNCs such as Uber and/or Lyft. For example, prior to becoming a ridesharing driver, Uber and Lyft impose similar uniform requirements on all ridesharing vehicles and drivers. Generally, the ridesharing driver must meet the following standard "<u>Driver Qualification Requirements</u>":

- The ridesharing driver must obtain a minimum age of 21 years old;
- The ridesharing driver's vehicle must be a four-door car made in year 2007 or newer (in most cities- 2002 or newer for Los Angeles, Orange County, San Francisco);
- The ridesharing driver must have in-state auto insurance with the driver's name on the policy;
- The ridesharing driver must have an in-state driver's license, licensed in the US for at least one year;
- The ridesharing driver must have in-state plates with a current registration (commercial plates are acceptable as well);
- The ridesharing driver must have a clean driving record;
- The ridesharing driver must pass on the background check; and
- The ridesharing driver's vehicle must pass the Cosmetic Qualification Requirements (as defined herein).

In addition, the TNCs may impose cosmetic guidelines on all ridesharing vehicles providing ridesharing services on behalf of the private ridesharing company. Certain cosmetic features may prevent a potential ridesharing driver's vehicle from qualifying under the vehicle inspection on account of the following: (i) the vehicle includes a full-body wrap containing advertisements, or any large ads; (ii) the vehicle has holes or damage to the exterior; (iii) the vehicle has taxi decals or taxi-style paint; (iv) the vehicle has significant damage to the interior (including any torn seats, large permanent stains, strong permanent odors); (v) the vehicle has paint oxidation; or (vi) the vehicle has different colored hoods/doors; (vii) the vehicle has objectionable aftermarket modification (collectively, "<u>Cosmetic Qualification Requirements</u>").

In addition to the Driver Qualification Requirements, private ridesharing companies also require all potential ridesharing drivers to undergo a vehicle inspection test on all personal driver vehicles to be used by the potential ridesharing driver to perform ridesharing services on behalf of the private ridesharing company. In order to become a Uber or Lyft driver, a potential ridesharing driver's vehicle generally must pass the 19-point vehicle inspection to confirm that it meets the private ridesharing companies requirements.

A 19-point inspection is a standard vehicle inspection procedure to check a car in 19 specific areas to ensure that it conforms to safety and operational requirements. While the 19 points are the same for different companies, their procedures differ slightly. The process also varies based on the geographical location where the inspection is performed. The 19 points of the vehicle checked for inspection include headlights, tail-lights, indicator lights, stop lights, foot brakes, emergency/parking brake, steering mechanism, windshield, heat and air conditioning, front, rear and side windows, front seat adjustment mechanism, door controls (open, close, lock), horn, speedometer, body condition/ damage, muffler and exhaust system, condition or tires, interior and exterior rear-view mirrors and safety belts for driver and passengers. Any vehicle having a problem or issue with any of the inspection points will generally not pass the vehicle inspection and will be refused the opportunity to become a ridesharing driver for the private ridesharing company.

**Company Growth Strategy**

Our long-term strategy is focused on four priorities: expanding and diversifying our revenues; improving our operating effectiveness; enhancing the customer experience; and disciplined capital management.

*Expand and Diversify Revenues* —Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint from Los Angeles, throughout California and then to the rest of North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

*Improve Operating Effectiveness*—We are focused on generating continuous improvement across our operations, with an emphasis on building a strong safety culture, fleet management business, e-commerce bookings website, fleet availability and improving margins. We are continuing to build a highly professional and technology-enabled sales force and to optimize our sales territories to support our revenue growth objectives. We will continue to improve the effectiveness of our sales team with focused training, strong customer relationship management capabilities, and ongoing technology enhancements.

*Enhance the Customer Experience*—We seek to differentiate our business by delivering a superior customer experience through the variety and quality of the vehicles and services we offer, the ease of doing business with us and the added value we offer through services, products and technologies. Our focus on quality vehicle brands tailored to meet the Vehicle Qualification Requirements of the ridesharing industry is intended to meet the preferences of ridesharing drivers, including the expectations for reliable, safe, efficient and effective maintained vehicles. We expect to add more expertise across our team to help our customers achieve the best results for their projects. In developing and providing vehicle rental related technologies, we are focused on meeting customer expectations related to convenience and on-demand access to data and information.

*Disciplined Asset Management*—We manage our vehicle rental fleet to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment.

## Intellectual Property

We generally rely on trademark, copyright and trade secret laws and employee and third-party non-disclosure agreements to protect its intellectual property and proprietary rights. We are currently in the process of pursuing trademark protection for our name and logos in the United States. Although we believe that our pending trademark applications will be granted by the United States Patent and Trademark Office, there can be no assurance that any trademarks will be granted or that any trademark relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We own registered trademarks "*YayYo®*" and the service mark for the stylized design representing an automobile.

In the future we may rely on patents to protect our intellectual property and proprietary technology, to the extent feasible, and plans to consult with intellectual property counsel to determine what patents we may be able to file to protect its intellectual property. As of the date of this Prospectus, we have not filed any patents in the United States or any other country. Although we believe that some of our technology may be patentable, there can be no assurance that any patents will be granted or that any patent relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We believe that due to the rapid pace of technological innovation for technology, mobile and internet products, our ability to establish and maintain a position of technological leadership in the ridesharing industry depends more on the skills of its development personnel than the legal protection afforded its existing technology. For more information see the section "*Risk Factors*".

## Employees

As of the date of this Prospectus, we have approximately 21 full-time employees and 3 consultants, based at our offices. None of our employees are subject to a collective bargaining agreement, and we believe that our relations with our employees generally are good.

## Regulatory

We are subject to a number of U.S. federal and state and foreign laws and regulations that involve matters central to our business. These laws and regulations may involve privacy, data protection, intellectual property, competition, consumer protection, export taxation or other subjects. Many of the laws and regulations to which we are subject are still evolving and being tested in courts and could be interpreted in ways that could harm our business. In addition, the application and interpretation of these laws and regulations often are uncertain, particularly in the new and rapidly evolving industry in which we operate. Because laws and regulations have continued to develop and evolve rapidly, it is possible that we may not be, or may not have been, compliant with each such applicable law or regulation. In addition to the foregoing, we are also subject to the following:

Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

***Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows. For additional information please see the section entitled "Risk Factors."***

## Litigation

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We have received, and may in the future continue to receive, claims from third parties asserting, among other things, infringement of their intellectual property rights. Future litigation may be necessary to defend ourselves, our partners and our customers by determining the scope, enforceability and validity of third-party proprietary rights, or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors. To date, we have not been made aware of any actual, pending or threatened litigation against the Company.

## Property

We lease and maintain our primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. We also lease and maintain executive offices at 6600 Sunset Blvd., Los Angeles, CA 90028, where the majority of our operations and staff will conduct activities on a daily basis. We do not currently own any real estate.

## MANAGEMENT

The following are our executive officers and directors and their respective ages and positions as of October 31, 2019.

| Name | Position | Age | Tenure with Company |
|------|----------|-----|---------------------|
| **Executive Officers:** | | | |
| Jonathan Rosen | Chief Executive Officer | 59 | Since February 2019 |
| Kevin F. Pickard | Chief Financial Officer, Secretary | 55 | Since June 2017 |
| Laurie DiGiovanni | Chief Operating Officer | 59 | Since May 2016 |
| | | | |
| **Directors:** | | | |
| Kevin F. Pickard | Director | 55 | Since October 2017 |
| Jeffrey J. Guzy | Director | 68 | Since October 2017 |
| Christopher Miglino | Director | 50 | Since October 2017 |
| Harbant S. Sidhu | Director | 61 | Since October 2017 |
| Paul Richter | Director | 64 | Since July 2019 |

During the past five (5) years, none of the persons identified above has been involved in any bankruptcy or insolvency proceeding or convicted in a criminal proceeding, excluding traffic violations and other minor offenses. There is no arrangement or understanding between the persons described above and any other person pursuant to which the person was selected to his or her office or position.

*Jonathan Rosen, Chief Executive Officer.* Mr. Rosen is the Chief Executive Officer of the Company. Mr. Rosen has more than 25 years' experience serving as an executive driving revenue, operations and marketing for leading public and private companies. For the past 15 years, Mr. Rosen has focused on automotive, software and media markets at both successful startups and global companies. He held the founding Chief Marketing and Chief Revenue Officer positions at Involvesoft, a leading SaaS software company (2017-2018), where he was brought in by the company's venture bankers to launch the entity and raise capital. Mr. Rosen held multiple interim executive and advisory positions to numerous early-stage companies similar to YayYo. His experience over the last five years includes interim executive or consulting roles at WeWork (2017-2018), Beachbody (2015-2016), Ziff Davis/J2 Equities (2015), iInside and Opus Research (2014-2015) and others. Prior to that he held executive roles at companies including Autobytel, Webvisible, and America Online. At AOL, he served as the Executive Director of Strategy, where he shepherded high-value acquisitions and partnerships including Advertising.com; and architected their first traffic acquisition programs. Rosen served as Senior Vice President for Autobytel – one of the largest automotive search and online properties where he led business development, ad networks and advertising sales and operations. Early in his career, Mr. Rosen held senior management roles in the computer storage industry and was the founding President of iProspect; now the world's largest search marketing agency and a subsidiary of Dentsu.

*Laurie DiGiovanni, Chief Operating Officer.* Ms. DiGiovanni is the Chief Operating Officer of the Company. She has served as Chief Operating Officer since May 2016. In addition, Ms. DiGiovanni served as Chief Executive Officer of the Company from October 4, 2018 to November 17, 2018. Since 2012, Ms. DiGiovanni has held marketing and operating executive positions at Beverly Hills Rent a Car and Executive Transportation pursuant to which Ms. DiGiovanni managed national corporate expansions and activation of transportation industry leading brands and was executive producer for a range of marketing campaigns at auto shows and transportation industry live events. Ms. DiGiovanni manages all business operations of the Company and its subsidiaries including driver training and the Fleet Management business segment. Ms. DiGiovanni is the founder of the Association for Finance and Insurance Professionals (AFIP), an association that has certified tens of thousands for more ethical car buying practices, and mandatory for auto industry employees and implemented in leading global automotive markets. She also played key roles in the launch of many automotive initiatives, including managing new divisions and brands for Beverly Hills Travel and Lifestyle and American Dream Classics; serving as Director of Training for CarsDirect.com; and leading marketing and customer experience campaigns for Barrett-Jackson Car Auction. Ms. DiGiovanni also has direct brand experience within the automotive industry, including project management and training positions with Toyota, Mazda, and Nissan. Ms. DiGiovanni has a Bachelor of Arts degree from California State University, Fullerton.

_Kevin F. Pickard, Chief Financial Officer, Secretary and Director_. Mr. Pickard is the chief financial officer, secretary and a director of the Company and has worked with the Company since October 2017. Since 2000, Mr. Pickard has been providing management consulting services through Pickard & Company, CPAs to small and medium-sized companies, included due diligence on potential acquisitions, the preparation of projections and business plans, assistance with restructuring of companies, posturing companies for initial public offerings, review and preparation of filings with the Securities and Exchange Commission. Prior to 2000, Mr. Pickard was a partner of Singer Lewak Greenbaum & Goldstein, LLP, Los Angeles, California, where he co-managed the accounting its securities industry practice group. Mr. Pickard also worked at PricewaterhouseCoopers, LLP (formerly, Coopers & Lybrand, LLP) where he focused on auditing companies in insurance, high-tech and industries. Mr. Pickard holds a Bachelor's of Science in Accounting and a Master of Accountancy from Brigham Young University. Mr. Pickard is currently a licensed Certified Public Accountant in North Carolina, and California. Mr. Pickard's experience in accounting and finance qualify him for a position on our board of directors.

_Jeffrey J. Guzy, Director_. Mr. Guzy serves as a business development consultant and entrepreneur in Arlington, Virginia. Mr. Guzy is currently working with CoJax Oil and Gas Corporation and PrecyseTech. Prior to that, Mr. Guzy served, from October 2007 to August 2010 as the President of Leatt Corp. and has remained a director of that public company since April 2007. Mr. Guzy has an MBA in Strategic Planning and Management from The Wharton School of the University of Pennsylvania; a M.S. in Systems Engineering from the University of Pennsylvania; a B.S. in Electrical Engineering from Penn State University; and a Certificate in Theology from Georgetown University. Mr. Guzy has served as an executive manager or consultant for business development, sales, customer service and management in the telecommunications industry, specifically, with IBM Corp., Sprint International, Bell Atlantic Video Services, Loral CyberStar and FaciliCom International. Mr. Guzy has also started his own telecommunications company providing Internet services in Western Africa. He serves as an independent director and chairman of the audit committee of Capstone Companies, Inc., a public corporation. Mr. Guzy's financial background, as well as his ability to serve as our audit committee financial expert, qualifies him to serve as a member of our board of directors.

_Christopher Miglino, Director_. Mr. Miglino serves as a director of the Company. Mr. Miglino has long been at the nexus of consumers, brands, social and lifestyle media, cause marketing and the enlightened, sustainable business movement. Mr. Miglino is the founder and CEO of Social Reality. Since 2010, Mr. Miglino has served as the Chief Executive Officer of Social Reality. Prior to founding Social Reality, Mr. Miglino served as the Chief Executive Officer of Lime Ad Network, a vanguard in the green and sustainable online business arena that connected consumers and brands with a collection of more than 250 green and socially conscious businesses. From June 2004 until August 2008, Mr. Miglino was CEO of Conscious Enlightenment, where he oversaw their day to day operations in the publishing and advertising industry. From 2004 until 2008, Mr. Miglino served as a board member for Golden Bridge Yoga in Los Angeles, a studio that encompasses over 20,000 square feet of yoga spaces including a restaurant. Mr. Miglino's extensive knowledge of marketing, advertising and social media make him valuable as a member of our board of directors.

_Harbant S. Sidhu, Director_. Mr. Sidhu serves as a director of the Company. Mr. Sidhu is a design engineer and founder of Advanced Tek Group, Inc. (formerly Magnaspec, Inc.), a private aerospace manufacturing business. Since 2012, Mr. Sidhu has operated Advanced Tek Group, Inc., managing all aspects of the operating business. Mr. Sidhu has experience in personnel management and oversite, aerospace and defense engineering, sales, manufacturing, accounting and operational experience in the aerospace and defense manufacturing industry. Mr. Sidhu has performed unclassified contracting work in components production for Mexico's Department of Defense. Mr. Sidhu graduated as an electrical engineer in 1980 from Punjab University, India. Mr. Sidhu's experience in human resources coupled with his business experience qualifies him to serve on our board of directors.

_Paul Richter, Director._ Mr. Richter is a member of the board of directors of the Company since July 2019. In addition, he previously served as a director of the Company from October 2017 to November 2018. Since 1986, Mr. Richter, a licensed attorney, has performed legal services in the areas of securities and corporate law representing public and private companies in the U.S. Mr. Richter's legal practice focuses predominantly on SEC/state securities law compliance (including public and private securities offerings and SEC filings); corporate governance law compliance; contracts; commercial transactions; regulatory dispute resolution; business start-up formation and funding; employee-employer dispute resolution; corporate compensation plans; business immigration; and compliance with FINRA, NASDAQ and The OTC Markets Group, Inc. rules and regulations. In addition, Mr. Richter has experience in cross-border transactional matters having performed U.S. legal work for companies based in Hong Kong, India, Poland, Norway, Canada, United Kingdom and U.A.E. Mr. Richter is a licensed attorney with the state bar of Virginia.

Mr. Richter has an L.L.M. in Securities Regulation from Georgetown Law Center, Washington, D.C. (1987) and a J.D. from George Mason University Law School, Arlington, Virginia (1985). He has a B.A. with honors from Knox College, Galesburg, Illinois. Mr. Richter originated and authored the first few editions of _Corporate Anti-Takeover Defenses: The Poison Pill Device_ (published by Clark Boardman Co. and then by West Publishing for 18 annual editions) and he currently updates or assists in updating the following legal publications of Thomson Reuters West that were originally authored by other persons: _Securities Public and Private Offerings_ _(since 2006); Acquisitions and Mergers in Negotiated and Contested Transactions (since 2008); and Designing and Effective Securities and Corporate Compliance Program_, (2017-2018 edition) (Corporate Compliance Series). He authored two CLE lectures and materials on Securities Law for Access MCLE (2016). Mr. Richter's experience in corporate and securities law matters coupled with his international experience qualifies him to serve on our board of directors.

**Code of Ethics**

Our Board plans to adopt a written code of business conduct and ethics ("Code") that applies to our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer or controller, or persons performing similar functions. We intend to post on our website a current copy of the Code and all disclosures that are required by law in regard to any amendments to, or waivers from, any provision of the Code.

**Voting Trust**

Mr. El-Batrawi has entered into a Voting Trust Agreement pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters, other than certain extraordinary matters, presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. Mr. El-Batrawi's entrance into the Voting Trust Agreement is a condition for the Company's approval for listing on The Nasdaq Capital Market.

The Trust shall be irrevocable, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of Nasdaq, or (b) the date upon which the Company is not listed on a security exchange controlled by Nasdaq.

The trustee, initially one of our directors, Harbant S. Sidhu, shall have discretion to vote the Trust's shares on all extraordinary matters which shall include any merger, consolidation, business combination, share exchange, restructuring, recapitalization or acquisition involving the Company or any similar transaction or the sale, lease, exchange, pledge, mortgage or transfer of all or a material portion of the Company's assets.

**Board Leadership Structure and Risk Oversight**

The Board oversees our business and considers the risks associated with our business strategy and decisions. The Board currently implements its risk oversight function as a whole. Each of the Board committees, as set forth below, will also provide risk oversight in respect of its areas of concentration and reports material risks to the board for further consideration.

**Board of Directors**

Our business and affairs are managed under the direction of our Board. Our Board consists of five directors, three of whom qualify as "independent" under the listing standards of Nasdaq.

Directors serve until the next annual meeting and until their successors are elected and qualified. Officers are appointed to serve for one year until the meeting of the Board following the annual meeting of shareholders and until their successors have been elected and qualified.

**Director Independence**

Our board of directors are composed of a majority of "independent directors" as defined under the rules of Nasdaq. We use the definition of "*independence*" of Nasdaq to make this determination. Nasdaq Listing Rule 5605(a)(2) provides that an "*independent director*" is a person other than an officer or employee of the company or any other individual having a relationship which, in the opinion of the Company's Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. The Nasdaq listing rules provide that a director cannot be considered independent if:

- the director is, or at any time during the past three (3) years was, an employee of the company;

- the director or a family member of the director accepted any compensation from the company in excess of $120,000 during any period of twelve (12) consecutive months within the three (3) years preceding the independence determination (subject to certain exemptions, including, among other things, compensation for board or board committee service);

- the director or a family member of the director is a partner in, controlling shareholder of, or an executive officer of an entity to which the company made, or from which the company received, payments in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenue for that year or $200,000, whichever is greater (subject to certain exemptions);

- the director or a family member of the director is employed as an executive officer of an entity where, at any time during the past three (3) years, any of the executive officers of the company served on the compensation committee of such other entity; or

- the director or a family member of the director is a current partner of the company's outside auditor, or at any time during the past three (3) years was a partner or employee of the company's outside auditor, and who worked on the company's audit.

Under such definitions, our Board has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment and affiliations, our Board has determined that Jeffrey J. Guzy, Christopher Miglino, Paul Richter and Harbant S. Sidhu are all independent directors of the Company. However, our common stock is not currently quoted or listed on any national exchange or interdealer quotation system with a requirement that a majority of our Board be independent and, therefore, the Company is not subject to any director independence requirements.

## Committees of the Board of Directors

Our Board has established an audit committee and a compensation committee. Our Board has not yet adopted procedures by which stockholders may recommend nominees to the Board of Directors. The composition and responsibilities of each of the committees of our Board is described below. Members serve on these committees until their resignation or until as otherwise determined by our board of directors.

## Audit Committee

We have established an audit committee consisting of Harbant Sidhu, Paul Richter and Jeffrey J. Guzy. In addition, our Board has determined that Mr. Guzy is an audit committee financial expert within the meaning of Item 407(d) of Regulation S-K under the Securities Act of 1933, as amended, or the Securities Act. The audit committee's duties, which are specified in our Audit Committee Charter, include, but are not limited to:

- reviewing and discussing with management and the independent auditor the annual audited financial statements, and recommending to the board whether the audited financial statements should be included in our annual disclosure report;
- discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of our financial statements;
- discussing with management major risk assessment and risk management policies;
- monitoring the independence of the independent auditor;
- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law;
- reviewing and approving all related-party transactions;
- inquiring and discussing with management our compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by our independent auditor, including the fees and terms of the services to be performed;
- appointing or replacing the independent auditor;
- determining the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;
- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies; and
- approving reimbursement of expenses incurred by our management team in identifying potential target businesses.

The audit committee is composed exclusively of "independent directors" who are "financially literate" as defined under the Nasdaq listing standards. The Nasdaq listing standards define "financially literate" as being able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement.

In addition, the Company intends to certify to Nasdaq that the committee has, and will continue to have, at least one member who has past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background that results in the individual's financial sophistication.

## Compensation Committee

We have established a compensation committee of the board of directors to consist of Christopher Miglino and Harbant S. Sidhu, each of whom is an independent director. Each member of our compensation committee is also a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act, or Rule 16b-3, and an outside director, as defined pursuant to Section 162(m) of the Code, or Section 162(m). Mr. Miglino is the chairman of the compensation committee. The compensation committee's duties, which are specified in our Compensation Committee Charter, include, but are not limited to:

- reviews, approves and determines, or makes recommendations to our board of directors regarding, the compensation of our executive officers;
- administers our equity compensation plans;
- reviews and approves, or makes recommendations to our board of directors, regarding incentive compensation and equity compensation plans; and
- establishes and reviews general policies relating to compensation and benefits of our employees.

## Non-Employee Director Compensation

In November 2017, the Company entered into two separate independent director agreements with Jeffrey J. Guzy and director Paul Wesley Richter, each an independent director of the Company (each a "Subject Director" and, collectively, the "Subject Directors"), pursuant to which the Company has agreed to pay each Subject Director a flat, fixed cash fee of $2,500 for each fiscal quarter that each Subject Director serves as an independent director on the board of directors of the Company (the "Subject Director Agreements"). The first payment under Subject Director Agreements was due and payable on or before November 30, 2017 for the fourth fiscal quarter of 2017.

**Family Relationships**

There are no family relationships among any of our officers or directors.

**Involvement in Certain Legal Proceedings**

Except as disclosed below, to our knowledge, none of our current directors or executive officers has, during the past ten (10) years:

- been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

- had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two (2) years prior to that time;

- been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in any type of business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;

- been found by a court of competent jurisdiction in a civil action or by the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

*YayYo, Inc., vs. Hurst Capital LLLP, Zach Hurst, Austin Hurst, Ryan O'Connor, Scott Carl Edwards, Robert Lisiescki, Christopher John Gilbert, Joseph Andreini III, and Joseph Hoffman.*

On November 21, 2016, the Company filed a lawsuit in U.S. District Court, for the Central District of California against Hurst Capital LLLP, Zach Hurst, Austin Hurst, Ryan O'Connor, Scott Carl Edwards, Robert Lisiescki, Christopher John Gilbert, Joseph Andreini III, and Joseph Hoffman (collectively, the "Defendants"). The lawsuit alleges claims for fraud, fraudulent inducement and concealment, negligent misrepresentation, unfair business practices, intentional interference with contractual relations and prospective economic relations, and conversion, based on the Company's belief that the Defendants made fraudulent and intentionally misleading representations to induce the Company to retain their services in connection with building our website and mobile applications, failed to satisfy the terms of their engagement with the Company and attempts to charge the Company for services which was never performed or was subpar. On February 23, 2018, the Company entered into a settlement agreement and mutual release by and between Ryan O'Connor, Robert Lisiescki, Christopher John Gilbert, and Joseph Hoffman pursuant to which the parties agreed to settlement and dismiss the action and to sever, release and discharge and terminate all rights, obligations and liabilities against the Defendants.

Except as set forth above and in our discussion below in "*Certain Relationships and Related Transactions*," none of our directors or executive officers has been involved in any transactions with us or any of our directors, executive officers, affiliates or associates which are required to be disclosed pursuant to the rules and regulations of the SEC.

We are not currently a party to any legal proceedings, the adverse outcome of which, individually or in the aggregate, we believe will have a material adverse effect on our business, financial condition or operating results.

70

**EXECUTIVE COMPENSATION**

The following table illustrates the compensation paid by the Company to its Chief Executive Officer, its two most highly compensated executive officers other than the Chief Executive Officer who were serving as executive officers at the end of the last completed fiscal year, and up to one additional individual for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the last completed fiscal year. We refer to these individuals as the "Named Executive Officers". The disclosure is provided for the years ended December 31, 2018 and December 31, 2017.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Benefits ($) **(4)** | Option Award ($) **(5)** | Total ($) |
|---|---|---|---|---|---|---|
| Laurie DiGiovanni, Former Chief Executive Officer and Chief Operating Officer, Former Director (1) | 2018 | 120,000 | — | — | — | 120,000 |
| | 2017 | 120,000 | — | — | — | 120,000 |
| Kevin F. Pickard, Chief Financial Officer, Secretary, Director | 2018 | 66,000 | — | 904,468 | — | 970,468 |
| | 2017 | 16,800 | — | 1,356,703 | — | 1,373,503 |
| Ramy El-Batrawi, Former Chief Executive Officer, Former Director (6) | 2018 | 205,000 | — | — | — | 205,000 |
| | 2017 | 286,300 | — | — | — | 286,300 |
| Anthony Davis, Former President, Chief Executive Officer, Director | 2018 | - | — | — | — | — |
| | 2017 | 20,000(2) | — | — | — | 20,000 |
| Robert W. Vanech, Former Chief Financial Officer, Treasurer, Secretary, Director | 2018 | - | — | — | — | — |
| | 2017 | 20,000(3) | — | — | — | 20,000 |

(1) Ms. DiGiovanni has served as Chief Operating Officer since May 2016. Ms. DiGiovanni served as Chief Executive Officer from October 4, 2018 to November 17, 2018.

(2) Executive compensation in the amount of $10,000 payable for each of the months of January and February 2017.

(3) Executive compensation in the amount of $10,000 payable for each of the months of January and February 2017.

(4) Any values reported in the "Other Compensation", if applicable, column represents the aggregate grant date fair value, computed in accordance with Accounting Standards Codification ("ASC") 718 Share Based Payments, of grants of stock options to each of our named executive officers and directors.

(5)  The amount included in the "Option Awards" column does not reflect compensation actually received by the Named Executive Officer but represents the compensation cost that we recognized in each year presented, determined in accordance with FASB ASC 718. On December 1, 2016, each of Mr. Davis and Mr. Vanech received non-qualified stock options expiring on December 31, 2018, entitling them to purchase 100,000 shares of Company common stock at an exercise price of $1.00 per share at any time on or after June 1, 2017. On June 9, 2017, Mr. Pickard received non-qualified stock options to purchase up to an aggregate of 300,000 shares of underlying Company common stock expiring on December 31, 2020, provided, further, that as of December 31, 2018, options to purchase an aggregate of 300,000 underlying shares of Company common stock are vested and exercisable. All such options terminate within three months of each employee ceasing to be in the continuous employment of the Company.

(6)  On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company upon the appointment of Jonathan Rosen as Chief Executive Officer. Mr. El-Batrawi resigned as our director effective as of September 1, 2019.

71

The following table provides information about equity awards granted to our named executive officers that were outstanding on December 31, 2018.

| Name | Number of securities underlying unexercised options (#) exercisable | | Number of securities underlying unexercised options (#) unexercisable | Equity incentive plan awards: Number of securities underlying unexercised unearned options (#) | Options Exercise Price ($) | Options Expiration Date | Number of shares or units of stock that have not vested (#) | Market value of shares of units of stock that have not vested ($) | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested (#) | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | |
| Ramy El-Batrawi (1) | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| Laurie DiGiovanni (2) | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| Kevin F. Pickard | 300,000 | | — | — | $ 8.00 | 12/31/2020 | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |
| | — | | — | — | $ — | */*/* | — | — | — | — |

(1) On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company upon the appointment of Jonathan Rosen as Chief Executive Officer. In addition, Mr. El-Batrawi resigned as our director effective as of September 1, 2019.

(2) Ms. DiGiovanni has served as Chief Operating Officer since May 2016. Ms. DiGiovanni served as Chief Executive Officer from October 4, 2018 to November 17, 2018.

**Employment Agreements**.

As of December 31, 2018, the Company had no employment agreements with any of its named executive officers. The Company has entered into an oral agreement with its Chief Executive Officer, Jonathan Rosen, for an annual salary of $300,000, retroactive to his start date of February 1, 2019. The Company also agreed to issue a restricted share grant of 500,000 shares of common stock with one-third of the restricted shares vesting upon the closing of the Company's initial public offering with the remainder vesting ratably each month over the twenty-four months following the initial public offering.

On November 29, 2016, the Company and Mr. Davis, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Davis's first three months of service and performance under his term of employment with the Company. As set forth under the employment offer, Mr. Davis was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and an additional $10,000 for service performed by Mr. Davis during the month of February 2017.

On November 29, 2016, the Company and Mr. Vanech, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Vanech first three months of service and performance under his term of employment. As set forth under the employment offer, Mr. Vanech was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and (iii) an additional $10,000 for service performed by Mr. Vanech during the month of February 2017.

**Board Compensation**

During the fiscal year ended December 31, 2018, Jeffrey J. Guzy and director Paul Wesley Richter received $7,500 in cash for board service fees. For more information please see the section entitled "*Non-Employee Director Compensation*" above.

## PRINCIPAL STOCKHOLDERS

The following table sets forth certain information, as of October 31, 2019, with respect to the holdings of (1) each person who is the beneficial owner of more than 5% of Company common stock, (2) each of our directors, (3) each executive officer, and (4) all of our current directors and executive officers as a group.

Beneficial ownership of the common stock is determined in accordance with the rules of the Securities and Exchange Commission (the "SEC") and includes any shares of Company common stock over which a person exercises sole or shared voting or investment power, or of which a person has a right to acquire ownership at any time within 60 days of October 31, 2019. Except as otherwise indicated, we believe that the persons named in this table have sole voting and investment power with respect to all shares of common stock held by them. Applicable percentage ownership in the following table is based on 26,802,976 shares of common stock issued and outstanding before the offering, and 29,302,976 after the offering assuming a common stock offering of 2,500,000 shares (excluding 375,000 shares which may be sold upon exercise of the underwriters' over-allotment option), plus, for each individual, any securities that individual has the right to acquire within 60 days of October 31, 2019.

To the best of our knowledge, except as otherwise indicated, each of the persons named in the table has sole voting and investment power with respect to the shares of our common stock beneficially owned by such person, except to the extent such power may be shared with a spouse. To our knowledge, none of the shares listed below are held under a voting trust or similar agreement, except as noted. To our knowledge, there is no arrangement, including any pledge by any person of securities of the Company, the operation of which may at a subsequent date result in a change in control of the Company.

| Name and Address of Beneficial Owner | Title | Beneficially Owned | Percent of Class Before Offering | Percent of Class After Offering |
|---|---|---|---|---|
| **Officers and Directors** [1] | | | | |
| Jonathan Rosen | Chief Executive Officer | — | — | — |
| Kevin F. Pickard [2] | Chief Financial Officer and Director | 300,000 | 1.1% | 1.0% |
| Laurie DiGiovanni | Chief Operating Officer | — | — | — |
| | | | | |
| Jeffrey J. Guzy | Director | — | — | — |
| Christopher Miglino | Director | — | — | — |
| Harbant S. Sidhu | Director | — | — | — |
| Paul Richter | Director | — | — | — |
| **Officers and Directors as a Group (total of 7 persons)** | | **300,000** | **1.1%** | **1.0%** |
| **5% Stockholders** | | | | |
| X, LLC [3] [5] | | 2,900,000 | 10.8% | 9.9% |
| Gray Mars Venus Trust, Arizona 2015 [4] [5] | | 10,325,000 | 38.5% | 35.2% |
| Bellridge Capital, L.P. [5] [6] | | 2,400,000 | 8.5% | 7.8% |
| David Haley [5] [7] | | 2,844,945 | 10.6% | 9.7% |
| James Malackowski [5] [8] | | 2,758,824 | 10.3% | 9.4% |
| John O'Hurley [5] [9] | | 2,018,750 | 7.5% | 6.9% |
| Acuitas Group Holdings, LLC [5] [10] | | 1,654,412 | 6.2% | 5.7% |

* Less than 1%

(1) Unless otherwise indicated, the principal address of the named directors and officers of the Company is c/o YayYo, Inc., 433 N Camden Dr., # 600 Beverly Hills, CA, 90210.

(2) Includes non-qualified stock option to purchase up to an aggregate of 300,000 shares of common stock.

(3) Common stock beneficially owned by Ramy El-Batrawi are held of record by X, LLC, which is an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and director. Its address is 2635 Astral Dr., Los Angeles, CA 90046. Mr. El-Batrawi has voting and dispositive control over any securities owned of record by X, LLC. Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

(4) Gray Mars Venus Trust, Arizona 2015, an entity beneficially owned and controlled by John Gray. Its address is 75 Avon Ave, Mill Valley, CA 94941.

(5) As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, agreed to sell 12,525,000 of its 15,425,000 shares of the Company's common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration under the Securities Act to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. X, LLC transferred all rights of ownership to the purchasers. The purchasers shall be entitled to receive all dividends and distributions, shall have the power to exercise all voting rights and may sell or pledge the Private Shares. The Private Shares, however, shall not be electronically transferred to the purchasers' account until the pricing of this public offering.

(6) Includes the following: (i) 650,000 shares of common stock, (ii) 1,500,000 underlying shares of common stock to be acquired upon the exercise of the Selling Securityholder Warrant, and (iii) an option (exercisable at any time by Bellridge Capital, L.P.) from a non-affiliate shareholder of the Company to purchase 250,000 shares of issued and outstanding common stock of the Company from the non-affiliate shareholder. Bellridge Capital LLC ("BC LLC") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described. Bellridge Capital. L.P.'s address is 515 E. Las Olas Boulevard, #120A, Fort Lauderdale, FL 33301.

(7) The address of the stockholder is 32107 W Lindero Canyon Dr., #120, Westlake Village, CA 91361. Includes 80,000 shares of common stock owned by American Business Insurance Services, Inc. Mr. Haley is the Chief Executive Officer of American Business Insurance Services, Inc. and in such capacity has the right to vote and dispose of the securities held by such entity.

(8) The address of the stockholder is 330 W. Wellington Ave., Chicago, IL 60605.

(9) The address of the stockholder is 1710 Monte Cielo Ct., Beverly Hills, CA 90210.

(10) Acuitas Group Holdings, LLC, an entity beneficially owned and controlled by Terren Peizer. Its address is 11601 Wilshire Blvd #1100, Los Angeles, CA 90025. Mr. Peizer has voting and dispositive control over any securities owned of record by Acuitas Group Holdings, LLC.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In addition to the arrangements, discussed in the sections titled "*Directors, Executive Officers and Corporate Governance*" and "*Executive Compensation*" the following is a description of each transaction since June 21, 2016 and each currently proposed transaction in which:

- we have been or are to be a participant;

- the amount involved exceeded or exceeds the lesser of $120,000 or one percent of our total assets at the end of our last two completed fiscal years; and

- any of our directors, executive officers or holders of more than 5% of our outstanding capital stock, or any immediate family member of, or person sharing the household with, any of these individuals or entities, had or will have a direct or indirect material interest.

*Selling Securityholder Transactions*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K, in the original principal amount of $222,222 (the "First Note"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of YayYo, Inc. (including a pledge of securities, owned as of record and beneficially by YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired.

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K and "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares of common stock (the "Warrant Shares"), with an exercise price of $4.00 per share (the "Warrant") and 150,000 commitment shares of common stock (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. The Selling Securityholder Warrant expire five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a new note payable for $1,296,018. This note payable is due the earlier of November 30, 2019 or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

We are party to an investors' rights agreement with the Selling Securityholder, a security holder of the Company under Item 404(a) of Regulation S-K, which provides, among other things, that certain holders of our capital stock and securities have the right to demand that we file a registration statement or request that their shares of our capital stock or common stock equivalents be covered by a registration statement that we are otherwise filing under this prospectus. See the section titled "*Description of Securities— Registration Rights.*"

75

*X, LLC*

During the fiscal year ended December 31, 2017 and the periods from June 21, 2016 (inception) to December 31, 2016, X, LLC, a limited liability company owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, issued to the Company advances of a total of $50,000 and $75,000, respectively. As of December 31, 2017, $125,000 of these loan advances were repaid in full. The loan advances were non-interest bearing and due upon demand. At December 31, 2018 and December 31, 2017, there was no balance owed under the note.

During the period from June 21, 2016 (inception) to October 31, 2016, the Company paid management fees of $110,000 to X, LLC, a company that is beneficially owned and controlled by Ramy El-Batrawi. During the year ended December 31, 2018 and December 31, 2017, the Company paid management fees of $205,000 and $286,300, respectively, to a company that is owned by the Company's majority stockholder.

On January 6, 2017, the Company received $50,000 from Chase Financing, Inc., ("CFI") and issued its 10% original issue discount senior secured convertible note in the amount of $55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017, the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note"). Subsequent to the Second CFI note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms.

Pursuant to the terms, the CFI Notes were secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and were convertible at the option of the holder into shares of our common stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our common stock during the 20 trading days immediately prior to the date of conversion. In an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI notes by the Company, Ramy El-Batrawi and X, LLC (an entity wholly owned and controlled by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge Agreement with CFI (the "Guaranty and Pledge Agreement"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our common stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty and Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a common stock Purchase Agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our common stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of $1.00. Under the Stock Purchase Agreement, and in addition to the 200,000 shares of common stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our common stock, held as of record and beneficially by X, LLC, equal to 2% of the number of shares of common stock issued or underlying common stock equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three months. As of December 31, 2017, the CFI Notes have been repaid in full by the Company.

76

*Lexicon Labs*

On September 28, 2016, YayYo, LLC entered into a product management proposal with Lexicon Labs (the "Product Management Proposal"), whereas Lexicon Labs shall use its own personnel and other assets to oversee and manage the development of our technology and to assist with product development services to the Company in the form of (a) design and development services to provide iOS operating system capabilities for our mobile app "*YayYo!*", (b) design and development for a web registration portal for on-boarding new users, and (c) development of web administration applications to allow high level team members to be able to track user analytical information. On November 16, 2016, the Company adopted and ratified the terms of the Product Management Proposal and accepted the benefits of such arrangement on behalf of the Company.

Lexicon Labs is managed by Ali Rashidifar, a former director of the Company and consultant to the Company holding the position of product manager. Under the terms of the Product Management Proposal, the Company has agreed to pay Lexicon Labs compensation in the form of a management cost in an amount equal to $10,000 (paid on a monthly basis). Since November 16, 2016 (the date of the Company's incorporation), the Company has paid Lexicon Labs $10,000 for services rendered for the month of November 2016 under the terms off the Product Management Proposal. As a manager of Lexicon Labs, the Company believes that Mr. Rashidifar will directly or indirectly benefit financially from our Product Management Proposal and it is further assumed, at this stage, that the Company will continue the engagement of Lexicon Labs for the performance of product management services under the Product Management Proposal beyond November 2017, whereby the Company anticipates that aggregate fees paid to Lexicon Labs will exceed an aggregate of $120,000 in total payments issue and received by Lexicon Labs. As of December 31, 2017, the Product Management Proposal with Lexicon Labs has been terminated.

*Independent Director Agreements*

In November 2017, the Company entered into two separate independent director agreements with Jeffrey J. Guzy and Paul Wesley Richter, a director of the Company (each a "Subject Director" and, collectively, the "Subject Directors"), pursuant to which the Company has agreed to pay each Subject Director a flat, fixed cash fee of $2,500 for each fiscal quarter that each Subject Director serves as an independent director on the board of directors of the Company (the "Subject Director Agreements"). The first payment under Subject Director Agreements was due and payable on or before November 30, 2017 for the fourth fiscal quarter of 2017.

*Loan from Stockholder*

On September 17, 2017 the Company entered into a promissory note with John Gray, the control person for Gray Mars Venus Trust, Arizona 2015, for $390,000. The largest balances for the year ended December 31, 2018 and December 31, 2017, respectively, were $986,200 and $445,000. The current balance of the promissory note is $880,000. The promissory note accrues interest at a rate of 5%. The Company accrued but did not pay $7,463 and $4,051 of interest for the years ended December 31, 2018 and 2017, respectively.

*Incentive Agreement for Grant of Stock*

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with David Haley, a former director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies for Rideshare Car Rentals, LLC and Distinct Cars, LLC (the "Special Policies") in consideration for a grant of 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 14,945 shares of Company restricted common stock, at a price per share equal to $8.00, as reimbursement for the cost of Mr. Haley's monetary advances made on behalf of the Company. In March 2019, the Company issued American Business Insurance Services, Inc. 80,000 shares of common stock in connection the settlement of $400,000 of debt related to insurance policies. Mr. Haley is the Chief Executive Officer of American Business Insurance Services, Inc. 258,695 shares of Company restricted common stock was issued on April 1, 2018 and 6,250 shares of Company restricted common stock was issued on October 8, 2018.

*Social Reality, Inc.*

During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc. The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

*Non-Qualified Stock Option Agreement*

On June 9, 2017, the Company entered into a non-qualified stock option agreement with Kevin Pickard, our Chief Financial Officer and director, providing for an option grant to purchase an aggregate of 300,000 shares at an exercise price of $8.00 per share. The option grant vests at a rate of 10,000 options per month following the date of the option grant. As of December 31, 2018, an aggregate of 300,000 options are vested and exercisable. The options expire December 31, 2020.

On December 1, 2016, the Company entered into a series of non-qualified stock option agreements with former executive officers and directors of the Company providing for a series of option grants to those former executive officers and directors to purchase an aggregate of 450,000 shares at an exercise price of $1.00 per share. The options expired December 31, 2018.

77

## DESCRIPTION OF SECURITIES

The following description of our securities is only a summary and is qualified in its entirety by reference to the actual terms and provisions of the capital stock contained in our certificate of incorporation and our bylaws.

### General

The Company is authorized to issue two classes of stock. The total number of shares of stock which the Company is authorized to issue is 100,000,000 shares of capital stock, consisting of 90,000,000 shares of common stock, $0.000001 par value per share, and 10,000,000 shares of preferred stock, $0.000001 par value per share.

### Common stock

The holders of our common stock are entitled to the following rights:

#### *Voting Rights*

Each share of our common stock entitles its holder to one vote per share on all matters to be voted or consented upon by the stockholders. Holders of our common stock are not entitled to cumulative voting rights with respect to the election of directors.

#### *Dividend Rights*

Subject to limitations under Delaware law and preferences that may apply to any shares of preferred stock that we may decide to issue in the future, holders of our common stock are entitled to receive ratably such dividends or other distributions, if any, as may be declared by our Board out of funds legally available therefor.

#### *Liquidation Rights*

In the event of the liquidation, dissolution or winding up of our business, the holders of our common stock are entitled to share ratably in the assets available for distribution after the payment of all of our debts and other liabilities, subject to the prior rights of the holders of our preferred stock.

#### *Other Matters*

The holders of our common stock have no subscription, redemption or conversion privileges. Our common stock does not entitle its holders to preemptive rights. All of the outstanding shares of our common stock are fully paid and non-assessable. The rights, preferences and privileges of the holders of our common stock are subject to the rights of the holders of shares of any series of preferred stock which we may issue in the future.

#### *Preferred Stock*

Our authorized preferred stock consists of 10,000,000 shares of preferred stock, par value $0.000001 per share. As of the date of this filing, 2,000,000 shares of preferred stock have been designated as Series A non-voting convertible preferred stock, none of which have been issued. Our Board has the authority to issue preferred stock in one or more classes or series and to fix the designations, powers, preferences, and rights, and the qualifications, limitations or restrictions thereof including dividend rights, dividend rates, conversion rights, voting rights, terms of redemption, redemption prices, liquidation preferences and the number of shares constituting any class or series, without further vote or action by the stockholders.

While we do not currently have any plans for the issuance of any preferred stock, the issuance of preferred stock could adversely affect the rights of the holders of common stock and, therefore, reduce the value of the common stock. It is not possible to state the actual effect of the issuance of any shares of preferred stock on the rights of holders of the common stock until the Board of Directors determines the specific rights of the holders of the preferred stock; however, these effects may include:

- Restricting dividends on the common stock;
- Diluting the voting power of the common stock;
- Impairing the liquidation rights of the common stock; or
- Delaying or preventing a change in control of the Company without further action by the stockholders.

### *Warrants*

On March 8, 2018, the Company issued to the Selling Securityholder warrants to purchase a total of 1,500,000 shares of Company common stock at the exercise price of $4.00 per share. The shares of Company common stock underlying the Selling Securityholder Warrant are being registered under this prospectus. The Selling Securityholder Warrant expires five years from the date of issuance. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

In March 2018, the Company issued to Aegis Capital Corp., as a placement agent ("Aegis") warrants (the "Aegis Warrants") to purchase a certain number of shares of common stock of the Company ("Placement Agent Warrant Shares") equal to 8% of the aggregate number of securities placed in the Second Note Offering (or the 2018 Senior Secured Note offering), plus any securities underlying any convertible securities placed in the Second Note Offering to such purchasers. The Aegis Warrants provide the holder with the right to purchase the underlying Warrant Shares at a price of $4.00 per share. The Aegis Warrants expires five years from the date of issuance.

### *Options*

### *2016 Equity Incentive Plan*

On November 30, 2016, we adopted our 2016 Equity Incentive Plan (the "Plan") to reward and provide incentives to our officers, directors, employees, consultants and other eligible participants. We have set aside options to purchase up to 10,000,000 shares of common stock for issuance under the Plan, which may be granted in the form of either incentive stock options or non-qualified stock options. Our Board of Directors administers the Plan and has the authority: (i) to select the Plan recipients, the time or times at which awards may be granted, the number of shares to be subject to each option awarded, the vesting schedule of the options and (ii) to amend the stock option Plan to reward and provide incentives to its officers, directors, employees, consultants and other eligible participants. As of the date of this prospectus, 750,000 options have been granted under the Plan, of which 720,000 are vested and exercisable. 100% of the outstanding options have been granted to former officers and directors of the Company. Subsequent to the completion of this offering, the Company expects to continue to issue options as an inducement for managerial and qualified personnel to remain with and to join the Company. As of December 31, 2018, the Company granted an aggregate of 750,000 (450,000 expired in 2018) non-qualified stock options under the plan. As of June 30, 2019, an aggregate of 300,000 non-qualified stock options are vested and exercisable.

### Restricted Stock

As of June 30, 2019, we had issued and outstanding 1,413,820 shares of restricted common stock, of which 924,695 shares are subject to lock-up agreements described elsewhere in this prospectus.

### Registration Rights

The Selling Securityholder, a principal shareholder of the Company and the holder of the Selling Securityholder Warrant, is entitled to rights with respect to the registration of their shares beneficially owned under the Securities Act. These registration rights are set forth under the terms of the Purchase Agreement, dated March 8, 2018, and as further set forth under a registration rights agreement, dated March 8, 2018, by and between the Company and Bellridge Capital, L.P. (the "Registration Rights Agreement"). For more information see "*Certain Relationships and Related Transactions*." The Registration Rights Agreement sets forth a mandatory date for registration of 1,650,000 shares of restricted common stock of the Company beneficially owned as of record by the Selling Securityholder, pursuant to which the parties agreed that as soon as practicable after the date on which the shares of Company common stock, whether as a result of a public offering, merger, recapitalization, reorganization or otherwise, are registered under the Securities Exchange Act of 1934, as amended (each a "Public Company Date"), but in no event later than thirty (30) days after a Public Company Date (the "Filing Deadline"). The Registration Rights Agreement sets forth that the Company shall use its best efforts to cause the

registration statement filed on behalf of the registrable securities to become effective as soon as practicable after filing, subject to the Filing Deadline. Under this prospectus, the Company is registering the underlying shares of common stock under the Selling Securityholder Warrant and such other registrable securities in accordance with the terms of the Purchase Agreement and Registration Rights Agreement. We will pay the registration expenses (other than underwriting discounts, selling commissions and stock transfer taxes) of the holders of the shares registered pursuant to the registrations described below.

79

**Indebtedness**

As of December 31, 2018, we had outstanding indebtedness, excluding capital leases, of approximately a total of $2,690,181, which consisted of the following: (i) $790,000 in unsecured notes payable to an investor, accruing interest at 5% per annum, to be made due and payable as of August 31, 2019; (ii) $319,667 in unsecured notes payable to an investor, accruing interest at 8% per annum, with principal payments equal to 1/12 of the original balance plus interest due quarterly- due and payable from dates ranging from August 9, 2020 to December 11, 2020; (iii) $222,222 in unsecured notes payable to an investor, accruing interest at 6% per annum, to be made due and payable as of August 31, 2019, as subsequently amended to October 31, 2019; (iv) $1,296,018 in a secured note payable due the earlier of August 31, 2019, as subsequently amended to October 31, 2019, as amended, or the closing of an offering of at least $3,000,000 and (v) $62,274 in unsecured notes payable/line of credit to a merchant banks, accruing interest at 15%. Other than the foregoing, and to vendors and service providers in the ordinary course of our business, we do not have any other credit facilities or other access to bank credit.

On November 1, 2019, the Company, extended three notes payable as each of the three notes payable were due and payable on October 31, 2019.  The interest rates and other material terms, other than the due dates, for all three notes payable were not amended by the extensions.  As a result of the extensions, (i) two notes payable totaling $1,518,240 (the $222,222 note payable and the $1,296,018 note payable) are due November 30, 2019 and (ii) the note payable to an investor, with a current balance of $880,000, is due on December 31, 2019.

Our contractual obligations and commercial commitments as of December 31, 2018 are summarized below:

*Long-term debt*—We have long-term debt obligations of nil as of December 31, 2018.

*Capital lease obligations*—We have capital lease obligations of $3,790,147 as of December 31, 2018.

Operating leases—We have operating lease obligations of nil as of December 31, 2018.

### *Bellridge Second Note Offering*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Selling Securityholder, an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased:

- a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note");

- warrants to acquire up to an aggregate of 1,500,000 shares, with an exercise price of $4.00 per share (the "Warrant Shares") of common stock (defined below) of the Company (the "Warrants" or the "Selling Securityholder Warrant");

- 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares").

In consideration for the Second Note, Warrant Shares and Commitment Shares, the Lender paid an aggregate purchase price of $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below).

The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Second Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the Second Note.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and restrictive financial covenants, including but not limited to, the following restrictive covenants:

- The Company will not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, incur or

guarantee, assume or suffer to exist any indebtedness (other than (i) the Indebtedness evidenced by the Second Note and the First Note and (ii) other Permitted Indebtedness). Under the terms of the Second Note, "Permitted Indebtedness" means (i) indebtedness evidenced by the Second Note and the First Note, (ii) indebtedness secured by permitted liens or unsecured indebtedness and (iii) permitted subordinated indebtedness;

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on any of its capital stock;

- At any time a Defeasance Failure exists (defined below), the Company shall not, and the Company shall cause each of its Subsidiaries to not, directly or indirectly, permit any indebtedness of the Company or any of its subsidiaries to mature or accelerate prior to the maturity date of the Second Note. "Defeasance Failure" means, as of any given time of determination, the failure of the cash amount in the Holder Master Restricted Account to be greater than or equal to the outstanding amount. "Holder Master Restricted Account" means, solely with respect to the holder, a certain account at Umpqua Bank, or such other account as may be directed by the holder of the Second Note, from time to time, subject to a Controlled Account Agreement in favor of the holder in a form reasonably acceptable to the holder; and

- The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by or publicly contemplated to be conducted by the Company and each of its subsidiaries on March 8, 2018 or any business substantially related or incidental thereto. The Company shall not, and the Company shall cause each of its subsidiaries to not, directly or indirectly, modify its or their corporate structure or purpose.

The Company believes that as of the date of this prospectus, the Company is in compliance with all of the foregoing restricted covenants, including such additional covenants set forth under Second Note. Further, the Company believes that as of the date of this prospectus, the Company is in compliance with all affirmative covenants set forth below.

Under the terms and conditions of the Second Note, the Company is required to adhere to certain obligations and affirmative covenants, including but not limited to, the following affirmative covenants:

- The Company will establish and maintain a bank account for the holder of the Second Note (collectively, including the Holder Master Restricted Account, the "Master Restricted Accounts") which Master Restricted Account applicable to a holder of Second Note shall be subject to a deposit account control agreement in form and substance reasonably acceptable to such holder of Notes (each, a "Controlled Account Agreement"). On the issuance date of the Second Note, the Company shall have directed the Lender to deposit an aggregate of $6 million of the purchase price for the Second Note, Commitment Shares and Warrant into Master Restricted Accounts;

- Upon the occurrence of any Controlled Account Release Event (defined below), the holder of the Second Note shall, as soon as commercially practicable, but in no event later than two trading days thereafter, cause the applicable Controlled Account Release Amount to be released from the Holder Master Restricted Account and deposited into an bank account specified in writing by the Company on or prior to such date (each a "Controlled Account Release"); provided, that if the Company fails to select a bank account in a writing delivered to the holder on or prior to such second trading day, the holder shall effect such Controlled Account Release as soon as commercially practicable after receipt of such bank account election from the Company. "Controlled Account Release Amount" means, with respect to any given Controlled Account Release Event, such amount of cash as specified in the applicable clause of the definition of "Controlled Account Release Event". "Controlled Account Release Event" means, as applicable, (i) the Company's receipt of a notice by the Holder electing to effect a release of cash with respect to any Restricted Principal to the Company or (ii) at any time the outstanding amount hereunder is greater than the cash amount in the Holder Master Restricted Account (such excess amount, the "Excess Collateral"), as long as no event of default has occurred and is continuing, the Company may, by delivery of written notice to the Holder, require the release of such Excess Collateral to the Company from the Holder Master Restricted Account;

- The Company grants and pledges to the holder of the Second Note a continuing security interest in any cash or other assets, from time to time, in that certain deposit account called the Holder Master Restricted Account, including any and all cash, proceeds, funds, credits, rights and other assets therein or arising therefrom, from time to time, and any additions, dividends, profits and interest in the foregoing and any replacements or substitutions therefore (collectively, the "Collateral") to secure prompt repayment of any and all amounts outstanding hereunder from time to time and to secure prompt performance by the Company of each of its covenants and duties under the transaction documents. Such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Notwithstanding any filings undertaken related to Holder's rights under the New York Uniform Commercial Code, the Holder's Lien (as defined in the Second Note) on the Collateral shall remain in effect for so long as any Restricted Principal remains outstanding. Notwithstanding the foregoing, upon any Controlled Account Release, but solely with respect to such the applicable Controlled Account Release Amount, the holder of the Second Note will automatically release any lien on such Controlled Account Release Amount. "Restricted Principal" means, as of any given date, the difference of (i) all cash amounts held in the Master Restricted Account of the Holder as of the Closing Date of the Second Note Offering and (ii) all cash amounts released from the Master Restricted Account of the holder of the Second Note to the Company (or at the Company's direction) on or prior to such given date;

- Notwithstanding anything herein to the contrary, at the option of the holder of the Second Note, the holder of the Second Note may satisfy all, or any part, of any redemption or other cash payment obligation of the Company hereunder and/or pursuant to any other transaction document (each, a "Cash Payment Obligation"), in whole or in part, at the sole option of the holder of the Second Note, from the Collateral in the Holder Master Restricted Account, including, without limitation, in connection with any redemption hereunder upon any event of default under the Second Note, or any other payment due hereunder (whether at or prior to the Maturity Date). In connection with any Cash Payment Obligation, the Company irrevocably consents to delivery by the holder of the Second Note of an instruction letter to the Controlled Account Bank to release Collateral from the Holder Master Restricted Account in an amount not to exceed such Cash Payment Obligation to the holder of the Second Note. Notwithstanding the foregoing, in the absence of any such election by the holder of the Second Note, the Company shall remain obligated to pay such Cash Payment Obligation to the holder of the Second Note without regard to any Collateral in the Holder Master Restricted Account. Upon the occurrence of any event which could reasonably be expected to result in a Cash Payment Obligation, the holder of the Second Note may, at the holder of the Second Note option, withdraw any Collateral in the Holder Master Restricted Account; provided that (x) such withdrawn amount shall not exceed such amount which the holder of the Second Note reasonably believes would be necessary to satisfy such Cash Payment Obligation, and (y) such withdrawal shall not constitute the delivery of a Redemption Notice hereunder or payment hereunder unless the holder of the Second Note specifies in writing to the Company that the holder of the Second Note has applied such Collateral in satisfaction of such Cash Payment Obligation; and

- If the Controlled Account Bank breaches any covenant or other term or condition of any Controlled Account Agreement or otherwise fails to promptly comply with the instructions of the holder of the Second Note in connection with the Collateral, the holder of the Second Note may, at its option, withdraw the Collateral from the Controlled Account Bank and hold such Collateral until such time as (x) the Company and the holder of the Second Note have agreed upon a replacement Controlled Account Bank and (y) a Controlled Account Agreement with respect to such Collateral and a new account shall have been duly executed by the Company, the holder of the Second Note and the replacement Controlled Account Bank. Notwithstanding anything herein to the contrary, if the Company or any of its Subsidiaries receives any of the Collateral in breach of any Controlled Account Agreement (or receives notice from any holder of Notes that an amount was wired to the Company from a Master Restricted Account attributable to such holder of Notes without the proper authorization of such holder of Notes), the Company shall promptly cause such amounts to be returned to such applicable Master Restricted Account.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019, as amended, or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

**Related Party Debt**

*Capital and Operating Leases*

We maintain capital leases mainly for certain vehicles maintained and under lease with Distinct Cars, LLC. We have several operating vehicle leases with Acme Auto Leasing LLC (the "Lessor") with lease terms expiring on a monthly basis. As of December 31, 2018, our total future operating lease payments amounted to $4,084,152 and the present value of minimum lease payments under our capital leases amounted to $3,790,147.

As of the date of this prospectus, Distinct Cars, LLC, as lessee, entered into series open-ended lease agreements and disclosure statements with the Lessor to lease standard passenger vehicles, each with an approximate lease term of thirty (30) to thirty-six (36) months (each a "Lease Agreement" and collectively, the "Lease Agreements"). Monthly payments under each Lease Agreement range from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, Lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to the grant of a purchase money security interest on each leased vehicle.

As of the date of this prospectus, we are indebted to certain principal stockholders of the Company for loans and advances made to our Company over the past five years in the aggregate amount of $1,518,240.

81

*2017 Senior Secured Note*

In December 2017, YayYo, Inc., issued a senior secured promissory note to the Selling Securityholder, in the original principal amount of $222,222 (the "First Note"). As an inducement for the secured parties to extend the loan as evidenced by the First Note and to secure complete and timely payment of the First Note, YayYo, Inc., as borrower, issued and granted a security interest in all the assets of YayYo, Inc., (including a pledge of securities, owned as of record and beneficially by YayYo, Inc., in the wholly-owned subsidiaries of the Company) and its subsidiaries, existing as of the date of issuance of thereafter acquired. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

*2018 Senior Secured Note*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Selling Securityholder, an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Second Note"). The aggregate purchase price of the Second Note is $6,000,000 (the "Second Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Second Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Second Note. Further, the Company paid $178,228 of issuance costs associated with the Second Note.

YayYo, Inc., obligations to repay and otherwise perform its obligations under the Second Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Second Note and Controlled Account Agreement, upon the exercise of the Selling Securityholder Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Second Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Second Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes. See "*Certain Relationships and Related Transactions*" elsewhere in this prospectus.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable is due the earlier of November 30, 2019, as amended, or the closing of an offering of at least $3,000,000. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

**Exclusive forum for adjudication of disputes provision which limits the forum to the Delaware Court of Chancery for certain actions against the Company**

Our Amended and Restated Bylaws provide that, unless we consent in writing to the selection of an alternative forum, a state court in the State of Delaware (or, if that court does not have jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the DGCL or the Certificate of Incorporation or these Bylaws (in each case, as they may be amended from time to time), or (d) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation governed by the internal affairs doctrine. This exclusive forum provision may limit the ability of our stockholders to bring a claim in a judicial forum that such stockholders find favorable for disputes with us or our directors or officers, which may discourage lawsuits against us or our directors or officers.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock will be VStock Transfer, LLC.

**Listing**

We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering.

## SHARES ELIGIBLE FOR FUTURE SALE

There is not currently an established U.S. trading market for our common stock. We cannot predict the effect, if any, that market sales of shares of our common stock or the availability of shares of our common stock for sale will have on the market price of our common stock prevailing from time to time. Sales of substantial amounts of our common stock, including shares issued upon exercise of outstanding warrants, in the public market after this offering, could adversely affect market prices prevailing from time to time and could impair our ability to raise capital through the sale of our equity securities.

Upon the completion of the sale of 2,500,000 shares of our common stock in our primary offering, a total of 29,302,976 shares of our common stock will be outstanding. This number excludes any issuance of an aggregate of additional shares of common stock that could occur in connection with the conversion of our outstanding convertible promissory notes, options and warrants.

All of the shares of common stock and shares of common stock issuable upon exercise of warrants, when sold pursuant to this prospectus, will be freely tradable, except that any shares acquired by our affiliates, as that term is defined in Rule 144 under the Securities Act, may only be sold in compliance with the limitations described below. As of October 31, 2019, our directors and executive officers did not own any of our common stock.

82

As explained in the Explanatory Note to the registration statement of which this prospectus forms a part, this prospectus is to be used in connection with the potential resale by the Selling Securityholder of up to an aggregate of 1,650,000 shares of our common stock, which shares (including 1,500,000 shares issuable upon exercise of outstanding Selling Securityholder Warrant). We will not receive any of the net proceeds from the sale of shares by the Selling Securityholder; however, we may receive proceeds if the Selling Securityholder Warrant is exercised for cash. The shares of common stock being registered under this prospectus permit public resales of such shares, and the Selling Securityholder may offer the shares for resale from time to time pursuant to this prospectus. The Selling Securityholder may also sell, transfer or otherwise dispose of all or a portion of their shares in transactions exempt from the registration requirements of the Securities Act of 1933, as amended, or pursuant to another effective registration statement covering those shares.

25,885,303 shares of our outstanding common stock that are not registered under the registration statement of which this prospectus is a part and have not been registered under another registration statement will be deemed restricted securities as defined under Rule 144. Restricted shares may be sold in the public market only if registered or if they qualify for an exemption from registration promulgated under the Securities Act. Subject to the provisions of Rule 144, all of the outstanding shares of common stock that are currently restricted are available for sale in the public market under Rule 144.

For information about shares of common stock issuable upon the exercise of options and warrants, see "*Description of Securities.*"

In general, under Rule 144 as currently in effect, a person, or group of persons whose shares are required to be aggregated, who is deemed to have been an affiliate at any time during the three months preceding a sale, who has beneficially owned shares that are restricted securities as defined in Rule 144 for at least six months is entitled to sell, within any three-month period commencing 90 days after the date of this prospectus, a number of shares that does not exceed 1% of the then outstanding shares of our common stock.

Sale under Rule 144 by affiliates, whether of restricted or non-restricted shares, include requirements for current public information about the Company; selling the shares pursuant to broker transactions; and limitations on the number of shares sold within a three-month period.

In addition, a person who is not deemed to have been one of our affiliates at any time during the 90 days preceding a sale and who has beneficially owned shares of our common stock for at least six months, including the holding period of any prior owner, except if the prior owner was one of our affiliates, would be entitled to sell all of their shares, provided the availability of current public information about our company. To the extent that shares were acquired from one of our affiliates, a person's holding period for the purpose of effecting a sale under Rule 144 would commence on the date the shares were acquired from the affiliate.

**Lock-Up Agreements**

Our officers, directors affiliates and certain existing stockholders have agreed, subject to certain exceptions, not to offer, issue, sell, contract to sell, encumber, grant any option for the sale of or otherwise dispose of any shares of our common stock or other securities convertible into or exercisable or exchangeable for shares of our common stock without the prior written consent of the Representative (as defined herein). An aggregate of 25,067,786 of our outstanding shares of common stock shall be subject to lock-up agreements as follows: (i) 2,900,000 shares of common stock held by X, LLC, 10,325,000 shares of common stock held by Gray Mars Venus Trust, Arizona 2015, 2,844,945 shares of common stock controlled by David Haley, 2,758,824 shares of common stock held by James Malackowiski, 2,018,750 shares of common stock held by John O'Hurley and 1,654,412 shares held by Acuitas Group Holdings, LLC for six months; (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding warrants held by Bellridge Capital, L.P. for 60 days; (iii) 400,000 shares of common stock held by Bellridge Capital, L.P. for 30 days and (iv) an additional 2,165,855 shares of common stock held by other stockholders for periods ranging from 47 days to six months.

Except for Acuitas Group Holdings, LLC, with respect to the stockholders locking up their shares of common stock for a period of 180 or 120 days, the lock-up restriction shall not apply to their shares to the extent that such shares are sold for a price per share of no less than $6.00. The 400,000 shares of common stock held by Bellridge Capital, L.P. which are being locked up for 30 days shall not be subject to the lock-up to the extent that such shares are sold for a price per share of no less than $6.00. One additional stockholder is locking up his shares as follows: (i) 150,000 shares shall be locked up until the earlier of (x) 47 after the closing of this offering and (y) such time that the Company's closing price on The Nasdaq Capital Market is $5.00 per share, and (ii) the balance of such shares (the "Additional Shares") that are being locked up shall be locked up for a period of 180 days; provided, however, that the lock-up restriction shall not apply to the Additional Shares to the extent that such Additional Shares are sold for a price per share of no less than $6.00. Lastly, one other stockholder is locking up his shares as follows: initially 100% of such stockholders shares shall be locked up; provided, however, commencing 47 days after the closing of this offering, only 90% of such shares shall continue to be subject to such lock up. Furthermore, the 90% of such shares that shall be locked-up shall not be subject to the lock-up to the extent that such shares are sold for a price per share of no less than $6.00.

**Sale of Founder's Shares and Voting Trust**

As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, agreed to sell 12,525,000 of its 15,425,000 shares of common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. As a result of the sale, X, LLC's beneficial ownership shall be reduced to 9.9% of the shares outstanding after the completion of this Offering. We will not receive any proceeds from the sale of the Private Shares. If the offering contemplated by this registration statement is not consummated by January 31, 2020, the parties have agreed to unwind the sale of the Private Shares transaction in compliance with applicable law. Mr. El-Batrawi has also entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his remaining 2,900,000 shares of common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

**Electronic Distribution**

A prospectus in electronic format may be made available on the websites maintained by Selling Securityholder, if any, participating in the offering. The Selling Securityholder may agree to allocate a number of shares of common stock to their online brokerage account holders. Internet distributions will be allocated by the Selling Securityholder to make Internet distributions on the same basis as other allocations.

83

# UNDERWRITING

Aegis Capital Corp. is acting as the lead managing underwriter and as representative of the underwriters (the "Representative"). Subject to the terms and conditions of an underwriting agreement between us and the Representative, we have agreed to sell to each underwriter named below, and each underwriter named below has severally agreed to purchase, at the public offering price, less the underwriting discounts set forth on the cover page of this prospectus, the number of shares of common stock listed next to its name in the following table:

| Underwriter | Number of shares of common stock |
|---|---|
| Aegis Capital Corp. | |
| WestPark Capital, Inc. | |
| **Total** | |

The underwriters are committed to purchase all the shares of common stock offered by this prospectus, if they purchase any shares of common stock. The underwriting agreement also provides that if an underwriter defaults, the purchase commitments of non-defaulting underwriters may be increased, or the offering may be terminated. The underwriters are not obligated to purchase the shares of common stock covered by the underwriters' option to purchase additional shares of common stock described below. The underwriters are offering the shares of common stock, subject to prior sale, when, as and if issued to and accepted by them, subject to approval of legal matters by their counsel, and other conditions contained in the underwriting agreement, such as the receipt by the underwriters of officer's certificates and legal opinions. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

## Over-allotment Option

We have granted the representative of the underwriters, an option exercisable, for up to 45 days after the date of the underwriting agreement, to purchase up to shares of common stock at the public offering price listed on the cover page of this prospectus, less underwriting discounts. The underwriters may exercise this option solely to cover over-allotments, if any, made in connection with this offering. To the extent the option is exercised, and the conditions of the underwriting agreement are satisfied, we will be obligated to sell to the underwriters, and the underwriters will be obligated to purchase, these additional shares of common stock.

## Discounts and Commissions

We have agreed to pay the underwriters a cash fee equal to 8.0% of the aggregate gross proceeds.

The Representative has advised us that the underwriters propose to offer the shares directly to the public at the public offering price set forth on the cover of this prospectus. In addition, the Representative may offer some of the shares to other securities dealers at such price less a concession of up to $[ ] per share. After the offering to the public, the offering price and other selling terms may be changed by the Representative without changing the Company's proceeds from the underwriters' purchase of the shares.

The following table shows the public offering price, underwriting discounts and proceeds, before expenses, to us. The information assumes either no exercise or full exercise by the underwriters of their over-allotment option. The underwriting discounts are equal to the public offering price per share less the amount per share the underwriters pay us for the shares.

| | Per Share of Common Stock | Total without Over-allotment Option | Total Over-allotment Option |
|---|---|---|---|
| Public offering price | $ | $ | $ |
| Underwriting discounts | $ | $ | $ |
| Proceeds, before expenses, to us | $ | $ | $ |
| | $ | $ | $ |

We have agreed to pay the Representative a non-accountable expense allowance of 1% of the gross proceeds of the offering. We estimate that the total expenses, but excluding underwriting discounts and commissions and the 1% non-accountable expense allowances, will be approximately $100,000, all of which are payable by us. This figure includes expense reimbursements we have agreed to pay the Representative for reimbursement of its expenses related to the offering up to a maximum aggregate expense allowance of $125,000, for which we have paid a $50,000 advance, which will be returned to us to the extent not offset by actual expenses.

**Underwriters' Warrants**

As additional compensation to the underwriters, upon consummation of this offering, we will issue to the underwriters or their designees warrants to purchase an aggregate number of shares of our common stock equal to 5% of the number of shares of common stock issued in this offering (excluding shares of common stock sold to cover over-allotments, if any), at an exercise price per share equal to 125% of the initial public offering price (the "Underwriters' Warrants"). The Underwriters' Warrants and the underlying shares of common stock will not be exercised exercise, sold, transferred, assigned, or hypothecated or be the subject of any hedging, short sale, derivative, put, or call transaction that would result in the effective economic disposition of the Underwriters' Warrants by any person for a period of 180 days from the effective date of the registration statement (the "Effective Date") for this offering in accordance with FINRA Rule 5110. The Underwriters' Warrants will be exercisable, in whole or in part, commencing one year from the Effective Date and will expire on the fifth anniversary of the Effective Date of the registration statement for this offering. In addition, we have granted the underwriters a one-time demand registration right and unlimited "piggyback" registration rights with respect to the underlying shares. The piggyback registration right will not be greater than seven years from the effective date of the offering in compliance with FINRA Rule 5110(f)(2)(G)(v).

**Determination of Offering Price**

Before this offering, there has been no public market for our common stock. Accordingly, the public offering price will be negotiated between us and the Representative. Among the factors to be considered in these negotiations are:

- the prospects for our Company and the industry in which we operate;
- our past and present financial and operating performance;
- financial and operating information and market valuations of publicly traded companies engaged in activities similar to ours;
- the prevailing conditions of United States securities markets at the time of this offering; and
- other factors deemed relevant.

85

**Lock-Up Agreements**

We and each of our officers, directors affiliates and certain existing stockholders have agreed, subject to certain exceptions, not to offer, issue, sell, contract to sell, encumber, grant any option for the sale of or otherwise dispose of any shares of our common stock or other securities convertible into or exercisable or exchangeable for shares of our common stock without the prior written consent of the Representative. An aggregate of 25,067,786 of our outstanding shares of common stock shall be subject to lock-up agreements as follows: (i) 2,900,000 shares of common stock held by X, LLC, 10,325,000 shares of common stock held by Gray Mars Venus Trust, Arizona 2015, 2,844,945 shares of common stock controlled by David Haley, 2,758,824 shares of common stock held by James Malackowiski, 2,018,750 shares of common stock held by John O'Hurley and 1,654,412 shares held by Acuitas Group Holdings, LLC for six months; (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding warrants held by Bellridge Capital, L.P. for 60 days; (iii) 400,000 shares of common stock held by Bellridge Capital, L.P. for 30 days and (iv) an additional 2,165,855 shares of common stock held by other stockholders for periods ranging from 47 days to six months; provided, however, certain shares may not be subject to a lock up period in the event that such shares are sold at certain minimum prices (see "Shares Eligible for Future – Lock-Up Agreements").

The Representative may in its sole discretion and at any time without notice release some or all of the shares subject to lock-up agreements prior to the expiration of the lock-up period. When determining whether or not to release shares from the lock-up agreements, the Representative will consider, among other factors, the security holder's reasons for requesting the release, the number of shares for which the release is being requested and market conditions at the time.

Pursuant to the underwriting agreement, we have also agreed, for a period of 180 days from the date of the offering, that we will not, subject to specified exempt issuances, offer, pledge, issue, sell, contract to sell, purchase, contract to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock; or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of common stock or such other securities, in cash or otherwise; or (iii) file any registration statement with the SEC relating to the offering of any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock.

**Right of First Refusal**

According to the terms of the underwriting agreement, the Representative shall have the right of first refusal for a period of twelve months after the closing of this offering to act as sole book-running manager for all future public equity offerings by us, or any successor to or subsidiary of our company, during such period.

**Indemnification**

We have agreed to indemnify the underwriters against specified liabilities, including liabilities under the Securities Act, and to contribute to payments the underwriters may be required to make in respect thereof.

**Electronic Offer, Sale and Distribution of Shares**

A prospectus in electronic format may be made available on a website maintained by the Representative and may also be made available on a website maintained by other underwriters. The underwriters may agree to allocate a number of shares to underwriters for sale to their online brokerage account holders. Internet distributions will be allocated by the Representative to underwriters that may make Internet distributions on the same basis as other allocations. In connection with the offering, the underwriters or syndicate members may distribute prospectuses electronically. No forms of electronic prospectus other than prospectuses that are printable as Adobe® PDF will be used in connection with this offering.

The underwriters have informed us that they do not expect to confirm sales of shares offered by this prospectus to accounts over which they exercise discretionary authority.

Other than the prospectus in electronic format, the information on any underwriter's website and any information contained in any other website maintained by an underwriter is not part of the prospectus or the registration statement of which this prospectus forms a part, has not been approved and/or endorsed by us or any underwriter in its capacity as underwriter and should not be relied upon by investors.

**Price Stabilization, Short Positions and Penalty Bids**

In connection with this offering, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of our common stock. Specifically, the underwriters may over-allot in connection with this offering by selling more shares than are set forth on the cover page of this prospectus. This creates a short position in our common stock for its own account. The short position may be either a covered short position or a naked short position. In a covered short position, the number of shares of common stock over-allotted by the underwriters is not greater than the number of shares of common stock that they may purchase in the over-allotment option. In a naked short position, the number of shares of common stock involved is greater than the number of shares of common stock in the over-allotment option. To close out a short position, the underwriters may elect to exercise all or part of the over-allotment option. The underwriters may also elect to stabilize the price of our common stock or reduce any short position by bidding for, and purchasing, common stock in the open market.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter or dealer repays selling concessions allowed to it for distributing a security in this offering because the underwriter repurchases that security in stabilizing or short covering transactions.

Finally, the underwriters may bid for, and purchase, shares of our common stock in market making transactions, including "passive" market making transactions as described below.

These activities may stabilize or maintain the market price of our common stock at a price that is higher than the price that might otherwise exist in the absence of these activities. The underwriters are not required to engage in these activities, and may discontinue any of these activities at any time without notice.

In connection with this offering, the underwriters and selling group members, if any, or their affiliates may engage in passive market making transactions in our common stock immediately prior to the commencement of sales in this offering, in accordance with Rule 103 of Regulation M under the Exchange Act. Rule 103 generally provides that:

a passive market maker may not effect transactions or display bids for our common stock in excess of the highest independent bid price by persons who are not passive market makers:

- net purchases by a passive market maker on each day are generally limited to 30% of the passive market maker's average daily trading volume in our common stock during a specified two-month prior period or 200 shares, whichever is greater, and must be discontinued when that limit is reached; and
- passive market making bids must be identified as such.

### Certain Relationships

Certain of the underwriters and their affiliates have provided and may in the future provide various investment banking, commercial banking and other financial services for us and our affiliates for which they have or may in the future receive customary fees, however, except for the right of first refusal disclosed in this prospectus, we have no present arrangements with any of the underwriters for any further services.

### Offer Restrictions Outside the United States

Other than in the United States, no action has been taken by us or the underwriters that would permit a public offering of the securities offered by this prospectus in any jurisdiction where action for that purpose is required. The securities offered by this prospectus may not be offered or sold, directly or indirectly, nor may this prospectus or any other offering material or advertisements in connection with the offer and sale of any such securities be distributed or published in any jurisdiction, except under circumstances that will result in compliance with the applicable rules and regulations of that jurisdiction. Persons into whose possession this prospectus comes are advised to inform themselves about and to observe any restrictions relating to the offering and the distribution of this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities offered by this prospectus in any jurisdiction in which such an offer or a solicitation is unlawful.

## EXPERTS

AJ Robbins CPA, LLC, an independent certified public accounting firm, audited our financial statements for the years ended December 31, 2018 and 2017. We have included our financial statements in this prospectus and elsewhere in the registration statement in reliance on the reports of AJ Robbins CPA, LLC, given on their authority as experts in accounting and auditing.

88

## LEGAL MATTERS

Certain legal matters with respect to the validity of the securities being offered by this prospectus will be passed upon by Carmel, Milazzo & DiChiara LLP, New York, New York. Sheppard, Mullin, Richter & Hampton LLP, New York, New York, is acting as counsel for the underwriters with respect to the primary offering.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of our common stock offered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement, some of which is contained in exhibits to the registration statement as permitted by the rules and regulations of the SEC. For further information with respect to us and our common stock, we refer you to the registration statement, including the exhibits filed as a part of the registration statement. Statements contained in this prospectus concerning the contents of any contract or any other document is not necessarily complete. If a contract or document has been filed as an exhibit to the registration statement, please see the copy of the contract or document that has been filed. Each statement in this prospectus relating to a contract or document filed as an exhibit is qualified in all respects by the filed exhibit. You may obtain copies of this information by mail from the Public Reference Section of the SEC, 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates. You may obtain information on the operation of the public reference rooms by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet website that contains reports, proxy statements and other information about issuers, like us, that file electronically with the SEC. The address of that website is *www.sec.gov*.

We are subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, are required to file periodic reports, proxy statements and other document with the SEC. These periodic reports, proxy statements and other information are available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. We also maintain a website at *www.yayyo.com*. You may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

89

# INDEX TO FINANCIAL STATEMENTS

**YAYYO, INC**
**Financial Statements**
**December 31, 2018 and 2017**

## Contents

| | Page |
|---|---|
| **Financial Statements:** | |
| Report of Independent Registered Public Accounting Firm | F - 2 |
| Consolidated Balance Sheets as of December 31, 2018 and December 31, 2017 | F - 3 |
| Consolidated Statements of Operations for the year ended December 31, 2018 and 2017 | F - 4 |
| Consolidated Statement of Stockholders' Equity for the year ended December 31, 2018 and 2017 | F - 5 |
| Consolidated Statements of Cash Flows for the year ended December 31, 2018 and 2017 | F - 6 |
| Notes to Consolidated Financial Statements | F - 7 |
| Condensed Consolidated Balance Sheets as of June 30, 2019 (unaudited) and December 31, 2018 | F - 21 |
| Condensed Consolidated Statements of Operations for the six months ended June 30, 2019 and 2018 (unaudited) | F - 22 |
| Condensed Consolidated Statements of Stockholders' Equity (Deficit) for the six months ended June 30, 2019 and 2018 (unaudited) | F - 23 |
| Condensed Consolidated Statements of Cash Flows for the six months ended June 30, 2019 and 2018 (unaudited) | F - 24 |
| Notes to Condensed Consolidated Financial Statements | F - 25 |

**AJ Robbins CPA, LLC**
Certified Public Accountant

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and
Stockholders of Yayyo Inc.

### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Yayyo, Inc. (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, changes in stockholders' equity (deficit), and cash flows for each of the years in the two years then ended and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Yayyo, Inc. as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the years in the two years then ended, in conformity with accounting principles generally accepted in the United States of America.

### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United Sates) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we were required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. According we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluation of the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

### Emphasis of Matter

As discussed in Note 13 to the financial statements, the 2017 financial statements have been restated to correct a misstatement. Our opinion is not modified with respect to this matter.

We have served as the Company's auditor since 2016
Denver, Colorado
March 22, 2019

**aj@ajrobbins.com**
400 South Colorado Blvd, Suite 870, Denver, Colorado 80246
(B)303-537-5898 (M)720-339-5566 (F)303-586-6261

**YAYYO, INC.**
**CONSOLIDATED BALANCE SHEETS**
**As of December 31, 2018 and 2017**

| | | **2018** | | **2017** |
|---|---|---|---|---|
| | | | | **(restated)** |
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 277,444 | $ | 308,738 |
| Accounts receivable | | - | | - |
| Prepaid expenses | | 108,900 | | 13,406 |
| Total current assets | | 386,344 | | 322,144 |
| | | | | |
| Equipment, net | | 5,092 | | 2,860 |
| Leased assets, net | | 5,115,117 | | 2,033,482 |
| Deferred offering costs | | 66,500 | | - |
| **TOTAL ASSETS** | $ | 5,573,053 | $ | 2,358,486 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| Current Liabilities: | | | | |
| Accounts payable (including $334,471 in 2018 to related party) | $ | 719,386 | $ | 100,000 |
| Accrued expenses | | 494,066 | | 31,453 |
| Notes payables, current (net of discount of $72,211 and $48,600) | | 2,617,970 | | 254,511 |
| Finance lease obligations, current | | 1,562,651 | | 555,090 |
| Total current liabilities | | 5,394,073 | | 941,054 |
| | | | | |
| Notes payable, net of current portion (net of discount of $54,190) | | - | | 552,588 |
| Finance lease obligations, net of current portion | | 2,227,496 | | 1,038,201 |
| **TOTAL LIABILITIES** | | 7,621,569 | | 2,531,843 |
| | | | | |
| Commitments and contingencies | | - | | - |
| | | | | |
| **STOCKHOLDERS' DEFICIT** | | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | | | |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 26,718,676 and 25,770,551 shares issued and outstanding | | 27 | | 26 |
| Additional paid-in capital | | 19,193,151 | | 7,879,189 |
| Accumulated deficit | | (21,241,694) | | (8,052,572) |
| Total stockholders' deficit | | (2,048,516) | | (173,357) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $ | 5,573,053 | $ | 2,358,486 |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-3

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Year Ended December 31, 2018 and 2017**

| | | 2018 | | 2017 |
|---|---|---|---|---|
| | | | | (restated) |
| Revenue | $ | 3,289,478 | $ | 235,690 |
| Cost of revenue | | 2,374,397 | | 213,111 |
| Gross profit | | 915,081 | | 22,579 |
| **Operating expenses:** | | | | |
| Selling and marketing expenses | | 482,811 | | 86,098 |
| Product development | | 9,699 | | 303,555 |
| General and administrative expenses | | 6,584,251 | | 3,249,659 |
| Impairment of leased assets | | 2,388,000 | | 2,800,000 |
| Total operating expenses | | 9,464,761 | | 6,439,312 |
| **Loss from operations** | | (8,549,680) | | (6,416,733) |
| **Other income (expense):** | | | | |
| Interest and financing costs | | (4,639,442) | | (192,395) |
| Change in value of derivative liability | | - | | 40,265 |
| Total other income (expense) | | (4,639,442) | | (152,130) |
| **Net loss** | $ | (13,189,122) | $ | (6,568,863) |
| **Weighted average shares outstanding:** | | | | |
| Basic | | 26,321,137 | | 25,297,066 |
| Diluted | | 26,321,137 | | 25,297,066 |
| **Loss per share** | | | | |
| Basic | $ | (0.50) | $ | (0.26) |
| Diluted | $ | (0.50) | $ | (0.26) |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-4

**YAYYO, INC.**
**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY (DEFICIT)**
**For the Year Ended December 31, 2018 and 2017**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Capital | Deficit | Deficit |
| **Balance, December 31,2016** | 25,011,000 | $ 25 | $ 1,382,930 | $ (1,483,709) | $ (100,754) |
| Issuance of common stock for cash | 371,351 | 1 | 2,484,198 | | 2,484,199 |
| Payment of offering costs | | | (814,442) | | (814,442) |
| Value of common stock of related party issued with convertible note payable | | | 99,027 | | 99,027 |
| Value of common stock issued with notes payable | 18,200 | | 91,000 | | 91,000 |
| Value of common stock issued with capital lease obligation | 350,000 | | 2,800,000 | | 2,800,000 |
| Issuance of common stock for accounts payable | 20,000 | | 160,000 | | 160,000 |
| Stock option expense | | | 1,676,476 | | 1,676,476 |
| Net loss | | | | (6,568,863) | (6,568,863) |
| **Balance, December 31, 2017** | 25,770,551 | 26 | 7,879,189 | (8,052,572) | (173,357) |
| Issuance of common stock for cash | 46,330 | | 307,924 | | 307,924 |
| Value of common stock issued with notes payable | 155,850 | | 407,791 | | 407,791 |
| Value of warrants issued with notes payable | | | 3,726,506 | | 3,726,506 |
| Value of common stock issued with capital lease obligation | 298,500 | | 2,388,000 | | 2,388,000 |
| Issuance of common stock for services | 432,500 | 1 | 3,459,999 | | 3,460,000 |
| Issuance of common stock for accounts payable | 14,945 | | 119,274 | | 119,274 |
| Stock option expense | | | 904,468 | | 904,468 |
| Net loss | | | | (13,189,122) | (13,189,122) |
| **Balance, December 31, 2018** | 26,718,676 | $ 27 | $ 19,193,151 | $ (21,241,694) | $ (2,048,516) |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-5

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
For the Year Ended December 31, 2018 and 2017

| | | 2018 | 2017 |
|---|---|---:|---:|
| | | | **(restated)** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $ | (13,189,122) | (6,568,863) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | | 500,622 | 82,904 |
| Stock option expense | | 904,468 | 1,676,476 |
| Common stock issued for services | | 3,460,000 | |
| Non-cash financing costs | | - | 39,293 |
| Amortization of debt discounts | | 4,460,931 | 124,320 |
| Change in value of derivative liability | | - | (40,266) |
| Gain on disposal of assets | | (17,360) | - |
| Impairment of leased assets | | 2,388,000 | 2,800,000 |
| Accounts receivable | | - | - |
| Prepaid expenses | | (95,494) | (13,406) |
| Accounts payable | | 673,836 | 15,966 |
| Accrued expenses | | 489,963 | 31,453 |
| Net cash used in operating activities | | (424,156) | (1,852,123) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Purchase of equipment | | (2,840) | (3,178) |
| Deposit for leased vehicles | | - | - |
| Net cash used in investing activities | | (2,840) | (3,178) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from sale of common stock | | 307,924 | 2,484,199 |
| Payment of offering costs | | - | (614,805) |
| Proceeds from convertible note payable | | - | 100,000 |
| Repayment of convertible note payable | | - | (113,888) |
| Proceeds from notes payable | | 7,746,378 | 887,667 |
| Repayment of note payable | | (6,111,263) | |
| Payment for debt issuance costs | | (178,228) | - |
| Proceeds from advance from related party | | - | 50,000 |
| Repayment of advance from related party | | - | (125,000) |
| Repayment of finance lease obligations | | (1,369,109) | (522,777) |
| Net cash provided by financing activities | | 395,702 | 2,145,396 |
| **NET INCREASE (DECREASE) IN CASH** | | (31,294) | 290,095 |
| **CASH, BEGINNING OF PERIOD** | | 308,738 | 18,643 |
| **CASH, END OF PERIOD** | $ | 277,444 | $ 308,738 |
| | | | |
| **CASH PAID FOR:** | | | |
| Interest | $ | 139,825 | $ 16,402 |
| Income taxes | $ | - | $ - |
| | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | |
| Payment of accounts payable with common stock | $ | 119,274 | $ - |
| Value of equity recorded as debt discounts | $ | 4,134,297 | $ 1,368,063 |
| Finance lease obligations | $ | 3,700,674 | $ 2,116,068 |

The accompanying footnotes are an integral part of these consolidated financial statements.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 1 - Organization and Basis of Presentation**

Organization and Line of Business

YayYo, Inc. ("YayYo" or the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents cars to Uber and Lyft drivers.

Basis of Presentation

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

**Note 2 – Summary of Significant Accounting Policies**

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC, RideShare Car Rentals, LLC, RideYayYo, LLC and Savy, LLC. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash Equivalents

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at December 31, 2018 and 2017, the Company took an impairment charge against its leased assets for $2,388,000 and $2,800,000, respectively.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 1,500,000 warrants and 300,000 options outstanding as of December 31, 2018.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There were 1,800,000 and 750,000 potentially dilutive securities outstanding at December 31, 2018 and 2017, respectively.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the years ended December 31, 2018 and 2017 were $482,811 and $86,098, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Research and developments costs for the years ended December 31, 2018 and 2017 were $9,699 and $303,555, respectively.

Deferred Offering Costs

Deferred offering costs are amounts incurred that are directly related to the offering of the Company's common stock. These costs will be offset against the proceeds from the Company's equity offering.

Software Development Costs

Software development costs are capitalized in accordance with FASB ASC 985-20 *Cost of Software to Be Sold, Leased, or Marketed*. Capitalization of software development costs begins upon the establishment of technological feasibility and is discontinued when the product is available for sale. The establishment of technological feasibility and the ongoing assessment for recoverability of capitalized software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenues, estimated economic life, and changes in software and hardware technologies. Capitalized software development costs are comprised primarily of direct overhead, payroll costs, and consultants' fees of individuals working directly on the development of specific software products.

Amortization of capitalized software development costs is provided on a product-by-product basis on the straight-line method over the estimated economic life of the products (not to exceed three years). Management periodically compares estimated net realizable value by product to the amount of software development costs capitalized for that product to ensure the amount capitalized is not in excess of the amount to be recovered through revenues. Any such excess of capitalized software development costs over expected net realizable value is expensed at that time.

Organizational Costs

In accordance with FASB ASC 720, organizational costs, including accounting fees, legal fees, and costs of incorporation, are expensed as incurred.

Derivative Financial Instruments

The Company evaluates all of its agreements to determine if such instruments have derivatives or contain features that qualify as embedded derivatives. For derivative financial instruments that are accounted for as liabilities, the derivative instrument is initially recorded at its fair value and is then re-valued at each reporting date, with changes in the fair value reported in the statements of operations. For stock-based derivative financial instruments, the Company uses the Black-Scholes-Merton option pricing model to value the derivative instruments at inception and on subsequent valuation dates. The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is evaluated at the end of each reporting period. Derivative instrument liabilities are classified in the balance sheet as current or non-current based on whether or not net-cash settlement of the derivative instrument could be required within 12 months of the balance sheet date. During the year ended December 31, 2017, the Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. The convertible note was repaid therefore, there are no derivative financial instruments at December 31, 2018 and 2017.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company uses Level 2 inputs for its valuation methodology for derivative liabilities as their fair values were determined by using the Black-Scholes-Merton pricing model based on various assumptions. The Company's derivative liabilities are adjusted to reflect fair value at each period end, with any increase or decrease in the fair value being recorded in results of operations as adjustments to fair value of derivatives.

At December 31, 2018 and 2017, the Company did not identify any liabilities that are required to be presented on the balance sheet at fair value. The derivative liability associated with the convertible notes payable were both issued and repaid during the year ended December 31, 2017; therefore, there was no derivative liability at December 31, 2018 or December 31, 2017.

Recent Accounting Pronouncements

In June 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") ASU 2018-07, *Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for share-based payments granted to nonemployees for goods and services and aligns most of the guidance on such payments to nonemployees with the requirements for share-based payments granted to employees. ASU 2018-07 is effective on January 1, 2019. Early adoption is permitted. The Company is in the process of evaluating the impact of this ASU on its financial statements.

In January 2017, the FASB issued ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this update clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for interim and annual periods beginning after December 15, 2017 and should be applied prospectively on or after the effective date. The adoption of this ASU did not have an impact on its financial statements.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* which requires restricted cash to be presented with cash and cash equivalents on the statement of cash flows and disclosure of how the statement of cash flows reconciles to the balance sheet if restricted cash is shown separately from cash and cash equivalents on the balance sheet. ASU 2016-18 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In October 2016, the FASB issued ASU 2016-16, *Income Taxes (Topic 740): Intra-Entity Transfer of Assets Other than Inventory*, which requires the recognition of the income tax consequences of an intra-entity transfer of an asset, other than inventory, when the transfer occurs. ASU 2016-16 is effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. The Company is in the process of evaluating the impact of this ASU on its financial statements.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

In August 2016, the FASB issued ASU 2016-15*, Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments*. ASU 2016-15 provides guidance for targeted changes with respect to how cash receipts and cash payments are classified in the statements of cash flows, with the objective of reducing diversity in practice. ASU 2016-15 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ASU 2016-02 requires lessees to recognize lease assets and lease liabilities on the balance sheet and requires expanded disclosures about leasing arrangements. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 and interim periods in fiscal years beginning after December 15, 2018, with early adoption permitted. The Company adopted this ASU for its year ended December 31, 2017.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under current U.S. GAAP and replace it with a principle-based approach for determining revenue recognition. ASU 2014-09 will require that companies recognize revenue based on the value of transferred goods or services as they occur in the contract. The ASU also will require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. ASU 2014-09 is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted only in annual reporting periods beginning after December 15, 2016, including interim periods therein. Entities will be able to transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption. The Company adopted this ASU beginning on January 1, 2018 and used the modified retrospective method of adoption. The adoption of this ASU did not have a material impact on the Company's financial statements and disclosures.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 3 – Equipment**

At December 31, 2018 and 2017 equipment consisted of the following:

|                                | 2018      | 2017      |
| ------------------------------ | --------- | --------- |
| Computer equipment             | $ 6,046   | $ 3,178   |
|                                | 6,046     | 3,178     |
| Less accumulated depreciation  | (954)     | (318)     |
| Equipment, net                 | $ 5,092   | $ 2,860   |

Depreciation expense for equipment for the years ended December 31, 2018 and 2017 was $636 and $318, respectively.

**Note 4 – Leased Assets**

At December 31, 2018 and 2017 all of the Company's leased assets were finance leased right-of-use assets and consisted of the following:

|                                | 2018         | 2017         |
| ------------------------------ | ------------ | ------------ |
| Vehicles                       | $ 5,661,749  | $ 2,116,068  |
|                                | 5,661,749    | 2,116,068    |
| Less accumulated depreciation  | (546,632)    | (82,586)     |
| Leased assets, net             | $ 5,115,117  | $ 2,033,482  |

The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. The value of the leased assets was initially determined as the sum of the lease liability plus the up-front consideration of 298,500 shares of the Company's common stock (valued at $2,388,000) paid to the lessor in 2018 and 350,000 shares of the Company's common stock (valued at $2,800,000) paid to the lessor in 2017. During the years ended December 31, 2018 and 2017, the Company determined that the carrying value of the leased assets was impaired and took an impairment charge of $2,388,000 and $2,800,000, respectively, to reduce the carrying value of the leased assets to fair value. Amortization expense for leased assets for the years ended December 31, 2018 and 2017 was $499,986 and $82,586, respectively. The lease terms are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

**Note 5 – Notes Payable**

Notes payable at December 31, 2018 and 2017 consisted of the following:

|                                                                                                                                                                        | 2018        | 2017      |
| ---------------------------------------------------------------------------------------------------------------------------------------------------------------------- | ----------- | --------- |
| Note payable to stockholder; accrue interest at 5% per annum; due March 31, 2019; unsecured                                                                           | $ 790,000   | $ 445,000 |
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 of original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to March 26, 2021; unsecured (A) | 319,667     | 242,667   |
| Note payable to investor; accrue interest at 6% per annum; due March 31, 2018; unsecured (B)                                                                          | 222,222     | 222,222   |
| Note payable to investor; original issue discount of $117,828; due the earlier of July 31, 2019 or closing of an offering of at least $3,000,000; secured by assets of the Company (C) | 1,296,018   | -         |

| | | | |
|---|---|---:|---:|
| Note payable to merchant bank; accrues interest at 15% per annum; daily payments of $813 | | 37,308 | - |
| | | | |
| Line of credit; $65,000 limit; accrues interest at 15% per annum; weekly payments of $3,038 | | 24,966 | - |
| Total notes payable | | 2,690,181 | 909,889 |
| Unamortized debt discount | | (72,211) | (102,790) |
| Notes payable, net discount | | 2,617,970 | 807,099 |
| Less current portion | | (2,617,970) | (254,511) |
| Long-term portion | $ | - | $ 552,588 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

(A) In connection with the issuance of these notes payable, during the year ended December 31, 2018, the Company also issued an aggregate of 5,850 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $28,875 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $28,875 is being amortized over the term of the notes payable. During the year ended December 31, 2017, the Company also issued an aggregate of 18,200 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $91,000 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $91,000 is being amortized over the term of the notes payable. During the years ended December 31, 2018 and 2017, $37,949 and $0, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $72,211 at December 31, 2018.

(B) This note payable was issued with an original issuance discount of $22,222 which is being amortized over the term of the notes payable. During the years ended December 31, 2018 and 2017, $21,506 and $0, respectively, was charged to interest expense as amortization of the discount, with an unamortized balance of $0 at December 31, 2018.

(C) On March 8, 2018, the Company issued a note payable for $6,000,000. The note accrues interest at LIBOR plus 100 basis points and is due five years from the date of issuance. The note payable is secured by the restricted cash balance. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per shares. The warrants expire five years from the date of issuance. The Company also paid $178,228 of issuance costs associated with this note. The relative fair value of the 150,000 shares of common stock was $378,916 and the relative fair value of the 1,500,000 warrants was $3,726,506 and both were recorded as a discount on the note payable and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the note payable. On September 12, 2018, the Company entered into a new note payable agreement with this investor whereby, the Company repaid $4,821,810 of the original $6,000,000 note payable and with the balance of $1,178,190 plus an original issue discount of $117,828 being rolled into the September 12, 2018 note payable for $1,296,018. The original issue discount of $117,828 is being amortized to interest expense over the term of the new note payable. As a result of the $6,000,000 note payable being repaid in September 2018, the Company amortized to interest expense the remaining debt discount associated with the note payable of $4,018,560. During the years ended December 31, 2018 and 2017, $4,401,477 and $0, respectively, was charged to interest expense as amortization of the debt discounts associated with the notes payable to this investor, with an unamortized balance of $0 at December 31, 2018.

A rollforward of notes payable from December 31, 2016 to December 31, 2018 is below:

| | | |
|---|---|---:|
| Notes payable, December 31, 2016 | $ | 0 |
| Issued for cash | | 887,667 |
| Issued for original issue discount | | 22,222 |
| Debt discount related to notes payable | | (113,222) |
| Amortization of debt discounts | | 10,432 |
| Notes payable, December 31, 2017 | $ | 807,099 |
| Issued for cash | | 7,746,378 |
| Repayments | | (6,111,263) |
| Accrued interest converted to note payable | | 27,350 |
| Debt discount related to notes payable | | (4,312,525) |
| Amortization of debt discounts | | 4,460,931 |
| Notes payable, December 31, 2018 | $ | 2,617,970 |

**Note 6 – Lease Obligations**

Lease obligations at December 31, 2018 and 2017 consisted of the following:

| | | 2018 | | 2017 |
|---|---|---:|---|---:|
| Lease obligations | $ | 3,790,147 | $ | 1,593,291 |
| Less current portion | | (1,562,651) | | (555,090) |

| | | | | |
|---|---|---|---|---|
| Long-term portion | $ | 2,227,496 | $ | 1,038,201 |

In connection with these finance lease obligations, during the years ended December 31, 2018, the Company also issued to the lessor 298,500 shares of its common stock as additional incentive for the lessor to enter into additional lease agreements. The fair value of these 298,500 shares of common stock was $2,388,000 and was recorded as an up-front lease payment. The fair value of the common stock was based on sales of the Company's common stock to third parties. Increasing the value of the leased vehicles for the value of the 298,500 shares of common stock resulted in the carrying amount of the vehicles exceeding the fair value of the vehicles. Accordingly, the Company has taken an impairment charge of $2,388,000 during the years ended December 31, 2018 to reduce the carrying value of the vehicles to fair value.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

A rollforward of lease obligations from December 31, 2016 to December 31, 2018 is below:

| | | |
|---|---|---:|
| Lease obligations, December 31, 2016 | $ | - |
| New lease obligations | | 2,116,068 |
| Payments on lease obligations | | (522,777) |
| Lease obligations, December 31, 2017 | $ | 1,593,291 |
| New lease obligations | | 3,700,674 |
| Disposal of leased vehicles | | (134,709) |
| Payments on lease obligations | | (1,369,109) |
| Lease obligations, December 31, 2018 | $ | 3,790,147 |

Future payments under lease obligations are as follows:

| Years ending December 31, | | |
|---|---|---:|
| 2019 | $ | 1,747,166 |
| 2020 | | 1,637,780 |
| 2021 | | 699,206 |
| Total payments | | 4,084,152 |
| Amount representing interest | | (294,005) |
| Lease obligation, net | $ | 3,790,147 |

The weighted-average remaining lease term at December 31, 2018 is 2.17 years and the weighted average discount rate is 5%.

The finance lease costs for the year ended December 31, 2018 consisted of amortization expense of $499,986 and interest expense of $117,858. The finance lease costs for the year ended December 31, 2017 consisted of amortization expense of $82,586 and interest expense of $16,292.

**Note 7 – Convertible Notes Payable**

On January 6, 2017, the Company entered into a letter agreement (the "CFI Letter Agreement") with Chase Financing, Inc. ("CFI"), pursuant to which CFI agreed to provide up to $100,000 in capital to the Company through one or more loans with an aggregate principal amount of $113,888.

On January 6, 2017, the Company received $50,000 from CFI and issued its 10% original issue discount senior secured convertible note in the principal amount of $ 55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017 the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note "). Subsequent to the Second CFI Note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms of the CFI Notes.

Pursuant to the terms, the CFI Notes are secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and are convertible at the option of the holder into shares of our Common Stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our Common Stock during the twenty (20) trading days immediately prior to the date of conversion. If an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

F-14

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI Notes by the Company, Ramy El-Batrawi, our founder, former Chief Executive Officer and former Director, entered into a Limited Recourse Guaranty and Pledge agreement with CFI (the "Guaranty & Pledge"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our Common Stock held of record and beneficially owned by X, LLC.

In addition to the Guaranty & Pledge, on January 6, 2017, X, LLC (an entity wholly owned by Mr. El-Batrawi) entered into a Common Stock Purchase Agreement ("Stock Purchase Agreement"), pursuant to which X, LLC agreed to sell and transfer to CFI 200,000 shares of our Common Stock, held of record and beneficially owned by X, LLC, in exchange for the aggregate nominal consideration of one dollar ($1.00). Under the Stock Purchase Agreement, and in addition to the 200,000 shares of Common Stock to be issued upon the effective date of the Stock Purchase Agreement, X, LLC has agreed to provide CFI with certain anti-dilution protection provisions, whereby X, LLC will issue a number of shares of our Common Stock, held as of record and beneficially by X, LLC, equal to two percent (2%) of the number of shares of Common Stock issued or underlying Common Stock Equivalents (as defined under the Stock Purchase Agreement) issued, as the case may be, in the event of a Dilutive Share Issuance (as defined under the Stock Purchase Agreement). X, LLC has the right to repurchase 100,000 of such shares at an aggregate purchase price of $208,500 if exercises within the initial three (3) months after the date of the Stock Purchase Agreement, or $258,500 if exercised within the second three (3) months.

The CFI Notes have been repaid by the Company.

A rollforward of the convertible note payable from December 31, 2016 to December 31, 2017 is below:

| | |
|---|---:|
| Convertible notes, December 31, 2016 | $ - |
| Issued for cash | 100,000 |
| Issued for original issue discount | 13,888 |
| Debt discount related to new convertible notes | (113,888) |
| Amortization of debt discounts | 113,888 |
| Repayment in cash | (113,888) |
| Convertible notes, December 31, 2017 | $ - |

**Note 8 – Derivative Liability**

The convertible notes payable discussed in Note 7 had a conversion price that can be adjusted based on the Company's stock price which results in the conversion feature being recorded as a derivative liability.

The fair value of the derivative liability was recorded and shown separately under current liabilities. However, as of December 31, 2017 the convertible note payable giving rise to the derivative liability was repaid, and as a result, the derivative liability at December 31, 2017 was $0. Changes in the fair value of the derivative liability is recorded in the statement of operations under other income (expense).

The Company uses a weighted average Black-Scholes-Merton option pricing model with the following assumptions to measure the fair value of derivative liability:

| | |
|---|---|
| Stock price | $4.00 |
| Risk free rate | 0.53% |
| Volatility | 275% |
| Conversion/ Exercise price | $4.00 |
| Dividend rate | 0% |
| Term (years) | 0.16 to 0.25 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

The following table represents the Company's derivative liability activity from December 31, 2016 to December 31, 2017:

| | |
|---|---:|
| Derivative liability balance, December 31, 2016 | $ - |
| Issuance of derivative liability during the period | 40,266 |
| Change in derivative liability during the period | (40,266) |
| Derivative liability balance, December 31, 2017 | $ - |

**Note 9 – Stockholders' Equity**

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

Common Stock

During the years ended from December 31, 2018, the Company:

- sold 46,330 shares of common stock to investors for gross cash proceeds of $307,924;

- issued 155,850 shares of common stock in connection with the issuance of notes payable;

- issued 298,500 shares of common stock in connection with lease obligations;

- issued 432,500 shares of common stock for services rendered valued at $3,460,000. The value was determined based on the shares price for recent sales of the Company's common stock; and

- issued 14,945 shares of common stock for payment of accounts payable of $119,274.

During the year ended from December 31, 2017, the Company:

- sold 371,351 shares of common stock to investors for gross cash proceeds of $2,484,199 of which 326,126 shares and $2,303,299 of cash proceeds were related to the Company's Regulation A offering. The Company incurred $814,442 of offering cost related to the sale of common stock which consisted principally of legal fees and costs associated with soliciting the sale of common stock directly to the Regulation A investors;

- issued 18,200 shares of common stock in connection with the issuance of notes payable;

- issued 350,000 shares of common stock in connection with lease obligations;

- issued 432,500 shares of common stock for services rendered valued at $3,460,000. The value was determined based on the shares price for recent sales of the Company's common stock; and

- issued 20,000 shares of common stock for payment of accounts payable of $160,000.

Stock Options

The following is a summary of stock option activity:

| | Options Outstanding | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---:|---|---:|---|---:|---|---:|
| Outstanding, December 31, 2016 | 450,000 | $ | 1.00 | | 2.00 | $ | - |

| | | | | | |
|---|---|---|---|---|---|
| Granted | 300,000 | $ | 8.00 | | |
| Forfeited | - | | | | |
| Exercised | - | | | | |
| Outstanding, December 31, 2017 | 750,000 | $ | 3.80 | 1.80 | $ 3,150,000 |
| | | | | | |
| Granted | - | | | | |
| Forfeited | (450,000) | | 1.00 | | |
| Exercised | - | | | | |
| Outstanding, December 31, 2018 | 300,000 | $ | 8.00 | 2.00 | $ |
| Exercisable, December 31, 2018 | 300,000 | $ | 8.00 | 2.00 | $ |

The exercise price for options outstanding at December 31, 2018:

| Outstanding | | Exercisable | |
|---|---|---|---|
| Number of Options | Exercise Price | Number of Options | Exercise Price |
| 300,000 $ | 8.00 $ | 300,000 | 8.00 |
| 300,000 | | 300,000 | |

F-16

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

Warrants

The following is a summary of warrant activity:

| | Warrants Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2017 | - | | | | | |
| Granted | 1,500,000 | $ | 4.00 | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2018 | 1,500,000 | $ | 4.00 | 4.44 | $ | 6,000,000 |
| Exercisable, December 31, 2018 | 1,500,000 | $ | 4.00 | 4.44 | $ | 6,000,000 |

The exercise price for warrants outstanding at December 31, 2018:

| Outstanding and Exercisable | | |
|---|---|---|
| Number of Warrants | Exercise Price | |
| 1,500,000 | $ | 4.00 |
| 1,500,000 | | |

**Note 10 – Related Party Transactions**

During the years ended December 31, 2018 and 2017, the Company paid management fees of $205,000 and $286,300, respectively, to a company that is owned by the Company's majority stockholder.

During the year ended December 31, 2017 and the period from June 21, 2016 (inception) to December 31, 2016, the Company's majority stockholder advanced a total of $50,000 and $75,000 to the Company. During the year ended December 31, 2017, $125,000 of these advances were repaid. These advances are non-interest bearing and due upon demand.

During the years ended December 31, 2018 and 2017, the Company expensed $334,471 and $0, respectively, in advertising expense from a company whose CEO is also a director of the Company. At December 31, 2018 and 2017, $334,471 and $0, respectively, was owed to this company and is included in accounts payable in the accompanying consolidated balance sheets.

At December 31, 2018 and 2017, the Company had a note payable to a stockholder for $790,000 and $445,000, respectively.

**Note 11 – Commitments and Contingencies**

The Company is party to certain legal proceedings from time to time incidental to the conduct of its business. These proceedings could result in fines, penalties, compensatory or treble damages or non-monetary relief. The nature of legal proceedings is such that the Company cannot assure the outcome of any particular matter, and an unfavorable ruling or development could have a materially adverse effect on our consolidated financial position, results of operations and cash flows in the period in which a ruling or settlement occurs. However, based on information available to the Company's management to date, the Company's management does not expect that the outcome of any matter pending against the Company is likely to have a materially adverse effect on the Company's consolidated financial position as of December 31, 2018, results of operations, cash flows or liquidity of the Company.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 12 – Income Taxes**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A full valuation allowance is established against all net deferred tax assets as of December 31, 2018 and 2017 based on estimates of recoverability. While the Company has optimistic plans for its business strategy, it determined that such a valuation allowance was necessary given the current and expected near term losses and the uncertainty with respect to its ability to generate sufficient profits from its business model. Because of the impacts of the valuation allowance, there was no income tax expense or benefit for the years ended December 31, 2018 and 2017.

A reconciliation of the differences between the effective and statutory income tax rates for the years ended December 31, 2018 and 2017:

|  | 2018 | | 2017 | |
|---|---|---|---|---|
|  | **Amount** | **Percent** | **Amount** | **Percent** |
| Federal statutory rates | $ (2,769,716) | 21.0% | $ (2,233,413) | 34.0% |
| State income taxes | (923,239) | 7.0% | (328,443) | 5.0% |
| Permanent differences | 3,144,503 | -23.8% | 1,786,485 | -27.2% |
| Valuation allowance against net deferred tax assets | 548,452 | -4.2% | 775,371 | -11.8% |
| Effective rate | $ - | 0.0% | $ - | 0.0% |

At December 31, 2018 and 2017, the significant components of the deferred tax assets are summarized below:

|  | **2018** | **2017** |
|---|---|---|
| Deferred income tax asset |  |  |
| Net operation loss carryforwards | 1,497,497 | 1,321,885 |
| Total deferred income tax asset | 1,497,497 | 1,321,885 |
| Less: valuation allowance | (1,497,497) | (1,321,885) |
| Total deferred income tax asset | $ - | $ - |

The valuation allowance increased by $175,612 in 2018 of which $548,452 was a result of the Company generating additional net operating losses offset by $372,840 as a result of the change in the corporate tax rate from 34% to 21%. The valuation allowance increased by $775,371 in 2017 as a result of the Company generating additional net operating losses.

The Company has recorded as of December 31, 2018 and 2017 a valuation allowance of $1,497,497 and $1,321,885, respectively, as it believes that it is more likely than not that the deferred tax assets will not be realized in future years. Management has based its assessment on the Company's lack of profitable operating history.

The Company conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2018 and 2017.

The Company has net operating loss carry-forwards of approximately $5,350,000. Such amounts are subject to IRS code section 382 limitations and expire in 2031. The 2016, 2017 and 2018 tax year is still subject to audit.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Note 13 – Restatement of Previously Issued Financial Statements**

In connection finance lease obligations as discussed in Note 6, the Company issued the lessor an aggregate of 350,000 shares of its common stock as additional incentive for the lessor to enter into the lease agreements. The Company originally accounted for the issuance of the 350,000 shares of common stock as a debt discount to the lease obligation by recording the relative fair value of the common stock as a debt discount that would be amortized to interest expense over the term of the lease obligations. The Company has restated its previously issued financial statements to record the fair value of the 350,000 shares of common stock as an up-front lease payment; and therefore included in the value of the leased vehicles. Increasing the value of the leased vehicles for the value of the 350,000 shares of common stock resulted in the carrying amount of the vehicles exceeding the fair value of the vehicles. Accordingly, the Company has taken an impairment charge of $2,800,000 to reduce the carrying value of the vehicles to fair value. The adjustments to the previously issued financial statements reflect the following:

a. removal of the debt discount from the financing lease obligation
b. removal of the amortization of the debt discount to interest expense
c. record the impairment of the leased vehicles

**Consolidated Balance Sheet**
**As of December 31, 2017**

| | Previously Filed | | Adjustment | | As Restated | |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash | $ | 308,738 | $ | — | $ | 308,738 |
| Prepaid expenses | | 13,406 | | — | | 13,406 |
| Total current assets | | 322,144 | | — | | 322,144 |
| Equipment, net | | 2,860 | | — | | 2,860 |
| Leased assets, net | | 2,033,482 | | — | | 2,033,482 |
| **TOTAL ASSETS** | $ | 2,358,486 | $ | — | $ | 2,358,486 |
| | | | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities: | | | | | | |
| Accounts payable | $ | 100,000 | $ | — | $ | 100,000 |
| Accrued expenses | | 31,453 | | — | | 31,453 |
| Notes payable, current (net of discount of $48,600) | | 254,511 | | — | | 254,511 |
| Finance lease obligations, current | | 72,485 | | 482,605 a | | 555,090 |
| Total current liabilities | | 458,449 | | 482,605 | | 941,054 |
| Notes payable, net of current portion (net of discount of $54,190) | | 552,588 | | — | | 552,588 |
| Finance lease obligations, net of current portion | | 674,208 | | 363,993 a | | 1,038,201 |
| **TOTAL LIABILITIES** | | 1,685,245 | | 846,598 | | 2,531,843 |
| | | | | | | |
| Commitments and contingencies | | — | | — | | — |
| | | | | | | |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Preferred stock | | — | | — | | — |
| Common stock | | 26 | | — | | 26 |
| Additional paid-in capital | | 6,257,225 | | 1,621,964 a,c | | 7,879,189 |
| Accumulated deficit | | (5,584,010) | | (2,468,562) b,c | | (8,052,572) |
| Total stockholders' equity (deficit) | | 673,241 | | (846,598) | | (173,357) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | $ | 2,358,486 | $ | — | $ | 2,358,486 |

**Consolidated Statement of Operations**
**For the Year Ended December 31, 2017**

|  | Previously Filed | | Adjustment | | As Restated | |
|---|---|---|---|---|---|---|
| **Revenue** | $ | 235,690 | $ | — | $ | 235,690 |
| **Cost of revenue** | | 213,111 | | — | | 213,111 |
| **Gross profit** | | 22,579 | | — | | 22,579 |
| | | | | | | |
| **Operating expenses:** | | | | | | |
| Selling and marketing expenses | | 86,098 | | — | | 86,098 |
| Product development | | 303,555 | | — | | 303,555 |
| General and administrative expenses | | 3,249,659 | | — | | 3,249,659 |
| Impairment of leased assets | | — | | 2,800,000 c | | 2,800,000 |
| Total operating expenses | | 3,639,312 | | 2,800,000 | | 6,439,312 |
| **Loss from operations** | | (3,616,733) | | (2,800,000) | | (6,416,733) |
| | | | | | | |
| **Other income (expense):** | | | | | | |
| Interest and financing costs | | (523,833) | | 331,438 b | | (192,395) |
| Change in value of derivative liability | | 40,265 | | — | | 40,265 |
| Total other income (expense) | | (483,568) | | 331,438 | | (152,130) |
| **Net loss** | $ | (4,100,301) | $ | (2,468,562) | $ | (6,568,863) |
| | | | | | | |
| **Weighted average shares outstanding :** | | | | | | |
| Basic | | 25,297,066 | | — | | 25,297,066 |
| Diluted | | 25,297,066 | | — | | 25,297,066 |
| **Loss per share** | | | | | | |
| Basic | $ | (0.16) | $ | (0.10) | $ | (0.26) |
| Diluted | $ | (0.16) | $ | (0.10) | $ | (0.26) |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For Year Ended December 31, 2018 and 2017**

**Consolidated Statement of Cash Flows**
**For the Year Ended December 31, 2017**

| | Previously Filed | Adjustment | As Restated |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $ (4,100,301) | $ (2,468,562) | $ (6,568,863) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation | 82,904 | — | 82,904 |
| Stock option expense | 1,676,476 | — | 1,676,476 |
| Non-cash financing costs | 39,293 | — | 39,293 |
| Amortization of debt discounts | 455,758 | (331,438) b | 124,320 |
| Impairment of leased assets | — | 2,800,000 c | 2,800,000 |
| Change in value of derivative liability | (40,266) | — | (40,266) |
| Change in operating assets and liabilities: | | — | |
| Prepaid expenses | (13,406) | — | (13,406) |
| Accounts payable | 15,966 | — | 15,966 |
| Accrued expenses | 31,453 | — | 31,453 |
| Net cash used in operating activities | (1,852,123) | — | (1,852,123) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Purchase of equipment | (3,178) | — | (3,178) |
| Net cash used in investing activities | (3,178) | — | (3,178) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from sale of common stock | 2,484,199 | — | 2,484,199 |
| Payment of offering costs | (614,805) | — | (614,805) |
| Proceeds from convertible note payable | 100,000 | — | 100,000 |
| Repayment of convertible note payable | (113,888) | — | (113,888) |
| Proceeds from notes payable | 887,667 | — | 887,667 |
| Proceeds from advance from related party | 50,000 | — | 50,000 |
| Repayment of advance from related party | (125,000) | — | (125,000) |
| Repayment of finance lease obligations | (522,777) | — | (522,777) |
| Net cash provided by financing activities | 2,145,396 | — | 2,145,396 |
| | | | |
| **NET INCREASE IN CASH** | 290,095 | — | 290,095 |
| **CASH, BEGINNING OF PERIOD** | 18,643 | — | 18,643 |
| **CASH, END OF PERIOD** | $ 308,738 | $ — | $ 308,738 |
| | | | |
| **CASH PAID FOR:** | | | |
| Interest | $ 16,402 | $ — | $ 16,402 |
| Income taxes | $ — | $ — | $ — |
| | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | |
| Finance lease obligations | $ 2,116,068 | $ — | $ 2,116,068 |
| Value of equity recorded as debt discounts | $ 1,368,063 | (1,178,036) a | $ 190,027 |

**YAYYO, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
As of June 30, 2019 and December 31, 2018

|  | (unaudited) June 30, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash | $ 34,381 | $ 277,444 |
| Accounts receivable | 65,115 | - |
| Prepaid expenses | 145,597 | 108,900 |
| Total current assets | 245,093 | 386,344 |
| Equipment, net | 4,934 | 5,092 |
| Leased assets, net | 4,758,110 | 5,115,117 |
| Deferred offering costs | 66,500 | 66,500 |
| **TOTAL ASSETS** | $ 5,074,637 | $ 5,573,053 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current Liabilities: | | |
| Accounts payable (including $387,978 and 334,471, respectively to related party) | $ 504,801 | $ 719,386 |
| Accrued expenses | 538,409 | 494,066 |
| Notes payables, current (net of discount of $52,414 and $72,211) | 3,180,673 | 2,617,970 |
| Finance lease obligations, current | 1,662,476 | 1,562,651 |
| Total current liabilities | 5,886,359 | 5,394,073 |
| Finance lease obligations, net of current portion | 1,559,309 | 2,227,496 |
| **TOTAL LIABILITIES** | 7,445,668 | 7,621,569 |
| | | |
| Commitments and contingencies | - | - |
| | | |
| **STOCKHOLDERS' DEFICIT** | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 26,802,976 and 26,718,676 shares issued and outstanding | 27 | 27 |
| Additional paid-in capital | 19,867,551 | 19,193,151 |
| Accumulated deficit | (22,238,609) | (21,241,694) |
| Total stockholders' deficit | (2,371,031) | (2,048,516) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $ 5,074,637 | $ 5,573,053 |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

F-21

**YAYYO, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

| | Six months ended June 30, | |
| | 2019 | 2018 |
|---|---|---|
| **Revenue** | $ 3,475,518 | $ 1,037,415 |
| **Cost of revenue** | 2,044,241 | 727,624 |
| **Gross profit** | 1,431,277 | 309,791 |
| **Operating expenses:** | | |
| Selling and marketing expenses | 102,606 | 91,495 |
| Product development | - | 9,699 |
| General and administrative expenses | 1,460,811 | 3,972,915 |
| Loss on the settlement of debt | 252,900 | - |
| Total operating expenses | 1,816,317 | 4,074,109 |
| **Loss from operations** | (385,040) | (3,764,318) |
| **Other income (expense):** | | |
| Interest and financing costs | (611,875) | (380,872) |
| Total other income (expense) | (611,875) | (380,872) |
| **Net loss** | $ (996,915) | $ (4,145,190) |
| **Weighted average shares outstanding:** | | |
| Basic | 26,760,318 | 26,086,952 |
| Diluted | 26,760,318 | 26,086,952 |
| **Loss per share** | | |
| Basic | $ (0.04) | $ (0.16) |
| Diluted | $ (0.04) | $ (0.16) |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

**YAYYO, INC.**
**CONDENSED CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY (DEFICIT)**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Deficit | Deficit |
| **Balance, December 31, 2018** | 26,718,676 | 27 | 19,193,151 | (21,241,694) | (2,048,516) |
| Issuance of common stock for accounts payable and accrued expenses | 84,300 | | 674,400 | | 674,400 |
| Net loss | | | | (996,915) | (996,915) |
| **Balance, June 30, 2019** | 26,802,976 | $ 27 | $ 19,867,551 | $ (22,238,609) | $ (2,371,031) |
| | | | | | |
| **Balance, December 31, 2017** | 25,770,551 | 26 | 7,879,189 | (8,052,572) | (173,357) |
| Issuance of common stock for cash | 46,330 | | 307,924 | | 307,924 |
| Value of common stock issued with notes payable | 155,850 | | 407,791 | | 407,791 |
| Value of warrants issued with notes payable | | | 3,726,506 | | 3,726,506 |
| Issuance of common stock for services | 332,500 | | 2,660,000 | | 2,660,000 |
| Issuance of common stock for accounts payable | 8,695 | | 69,274 | | 69,274 |
| Stock option expense | | | 452,234 | | 452,234 |
| Net loss | | | | (4,145,190) | (4,145,190) |
| **Balance, June 30, 2018** | 26,313,929 | $ 26 | $ 15,502,918 | $ (12,197,762) | $ 3,305,182 |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

F-23

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
For the Six Months Ended June 30, 2019 and 2018 (unaudited)

| | Six months ended June 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (996,915) | $ (4,145,190) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 514,402 | 186,061 |
| Stock option expense | - | 452,234 |
| Common stock issued for services | - | 2,660,000 |
| Amortization of debt discounts | 19,797 | 304,419 |
| Gain on disposal of assets | - | (11,302) |
| Loss on the settlement of debt | 252,900 | - |
| Accounts receivable | (65,115) | - |
| Prepaid expenses | (36,697) | 12,859 |
| Accounts payable | (214,585) | 40,142 |
| Accrued expenses | 465,843 | 13,161 |
| Net cash used in operating activities | (60,370) | (487,616) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of equipment | - | (2,840) |
| Net cash used in investing activities | - | (2,840) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from sale of common stock | - | 307,924 |
| Proceeds from notes payable | 1,051,330 | 6,645,000 |
| Repayment of note payable | (508,394) | (122,744) |
| Payment for debt issuance costs | - | (178,228) |
| Repayment of finance lease obligations | (725,599) | (333,730) |
| Net cash provided by (used in) financing activities | (182,693) | 6,318,222 |
| | | |
| **NET INCREASE (DECREASE) IN CASH** | (243,063) | 5,827,766 |
| **CASH, BEGINNING OF PERIOD** | 277,444 | 308,738 |
| **CASH, END OF PERIOD** | $ 34,381 | $ 6,136,504 |
| | | |
| **CASH PAID FOR:** | | |
| Interest | $ 564,961 | $ 24,372 |
| Income taxes | $ - | $ - |
| | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| Payment of accounts payable/accrued expenses with common stock | $ 421,500 | $ 69,274 |
| Value of equity recorded as debt discounts | $ - | $ 4,134,297 |
| Finance lease obligations | $ 510,136 | $ 659,539 |

The accompanying footnotes are an integral part of these unaudited condensed consolidated financial statements.

F-24

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 1 - Organization and Basis of Presentation**

Organization and Line of Business

YayYo, Inc. ("YayYo" or the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents cars to Uber and Lyft drivers.

Basis of Presentation

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

Interim financial statements

The unaudited interim financial statements included herein, presented in accordance with United States generally accepted accounting principles and stated in US dollars, have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). Certain information and footnote disclosure normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosure are adequate to make the information presented not misleading.

These statements reflect all adjustment, consisting of normal recurring adjustments, which, in the opinion of management, are necessary for fair presentation of the information contained therein. It is suggested that these interim financial statements be read in conjunction with the financial statements of the Company for the year ended December 31, 2018 and notes thereto included in the Company's annual report on Form 1-K. The Company follows the same accounting policies in the preparation of interim report. Results of operations for the interim period are not indicative of annual results.

**Note 2 – Summary of Significant Accounting Policies**

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC, RideShare Car Rentals, LLC, RideYayYo, LLC and Savy, LLC. All significant intercompany transactions and balances have been eliminated.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

Cash Equivalents

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

---

Equipment

Equipment is stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at June 30, 2019, the Company determined that no impairment charge was necessary.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 1,500,000 warrants and 300,000 options outstanding as of June 30, 2019.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase

common stock at the average market price during the period. There were 1,800,000 potentially dilutive securities outstanding at June 30, 2019.

F- 26

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the six months ended June 30, 2019 and 2018 were $102,606 and $91,495, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Research and developments costs for the six months ended June 30, 2019 and 2018 were $0 and $9,699, respectively.

Deferred Offering Costs

Deferred offering costs are amounts incurred that are directly related to the offering of the Company's common stock. These costs will be offset against the proceeds from the Company's equity offering.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

The Company uses Level 2 inputs for its valuation methodology for derivative liabilities as their fair values were determined by using the Black-Scholes-Merton pricing model based on various assumptions. The Company's derivative liabilities are adjusted to reflect fair value at each period end, with any increase or decrease in the fair value being recorded in results of operations as adjustments to fair value of derivatives.

At June 30, 2019 and December 31, 2018, the Company did not identify any liabilities that are required to be presented on the balance sheet at fair value.

Recent Accounting Pronouncements

In June 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") ASU 2018-07, *Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for share-based payments granted to nonemployees for goods and services and aligns most of the guidance on such payments to nonemployees with the requirements for share-based payments granted to employees. ASU 2018-07 is effective on January 1, 2019. Early adoption is permitted. The adoption of this ASU did not have an impact on its financial statements.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

In January 2017, the FASB issued ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this update clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for interim and annual periods beginning after December 15, 2017 and should be applied prospectively on or after the effective date. The adoption of this ASU did not have an impact on its financial statements.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* which requires restricted cash to be presented with cash and cash equivalents on the statement of cash flows and disclosure of how the statement of cash flows reconciles to the balance sheet if restricted cash is shown separately from cash and cash equivalents on the balance sheet. ASU 2016-18 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In October 2016, the FASB issued ASU 2016-16, *Income Taxes (Topic 740): Intra-Entity Transfer of Assets Other than Inventory*, which requires the recognition of the income tax consequences of an intra-entity transfer of an asset, other than inventory, when the transfer occurs. ASU 2016-16 is effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In August 2016, the FASB issued ASU 2016-15*, Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments*. ASU 2016-15 provides guidance for targeted changes with respect to how cash receipts and cash payments are classified in the statements of cash flows, with the objective of reducing diversity in practice. ASU 2016-15 is effective for interim and annual periods beginning after December 15, 2017, with early adoption permitted. The adoption of this ASU did not have an impact on its financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ASU 2016-02 requires lessees to recognize lease assets and lease liabilities on the balance sheet and requires expanded disclosures about leasing arrangements. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 and interim periods in fiscal years beginning after December 15, 2018, with early adoption permitted. The Company adopted this ASU for its year ended December 31, 2017.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under current U.S. GAAP and replace it with a principle-based approach for determining revenue recognition. ASU 2014-09 will require that companies recognize revenue based on the value of transferred goods or services as they occur in the contract. The ASU also will require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. ASU 2014-09 is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted only in annual reporting periods beginning after December 15, 2016, including interim periods therein. Entities will be able to transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption. The Company adopted this ASU beginning on January 1, 2018 and used the modified retrospective method of adoption. The adoption of this ASU did not have a material impact on the Company's financial statements and disclosures.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 3 – Equipment**

At June 30, 2019 and December 31, 2018 equipment consisted of the following:

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Computer equipment | $ 6,046 | $ 6,046 |
|  | 6,046 | 6,046 |
| Less accumulated depreciation | (1,112) | (954) |
| Equipment, net | $ 4,934 | $ 5,092 |

Depreciation expense for equipment for the six months ended June 30, 2019 and 2018 was $158 and $318, respectively.

**Note 4 – Leased Assets**

At June 30, 2019 and December 31, 2018 all of the Company's leased assets were finance leased right-of-use assets and consisted of the following:

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Vehicles | $ 5,825,988 | $ 5,661,749 |
|  | 5,825,988 | 5,661,749 |
| Less accumulated depreciation | (1,067,878) | (546,632) |
| Leased assets, net | $ 4,758,110 | $ 5,115,117 |

The Company's leased assets, consisting of vehicles, are depreciated over their estimated useful life of five years. Depreciation expense for leased assets for the six months ended June 30, 2019 and 2018 was $514,244 and $185,743, respectively. The lease terms are generally for 30 to 36 months and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

F- 29

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 5 – Notes Payable**

Notes payable at June 30, 2019 and December 31, 2018 consisted of the following:

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Note payable to stockholder; accrue interest at 5% per annum; due December 31, 2019, as amended; unsecured | $ 880,000 | $ 790,000 |
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to March 26, 2021; unsecured (A) | 319,667 | 319,667 |
| Note payable to investor; accrue interest at 6% per annum; due November 30, 2019, as amended; unsecured (B) | 222,222 | 222,222 |
| Note payable to investor; original issue discount of $117,828; due the earlier of November 30, 2019, as amended, or closing of a public offering; secured by assets of the Company (C) | 1,296,018 | 1,296,018 |
| Note payable to merchant bank; accrues interest at 15% per annum; daily payments of $813 | - | 37,308 |
| Line of credit; $65,000 limit; accrues interest at 15% per annum; weekly payments of $3,038 | - | 24,966 |
| Note payable to merchant bank; accrues interest at 127% per annum; 28 weekly payments of $7,446 | 66,924 | - |
| Note payable to merchant bank; accrues interest at 79% per annum; 26 weekly payments of $1,401 | 69,752 | - |
| Note payable to merchant bank; accrues interest at 128 per annum; 130 daily payments of $1,558 | 101,273 | - |
| Note payable to merchant bank; accrues interest at 150% per annum; 120 daily payments of $1,159 | 34,690 | - |
| Note payable to merchant bank; accrues interest at 87% per annum; 160 daily payments of $2,016 | 76,548 | - |
| Note payable to merchant bank; accrues interest at 138% per annum; 125 daily payments of $1,644 | 165,993 | - |
| Total notes payable | 3,233,087 | 2,690,181 |
| Unamortized debt discount | (52,414) | (72,211) |
| Notes payable, net discount | 3,180,673 | 2,617,970 |
| Less current portion | (3,180,673) | (2,617,970) |
| Long-term portion | $ - | $ - |

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

(A) In connection with the issuance of these notes payable in 2018 and 2017, the Company also issued an aggregate of 24,050 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $119,875 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $119,875 is being amortized over the term of the notes payable. During the six months ended June 30, 2019 and 2018, $19,797 and $17,824, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $52,414 at June 30, 2019.

(B) This note payable was issued with an original issuance discount of $22,222 which is being amortized over the term of the notes payable. During the six months ended June 30, 2019 and 2018, $0 and $21,506, respectively, was charged to interest expense as amortization of the discount, with an unamortized balance of $0 at June 30, 2019.

(C) On March 8, 2018, the Company issued a note payable for $6,000,000. The note accrues interest at LIBOR plus 100 basis points and is due five years from the date of issuance. The note payable is secured by the restricted cash balance. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per shares. The warrants expire five years from the date of issuance. The Company also paid $178,228 of issuance costs associated with this note. The relative fair value of the 150,000 shares of common stock was $378,916 and the relative fair value of the 1,500,000 warrants was $3,726,506 and both were recorded as a discount on the note payable and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the note payable. On September 12, 2018, the Company entered into a new note payable agreement with this investor whereby, the Company repaid $4,821,810 of the original $6,000,000 note payable and with the balance of $1,178,190 plus an original issue discount of $117,828 being rolled into the September 12, 2018 note payable for $1,296,018. The original issue discount of $117,828 is being amortized to interest expense over the term of the new note payable. As a result of the $6,000,000 note payable being repaid in September 2018, the Company amortized to interest expense the remaining debt discount associated with the note payable of $4,018,560. During the six months ended June 30, 2019 and 2018, $0 and $265,089, respectively, was charged to interest expense as amortization of the debt discounts associated with the notes payable to this investor, with an unamortized balance of $0 at June 30, 2019.

A rollforward of notes payable from December 31, 2018 to June 30, 2019 is below:

| | | |
|---|---|---|
| Notes payable, December 31, 2018 | $ | 2,617,970 |
| Issued for cash | | 1,051,330 |
| Repayments | | (508,394) |
| Amortization of debt discounts | | 19,797 |
| Notes payable, June 30, 2019 | $ | 3,180,673 |

F- 31

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 6 – Lease Obligations**

Lease obligations at June 30, 2019 and December 31, 2018 consisted of the following:

|  | June 30, 2019 | | December 31, 2018 | |
| --- | --- | --- | --- | --- |
| Lease obligations | $ | 3,221,785 | $ | 3,790,147 |
| Less current portion | | (1,662,476) | | (1,562,651) |
| Long-term portion | $ | 1,559,309 | $ | 2,227,496 |

A rollforward of lease obligations from December 31, 2018 to June 30, 2019 is below:

| | | |
| --- | --- | --- |
| Lease obligations, December 31, 2018 | $ | 3,790,147 |
| New lease obligations | | 510,136 |
| Disposal of leased vehicles | | (352,899) |
| Payments on lease obligations | | (725,599) |
| Lease obligations, June 30, 2019 | $ | 3,221,785 |

The weighted-average remaining lease term at June 30, 2019 is 1.71 years and the weighted average discount rate is 5%.

The finance lease costs for the six months ended June 30, 2019 and 2018 consisted of depreciation expense of $514,244 and $170,059, respectively and interest expense of $114,221 and $41,758, respectively.

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 7 – Stockholders' Equity**

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

Common Stock

During the six months ended June 30, 2019, the Company issued 84,300 shares of common stock to vendors in satisfaction of $421,500 of accounts payable and accrued expenses. The 84,300 shares were valued at $674,000; therefore the Company took a charge to earnings of $252,900 related to the settlement of debt during the six months ended June 30, 2019.

Stock Options

The following is a summary of stock option activity:

| | Options Outstanding | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | 300,000 | $ | 8.00 | | 2.00 | $ | - |
| Granted | - | | | | | | |
| Forfeited | - | | | | | | |
| Exercised | - | | | | | | |
| Outstanding, June 30, 2019 | 300,000 | $ | 8.00 | | 1.50 | $ | - |
| Exercisable, June 30, 2019 | 300,000 | $ | 8.00 | | 1.50 | $ | - |

The exercise price for options outstanding at June 30, 2019:

| Outstanding | | | Exercisable | |
|---|---|---|---|---|
| Number of Options | | Exercise Price | Number of Options | Exercise Price |
| 300,000 | $ | 8.00 | 300,000 | 8.00 |
| 300,000 | | | 300,000 | |

The following is a summary of warrant activity:

| | Warrants Outstanding | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | 1,500,000 | $ | 4.00 | | 4.44 | $ | 6,000,000 |
| Granted | - | | | | | | |
| Forfeited | - | | | | | | |
| Exercised | - | | | | | | |
| Outstanding, June 30, 2019 | 1,500,000 | $ | 4.00 | | 3.94 | $ | 6,000,000 |
| Exercisable, June 30, 2019 | 1,500,000 | $ | 4.00 | | 3.94 | $ | 6,000,000 |

The exercise price for warrants outstanding at June 30, 2019:

| Outstanding and Exercisable | |
|---|---|
| Number of Warrants | Exercise Price |

| | | |
|---|---|---|
| 1,500,000 | | $4.00 |
| 1,500,000 | | |

**YAYYO, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**For the Six Months Ended June 30, 2019 and 2018 (unaudited)**

**Note 8 – Related Party Transactions**

During the six months ended June 30, 2018, the Company paid management fees of $120,000, to a company that is owned by the Company's former Chief Executive Officer and director. Beginning on February 1, 2019, the Company entered into a consulting agreement with this individual and paid $132,000 under the consulting agreement. The consulting agreement was terminated effective September 1, 2019.

During the six months ended June 30, 2019 and 2018, the Company expensed $53,507 and $0, respectively, in advertising expense from a company whose CEO is also a director of the Company. At June 30, 2019 and December 31, 2018, $387,978 and $334,471, respectively, was owed to this company and is included in accounts payable in the accompanying consolidated balance sheets.

At June 30, 2019 and December 31, 2018, the Company had a note payable to a stockholder for $880,000 and $790,000, respectively.

**Note 9 – Commitments and Contingencies**

The Company is party to certain legal proceedings from time to time incidental to the conduct of its business. These proceedings could result in fines, penalties, compensatory or treble damages or non-monetary relief. The nature of legal proceedings is such that the Company cannot assure the outcome of any particular matter, and an unfavorable ruling or development could have a materially adverse effect on our consolidated financial position, results of operations and cash flows in the period in which a ruling or settlement occurs. However, based on information available to the Company's management to date, the Company's management does not expect that the outcome of any matter pending against the Company is likely to have a materially adverse effect on the Company's consolidated financial position as of June 30, 2019, results of operations, cash flows or liquidity of the Company.

F- 34

---

Through and including, 2019, (the 25th day after the date of this prospectus), all dealers effecting transactions in the Common Stock, whether or not participating in this offering, may be required to deliver a prospectus. This delivery requirement is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.

**2,500,000 Shares**



**YayYo, Inc.**

---

**PROSPECTUS**

---

# Aegis Capital Corp.            WestPark Capital, Inc.

**, 2019**

**Part II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 13. Other Expenses of Issuance and Distribution.**

The following table indicates the expenses to be incurred in connection with the offering described in this registration statement, other than underwriting discounts and commissions, all of which will be paid by us. All amounts are estimated except the Securities and Exchange Commission registration fee and the Financial Industry Regulatory Authority, Inc., or FINRA filing.

|  | Amount |
|---|---|
| Securities and Exchange Commission registration fee | $ 2,281 |
| FINRA filing fee | 3,323 |
| NASDAQ listing fee | 75,000 |
| Accountants' fees and expenses | 21,500 |
| Legal fees and expenses | 50,000 |
| Printing and engraving expenses | 5,000 |
| Miscellaneous | 15,000 |
| Total expenses | $ 172,104 |

**Item 14. Indemnification of Directors and Officers.**

Section 102 of the General Company Law of the State of Delaware ("DGCL") permits a Company to eliminate the personal liability of directors of a Company to the Company or its stockholders for monetary damages for a breach of fiduciary duty as a director, except where the director breached his duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of Delaware corporate law or obtained an improper personal benefit. Our amended and restated certificate of incorporation provides that no director of the Company shall be personally liable to it or its stockholders for monetary damages for any breach of fiduciary duty as a director, notwithstanding any provision of law imposing such liability, except to the extent that the DGCL prohibits the elimination or limitation of liability of directors for breaches of fiduciary duty.

Section 145 of the DGCL provides that a Company has the power to indemnify a director, officer, employee, or agent of the Company, or a person serving at the request of the Company for another Company, partnership, joint venture, trust or other enterprise in related capacities against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with an action, suit or proceeding to which he was or is a party or is threatened to be made a party to any threatened, ending or completed action, suit or proceeding by reason of such position, if such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, in any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful, except that, in the case of actions brought by or in the right of the Company, no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been adjudged to be liable to the Company unless and only to the extent that the Court of Chancery or other adjudicating court determines that, despite the adjudication of liability but in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Our amended and restated certificate of incorporation provides that we will indemnify to the fullest extent permitted from time to time by the DGCL or any other applicable laws as presently or hereafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including, without limitation, an action by or in the right of the Company, by reason of his acting as a director or officer of the Company or any of its subsidiaries (and the Company, in the discretion of the Board of Directors, may so indemnify a person by reason of the fact that he is or was an employee or agent of the Company or any of its subsidiaries or is or was serving at the request of the Company in any other capacity for or on behalf of the Company) against any liability or expense actually and reasonably incurred by such person in respect thereof; *provided, however*, the Company shall be required to indemnify an officer or director in connection with an action, suit or proceeding (or part thereof) initiated by such person only if (i) such action, suit or proceeding (or part thereof) was authorized by the Board of Directors and (ii) the indemnification does not relate to any liability arising under Section 16(b) of the Exchange Act, as amended, or any rules or regulations promulgated thereunder. Such indemnification is not exclusive of any other right to indemnification provided by law or otherwise.

If a claim is not paid in full by the Company, the claimant may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where any undertaking required by the By-laws of the Company has been tendered to the Company) that the claimant has not met the standards of conduct which make it permissible under the DGCL for the Company to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Company. Neither the failure of the Company (including its Board of Directors, legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Company (including its Board of Directors, legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct. Indemnification shall include payment by the Company of expenses in defending an action or proceeding in advance of the final disposition of such action or proceeding upon receipt of an undertaking by the person indemnified to repay such payment if it is ultimately determined that such person is not entitled to indemnification.

In any underwriting agreement we enter into in connection with the sale of common stock being registered hereby, the underwriters will agree to indemnify, under certain conditions, us, our directors, our officers and persons who control us within the meaning of the Securities Act of 1933, as amended, or the Securities Act, against certain liabilities.

**Item 15. Recent Sales of Unregistered Securities.** Set forth below is information regarding shares of common stock issued by us since the Company's inception on June 21, 2016.

(a) Issuance of Capital Stock.

On June 21, 2016 the Company issued 15,625,000 shares of common stock to our Founder, Ramy El-Batrawi, for no cost. Ramy El-Batrawi is an accredited investor for purposes of Rule 501 of Regulation D.

During the period from inception to December 31, 2016, the Company issued 9,386,000 shares of common stock to accredited investors for $1,319,900.

During the quarter ended March 31, 2017, the Company issued 45,225 to accredited investors for $180,900.

II-2

On July 15, 2017, the Company entered into an agreement pursuant to which the Company agreed to issue additional consideration to Acme Auto Leasing (the "Lessor") in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by the Lessor under all lease agreements entered into between the Lessor and the Company. On December 15, 2017, the Company issued the Lessor an additional 250,000 under a similar arrangement.

On December 20, 2017, the Company issued 20,000 shares of common stock to an attorney in exchange for the payment of legal services.

In the fourth quarter of 2017, the Company, in connection with the issuance of notes payable to investors, the Company issued an aggregate of 18,200 shares of common stock as additional incentive to make the loans.

In the first quarter of 2018, the Company, in connection with the issuance of notes payable to investors, the Company issued an aggregate of 3,000 shares of common stock as additional incentive to make the loans.

On February 21, 2018, the Company issued 81,250 shares of common stock to two accredited investors in exchange for services.

On March 8, 2018, the Company issued a note payable in the amount of $6,000,000. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per share.

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with David Haley, a former director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies for Rideshare Car Rentals, LLC and Distinct Cars, LLC (the "Special Policies") in consideration for a grant of 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 14,945 shares of Company restricted common stock. 258,695 shares of Company restricted common stock was issued on April 1, 2018 and 6,250 shares of Company restricted common stock was issued on October 8, 2018.

In April 2018, the Company, in connection with the issuance of notes payable to three investors, issued an aggregate of 2,250 shares of common stock as additional incentive to make the loans.

In May 2018, the Company issued an accredited investor 1,250 shares of common stock for services.

In May 2018, the Company, in connection with the issuance of notes payable to one investor, issued an aggregate of 600 shares of common stock as additional incentive to make the loans.

In July 2018, the Company issued a consultant 100,000 shares of common stock for an agreement to provide services. The Company entered into an agreement with the consultant to cancel the shares in November 2018.

In July 2018, the Company issued the Lessor 91,500 shares of common stock in connection with a lease arrangement.

In November 2018, the Company issued the Lessor 207,000 shares of common stock in connection with a lease arrangement.

In March 2019, the Company issued American Business Insurance Services, Inc. 80,000 shares of common stock in connection the settlement of $400,000 of debt. Mr. Haley, a former director of the Company, is the Chief Executive Officer of American Business Insurance Services, Inc.

In June 2019, the Company issued RG Alliance 4,300 shares of common stock in connection the settlement of $21,500 of debt.

The offers, sales and issuances of securities listed above were deemed exempt from registration under Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder in that the issuance of securities were made to accredited investors and did not involve a public offering. The recipients of such securities in each of these transactions represented their intention to acquire the securities for investment purposes only and not with a view to or for sale in connection with any distribution thereof.

(b) Warrants.

As discussed above, on March 8, 2018, the Company issued a note payable in the amount of $6,000,000. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per share.

The warrant listed above was deemed exempt from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder in that the issuance of securities were made to accredited investors and did not involve a public offering. The recipient of such securities represented its intention to acquire the securities for investment purposes only and not with a view to or for sale in connection with any distribution thereof.

(c) Option Grants.

During the year ended December 31, 2016, the Company issued 450,000 options. For options granted during fiscal year 2016 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.85 and the weighted-average exercise price of such options was $1.00. No options were granted during fiscal 2016 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

During the year ended December 31, 2016, the Company issued 300,000 options. For options granted during fiscal year 2017 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $7.54 and the weighted-average exercise price of such options was $8.00. No options were granted during fiscal 2017 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

The option described above were deemed exempt from registration in reliance on Section 4(a)(2) of the Securities Act or Rule 701 promulgated thereunder as transactions pursuant to benefit plans and contracts relating to compensation as provided under Rule 701. The recipients of such securities were our employees, directors or bona fide consultants and received the securities under our stock option plans.

(d) Issuance of Notes.

The Company has issued the following notes:

- Unsecured note payable for $390,000 to an investor that accrues interest at 5% per annum.
- Unsecured notes payable for $319,667 to 38 individual investors that accrue interest at 8% per annum.
- Unsecured note payable to investor for 222,222 that accrues interest at 6% per annum.

The notes were deemed exempt from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder in that the issuance of securities to accredited investors and did not involve a public offering.

II-4

**Item 16. Exhibits and Financial Statement Schedules.**

(a) ***Exhibits***: Reference is made to the Exhibit Index following the signature pages hereto, which Exhibit Index is hereby incorporated into this Item.

(b) ***Financial Statement Schedules***: All schedules are omitted because the required information is inapplicable or the information is presented in the financial statements and the related notes.

**Item 17. Undertakings.**

The undersigned registrant hereby undertakes:

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by section 10(a)(3) of the Securities Act of 1933, as amended (the "Securities Act");

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Securities and Exchange Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement; provided, however, that paragraphs (1)(i), (1)(ii) and (1)(iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Securities and Exchange Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining liability under the Securities Act to any purchaser:

(A) Each prospectus filed by the registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement; and

(B) Each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(5) That for the purpose of determining liability of the registrant under the Securities Act to any purchaser in the initial distribution of securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to any charter provision, by law or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized in the City of Los Angeles, State of California, on November 6, 2019.

**YAYYO, INC.**

By: */s/ Jonathan Rosen*

Jonathan Rosen
Chief Executive Officer (Principal Executive Officer)

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on November 6, 2019.

*/s/ Harbant S. Sidhu*

Harbant S. Sidhu
Director

*/s/ Kevin Pickard*

Kevin Pickard
Director and Chief Financial Officer
Principal Financial Officer and Accounting Officer

*/s/ Jeffrey Guzy*

Jeffrey Guzy
Director

EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 1.1# | Form of Underwriting Agreement (incorporated by reference to Exhibit 1.1 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 3.1# | Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.2 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.2# | Amended and Restated Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.4 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.3# | Bylaws of YayYo, Inc. (incorporated by reference to Exhibit 2.3 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.4# | Amended and Restated Bylaws of YayYo, Inc. (incorporated by reference to Exhibit 3.4 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 3.5# | Certificate of Conversion of YayYo, LLC (incorporated by reference to Exhibit 2.1 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.6# | Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock (incorporated by reference to Exhibit 2.5 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 4.1# | Secured Convertible Note to Chase Financing Inc., dated January 6, 2017 (incorporated by reference to Exhibit 6.6 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 4.2# | Promissory Note with X, LLC, dated January 15, 2017 (incorporated by reference to Exhibit 6.8 contained in the Registrant's Form 1-A filed on February 3, 2017). |
| 4.3# | Warrant, dated March 8, 2018 (incorporated by reference to Exhibit 4.3 contained in the Registrant's Form S-1/A filed on June 7, 2018). |

4.4#    Senior Secured Note, dated March 8, 2018 (incorporated by reference to Exhibit 4.4 contained in the Registrant's Form S-1/A filed on June 7, 2018).

4.5#    Form of Secured Promissory Note (incorporated by reference to Exhibit 6.14 contained in the Registrant's Form 1-U filed on March 26, 2018).

4.6#    Secured Promissory Note, dated December 27, 2017 (incorporated by reference to Exhibit 6.16 contained in the Registrant's Form 1-A filed on March 26, 2018).

4.7#    Form of Underwriter Warrant (incorporated by reference to Exhibit 4.7 contained in the Registrant's Form S-1/A filed on October 7, 2019).

5.1#    Opinion of Counsel to Registrant

10.1#   Form of Subscription Agreement (incorporated by reference to Exhibit 4.1 contained in the Registrant's Form 1-A filed on January 19, 2017).

10.2#   Product Management Proposal (incorporated by reference to Exhibit 10.2 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.3#+  Executive Employment Offer (incorporated by reference to Exhibit 10.3 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.4#+  2016 Equity Incentive Plan (incorporated by reference to Exhibit 10.4 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.5#   Agreement with Chase Financing Inc., dated January 1, 2017 (incorporated by reference to Exhibit 10.5 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.6#   Limited Recourse Guaranty and Pledge with X, LLC, dated January 6, 2017 (incorporated by reference to Exhibit 6.5 contained in the Registrant's Form 1-A filed on January 19, 2017).

10.7#   Common Stock Purchase Agreement, dated January 6, 2017 (incorporated by reference to Exhibit 10.7 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.8#   Form of SAFE Agreement (incorporated by reference to Exhibit 6.9 contained in the Registrant's Form 1-A filed on February 3, 2017).

10.9#   Securities Purchase Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.9 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.10#   Side Agreement, dated July 15, 2017 (incorporated by reference to Exhibit 6.13 contained in the Registrant's Form 1-A filed on March 28, 2018).

10.11#   Deposit Account Control Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.11 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.12#   Security Agreement, dated December 27, 2017 (incorporated by reference to Exhibit 6.28 contained in the Registrant's Form 1-A filed on March 26, 2018).

10.13#   Registration Rights Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.13 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.14#   Patent and Trademark Security Agreement, dated December 27, 2017 (incorporated by reference to Exhibit 10.14 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.15#+   Incentive Agreement For Grant of Stock, dated April 1, 2018 (incorporated by reference to Exhibit 10.15 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.16#   Form of Open End Lease Agreement and Disclosure Statement (incorporated by reference to Exhibit 10.16 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.17#+   Non-Qualified Stock Option Agreement, dated June 9, 2017 (incorporated by reference to Exhibit 10.17 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.18#   Independent Director Agreement, dated November 27, 2017 (incorporated by reference to Exhibit 10.18 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.19#   Independent Director Agreement, dated November 8, 2017 (incorporated by reference to Exhibit 10.19 contained in the Registrant's Form S-1/A filed on June 7, 2018).

10.20#   Voting Trust Agreement, dated October 11, 2018, by and among YayYo, Inc., X, LLC, and each Trustee

10.21   Amendment and Exchange Agreement with Note, dated September 12, 2018 (incorporated by reference to Exhibit 10.21 contained in the Registrant's Form S-1/A filed on October 7, 2019).

10.21.1#   Amendment to Note Payable Agreement (incorporated by reference to Exhibit 10.21.1 contained in the Registrant's Form S-1/A filed on November 5, 2019).

10.22#   Consulting Agreement with Ramy El-Batrawi, dated February 1, 2019 (incorporated by reference to Exhibit 10.22 contained in the Registrant's Form S-1/A filed on October 7, 2019).

10.23#   Promissory Note to Stockholder (incorporated by reference to Exhibit 10.21.1 contained in the Registrant's Form S-1/A filed on November 5, 2019)

21.1#     List of Subsidiaries of the Registrant (incorporated by reference to Exhibit 21.1 contained in the Registrant's Form S-1 filed on April 30, 2018).

23.1*     Consent of AJ Robbins CPA, LLC, dated November 6, 2019.

23.2#     Consent of Counsel to Registrant (included in Exhibit 5.1).

24.1#     Power of Attorney

\* Filed herewith.
\# Previously filed.
\+ Indicates a management contract or any compensatory plan, contract or arrangement.

II-8

**ALTERNATE PAGES FOR SELLING STOCKHOLDER PROSPECTUS**

The information in this prospectus is not complete and may be changed. The selling stockholders named in this prospectus may not sell these securities until the registration statement filed with the Securities and Exchange Commission is declared effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state or other jurisdiction where the offer or sale is not permitted.

**Subject to Completion, dated November 6, 2019**

**PROSPECTUS**



**YAYYO, INC.**

**1,650,000 Shares of Common Stock**

The selling stockholders plan to sell an aggregate of up to (a) 150,000 outstanding shares of the registrant's common stock, and (b) 1,500,000 shares of common stock issuable upon exercise of common stock purchase warrants.

The selling stockholders must sell their shares at a fixed price per share of $4.00, which is the per share price of the shares being offered in the IPO, until such time our shares are listed on a national securities exchange or quoted on the OTCBB, OTCQX or OTCQB marketplaces. Thereafter, the shares offered by this prospectus may be sold by the selling stockholders from time to time in the open market, through privately negotiated transactions or a combination of these methods, at market prices prevailing at the time of sale or at negotiated prices. By separate prospectus (the "IPO Prospectus"), we have registered an aggregate of shares of our common stock which we are offering for sale to the public through our underwriters, excluding any shares issuable upon the underwriters' over-allotment option.

We have applied to have our common stock listed on the Nasdaq Capital Market under the symbol "YAYO" which listing is a condition to this offering.

The distribution of the shares by the selling stockholders is not subject to any underwriting agreement. We will not receive any proceeds from the sale of the shares by the selling stockholders; however, we may receive proceeds if the Selling Securityholder Warrant is exercised for cash. We will bear all expenses of registration incurred in connection with this offering, but all selling and other expenses incurred by the selling stockholders will be borne by them.

**We are an "emerging growth company" under the federal securities laws and have elected to be subject to reduced public company reporting requirements. An investment in our common stock may be considered speculative and involves a high degree of risk, including the risk of a substantial loss of your investment. See "Risk Factors" beginning on page 7 to read about the risks you should consider before buying shares of our common stock. An investment in our common stock is not suitable for all investors. See "Risk Factors-Risks Relating to Ownership of Our Securities."**

Sales of the shares of our common stock registered in this prospectus and the IPO Prospectus will result in two offerings taking place concurrently which might affect price, demand, and liquidity.

You should rely only on the information contained in this prospectus and any prospectus supplement or amendment. We have not authorized anyone to provide you with different information. This prospectus may only be used where it is legal to sell these securities. The information in this prospectus is only accurate on the date of this prospectus, regardless of the time of any sale of securities.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS**

**PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The date of this prospectus is                    , 2019

## EXPLANATORY NOTE

Concurrent with this offering, the Company is registering shares of common stock in connection with a public offering of 2,500,000 shares of our common stock through the underwriters (excluding 375,000 shares which may be sold upon exercise of the underwriters' over-allotment option). Sales by stockholders that purchased shares in our common stock from the underwritten offering may reduce the price of our common stock, demand for our shares and, as a result, the liquidity of your investment.

## SELLING STOCKHOLDERS

The shares of common stock being offered by the Selling Securityholder are those previously issued to the Selling Securityholder and those issuable to the Selling Securityholder upon exercise of the Selling Securityholder Warrant. For additional information regarding the issuance of common stock and the Selling Securityholder Warrant, see "*Certain Relationships and Related Party Transactions*" below. We are registering shares of common stock in order to permit the Selling Securityholder to offer the shares for resale from time to time. Except for the ownership of the common stock and the Selling Securityholder Warrant issued pursuant to the Securities Purchase Agreement, the Selling Securityholder have not had any material relationship with us within the past three years.

The table below lists the Selling Securityholder and other information regarding the beneficial ownership (as determined under Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder) of the shares of common stock held by the Selling Securityholder. The second column lists the number of shares of common stock beneficially owned by the Selling Securityholder, based on their respective ownership of shares of common stock of the Company and the Selling Securityholder Warrant, as of October 31, 2019, assuming exercise of the Selling Securityholder Warrant held by each such Selling Securityholder on that date but taking account of any limitations on exercise set forth therein.

The third column lists the shares of common stock being offered by this Prospectus by the Selling Securityholder and does not take in account any limitations on exercise of the Selling Securityholder Warrant set forth therein.

In accordance with the terms of the Registration Rights Agreement with the holders of the common stock and the Selling Securityholder Warrant, this Prospectus generally covers the resale of the sum of (i) the number of shares of common stock issued in connection with the Securities Purchase Agreement and (ii) 200% of the maximum number of shares of common stock issuable upon exercise of the Selling Securityholder Warrant, in each case, determined as if the outstanding Selling Securityholder Warrant were exercised in full (without regard to any limitations on exercise contained therein) as of the trading day immediately preceding the date this registration statement was initially filed with the SEC. Because the exercise price of the Selling Securityholder Warrant may be adjusted, the number of shares that will actually be issued may be more or less than the number of shares being offered by this Prospectus. The fourth column assumes the sale of all of the shares of common stock offered by the Selling Securityholder pursuant to this Prospectus. For additional information regarding the Registration Rights Agreement, see "*Description of Securities*" below.

Under the terms of the Selling Securityholder Warrant, a Selling Securityholder may not exercise the warrants to the extent (but only to the extent) such selling stockholder or any of its affiliates would beneficially own a number of shares of our common stock which would exceed 4.99%. The number of shares in the second column reflects these limitations. The selling stockholders may sell all, some or none of their shares in this offering. See "*Plan of Distribution*."

| Name of Selling Stockholder | Number of Shares of Common Stock Owned Prior to Offering | Maximum Number of Shares of Common Stock to be Sold Pursuant to this Prospectus | Number of Shares of Common Stock Owned After Offering | Percentage Ownership After Offering |
|---|---|---|---|---|
| Bellridge Capital, L.P. **(1)** | 2,400,000(2) | 1,650,000 | 750,000 | 2.6% |

(1) Bellridge Capital LLC ("BC LLC") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described.

(2)  Includes the following: (i) 650,000 shares of common stock, (ii) 1,500,000 underlying shares of common stock to be acquired upon the exercise of the Selling Securityholder Warrant, and (iii) an option (exercisable at any time by Bellridge Capital, L.P.) from a non-affiliate shareholder of the Company to purchase an aggregate of 250,000 shares of issued and outstanding common stock of the Company from the non-affiliate shareholder.

## PLAN OF DISTRIBUTION

The selling stockholders may, from time to time, sell any or all of their shares of our common stock on any stock exchange, market or trading facility on which the shares are traded or in private transactions. If the shares of our common stock are sold through underwriters, the selling stockholders will be responsible for underwriting discounts or commissions or agent's commissions. The shares of common stock may be sold in one or more transactions at a price of $4.00 per share until our shares are listed on The Nasdaq Capital Market and thereafter at prevailing market prices or privately negotiated prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale or at negotiated prices. The selling stockholders may use any one or more of the following methods when selling shares:

- any national securities exchange or quotation service on which the securities may be listed or quoted at the time of sale;

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- transactions other than on these exchanges or systems or in the over-the-counter market;

- through the writing of options, whether such options are listed on an options exchange or otherwise;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- short sales;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act, if available, rather than under this prospectus. In general, a person who has beneficially owned restricted shares of our common stock for at least six months, in the event we have been a reporting company under the Exchange Act for at least 90 days, would be entitled to sell such securities, provided that such person is not deemed to be an affiliate of ours at the time of sale or to have been an affiliate of ours at any time during the three months preceding the sale.

The selling stockholders may also engage in short sales against the box, puts and calls and other transactions in our securities or derivatives of our securities and may sell or deliver shares in connection with these trades.

Broker-dealers engaged by the selling stockholders may arrange for other broker-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated. The selling stockholders do not expect these commissions and discounts to exceed what is customary in the types of transactions involved. Any profits on the resale of shares of our common stock by a broker-dealer acting as principal might be deemed to be underwriting discounts or commissions under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, attributable to the sale of shares will be borne by a selling stockholder. The selling stockholders may agree to indemnify any agent, dealer or broker-dealer that participates in transactions involving sales of the shares if liabilities are imposed on that person under the Securities Act.

In connection with the sale of the shares of our common stock or otherwise, the selling stockholders may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of our common stock in the course of hedging in positions they assume. The selling stockholders may also sell shares of our common stock short and deliver shares of our common stock covered by this prospectus to close out short positions and to return borrowed shares in connection with such short sales. The selling stockholders may also loan or pledge shares of our common stock to broker-dealers that in turn may sell such shares.

The selling stockholders may from time to time pledge or grant a security interest in some or all of the shares of our common stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of our common stock from time to time under this prospectus after we have filed an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

The selling stockholders also may transfer the shares of our common stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus and may sell the shares of our common stock from time to time under this prospectus after we have filed an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act amending the list of selling stockholders to include the pledgees, transferees or other successors in interest as selling stockholders under this prospectus. The selling stockholders also may transfer and donate the shares of our common stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be an "Underwriter" within the meaning of the Securities Act in connection with such sales. In such event, any commissions paid, or any discounts or concessions allowed to, such broker-dealers or agents and any profit realized on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. At the time a particular offering of the shares of our common stock is made, a prospectus supplement, if required, will be distributed which will set forth the aggregate amount of shares of our common stock being offered and the terms of the offering, including the name or names of any broker-dealers or agents, any discounts, commissions and other terms constituting compensation from the selling stockholders and any discounts, commissions or concessions allowed or re-allowed or paid to broker-dealers. Under the securities laws of some states, the shares of common stock may be sold in such states only through registered or licensed brokers or dealers. In addition, in some states the shares of our common stock may not be sold unless such shares have been registered or qualified for sale in such state or an exemption from registration or qualification is available and is complied with. There can be no assurance that any selling stockholder will sell any or all of the shares of our common stock registered pursuant to the registration statement, of which this prospectus forms a part.

Each selling stockholder has informed us that it does not have any agreement or understanding, directly or indirectly, with any person to distribute our common stock. None of the selling stockholders who are affiliates of broker-dealers, other than the initial purchasers in private transactions, purchased the shares of common stock outside of the ordinary course of business or, at the time of the purchase of the common stock, had any agreements, plans or understandings, directly or indirectly, with any person to distribute the securities.

We are required to pay all fees and expenses incident to the registration of the shares of common stock. Except as provided for indemnification of the selling stockholders, we are not obligated to pay any of the expenses of any attorney or other advisor engaged by a selling stockholder. We have agreed to indemnify the selling stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

If we are notified by any selling stockholder that any material arrangement has been entered into with a broker-dealer for the sale of shares of common stock, we will file a post-effective amendment to the registration statement. If the selling stockholders use this prospectus for any sale of the shares of our common stock, they will be subject to the prospectus delivery requirements of the Securities Act.

The anti-manipulation rules of Regulation M under the Exchange Act may apply to sales of our common stock and activities of the selling stockholders, which may limit the timing of purchases and sales of any of the shares of common stock by the selling stockholders and any other participating person. Regulation M may also restrict the ability of any person engaged in the distribution of the shares of common stock to engage in passive market-making activities with respect to the shares of common stock. Passive market making involves transactions in which a market maker acts as both our underwriter and as a purchaser of our common stock in the secondary market. All of the foregoing may affect the marketability of the shares of common stock and the ability of any person or entity to engage in market-making activities with respect to the shares of common stock.

Once sold under the registration statement, of which this prospectus forms a part, the shares of common stock will be freely tradable in the hands of persons other than our affiliates.

### USE OF PROCEEDS

We will not receive proceeds from sales of our common stock made under this prospectus; however, if we receive proceeds from the cash exercise of the Selling Securityholder Warrant, such proceeds will be used for working capital and general corporate purposes.

### DETERMINATION OF OFFERING PRICE

There currently is no public market for our common stock. The shares of common stock may be sold in one or more transactions at a price of $4.00 per share until our shares are listed on The Nasdaq Capital Market and thereafter at prevailing market prices or privately negotiated prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale or at negotiated prices. See "Plan of Distribution" above for more information.

### LEGAL MATTERS

Certain legal matters with respect to the validity of the securities being offered by this prospectus will be passed upon by Carmel, Milazzo & DiChiara LLP, New York, New York.

**Exhibit 4.3**

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL TO THE HOLDER (IF REQUESTED BY THE COMPANY), IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. THE NUMBER OF SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 1(a) OF THIS WARRANT.**

**Yayyo, Inc.**

**Warrant To Purchase Common Stock**

Warrant No.: W-1

Date of Issuance: March 8, 2018 ("**Issuance Date**")

Yayyo, Inc., a Delaware corporation (the "**Company**"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, BELLRIDGE CAPITAL, LP, the registered holder hereof or its permitted assigns (the "**Holder**"), is entitled, subject to the terms set forth below, to purchase from the Company, at the Exercise Price (as defined below) then in effect, upon exercise of this Warrant to Purchase Common Stock (including any Warrants to Purchase Common Stock issued in exchange, transfer or replacement hereof, the "**Warrant**"), at any time or times on or after the Issuance Date, but not after 11:59 p.m., New York time, on the Expiration Date (as defined below), 1,500,000 (subject to adjustment as provided herein) fully paid and non-assessable shares of Common Stock (as defined below) (the "**Warrant Shares**", and such number of Warrant Shares, the "**Warrant Number**"). Except as otherwise defined herein, capitalized terms in this Warrant shall have the meanings set forth in Section 19. This Warrant is one of the Warrants to Purchase Common Stock (the "**SPA Warrants**") issued pursuant to Section 1 of that certain Securities Purchase Agreement, dated as of March 8, 2018 (the "**Subscription Date**"), by and among the Company and the investors (the "**Buyers**") referred to therein, as amended from time to time (the "**Securities Purchase Agreement**").

1.    <u>EXERCISE OF WARRANT.</u>

(a)    Mechanics of Exercise. Subject to the terms and conditions hereof (including, without limitation, the limitations set forth in Section 1(f)), this Warrant may be exercised by the Holder on any day on or after the Issuance Date (an "**Exercise Date**"), in whole or in part, by delivery (whether via facsimile or otherwise) of a written notice, in the form attached hereto as **Exhibit A** (the "**Exercise Notice**"), of the Holder's election to exercise this Warrant. Within one (1) Trading Day following an exercise of this Warrant as aforesaid, the Holder shall deliver payment to the Company of an amount equal to the Exercise Price in effect on the date of such exercise multiplied by the number of Warrant Shares as to which this Warrant was so exercised (the "**Aggregate Exercise Price**") in cash or via wire transfer of immediately available funds if the Holder did not notify the Company in such Exercise Notice that such exercise was made pursuant to a Cashless Exercise (as defined in Section 1(d)). The Holder shall not be required to deliver the original of this Warrant in order to effect an exercise hereunder. Execution and delivery of an Exercise Notice with respect to less than all of the Warrant Shares shall have the same effect as cancellation of the original of this Warrant and issuance of a new Warrant evidencing the right to purchase the remaining number of Warrant Shares. Execution and delivery of an Exercise Notice for all of the then-remaining Warrant Shares shall have the same effect as cancellation of the original of this Warrant after delivery of the Warrant Shares in accordance with the terms hereof. On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by facsimile or electronic mail an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as **Exhibit B**, to the Holder and, if after the Public Company Date, the Company's transfer agent (the "**Transfer Agent**"), which confirmation shall, if after the Public Company Date, constitute an instruction to the Transfer Agent to process such Exercise Notice in accordance with the terms herein. On or before the second (2nd) Trading Day following the date on which the Company has received such Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date), the Company shall (X) if on or after the Public Company Date, provided that the Transfer Agent is participating in The Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal at Custodian system, or (Y) if either (x) prior to the Public Company Date or (y) on or after the Public Company Date if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, upon the request of the Holder, issue and deliver (via reputable overnight courier) to the address as specified in the Exercise Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled pursuant to such exercise. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of delivery of the certificates evidencing such Warrant Shares (as the case may be). If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant submitted for exercise is greater than the number of Warrant Shares being acquired upon an exercise and upon surrender of this Warrant to the Company by the Holder, then, at the request of the Holder, the Company shall as soon as practicable and in no event later than two (2) Business Days after any exercise and at its own expense, issue and deliver to the Holder (or its designee) a new Warrant (in accordance with Section 7(d)) representing the right to purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number. The Company shall pay any and all transfer, stamp, issuance and similar taxes, costs and expenses (including, without limitation, fees and expenses of the Transfer Agent) that may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant. Notwithstanding the foregoing, except in the case where an exercise of this Warrant is validly made pursuant to a Cashless Exercise), the Company's failure to deliver Warrant Shares to the Holder on or prior to the later of ((i) two (2) Trading Days after receipt of the applicable Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date) and (ii) one (1) Trading Day after the Company's receipt of the Aggregate Exercise Price (or valid notice of a Cashless Exercise (such later date, the "**Share Delivery Date**") shall not be deemed to be a breach of this Warrant. Notwithstanding anything to the contrary contained in this Warrant or the Registration Rights Agreement, after the effective date of the Registration Statement (as defined in the Registration Rights Agreement) and prior to the Holder's receipt of the notice of a Grace Period (as defined in the Registration Rights Agreement), the Company shall cause the Transfer Agent to deliver unlegended shares of Common Stock to the Holder (or its designee) in connection with any sale of Registrable Securities (as defined in the Registration Rights Agreement) with respect to which the Holder has entered into a contract for sale, and delivered a copy of the prospectus included as part of the particular Registration Statement to the extent applicable, and for which the Holder has not yet settled. From the Issuance Date through and including the Expiration Date, the Company shall maintain a transfer agent that participates in the DTC's Fast Automated Securities Transfer Program. Notwithstanding any provision of this Warrant to the contrary, at any time prior to the Listing Date, no more than the Pre-Listing Maximum Eligibility Number of Warrant Shares shall be exercisable hereunder.

(b)          Exercise Price. For purposes of this Warrant, "**Exercise Price**" means $4.00, subject to adjustment as provided herein.

(c)          Company's Failure to Timely Deliver Securities.

        (i)          General. The Company shall in all cases use its reasonable best efforts to comply with the delivery requirements set forth herein and shall do all things and take all actions reasonably requested by the Holder in furtherance thereof.

        (ii)          Exercise Failures On or After the Public Company Date. If on or after the Public Company Date, the Company shall fail, for any reason or for no reason, on or prior to the Share Delivery Date, either (I) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, to issue and deliver to the Holder (or its designee) a certificate for the number of Warrant Shares to which the Holder is entitled and register such Warrant Shares on the Company's share register or, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, to credit the balance account of the Holder or the Holder's designee with DTC for such number of Warrant Shares to which the Holder is entitled upon the Holder's exercise of this Warrant (as the case may be) or (II) if a Registration Statement covering the resale of the Warrant Shares that are the subject of the Exercise Notice (the "**Unavailable Warrant Shares**") is not available for the resale of such Unavailable Warrant Shares and the Company fails to promptly, but in no event later than as required pursuant to the Registration Rights Agreement (x) so notify the Holder and (y) deliver the Warrant Shares electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal At Custodian system (the event described in the immediately foregoing clause (II) is hereinafter referred as a "**Notice Failure**" and together with the event described in clause (I) above, a "**Delivery Failure**"), then, in addition to all other remedies available to the Holder, (X) the Company shall pay in cash to the Holder on each day after the Share Delivery Date and during such Delivery Failure an amount equal to 2% of the product of (A) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, multiplied by (B) any trading price of the Common Stock selected by the Holder in writing as in effect at any time during the period beginning on the applicable Exercise Date and ending on the applicable Share Delivery Date, and (Y) the Holder, upon written notice to the Company, may void its Exercise Notice with respect to, and retain or have returned, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the voiding of an Exercise Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise. In addition to the foregoing, if on or after the Public Company Date and on or prior to the Share Delivery either (I) the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, the Company shall fail to issue and deliver to the Holder (or its designee) a certificate and register such shares of Common Stock on the Company's share register or, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, the Transfer Agent shall fail to credit the balance account of the Holder or the Holder's designee with DTC for the number of shares of Common Stock to which the Holder is entitled upon the Holder's exercise hereunder or pursuant to the Company's obligation pursuant to clause (ii) below or (II) a Notice Failure occurs, and if on or after such Share Delivery Date the Holder purchases (in an open market transaction or otherwise) shares of Common Stock corresponding to all or any portion of the number of shares of Common Stock issuable upon such exercise that the Holder is entitled to receive from the Company and has not received from the Company in connection with such Delivery Failure or Notice Failure, as applicable (a "**Buy-In**"), then, in addition to all other remedies available to the Holder, the Company shall, within two (2) Business Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (including, without limitation, by any other Person in respect, or on behalf, of the Holder) (the "**Buy-In Price**"), at which point the Company's obligation to so issue and deliver such certificate (and to issue such shares of Common Stock) or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) (and to issue such Warrant Shares) shall terminate, or (ii) promptly honor its obligation to so issue and deliver to the Holder a certificate or certificates representing such Warrant Shares or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of Warrant Shares multiplied by (B) the lowest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date of the applicable Exercise Notice and ending on the date of such issuance and payment under this clause (ii) (the "**Buy-In Payment Amount**"). Nothing shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock (or

to electronically deliver such shares of Common Stock upon the exercise of this Warrant as required pursuant to the terms hereof. After the Public Company Date, while this Warrant is outstanding, the Company shall cause its transfer agent to participate in the DTC Fast Automated Securities Transfer Program. In addition to the foregoing rights, (i) if the Company fails to deliver the applicable number of Warrant Shares upon an exercise pursuant to Section 1 by the applicable Share Delivery Date, then the Holder shall have the right to rescind such exercise in whole or in part and retain and/or have the Company return, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an exercise shall not affect the Company's obligation to make any payments that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and (ii) if a registration statement covering the issuance or resale of the Warrant Shares that are subject to an Exercise Notice is not available for the issuance or resale, as applicable, of such Exercise Notice Warrant Shares and the Holder has submitted an Exercise Notice prior to receiving notice of the non-availability of such registration statement and the Company has not already delivered the Warrant Shares underlying such Exercise Notice electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit / Withdrawal At Custodian system, the Holder shall have the option, by delivery of notice to the Company, to (x) rescind such Exercise Notice in whole or in part and retain or have returned, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an Exercise Notice shall not affect the Company's obligation to make any payments that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and/or (y) switch some or all of such Exercise Notice from a cash exercise to a Cashless Exercise.

(d)      <u>Cashless Exercise</u>. Notwithstanding anything contained herein to the contrary (other than Section 1(f) below), if at the time of exercise hereof a registration statement is not effective (or the prospectus contained therein is not available for use) for the issuance of all of the Warrant Shares being exercised pursuant to the applicable Exercise Notice, but not prior to the earlier to occur of (x) such initial time the Common Stock of the Company is listed on an Eligible Market and (y) August 31, 2018, then the Holder may, in its sole discretion, exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of Warrant Shares determined according to the following formula (a "**Cashless Exercise**"):

$$\text{Net Number} = \frac{(A \times B) - (A \times C)}{D}$$

For purposes of the foregoing formula:

A= the total number of shares with respect to which this Warrant is then being exercised.

B = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders; and (ii) on or after the Public Company Date, the greater of (I) the Spot Price and (II) the quotient of (A) the sum of the VWAP of the Common Stock of each of the twenty (20) Trading Days ending at the close of business on the Principal Market immediately prior to the time of exercise as set forth in the applicable Exercise Notice, divided by (B) twenty (20).

C = the Exercise Price then in effect for the applicable Warrant Shares at the time of such exercise.

D = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders and (ii) after the Public Company Date, the Spot Price.

For purposes of Rule 144(d) promulgated under the 1933 Act, as in effect on the Subscription Date, it is intended that the Warrant Shares issued in a Cashless Exercise shall be deemed to have been acquired by the Holder, and the holding period for the Warrant Shares shall be deemed to have commenced, on the date this Warrant was originally issued pursuant to the Securities Purchase Agreement.

     (e)    <u>Disputes</u>. In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the number of Warrant Shares to be issued pursuant to the terms hereof, the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed and resolve such dispute in accordance with Section 13.

     (f)    <u>Limitations on Exercises</u>. From and after the Public Company Date, the Company shall not effect the exercise of any portion of this Warrant, and the Holder shall not have the right to exercise any portion of this Warrant, pursuant to the terms and conditions of this Warrant and any such exercise shall be null and void and treated as if never made, to the extent that after giving effect to such exercise, the Holder together with the other Attribution Parties collectively would beneficially own in excess of 4.99% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such exercise. For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by the Holder and the other Attribution Parties shall include the number of shares of Common Stock held by the Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (A) exercise of the remaining, unexercised portion of this Warrant beneficially owned by the Holder or any of the other Attribution Parties and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including other SPA Warrants) beneficially owned by the Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 1(f). For purposes of this Section 1(f), beneficial ownership shall be calculated in accordance with Section 13(d) of the 1934 Act. For purposes of determining the number of outstanding shares of Common Stock the Holder may acquire upon the exercise of this Warrant without exceeding the Maximum Percentage, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (y) a more recent public announcement by the Company or (z) any other written notice by the Company or the Transfer Agent, if any, setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**"). If the Company receives an Exercise Notice from the Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall (i) notify the Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Exercise Notice would otherwise cause the Holder's beneficial ownership, as determined pursuant to this Section 1(f), to exceed the Maximum Percentage, the Holder must notify the Company of a reduced number of Warrant Shares to be acquired pursuant to such Exercise Notice (the number of shares by which such purchase is reduced, the "**Reduction Shares**") and (ii) as soon as reasonably practicable, the Company shall return to the Holder any exercise price paid by the Holder for the Reduction Shares. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing or by electronic mail to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Holder and any other Attribution Party since the date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to the Holder upon exercise of this Warrant results in the Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the 1934 Act), the number of shares so issued by which the Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and the Holder shall not have the power to vote or to transfer the Excess Shares. As soon as reasonably practicable after the issuance of the Excess Shares has been deemed null and void, the Company shall return to the Holder the exercise price paid by the Holder for the Excess Shares. Upon delivery of a written notice to the Company, the Holder may from time to time increase (with such increase not effective until the sixty-first (61st) day after delivery of such notice) or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to the Holder and the other Attribution Parties and not to any other holder of SPA Warrants that is not an Attribution Party of the Holder. For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Warrant in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act. No prior inability to exercise this Warrant pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of exercisability. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 1(f) to the extent necessary to correct this paragraph or any portion of this paragraph which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 1(f) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of this Warrant.

(g)     <u>Reservation of Shares</u>.

(i)     <u>Required Reserve Amount</u>. So long as this Warrant remains outstanding, the Company shall at all times keep reserved for issuance under this Warrant a number of shares of Common Stock at least equal to 200% of the maximum number of shares of Common Stock as shall be necessary to satisfy the Company's obligation to issue shares of Common Stock under the SPA Warrants then outstanding (without regard to any limitations on exercise) (the "**Required Reserve Amount**"); provided that at no time shall the number of shares of Common Stock reserved pursuant to this Section 1(g)(i) be reduced other than proportionally in connection with any exercise or redemption of SPA Warrants or such other event covered by Section 2(a) below. The Required Reserve Amount (including, without limitation, each increase in the number of shares so reserved) shall be allocated pro rata among the holders of the SPA Warrants based on number of shares of Common Stock issuable upon exercise of SPA Warrants held by each holder on the Closing Date (without regard to any limitations on exercise) or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**"). In the event that a holder shall sell or otherwise transfer any of such holder's SPA Warrants, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any SPA Warrants shall be allocated to the remaining holders of SPA Warrants, pro rata based on the number of shares of Common Stock issuable upon exercise of the SPA Warrants then held by such holders (without regard to any limitations on exercise).

(ii)      Insufficient Authorized Shares. If, notwithstanding Section 1(g)(i) above, and not in limitation thereof, at any time while any of the SPA Warrants remain outstanding, the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve the Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for all the SPA Warrants then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its board of directors to recommend to the stockholders that they approve such proposal. In the event that the Company is prohibited from issuing shares of Common Stock upon an exercise of this Warrant due to the failure by the Company to have sufficient shares of Common Stock available out of the authorized but unissued shares of Common Stock (such unavailable number of shares of Common Stock, the "**Authorization Failure Shares**"), in lieu of delivering such Authorization Failure Shares to the Holder, the Company shall pay cash in exchange for the cancellation of such portion of this Warrant exercisable into such Authorization Failure Shares at a price equal to the sum of (i) the product of (x) such number of Authorization Failure Shares and (y) the greatest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date the Holder delivers the applicable Exercise Notice with respect to such Authorization Failure Shares to the Company and ending on the date of such issuance and payment under this Section 1(f); and (ii) to the extent the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of Authorization Failure Shares, any Buy-In Payment Amount, brokerage commissions and other out-of-pocket expenses, if any, of the Holder incurred in connection therewith. Nothing contained in this Section 1(g) shall limit any obligations of the Company under any provision of the Securities Purchase Agreement.

2.      ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.

(a)      <u>Stock Dividends and Splits</u>. Without limiting any provision of Section 2(b) or Section 4, if the Company, at any time on or after the Subscription Date, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in shares of Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

(b)      <u>Adjustment Upon Issuance of Shares of Common Stock</u>. If and whenever on or after the Subscription Date, the Company issues or sells, or in accordance with this Section 2 is deemed to have issued or sold, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding any Excluded Securities issued or sold or deemed to have been issued or sold) for a consideration per share (the "**New Issuance Price**") less than a price equal to the Exercise Price in effect immediately prior to such issuance or sale or deemed issuance or sale (such Exercise Price then in effect is referred to herein as the "**Applicable Price**") (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance, the Exercise Price then in effect shall be reduced to an amount equal to 90% of the New Issuance Price. For all purposes of the foregoing (including, without limitation, determining the adjusted Exercise Price and the New Issuance Price under this Section 2(b)), the following shall be applicable:

8

(i)        Issuance of Options. If the Company in any manner grants or sells any Options and the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Option or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 2(b)(i), the "lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof and (y) the lowest exercise price set forth in such Option for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Option (or any other Person) upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Option (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or otherwise pursuant to the terms of or upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities.

(ii)        Issuance of Convertible Securities. If the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 2(b)(ii), the "lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to one share of Common Stock upon the issuance or sale of the Convertible Security and upon conversion, exercise or exchange of such Convertible Security or otherwise pursuant to the terms thereof and (y) the lowest conversion price set forth in such Convertible Security for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Convertible Security (or any other Person) upon the issuance or sale of such Convertible Security plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Convertible Security (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities or otherwise pursuant to the terms thereof, and if any such issuance or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of this Warrant has been or is to be made pursuant to other provisions of this Section 2(b), except as contemplated below, no further adjustment of the Exercise Price shall be made by reason of such issuance or sale.

(iii)     <u>Change in Option Price or Rate of Conversion</u>. If the purchase or exercise price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exercise or exchange of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exercisable or exchangeable for shares of Common Stock increases or decreases at any time (other than proportional changes in conversion or exercise prices, as applicable, in connection with an event referred to in Section 2(a)), the Exercise Price in effect at the time of such increase or decrease shall be adjusted to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 2(b)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 2(b) shall be made if such adjustment would result in an increase of the Exercise Price then in effect.

(iv)     <u>Calculation of Consideration Received</u>. If any Option and/or Convertible Security and/or Adjustment Right is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "**Primary Security**", and such Option and/or Convertible Security and/or Adjustment Right, the "**Secondary Securities**"), together comprising one integrated transaction, (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing) the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be equal to the difference of (x) the lowest price per share for which one share of Common Stock was issued (or was deemed to be issued pursuant to Section 2(b)(i) or 2(b)(ii) above, as applicable) in such integrated transaction solely with respect to such Primary Security, minus (y) with respect to such Secondary Securities, the sum of (I) the Black Scholes Consideration Value of each such Option, if any, (II) the fair market value (as determined by the Holder in good faith) or the Black Scholes Consideration Value, as applicable, of such Adjustment Right, if any, and (III) the fair market value (as determined by the Holder) of such Convertible Security, if any, in each case, as determined on a per share basis in accordance with this Section 2(b)(iv). If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the net amount of consideration received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company for such securities will be the arithmetic average of the VWAPs of such security for each of the five (5) Trading Days immediately preceding the date of receipt. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities (as the case may be). The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Holder. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five (5) Trading Days after the tenth (10th) day following such Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Holder. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company.

(v)  Record Date. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issuance or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase (as the case may be).

(c)  Number of Warrant Shares. Simultaneously with any adjustment to the Exercise Price pursuant to this Section 2, the number of Warrant Shares that may be purchased upon exercise of this Warrant shall be increased or decreased proportionately, so that after such adjustment the aggregate Exercise Price payable hereunder for the adjusted number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment (without regard to any limitations on exercise contained herein).

(d)  Holder's Right of Alternative Exercise Price Following Issuance of Certain Options or Convertible Securities. In addition to and not in limitation of the other provisions of this Section 2, if the Company in any manner issues or sells or enters into any agreement to issue or sell, any Common Stock, Options or Convertible Securities (any such securities, "**Variable Price Securities**") after the Subscription Date that are issuable pursuant to such agreement or convertible into or exchangeable or exercisable for shares of Common Stock at a price which varies or may vary with the market price of the shares of Common Stock, including by way of one or more reset(s) to a fixed price, but exclusive of such formulations reflecting customary anti-dilution provisions (such as share splits, share combinations, share dividends and similar transactions) (each of the formulations for such variable price being herein referred to as, the "**Variable Price**"), the Company shall provide written notice thereof via facsimile and overnight courier to the Holder on the date of such agreement and the issuance of such Variable Price Securities. From and after the date the Company enters into such agreement or issues any such Variable Price Securities, the Holder shall have the right, but not the obligation, in its sole discretion to substitute the Variable Price for the Exercise Price upon exercise of this Warrant by designating in the Exercise Notice delivered upon any exercise of this Warrant that solely for purposes of such exercise the Holder is relying on the Variable Price rather than the Exercise Price then in effect. The Holder's election to rely on a Variable Price for a particular exercise of this Warrant shall not obligate the Holder to rely on a Variable Price for any future exercises of this Warrant.

11

(e)        Stock Combination Event Adjustment. If at any time and from time to time on or after the Issuance Date there occurs any stock split, stock dividend, stock combination recapitalization or other similar transaction involving the Common Stock (each, a "**Stock Combination Event**", and such date thereof, the "**Stock Combination Event Date**") and the Event Market Price is less than the Exercise Price then in effect (after giving effect to the adjustment in clause 2(a) above), then on the sixteenth (16th) Trading Day immediately following such Stock Combination Event, the Exercise Price then in effect on such sixteenth (16th) Trading Day (after giving effect to the adjustment in clause 2(a) above) shall be reduced (but in no event increased) to the Event Market Price. For the avoidance of doubt, if the adjustment in the immediately preceding sentence would otherwise result in an increase in the Exercise Price hereunder, no adjustment shall be made.

(f)        Other Events. In the event that the Company (or any Subsidiary (as defined in the Securities Purchase Agreement)) shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect the Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 2 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's board of directors shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the number of Warrant Shares (if applicable) so as to protect the rights of the Holder, provided that no such adjustment pursuant to this Section 2(f) will increase the Exercise Price or decrease the number of Warrant Shares as otherwise determined pursuant to this Section 2, provided further that if the Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Company's board of directors and the Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding absent manifest error and whose fees and expenses shall be borne by the Company.

(g)        Calculations. All calculations under this Section 2 shall be made by rounding to the nearest cent or the nearest $1/100^{th}$ of a share, as applicable. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issuance or sale of Common Stock.

(h)     Voluntary Adjustment By Company. The Company may at any time during the term of this Warrant, with the prior written consent of the Required Holders (as defined in the Securities Purchase Agreement), reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the board of directors of the Company.

(i)     Dollar-Value Adjustment. At any time the Dollar Value of this Warrant is less than $6 million, the number of Warrant Shares that may be purchased upon exercise of this Warrant (without regard to any limitations on exercise set forth herein) shall automatically be increased such that, after giving effect to such increase, the Dollar Value of this Warrant equals $6 million.

3.     RIGHTS UPON DISTRIBUTION OF ASSETS. In addition to any adjustments pursuant to Section 2 above, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property, options, evidence of indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "**Distribution**"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution (provided, however, that, on or after the Public Company Date, to the extent that the Holder's right to participate in any such Distribution would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to the extent of the Maximum Percentage (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Distribution (and beneficial ownership) to the extent of any such excess) and the portion of such Distribution shall be held in abeyance for the benefit of the Holder until such time or times, if ever, as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such Distribution (and any Distributions declared or made on such initial Distribution or on any subsequent Distribution held similarly in abeyance) to the same extent as if there had been no such limitation).

4.     PURCHASE RIGHTS; FUNDAMENTAL TRANSACTIONS.

(a)     Purchase Rights. In addition to any adjustments pursuant to Section 2 above, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issuance or sale of such Purchase Rights (provided, however, that, on or after the Public Company Date, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to the extent of the Maximum Percentage (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Purchase Right (and beneficial ownership) to the extent of any such excess) and such Purchase Right to such extent shall be held in abeyance for the benefit of the Holder until such time or times, if ever, as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such right (and any Purchase Right granted, issued or sold on such initial Purchase Right or on any subsequent Purchase Right held similarly in abeyance) to the same extent as if there had been no such limitation).

(b) <u>Fundamental Transactions</u>. The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Warrant and the other Transaction Documents (as defined in the Securities Purchase Agreement) in accordance with the provisions of this Section 4(b) pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction, including agreements to deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant, including, without limitation, which is exercisable for a corresponding number of shares of capital stock equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such adjustments to the number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction). Upon the consummation of each Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of the applicable Fundamental Transaction, the provisions of this Warrant and the other Transaction Documents referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Warrant and the other Transaction Documents with the same effect as if such Successor Entity had been named as the Company herein. Upon consummation of each Fundamental Transaction, the Successor Entity shall deliver to the Holder confirmation that there shall be issued upon exercise of this Warrant at any time after the consummation of the applicable Fundamental Transaction, in lieu of the shares of Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 2(b)(i) and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of this Warrant prior to the applicable Fundamental Transaction, such shares of publicly traded common stock (or its equivalent) of the Successor Entity (including its Parent Entity) which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Warrant been exercised immediately prior to the applicable Fundamental Transaction (without regard to any limitations on the exercise of this Warrant), as adjusted in accordance with the provisions of this Warrant. Notwithstanding the foregoing, and without limiting Section 1(f) hereof, the Holder may elect, at its sole option, by delivery of written notice to the Company to waive this Section 4(b) to permit the Fundamental Transaction without the assumption of this Warrant. In addition to and not in substitution for any other rights hereunder, prior to the consummation of each Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities or other assets with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon an exercise of this Warrant at any time after the consummation of the applicable Fundamental Transaction but prior to the Expiration Date, in lieu of the shares of the Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 2(b)(i) and 4(a) above, which shall continue to be receivable thereafter)) issuable upon the exercise of the Warrant prior to such Fundamental Transaction, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights) which the Holder would have been entitled to receive upon the happening of the applicable Fundamental Transaction had this Warrant been exercised immediately prior to the applicable Fundamental Transaction (without regard to any limitations on the exercise of this Warrant). Provision made pursuant to the preceding sentence shall be in a form and substance reasonably satisfactory to the Holder.

(c)     Black Scholes Value.

(i)     Fundamental Transaction Redemption. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time commencing on the earliest to occur of (x) the public disclosure of any Fundamental Transaction, (y) the consummation of any Fundamental Transaction and (z) the Holder first becoming aware of any Fundamental Transaction through the date that is ninety (90) days after the public disclosure of the consummation of such Fundamental Transaction by the Company pursuant to a Current Report on Form 8-K filed with the SEC, the Company or the Successor Entity (as the case may be) shall purchase this Warrant from the Holder on the date of such request by paying to the Holder cash in an amount equal to the Black Scholes Value. Payment of such amounts shall be made by the Company (or at the Company's direction) to the Holder on or prior to the later of (x) the second (2nd) Trading Day after the date of such request and (y) the date of consummation of such Fundamental Transaction.

(ii)     Event of Default Redemption. Notwithstanding the foregoing and the provisions of Section 4(b) above, at the request of the Holder delivered at any time after the occurrence of an Event of Default (as defined in the Notes)(assuming for such purpose that the Notes remain outstanding), the Company or the Successor Entity (as the case may be) shall purchase this Warrant from the Holder on the date of such request by paying to the Holder cash in an amount equal to the Event of Default Black Scholes Value.

15

(d)         Application. The provisions of this Section 4 shall apply similarly and equally to successive Fundamental Transactions and Corporate Events and shall be applied as if this Warrant (and any such subsequent warrants) were fully exercisable and without regard to any limitations on the exercise of this Warrant (provided that the Holder shall continue to be entitled to the benefit of the Maximum Percentage, applied however with respect to shares of capital stock registered under the 1934 Act and thereafter receivable upon exercise of this Warrant (or any such other warrant)).

5.         NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation (as defined in the Securities Purchase Agreement), Bylaws (as defined in the Securities Purchase Agreement) or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issuance or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (a) shall not increase the par value of any shares of Common Stock receivable upon the exercise of this Warrant above the Exercise Price then in effect, and (b) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the exercise of this Warrant. Notwithstanding anything herein to the contrary, if after the sixty (60) calendar day anniversary of the Issuance Date, the Holder is not permitted to exercise this Warrant in full for any reason (other than pursuant to restrictions set forth in Section 1(f) hereof), the Company shall use its best efforts to promptly remedy such failure, including, without limitation, obtaining such consents or approvals as necessary to permit such exercise into shares of Common Stock.

6.         WARRANT HOLDER NOT DEEMED A STOCKHOLDER. Except as otherwise specifically provided herein, the Holder, solely in its capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in its capacity as the Holder of this Warrant, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which it is then entitled to receive upon the due exercise of this Warrant. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 6, the Company shall provide the Holder with copies of the same notices and other information given to the stockholders of the Company generally, contemporaneously with the giving thereof to the stockholders.

7.         REISSUANCE OF WARRANTS.

(a)         Transfer of Warrant. If this Warrant is to be transferred, the Holder shall surrender this Warrant to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Warrant (in accordance with Section 7(d)), registered as the Holder may request, representing the right to purchase the number of Warrant Shares being transferred by the Holder and, if less than the total number of Warrant Shares then underlying this Warrant is being transferred, a new Warrant (in accordance with Section 7(d)) to the Holder representing the right to purchase the number of Warrant Shares not being transferred.

(b)      Lost, Stolen or Mutilated Warrant. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of this Warrant, the Company shall execute and deliver to the Holder a new Warrant (in accordance with Section 7(d)) representing the right to purchase the Warrant Shares then underlying this Warrant.

(c)      Exchangeable for Multiple Warrants. This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Warrant or Warrants (in accordance with Section 7(d)) representing in the aggregate the right to purchase the number of Warrant Shares then underlying this Warrant, and each such new Warrant will represent the right to purchase such portion of such Warrant Shares as is designated by the Holder at the time of such surrender; provided, however, no warrants for fractional shares of Common Stock shall be given.

(d)      Issuance of New Warrants. Whenever the Company is required to issue a new Warrant pursuant to the terms of this Warrant, such new Warrant (i) shall be of like tenor with this Warrant, (ii) shall represent, as indicated on the face of such new Warrant, the right to purchase the Warrant Shares then underlying this Warrant (or in the case of a new Warrant being issued pursuant to Section 7(a) or Section 7(c), the Warrant Shares designated by the Holder which, when added to the number of shares of Common Stock underlying the other new Warrants issued in connection with such issuance, does not exceed the number of Warrant Shares then underlying this Warrant), (iii) shall have an issuance date, as indicated on the face of such new Warrant which is the same as the Issuance Date, and (iv) shall have the same rights and conditions as this Warrant.

8.      NOTICES. Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant (other than the issuance of shares of Common Stock upon exercise in accordance with the terms hereof), including in reasonable detail a description of such action and the reason therefor. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) immediately upon each adjustment of the Exercise Price and the number of Warrant Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s), (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the shares of Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property to holders of shares of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder, (iii) at least ten (10) Trading Days prior to the consummation of any Fundamental Transaction and (iv) within one (1) Business Day of the occurrence of an Event of Default (as defined in the Notes), setting forth in reasonable detail any material events with respect to such Event of Default and any efforts by the Company to cure such Event of Default. To the extent that any notice provided hereunder constitutes, or contains, material, non-public information regarding the Company or any of its Subsidiaries, the Company shall simultaneously file such notice with the SEC (as defined in the Securities Purchase Agreement) pursuant to a Current Report on Form 8-K. If the Company or any of its Subsidiaries provides material non-public information to the Holder that is not simultaneously filed in a Current Report on Form 8-K and the Holder has not agreed to receive such material non-public information, the Company hereby covenants and agrees that the Holder shall not have any duty of confidentiality to the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents with respect to, or a duty to any of the foregoing not to trade on the basis of, such material non-public information. It is expressly understood and agreed that the time of execution specified by the Holder in each Exercise Notice shall be definitive and may not be disputed or challenged by the Company.

9.    <u>AMENDMENT AND WAIVER</u>. Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f)) may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

10.    <u>SEVERABILITY</u>. If any provision of this Warrant is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Warrant so long as this Warrant as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

18

11.     <u>GOVERNING LAW</u>. This Warrant shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to the Company at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS WARRANT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

12.     <u>CONSTRUCTION; HEADINGS</u>. This Warrant shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any Person as the drafter hereof. The headings of this Warrant are for convenience of reference and shall not form part of, or affect the interpretation of, this Warrant. Terms used in this Warrant but defined in the other Transaction Documents shall have the meanings ascribed to such terms on the Closing Date (as defined in the Securities Purchase Agreement) in such other Transaction Documents unless otherwise consented to in writing by the Holder.

13.     <u>DISPUTE RESOLUTION</u>.

(a)     <u>Submission to Dispute Resolution</u>.

(i)     In the case of a dispute relating to the Exercise Price, the Closing Sale Price, the Bid Price, Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or fair market value or the arithmetic calculation of the number of Warrant Shares (as the case may be) (including, without limitation, a dispute relating to the determination of any of the foregoing), the Company or the Holder (as the case may be) shall submit the dispute to the other party via facsimile (A) if by the Company, within two (2) Business Days after the occurrence of the circumstances giving rise to such dispute or (B) if by the Holder, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Company are unable to promptly resolve such dispute relating to such Exercise Price, such Closing Sale Price, such Bid Price, such Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or such fair market value or such arithmetic calculation of the number of Warrant Shares (as the case may be), at any time after the second (2nd) Business Day following such initial notice by the Company or the Holder (as the case may be) of such dispute to the Company or the Holder (as the case may be), then the Holder may, at its sole option, select an independent, reputable investment bank to resolve such dispute.

19

(ii)      The Holder and the Company shall each deliver to such investment bank (A) a copy of the initial dispute submission so delivered in accordance with the first sentence this Section 13 and (B) written documentation supporting its position with respect to such dispute, in each case, no later than 5:00 p.m. (New York time) by the fifth (5th) Business Day immediately following the date on which the Holder selected such investment bank (the "**Dispute Submission Deadline**") (the documents referred to in the immediately preceding clauses (A) and (B) are collectively referred to herein as the "**Required Dispute Documentation**") (it being understood and agreed that if either the Holder or the Company fails to so deliver all of the Required Dispute Documentation by the Dispute Submission Deadline, then the party who fails to so submit all of the Required Dispute Documentation shall no longer be entitled to (and hereby waives its right to) deliver or submit any written documentation or other support to such investment bank with respect to such dispute and such investment bank shall resolve such dispute based solely on the Required Dispute Documentation that was delivered to such investment bank prior to the Dispute Submission Deadline). Unless otherwise agreed to in writing by both the Company and the Holder or otherwise requested by such investment bank, neither the Company nor the Holder shall be entitled to deliver or submit any written documentation or other support to such investment bank in connection with such dispute (other than the Required Dispute Documentation).

(iii)      The Company and the Holder shall cause such investment bank to determine the resolution of such dispute and notify the Company and the Holder of such resolution no later than ten (10) Business Days immediately following the Dispute Submission Deadline. The fees and expenses of such investment bank shall be borne solely by the Company, and such investment bank's resolution of such dispute shall be final and binding upon all parties absent manifest error.

(b)      <u>Miscellaneous</u>. The Company expressly acknowledges and agrees that (i) this Section 13 constitutes an agreement to arbitrate between the Company and the Holder (and constitutes an arbitration agreement) under the rules then in effect under § 7501, et seq. of the New York Civil Practice Law and Rules ("**CPLR**") and that the Holder is authorized to apply for an order to compel arbitration pursuant to CPLR § 7503(a) in order to compel compliance with this Section 13, (ii) a dispute relating to the Exercise Price includes, without limitation, disputes as to (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(b), (B) the consideration per share at which an issuance or deemed issuance or sale of Common Stock occurred, (C) whether any issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred, (iii) the terms of this Warrant and each other applicable Transaction Document shall serve as the basis for the selected investment bank's resolution of the applicable dispute, such investment bank shall be entitled (and is hereby expressly authorized) to make all findings, determinations and the like that such investment bank determines are required to be made by such investment bank in connection with its resolution of such dispute (including, without limitation, determining (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(b), (B) the consideration per share at which an issuance or deemed issuance of Common Stock occurred, (C) whether any issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred) and in resolving such dispute such investment bank shall apply such findings, determinations and the like to the terms of this Warrant and any other applicable Transaction Documents, (iv) the Holder (and only the Holder), in its sole discretion, shall have the right to submit any dispute described in this Section 13 to any state or federal court sitting in The City of New York, Borough of Manhattan in lieu of utilizing the procedures set forth in this Section 13 and (v) nothing in this Section 13 shall limit the Holder from obtaining any injunctive relief or other equitable remedies (including, without limitation, with respect to any matters described in this Section 13).

14.     REMEDIES, CHARACTERIZATION, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Warrant shall be cumulative and in addition to all other remedies available under this Warrant and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the right of the Holder to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Warrant. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, exercises and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holder of this Warrant shall be entitled, in addition to all other available remedies, to specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving actual damages and without posting a bond or other security. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Warrant (including, without limitation, compliance with Section 2 hereof). The issuance of shares and certificates for shares as contemplated hereby upon the exercise of this Warrant shall be made without charge to the Holder or such shares for any issuance tax or other costs in respect thereof, provided that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the Holder or its agent on its behalf.

15.     PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Warrant is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the holder otherwise takes action to collect amounts due under this Warrant or to enforce the provisions of this Warrant or (b) there occurs any bankruptcy, reorganization, receivership of the company or other proceedings affecting company creditors' rights and involving a claim under this Warrant, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, without limitation, attorneys' fees and disbursements.

16.     <u>TRANSFER</u>. This Warrant may be offered for sale, sold, transferred or assigned without the consent of the Company, except as may otherwise be required by Section 2(g) of the Securities Purchase Agreement.

17.     <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Warrant, from and after the Public Company Date, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-k or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries.

19.     <u>CERTAIN DEFINITIONS</u>. For purposes of this Warrant, the following terms shall have the following meanings:

(a)     "**1933 Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(b)     "**1934 Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(c)     "**Adjustment Right**" means any right granted with respect to any securities issued in connection with, or with respect to, any issuance or sale (or deemed issuance or sale in accordance with Section 2) of shares of Common Stock (other than rights of the type described in Section 2(b)(i) and 4 hereof) that could result in a decrease in the net consideration received by the Company in connection with, or with respect to, such securities (including, without limitation, any cash settlement rights, cash adjustment or other similar rights).

(d)     "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(e)     "**Approved Stock Plan**" means any employee benefit plan which has been approved by the board of directors of the Company prior to or subsequent to the date hereof pursuant to which shares of Common Stock and standard options to purchase Common Stock may be issued to any employee, officer or director for services provided to the Company in their capacity as such.

22

(f)  "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Section 13(d) of the 1934 Act. For clarity, the purpose of the foregoing is to subject collectively the Holder and all other Attribution Parties to the Maximum Percentage.

(g)  "**Bid Price**" means, for any security as of the particular time of determination, the bid price for such security on the Principal Market as reported by Bloomberg as of such time of determination, or, if the Principal Market is not the principal securities exchange or trading market for such security, the bid price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg as of such time of determination, or if the foregoing does not apply, the bid price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg as of such time of determination, or, if no bid price is reported for such security by Bloomberg as of such time of determination, the average of the bid prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC) as of such time of determination. If the Bid Price cannot be calculated for a security as of the particular time of determination on any of the foregoing bases, the Bid Price of such security as of such time of determination shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(h)  "**Black Scholes Consideration Value**" means (x) prior to the Public Company Date, the fair market value of the applicable Option, Convertible Security or Adjustment Right (as the case may be) as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the applicable Option, Convertible Security or Adjustment Right (as the case may be) as of the date of issuance thereof calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the public announcement of the execution of definitive documents with respect to the issuance of such Option or Convertible Security (as the case may be), (ii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the remaining term of such Option, Convertible Security or Adjustment Right (as the case may be) as of the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be), (iii) a zero cost of borrow and (iv) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be).

23

(i)      **"Black Scholes Value"** means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(i), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the greater of (1) the highest Closing Sale Price of the Common Stock during the period beginning on the Trading Day immediately preceding the announcement of the applicable Fundamental Transaction (or the consummation of the applicable Fundamental Transaction, if earlier) and ending on the Trading Day of the Holder's request pursuant to Section 4(c)(i) and (2) the sum of the price per share being offered in cash in the applicable Fundamental Transaction (if any) plus the value of the non-cash consideration being offered in the applicable Fundamental Transaction (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(i), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(i) and (2) the remaining term of this Warrant as of the date of consummation of the applicable Fundamental Transaction or as of the date of the Holder's request pursuant to Section 4(c)(i) if such request is prior to the date of the consummation of the applicable Fundamental Transaction, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the earliest to occur of (A) the public disclosure of the applicable Fundamental Transaction, (B) the consummation of the applicable Fundamental Transaction and (C) the date on which the Holder first became aware of the applicable Fundamental Transaction.

(j)      **"Bloomberg"** means Bloomberg, L.P.

(k)      **"Business Day"** means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(l)      **"Closing Sale Price"** means, for any security as of any date, the last closing trade price for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing trade price, then the last trade price of such security prior to 4:00:00 p.m., New York time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing does not apply, the last trade price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no last trade price is reported for such security by Bloomberg, the average of the ask prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Sale Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(m) "**Common Stock**" means (i) the Company's shares of common stock, $0.000001 par value per share, and (ii) any capital stock into which such common stock shall have been changed or any share capital resulting from a reclassification of such common stock.

(n) "**Convertible Securities**" means any stock or other security (other than Options) that is at any time and under any circumstances, directly or indirectly, convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any shares of Common Stock.

(o) "**Dollar Value**" means, as of any given time, the sum of (x) the sum of each Aggregate Exercise Price of each exercise of this Warrant (assuming solely for such purpose that each such exercise was a cash exercise of this Warrant) that occurred prior to such given time and (y) the Aggregate Exercise Price of a cash exercise of the unexercised portion of this Warrant as of such given time.

(p) "**Eligible Market**" means The New York Stock Exchange, the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Select Market, the Nasdaq Global Market, the OTCQB, the OTCQX or the Principal Market.

(q) "**Event Market Price**" means, with respect to any Stock Combination Event Date, the quotient determined by dividing (x) the sum of the VWAP of the Common Stock for each of the five (5) lowest Trading Days during the twenty (20) consecutive Trading Day period ending and including the Trading Day immediately preceding the sixteenth (16th) Trading Day after such Stock Combination Event Date, divided by (y) five (5).

(r) "**Event of Default Black Scholes Value**" means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(ii), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the highest Closing Sale Price of the Common Stock during the period beginning on the date of the occurrence of the Event of Default through the date all Events of Default have been cured (assuming for such purpose that the Notes remain outstanding) or, if earlier, the Trading Day of the Holder's request pursuant to Section 4(c)(ii), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(ii), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(ii) and (2) the remaining term of this Warrant as of the date of the occurrence of such Event of Default, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following later of (x) the date of the occurrence of such Event of Default and (y) the date of the public announcement of such Event of Default.

(s)        "**Excluded Securities**" means (i) shares of Common Stock or standard options to purchase Common Stock issued to directors, officers or employees of the Company for services rendered to the Company in their capacity as such pursuant to an Approved Stock Plan (as defined above), provided that (A) all such issuances (taking into account the shares of Common Stock issuable upon exercise of such options) after the Subscription Date pursuant to this clause (i) do not, in the aggregate, exceed more than 5% of the Common Stock issued and outstanding immediately prior to the Subscription Date and (B) the exercise price of any such options is not lowered, none of such options are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such options are otherwise materially changed in any manner that adversely affects any of the Buyers; (ii) shares of Common Stock issued upon the conversion or exercise of Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) issued prior to the Subscription Date, provided that the conversion price of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) is not lowered, none of such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are otherwise materially changed in any manner that adversely affects any of the Buyers; and (iii) the shares of Common Stock issuable upon exercise of the SPA Warrants; provided, that the terms of the SPA Warrant are not amended, modified or changed on or after the Subscription Date (other than antidilution adjustments pursuant to the terms thereof in effect as of the Subscription Date).

(t)        "**Expiration Date**" means the date that is the fifth (5th) anniversary of the Issuance Date or, if such date falls on a day other than a Trading Day or on which trading does not take place on the Principal Market (a "**Holiday**"), the next date that is not a Holiday.

26

(u) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby all such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Warrant calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other shareholders of the Company to surrender their shares of Common Stock without approval of the shareholders of the Company or (C) directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(v) "**Group**" means a "group" as that term is used in Section 13(d) of the 1934 Act and as defined in Rule 13d-5 thereunder.

(w) "**Listing Date**" means the earlier to occur of (x) May 31, 2018 (solely if the Company fails to use its reasonably best efforts to effect this listing of the Common Stock on an Eligible Market (other than the OTCQB or the OTCQX) on or prior thereto) or (y) the initial date any security of the Company (including, without limitation, the Common Stock) is listed on an Eligible Market (other than the OTCQB or the OTCQX).

(x)        "**Notes**" has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all notes issued in exchange therefor or replacement thereof.

(y)        "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(z)        "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(aa)        "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity or a government or any department or agency thereof.

(bb)        "**Pre-Listing Maximum Eligibility Number**" means 100,000 Warrant Shares (as adjusted for stock splits, stock dividends, recapitalizations and similar events).

(cc)        "**Public Company Date**" means the date on which the shares of Common Stock of the Company (or its direct or indirect successor, subsidiary or parent company, whose securities are issued or issuable to holders of Common Stock), whether as a result of a public offering, merger, recapitalization, reorganization or otherwise, are registered under the 1934 Act.

(dd)        "**Principal Market**" means, as of any date of determination, the Eligible Market that is the principal securities exchange market for the Common Stock as of such date of determination.

(ee)        "**Registration Rights Agreement**" means that certain registration rights agreement, dated as of the Closing Date, by and among the Company and the initial holders of the Notes relating to, among other things, the registration of the resale of the Common Stock issued pursuant to the Securities Purchase Agreement and issuable upon exercise of the SPA Warrants, as may be amended from time to time.

(ff)        "**SEC**" means the United States Securities and Exchange Commission or the successor thereto.

(gg)        "**Spot Price**" means, with respect to any given Exercise Notice, as applicable: (A) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the date of the applicable Exercise Notice if such Exercise Notice is (1) both executed and delivered pursuant to Section 1(a) hereof on a day that is not a Trading Day or (2) both executed and delivered pursuant to Section 1(a) hereof on a Trading Day prior to the opening of "regular trading hours" (as defined in Rule 600(b)(64) of Regulation NMS promulgated under the federal securities laws) on such Trading Day, (B) the Bid Price of the Common Stock as of the time of the Holder's execution of the applicable Exercise Notice if such Exercise Notice is executed during "regular trading hours" on a Trading Day and is delivered within two (2) hours thereafter pursuant to Section 1(a) hereof, or (C) the Closing Sale Price of the Common Stock on the date of the applicable Exercise Notice if the date of such Exercise Notice is a Trading Day and such Exercise Notice is both executed and delivered pursuant to Section 1(a) hereof after the close of "regular trading hours" on such Trading Day

28

(hh)  **"Subject Entity"** means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(ii)  **"Successor Entity"** means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(jj)  **"Trading Day"** means, as applicable, (i) prior to the Public Company Date, any Business Day, and (ii) from and after the Public Company Date, (x) with respect to all price or trading volume determinations relating to the Common Stock, any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded, provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Holder or (y) with respect to all determinations other than price or trading volume determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

(kk)  **"VWAP"** means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market (or, if the Principal Market is not the principal trading market for such security, then on the principal securities exchange or securities market on which such security is then traded) during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "HP" function (set to weighted average) or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the VWAP cannot be calculated for such security on such date on any of the foregoing bases, the VWAP of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination, recapitalization or other similar transaction during such period.

[*signature page follows*]

**IN WITNESS WHEREOF,** the Company has caused this Warrant to Purchase Common Stock to be duly executed as of the Issuance Date set out above.

**YAYYO, INC.**

By:  /s/ Ramy El-Batrawi
        **Name:** Ramy El-Batrawi
        **Title:** CEO

**EXHIBIT A**

### EXERCISE NOTICE

### TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS WARRANT TO PURCHASE COMMON STOCK

### YAYYO, INC.

The undersigned holder hereby elects to exercise the Warrant to Purchase Common Stock No. _____ (the "**Warrant**") of Yayyo, Inc., a Delaware corporation (the "**Company**") as specified below. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1.   <u>Form of Exercise Price</u>. The Holder intends that payment of the Aggregate Exercise Price shall be made as:

☐   a "<u>Cash Exercise</u>" with respect to _____ Warrant Shares; and/or

☐   a "<u>Cashless Exercise</u>" with respect to _____ Warrant Shares.

In the event that the Holder has elected a Cashless Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder hereby represents and warrants that (i) this Exercise Notice was executed by the Holder at _____ [a.m.][p.m.] on the date set forth below and (ii) if applicable, the Bid Price as of such time of execution of this Exercise Notice was $_____.

2.   <u>Payment of Exercise Price</u>. In the event that the Holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder shall pay the Aggregate Exercise Price in the sum of $_____ to the Company in accordance with the terms of the Warrant.

4.   <u>Delivery of Warrant Shares</u>. The Company shall deliver to Holder, or its designee or agent as specified below, _____ shares of Common Stock in accordance with the terms of the Warrant. Delivery shall be made to Holder, or for its benefit, as follows:

☐   Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to:   _____

_____

_____

_____

☐        Check here if (x) after the Public Company Day and (y) requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant: _____

DTC Number: _____

Account Number: _____

Date: _____ __, _____

_____
Name of Registered Holder

By: _____

   Name:
   Title:

Tax ID: _____

Facsimile: _____

E-mail Address: _____

_____

**EXHIBIT B**

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Exercise Notice and hereby directs _____ to issue the above indicated number of shares of Common Stock from the Company and acknowledged and agreed to by _____.

**YAYYO, INC.**

By: _____

     Name:
     Title:

# EXHIBIT E

EXHIBIT A

## EXERCISE NOTICE

## TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS WARRANT TO PURCHASE COMMON STOCK

## YAYYO, INC.

The undersigned holder hereby elects to exercise the Warrant to Purchase Common Stock No. _W-1_ (the "**Warrant**") of Yayyo, Inc., a Delaware corporation (the "**Company**") as specified below. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1.  <u>Form of Exercise Price</u>. The Holder intends that payment of the Aggregate Exercise Price shall be made as:

[X] a "<u>Cash Exercise</u>" with respect to ___1,500,000___ Warrant Shares; and/or

[ ] a "<u>Cashless Exercise</u>" with respect to _____ Warrant Shares.

In the event that the Holder has elected a Cashless Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder hereby represents and warrants that (i) this Exercise Notice was executed by the Holder at _____ [a.m.][p.m.] on the date set forth below and (ii) if applicable, the Bid Price as of such time of execution of this Exercise Notice was $_____.

2.  <u>Payment of Exercise Price</u>. In the event that the Holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the Holder shall pay the Aggregate Exercise Price in the sum of $ 13,200.00 _____ to the Company in accordance with the terms of the Warrant.

4.  <u>Delivery of Warrant Shares</u>. The Company shall deliver to Holder, or its designee or agent as specified below, _1,500,000_ shares of Common Stock in accordance with the terms of the Warrant. Delivery shall be made to Holder, or for its benefit, as follows:

[ ] Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to: _____

_____

_____

*4836-4821-4879v.2*

x    Check here if (x) after the Public Company Day and (y) requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant:   LEK Securities

DTC Number:       0512

Account Number:   BELLRIDGELP

Date: _____ May 28, 2021

Bellridge Capital LP
Name of Registered Holder

By: _____
Name:  Robert Klimov
Title:   Managing Partner

Tax ID: 81-3006329

Facsimile: 877-276-7018

E-mail Address: robertk@berllridgecapital.com
               cc: yuriy@bellridgecapital.com

*4836-4821-4879v.2*

# EXHIBIT F

10-K 1 form10-k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

[X] ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the year ended December 31, 2019

[ ] TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number: **001-39132**



# YayYo, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **81-3028414** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
(Address of principal executive offices) (Zip Code)

**+1-310-926-2643**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **None** | **N/A** | **N/A** |

Securities registered pursuant to section 12(g) of the Act:

**Common Stock, $0.000001 par value per share**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes [ ] No [X]

Indicate by checkmark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | [ ] | Accelerated filer | [ ] |
| Non-accelerated filer | [X] | Smaller reporting company | [X] |
| Emerging Growth Company | [X] | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter.

As of June 30, 2019, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $12,647,980 based on the closing price as reported on the OTC.

As of March 27, 2020, there are 29,427,803 shares of common stock, $0.000001 par value per share, outstanding.

# TABLE OF CONTENTS

| Item Number and Caption | Page |
|---|---|
| Forward-Looking Statements | ii |
| | |
| **PART I** | |
| 1. Business | 1 |
| 1A. Risk Factors | 10 |
| 1B. Unresolved Staff Comments | 37 |
| 2. Properties | 37 |
| 3. Legal Proceedings | 37 |
| 4. Mine Safety Disclosures | 38 |
| | |
| **PART II** | |
| 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 38 |
| 6. Selected Financial Data | 41 |
| 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| 7A. Quantitative and Qualitative Disclosures About Market Risk | 50 |
| 8. Financial Statements and Supplementary Data | 50 |
| 9. Changes in and Disagreements with Accountants on Accounting, and Financial Disclosure | 50 |
| 9A. Controls and Procedures | 51 |
| 9B. Other Information | 52 |
| | |
| **PART III** | |
| 10. Directors, Executive Officers, and Corporate Governance | 53 |
| 11. Executive Compensation | 59 |
| 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 60 |
| 13. Certain Relationships and Related Transactions, and Director Independence | 64 |
| 14. Principal Accounting Fees and Services | 66 |
| | |
| **PART IV** | |
| 15. Exhibits, Financial Statement Schedules | 67 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K (this Report) contains forward looking statements that involve risks and uncertainties, principally in the sections entitled "Description of Business," "Risk Factors," and "Management's Discussion and Analysis of Financial Condition and Results of Operations." All statements other than statements of historical fact contained in this Report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should," or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks outlined under "Risk Factors" or elsewhere in this Report, which may cause our or our industry's actual results, levels of activity, performance or achievements to differ materially from those expressed or implied by these forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time and it is not possible for us to predict all risk factors, nor can we address the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause our actual results to differ materially from those contained in any forward-looking statements. All forward-looking statements included in this document are based on information available to us on the date hereof, and we assume no obligation to update any such forward-looking statements.

You should not place undue reliance on any forward-looking statement, each of which applies only as of the date of this Report on Form-10-K. Before you invest in our securities, you should be aware that the occurrence of the events described in the section entitled "Risk Factors" and elsewhere in this Report could negatively affect our business, operating results, financial condition and stock price. Except as required by law, we undertake no obligation to update or revise publicly any of the forward-looking statements after the date of this Report on Form-10-K to conform our statements to actual results or changed expectations.

ii

# PART I

*All brand names or trademarks appearing in this report are the property of their respective holders. Unless the context requires otherwise, references in this report to "YayYo," the "Company," "we," "us," and "our" refer to YayYo, Inc., a Delaware corporation, and its consolidated subsidiaries.*

## ITEM 1. BUSINESS

### Corporate History

YayYo, Inc. (YayYo, the Company, we, or us) (a Delaware corporation), was formed on June 21, 2016 under the name "YayYo, LLC," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC, to the Company in exchange for common stock, par value $0.000001 per share, of the Company. All of the YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities upon the filing of the "Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "C" corporation formed under the laws of the State of Delaware.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from being an exclusive provider of transportation networks systems towards a more diversified operating company with a direct focus on the vehicle rental business and a related transportation network system. As of the date of this Report, the Company's operating business segments include (i) an online peer-to-peer bookings platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

On November 15, 2019, the Company closed its initial public offering of 2,625,000 common shares at $4.00 per share, for gross proceeds, before underwriting discounts and commissions and expenses, of $10.5 million. and the shares became listed on the Nasdaq Capital Market ("Nasdaq") under the symbol "YAYO".

On February 10, 2020, the Company notified Nasdaq of its intent to voluntarily delist its Common Stock from Nasdaq. In connection therewith, the Company notified Nasdaq of the Company's intention to file a Form 25 with the Securities and Exchange Commission (the "SEC") on or about February 20, 2020. The Company elected to effect the voluntary delisting of its common stock after discussions with Nasdaq's staff, and based on the determination of the Company's board of directors that voluntarily delisting the Common Stock from Nasdaq was in the best interests of the Company and its stockholders. Following delisting from Nasdaq, the Company's Common Stock now trades on the OTC Pink Market under the trading symbol, "YAYO."

### Business Overview

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

**Rideshare Rental E-Commerce Platform**

On October 31, 2017, the Company created the wholly-owned subsidiary, Rideshare to incubate the concept of Rideshare Platform, a proprietary, peer-to-peer booking platform to rent standard passenger vehicles to self-employed ridesharing drivers. The Company has now deployed and launched the Rideshare Platform on the Company's e-commerce website Ridesharerental.com (http://www.Ridesharerental.com). Further, the Rideshare Platform also commercially markets the Company's own fleet of cars as well as other fleet owners and selected individual car owners. The Rideshare Platform bookings service provides all standard passenger car owners with a financial opportunity to monetize personally owned vehicles by renting them out to ridesharing economy drivers. Our business strategy with our operating Rideshare Platform is to continue developing our brand equity around becoming the premiere peer-to-peer Transportation Network Company (TNC) vehicle rental business for the ridesharing economy that matches the owners and/or operators of passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing economy drivers. The Company initially launched the Rideshare Platform in Los Angeles, CA and intends to launch in additional cities.

The Rideshare Platform leverages technology to connect the owners and/or operators of standard passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing drivers. The platform's functionality provides ridesharing drivers with access to certain data emitted from their respective Company rental vehicle(s) through a personal Rideshare rental dashboard. Vehicle owners can also access and manage data emitted from their personal vehicle(s) under rental to a third-party from the Rideshare Platform inventory dashboard and can further manage the other aspects of the vehicle rental transaction through the Rideshare Platform. Further, customers renting vehicles on the Rideshare Platform can also access rental extension options through the Rideshare Platform. All transactional aspects of the rental vehicle(s) (including, but not limited to, background checks, terms, deposits and insurance costs) are run securely through the Rideshare Platform. In addition, our Rideshare website located at Rideshareerentals.com (http://www.rideshareerental.com) not only effectively monetizes Company-owned vehicle fleets, made available under our Fleet Management business, but also generates revenue by charging transactional fees to other vehicle owners and ridesharing economy drivers for all rental transactions consummated on the Rideshare Platform. The Rideshare Platform is available on desktop, iOS and Android devices. The development and functionality of our mobile applications are a material component to our business as drivers are more likely to transact via mobile devices.

Most importantly, all standard passenger vehicles made available on the Rideshare platform are fully qualified by the Company and guaranteed to meet the necessary Ridesharing Qualification Requirements imposed on ridesharing economy drivers by the private ridesharing TNCs. The Company mission seeks to put more prospective ridesharing drivers on roadways by providing ridesharing drivers with fully inspected vehicle offerings that are guaranteed to meet the Ridesharing Qualification Requirements.

Further, the Company's car liability and physical damage insurance policies ("Company Insurance Policies") cover both third-party vehicle owners as well as ridesharing drivers under rental contract. The Company Insurance Policies provide insurance on all listed Rideshare rental vehicles, provided that the Company Insurance Policy coverage is suspending during periods when the ridesharing driver under rental contract with the Company is actively operating on either the Uber or Lyft platform. During these periods when ridesharing drivers are actively operating Rideshare rental vehicles on either the Uber or Lyft platforms, coverage under the Company Insurance Policies are subordinate to the vehicle insurance coverage provided by Uber, Lyft or such other TNCs.

The Company believes that due to the development of the ridesharing economy and its anticipated growth trajectory, the commercial ridesharing economy market will reward the Company as an early entrant to the third-party vehicle rental business. Under the Rideshare Platform we intend to become the go-to booking destination and brand for ridesharing economy vehicle rentals in a TNC marketplace that connects owners and/or operators of standard passenger vehicles with ridesharing economy drivers. We believe that our product and service offerings on the Rideshare Platform will continue to be an attractive proposition for all ridesharing economy drivers either simply requiring a standard passenger vehicle to operate or otherwise struggling to qualify their personal vehicles under the Vehicle Inspection Requirements. Further, we believe that the Company will require additional capital investment to continue funding Rideshare, the Rideshare Platform or rideshareerental.com (http://www.rideshareerental.com), including technology, payments and advertising, for purposes of continuing to develop and scale the Rideshare Platform and business. Further, we believe there is an immediate opportunity and necessity to grow and scale the Rideshare Platform in new geographical territories for purposes of developing and strengthening the Company's brand and competitive advantage in the ridesharing economy vehicle rental market. For more information see "Risk Factors."

*Insurance Policy*

As of the date of this Annual Report, the Company together with a Managing General Underwriter ("MGU") maintains an insurance policy of behalf of the Company. Under the policy the MGU will handle all back-end insurance generation and processing through an API connection with the Company's databases. We believe that this MGU insurance policy has made it possible for us to launch our Rideshare Platform, which will also allow the Company to have other third-party fleet owners supply vehicles to drivers through our platform and have them covered under the terms of our insurance policy. Our insurance policy provides physical damage and liability coverage to all rideshare drivers and fleet owners under the Rideshare Platform. Under the terms of our policy, ridesharing drivers acquiring rental vehicles under our Rideshare Platform as well as owners of the rental vehicles are provided with an insurance ID card that lists each parties name and the vehicle VIN number. Further, customers to our Rideshare Platform pay daily (for the duration of the rental period) to become designated as a supplemental insured party under the Company's insurance policy. Under the terms of our policy, insurance coverage is valid from the date of commencement of the rental period up until the date that the vehicle is returned.

*Ambassador Referral Program*

The Company has further enhanced the monetization of the Rideshare Platform by creating and deploying the Rideshare Rental Ambassador program. Drivers renting cars from our Rideshare Platform can join the Ambassador program and refer other potential drivers and prospective customers to rent from the Rideshare Platform, providing our customers with additional income opportunities. The Company has designed and deployed a referral commissions team matrix that allows for both depth and breadth of commissionable referrals for the participating driver. As participating drivers add additional referred drivers to their down line, they progress in gaining additional levels of commission rewards. Eventually they are able to earn a free vehicle rental from Rideshare as a premium reward. This program requires that the driver continues to rent their vehicle from Rideshare in order to continue receiving commissions from other drivers' rentals under the Ambassador's down line. For further details on our Ambassador Referral Program, please visit http://www.Ridesharerental.com/company/ambassador-program-terms-conditions.

## Fleet Management Business

On June 10, 2017, the Company formed the wholly-owned subsidiary, Distinct Cars for purposes of developing a fleet management business. The Company's Fleet Management business maintains a fleet of brand new standard passenger vehicles to be subsequently rented directly to drivers in the ridesharing economy through the Rideshare Platform. The Company's fleet of vehicles, under lease contract and maintained by Distinct Cars, as well as other third-party vehicles will be made commercially available for rental bookings on the Rideshare Platform as well as on other third-party e-commerce booking platforms and/or through strategic partnerships and relationships. The Company seeks to provide drivers in the ridesharing economy with full-service vehicle rentals and fleet contract maintenance solutions for commercial standard passenger vehicles.

The Company's material operations for the Fleet Management business are primarily conducted in the State of California. As a provider of comprehensive, integrated vehicle rental and fleet management solutions, the Fleet Management business markets and manages short and long-term vehicle rentals to ridesharing economy drivers located in Los Angeles County.

The Company is focused on operating, developing and investing in its vehicle rental business with a focus on marketing directly to the peer-to-peer car sharing and ridesharing industry professionals. The Company is capable of meeting customers' needs, including but not limited to a guaranty that all vehicles maintained under the Fleet Management business will comply with and pass the Ridesharing Qualification Requirements. Our Fleet Management product and service offering includes full-service vehicle rental(s) and contract maintenance, along with distribution center management and transportation management service. As of the date of this Report, the Company's customer base is primarily ridesharing drivers located within Los Angeles County that are operating and performing driving services on behalf of a host of the private ridesharing TNCs (primarily Lyft and Uber). While our Fleet Management business is primarily concentrated within the State of California, Los Angeles County, the Company intends to aggressively expand our Fleet Management services and product offerings nationally.

In August 2017, following our announcement that we were shifting our primary corporate operations, we entered into a leasing arrangement for an initial group of twelve (12) vehicles, with the intent of testing our fleet management concept within the ridesharing industry. Following the Company's proof on concept period, we expanded our Fleet Management business in December 2017 by adding an additional 135 vehicles to our fleet of vehicles. As of the date of this Report, our full-service vehicle rental and contract maintenance under our Fleet Management segment is the Company's main operating line of business and primary revenue generating business segment. As of March 19, 2018, the Company Fleet Management business manages a fleet of approximately 150 vehicles under lease contract. During fiscal year 2017, professional ridesharing drivers contracted with private ridesharing TNCs for vehicle rental periods generally ranging from less than three days to six months. The rental vehicles made commercial available to customers by the Company are configured and guaranteed to be compliant with the Vehicle Inspection Requirements imposed on ridesharing vehicles by the private ridesharing TNCs (specifically, Uber and Lyft).

The Company believes that customers will rent vehicles offered by our Fleet Management business in order to reduce the complexity, cost and total capital associated with vehicle ownership. Further, we believe that due to our market focus on the ridesharing industry and the additional imposition of the Ridesharing Qualification Requirements imposed on ridesharing vehicles by the dominant private ridesharing TNCs, customers will be further incentivized to rent our Fleet Management vehicles to guarantee compliance with the Ridesharing Qualification Requirements.

Under a full-service rental agreement, the Company provides and fully maintains the vehicle, which is generally specifically configured to meet the Ridesharing Qualification Requirements. The services provided under full-service rental and contract maintenance agreements generally include preventive and regular maintenance, advanced diagnostics, emergency road service, fleet services, and safety programs, through our company-operated facilities.

*Fleet Management Software*

The Company has been an early adopter of technologies to leverage the Fleet Management business. To ensure that the Company's fleet of vehicles meet and comply with the Ridesharing Qualification Requirements and transmit relevant data our customers, the Company has fit its Fleet Management vehicles with fleet management GPS solution software, providing open platform fleet management solutions to businesses of all sizes. These full-featured solutions help the Company manage their drivers and vehicles by extracting accurate and actionable intelligence from real-time and historical location trip data. The telematics solutions for fleet optimization provide our Fleet Management vehicles with fitted software analytics and data involving (i) fuel efficiency; (ii) management of vehicle maintenance and (iii) prevention of vehicle wear and tear.

**Commercial Partnership Programs**

The Company has become a member of a commercial partnership program with Hyundai USA, a subsidiary of the Hyundai Motor Group. Hyundai provides and sells its vehicles in the United States through its subsidiary Hyundai USA (collectively, "Hyundai").

In June of 2017, the Company entered into a strategic partnership arrangement with Hyundai for purposes of entering into a fleet purchase program. Hyundai has agreed to a partnership arrangement with the Company under Hyundai's special fleet pricing. The Hyundai program will provide the Company with competitive pricing options (or best available pricing) below manufacturer suggested retail prices ("MSRP") on all purchases for brand-new Hyundai vehicles and priority status on the availability and delivery of all Hyundai vehicles under contract with the Company. The vehicles are currently purchased by ACME Auto Leasing, LMP Financial Services and United Mile Fleet and leased to the company at favorable terms. To further induce AMCE to enter into these lease agreements, during 2018, the company granted 298,500 common shares to ACME.

The Company believes that this strategic partnership with Hyundai is a key relationship for the going concern of the Company's continuing operations. Any termination or suspension of our strategic partnership with Hyundai would have a material impact on the Company's operating expenses. For more information please see the section entitled "Risk Factors."

**Metasearch App**

We had developed a single sign-on metasearch "ridesharing" application for smartphone users to provide price comparison and bookings of available ridesharing and taxi services along with select limousine and other public and/or private transportation services ("Metasearch App"). However, due to partner limitations and other rationale, the Company has no further intention to continue the development or marketing of the Metasearch App.

**The Ridesharing Industry**

At the most basic level, real-time ridesharing is a service that arranges one-time shared rides on short notice. Traditionally, ridesharing arrangements between two or more unrelated individuals for commuting purposes have been relatively inflexible, long-term arrangements. These commuting arrangements will establish reasonably fixed departure time schedules and driving responsibilities. The complexity of work and social schedules and the perceived increase in vehicle trip complexity, such as trip chaining, has made this type of commuting arrangement much less desirable. "Real-time" ridesharing attempts to provide added flexibility to ridesharing arrangements by allowing drivers and passengers to partake in occasional shared rides. The internet-connected, global positioning system ("GPS") enabled device automatically detects your current location, takes the home location that you have programmed in previously and searches the database for drivers traveling a similar route and willing to pick up passengers. According to Wikipedia.org, "real-time" ridesharing is defined as "a single, or recurring ridesharing trip with no fixed schedule, organized on a one-time basis, with matching of participants occurring as little as a few minutes before departure or as far in advance as the evening before a trip is scheduled to take place".

A number of TNCs located in San Francisco premiered apps for real-time ridesharing in early 2010, several TNCs were introduced that were advertising as ridesharing, but in fact dispatched commercial operators similar to a taxi service. Transportation industry experts have frequently referred to these services as "ridesourcing" to clarify that drivers do not share a destination with their passengers. Rather, the "ridesourcing" app simply outsources rides to available commercial drivers. In 2013 an agreement was reached with California Public Utilities Commission creating a new category of service called "Transportation Network Companies" or "TNCs" to cover both real-time and scheduled ridesharing companies. Transportation Network Companies have faced regulatory opposition in many other cities, including Los Angeles, Chicago, New York City, and Washington, D.C, among others.

"Ridesharing" has been controversial, variously criticized as lacking adequate regulation, insurance, licensure, and training. One of the main so-called ridesharing (but actually ridesourcing) firms, Uber, was banned in Berlin and a number of other European cities. Opposition may also come from taxi companies and public transit operators because they are seen as alternatives. Early real-time ridesharing projects are believed to have begun in the 1990s, but they faced obstacles such as the need to develop a user network and a convenient means of communication. Gradually the means of arranging the ride shifted from telephone to internet, email, and smartphone; and user networks were developed around major employers and universities. As of 2006, the goal of taxi-like responsiveness still generally eluded the industry; "next day" responsiveness was generally considered the state of the art.

The term "ridesharing" was starting to become a misnomer, they're a lot more like successful private cab or taxi businesses that cater to a smartphone-toting clientele and actively rival traditional cab or taxi companies and having reliable and affordable door-to-door transportation in general can help expand car-free living. Given the fast rise of smartphone adoption globally, ridesharing's success doesn't come as a surprise. But there are many reasons why customers prefer to book those services versus taxis. Among those are a clear overview of pricing prior to booking, the ease and convenience of "one-tap" rides, the ability to monitor and follow drivers on map displayed on the user's smartphone, the convenience of a cashless transaction, fare splitting, and feedback options. The premier and probably most well know ridesharing service, Uber, was born when its founders became annoyed that they could not get a taxi in Paris. By eliminating the antiquated taxi dispatch system through technology (call and book taxi, call to request driver's location, call when taxi doesn't arrive), the founders of Uber created an innovative technology alternative to the traditional taxi dispatch system that has been widely adopted by users worldwide. By eliminating a key piece of the supply chain and streamlining efficiencies for the users, Uber was able to completely disrupt a century-old taxi industry. In essence, Uber & Lyft are really the two companies that dominate the market and Uber so far has won across the board: access, driver experience, customer experience, brand and funding.

The growth of the ridesharing economy has resulted in increasing consumer demand for ridesharing services, provided by Transportation Network Companies ("TNCs") such as Lyft, Gett and Uber, which offer a ridesharing economy service through mobile applications.

Ridesharing apps connect people who need a ride with people who have a vehicle and time to drive - notably, not necessarily people who are licensed taxi drivers. Ridesharing TNCs like Lyft, Gett and Uber provide a smartphone app that lets consumers hail a ride, set their destination, and pay without leaving the app itself. The benefits to the consumer is ease of use, availability of rides, and sometimes lower prices than traditional taxis. Many companies require at least some sort of certification for the drivers and take a portion of the drivers' fares. Ridesharing drivers can choose when they work (though they can receive bonuses for logging a certain number of hours) and provide their own vehicles. In the United States, ridesharing companies argue that the work-when-you-want arrangement qualifies drivers as contractors, not employees. Despite legal battles and controversy over surge pricing, ridesharing companies have exploded in popularity, both in the U.S. and internationally. Early entrants in the TNC app space, like Uber and Flywheel, were founded around 2009. Overall, the industry has raised more than $10 billion in venture funding.

We believe that we have strong economic prospects by virtue of the following dynamics of the industry:

- **_Continued Growth in Ridesharing Market._** The ridesharing services market has grown faster, gone to more places and has produced robust growth and consumer traffic figures since commercial introduction in approximately 2009. The pace of growth is also picking up. It has been reported that Uber took six (6) years before it reached a billion rides in December of 2015, but it took only six (6) months for Uber to get to two billion rides. In the U.S., the number of users of ridesharing services has been estimated to increase from 8.2 million in 2014 to 20.4 million in 2020, producing a compounded annual growth rate ("CAGR") of approximately 13.92% over the seven-year period. However, since the beginning of 2020 and the spread of COVID-19, rideshare companies have increasingly been negatively impacted. According to its recent investor update call, Uber's gross bookings in Seattle are down by 60-70%, and Uber assumes similar declines in other big cities hit by COVID-19. As Americans practice social distancing and self-isolation, Uber, Lyft, and other rideshare companies have seen a steep decline in ridership and revenue, as a result. Given that rideshare drivers are both at risk themselves and of risk to the public, and in addition to decreased demand overall, less people are even still driving. We cannot at this time estimate the long term effect of this unprecedented situation on the rideshare market in general or our Company in particular.

- **_Globalization of Ridesharing._** In the same vein, ridesharing which started as an experiment in California has grown into a global marketplace over a short period of time. Asia has emerged as a geographical territory to drive future growth. For example, Didi Chuang, the Chinese ridesharing company, completed 1.43 billion rides just in 2015 and it now claims to have 250 million users in 360 Chinese cities. Ridesharing is also acquiring deep roots in both India and Malaysia, and is making advances in Europe and Latin America, despite regulatory pushback.

- **_Expanding Choices._** Consumer options in ridesharing are expanding to attract an even larger audience, such as carpooling and private bus services. The expansion of consumer options has also attracted mass transit customers to more expensive luxury options. In addition, it has been reported that dominant TNC businesses are experimenting with pre-scheduled rides and multiple stops on single trip gain to meet customer needs. Our Fleet Management business and fleet of rental vehicles are designed to put more certified ridesharing vehicles on the roadways to meet the increasing consumer demand of the availability of ridesharing services.

**Regulation of the Ridesharing Industry**

In the current ridesharing marketplace, often times the TNCs (such as Uber or Lyft) generally takes the place of government in enforcing standards for drivers and vehicles, though two (2) states and the District of Columbia now have basic driver background and minimum insurance requirements in place for TNCs. Each TNC has its own regulations at the corporate level. However, in many instances, state, local or federal governments are beginning to seriously assess the ridesharing industry and it is likely that regulations and mandated standards are imminent. For more information see section "Vehicle Registration Requirements."

**Our Opportunity**

The increasing demand for ridesharing services has produced an increase in demand by TNC businesses for more ridesharing drivers and vehicles on the road at any given time. The growing demographic of ridesharing drivers, as determined on a global basis, has drawn ridesharing drivers to the ridesharing marketing to perform services for a host of private TNC businesses focused on ridesharing, such as Uber and Lyft. The Company believes that private ridesharing TNC businesses are hiring more than 50,000 drivers a month to keep pace with the current commercial demand for ridesharing services.

Complicating this matter further, many potential ridesharing drivers drawn to the ridesharing market are being rejected or turned away from employment by the private ridesharing TNCs on account of the fact that many potential ridesharing driver's personal vehicles are failing to meet the Ridesharing Qualification Requirements imposed on all ridesharing vehicles by the private ridesharing TNCs. Private ridesharing TNCs impose certain vehicle safety tests and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs. Generally, the TNCs impose certain standard requirements on all ridesharing drivers and their respective vehicles (the "Driver Qualification Requirements") as well as additional vehicle safety tests, inspections and precautions on all ridesharing vehicles to be utilized by drivers under employment with the private ridesharing TNCs (the "Vehicle Qualification Requirements", together with the Driver Qualification Requirements, the "Ridesharing Qualification Requirements"). For more information see "Ridesharing Qualification Requirements". The Company estimates that approximately 30%-50% of potential ridesharing drivers do not own or have rights or access to a car or vehicle that will meet the Ridesharing Qualification Requirements. Further, the Company believes that this issue surrounding the Ridesharing Qualifications Requirements are exacerbating the problem and resulting in a shortfall of ridesharing drivers on the road at any given time. Private ridesharing TNCs have responded to this issue by actively pursuing programs to get eligible ridesharing drivers into qualified cars that meet the Ridesharing Qualification Requirements. The Company believes that the TNC line of business and immense capital requirements in developing a fleet management business to service the growing ridesharing industry on such a large scale will restrict the ability of the private ridesharing TNCs to dominate the ridesharing vehicle rental market. Further, despite the financial resources and scale of the dominant TNCs in the ridesharing business, the Company believes that third-party vehicle rental providers are a necessity to the growth and service of a robust ridesharing market.

*Ridesharing Qualification Requirements*

The TNCs generally impose a host of requirements on potential ridesharing driver applicants seeking employment with TNCs such as Uber and/or Lyft. For example, prior to becoming a ridesharing driver, Uber and Lyft impose similar uniform requirements on all ridesharing vehicles and drivers. Generally, the ridesharing driver must meet the following standard requirements (collectively, the "Driver Qualification Requirements"):

- The ridesharing driver must obtain a minimum age of 21 years old;

- The ridesharing driver's vehicle must be a four-door car made in year 2007 or newer (in most cities- 2002 or newer for Los Angeles, Orange County, San Francisco);

- The ridesharing driver must have in-state auto insurance with the driver's name on the policy;

- The ridesharing driver must have an in-state driver's license, licensed in the US for at least one year;

- The ridesharing driver must have in-state plates with a current registration (commercial plates are acceptable as well);

- The ridesharing driver must have a clean driving record;

- The ridesharing driver must pass on the background check;

- The ridesharing driver's vehicle must pass the Cosmetic Qualification Requirements.

7

For example, prior to becoming an Uber driver, the company requires all potential ridesharing drivers of UberX, UberXL and UberPlus/UberSelect to meet the following vehicle requirements:

- Access to a four-door car that is year 2007 or newer (in most cities- 2002 or newer for Los Angeles, Orange County, San Francisco);

- The vehicle is in good physical condition with no cosmetic damage;

- No marketing or commercial branding is being outwardly displayed on the vehicle;

- Passing score on the vehicle inspection.

In addition, the TNCs may impose cosmetic guidelines on all ridesharing vehicles providing ridesharing services on behalf of the private ridesharing company. Certain cosmetic features may prevent a potential ridesharing driver's vehicle from qualifying under the vehicle inspection on account of the following: (i) the vehicle includes a full-body wrap containing advertisements, or any large ads; (ii) the vehicle has holes or damage to the exterior; (iii) the vehicle has taxi decals or taxi-style paint; (iv) the vehicle has significant damage to the interior (including any torn seats, large permanent stains, strong permanent odors); (v) the vehicle has paint oxidation; or (vi) the vehicle has different colored hoods/doors; (vii) the vehicle has objectionable aftermarket modification (collectively, "Cosmetic Qualification Requirements").

In addition to the Driver Qualification Requirements, private ridesharing companies also require all potential ridesharing drivers to undergo a vehicle inspection test on all personal driver vehicles to be used by the potential ridesharing driver to perform ridesharing services on behalf of the private ridesharing company. In order to become a Uber or Lyft driver, a potential ridesharing driver's vehicle generally must pass the 19-point vehicle inspection to confirm that it meets the private ridesharing companies requirements (the "Vehicle Qualification Requirements", together with the Driver Qualification Requirements, the "Ridesharing Qualification Requirements").

A 19-point inspection is a standard vehicle inspection procedure to check a car in 19 specific areas to ensure that it conforms to safety and operational requirements. While the 19 points are the same for different companies, their procedures differ slightly. The process also varies based on the geographical location where the inspection is performed. The 19 points of the vehicle checked for inspection include headlights, tail-lights, indicator lights, stop lights, foot brakes, emergency/parking brake, steering mechanism, windshield, heat and air conditioning, front, rear and side windows, front seat adjustment mechanism, door controls (open, close, lock), horn, speedometer, body condition/ damage, muffler and exhaust system, condition or tires, interior and exterior rear-view mirrors and safety belts for driver and passengers. Any vehicle having a problem or issue with any of the inspection points will generally not pass the vehicle inspection and will be refused the opportunity to become a ridesharing driver for the private ridesharing company.

**Company Growth Strategy**

Our long-term strategy is focused on four priorities: expanding and diversifying our revenues; improving our operating effectiveness; enhancing the customer experience; and disciplined capital management.

*Expand and Diversify Revenues*—Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint in North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

*Improve Operating Effectiveness*—We are focused on generating continuous improvement across our operations, with an emphasis on building a strong safety culture, fleet management business, e-commerce bookings website, fleet availability and improving margins. We are continuing to build a highly professional and technology-enabled sales force and to optimize our sales territories to support our revenue growth objectives. We will continue to improve the effectiveness of our sales team with focused training, strong customer relationship management capabilities, and ongoing technology enhancements.

*Enhance the Customer Experience*—We seek to differentiate our business by delivering a superior customer experience through the variety and quality of the vehicles and services we offer, the ease of doing business with us and the added value we offer through services, products and technologies. Our focus on quality vehicle brands tailored to meet the Vehicle Qualification Requirements of the ridesharing industry is intended to meet the preferences of ridesharing drivers, including the expectations for reliable, safe, efficient and effective maintained vehicles. We expect to add more expertise across our team to help our customers achieve the best results for their projects. In developing and providing vehicle rental related technologies, we are focused on meeting customer expectations related to convenience and on-demand access to data and information.

*Disciplined Asset Management*—We manage our vehicle rental fleet to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment.

## Intellectual Property

We generally rely on trademark, copyright and trade secret laws and employee and third-party non-disclosure agreements to protect its intellectual property and proprietary rights. We are currently in the process of pursuing trademark protection for our name and logos in the United States. Although we believe that our pending trademark applications will be granted by the United States Patent and Trademark Office, there can be no assurance that any trademarks will be granted or that any trademark relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We own registered trademarks "YayYo®" and the service mark for the stylized design representing an automobile.

In the future we may rely on patents to protect our intellectual property and proprietary technology, to the extent feasible, and plans to consult with intellectual property counsel to determine what patents we may be able to file to protect its intellectual property. As of the date of this Report, we have not filed any patents in the United States or any other country. Although we believe that some of our technology may be patentable, there can be no assurance that any patents will be granted or that any patent relied upon by us in the future, if any, will not be challenged, invalidated or circumvented or that the rights granted thereunder or under licensing agreements will provide competitive advantages to the Company. We believe that due to the rapid pace of technological innovation for technology, mobile and internet products, our ability to establish and maintain a position of technological leadership in the ridesharing industry depends more on the skills of its development personnel than the legal protection afforded its existing technology. For more information see the section "Risk Factors".

## Employees

As of the date of this Annual Report, we had approximately 25 full-time employees and two consultants, based at our offices. None of our employees are subject to a collective bargaining agreement, and we believe that our relations with our employees generally are good.

## Regulatory

We are subject to a number of U.S. federal and state and foreign laws and regulations that involve matters central to our business. These laws and regulations may involve privacy, data protection, intellectual property, competition, consumer protection, export taxation or other subjects. Many of the laws and regulations to which we are subject are still evolving and being tested in courts and could be interpreted in ways that could harm our business. In addition, the application and interpretation of these laws and regulations often are uncertain, particularly in the new and rapidly evolving industry in which we operate. Because laws and regulations have continued to develop and evolve rapidly, it is possible that we may not be, or may not have been, compliant with each such applicable law or regulation. In addition to the foregoing, we are also subject to the following:

Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows. For additional information please see the section entitled "Risk Factors."

**Property**

We lease and maintain our primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. We also lease and maintain executive offices at 6600 Sunset Blvd. Los Angeles, CA 90028, where the majority of our operations and staff will conduct activities on a daily basis. We do not currently own any real estate.

**ITEM 1A. RISK FACTORS**

Our business faces significant risks. You should carefully consider the risks described below, together with all of the other information included in our filings with the United States Securities and Exchange Commission (SEC) when evaluating our business. If any of the following risks actually occurs, our business, financial condition or results of operations could be materially adversely affected and the trading price of shares of our common stock could decline. The occurrence of any of the following risks could cause our actual results to differ materially from those contained in forward-looking statements we have made in this report and those we may make from time to time.

**Risk Related to Our Business**

*We are an emerging growth company with a limited operating history and limited sales to date.*

The Company is subject to all of the risks inherent in the establishment of an emerging growth company, including the absence of an operating history, and the risk that we may be unable to successfully operate our business segments. There can be no assurance that the Company will be able to successfully operate our business segments, including without limitation the Company's technologies, products and services.

The Company was incorporated on November 16, 2016 and only commenced operations thereafter. The Company was incorporated pursuant to the simultaneous filing of the Company's certificate of incorporation, as filed and stamped by the Delaware Secretary of State on November 16, 2016, and the "Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation", as filed and stamped on the same date by the Delaware Secretary of State pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "C" corporation formed under the laws of the State of Delaware. Accordingly, we have limited operating history upon which to base an evaluation of our business and prospects. You must consider the risks and difficulties we face as a small operating company with limited operating history.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry towards the vehicle rental business with a focus on developing (i) an online rideshare marketplace booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, we have limited operating history in the vehicle rental, fleet management and transportation industry. We generated $3,289,478 in revenue for fiscal year 2018.

Operating results for future periods are subject to numerous uncertainties and we cannot assure you that the Company will achieve or sustain profitability. The Company's prospects must be considered in light of the risks encountered by small operating companies with limited operating history, particularly companies in new and rapidly evolving markets. Operating results will depend upon many factors, including our success in attracting and retaining motivated and qualified personnel, our ability to establish short term credit lines or obtain financing from other sources, our ability to develop and market new products, control costs, and general economic conditions. The Company has engaged in limited operations to date, and although the Company believes that its plans to grow, expand and scale operations organically will be successful, there is no assurance that this will be the case. There can be no assurance that the Company's sales projections and marketing plans will be achieved as anticipated and planned. The Company cannot assure prospective investors that it will be able to successfully develop and market its products and services which may have a material adverse effect on our business.

*We will need but may be unable to obtain additional funding on satisfactory terms, which could dilute our shareholders or impose burdensome financial restrictions on our business.*

We have relied upon cash from financing activities and in the future, we hope to rely predominantly on revenues generated from operations to fund all of the cash requirements of our activities; however, we do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. Future financings may not be available on a timely basis, in sufficient amounts or on terms acceptable to us, if at all. Any debt financing or other financing of securities senior to the common stock will likely include financial and other covenants that will restrict our flexibility. Any failure to comply with these covenants would have a material adverse effect on our business, prospects, financial condition and results of operations because we could lose our existing sources of funding and impair our ability to secure new sources of funding.

*We have incurred net losses since inception.*

For the year ended December 31, 2019, we generated a loss of $3,930,221 and had an accumulated deficit of $25,171,915. For the year ended December 31, 2018, we generated a loss of $13,189,122 and had an accumulated deficit of $21,241,694. For the year ended December 31, 2017, we generated a loss of $6,568,863 and had an accumulated deficit of $8,052,572. Increases in costs and expenses may result in a continuation of losses for the foreseeable future. There can be no assurance that we will be commercially successful.

***We have significant working capital requirements and issuance of common stock or the exercise of outstanding warrants and options to meet these working capital requirements and fund our operations may dilute your investment.***

We have been operating at a loss since inception and our working capital requirements continue to be significant. As of December 31, 2019, 2018, and 2017, our working capital deficit was $556,395, $5,007,729 and $618,910, respectively. We have been supporting our business predominantly through the sale of debt and equity since inception. Since 2017, we have also been supporting our business through our operating cash flow from our limited operational business segments. However, to date the majority of our working capital needs have been funded through third-party capital financings. We will need additional funding to develop our business segments, to increase our sales and marketing capabilities, technologies and assets, as well as for working capital requirements and other operating and general corporate purposes. Our working capital requirements depend and will continue to depend on numerous factors, including the timing of revenues, the expense involved in development of our products and services, and capital improvements. If we are unable to generate sufficient revenue and cash flow from operations, we will need to seek additional equity or debt financing to provide the capital required to maintain or expand our operations, which may have the effect of diluting our existing stockholders or restricting our ability to run our business.

There can be no assurance that we will be able to raise sufficient additional capital on acceptable terms, or at all. If such financing is not available on satisfactory terms, or is not available at all, we may be required to delay, scale back or eliminate the development of business opportunities and our operations and financial condition may be materially adversely affected. Debt financing, if obtained, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, could increase our expenses and require that our assets be provided as a security for such debt. Debt financing would also be required to be repaid regardless of our operating results. Equity financing, if obtained, could result in dilution to our then existing stockholders. As of the date of this filing, we have issued and outstanding the Bellridge Capital Warrant to purchase an aggregate of 1,500,000 shares of our common stock. We have also reserved an aggregate of 10,000,000 shares of common stock for issuance under our 2016 Equity Incentive Plan (the "2016 Plan"). As of June 30, 2019, we have options to purchase an aggregate of 300,000 shares of our common stock outstanding pursuant to our 2016 Plan.

***We have outstanding debt and lease commitments, which are secured by our assets and it may make it more difficult for us to make payments on our other debt and lease obligations.***

As of December 31, 2019, 2018 and 2017, we had outstanding indebtedness totaling $319,667, $2,690,181 and $909,889, respectively. As of December 31, 2019, 2018 and 2017, we had outstanding lease obligations totaling $2,400,565, $3,790,147 and $1,593,291, respectively.

Our debt and lease commitments could have important consequences to you. For example, they could:

- make it more difficult for us to obtain additional financing in the future for our acquisitions and operations, working capital requirements, capital expenditures, debt service or other general corporate requirements;

- require us to dedicate a substantial portion of our cash flows from operations to the repayment of our debt and the interest associated with our debt rather than to other areas of our business;

- limit our operating flexibility due to financial and other restrictive covenants, including restrictions on incurring additional debt, creating liens on our properties, making acquisitions or paying dividends;

- make it more difficult for us to satisfy our obligations with respect to our notes;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- make us more vulnerable in the event of adverse economic and industry conditions or a downturn in our business.

Our ability to meet our debt service and lease obligations depends on our future financial and operating performance, which will be impacted by general economic conditions and by financial, business and other competitive factors, many of which are beyond our control. These factors could include operating difficulties, increased operating costs, competition, regulatory developments and delays in our business strategies. Our ability to meet our debt service and lease obligations may depend in significant part on the extent to which we can successfully execute our business strategy and successfully operate our business segments. We may not be able to execute our business strategy and our business operations may be materially impacted.

Typical loan agreements also might contain restrictive covenants, which may impair our operating flexibility. Such loan agreements would also provide for default under certain circumstances, such as failure to meet certain financial covenants. A default under a loan agreement could result in the loan becoming immediately due and payable and, if unpaid, a judgment in favor of such lender which would be senior to our rights. A judgment creditor would have the right to foreclose on any of our assets resulting in a material adverse effect on our business, ability to generate revenue, operating results or financial condition.

If our business does not generate sufficient cash flow from operations or future sufficient borrowings are not available to us under our credit agreements or from other sources, we might not be able to service our debt and lease commitments, including the notes, or to fund our other liquidity needs. If we are unable to service our debt and lease commitments, due to inadequate liquidity or otherwise, we may have to delay or cancel potential acquisitions, sell equity securities, sell assets or restructure or refinance our debt. We might not be able to sell our equity securities, sell our assets or restructure or refinance our debt on a timely basis or on satisfactory terms or at all. In addition, the terms of our agreements with original equipment manufacturers or debt agreements may prohibit us from pursuing any of these alternatives.

### *Impact of COVID-19 on Our Business*

In December 2019, a novel strain of coronavirus surfaced in China, which has and is continuing to spread throughout the world, including the United States. On January 30, 2020, the World Health Organization declared the outbreak of the coronavirus disease (COVID-19) a "Public Health Emergency of International Concern," and on March 11, 2020, the World Health Organization characterized the outbreak as a "pandemic." The governors of New York, California and several other states, as well as mayors on many cities, have ordered their residents to cease traveling to non-essential jobs and to curtail all unnecessary travel, and to stay in their homes as much as possible in the coming weeks, as the nation confronts the escalating coronavirus outbreak, and similar restrictions have been recommended by the federal authorities and authorities in many other states and cities. Since the beginning of 2020 and the spread of COVID-19, rideshare companies have increasingly been negatively impacted. According to its recent investor update call, Uber's gross bookings in Seattle are down by 60-70%, and Uber assumes similar declines in other big cities hit by COVID-19. As Americans practice social distancing and self-isolation, Uber, Lyft, and other rideshare companies have seen a steep decline in ridership and revenue, as a result. Given that rideshare drivers are both at risk themselves and of risk to the public, and in addition to decreased demand overall, less people are even still driving. Over the past few weeks, the Company has seen a decline in revenue of approximately 20% and a negative impact on the cash flows of the business. The Company is not able to predict the ultimate impact that COVID-19 will have on its business; however, if the current economic conditions continue, the Company will be forced to significantly scale back its business operations and its growth plans, and could ultimately have a significant negative impact on the Company. We cannot at this time estimate the long term effect of this unprecedented situation on the rideshare market in general or our Company in particular.

### ***Our Rideshare Platform user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review key metrics related to the operation of our Rideshare Platform business, including, but not limited to, our monthly average users, subscribers and customers to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data and have not been validated by an independent third party. Errors or inaccuracies in our metrics or data could result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of Rideshare Platform users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies.

***Our Rideshare Platform emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes do not align with the market's expectations. If that happens, our stock price may be negatively affected.***

Our Rideshare Platform business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. Our focus on complexity and quick reactions could result in unintended outcomes or decisions that are poorly received by our users or partners. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and will thereby improve our financial performance over the long-term. These decisions may not produce the long-term benefits that we expect, in which case, our user growth and engagement, our relationships with advertisers and partners, as well as our business, operating results, and financial condition could be seriously harmed.

***Our Rideshare Platform and software is highly technical and may contain undetected software bugs or vulnerabilities, which could manifest in ways that could seriously harm our reputation and our business.***

Our Rideshare Platform and software is highly technical and complex. Our Rideshare Platform may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently.

We also could face claims for product liability, tort, or breach of warranty. Defending a lawsuit, regardless of its merit, is costly and may divert management's attention and seriously harm our reputation and our business. In addition, if our liability insurance coverage proves inadequate or future coverage is unavailable on acceptable terms or at all, our business could be seriously harmed.

***To carry out our business plan we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to fund planned capital expenditures will depend on our ability to generate cash in the future. This ability, to some extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We do not believe that our cash flow from operating activities and our existing capital resources, including the liquidity provided by our credit agreements and lease financing arrangements, will be sufficient to fund our planned capital expenditures. We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to fund our other liquidity needs. We may need to delay capital expenditures or seek additional equity financing. For more information see "Management's Discussion Analysis of Financial Condition and Results of Operation—Liquidity, Capital Resources and Plan of Operations" below.

***Our debt and other commitments expose us to a number of risks, including cash requirements for debt and lease obligations, availability and interest rate variability, each of which could hamper our growth and profitability.***

A significant portion of the cash flow we generate must be used to service the interest and principal payments relating to our various financial commitments, including $319,667 of total notes payable of which $0 is long-term, and $2,400,565 of lease commitment obligations of which $984,119 is long-term, as of December 31, 2019. A sustained or significant decrease in our operating cash flows could lead to an inability to meet our debt service requirements or to a failure to meet specified financial and operating covenants included in certain of our agreements. If this were to occur, it may lead to a default under one or more of our commitments. In the event of a default for this reason, or any other reason, the potential result could be the acceleration of amounts due, which could have a significant and adverse effect on us.

Because we finance the majority of our operating and strategic initiatives using a variety of commitments, including $2,720,232 in total notes payable and loan facilities, we are dependent on continued availability of these sources of funds. If these agreements are terminated or we are unable to access them because of a breach of financial or operating covenants or otherwise, we will likely be materially affected.

The interest rates we are charged on a substantial portion of our debt, including the Bellridge Note (as defined below), are variable, increasing or decreasing based on changes in certain published interest rates. Increases to such interest rates would likely result in significantly higher interest expense for us, which would negatively affect our operating results. Because many of our customers finance their vehicle purchases, increased interest rates may also decrease vehicle sales, which would negatively affect our operating results.

***We are a holding company and as a result rely on payments from our subsidiaries in order to meet our cash needs and service our debt. Our subsidiaries may not be able to distribute the necessary funds to us and this could adversely affect our ability to make payments on our indebtedness.***

As a holding company without independent means of generating operating revenues, YayYo, Inc., depends on dividends, distributions and other payments, from our subsidiaries to fund our obligations and to meet our cash needs. If the operating results of our subsidiaries at any given time are insufficient to make distributions to us, we would be unable to make payments on our outstanding indebtedness

***We face intense competition that may lead to downward pricing or an inability to increase prices.***

The vehicle rental and used-vehicle sale industries are highly competitive and are increasingly subject to substitution. While price is not the only competitive factor, we believe price is one of the primary competitive factors in the vehicle rental market and that technology has enabled cost-conscious customers, including business travelers, to more easily compare rates available from rental companies. In addition, our competitors may reduce prices in order to, among other things, attempt to gain a competitive advantage, capture market share, or to compensate for declines in rental activity. To the extent we do not match or remain within a reasonable competitive margin of our competitors' pricing, our revenues and results of operations, financial condition, liquidity and cash flows could be materially adversely affected. If competitive pressures lead us to match any of our competitors' downward pricing and we are not able to reduce our operating costs, then our margins, results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Further, we may in the future develop and launch other products or services that may be in direct competition with the various players in the ridesharing industry, such as Uber and Lyft, and all of whom have greater resources than us. There are low barriers to entry, and we expect that competition will intensify in the future. We believe that numerous factors, including price, offerings, reliability, client base, brand name and general economic trends will affect our ability to compete successfully. Our existing and future competitors may include many large companies that have substantially greater market presence and financial, technical, marketing and other resources than we do. There can be no assurance that we will have the financial resources, technical expertise or marketing and support capabilities to compete successfully. Increased competition could result in significant competition, which in turn could result in lower revenues, which could materially adversely affect our potential profitability.

***We might incur expenses to develop products that are never successfully commercialized.***

We have incurred and expect to continue to incur research and development and other expenses in connection with our products business. The potential products to which we devote resources might never be successfully developed or commercialized by us for numerous reasons. For example, until June 30, 2017, we were focused on the development and commercialization of a single sign-on metasearch "ridesharing" (the "Metasearch App"). We completed the development of the Metasearch App; however, we have no intention to further develop or market the Metasearch App. Such additional expenses could have a material adverse effect on our business, financial condition and prospects.

***We face risks related to uninsured liabilities or future claims that exceed our insurance limits.***

Our businesses expose us to claims for personal injury, death and property damage resulting from the use of the vehicles rented by us, and for employment-related injury claims by our employees. We purchase insurance to cover us for these claims. We cannot assure you, however, that we will not be exposed to uninsured liability potentially resulting in multiple payouts or otherwise, liabilities in respect of existing or future claims exceeding the level of our insurance, availability of sufficient capital to pay any uninsured claims or the availability of insurance with unaffiliated carriers maintained on economically reasonable terms, if at all. While we have insurance for many of these risks, we retain risk relating to certain of these perils and certain perils are not covered by our insurance.

***We are subject to a wide variety of regulatory burdens related to our operations.***

We are subject to a wide variety of regulatory burdens related to our operations, and while management believes that the chosen operations and strategies are achievable in light of current economic and legal conditions, changes in the following regulatory areas may require management to make significant modifications to our stated strategies depending on future events.

**Governmental regulations, claims and legal proceedings.** Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws.

**Vehicle Requirements.** Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we sell.

**Environmental regulations**. We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations.

**Accounting rules and regulations.** The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows. In addition, the Securities and Exchange Commission is currently considering adopting rules that would require us to prepare our financial statements in accordance with International Financial Reporting Standards, which could also result in significant changes to our reported financial position, earnings and cash flows.

***Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, fuel costs, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows.***

We are subject to a wide variety of U.S. laws and regulations and changes in the level of government regulation of our business have the potential to materially alter our business practices and materially adversely affect our financial condition, results of operations, liquidity and cash flows, including our profitability. Those changes may come about through new laws and regulations or changes in the interpretation of existing laws and regulations.

Any new, or change in existing, U.S. law and regulation with respect to optional insurance products or policies could increase our costs of compliance or make it uneconomical to offer such products, which would lead to a reduction in revenue and profitability. If customers decline to purchase supplemental liability insurance products from us as a result of any changes in these laws or otherwise, our results of operations, financial condition, liquidity and cash flows could be materially adversely affected.

Certain proposed or enacted laws and regulations with respect to the banking and finance industries, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (including risk retention requirements) and amendments to the SEC's rules relating to asset-backed securities, could restrict our access to certain financing arrangements and increase our financing costs, which could have a material adverse effect on our financial condition, results of operations, liquidity and cash flows.

***We rely on third-party insurance policies to insure auto-related risks. If insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business, which could adversely affect our business, financial condition and results of operations.***

We procure third-party insurance policies which provide coverage for both owners and drivers on our platform. If the amount of one or more auto-related claims were to exceed our applicable aggregate coverage limits, we may bear the excess liability. Insurance providers have raised premiums and deductibles for many businesses and may do so in the future. As a result, our insurance and claims expense could increase. Our business, financial condition and results of operations could be adversely affected if (i) cost per claim, premiums or the number of claims significantly exceeds our historical experience and coverage limits, (ii) we experience a claim in excess of coverage limits, (iii) our insurance providers fail to pay insurance claims, or (iv) we experience a claim for which coverage is not provided.

***Our actual losses may exceed our insurance reserves, which could adversely affect our financial condition and results of operations.***

We establish insurance reserves for claims incurred but not yet paid and claims incurred but not yet reported and any related estimable expenses, and we periodically evaluate and, as necessary, adjust our insurance reserves as our experience develops or new information is learned. We employ various predictive modeling and actuarial techniques and make numerous assumptions based on limited historical experience and industry statistics to estimate our insurance reserves. Estimating the number and severity of claims, as well as related judgment or settlement amounts, is inherently difficult, subjective, and speculative. A number of external factors can affect the actual losses incurred for any given claim, including the length of time the claim remains open, fluctuations in healthcare costs, legislative and regulatory developments and judicial developments. Additionally, we may encounter in the future, instances of insurance fraud, which could increase our actual insurance-related costs. For any of the foregoing reasons, our actual losses for claims and related expenses may deviate, individually or in the aggregate, from the insurance reserves reflected in our consolidated financial statements. If we determine that our estimated insurance reserves are inadequate, we may be required to increase such reserves at the time of the determination, which could result in an increase to our net loss in the period in which the deficiency is determined and negatively impact our financial condition and results of operations.

***We may not be able to obtain adequate financing to continue our operations.***

We will need to raise additional funds through the issuance of equity, equity-related, or debt securities or through obtaining credit from government or financial institutions. This capital will be necessary to fund ongoing operations and continue research and development activities, including the Rideshare Platform, and our Fleet Management business. We cannot be certain that additional funds will be available to us on favorable terms when required, or at all. If we cannot raise additional funds when we need them, our financial condition, results of operations, business and prospects would be materially and adversely affected.

***We may pursue strategic transactions which could be difficult to implement, disrupt our business or change our business profile significantly.***

Any future strategic acquisition or disposition of assets or a business could involve numerous risks, including: (i) potential disruption of our ongoing business and distraction of management; (ii) difficulty integrating the acquired business or segregating assets and operations to be disposed of; (iii) exposure to unknown, contingent or other liabilities, including litigation arising in connection with the acquisition or disposition or against any business we may acquire; (iv) changing our business profile in ways that could have unintended negative consequences; and (v) the failure to achieve anticipated synergies.

If we enter into significant strategic transactions, the related accounting charges may affect our financial condition and results of operations, particularly in the case of an acquisition. The financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. A material disposition could require the amendment or refinancing of our outstanding indebtedness or a portion thereof.

***We have no long-term employment agreements in place with our executive officers.***

As of the date of this Annual Report we have no employment agreements or similar arrangements with our executive officers. If we fail to reach mutually satisfactory agreement with our executives, any one or more of such persons may terminate their association with the Company. The loss of any one or more of these experienced executives may have a material and adverse effect on our Company and its business prospects.

***Our business operations are dependent upon the ability of our new employees to learn their new roles.***

In connection with the transition of our business operations, we have replaced many employees in key functions. As new employees gain experience in their roles, we could experience inefficiencies or a lack of business continuity due to loss of historical knowledge and a lack of familiarity of new employees with business processes, operating requirements, policies and procedures, some of which are new, and key information technologies and related infrastructure used in our day-to-day operations and financial reporting and we may experience additional costs as new employees learn their roles and gain necessary experience. It is important to our success that these new employees quickly adapt to and excel in their new roles. If they are unable to do so, our business and financial results could be materially adversely affected. In addition, if we were to lose the services of any one or more key employees, whether due to death, disability or termination of employment, our ability to successfully operate our business segments, financial plans, marketing and other objectives, could be significantly impaired.

***Raising additional capital by issuing additional securities may cause dilution to our current and future shareholders.***

We will need to, or desire to, raise substantial additional capital in the future. Our future capital requirements will depend on many factors, including, among others:

- Our degree of success in generating rental and servicing fees from both our Fleet Management business and the Rideshare Platform;

- The costs of establishing or acquiring sales, marketing, and distribution capabilities for our services;

- The extent to which we acquire or invest in businesses, products, or technologies, and other strategic relationships; and

- The costs of financing unanticipated working capital requirements and responding to competitive pressures.

If we raise additional funds by issuing equity or convertible debt securities, we will reduce the percentage of ownership of the then-existing shareholders, and the holders of those newly-issued equity or convertible debt securities may have rights, preferences, or privileges senior to those possessed by our then-existing shareholders. Additionally, future sales of a substantial number of shares of our common stock, or other equity-related securities in the public market could depress the market price of our common stock and impair our ability to raise capital through the sale of additional equity or equity-linked securities. We cannot predict the effect that future sales of our common stock, or other equity-related securities would have on the market price of our common stock at any given time.

*If our management is unable to accurately estimate future levels of rental activity and adjust the number and mix of vehicles used in our rental operations, our results of operations, financial condition, liquidity and cash flows could suffer.*

Because vehicle costs typically represent our single largest expense and vehicle purchases are typically made weeks or months in advance of the expected use of the vehicle, our business is dependent upon the ability of our management to accurately estimate future levels of rental activity and consumer preferences with respect to the mix of vehicles used in our rental operations. To the extent we do not purchase sufficient numbers of vehicles, or the right types of vehicles, to meet consumer demand, we may lose revenue to our competitors. If we purchase too many vehicles, our vehicle utilization could be adversely affected and we may not be able to dispose of excess vehicles in a timely and cost-effective manner. If our management is unable to accurately estimate future levels of rental activity and determine the appropriate mix of vehicles used in our rental operations, including because of changes in the competitive environment or economic factors outside of our control, our results of operations, financial condition, liquidity and cash flows could suffer.

*Our corporate governance documents provide that we will indemnify our directors, officers and employees to the fullest extent permitted by law which may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties.*

Our Certificate of Incorporation limits the liability of directors to the maximum extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for breach of their fiduciary duties as directors, except for liability for any:

- breach of their duty of loyalty to us or our stockholders;

- act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- transactions for which the directors derived an improper personal benefit.

These limitations of liability do not apply to liabilities arising under the federal or state securities laws and do not affect the availability of equitable remedies such as injunctive relief or rescission. Our bylaws provide that we will indemnify our directors, officers and employees to the fullest extent permitted by law. Our bylaws also provide that we are obligated to advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding. We believe that these bylaw provisions are necessary to attract and retain qualified persons as directors and officers. The limitation of liability in our Certificate of Incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against directors and officers, even though an action, if successful, might provide a benefit to us and our stockholders. Our results of operations and financial condition may be harmed to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

*Concentrating voting control will limit or preclude our other stockholders' ability to influence corporate matters, including the election of directors, any merger, consolidation or other major corporate transaction requiring stockholder approval, which may negatively impact your liquidity and/or your gain on your investment.*

As a condition to our listing on Nasdaq,(i) Ramy El-Batrawi, our founder and original Chairman of the Board and original Chief Executive Officer, resigned from all positions with the Company, (ii) X, LLC, an entity that is wholly-owned and controlled by Mr. El-Batrawi, agreed to sell 12,525,000 of its 15,425,000 shares of common stock, reducing, X, LLC's beneficial ownership to 9.9% of our common stock then outstanding, and (iii) Mr. El-Batrawi entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock was controlled by a trustee who was required to use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. However, the Trust terminated upon our delisting from Nasdaq, and Mr. El-Batrawi has investment and voting control over our shares beneficially owned by him (2,900,000 shares as of the date of this Annual Report).

19

As of the date of this Annual Report, the Gray Mars Venus Trust ("Gray Mars"), of which John Gray is the beneficial owner, owns approximately 35.1% of our outstanding shares of common stock and thereby has a significant ability to influence corporate matters, including the election of directors, any merger, consolidation or other major corporate transaction requiring stockholder approval, which may negatively impact your liquidity and/or your gain on your investment.

In addition to the stock controlled by John Gray, seven other individuals or entities own 34.5% of our common stock, which further concentrates the influence on corporate matters among a few shareholders.

As a result, these stockholders, if they act together, will be able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. For example, effective January 22, 2020, eight stockholders, including the Trust and Gray Mars, acting by written consent, holding approximately 76% of our common stock then outstanding, removed three directors of the Company from office, and thereafter the remaining directors of the Company elected three new directors to fill such vacancies.

This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. This concentration of ownership may not be in the best interests of our other stockholders.

***Negative sentiment or press regarding our founder and Chief Executive Officer and director may harm the reputation of the Company.***

Mr. El-Batrawi is our founder and both a former and our current Chief Executive Officer and director. Since 2012, Mr. El-Batrawi has been the owner and Chief Executive Officer of Growth Strategy Investments, LLC and, since 2015, Mr. El-Batrawi has been the managing director of X, LLC, both of which are management companies. On April 13, 2006, Ramy El Batrawi was named, along with others officers, directors and/or associates of Genesis Intermedia, Inc., as defendants in an SEC enforcement action. In the SEC complaint, filed in the United States District Court for the Central District of California, entitled SEC v. Ramy El-Batrawi, et al., United States District Court for the Central District of California, Case No 2: -06-cv-02247-(MRP_(RZ) (the "Action"). The Action alleged violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in connection with a stock loan and manipulation scheme. The Action alleged, among other things, that defendants had violated antifraud provisions of federal securities laws by orchestrating a scheme to manipulate the stock price of Genesis Intermedia, Inc. (GENI), a now-defunct public company that was based in Van Nuys, California (the "Complaint"). On April 1, 2010, Mr. El-Batrawi settled the Action by entering into a final judgment by consent with the SEC, without admitting or denying the allegations contained in the Complaint (the "Settlement"). In connection with the voluntary Settlement of the charges set forth in the Complaint, the U.S. District Court for the Central District of California entered the consent against Mr. El-Batrawi, which, among other things, barred Mr. El-Batrawi from acting as an officer or director of a public company for a period of five years following the date of entry of the final judgment by consent. Any negative perception of Mr. El-Batrawi by our current or prospective investors, lenders, investment bankers, financial advisors, customers, service providers or suppliers, and/or any negative press stories about Mr. El-Batrawi, may harm the reputation of the Company and damage our business prospects.

***We rely on our management team, which has little experience working together.***

We depend on a small number of executive officers and other members of management to work effectively as a team, to execute our business strategy and operating business segments, and to manage employees and consultants. Our success will be dependent on the personal efforts of our Chief Executive Officer, our directors and such other key personnel. Any of our officers or employees can terminate his or her employment relationship at any time, and the loss of the services of such individuals could have a material adverse effect on our business and prospects. Ramy El-Batrawi, our founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The Nasdaq Capital Market. After our delisting from Nasdaq, Mr. El-Batrawi was reappointed as our Chief Executive Officer and a director, and our former Chief Executive Officer, Jonathan Rosen, and our former President, Boyd Bishop, resigned. Our management team has only worked together for only a very short period of time and may not work well together as a management team.

*We may fail to respond adequately to changes in technology and customer demands.*

In recent years our industry has been characterized by rapid changes in technology and customer demands. For example, in recent years, industry participants have taken advantage of new technologies to improve vehicle utilization, decrease customer wait times and improve customer satisfaction. Our industry has also seen the entry of new competitors whose businesses and efforts continue to introduce various types of self-driving vehicles. Our ability to continually improve our current processes, products and offerings in response to changes in technology is essential in maintaining our competitive position and maintaining current levels of customer satisfaction. We may experience technical or other difficulties that could delay or prevent the development, introduction or marketing of new products or enhanced product offerings.

*User engagement and growth depends on software and device updates beyond our control.*

Our mobile application and websites are currently available on multiple operating systems, including iOS and Android, across multiple different manufacturers, including Motorola, LG, Apple and Samsung and on thousands of devices. Changes to the device infrastructure or software updates on such devices could render our platform and services useless or inoperable and require users to utilize our website rather than our mobile application which may result in decreased user engagement. Any decrease in user engagement may devalue our value proposition to customers who may no longer continue to do business with us which may have a material adverse effect on business, financial conditions and results of operation.

*Defects in our mobile application may adversely affect our business.*

Tools, code, subroutines and processes contained within our mobile application may contain defects when updates and new versions are released. Our introduction of a mobile application with defects or quality problems may result in adverse publicity, uncollectible or delayed accounts receivable, product redevelopment costs, loss of or delay in market acceptance of our services or claims by customers or others against us. Such problems or claims may have a material and adverse effect on our business, prospects, financial condition and results of operations.

*We may not be able to manage our growth effectively.*

Our growth is expected to place, a significant strain on our managerial, operational and financial resources. As the number of our users, partners and other business partners grows, we must increasingly manage multiple relationships with various customers, strategic partners and other third parties. There can be no assurance that our systems, procedures or controls will be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully grow and scale our services, products and offerings. Our operating results will also depend on our ability to expand sales and marketing commensurate with the growth of our business and the ridesharing industry. If we are unable to manage growth effectively, our business, results of operations and financial condition will be adversely affected.

*Maintaining favorable brand recognition is essential to our success, and failure to do so could materially adversely affect our results of operations, financial condition, liquidity and cash flows.*

Our business is heavily dependent upon the favorable brand recognition that our "YayYo", "Distinct Cars" and "Rideshare" brand names have in the markets in which they participate. Factors affecting brand recognition are often outside our control, and our efforts to maintain or enhance favorable brand recognition, such as marketing and advertising campaigns, may not have their desired effects. In addition, it may be difficult to monitor or enforce such requirements, particularly in foreign jurisdictions and various laws may limit our ability to enforce the terms of these agreements or to terminate the agreements. Any decline in perceived favorable recognition of our brands could materially adversely affect our results of operations, financial condition, liquidity and cash flows.

*Changes in U.S., global or regional economic conditions.*

A current decrease in economic activity in the United States or, depending on future operations, in other regions of the world in which we plan to operate our Fleet Management business segment, Rideshare Platform and related services could adversely affect demand, thus reducing our ability to generate revenue. A decline in economic conditions could reduce our users' interest in utilizing our products and services. In addition, an increase in price levels generally, or in price levels in a particular sector such as the fuel sector, could result in a shift in consumer demand away from ridesharing services, which could also adversely affect our revenues and, at the same time, increase our costs.

**Risks Relating to Our Business and Industry.**

***If our efforts to attract prospective customers to our Fleet Management business and Rideshare Platform are not successful, or we fail to retain customers or continue attracting existing customers to our products and services, our growth prospects and revenue will be adversely affected.***

Our ability to grow our business and generate revenue depends on retaining and expanding our total customer base, increasing revenue by effectively monetizing our Rideshare Platform user base, and increasing the number of customers to our Fleet Management business. We must convince prospective customers of the benefits of our ridesharing vehicle rental services and equipment offerings and our existing users of the continuing value of our products and services, including our Rideshare Platform. Our ability to attract new users and customers, retain existing users and customers. If we fail to keep pace with competing offerings or technological advancements to the ridesharing industry or fail to offer compelling product offerings and state-of-the-art delivery for our Rideshare Platform to meet consumer demands, our ability to grow or sustain the reach of our product and service offerings, attract and retain users and customers may be adversely affected.

***We have no control over the Vehicle Registration Requirements or such other ridesharing vehicle requirements imposed by the major Transportation Network Company ("TNC") providers, and our business may be adversely affected in the event that TNC providers restrict or limit prospective ridesharing drivers from utilizing or registering rental vehicles with the TNC.***

We rely on the major TNC businesses that drive and service the ridesharing economy, over whom we have no control, to impose the Vehicle Registration Requirements and permit prospective ridesharing drivers to utilize lease or rental vehicles, such as our product offerings, under their employment with the major TNC ridesharing services. We cannot guarantee that each major TNC business will always permit prospective ridesharing drivers to use third-party lease or rental vehicles under their employment agreement with the TNC.

Our business may be adversely affected if our ability to rent vehicles maintained under our Fleet Management business is limited, impaired or delayed because of a modification to the Vehicle Registration Requirements or any similar prohibition that prevents prospective ridesharing drivers from renting our Fleet Management vehicles or other third-party vehicle rentals for use under the terms of the prospective ridesharing drivers agreement with such TNC businesses.

***We face risks of increased costs of cars, including as a result of limited supplies of competitively priced cars.***

As of the date of this Annual Report, we have financed the purchase and leasing of the Hyundai cars that we rent from ACME Auto Leasing, LMP Financial Services and United Mile Fleet. Under the terms of a commercial partnership program, Hyundai USA has agreed to extend fleet program competitive pricing options below manufactures' suggested retail prices ("MSRP") on all Hyundai vehicles purchased through selected dealerships. We cannot assure you that we will be able to maintain membership in the Hyundai commercial partnership program or continue receiving competitive pricing options below MSRP rates on all Hyundai vehicles purchased. If Hyundai USA cancels the commercial partnership program or does not offer us competitive terms and conditions, and we are not able to purchase sufficient quantities of cars from other automobile manufacturers on competitive terms and conditions or below MSRP rates, then we may be forced to purchase cars at higher prices, or on terms less competitive, than for cars purchased by our competitors. In addition, certain car manufacturers, such as Ford, have adopted strategies to de-emphasize sales to the car rental industry which they view as less profitable due to historical sales incentive and other discount programs that tended to lower the average cost of cars for fleet purchasers such as us. Reduced or limited supplies of equipment together with increased prices are risks that we also face in our equipment rental business. We cannot offer assurance that we will be able to pass on increased costs of cars or equipment to our rental customers. Failure to pass on significant cost increases to our customers would have a material adverse impact on our results of operations and financial condition.

***Fluctuations in fuel costs or reduced supplies could harm our business.***

We could be adversely affected by limitations on fuel supplies, the imposition of mandatory allocations or rationing of fuel or significant increases in fuel prices. A severe or protracted disruption of fuel supplies or significant increases in fuel prices could have a material adverse effect on our financial condition and results of operations, either by directly interfering with our normal activities or by disrupting the air travel on which a significant portion of our car rental business relies.

***The concentration of our reservations, accounting and information technology functions at a limited number of facilities in California creates risks for us.***

We have concentrated our reservations functions for the United States in one office location in Los Angeles, California, and we have concentrated our accounting functions for the United States in one office location in Los Angeles. In addition, our major information systems are centralized in our office location in Los Angeles. A disruption of normal business at any of our principal office location in Los Angeles, California, whether as the result of localized conditions (such as a fire or explosion) or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and systems activities.

***We face risks arising from our heavy reliance on communications networks and centralized information systems.***

We rely heavily on information systems to accept reservations, process rental and sales transactions, manage our fleets of cars and equipment, account for our activities and otherwise conduct our business. We have centralized our information systems in one office location in Los Angeles, California, and we rely on communications service providers to link our systems with the business locations these systems serve. A simultaneous loss of both facilities, or a major disruption of communications between the systems and the locations they serve, could cause a loss of reservations, interfere with our ability to manage our fleet, slow rental and sales processes and otherwise materially adversely affect our ability to manage our business effectively. Our systems back-up plans, business continuity plans and insurance programs are designed to mitigate such a risk, not to eliminate it. In addition, because our systems contain information about individuals and businesses, our failure to maintain the security of the data we hold, whether the result of our own error or the malfeasance or errors of others, could harm our reputation or give rise to legal liabilities leading to lower revenues, increased costs and other material adverse effects on our results of operations.

***The misuse or theft of information we possess could harm our reputation or competitive position, adversely affect the price at which shares of our common stock trade or give rise to material liabilities.***

We possess non-public information with respect to individuals, including our customers and our current and former employees, and businesses, as well as non-public information with respect to our own affairs. The misuse or theft of that information by either our employees or third parties could result in material damage to our brand, reputation or competitive position or materially affect the price at which shares of our common stock trade. In addition, depending on the type of information involved, the nature of our relationship with the person or entity to which the information relates, the cause and the jurisdiction whose laws are applicable, that misuse or theft of information could result in governmental investigations or material civil or criminal liability. The laws that would be applicable to such a failure are rapidly evolving and becoming more burdensome.

23

***If we acquire any businesses in the future, they could prove difficult to integrate, disrupt our business, or have an adverse effect on our results of operations.***

We intend to pursue growth primarily through internal growth, but from time to time we may consider opportunistic acquisitions which may be significant. Any future acquisition would involve numerous risks including, without limitation:

- potential disruption of our ongoing business and distraction of management;

- difficulty integrating the acquired business; and

- exposure to unknown liabilities, including litigation against the companies we may acquire.

If we make acquisitions in the future, acquisition-related accounting charges may affect our balance sheet and results of operations. In addition, the financing of any significant acquisition may result in changes in our capital structure, including the incurrence of additional indebtedness. We may not be successful in addressing these risks or any other problems encountered in connection with any acquisitions.

***Our business is cyclical, and a disruption in rental activity could materially adversely affect our results of operations.***

In the car rental business, a decline in economic activity typically results in a decline in both business and leisure travel and, accordingly, a decline in the volume of car rental transactions. In the equipment rental business, a decline in economic activity typically results in a decline in activity in non-residential construction and other businesses in which our equipment rental customers operate and, therefore, results in a decline in the volume of equipment rental transactions. In the case of a decline in car or equipment rental activity, we may reduce rental rates to meet competitive pressures, which could have a material adverse effect on our results of operations. A decline in economic activity also may have a material adverse effect on residual values realized on the disposition of our revenue earning cars and/or equipment.

Certain significant components of our expenses, including real estate taxes, rent, utilities, maintenance and other facility-related expenses, the costs of operating our information systems and minimum staffing costs, are fixed in the short-run. Cyclical changes in our revenues do not alter those fixed expenses, typically resulting in higher profitability in periods when our revenues are higher and lower profitability in periods when our revenues are lower. The Company believes that the second and third quarters of the year will be stronger quarters due to their increased levels of leisure travel and construction activity. Any occurrence that disrupts rental activity during the second or third quarters could have a disproportionately material adverse effect on our liquidity and/or results of operations.

***We may be unable to maintain or establish relationships with third-party partners, ridesharing services or technology providers, which could limit the information we are able to provide to users.***

We anticipate that the demand for our products and services will be dependent on key relationships with ridesharing services, auto manufacturers, fleet providers and other industry providers. We will seek to develop and maintain relationships with these companies. Failure to continue to develop and/or maintain these relationships, and/or a failure for these relationships to yield benefit would have an adverse effect on our business.

***We rely on the performance of highly skilled personnel, including senior management and our technology professionals, and if we are unable to retain or motivate key personnel or hire, retain and motivate qualified personnel, our business would be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our senior management and our skilled team members. Our future success depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially adversely affect our ability to build on the efforts they have undertaken and to execute and operate our business segments, and we may not be able to find adequate replacements. We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees.

***Competition for well-qualified employees in all aspects of our business, including software engineers and other technology professionals, is intense both in the U.S. and abroad.***

Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate existing employees. Software engineers and technology professionals are key individuals in designing the code and algorithms necessary to our Rideshare Platform. Therefore, our ability to attract top talent and experienced engineers and technology professional is important to our success. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business would be adversely affected.

***We rely on non-employee third parties for important services which may impact steady growth if third parties to provide important services cannot be retained.***

We will have a small number of employees and we do not have any operational infrastructure or prior operating history. We intend to rely on our management team, our advisors, third-party consultants, outside attorneys, advisors, accountants, auditors, and other administrators. The loss of services of any of such personnel may have a material adverse effect on our business and operations and there can be no assurance that if any or all of such personnel were to become unavailable, that qualified successors can be found, on acceptable terms.

We depend on third parties to provide us with services critical to our business including, equipment manufacturers that provide us with standard passenger vehicles and vehicle leasing services at competitive prices. While we believe that there is sufficient supply in the market, the failure of any of these third parties to adequately provide the needed services could have a material adverse effect on our business.

***Governmental regulation and associated legal uncertainties could limit our ability to expand our product offerings or enter into new markets and could require us to expend significant resources, including the attention of our management, to review and comply with such regulations.***

Elements of the ridesharing industry are currently or will be regulated by Federal, state, city and/or local governments, and our ability to provide these services is and will continue to be affected by government regulations. The implementation of unfavorable regulations or unfavorable interpretations of existing regulations by courts or regulatory bodies with respect to the ridesharing industry or "Transportation Network Companies" ("TNC") could require us to incur significant compliance costs, cause the development of the affected markets to become impractical and otherwise have a material adverse effect on our business, results of operations and financial condition. Moreover, in the future, we may elect to add services or products to our business plan that compete directly with ridesharing services, such as Uber and Lyft, which could expose us to additional regulations, compliance obligations and legal challenges. In addition, our business strategy involves expansion into regions around the world, many of which have different legislation, regulatory environments, tax laws and levels of political stability. Compliance with foreign legal, governmental, regulatory or tax requirements will place demands on our time and resources, and we may nonetheless experience unforeseen and potentially adverse legal, regulatory or tax consequences. It is intended that our business will assist with the processing of customer credit card transactions which would result in us receiving and storing personally identifiable information. This information is increasingly subject to legislation and regulations in numerous jurisdictions around the world. This legislation and regulation is generally intended to protect the privacy and security of personal information, including credit card information, which is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if government regulations require TNCs, and as a result, cause us to significantly change our business practices with respect to this type of information.

25

*We may not be able to adequately protect our intellectual property, which could harm the value of our brands and adversely affect our business.*

We believe that intellectual property will be critical to our success, and that we will rely on trademark, copyright and patent law, trade secret protection and confidentiality and/or license agreements to protect our proprietary rights. If we are not successful in protecting our intellectual property, it could have a material adverse effect on our business, results of operations and financial condition. While we believe that we will be issued trademarks, copyrights and other intellectual property to protect our business, there can be no assurance that our operations do not, or will not, infringe valid, enforceable third-party patents of third parties or that competitors will not devise new methods of competing with us that are not covered by our anticipated patent applications. Moreover, it is intended that we will rely on intellectual property and technology developed or licensed by third parties, and we may not be able to obtain or continue to obtain licenses and technologies from these third parties at all or on reasonable terms. Effective trademark, service mark, copyright and trade secret protection may not be available in every country in which our intended services will be provided. The laws of certain countries do not protect proprietary rights to the same extent as the laws of the U.S. and, therefore, in certain jurisdictions, we may be unable to protect our proprietary technology adequately against unauthorized third party copying or use, which could adversely affect our competitive position. We may license in the future, certain proprietary rights, such as trademarks or copyrighted material, to third parties. These licensees may take actions that might diminish the value of our proprietary rights or harm our reputation, even if we have agreements prohibiting such activity. Also, to the extent third parties are obligated to indemnify us for breaches of our intellectual property rights, these third parties may be unable to meet these obligations. Any of these events could have a material adverse effect on our business, results of operations or financial condition.

*Confidentiality agreements with employees and others may not adequately prevent disclosure of trade secrets and other proprietary information.*

We anticipate that a substantial amount of our processes and technologies will be protected by trade secret laws. In order to protect these technologies and processes, we intend to rely in part on confidentiality agreements with our employees, licensees, independent contractors and other advisors. These agreements may not effectively prevent disclosure of confidential information, including trade secrets, and may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. In addition, others may independently discover our trade secrets and proprietary information, and in such cases, we could not assert any trade secret rights against such parties. To the extent that our employees, contractors or other third parties with which we do business use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. Laws regarding trade secret rights in certain markets in which we operate may afford little or no protection to our trade secrets. The loss of trade secret protection could make it easier for third parties to compete with our products, services by copying functionality, among other things. In addition, any changes in, or unexpected interpretations of, the trade secret and other intellectual property laws in any country in which we operate may compromise our ability to enforce our trade secret and intellectual property rights. Costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights, and failure to obtain or maintain trade secret protection could adversely affect our business, revenue, reputation and competitive position.

*Our business is heavily reliant upon communications networks and centralized information technology systems and the concentration of our systems creates risks for us.*

We rely heavily on communication networks and information technology systems to accept reservations, process rental and sales transactions, manage our pricing, manage our revenue earning vehicles, manage our financing arrangements, account for our activities and otherwise conduct our business. Our reliance on these networks and systems exposes us to various risks that could cause a loss of reservations, interfere with our ability to manage our vehicles, slow rental and sales processes, adversely affect our ability to comply with our financing arrangements and otherwise materially adversely affect our ability to manage our business effectively. Our major information technology systems, reservations and accounting functions are centralized in a few locations worldwide. Any disruption, termination or substandard provision of these services, whether as the result of localized conditions (such as a fire, explosion or hacking), failure of our systems to function as designed, or as the result of events or circumstances of broader geographic impact (such as an earthquake, storm, flood, epidemic, strike, act of war, civil unrest or terrorist act), could materially adversely affect our business by disrupting normal reservations, customer service, accounting and information technology functions or by eliminating access to financing arrangements. Any disruption or poor performance of our systems could lead to lower revenues, increased costs or other material adverse effects on our results of operations, financial condition, liquidity or cash flows.

*Defects in our Rideshare Platform and its functionality and the technology powering our custom development services may adversely affect our business.*

It is anticipated that the tools, code, subroutines and processes contained within our Rideshare Platform or the technology powering our custom development services may contain defects when introduced and also when updates and new versions are released. The

introduction of our Rideshare Platform or custom development services with defects or quality problems may result in adverse publicity, product returns, reduced orders, uncollectible or delayed accounts receivable, product redevelopment costs, loss of or delay in market acceptance of our products or claims by customers or others against us. Such problems or claims may have a material and adverse effect on our business, prospects, financial condition and results of operations.

26

***Manufacturer safety recalls could create risks to our business.***

Our Fleet Management vehicles may be subject to safety recalls by their manufacturers. The Raechel and Jacqueline Houck Safe Rental Car Act of 2015 prohibits us from renting vehicles with open federal safety recalls and to repair or address these recalls prior to renting or selling the vehicle. Any federal safety recall with respect to our vehicles would require us to decline to rent recalled vehicles until we can arrange for the steps described in the recall to be taken. If a large number of vehicles are the subject of a recall or if needed replacement parts are not in adequate supply, we may not be able to rent recalled vehicles for a significant period of time. Those types of disruptions could jeopardize our ability to fulfill existing contractual commitments or satisfy demand for our vehicles and could also result in the loss of business to our competitors. Depending on the severity of any recall, it could materially adversely affect our revenues, create customer service problems, reduce the residual value of the recalled vehicles and harm our general reputation.

*If we are unable to purchase adequate supplies of competitively priced vehicles and the cost of the vehicles we purchase increases, our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.*

The price and other terms at which we can acquire vehicles vary based on market and other conditions. For example, certain vehicle manufacturers have in the past, and may in the future, utilize strategies to de-emphasize sales to the vehicle rental industry, which can negatively impact our ability to obtain vehicles on competitive terms and conditions. Consequently, there is no guarantee that we can purchase a sufficient number of vehicles at competitive prices and on competitive terms and conditions. If we are unable to obtain an adequate supply of vehicles, or if we obtain less favorable pricing and other terms when we acquire vehicles and are unable to pass on any increased costs to our customers, then our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.

***If third parties claim that we infringe their intellectual property, it may result in costly litigation.***

We cannot assure you that third parties will not claim our current or future products or services infringe their intellectual property rights. Any such claims, with or without merit, could cause costly litigation that could consume significant management time. As the number of product and services offerings in the ridesharing industry increases and functionalities increasingly overlap, companies such as ours may become increasingly subject to infringement claims. Such claims also might require us to enter into royalty or license agreements. If required, we may not be able to obtain such royalty or license agreements or obtain them on terms acceptable to us.

***Failure to comply with federal and state privacy laws and regulations, or the expansion of current or the enactment of new privacy laws or regulations, could adversely affect our business.***

A variety of federal and state laws and regulations govern the collection, use, retention, sharing and security of consumer data. The existing privacy-related laws and regulations are evolving and subject to potentially differing interpretations. In addition, various federal, state and foreign legislative and regulatory bodies may expand current or enact new laws regarding privacy matters. Further, several states have adopted legislation that requires businesses to implement and maintain reasonable security procedures and practices to protect sensitive personal information and to provide notice to consumers in the event of a security breach. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or orders or other federal, state or international privacy or consumer protection-related laws, regulations or industry self-regulatory principles could result in claims, proceedings or actions against us by governmental entities or others or other liabilities, which could adversely affect our business. In addition, a failure or perceived failure to comply with industry standards or with our own privacy policies and practices could adversely affect our business. Federal and state governmental authorities continue to evaluate the privacy implications inherent in the use of third-party web "cookies" for behavioral advertising. The regulation of these cookies and other current online advertising practices could adversely affect our business.

*Our business model is entirely dependent on the continued success and viability of the ridesharing industry and "transportation network companies", and we may become subject to government regulation and legal uncertainties that could reduce demand for our products and services or increase the cost of doing business, thereby adversely affecting our ability to generate revenues.*

Private drivers use their personal automobiles to pick up the customers and drive them to the desired destination in exchange for a negotiated fee. The passengers then write reviews, similar to other peer-to-peer online services. Large amounts of venture capital and private equity has been invested in a handful of these new companies, which have the potential to disrupt the traditional transportation industry. However, the ridesharing marketplace has come under increased scrutiny from governments and various interested groups (such as taxi drivers, taxi companies, environmentalists, etc.) have continuously opposed the proliferation of ridesharing services in recent years. Despite opposition from many of these interested groups and governmental agencies, on September 19, 2013, the California Public Utilities Commission ("CPUC") voted unanimously to allow these ridesharing services to operate in California as a new category of business called "transportation network companies" ("TNC").

In California, licenses will be issued to qualifying TNCs, subject to new regulations that require drivers to undergo criminal background checks and vehicle inspections, receive driver training, follow a zero-tolerance policy on drugs and alcohol, and carry insurance policies with a minimum of $1 million in liability coverage. Some of the companies that are expected to receive new TNC licenses include Lyft (www.lyft.me), SideCar (www.side.cr) and UberX (www.uber.com). The CPUC has responded to rapidly evolving disruptive technology and its decision will likely set an example for cities and states across the country. Its decision is also expected to preempt ongoing efforts by some California cities to regulate or ban peer-to-peer ridesharing under their authority to license taxi companies. The City of Los Angeles, however, is currently considering a possible appeal of the CPUC decision and implementing additional regulations to TNC drivers, which have been referred to as "Bandit cabs" by some on the City Council. Other cities across the country are also now looking at new regulations for Rideshare companies.

As can be gleaned from these recent events around the ridesharing industry, this new business model is not without its opponents. Some raise concerns about public safety and the potential for abuse or unintended consequences, while others question whether the new regulations require additional enforcement capability. The taxi industry, which is less than pleased to see this new competition, has criticized these ridesharing apps as operating essentially like unlicensed taxi cabs. Since the new technology uses GPS to measure the distance of a ride and the corresponding fee, the taxi industry believes that it works similarly to a taxi meter and should therefore comply with local taxi ordinances. Some of the primary concerns raised by skeptics include how liability will be allocated between the TNC and its independent contractor driver, and how the insurance industry will adapt to this new business. Proper hiring practices, training and oversight by the TNC also will be necessary to ensure public safety. The extent to which the TNCs will be inspected and the new regulations enforced is still unclear, but this will be an important means by which the public may judge the safety of this new industry. Based on the direction states and cities are heading with respect to the governance of TNCs or ridesharing services, and the ever increasing popularity and use of ridesharing services and TNCs, it is likely that a number of laws and regulations will become applicable to us or the TNCs which we rely upon for the operation of products and related services or may be adopted in the future with respect to mobile applications and/or TNCs covering issues such as: (i) liability, (ii) unionization, (iii) rules and standards for drivers, vehicles, and passenger safety, (iv) licensing and insurance requirements, and (v) environmental concerns, among others. It is difficult to predict how existing laws will be applied to our business and the new laws and regulations to which we and/or ridesharing services will likely become subject. If ridesharing services are not able to comply with these laws or regulations or if we become liable under these laws or regulations, we could be directly harmed, and we may be forced to implement new measures to sustain our operating business segments. We anticipate that scrutiny and regulation of the ridesharing industry will increase and we will be required to devote legal and other resources to addressing such regulation, either directly or indirectly. Changes to these laws intended to address these issues, including some recently proposed changes, could create uncertainty in the marketplace. Such uncertainty could reduce demand for our services or increase the cost of doing business due to increased costs of litigation or increased service or operating costs.

***We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business financial condition and results of operations.***

We may be subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business, financial condition and results of operations. We anticipate accepting payment from our users primarily through credit card transactions and certain online payment service providers. The ability to access credit card information on a real time-basis without having to proactively reach out to the consumer each time we process an auto-renewal payment or a payment for the purchase of a premium feature on any of our dating products is critical to our success. When we or a third party experiences a data security breach involving credit card information, affected cardholders will often cancel their credit cards. In the case of a breach experienced by a third party, the more sizable the third party's customer base and the greater the number of credit card accounts impacted, the more likely it is that our users would be impacted by such a breach. To the extent our users are ever affected by such a breach experienced by us or a third party, affected users would need to be contacted to obtain new credit card information and process any pending transactions. It is likely that we would not be able to reach all affected users, and even if we could, some users' new credit card information may not be obtained and some pending transactions may not be processed, which could adversely affect our business, financial condition and results of operations. Even if our users are not directly impacted by a given data security breach, they may lose confidence in the ability of service providers to protect their personal information generally, which could cause them to stop using their credit cards online and choose alternative payment methods that are not as convenient for us or restrict our ability to process payments without significant user effort. Additionally, if we fail to adequately prevent fraudulent credit card transactions, we may face civil liability, diminished public perception of our security measures and significantly higher credit card-related costs, any of which could adversely affect our business, financial condition and results of operations. Finally, the passage or adoption of any legislation or regulation affecting the ability of service providers to periodically charge consumers for recurring membership payments may adversely affect our business, financial condition and results of operations.

***We depend upon intellectual property and proprietary rights that are vulnerable to unauthorized use.***

We rely on a combination of copyright and trademark laws, trade secrets, software security measures, license agreements and nondisclosure agreements to protect our proprietary information. Our success will depend, in part, on our ability to operate without infringing the patent or other proprietary rights of others and our ability to preserve our trade secrets and other proprietary property, including our rights in any technology licenses upon which any of our products or services are based. Our inability to preserve such rights properly or operate without infringing on such rights would have a material adverse effect on our business, results of operations and financial condition. We currently do not own any registered copyrights, patents or patent applications pending. It may be possible for unauthorized third parties to copy aspects of, or otherwise obtain and use, our proprietary information without authorization. In addition, there can be no assurance that any confidentiality agreements between us and our employees, or any license agreements with our customers, will provide meaningful protection for our proprietary information in the event of any unauthorized use or disclosure of such proprietary information.

***We may not be able to keep up with rapid technological changes.***

To remain competitive, we must continue to enhance and improve the usability, functionality, and features of our Rideshare Platform and related services. The evolving nature of the ridesharing industry, transportation network companies, telecommunications, apps, and mobile based services, which is characterized by rapid technological change, changes in user and customer requirements and preferences, frequent new product and service introductions and the emergence of new industry standards and practices, could render our existing systems, app and services obsolete. Our success will depend, in part, on our ability to develop, innovate, license or acquire leading technologies useful in our business, enhance our existing solutions, develop new solutions and technology that address the increasingly sophisticated and varied needs of our current and prospective users, and respond to technological advances and emerging industry and regulatory standards and practices in a cost-effective and timely manner. Future advances in technology may not be beneficial to, or compatible with, our business. Furthermore, we may not successfully use new technologies effectively or adapt our proprietary technology and app to user requirements or emerging industry standards on a timely basis. Our ability to remain technologically competitive may require substantial expenditures and lead time. If we are unable to adapt in a timely manner to changing market conditions or user requirements, our business, financial condition and results of operations could be seriously harmed.

***We depend on the continued growth and reliability of the internet, global positioning systems, ridesharing services and apps.***

The recent growth in the use of apps and ridesharing services may cause periods of decreased performance for many ridesharing services, internet providers, apps and related service providers. If app and ridesharing usage continues to grow rapidly, the infrastructure these services are reliant upon (i.e. the internet, global positioning systems, and telecommunications networks and devices) may not be able to support these demands and therefore performance and reliability may decline. Decreased performance with respect to some or all of these critical components of our business model has also been attributed to illegal attacks by third parties. If outages or delays occur frequently or increase in frequency, or businesses are not able to protect themselves adequately from such illegal attacks, the market for mobile apps, ridesharing services and related technologies could grow more slowly or decline, which may reduce the demand for our Rideshare Platform and related services.

***Our business is dependent upon consumers renting our Fleet Management vehicles, using our Rideshare Platform and related services and if we fail to obtain broad adoption, our business would be adversely affected.***

Our success will depend on our ability to monetize our fleet of vehicles and our Rideshare Platform, ensuring our Rideshare Platform is fully functional and reliable as intended, operate and educate consumers regarding the benefits of renting vehicles for ridesharing opportunities, and persuade them to adopt YayYo! and/or "Rideshare" as their "go to" ridesharing vehicle rental service provider. We do not know if our products and services will be successful over the long term and market acceptance may be hindered if our Rideshare platform does not function efficiently and/or our user experience is not compelling and financially beneficial to our users. If consumers do not adopt and use our Rideshare Platform and related services, we will not be able to generate revenues and our financial condition will suffer as a result.

***International expansion of our business exposes us to market, regulatory, political, operational, financial and economic risks associated with doing business outside of the United States.***

Our business strategy includes eventual international expansion. Adapting our Rideshare Platform to function internationally and doing business internationally involves a number of risks, including: (i) multiple, conflicting and changing laws and regulations such as tax laws, privacy laws, export and import restrictions, employment laws, regulatory requirements and other governmental approvals, permits and licenses; (ii) obtaining regulatory approvals where required; (iii) requirements to maintain data and the processing of that data on servers located within such countries; (iv) complexities associated with managing multiple payment processing methods and multiple ridesharing service providers; (v) natural disasters, political and economic instability, including wars, terrorism, political unrest, outbreak of disease, protests, boycotts, curtailment of trade and other market restrictions; and (vi) regulatory and compliance risks that relate to maintaining accurate information and control over activities subject to regulation under the United States Foreign Corrupt Practices Act of 1977 ("FCPA"), U.K. Bribery Act of 2010 and comparable laws and regulations in other countries. Any of these factors could significantly harm our future international expansion and operations and, consequently, our ability to generate revenue and results of operations.

***Security breaches, loss of data and other disruptions could compromise sensitive information related to our business or users or prevent us from accessing critical information and expose us to liability, which could adversely affect our business and our reputation.***

In the ordinary course of our business, we and our third-party billing and collections providers and ridesharing service partners may collect and store sensitive data, including legally-protected personal information. We may also process and store and use additional third-parties to process and store, sensitive intellectual property and other proprietary business information, including that of our customers and collaborative partners. While we intend to implemented data privacy and security measures that will be compliant with applicable privacy laws and regulations, future security breaches could subject us to liability for violations of various laws, rules or regulations, civil liability, government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

30

***We may become a party to intellectual property litigation or administrative proceedings that could be costly and could interfere with our ability to focus on our operating business segments.***

The technology industry has been characterized by extensive litigation regarding patents, trademarks, trade secrets, and other intellectual property rights, and companies in the industry have used intellectual property litigation to gain a competitive advantage. It is possible that U.S. and foreign patents and pending patent applications or trademarks controlled by third parties may be alleged to cover our products or services, or that we may be accused of misappropriating third parties' trade secrets. Additionally, our products may include hardware and software components that we purchase from vendors and may include design components that are outside of our direct control. Our competitors, many of which have substantially greater resources and have made substantial investments in patent portfolios, trade secrets, trademarks, and competing technologies, may have applied for or obtained, or may in the future apply for or obtain, patents or trademarks that will prevent, limit or otherwise interfere with our ability to make, use, sell and/or export our products and services or to use product names. We may become a party to patent or trademark infringement or trade secret related disputes or litigation as a result of these and other third party intellectual property rights being asserted against us. The defense and prosecution of these matters are both costly and time consuming. Vendors from whom we purchase hardware or software may not indemnify us in the event that such hardware or software is accused of infringing a third party's patent or trademark or of misappropriating a third party's trade secret.

Further, if such patents, trademarks, or trade secrets are successfully asserted against us, this may harm our business and result in injunctions preventing us from selling our products, license fees, damages and the payment of attorney fees and court costs. In addition, if we are found to willfully infringe third party patents or trademarks or to have misappropriated trade secrets, we could be required to pay treble damages in addition to other penalties. Although patent, trademark, trade secret, and other intellectual property disputes in the technology industry have often been settled through licensing or similar arrangements, costs associated with such arrangements may be substantial and could include ongoing royalties. We may be unable to obtain necessary licenses on satisfactory terms, if at all. If we do not obtain necessary licenses, we may not be able to redesign our Rideshare Platform or related services in order to avoid infringement.

Additionally, in the future we may need to commence proceedings against others to enforce our patents or trademarks, if applicable, or to protect our copyrights, trade secrets or know how, trade secrets or know how, or to determine the enforceability, scope and validity of the proprietary rights of others. These proceedings would result in substantial expense to us and significant diversion of effort by our technical and management personnel. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful. We may not be able to stop a competitor from marketing and selling products that are the same or similar to our products and services or from using product or service names that are the same or similar to ours, and our business may be harmed as a result.

We may face claims from companies that incorporate open source software into their products or from open source licensors, claiming ownership of, or demanding release of, the source code, the open source software or derivative works that were developed using such software, or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to cease offering our Rideshare Platform unless and until we can re-engineer it to avoid infringement. This re-engineering process could require significant additional research and development resources, and we may not be able to complete it successfully. These risks could be difficult to eliminate or manage, and, if not addressed, could harm our business, financial condition and operating results.

***Our use of "open source" software could adversely affect our ability to offer our services and subject us to possible litigation.***

We use open source software in connection with our technology development. From time to time, companies that use open source software have faced claims challenging the use of open source software and/or compliance with open source license terms. We could be subject to suits by parties claiming ownership of what we believe to be open source software or claiming noncompliance with open source licensing terms. Some open source licenses require users who distribute software containing open source to make available all or part of such software, which in some circumstances could include valuable proprietary code of the user. We intend to monitor the use of open source software and will try to ensure that none is used in a manner that would require us to disclose our proprietary source code or that would otherwise breach the terms of an open source agreement, such use could inadvertently occur, in part because open source license terms are often ambiguous. Any requirement to disclose proprietary source code or pay damages for breach of contract could be harmful to our business, results of operations or financial condition, and could help our competitors develop products and services that are similar to or better than ours.

***No assurances of protection for proprietary rights; reliance on trade secrets.***

In certain cases, we may rely on trade secrets to protect intellectual property, proprietary technology and processes, which we have acquired, developed or may develop in the future. There can be no assurances that secrecy obligations will be honored or that others will not independently develop similar or superior products or technology. The protection of intellectual property and/or proprietary technology through claims of trade secret status has been the subject of increasing claims and litigation by various companies both in order to protect proprietary rights as well as for competitive reasons even where proprietary claims are unsubstantiated. The prosecution of proprietary claims or the defense of such claims is costly and uncertain given the uncertainty and rapid development of the principles of law pertaining to this area. We may also be subject to claims by other parties with regard to the use of intellectual property, technology information and data, which may be deemed proprietary to others.

***Our network operations may be vulnerable to hacking, viruses and other disruptions, which may make our Rideshare online platform and related services less attractive and reliable.***

Internet usage and mobile app usage could decline if any well-publicized compromise of security occurs. Hacking involves efforts to gain unauthorized access to information or systems or to cause intentional malfunctions, loss or corruption of data, software, hardware or other computer equipment. Hackers, if successful, could misappropriate proprietary information or cause disruptions in our service. We may be required to expend capital and other resources to protect our products and services and related systems upon which our products and services is reliant against hackers. There can be no assurance that any measures we may take will be effective. Security breaches could have a material adverse effect on our business. In addition, the inadvertent transmission if computer viruses or other digital problems could expose us to a material risk of loss or litigation and possible liability, as well as materially damage our reputation and decrease our user base.

***We currently have a small sales and marketing organization. If we are unable to expand our direct sales force in the U.S. to promote our services and related products, the commercial appeal and brand awareness for our products and services may be diminished.***

We currently have a small sales and marketing organization. The Company may expand the core sales and marketing team to oversee the sales and marketing of our "YayYo!" business. We will incur significant additional expenses and commit significant additional management resources to expand and grow our sales force. We may not be able to build on the expansion of these capabilities despite these additional expenditures. If we elect to rely on third parties to sell our products in the U.S., we may receive less revenue than if we sold our products directly. In addition, although we would intend to diligently monitor their activities, we may have little or no control over the sales efforts of those third parties. In the event we are unable to develop and expand our own sales force or collaborate with a third party to sell our products, we may not be able to operate our products and/or services which would negatively impact our ability to generate revenue. We may not be able to enter into any marketing arrangements on favorable terms or at all. If we are unable to enter into a marketing arrangement for our products, we may not be able to develop an effective sales force to successfully operate our products and/or services. If we fail to enter into marketing arrangements for our products and are unable to develop an effective sales force, our ability to generate revenue would be limited.

*We currently serve a segment of the Rideshare driver market that is large and valuable, but has less than average credit and commercial financial performance. We cannot predict the future performance of this market segment.*

Rideshare drivers are frequently unemployed, underemployed or otherwise financially challenged, which is one reason they are attracted to the rideshare business. We believe these drivers are critical to the rideshare ecosystem, that their numbers will grow, and they still perform financially to a degree that we can benefit. However, there can be no assurance that they will grow or maintain their percentage of the driver population, and that they will perform fiscally in a way that the company needs to generate a profit. Should they decrease in numbers or percentage of the driver population, or should we be unable to manage their successful payments for our cars, services, repairs or other charges, we may not be able to operate at a level of profit acceptable to the Company.

**Risks Relating to Ownership of Our Securities.**

*Our common stock is quoted on the OTC Pink, and thus may have a limited market and lack of liquidity.*

Our common stock is quoted on the OTC Pink, which may have an unfavorable impact on our stock price and liquidity. The OTC Pink Market is a significantly more limited market than the New York Stock Exchange or The Nasdaq Stock Market. The quotation of our shares on such marketplace may result in a less liquid market available for existing and potential stockholders to trade shares of our common stock, could depress the trading price of our common stock, and could have a long-term adverse impact on our ability to raise capital in the future. There can be no assurance that there will be an active market for our shares of common stock, either now or in the future, or that stockholders will be able to liquidate their investment or liquidate it at a price that reflects the value of the business.

*Our existing shareholders may experience dilution if we elect to raise equity capital*

Due to our past liquidity issues, we have had to raise capital in the form of debt and/or equity to meet our working capital needs. We may also choose to issue equity or debt securities in the future to meet our liquidity or other needs which would result in additional dilution to our existing stockholders. Although we will attempt to minimize the dilutive impact of any future capital-raising activities, we cannot offer any assurance that we will be able to do so. We may have to issue additional shares of our common stock at prices at a discount from the then-current market price of our common stock. If we raise additional working capital, existing shareholders may experience dilution.

*Our stock price could become more volatile and your investment could lose value.*

All of the factors discussed in this section could affect our stock price. A significant drop in our stock price could also expose us to the risk of securities class actions lawsuits, which could result in substantial costs and divert management's attention and resources, which could adversely affect our business.

*Our stock is a penny stock*

Our stock is a penny stock. The Securities and Exchange Commission ("SEC") has adopted Rule 15g-9 which generally defines "penny stock" to be any equity security that has a market price (as defined in Rule 15g-9) less than $5.00 per share or an exercise price of less than $5.00 per share, subject to certain exceptions. Our securities are covered by the penny stock rules, which impose additional sales practice requirements on broker-dealers who sell to persons other than established customers and "accredited investors". The term "accredited investor" refers generally to institutions with assets in excess of $5,000,000 or individuals with a net worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 jointly with their spouse. The penny stock rules require a broker-dealer, prior to a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document in a form prepared by the SEC, which provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction and monthly account statements showing the market value of each penny stock held in the customer's account. The bid and offer quotations, and the broker-dealer and salesperson compensation information, must be given to the customer orally or in writing prior to effecting the transaction and must be given to the customer in writing before or with the customer's confirmation. In addition, the penny stock rules require that prior to a transaction in a penny stock not otherwise exempt from these rules; the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. These disclosure requirements may have the effect of reducing the level of trading activity in the secondary market for the stock that is subject to these penny stock rules. Consequently, these penny stock rules may affect the ability of broker-dealers to trade our securities.

***Sales of our common stock under our resale registration statement and under Rule 144 could reduce the price of our stock.***

An aggregate of 25,067,786 of our outstanding shares of common stock are subject to lock-up agreements. An additional 339,125 of our outstanding shares of common stock are "restricted securities" and are subject to restrictions on transfer. In general, persons holding "restricted securities," must hold their shares for a period of at least six months, may not sell more than 1% of the total issued and outstanding shares in any 90-day period, and must resell the shares in an unsolicited brokerage transaction at the market price. Shares shall be locked up as follows: (i) 2,900,000 shares of common stock held by X, LLC, 10,325,000 shares of common stock held by Gray Mars Venus Trust, Arizona 2015, 2,844,945 shares of common stock controlled by David Haley, 2,758,824 shares of common stock held by James Malackowiski, 2,018,750 shares of common stock held by John O'Hurley and 1,654,412 shares held by Acuitas Group Holdings, LLC, until May 13, 2020; and (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding warrants held by Bellridge Capital, L.P. for 60 days; (iii) 400,000 shares of common stock held by Bellridge Capital, L.P. for 30 days and (iv) an additional 2,165,855 shares of common stock held by other stockholders for periods ranging from 47 days to six months; provided, however, certain shares may not be subject to a lock up period in the event that such shares are sold at certain minimum prices. However, Rule 144 will only be available for resale in the 90 days after the Company becomes subject to the ongoing SEC reporting requirements. The Company may voluntarily file current reports on Form 8-K. The availability for sale of substantial amounts of common stock under Rule 144 could reduce prevailing market prices for our securities. The registration statement to which this Report relates also registers the potential resale by certain selling stockholders of an aggregate amount up to 1,650,000 shares of our common stock consisting of up to (i) 150,000 shares of common stock and (ii) 1,500,000 shares of common stock issuable upon exercise of outstanding Bellridge Capital Warrant.

***Our failure to maintain effective internal controls over financial reporting could have an adverse impact on us.***

We are required to establish and maintain appropriate internal controls over financial reporting. Failure to establish those controls, or any failure of those controls once established, could adversely impact our public disclosures regarding our business, financial condition or results of operations. In addition, management's assessment of internal controls over financial reporting may identify weaknesses and conditions that need to be addressed in our internal controls over financial reporting or other matters that may raise concerns for investors. Any actual or perceived weaknesses and conditions that need to be addressed in our internal control over financial reporting, disclosure of management's assessment of our internal controls over financial reporting or disclosure of our public accounting firm's attestation to or report on management's assessment of our internal controls over financial reporting may have an adverse impact on the price of our common stock.

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints and the benefit of controls must be relative to their costs. Because of the inherent limitations in all control systems, no system of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Further, controls can be circumvented by individual acts of some persons, by collusion of two or more persons, or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, a control may become inadequate because of changes in conditions or the degree of compliance with policies or procedures may deteriorate. Because of inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected.

At present, we believe that we have effective internal controls in place. However, our management, including our Chief Executive Officer, cannot guarantee that our internal controls and disclosure controls that we have in place will prevent all possible errors, mistakes or all fraud.

***Our financial controls and procedures may not be sufficient to ensure timely and reliable reporting of financial information, which, as a public company, could materially harm our stock price.***

We require significant financial resources to maintain our public reporting status. We cannot assure you we will be able to maintain adequate resources to ensure that we will not have any future material weakness in our system of internal controls. The effectiveness of our controls and procedures may in the future be limited by a variety of factors including:

- faulty human judgment and simple errors, omissions or mistakes;

- fraudulent action of an individual or collusion of two or more people;

- inappropriate management override of procedures; and

- the possibility that any enhancements to controls and procedures may still not be adequate to assure timely and accurate financial information.

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Despite these controls, because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance of achieving their control objectives. Furthermore, smaller reporting companies like us face additional limitations. Smaller reporting companies employ fewer individuals and can find it difficult to employ resources for complicated transactions and effective risk management. Additionally, smaller reporting companies tend to utilize general accounting software packages that lack a rigorous set of software controls.

If we fail to have effective controls and procedures for financial reporting in place, we could be unable to provide timely and accurate financial information and be subject to investigation by the Securities and Exchange Commission and civil or criminal sanctions.

***We must implement additional and expensive procedures and controls in order to grow our business and organization and to satisfy new reporting requirements, which will increase our costs and require additional management resources.***

Upon becoming a fully public reporting company, we will be required to comply with the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and the related rules and regulations of the SEC, including the requirements that we maintain disclosure controls and procedures and adequate internal control over financial reporting. In the future, if our securities are listed on a national exchange, we may also be required to comply with marketplace rules and heightened corporate governance standards. Compliance with the Sarbanes-Oxley Act and other SEC and national exchange requirements will increase our costs and require additional management resources. We recently have begun upgrading our procedures and controls and will need to continue to implement additional procedures and controls as we grow our business and organization and to satisfy new reporting requirements. If we are unable to complete the required assessment as to the adequacy of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act or if we fail to maintain internal control over financial reporting, our ability to produce timely, accurate and reliable periodic financial statements could be impaired.

If we do not maintain adequate internal control over financial reporting, investors could lose confidence in the accuracy of our periodic reports filed under the Exchange Act. Additionally, our ability to obtain additional financing could be impaired or a lack of investor confidence in the reliability and accuracy of our public reporting could cause our stock price to decline.

*We are an "emerging growth company" under the JOBS Act of 2012 and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our common stock less attractive to investors.*

We are an "emerging growth company", as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 (the "Securities Act") for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We are choosing to take advantage of the extended transition period for complying with new or revised accounting standards.

We will remain an "emerging growth company" until the last day of the fiscal year following the fifth anniversary of the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act, although we will lose that status sooner if our revenues exceed $1.07 billion, if we issue more than $1 billion in non-convertible debt in a three year period, or if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last day of our most recently completed second fiscal quarter.

*Our status as an "emerging growth company" under the JOBS Act may make it more difficult to raise capital as and when we need it.*

Because of the exemptions from various reporting requirements provided to us as an "emerging growth company" and because we will have an extended transition period for complying with new or revised financial accounting standards, we may be less attractive to investors and it may be difficult for us to raise additional capital as and when we need it. Investors may be unable to compare our business with other companies in our industry if they believe that our financial accounting is not as transparent as other companies in our industry. If we are unable to raise additional capital as and when we need it, our financial condition and results of operations may be materially and adversely affected.

*We have not paid dividends in the past and do not expect to pay dividends in the future, and any return on investment may be limited to the value of our stock.*

We have never paid cash dividends on our common stock and do not anticipate paying cash dividends on our common stock in the foreseeable future. We currently intend to retain any future earnings to support the development of our business and do not anticipate paying cash dividends in the foreseeable future. Our payment of any future dividends will be at the discretion of our board of directors after taking into account various factors, including, but not limited to, our financial condition, operating results, cash needs, growth plans and the terms of any credit agreements that we may be a party to at the time. In addition, our ability to pay dividends on our common stock may be limited by Delaware state law. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize a return on their investment. Investors seeking cash dividends should not purchase our common stock.

***Our Amended and Restated Bylaws provide that a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) will be the sole and exclusive forum for certain disputes which could limit stockholders' ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers or employees.***

Our Amended and Restated Bylaws provide that unless the Company consents in writing to the selection of an alternative forum, a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for claims with respect to (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim against the Company or any director or officer or other employee of the Company arising pursuant to any provision of the Delaware General Corporation Law or the Certificate of Incorporation or the Amended and Restated Bylaws of the Company (in each case, as they may be amended from time to time), or (iv) any action asserting a claim against the Company or any director or officer or other employee of the Company governed by the internal affairs doctrine. This exclusive forum provision would not apply to suits brought to enforce any liability or duty created by the Securities Act or the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. To the extent that any such claims may be based upon federal law claims, Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder.

This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company or its directors, officers, other employees or agents, which may discourage such lawsuits against the Company and its directors, officers, other employees and agents. Alternatively, if a court were to find the choice of forum provision contained in our Amended and Restated Bylaws to be inapplicable or unenforceable in an action, the Company may incur additional costs associated with resolving such action in other jurisdictions, which could have a material adverse effect on the Company's business, results of operations, and financial condition.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2. PROPERTIES

We lease and maintain our primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. We also lease and maintain executive offices at 6600 Sunset Blvd., Los Angeles, CA 90028, where the majority of our operations and staff will conduct activities on a daily basis. We do not currently own any real estate.

## ITEM 3. LEGAL PROCEEDINGS

From time to time, the Company may become involved in lawsuits and other legal proceedings that arise in the course of business. Litigation is subject to inherent uncertainties, and it is not possible to predict the outcome of litigation with total confidence. Except as described below, the Company is currently not aware of any legal proceedings or potential claims against it whose outcome would be likely, individually or in the aggregate, to have a material adverse effect on the Company's business, financial condition, operating results, or cash flows.

*Social Reality Inc. v. YayYo, Inc.*

This action was filed on February 11, 2020, in the Superior Court of the State of California for the County of Los Angeles. Plaintiff Social Reality Inc. is a media company that claims to have provided media services to the Company. Plaintiff has sued the Company for breach of contract and related causes of action, arising from its claims that we have failed to pay for past outstanding invoices for services rendered. The plaintiff has also filed a motion for prejudgment attachment which is set for a hearing on April 28, 2020. The Company believes that it has valid defenses to the lawsuit, and expects to file counterclaims that will offset or negate any monies owed to plaintiff; it will vigorously defend both the lawsuit and plaintiff's application for attachment.

*Anthony Davis v. YayYo, Inc., and Ramy El-Batrawi*

This action was filed on March 5, 2020, in the Superior Court of the State of California for the County of Los Angeles. Plaintiff Anthony Davis was hired by the Company as its Chief Executive Officer in or about December 2016. Mr. El-Batrawi is the founder of the Company and our current Chief Executive Officer and director, and was involved, the complaint alleges, in Plaintiff's hiring. As part of his compensation, Mr. Davis claims that he expected to receive stock options in the Company. He has alleged that "after several months of unsuccessfully attempting to persuade the Company's founder to implement certain protocols and procedures" he resigned from his executive officer and director positions, and entered into a written agreement with the Company for services to be rendered as a consultant. Mr. Davis claims that the Company breached its agreement to award him certain stock options and includes a claim for wage and hour violations. The lawsuit also includes a request for declaratory and injunctive relief. He also included a claim under California Unfair Practices Act. The Company denies liability and asserts that it has paid Davis all amounts due to him under the contract. It intends to vigorously defend the lawsuit, by, *inter alia*, removing the case to binding arbitration pursuant to the contract the plaintiff alleges.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

Our common stock is listed on OTC Markets, under the symbol "YAYO".

On November 12, 2019, our common stock began trading on The Nasdaq Capital Market ("Nasdaq") under the symbol "YAYO". On February 10, 2020, the Company announced its intention to voluntarily delist its common stock from Nasdaq, effective on February 20, 2020. Our common stock now trades on the OTC Pink market under the symbol "YAYO." Over-the-counter market quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission, and may not necessarily represent actual transactions.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is VStock Transfer, LLC, 18 Lafayette Place, Woodmere, NY 11598, Phone: +1-212.828.8436, Toll-Free: +1-855-9VSTOCK, Email: info@vstocktransfer.com

**Holders**

As of March 27, 2020, there were approximately 1,079 holders of record of our common stock.

**Restricted Stock**

As of March 27, 2020, we had issued and outstanding 476,125 shares of restricted common stock that may be eligible for sale under Rule 144. 25,067,786 shares of common stock are subject to lock-up agreements described below.

**Warrants**

We have an outstanding warrant issued to Bellridge Capital, L.P. ("Bellridge Capital") to purchase up to 1,500,000 shares of Company common stock at an exercise price of $4.00 per share. (Both the number of shares issuable under this warrant and the exercise price are subject to adjustment in certain circumstances.) This warrant expires in March 2023.

In March 2018, the Company issued to a placement agent warrants to purchase a number of shares of our common stock equal to 8% of the aggregate number of shares placed in the Bellridge Note Offering (as defined below), plus the shares underlying convertible securities placed in the Bellridge Note Offering. These warrants provide the holder with the right to purchase up to 1,500,000 shares of common stock at a price of $4.00 per share, subject to adjustment in certain circumstances as provided therein. These warrants expire in March 2023.

In November 2019, in connection with the Company's initial public offering, the Company issued the underwriters a total of 131,250 warrants to purchase shares of the Company's common stock for $5.00 per share. The warrants expire in November 2024.

See "*Management's Discussion and Analysis of Financial Condition and Results of Operations—Bellridge Capital Transactions*" elsewhere in this Report for more information.

**Options**

*2016 Equity Incentive Plan*

On November 30, 2016, we adopted our 2016 Equity Incentive Plan (the "Plan") to reward and provide incentives to our officers, directors, employees, consultants and other eligible participants. We have set aside options to purchase up to 10,000,000 shares of common stock for issuance under the 2016 Plan, which may be granted in the form of either incentive stock options or non-qualified stock options. Our Board of Directors administers the 2016 Plan and has the authority: (i) to select the 2016 Plan recipients, the time or times at which awards may be granted, the number of shares to be subject to each option awarded, the vesting schedule of the options and (ii) to amend the stock option Plan to reward and provide incentives to its officers, directors, employees, consultants and other eligible participants. As of the date of this Report, 916,000 options have been granted under the 2016 Plan, of which 466,000 options are vested and exercisable. 100% of the outstanding options have been granted to former officers and directors of the Company. The Company expects to continue to issue options as an inducement for managerial and qualified personnel to remain with and to join the Company.

**Securities Authorized for Issuance under Equity Compensation Plans**

The types of awards permitted under the 2016 Plan include qualified incentive stock options and non-qualified stock options. Each option shall be exercisable at such times and subject to such terms and conditions as the Board may specify.

The Board of Directors has the power to amend, suspend or terminate the 2016 Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of our common stock reserved for issuance pursuant to incentive awards or reduces the minimum exercise price for options or exchange of options for other incentive awards, unless such change is authorized by our stockholders within one year.

The following table provides information as of December 31, 2019, with respect to compensation plans (including individual compensation arrangements) under which equity securities of the Company are authorized for issuance.

**Equity Compensation Plan Information**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders - 2016 Plan | 300,000 | $ 8.00 | 9,250,000 |
| Equity compensation plans not approved by security holders | - | - | - |
| Total | 300,000 | $ 8.00 | 9,250,000 |

As of December 31, 2019, options to purchase up to 9,250,000 shares of common stock have been granted under the 2016 Plan, of which options for 450,000 shares have expired and options for 300,000 shares are vested and exercisable.

As of the date of this Report, there are outstanding options to purchase 466,000 shares of common stock with a weighted-average exercise price $6.58 cents, with terms expiring between December 2020 and January 2024.

**Recent Sales of Unregistered Securities**

See "Executive Compensation—Employment Agreements" below. The common stock options described therein were issued pursuant to the exemption from the registration requirements of the Securities Act provided by Section 4(a)(2) thereof and/or Regulation D thereunder.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**Dividends**

We plan to retain any earnings for the foreseeable future for our operations. We have never paid any cash dividends on our stock and do not anticipate paying any cash dividends in the foreseeable future. Any future determination to pay cash dividends will be at the discretion of our Board of Directors and will depend on our financial condition, operating results, capital requirements and such other factors as our Board of Directors deems relevant.

**Use of Proceeds**

Our Registration Statement on Form S-1, SEC file number 333-224549, was declared effective by the SEC on November 12, 2019, pursuant to which we offered for sale to the public (i) by us in an underwritten public offering, 2,625,000 newly issued shares of our common stock at an offering price of $4.00 per share, for total gross proceeds to us of $10,500,000, before deducting underwriting discounts and commissions and other offering expenses, and (ii) by a selling stockholder, up to (a) 150,000 outstanding shares of common stock, and (b) 1,500,000 shares of common stock issuable upon exercise of common stock purchase warrants, from time to time at market prices prevailing at the time of sale or at negotiated prices, from which we have not received and will not receive any proceeds.

The sale of 2,625,000 shares by us was completed on November 15, 2019. Aegis Capital Corp. and WestPark Capital, Inc., were the underwriters.

We incurred expenses in connection with the issuance and distribution of the shares registered of $840,000 for underwriting discounts and commissions, $105,000 for expenses of the underwriters and $125,000 for other expenses, for total offering expenses of

$1,070,000. Such payments were not direct or indirect payments to our directors, officers or their associates, to persons owning 10% percent or more of our common stock, or to any of our affiliates.

The net offering proceeds to us after deducting the total expenses described above were $9,430,000. Such net proceeds were applies as follows:

| | | |
|---|---|---|
| Repayment of notes payable and accrued interest | $ | 3,515,520 |
| Working capital | | 2,793,962 |
| Director and officer insurance premiums and escrow account | | 922,400 |
| Vehicles | | 664,158 |
| Vehicle insurance | | 622,323 |
| Professional fees | | 534,363 |
| Advertising and media | | 377,274 |

Such payments were not direct or indirect payments to our directors, officers or their associates, to persons owning 10% percent or more of our common stock, or to any of our affiliates.

## ITEM 6. SELECTED FINANCIAL DATA

Smaller reporting companies are not required to provide the information required by this item.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This discussion contains forward-looking statements reflecting our current expectations that involve risks and uncertainties. Actual results may differ materially from those discussed in these forward-looking statements due to a number of factors, including those set forth in the section entitled "**Risk Factors**" and elsewhere herein. The information and financial data discussed below is only a summary and should be read in conjunction with the historical financial statements and related notes of YayYo, Inc. contained elsewhere in this document. YayYo's current consolidated financial position and consolidated results of operations; are not necessarily indicative of the Company's future performance. See "Cautionary Note Regarding Forward Looking Statements" above for a discussion of forward-looking statements and the significance of such statements in the context of this document.

**Our Corporate History and Background**

The Company was formed on June 21, 2016 under the name "YayYo, LLC," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities. The Company now operates as a "C" corporation formed under the laws of the State of Delaware.

The Company is a holding company operating through its wholly-owned subsidiaries, including Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars") and Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare").

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry away from the development of the Metasearch App.

As of the date of this Report, the Company's operating business divisions include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

On March 16, 2018, we closed our Regulation A+ offering under Regulation A of the Securities Act, which was qualified by the SEC on March 15, 2017. We sold a total of 365,306 shares of our common stock. We received cash proceeds of $1.8 million, net of commissions and other costs associated with the gross offering proceeds or payable by us.

On November 15, 2019, the Company closed its initial public offering of 2,625,000 common shares at $4.00 per share, for gross proceeds, before underwriting discounts and commissions and expenses, of $10.5 million. and the shares became listed on the Nasdaq Capital Market under the symbol "YAYO".

On February 10, 2020, the Company notified Nasdaq of its intent to voluntarily delist its Common Stock from Nasdaq. In connection therewith, the Company notified Nasdaq of the Company's intention to file a Form 25 with the SEC on or about February 20, 2020. The Company elected to effect the voluntary delisting of its common stock after discussions with Nasdaq's staff, and based on the determination of the Company's board of directors that voluntarily delisting the Common Stock from Nasdaq was in the best interests of the Company and its stockholders. Following delisting from Nasdaq, the Company's Common Stock now trades on the OTC Pink Market under the trading symbol, "YAYO."

### *Impact of COVID-19 on our business*

In December 2019, a novel strain of coronavirus surfaced in China, which has and is continuing to spread throughout the world, including the United States. On January 30, 2020, the World Health Organization declared the outbreak of the coronavirus disease (COVID-19) a "Public Health Emergency of International Concern," and on March 11, 2020, the World Health Organization characterized the outbreak as a "pandemic." The governors of New York, California and several other states, as well as mayors on many cities, have ordered their residents to cease traveling to non-essential jobs and to curtail all unnecessary travel, and to stay in their homes as much as possible in the coming weeks, as the nation confronts the escalating coronavirus outbreak, and similar restrictions have been recommended by the federal authorities and authorities in many other states and cities. Since the beginning of 2020 and the spread of COVID-19, rideshare companies have increasingly been negatively impacted. According to its recent investor update call, Uber's gross bookings in Seattle are down by 60-70%, and Uber assumes similar declines in other big cities hit by COVID-19. As Americans practice social distancing and self-isolation, Uber, Lyft, and other rideshare companies have seen a steep decline in ridership and revenue, as a result. Given that rideshare drivers are both at risk themselves and of risk to the public, and in addition to decreased demand overall, less people are even still driving. Over the past few weeks, the Company has seen a decline in revenue of approximately 20% and a negative impact on the cash flows of the business. The Company is not able to predict the ultimate impact that COVID-19 will have on its business; however, if the current economic conditions continue, the Company will be forced to significantly scale back its business operations and its growth plans, and could ultimately have a significant negative impact on the Company. We cannot at this time estimate the long term effect of this unprecedented situation on the rideshare market in general or our Company in particular.

### Factors Affecting Our Performance

We believe that the growth of our business and our future success are dependent upon many factors, including our products, services and market leadership, and the success of our sales and marketing efforts, our expansion strategy, our investments for scale and growth. While each of these areas presents significant opportunities for us, they also pose important challenges that we must successfully address in order to sustain the growth of our business and improve our results of operations. The investments that we make in these areas may not result in increased revenue or the growth of our business. Accordingly, these investments may delay or otherwise impair our ability to achieve profitability. The timing of our future profitability will depend upon many variables, including the success of our growth strategies and the timing and size of investments and expenditures that we choose to undertake, as well as market growth and other factors that are not within our control. We have not yet determined when we expect to achieve profitability.

***Product and Market Leadership.*** We are committed to delivering market-leading products and services in the ridesharing economy to continue to build and maintain credibility with the growing customer base. We believe we must expand our product, services and market leadership position and strength of our brand to drive further revenue growth. We intend to continue to invest in the capabilities of our business segments and marketing activities to maintain our strong position in the ridesharing economy. Our results of operations may fluctuate as we make these investments to drive increased customer adoption and usage.

***Sales and Marketing.*** In order to maintain our efficient customer acquisition, we must maintain and expand our operating business segments, customer outreach and effectively generate additional sales to enterprises and customers across the United States. Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business, Rideshare Platform and diversify our equipment rental fleet with a broader mix of vehicles to increase in the range of customer options and markets we serve. In addition, we seek to grow our Rideshare business which seeks to connect the owners and/or operators of standard passenger vehicles to existing or prospective ridesharing drivers. We will continue to offer a comprehensive equipment rental fleet to maintain our market leadership. We plan to expand our footprint in North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business; and (iii) to continue to reconfigure existing locations with fleet and expertise tailored to local markets. Our footprint expansion will include locations served under our Rideshare Platform and Fleet Management business to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

***Expansion Strategy.*** We are focused on expanding our existing customers' use of our products, services and Rideshare Platform. We believe that there is a significant opportunity to drive additional sales to existing customers, and expect to invest in sales, marketing and customer support to achieve additional revenue growth from existing customers. We believe that the large numbers of drivers and fleet operators that we do and will do business with, create a "Network Effect" that enables us to scale the business, increase diversification and revenue and expand our strength as a potential market leader.

***Investments for Scale.*** As our business grows and as we continue our Rideshare Platform optimization efforts, we expect to realize cost savings through economies of scale. We manage our Fleet Management business segment to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment. As a result, we expect our gross margin to fluctuate from period to period.

**<u>Consolidated Results of Operations—Year Ended December 31, 2019, Compared to Year Ended December 31, 2018.</u>**

*Principles of consolidation*

The consolidated financial statements include the accounts of the Company, its wholly owned subsidiaries Distinct Cars, LLC, a Delaware limited liability company ("<u>Distinct Cars</u>"), Savy LLC, a Delaware limited liability company ("<u>Savy</u>"), Rideyayyo LLC, a Delaware limited liability company ("<u>Rideyayyo</u>") and Rideshare Car Rentals LLC, a Delaware limited liability company ("<u>Rideshare</u>"). Savy and Rideyayyo have not had operations to date.

**Total Revenues**.

Revenue for the year ended December 31, 2019 was $6,914,910, an increase of $3,625,432 or 110.2% compared to revenue for the year ended December 31, 2018 of $3,289,478. The increase is due to us increasing our rental fleet over the comparable periods. During the year ended December 31, 2019, the average weekly rental income per vehicle placed in service was $335 compared to $302 for the same period in 2018.

From June 21, 2016 (inception) to December 31, 2016, the Company was a pre-revenue development stage company purposed to commercialize the ridesharing industry through the development and distribution of our planned meta-search ridesharing mobile App. The Company generated no revenues from the Company's inception on June 21, 2016 until October 31, 2016. As of the date of this Prospectus, the Company's operating business segments include (i) an online rideshare vehicle booking platform to service the ridesharing economy through the Company's wholly-owned subsidiary Rideshare (the "<u>Rideshare Platform</u>"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through the Company's wholly-owned subsidiary Distinct Cars ("<u>Fleet Management</u>").

**Cost of Revenues**.

The principal components of costs of revenue are depreciation of the vehicles, vehicle insurance and maintenance.

Cost of revenues for the year ended December 31, 2019 were $4,673,870, an increase of $2,299,473 or 96.8% compared to cost of revenues for the year ended December 31, 2018 of $2,374,397. The increase is due to the increase in revenue as noted above. For the year ended December 31, 2019 and 2018 our cost of revenue was 67.6% and 72.2% of our revenue, respectively.

**General and Administrative Expenses**.

General and administrative expenses for the year ended December 31, 2019 were $4,023,921, representing a decrease of $2,560,330 or 38.9% over the year ended December 31, 2018 of $6,584,251. The decrease is principally due to lower stock compensation expense of $4,364,468 for the year ended December 31, 2018 compared to $0 for the same period in 2019; offset by higher payroll costs as we hired additional personnel for our expanding operations and higher management salaries; and higher occupancy costs.

**Selling and Marketing Expenses**.

Selling and marketing expenses for the year ended December 31, 2019 were $765,441, representing an increase of $282,630 or 58.5% over the year ended December 31, 2018 of $482,811. The increase is due to an increase in advertising our rentals to Uber and Lyft drivers.

**Impairment of leased assets**

Impairment of leased assets for the year ended December 31, 2019 was $0 compared to $732,000 for the year ended December 31, 2018. The value of the leased assets was initially determined as the sum of the lease liability plus the up-front consideration of 298,500 shares of the Company's common stock (valued at $2,388,000) paid to the lessor during the year ended December 31, 2018.

**Loss on the settlement of debt**

Loss on the settlement of debt for the year ended December 31, 2019 was $252,900 as compared to $0 for the same period in 2018. During the year ended December 31, 2019, we settled outstanding debt of $421,500 with 84,300 shares of common stock valued at $674,000.

**Total Operating Expenses**

Total operating expenses for the year ended December 31, 2019 were $5,055,762, representing a decrease of $4,408,999 or 46.6% compared to the year ended December 31, 2018 of $9,464,761. The decrease is due to the reasons described above.

**Interest expense, net**

Interest and financing expenses for the year ended December 31, 2019 were $1,115,499 compared to $4,639,442 for the year ended December 31, 2018. The significant decrease in interest expense and financing costs is a result of amortization of debt discount. In September 2018, the Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560. The decrease in interest and financing cost described above is offset by an increase in interest expense for the year ended December 31, 2019 due to an increase in outstanding debt.

**Net Loss**

The net loss for the year ended December 31, 2019 was $3,930,221, representing a decrease of $9,258,901 or 70.2% compared to the year ended December 31, 2018 of $13,189,122. The decrease is due to the reasons described above.

**Liquidity, Capital Resources and Plan of Operations**

*Current Assets, Liabilities and Working Capital*

***Initial Public Offering.*** On November 15, 2019, we closed our initial public offering of common stock registered on an S-1 Registration Statement under the Securities Act, which was declared effective on November 13, 2019. We sold a total of 2,625,000 common shares at a price of $4.00 per share. Total gross proceeds from the offering were $10,500,000, before deducting underwriting discounts and commissions and other offering expenses. The shares are listed on the Nasdaq Capital Market under the symbol "YAYO".

***Current Assets, Liabilities and Working Capital.*** At December 31, 2019, the Company's current assets totaled $2,098,660, current liabilities totaled $2,655,055, and working capital was a deficit of $556,395. At December 31, 2018, the Company's current assets totaled $386,344, current liabilities totaled $5,394,073, and working capital was a deficit of $5,007,729.

Regarding current liabilities, the amounts categorized as accounts payable and accrued expenses totaled $951,231 and 1,213,452 as of December 31, 2019 and 2018, respectively, a decrease of $262,221 or 21.6%.

Since inception, our principal sources of operating funds have been proceeds from equity financing including the sale of our common stock to initial investors known to management and principal shareholders of the Company. We do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. If the Company is unable to raise sufficient additional funds, it will have to execute a slower than planned growth path, reduce overhead and scale back its business plan until sufficient additional capital is raised to support further operational expansion and growth. As of December 31, 2019, the Company had $1,256,429 in cash. The Company used $3,416,223 of cash for operating activities for the year ended December 31, 2019. The Company currently has cash on hand of approximately $150,000 and is seeking to raise additional capital. If the Company is not successful in raising additional capital it will be forced to significantly scale back its business operations and it growth plans. In addition, the COVID-19 virus and the related impact it is having on the U.S. economy is currently having a negative impact on the cash flows of our business.

*Capital Expenditures*

During the year ended December 31, 2019, the Company had capital expenditures of $1,159,470 in leased vehicles and purchased an additional of $225,000 of vehicles. At December 31, 2019, most of the Company's vehicles were finance with leases. At December 31, 2019 the Company had $6,284,211 of rental vehicles, net of accumulated depreciation in the amount of $1,547,164, totaling $4,737,047 in net rental vehicles. The Company's rental vehicles are depreciated over their estimated useful life of five years. The lease terms for those rental vehicles that are leased are generally for three years and the Company has the right to purchase the leased assets for $1 each at the end of the lease terms.

During the year ended December 31, 2018, the Company had capital expenditures in the amount of $3,703,514. $2,840 in computer equipment and $3,700,674 in Rental vehicles. At December 31, 2018, all of the Company's rental vehicles were leased and, net of accumulated depreciation in the amount of $546,632 for fiscal year 2018, totaled $5,115,117 in net rental vehicles.

45

### *Statement of Cash Flows*

*Cash Flows from Operating Activities*

Net cash used in operating activities for the year ended December 31, 2019 totaled $3,416,223, which was an increase of $2,992,067 or approximately 705% from the net cash used in operating activities of $424,156 for the same period in 2018. The increase is principally due to lower non-cash expense items in 2019 and an increase in prepared expenses and other assets.

*Cash Flows from Investing Activities.*

Net cash used in investing activities for the year ended December 31, 2019 totaled $389,080, which was an increase of $386,240 or 136% from the net cash used in investing activities of $2,840 for the same period in 2018. The increase is due to the purchase of new vehicles and the deposit on new vehicles.

*Cash Flows from Financing Activities*

Net cash provided by financing activities for the year ended December 31, 2019 totaled $4,784,288, which was an increase of $4,388,586 from the net cash provided by financing activities of $395,702 for the same period in 2018. The increase is principally due to the proceeds of $10,500,000 from the Company's IPO offset by the payment of offering costs and repayment of notes payable

### *Current Plan of Operations*

Our plan of operations is currently focused on the development of our operating business segments: (i) our Rideshare Platform offered through the Company's wholly-owned subsidiary Rideshare, and (ii) our Fleet Management business, made commercially available through the Company's wholly-owned subsidiary Distinct Cars. We expect to incur substantial expenditures in the foreseeable future for the potential operations of our business segments and ongoing internal research and development. At this time, we cannot reliably estimate the nature, timing or aggregate amount of such costs. Our Rideshare Platform will require extensive technical evaluation, potential regulatory review and approval, significant marketing efforts and substantial investment before it or any successors could provide us with any revenue. Further, we intend to continue to build our corporate and operational infrastructure and to build interest in our product and service offerings.

As noted above, the continuation of our current plan of operations requires us to raise significant additional capital immediately. If we are successful in raising capital, we believe that the Company will have sufficient cash resources to fund its plan of operations. The cash flow from our current vehicle leasing business and capital resources are sufficient for us to continue our current operations, but for us to fully execute our business plan we will require significant additional capital.

We continually evaluate our plan of operations discussed above to determine the manner in which we can most effectively utilize our limited cash resources. The timing of completion of any aspect of our plan of operations is highly dependent upon the availability of cash to implement that aspect of the plan and other factors beyond our control. There is no assurance that we will successfully obtain the required capital or revenues, or, if obtained, that the amounts will be sufficient to fund our ongoing operations. The inability to secure additional capital would have a material adverse effect on us, including the possibility that we would have to sell or forego a portion or all of our assets or cease operations. If we discontinue our operations, we will not have sufficient funds to pay any amounts to our stockholders.

Even if we raise additional capital in the near future, if our operating business segments fail to achieve anticipated financial results, our ability to raise additional capital in the future to fund our operating business segments would likely be seriously impaired. If in the future we are not able to demonstrate favorable financial results or projections from our operating business segments, we will not be able to raise the capital we need to continue our then current business operations and business activities, and we will likely not have sufficient liquidity or cash resources to continue operating.

46

Because our working capital requirements depend upon numerous factors there can be no assurance that our current cash resources will be sufficient to fund our operations. At present, we have no committed external sources of capital, and do not expect any significant product revenues for the foreseeable future. Thus, we will require immediate additional financing to fund future operations. There can be no assurance, however, that we will be able to obtain funds on acceptable terms, if at all.

**Contractual Obligations, Commitments and Contingencies**

During fiscal years 2017, 2018 and 2019, the Company entered into a series of monthly vehicle leasing agreements with ACME Auto Leasing, LMP Financial Services and United Mile Fleet, each with an approximate lease term of 12 to 36 months. As of December 31, 2019, 2018 and 2017, the Company had total lease obligations in the amount of $2,400,565, $3,790,147 and $1,593,291, respectively. The Company owes monthly payments under each Lease Agreement ranging from approximately $342 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to and secured by a grant of a purchase money security interest on each leased vehicle.

During fiscal years 2019 and 2018 and 2017, we leased and maintained primary offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210 and 6600 Sunset Blvd., Los Angeles, CA 90028, the latter being the location where the majority of our operations and staff conduct activities on a daily basis. We do not currently own any real property.

*Financings and Securities Offerings*

*YayYo, Inc., Equity Offerings*

In December 2016, we filed an offering statement pursuant to Regulation A of the Securities Act, which was qualified by the SEC on March 17, 2017. We offered up to a maximum of 6,250,000 shares of common stock on a "best efforts" basis, at a price of $8.00 per share. On March 16, 2018, we closed the Regulation A offering, after issuing 365,306 shares of common stock for proceeds of approximately $1.8 million net of offering expenses (the "Regulation A+ Offering").

During the year ended December 31, 2018, the Company sold 46,330 shares of common stock to two investors for cash proceeds of $307,924.

During the year ended from December 31, 2017, the Company sold 371,351 shares of common stock to investors for gross cash proceeds of $2,484,199 of which 326,126 shares and $2,303,299 of cash proceeds were related to the Company's Regulation A offering. The Company incurred $814,442 of offering cost related to the sale of common stock which consisted principally of legal fees and costs associated with soliciting the sale of common stock directly to the Regulation A+ Offering investors.

On July 15, 2017, the Company and ACME Auto Leasing entered into an agreement pursuant to which the Company agreed to issue additional consideration to ACME Auto Leasing in the form of a restricted stock grant in the amount of 100,000 shares of common stock, in exchange for certain terms to be provided by ACME Auto Leasing under all lease agreements entered into between it and the Company.

From June 21, 2016 (inception) to December 31, 2016, the Company raised an additional $175,400 from the funds subscribed to under SAFE agreements with 28 unaffiliated investors. In addition, between December 2016 and January 17, 2016, we received subscriptions for $175,400 of our SAFE Shares from 28 investors in our Rule 506(b) private placement under Regulation D of the Securities Act, that, by their terms, automatically convert into 43,850 shares of our common stock as of the filing of this Report (at a conversion price of $4.00 per share). We terminated such private placement on January 17, 2017. On March 17, 2017 our SAFE Shares were automatically converted into 43,850 shares of our common stock.

47

*Bellridge Capital Transactions*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with Bellridge Capital, L.P. ( "Bellridge Capital" or the "Lender"), an "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Bellridge Note Offering"), pursuant to which the Lender purchased:

- a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Bellridge Note");

- warrants to acquire up to an aggregate of 1,500,000 shares (the "Warrant Shares"), with an exercise price of $4.00 per share of common stock of the Company (both the number of Warrant Shares and the exercise price subject to adjustment as provided below) (the "Warrants" or the "Bellridge Capital Warrant"); and

- 150,000 commitment shares of common stock, par value $0.000001 per share, of the Company (the "Commitment Shares").

In consideration for the Bellridge Note, Warrant Shares and Commitment Shares, the Lender paid an aggregate purchase price of $6,000,000 to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below).

The principal balance of $6,000,000 on the Bellridge Note bore interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Bellridge Note. Further, the Company paid $178,228 of issuance costs associated with the Bellridge Note. The relative fair value of the 150,000 Commitment Shares of common stock was $378,916 and the relative fair value of the 1,500,000 Warrant Shares was $3,726,506 and both were recorded as a discount on the Bellridge Note and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 was amortized over the term of the Bellridge Note.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable was due the earlier of November 30, 2019, as amended, or the closing of an offering of at least $3,000,000, and was repaid in full from the proceeds of our initial public offering in November 2019. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

*Distinct Cars, LLC*

Distinct Cars, LLC has completed a debt round of financing pursuant to which Distinct Cars raised aggregate gross proceeds in the amount of $319,667 from 38 accredited investors in exchange for senior secured promissory notes issued by Distinct Cars (each a "Distinct Cars Note" and collectively, the "Distinct Cars Notes"). The maturity date under the Distinct Cars Notes is 36 months the date of issuance (the "DCN Maturity Date") ranging from August 9, 2020 to May 23, 2021. The principal amount under the Distinct Cars Notes ranges from a minimum amount of $5,000 per Distinct Cars Note up to $20,000 per Distinct Cars Note. The Distinct Cars Notes accrue interest at a rate of 8% per annum with interest due and payable upon the DCN Maturity Date. The principal amount and any unpaid and accrued interest thereunder is due and payable in twelve quarterly installments commencing upon January 1, 2018. The Distinct Cars Notes are secured by a senior secured priority lien in the equity of the fleet of leased automobiles acquired under the Lease Agreements described above subject to subordination in priority lien status to the purchase money security interest held by the lessor under the Lease Agreements. In addition to the total amount of principal and interest owing under the Distinct Cars Note, upon execution of the Distinct Cars Note and placement of funds the holder received a stock grant (the "Stock Grant") of YayYo, Inc., common stock (the "Parent Shares") in an amount equal to 100% of the principal sum as calculated by a price of $4.00 per share with 30% coverage. The Stock Grant is offered pursuant to Rule 506(b) of Regulation D and Section 4(a)(2) of the Securities Act of 1933.

**Off-Balance Sheet Arrangements**

The Company's only derivative financial instrument was an embedded conversion feature associated with convertible notes payable due to certain provisions that allow for a change in the conversion price based on a percentage of the Company's stock price at the date of conversion. As of December 31, 2017, the convertible note has been repaid and there is no derivative financial instrument.

*Quantitative and Qualitative Disclosures about Market Risk*

In the ordinary course of our business, we are not exposed to market risk of the sort that may arise from changes in interest rates or foreign currency exchange rates, or that may otherwise arise from transactions in derivatives.

*Critical Accounting Policies and Estimates*

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. Preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable. In many instances, we could have reasonably used different accounting estimates and in other instances changes in the accounting estimates are reasonably likely to occur from period to period. Actual results could differ significantly from our estimates. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving our judgments and estimates.

*Revenue Recognition*

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

We consider a signed contract or other similar documentation reflecting the terms and conditions under which products will be provided to be persuasive evidence of an arrangement. Collectability is assessed based on a number of factors, including payment history and the creditworthiness of a customer. If it is determined that collection is not reasonably assured, revenue is not recognized until collection becomes reasonably assured, which is generally upon receipt of cash.

*Stock-Based Compensation*

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees.

We account for stock-based compensation in accordance with the authoritative guidance on stock compensation. Under the fair value recognition provisions of this guidance, stock-based compensation is measured at the grant date based on the fair value of the award and is recognized as expense, net of estimated forfeitures, over the requisite service period, which is generally the vesting period of the respective award. As a result, we are required to estimate the amount of stock-based compensation we expect to be forfeited based on our historical experience. If actual forfeitures differ significantly from our estimates, stock-based compensation expense and our results of operations could be materially impacted.

For options granted during fiscal year 2016 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.85 and the weighted-average exercise price of such options was $1.00. No options were granted during fiscal 2016 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

For options granted during fiscal year 2017 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $7.54 and the weighted-average exercise price of such options was $8.00. No options were granted during fiscal 2017 where the exercise price was less than the stock price at the date of grant or the exercise price was greater than the stock price at the date of grant.

The fair value of the stock options is being amortized to stock option expense over the vesting period. The Company recorded stock option expense of $904,468 and $1,676,476, respectively, during the year ended December 31, 2018 and the year ended December 31, 2017. As of December 31, 2018, the unamortized stock option expense was $0.

The assumptions used in calculating the fair value of options granted using the Black-Scholes option-pricing model for options granted are as follows:

| | |
|---|---|
| Risk-free interest rate | 1.14% |
| Expected life of the options | 2.08 years |
| Expected volatility | 200% |
| Expected dividend yield | 0% |

**<u>Contingencies</u>**

Certain conditions may exist as of the date the financial statements are issued, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company's management, in consultation with its legal counsel as appropriate, assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company, in consultation with legal counsel, evaluates the perceived merits of any legal proceedings or unasserted claims, as well as the perceived merits of the amount of relief sought or expected to be sought therein. If the assessment of a contingency indicates it is probable that a material loss has been incurred and the amount of the liability can be estimated, then the estimated liability would be accrued in the Company's financial statements. If the assessment indicates a potentially material loss contingency is not probable, but is reasonably possible, or is probable, but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss, if determinable and material, would be disclosed. Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Not required for "smaller reporting companies" under Regulation S-K.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

See "Index to Consolidated Financial Statements" which appears on page F-1 of this Annual Report on Form 10-K.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

We maintain a set of disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) designed to ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in rules and forms adopted by the SEC.

In accordance with Rule 13a-15(b) under the Exchange Act, as of the end of the period covered by this quarterly report on Form 10-Q, an evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to assess the effectiveness of our disclosure controls and procedures as of September 20, 2019. Based upon that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were not effective to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and communicated to our management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure due to a material weakness.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

We do not have sufficient segregation of duties within accounting functions, which is a basic internal control. Due to our size and nature, segregation of all conflicting duties may not always be possible and may not be economically feasible. However, to the extent possible, the initiation of transactions, the custody of assets and the recording of transactions should be performed by separate individuals. Management evaluated the impact of our failure to have segregation of duties on our assessment of our disclosure controls and procedures and has concluded that the control deficiency that resulted represented a material weakness.

To address this material weakness, management performed procedures to ensure that the financial statements balances included herein fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented. In 2020, the Company plans to hire additional accounting and finance staff to address the material weakness identified herein.

### Changes in Internal Controls over Financial Reporting

There were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, at December 31, 2019, such disclosure controls and procedures were effective.

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

**Limitations on the Effectiveness of Controls**

Our disclosure controls and procedures are designed to provide reasonable, not absolute, assurance that the objectives of our disclosure control system are met. Because of inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within a company have been detected. Our Chief Executive Officer and Chief Financial Officer has concluded, based on his evaluation as of the end of the period covered by this Report that our disclosure controls and procedures were effective to provide reasonable assurance that the objectives of our disclosure control system were met.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Company's internal controls over financial reporting that occurred during the fourth quarter of the fiscal year covered by this Annual Report on Form 10-K that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

As required by the SEC rules and regulations for the implementation of Section 404 of the Sarbanes-Oxley Act, our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external reporting purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that:

(1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of our company,

(2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors, and

(3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect errors or misstatements in our consolidated financial statements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree or compliance with the policies or procedures may deteriorate. Management assessed the effectiveness of our internal control over financial reporting at December 31, 2019. In making these assessments, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission COSO (2013 framework). Based on our assessments and those criteria, management determined that we did maintain effective internal control over financial reporting at December 31, 2019.

**ITEM 9B. OTHER INFORMATION**

None.

## PART III

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE**

The following sets forth information about our directors and executive officers as of the date of this Report:

| Name | Age | Position |
| --- | --- | --- |
| Ramy El-Batrawi | 58 | Chief Executive Officer, and Director |
| Kevin F. Pickard | 56 | Chief Financial Officer, Director, and Secretary |
| Laurie DiGiovanni | 59 | Chief Operating Officer |
| Stephen M. Sanchez | 54 | Chairman of the Board and Director |
| Harbant S. Sidhu | 61 | Director |
| Douglas M. Mox | 53 | Director |
| John P. O'Neill | 62 | Director |

**Ramy El-Batrawi** was re-appointed at the Company's Chief Executive Officer in February 2020. Mr. El-Batrawi is a founder of the Company and previously served as its Chief Executive Officer from June 2016 until February 2019 and as a director from June 2016 until September 2019. Mr. El-Batrawi is the founder and sole owner of PDQ Pickup LLC, a moving and logistics company, which he founded in December 2018. Since May 2015, he has been the owner of X, LLC, a private investment firm. Prior thereto, Mr. El-Batrawi was the owner and chief executive officer of Growth Strategy Investments, LLC, a private investment firm.

**Kevin F. Pickard** is the Company's Chief Financial Officer, Director, and Secretary since October 2017. Since 2000, Mr. Pickard has been providing management consulting services through Pickard & Company, CPAs to small and medium-sized companies, included due diligence on potential acquisitions, the preparation of projections and business plans, assistance with restructuring of companies, posturing companies for initial public offerings, review and preparation of filings with the Securities and Exchange Commission. Prior to 2000, Mr. Pickard was a partner of Singer Lewak Greenbaum & Goldstein, LLP, Los Angeles, California, where he co-managed the accounting its securities industry practice group. Mr. Pickard also worked at PricewaterhouseCoopers, LLP (formerly, Coopers & Lybrand, LLP) where he focused on auditing companies in insurance, high-tech and industries. Mr. Pickard holds a Bachelor's of Science in Accounting and a Master of Accountancy from Brigham Young University. Mr. Pickard is currently a licensed Certified Public Accountant in North Carolina, and California. Mr. Pickard's experience in accounting and finance qualify him for a position on our board of directors.

**Laurie DiGiovanni** has served as the Company's Chief Operating Officer since May 2016. In addition, Ms. DiGiovanni served as Chief Executive Officer of the Company from October 4, 2018 to November 17, 2018. Since 2012, Ms. DiGiovanni has held marketing and operating executive positions at Beverly Hills Rent a Car and Executive Transportation pursuant to which Ms. DiGiovanni managed national corporate expansions and activation of transportation industry leading brands and was executive producer for a range of marketing campaigns at auto shows and transportation industry live events. Ms. DiGiovanni manages all business operations of the Company and its subsidiaries including driver training and the Fleet Management business segment. Ms. DiGiovanni is the founder of the Association for Finance and Insurance Professionals (AFIP), an association that has certified tens of thousands for more ethical car buying practices, and mandatory for auto industry employees and implemented in leading global automotive markets. She also played key roles in the launch of many automotive initiatives, including managing new divisions and brands for Beverly Hills Travel and Lifestyle and American Dream Classics; serving as Director of Training for CarsDirect.com; and leading marketing and customer experience campaigns for Barrett-Jackson Car Auction. Ms. DiGiovanni also has direct brand experience within the automotive industry, including project management and training positions with Toyota, Mazda, and Nissan. Ms. DiGiovanni has a Bachelor of Arts degree from California State University, Fullerton.

**Board of Directors**

**Stephen M. Sanchez** has been our Director since January 2020. Mr. Sanchez has over 30 years of experience in the logistics industry, particularly in the design, implementation and operation of last-mile delivery services. Since November 2019, Mr. Sanchez has served as the Chief Executive Officer of PDQ Pickup LLC, a moving and logistics company, or PDQ Pickup. From August 2019 until November 2019, Mr. Sanchez was the Chief Operating Officer of PDQ pickup. PDQ Pickup. From January 2018 until August 2019, Mr. Sanchez was Senior Vice President of Operations and Business Development for Boxbot, Inc., a robotics company focusing on the development and sale of autonomous last-mile delivery vehicles. From November 2015 until January 2018, Mr. Sanchez was Senior Manager of Final Mile Process Engineering for Amazon, Inc. From September 2014 until November 2015, Mr. Sanchez served as Vice President/Director of Supply Chain – Hub and Network Planning, for LaserShip Inc., a regional provider of same-day and next-day delivery services. Mr. Sanchez, who is a Veteran of the U.S. Navy, also has held positions of increasing responsibility with affiliates of DHL International GmbH, as well as with National Express Corporation and United Parcel Service. We believe that Mr. Sanchez is qualified to serve as a director of our company as a result of his extensive leadership experience in logistics and business development.

**Harbant S. Sidhu** serves as a director of the Company. Mr. Sidhu is a design engineer and founder of Advanced Tek Group, Inc. (formerly Magnaspec, Inc.), a private aerospace manufacturing business. Since 2012, Mr. Sidhu has operated Advanced Tek Group, Inc., managing all aspects of the operating business. Mr. Sidhu has experience in personnel management and oversite, aerospace and defense engineering, sales, manufacturing, accounting and operational experience in the aerospace and defense manufacturing industry. Mr. Sidhu has performed unclassified contracting work in components production for Mexico's Department of Defense. Mr. Sidhu graduated as an electrical engineer in 1980 from Punjab University, India. Mr. Sidhu's experience in human resources coupled with his business experience qualifies him to serve on our board of directors.

**Douglas M. Mox** has been our Director since January 2020. Mr. Mox, 53, has extensive experience in financial management and strategic planning, as well as logistics, engineering and operations. Since January 2013, Mr. Mox has been the Chief Operating Officer of Grace Thomas Investment, a private equity firm. Prior thereto, Mr. Mox, who has a B.S. degree in aviation management/logistics, worked as a senior manager at DHL Worldwide Express, an affiliate of DHL International GmbH, and as an industrial engineering manager for United Parcel Service. The Company believes that Mr. Mox is qualified to serve as a director of the Company as a result of his financial expertise and his extensive experience in the private equity and logistics industries.

**John P. O'Neill** has been our Director since January 2020. Mr. O'Neill, 62, is a 45-year veteran of the logistics industry and has worked both in the U.S. and internationally over the course of his career. Since 1990, Mr. O'Neill has been employed by affiliates of DHL International GmbH in positions of increasing responsibility in the U.S. and throughout Asia. Since March 2013, Mr. O'Neill has been the Deputy Managing Director of DHL-Sinotrans International Air Courier, in Beijing. The Company believes that Mr. O'Neill is qualified to serve as a director of the Company as a result of his extensive leadership experience in the logistics industry.

## CORPORATE GOVERNANCE

**Board of Directors**

The Board of Directors oversees our business affairs and monitors the performance of management. In accordance with our corporate governance principles, the Board of Directors does not involve itself in day-to-day operations of the Company. The directors keep themselves informed through discussions with the Chief Executive Officer, other key executives and by reading the reports and other materials that we send them and by participating in Board of Directors and committee meetings.

### *Term of Office*

Directors serve until the next annual meeting and until their successors are elected and qualified, or their earlier resignation, death or removal. Officers are appointed to serve for one year until the meeting of the Board following the annual meeting of shareholders and until their successors have been elected and qualified, or their earlier resignation, death or removal.

*Director Independence*

Our board of directors are composed of a majority of "independent directors" as defined under the rules of Nasdaq. Although we are not listed on Nasdaq or any other exchange, we use the definition of "independence" of Nasdaq to make this determination. Nasdaq Listing Rule 5605(a)(2) provides that an "independent director" is a person other than an officer or employee of the company or any other individual having a relationship which, in the opinion of the Company's Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. The Nasdaq listing rules provide that a director cannot be considered independent if:

- the director is, or at any time during the past three (3) years was, an employee of the company;

- the director or a family member of the director accepted any compensation from the company in excess of $120,000 during any period of twelve (12) consecutive months within the three (3) years preceding the independence determination (subject to certain exemptions, including, among other things, compensation for board or board committee service);

- the director or a family member of the director is a partner in, controlling shareholder of, or an executive officer of an entity to which the company made, or from which the company received, payments in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenue for that year or $200,000, whichever is greater (subject to certain exemptions);

- the director or a family member of the director is employed as an executive officer of an entity where, at any time during the past three (3) years, any of the executive officers of the company served on the compensation committee of such other entity; or

- the director or a family member of the director is a current partner of the company's outside auditor, or at any time during the past three (3) years was a partner or employee of the company's outside auditor, and who worked on the company's audit.

Under such definitions, our Board has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment and affiliations, our Board has determined that Douglas M. Mox, John P. O'Neill, Stephen M. Sanchez and Harbant S. Sidhu are all independent directors of the Company. However, our common stock is not currently quoted or listed on any national exchange or interdealer quotation system with a requirement that a majority of our Board be independent and, therefore, the Company is not subject to any director independence requirements.

**Board Leadership Structure and Risk Oversight**

The Board oversees our business and considers the risks associated with our business strategy and decisions. The Board currently implements its risk oversight function as a whole. Each of the Board committees, as set forth below, will also provide risk oversight in respect of its areas of concentration and reports material risks to the board for further consideration.

**Board of Directors Meetings and Attendance**

During the fiscal year ended December 31, 2019, the Board of Directors held eight meetings. All directors attended the board meetings, with the exception of one director was absent from one of the meetings.

**Code of Ethics**

Our Board plans to adopt a written code of business conduct and ethics ("Code") that applies to our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer or controller, or persons performing similar functions. We intend to post on our website a current copy of the Code and all disclosures that are required by law in regard to any amendments to, or waivers from, any provision of the Code.

**Committees of the Board of Directors**

Our Board has established an audit committee and a compensation committee. Our Board has not yet adopted procedures by which stockholders may recommend nominees to the Board of Directors. The composition and responsibilities of each of the committees of our Board is described below. Members serve on these committees until their resignation or until as otherwise determined by our board of directors.

**Audit Committee**

We have established an audit committee consisting of Douglas M. Mox and John P. O'Neill. The audit committee's duties, which are specified in our Audit Committee Charter, include, but are not limited to:

- reviewing and discussing with management and the independent auditor the annual audited financial statements, and recommending to the board whether the audited financial statements should be included in our annual disclosure report;

- discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of our financial statements;

- discussing with management major risk assessment and risk management policies;

- monitoring the independence of the independent auditor;

- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law;

- reviewing and approving all related-party transactions;

- inquiring and discussing with management our compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by our independent auditor, including the fees and terms of the services to be performed;

- appointing or replacing the independent auditor;

- determining the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies; and

- approving reimbursement of expenses incurred by our management team in identifying potential target businesses.

The audit committee is composed exclusively of "independent directors" who are "financially literate" as defined under the Nasdaq listing standards. The Nasdaq listing standards define "financially literate" as being able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement.

In addition, the committee has, and will continue to have, at least one member who has past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background that results in the individual's financial sophistication.

During the fiscal year ended December 31, 2019, the audit committee held one meeting.

**Compensation Committee**

We have established a compensation committee of the board of directors to consist of Harbant S. Sidhu and Stephen M. Sanchez, each of whom is an independent director. Each member of our compensation committee is also a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act, or Rule 16b-3, and an outside director, as defined pursuant to Section 162(m) of the Code, or Section 162(m). Mr. Sanchez is the chairman of the compensation committee. The compensation committee's duties, which are specified in our Compensation Committee Charter, include, but are not limited to:

- reviews, approves and determines, or makes recommendations to our board of directors regarding, the compensation of our executive officers;

- administers our equity compensation plans;

- reviews and approves, or makes recommendations to our board of directors, regarding incentive compensation and equity compensation plans; and

- establishes and reviews general policies relating to compensation and benefits of our employees.

During the fiscal year ended December 31, 2019, the compensation committee held three meetings.

**Nominating Committee**

We do not currently have a nominating committee. Instead of having such a committee, our Board of Directors historically has searched for and evaluated qualified individuals to become nominees for membership on our Board of Directors. The directors recommend candidates for nomination for election or reelection for each annual meeting of stockholders and, as necessary, to fill vacancies and newly created directorships.
We do not have a policy regarding the consideration of any director candidates which may be recommended by our stockholders, including the minimum qualifications for director candidates, nor has our Board of Directors established a process for identifying and evaluating director nominees. We have not adopted a policy regarding the handling of any potential recommendation of director candidates by our stockholders, including the procedures to be followed. In the event such a proposal is made, all members of our Board will participate in the consideration of director nominees.

**Non-Employee Director Compensation**

Directors do not currently receive compensation for their services on the Board or on ant Board committees.

**Family Relationships**

There are no family relationships among any of our officers or directors.

**Involvement in Certain Legal Proceedings**

To our knowledge, none of our current directors or executive officers has, during the past ten years:

- been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

- had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two years prior to that time;

- been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in any type of business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;

- been found by a court of competent jurisdiction in a civil action or by the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

Except as set forth above and in our discussion below in "Certain Relationships and Related Transactions," none of our directors or executive officers has been involved in any transactions with us or any of our directors, executive officers, affiliates or associates which are required to be disclosed pursuant to the rules and regulations of the SEC.

**Shareholder Communications**

Currently, we do not have a process for security holders to send communications to the board of directors. . To date, no security holders have made any such recommendations.

**Delinquent Section 16(a) Reports**

Based solely upon a review of copies of such forms filed on Forms 3, 4, and 5, and amendments thereto furnished to us, except as noted below, we believe as of the date of this Report that our executive officers, directors and greater than 10 percent beneficial owners have filed on a timely basis all Section 16(a) reports required to be filed during the year ended December 31, 2019.

| Name | Number of Late Reports | Number of Transactions Not Reported on a Timely Basis | Known Failure to File a Required Form |
|---|---|---|---|
| Gray Mars Venus Trust, Arizona | 2 | 2 | No |

## ITEM 11. EXECUTIVE COMPENSATION

The following table provides information regarding the compensation earned for the years ended December 31, 2019 and 2018, for (i) all individuals serving as our principal executive officer or acting in a similar capacity during 2019 ("PEO"), and (ii) our two most highly compensated executive officers other than the PEO who were serving as executive officers at the end of 2019:

| Name/Position | Year | Salary | Bonus | Option Awards | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | | | | | |
| Jonathan Rosen (1) Chief Executive Officer | 2019 | $275,000 | $25,000 | $ | $ | $ | $ | $300,000 |
| | 2018 | 0 | 0 | | | | | 0 |
| Ramy El-Batrawi (2) Chief Executive Officer | 2019 | $167,000 | $ | $ | $ | $ | $ | $167,000 |
| | 2018 | 205,000 | | | | | | 205,000 |
| Kevin F. Pickard Chief Financial Officer, Secretary | 2019 | $125,000 | $ | $ 0 | $ | $ | $ | $125,000 |
| | 2018 | 66,000 | | 904,468 | | | | 970,468 |
| Laurie DiGiovanni (3) Chief Operating Officer | 2019 | $147,250 | $ | $ | $ | $ | $ | $147,250 |
| | 2018 | 120,000 | | | | | | 120,000 |

(1) Mr. Rosen was appointed Chief Executive Officer on February 1, 2019, and served until January 26, 2020.

(2) On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company upon the appointment of Jonathan Rosen as Chief Executive Officer. In addition, Mr. El-Batrawi resigned as our director effective as of September 1, 2019. Mr. El-Batrawi was reappointed as our Chief Executive Officer and a director in February 2020.

(3) Ms. DiGiovanni has served as Chief Operating Officer since May 2016. Ms. DiGiovanni served as Chief Executive Officer from October 4, 2018 to November 17, 2018.

**Bonuses**

Mr. Rosen was paid a bonus of $25,000 upon completion of the Company's initial public offering.

**Employment Agreements**

The Company had entered into an oral agreement with its former Chief Executive Officer, Jonathan Rosen, for an annual salary of $300,000, retroactive to his start date of February 1, 2019. The Company and Mr. Rosen entered into an Executive Employment Agreement on January 10, 2020, pursuant to which Mr. Rosen would serve as Chief Executive Officer of the Company. Pursuant to the agreement, Mr. Bishop was to receive a base annual salary at a rate of $300,000 per annum. Additional performance-based incentive compensation was to be negotiated by the Company and the Mr. Rosen in good faith. Mr. Rosen was also granted an option to purchase up to 500,000 shares of our common stock at a price of $4.00 per share, with 166,000 shares vesting on the date of the agreement and thereafter 13,917 shares vesting in each succeeding month of his employment, except in the 24th month the number of shares to vest would be 13,909. On January 26, 2020, Mr. Rosen resigned from his position as the Company's Chief Executive Officer. Mr. Rosen informed the Board that his resignation was for "Good Reason," as that term is defined in his Executive Employment Agreement. The Company disagrees with Mr. Rosen's characterization of the circumstances surrounding his resignation and does not believe that "Good Reason" existed for Mr. Rosen's resignation.

The Company and Boyd Bishop entered into an Executive Employment Agreement on December 23, 2019, pursuant to which Mr. Bishop would serve as President of the Company effective January 6, 2020. Pursuant to the agreement, Mr. Bishop was to receive a base annual salary at a rate of $350,000 per annum. Mr. Bishop was to receive a signing bonus of $100,000 with $50,000 payable upon

his first day of employment and $50,000 payable on the three-month anniversary of his first day of employment if he was still employed by the Company. Future bonuses, up to the amount of his annual salary, were to be based on the number of vehicles rented, location openings and other metrics. The fiscal year 2020 bonus was to be a minimum of $40,000 for each 1,000 additional cars placed in service during 2020 over the number of cars in service on December 31, 2019, and other criteria as mutually established by the executive and the Board in good faith within 180 days after the effective date of the agreement. Mr. Bishop was also granted an option to purchase up to 1,000,000 shares of our common stock at a price to be determined by the Board within 30 days of the execution of the Agreement. The 1,000,000 options were to vest upon the following schedule: (a) 250,000 shares at the rate of 1/60[th] per day during the 60 days following the date of the agreement, and (b) 22,058 shares on each subsequent monthly anniversary of the date of the agreement, with 22,086 on the last monthly anniversary until the 1,000,000 shares have all vested. On March 1, 2020, Boyd Bishop resigned from his position as President of the Company, and future bonus payments and unvested options were cancelled.

59

**Director Compensation**

| Name | Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Stephen M. Sanchez | 2019 | $    - | $    - | $    - | $    - | $    - | $    - |
|  | 2018 | $    - | $    - | $    - | $    - | $    - | $    - |
| Douglas M. Mox | 2019 | $    - | $    - | $    - | $    - | $    - | $    - |
|  | 2018 | $    - | $    - | $    - | $    - | $    - | $    - |
| John P. O'Neill | 2019 | $    - | $    - | $    - | $    - | $    - | $    - |
|  | 2018 | $    - | $    - | $    - | $    - | $    - | $    - |
| Harbant S. Sidhu | 2019 | $    - | $    - | $    - | $    - | $    - | $    - |
|  | 2018 | $    - | $    - | $    - | $    - | $    - | $    - |
| Jeffrey J. Guzy | 2019 | $10,000 | $    - | $    - | $    - | $    - | $10,000 |
| former director | 2018 | $10,000 | $    - | $    - | $    - | $    - | $10,000 |
| Paul Richter | 2019 | $10,000 | $    - | $    - | $    - | $    - | $10,000 |
| former director | 2018 | $10,000 | $    - | $    - | $    - | $    - | $10,000 |
| Christopher Miglino | 2019 | $    - | $    - | $    - | $    - | $    - | $    - |
| former director | 2018 | $    - | $    - | $    - | $    - | $    - | $    - |

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table shows the beneficial ownership of our common stock (our only outstanding calls of voting securities) as of March 27, 2020, of (i) each person known to us to be the beneficial owner of at least five percent (5%) of our outstanding common stock; (ii) each director; (iii) each executive officer; and (iv) all directors and executive officers as a group.

Beneficial ownership is determined in accordance with the rules of the SEC, and generally includes voting power and/or investment power with respect to the securities held. Shares of common stock subject to options and warrants currently exercisable or exercisable within 60 days as of March 27, 2020, are deemed outstanding and beneficially owned by the person holding such options or warrants for purposes of computing the number of shares and percentage beneficially owned by such person, but are not deemed outstanding for purposes of computing the percentage beneficially owned by any other person. Except as indicated in the footnotes to this table, the persons or entities named have sole voting and investment power with respect to all shares of our common stock shown as beneficially owned by them.

The percentages in the table below are based on 29,427,803 outstanding shares of common stock. Unless otherwise indicated, the principal mailing address of each of the persons below is c/o YayYo, Inc., 433 N. Camden Drive, Suite 600, Beverly Hills, California, 90210. The Company's executive office is also located at 433 N. Camden Drive, Suite 600, Beverly Hills, California, 90210.

| Name and Address of Beneficial Owner | Title | Beneficially Owned | Percent of Class |
|---|---|---|---|
| **Officers and Directors** [(1)] | | | |
| Ramy El-Batrawi [(3) (5)] | Chief Executive Officer | 2,900,000 | 9.9% |
| Kevin F. Pickard [(2)] | Chief Financial Officer and Director | 300,000 | 1.0% |
| Laurie DiGiovanni | Chief Operating Officer | — | — |
| Stephen M. Sanchez | Director | 1,014 | * |
| Douglas M. Mox | Director | — | — |
| Harbant S. Sidhu | Director | — | — |
| John P. O'Neill | Director | — | — |
| **Officers and Directors as a Group (total of 7 persons)** | | **3,201,104** | **10.8%** |
| **5% Stockholders** | | | |
| Gray Mars Venus Trust, Arizona 2015 [(4) (5)] | | 10,325,000 | 35.1% |
| Bellridge Capital, L.P. [(5) (6)] | | 2,126,980 | 6.9% |
| David Haley [(5) (7)] | | 788,191 | 2.7% |
| James Malackowiski [(5) (8)] | | 2,758,824 | 9.4% |
| John O'Hurley [(5) (9)] | | 1,018,750 | 3.5% |
| Acuitas Group Holdings, LLC [(5) (10)] | | 1,654,412 | 5.6% |

* Less than 1%

(1) Unless otherwise indicated, the principal address of the named directors and officers of the Company is c/o YayYo, Inc., 433 N Camden Dr., # 600 Beverly Hills, CA, 90210.

(2) Includes non-qualified stock option to purchase up to an aggregate of 300,000 shares of common stock.

(3) Common stock beneficially owned by Ramy El-Batrawi are held of record by X, LLC, which is an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and director. Its address is 2635 Astral Dr., Los Angeles, CA 90046. Mr. El-Batrawi has voting and dispositive control over any securities owned of record by X, LLC. Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

(4) Gray Mars Venus Trust, Arizona 2015, an entity beneficially owned and controlled by John Gray. Its address is 75 Avon Ave, Mill Valley, CA 94941.

(5) As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, agreed to sell 12,525,000 of its 15,425,000 shares of the Company's common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration under the Securities Act to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. X, LLC transferred all rights of ownership to the purchasers. The purchasers shall be entitled to receive all dividends and distributions, shall have the power to exercise all voting rights and may sell or pledge the Private Shares. The Private Shares, however, shall not be electronically transferred to the purchasers' account until the pricing of this public offering.

(6) Includes the following: (i) 650,000 shares of common stock, (ii) 1,500,000 underlying shares of common stock to be acquired upon the exercise of the Selling Securityholder Warrant, and (iii) an option (exercisable at any time by Bellridge Capital, L.P.) from a non-affiliate shareholder of the Company to purchase 250,000 shares of issued and outstanding common stock of the Company from the non-affiliate shareholder. Bellridge Capital LLC ("BC LLC") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC may be deemed to share beneficial ownership of the shares beneficially owned by Bellridge Capital, L.P. BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described. Bellridge Capital. L.P.'s address is 515 E. Las Olas Boulevard, #120A, Fort Lauderdale, FL 33301.

(7) The address of the stockholder is 32107 W Lindero Canyon Dr., #120, Westlake Village, CA 91361. Includes 80,000 shares of common stock owned by American Business Insurance Services, Inc. Mr. Haley is the Chief Executive Officer of American Business Insurance Services, Inc. and in such capacity has the right to vote and dispose of the securities held by such entity.

(8) The address of the stockholder is 330 W. Wellington Ave., Chicago, IL 60605.

(9) The address of the stockholder is 1710 Monte Cielo Ct., Beverly Hills, CA 90210.

(10) Acuitas Group Holdings, LLC, an entity beneficially owned and controlled by Terren Peizer. Its address is 11601 Wilshire Blvd #1100, Los Angeles, CA 90025. Mr. Peizer has voting and dispositive control over any securities owned of record by Acuitas Group Holdings, LLC.

**Equity Compensation Plan Information**

On November 30, 2016, the Board of Directors of the Company adopted the 2016 Equity Incentive Plan (the "2016 Plan") that governs equity awards to our employees, directors, officers, consultants and other eligible participants. Under the 2016 Plan there are 10,000,000 shares of common stock reserved for issuance.

The types of awards permitted under the 2016 Plan include qualified incentive stock options and non-qualified stock options. Each option shall be exercisable at such times and subject to such terms and conditions as the Board may specify.

The Board of Directors has the power to amend, suspend or terminate the 2016 Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of our common stock reserved for issuance pursuant to incentive awards or reduces the minimum exercise price for options or exchange of options for other incentive awards, unless such change is authorized by our stockholders within one year.

**Outstanding Equity Awards at Fiscal Year-End Table**

**OUTSTANDING EQUITY AWARDS AT DECEMBER 31, 2019**

The following table sets forth all unexercised options and unvested restricted stock that have been awarded to our named executives by the Company and were outstanding as of December 31, 2019.

| Name | Number of securities underlying unexercised options (#) exercisable | Number of securities underlying unexercised options (#) unexercisable | Equity incentive plan awards: Number of securities underlying unexercised unearned options (#) | Options Exercise Price ($) | Options Expiration Date | Number of shares or units of stock that have not vested (#) | Market value of shares of units of stock that have not vested ($) | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested (#) | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested ($) |
|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) |
| Ramy El-Batrawi (1) | — | — | — | $ — | */*/* | — | — | — | — |
| | — | — | — | $ — | */*/* | — | — | — | — |
| | — | — | — | $ — | */*/* | — | — | — | — |
| | | | | | | | | | |
| Laurie DiGiovanni (2) | — | — | — | $ — | */*/* | — | — | — | — |
| | — | — | — | $ — | */*/* | — | — | — | — |
| | — | — | — | $ — | */*/* | — | — | — | — |
| | | | | | | | | | |
| Kevin F. Pickard | 300,000 | — | — | $ 8.00 | 12/31/2020 | — | — | — | — |
| | — | — | — | $ — | */*/* | — | — | — | — |
| | — | — | — | $ — | */*/* | — | — | — | — |
| | — | — | — | $ — | */*/* | — | — | — | — |

**Indemnification of Directors and Officers**

We have agreed to indemnify the underwriters against specified liabilities, including liabilities under the Securities Act, and to contribute to payments the underwriters may be required to make in respect thereof.

**Equity Compensation Plan Information**

On November 30, 2016, the Board of Directors of the Company adopted the 2016 Equity Incentive Plan (the "2016 Plan") that governs equity awards to our employees, directors, officers, consultants and other eligible participants. Under the 2016 Plan there are 10,000,000 shares of common stock reserved for issuance.

The types of awards permitted under the 2016 Plan include qualified incentive stock options and non-qualified stock options. Each option shall be exercisable at such times and subject to such terms and conditions as the Board may specify.

The Board of Directors has the power to amend, suspend or terminate the 2016 Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of our common stock reserved for issuance pursuant to incentive awards or reduces the minimum exercise price for options or exchange of options for other incentive awards, unless such change is authorized by our stockholders within one year.

## ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

In addition to the arrangements, discussed in the sections titled "Directors, Executive Officers and Corporate Governance" and "Executive Compensation" the following is a description of each transaction since June 21, 2016 and each currently proposed transaction in which:

- we have been or are to be a participant;

- the amount involved exceeded or exceeds the lesser of $120,000 or one percent of our total assets at the end of our last two completed fiscal years; and

- any of our directors, executive officers or holders of more than 5% of our outstanding capital stock, or any immediate family member of, or person sharing the household with, any of these individuals or entities, had or will have a direct or indirect material interest.

*Bellridge Capital Transactions*

On March 8, 2018, YayYo, Inc., entered into a Securities Purchase Agreement (the "Purchase Agreement") with the Bellridge Capital, a security holder of the Company under Item 404(a) of Regulation S-K and "accredited investor" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) (the "Lender"), pursuant to which the Lender purchased (i) a senior secured promissory note in the principal face amount of $6,000,000 due March 8, 2023, subject to extension (the "Bellridge Note") and (ii) warrants to acquire up to an aggregate of 1,500,000 shares of common stock (the "Warrant Shares"), with an exercise price of $4.00 per share (the "Warrant") and 150,000 commitment shares of common stock (the "Commitment Shares") for an aggregate purchase price of $6,000,000 (the "Bellridge Note Offering") to be directed and deposited by the Lender in the Company's Master Restricted Account (defined below). The principal balance of $6,000,000 on the Bellridge Note bears interest at a rate per annum equal to LIBOR plus 100 basis points, subject to adjustment in accordance with the terms of the Bellridge Note. The Bellridge Capital Warrant expires five years from the date of issuance. Further, the Company paid $178,228 of issuance costs associated with the Bellridge Note.

YayYo, Inc.'s obligations to repay and otherwise perform its obligations under the Bellridge Note are secured by a continuing first priority lien and perfected security interest in the $6,000,000 held in the Master Restricted Account (the "Collateral"), to be held and maintained at Umpqua Bank (the "Master Restricted Account"), subject to a deposit account control agreement, dated as of March 7, 2018, by and between YayYo, Inc., the Lender and Umpqua Bank (the "Controlled Account Agreement"). Subject to the terms of the Bellridge Note and Controlled Account Agreement, upon the exercise of the Warrant and following YayYo, Inc.'s receipt of a notice by the holder of the Bellridge Note electing to effect a release of cash with respect to the Collateral or at any such time that the outstanding amount of the Collateral is greater than or exceeds the principal face amount under the Bellridge Note, the Lender will release a certain percentage of cash held as Collateral in the Master Restricted Account to YayYo, Inc. Under the terms of the Purchase Agreement, YayYo, Inc., will use any proceeds received and distributed from the Master Restricted Account, if at all, for general corporate purposes.

The Company repaid and exchanged a senior secured promissory note in the principal face amount of $6,000,000. On September 12, 2018, the Company entered into a new note payable agreement, as amended on November 1, 2019, whereby the Company repaid $4,821,810 of the original $6,000,000 note payable and the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018. This note payable was repaid at the closing of our initial public offering in November 2019. As a result of this transaction, the Company recognized interest expense for the remaining unamortized debt discount associated of $4,018,560.

We are party to an investors' rights agreement with the Bellridge Capital, a security holder of the Company under Item 404(a) of Regulation S-K, which provides, among other things, that in the event Company decides to file a new registration statement, the Company must deliver a written notice of the decision to file the new registration statement to such investors. Within 15 days, such investors may request, in writing, to be included in the registration statement, provided, however, if such investor's securities are eligible for resale without restrictions and without the need for current public information, the Company shall include such registrable securities in the new registration statement.

*X, LLC*

During the years ended December 31, 2019 and 2018, the Company paid management fees of $167,000 and $205,000, respectively, to a company that is owned by the Company's majority stockholder.

On January 6, 2017, the Company received $50,000 from Chase Financing, Inc., ("CFI") and issued its 10% original issue discount senior secured convertible note in the amount of $55,555, with a maturity date of April 6, 2017 (the "First CFI Note"). Subsequent to the First CFI Note, on January 23, 2017, the Company received an additional $25,000 from CFI, and issued a second 10% original issue discount senior secured convertible note in the principal amount of $30,555, with a maturity date of April 6, 2017 (the "Second CFI Note"). Subsequent to the Second CFI note, the Company received an additional $25,000 from CFI, and issued a third 10% original issue discount senior secured convertible note in the amount of $27,778 (the "Third CFI Note" and together with the First CFI Note and the Second CFI Note, collectively, the "CFI Notes"). As a result, the Company is obligated to repay CFI a total of $113,888 in principal plus all accrued interest thereon to CFI under the CFI Notes on or before the stated maturity dates, subject to extension per the terms.

Pursuant to the terms, the CFI Notes were secured by a first priority lien and security interest on all of the assets of the Company, now owned or hereafter acquired, and were convertible at the option of the holder into shares of our common stock at a conversion price equal to the lower of $7.00 per share or the average of the five lowest volume weighted average trading prices ("VWAP") of our common stock during the 20 trading days immediately prior to the date of conversion. In an event of default occurs under the terms of the CFI Notes, the conversion price will be reduced to $1.00 per share.

Concurrently with the execution of the CFI Letter Agreement and the First CFI Note, as additional collateral to secure the repayment of the CFI notes by the Company, Ramy El-Batrawi and X, LLC (an entity wholly owned and controlled by Mr. El-Batrawi), entered into a Limited Recourse Guaranty and Pledge Agreement with CFI (the "Guaranty and Pledge Agreement"), pursuant to which X, LLC agreed to unconditionally and irrevocably guarantee the Company's repayment of the CFI Notes, and pursuant to which X, LLC pledged up to 300,000 shares of our common stock held of record and beneficially owned by X, LLC.

*Loan from Stockholder*

On September 17, 2017 the Company entered into a promissory note with John Gray, the control person for Gray Mars Venus Trust, Arizona 2015, for $390,000. The largest balances for the year ended December 31, 2018 and December 31, 2017, respectively, were $986,200 and $445,000. The promissory note accrued interest at a rate of 5%. The principal of and interest on this note was repaid at the closing of our initial public offering in November 2019

*Incentive Agreement for Grant of Stock*

On April 1, 2018, the Company entered into an incentive agreement for a grant of stock with David Haley, a former director of the Company, pursuant to which Mr. Haley has agreed to write, provide and procure two particular insurance policies for Rideshare Car Rentals, LLC and Distinct Cars, LLC (the "Special Policies") in consideration for a grant of 250,000 shares of Company restricted common stock, provided further, that in consideration for certain monetary advances made and extended by Mr. Haley on behalf of the Company for certain down payment requirements for the Special Policies, the Company has agreed to issue Mr. Haley 14,945 shares of Company restricted common stock, at a price per share equal to $8.00, as reimbursement for the cost of Mr. Haley's monetary advances made on behalf of the Company. In March 2019, the Company issued American Business Insurance Services, Inc. 80,000 shares of common stock in connection the settlement of $400,000 of debt related to insurance policies. Mr. Haley is the Chief Executive Officer of American Business Insurance Services, Inc. 258,695 shares of Company restricted common stock was issued on April 1, 2018 and 6,250 shares of Company restricted common stock was issued on October 8, 2018.

*Social Reality, Inc.*

During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our former directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc. The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

*Non-Qualified Stock Option Agreement*

On June 9, 2017, the Company entered into a non-qualified stock option agreement with Kevin Pickard, our Chief Financial Officer and director, providing for an option grant to purchase an aggregate of 300,000 shares at an exercise price of $8.00 per share. The option grant vests at a rate of 10,000 options per month following the date of the option grant. As of December 31, 2018, an aggregate of 300,000 options are vested and exercisable. The options expire December 31, 2020.

On December 1, 2016, the Company entered into a series of non-qualified stock option agreements with former executive officers and directors of the Company providing for a series of option grants to those former executive officers and directors to purchase an aggregate of 450,000 shares at an exercise price of $1.00 per share. The options expired December 31, 2018.

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

AJ Robbins CPA, LLC ("AJ Robbins") served as the Company's independent registered public accounting firm for the fiscal years ended December 31, 2019 and 2018.

The Audit Committee has appointed AJ Robbins as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2020. Representatives of AJ Robbins are expected to be present at the Annual Meeting and will have an opportunity to make a statement if they so desire and will be available to respond to appropriate questions.

Aggregate fees billed by the Company's independent registered public accounting firm are set forth below:

|  | 2019 | | 2018 |
| --- | --- | --- | --- |
| Audit fees and quarterly reviews (1) | $ | 117,500 | $ | 105,000 |
| Audit related fees |  | 62,500 |  | 36,000 |
| Tax fees |  | - |  | - |
| All other fees |  | 1 |  | - |

(1) Audit fees include fees for audit or review services in accordance with generally accepted auditing standards, such as statutory audits and services rendered for compliance with Section 404 of the Sarbanes-Oxley Act.

**Pre-Approval of Services**

Our Audit Committee has not adopted policies and procedures for pre-approval of audit or non-audit services to be performed by the independent registered public accounting firm The Audit Committee pre-approved the engagements for all services performed by the independent registered public accounting firm referred to above.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

**Financial Statement Schedules**

Our consolidated financial statements are listed on the Index to Financial Statements on this annual report on Form 10-K beginning on page F-1.

All financial statement schedules are omitted because they are not applicable or the required information is shown in the financial statements or notes thereto.

**YAYYO, INC.**
**Audited Financial Statements**

As of December 31, 2019 and 2018

68

**YAYYO, INC**
**Financial Statements**
**December 31, 2019 and 2018**

**Contents**

| | Page |
|---|---|
| **Financial Statements:** | |
| Report of Independent Registered Public Accounting Firm | 70 |
| Consolidated Balance Sheets as of December 31, 2019 and 2018 | 71 |
| Consolidated Statements of Operations for the years ended December 31, 2019 and 2018 | 72 |
| Consolidated Statement of Stockholders' Equity (Deficit) for the years ended December 31, 2019 and 2018 | 73 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2019 and 2018 | 74 |
| Notes to Consolidated Financial Statements | 75 |

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Stockholders of Yayyo Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Yayyo, Inc. (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of operations, changes in stockholders' equity (deficit), and cash flows for each of the years in the two year period then ended and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Yayyo, Inc. as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the years in the two year period then ended, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United Sates) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we were required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. According we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluation of the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ AJ Robbins CPA LLC

We have served as the Company's auditor since 2016
Denver, Colorado
March 30, 2020

70

**YAYYO, INC.**
**CONSOLIDATED BALANCE SHEETS**
**As of December 31, 2019 and 2018**

| | | 2019 | | 2018 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 1,256,429 | $ | 277,444 |
| Accounts receivable | | 59,331 | | - |
| Prepaid expenses | | 782,900 | | 108,900 |
| Total current assets | | 2,098,660 | | 386,344 |
| | | | | |
| Equipment, net | | 3,395 | | 5,092 |
| Rental vehicles, net | | 4,737,047 | | 5,115,117 |
| Deposit on vehicles | | 164,080 | | - |
| Deferred offering costs | | - | | 66,500 |
| Other assets | | 200,000 | | - |
| **TOTAL ASSETS** | $ | 7,203,182 | $ | 5,573,053 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| | | | | |
| Current Liabilities: | | | | |
| Accounts payable (including $394,183 and $334,471 to related party) | $ | 545,254 | $ | 719,386 |
| Accrued expenses (including $171,665 and $419,593 to related party) | | 405,977 | | 494,066 |
| Notes payables, current (net of discount of $32,289 and $72,211) | | 287,378 | | 2,617,970 |
| Finance lease obligations, current | | 1,416,446 | | 1,562,651 |
| Total current liabilities | | 2,655,055 | | 5,394,073 |
| | | | | |
| Finance lease obligations, net of current portion | | 984,119 | | 2,227,496 |
| | | | | |
| **TOTAL LIABILITIES** | | 3,639,174 | | 7,621,569 |
| | | | | |
| Commitments and contingencies | | - | | - |
| | | | | |
| **STOCKHOLDERS' DEFICIT** | | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | - | | - |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 29,427,803 and 26,718,676 shares issued and outstanding | | 29 | | 27 |
| Additional paid-in capital | | 28,735,894 | | 19,193,151 |
| Accumulated deficit | | (25,171,915) | | (21,241,694) |
| Total stockholders' deficit | | 3,564,008 | | (2,048,516) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $ | 7,203,182 | $ | 5,573,053 |

The accompanying footnotes are an integral part of these consolidated financial statements.

71

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
For the Years Ended December 31, 2019 and 2018

|  | 2019 | 2018 |
|---|---|---|
| **Revenue** | $ 6,914,910 | $ 3,289,478 |
| **Cost of revenue** | 4,673,870 | 2,374,397 |
| **Gross profit** | 2,241,040 | 915,081 |
| **Operating expenses:** | | |
| Selling and marketing expenses | 765,441 | 482,811 |
| Product development | 13,500 | 9,699 |
| General and administrative expenses | 4,023,921 | 6,584,251 |
| Impairment of leased assets | - | 2,388,000 |
| Loss on the settlement of debt | 252,900 | - |
| Total operating expenses | 5,055,762 | 9,464,761 |
| **Loss from operations** | (2,814,722) | (8,549,680) |
| **Other income (expense):** | | |
| Interest and financing costs | (1,115,499) | (4,639,442) |
| Total other income (expense) | (1,115,499) | (4,639,442) |
| **Net loss** | $ (3,930,221) | $ (13,189,122) |
| **Weighted average shares outstanding :** | | |
| Basic | 27,112,557 | 26,321,137 |
| Diluted | 27,112,557 | 26,321,137 |
| **Loss per share** | | |
| Basic | $ (0.14) | $ (0.50) |
| Diluted | $ (0.14) | $ (0.50) |

The accompanying footnotes are an integral part of these consolidated financial statements.

72

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
For the Years Ended December 31, 2019 and 2018

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' Equity |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Capital | Deficit | (Deficit) |
| **Balance, December 31, 2017** | 25,770,551 | $ 26 | $ 7,879,189 | $ (8,052,572) | $ (173,357) |
| Issuance of common stock for cash | 46,330 | | 307,924 | | 307,924 |
| Value of common stock issued with notes payable | 155,850 | | 407,791 | | 407,791 |
| Value of warrants issued with notes payable | | | 3,726,506 | | 3,726,506 |
| Value of common stock issued with capital lease obligation | 298,500 | | 2,388,000 | | 2,388,000 |
| Issuance of common stock for services | 432,500 | 1 | 3,459,999 | | 3,460,000 |
| Issuance of common stock for accounts payable | 14,945 | | 119,274 | | 119,274 |
| Stock option expense | | | 904,468 | | 904,468 |
| Net loss | | | | (13,189,122) | (13,189,122) |
| **Balance, December 31, 2018** | 26,718,676 | 27 | 19,193,151 | (21,241,694) | (2,048,516) |
| Correction to outstanding shares | (173) | | | | - |
| Proceeds from the sale of common stock | 2,625,000 | 2 | 10,499,998 | | 10,500,000 |
| Offering costs | | | (1,631,655) | | (1,631,655) |
| Issuance of common stock for settlement of debt | 84,300 | | 674,400 | | 674,400 |
| Net loss | | | | (3,930,221) | (3,930,221) |
| **Balance, December 31, 2019** | 29,427,803 | $ 29 | $ 28,735,894 | $ (25,171,915) | $ 3,564,008 |

The accompanying footnotes are an integral part of these consolidated financial statements.

**YAYYO, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
For the Years Ended December 31, 2019 and 2018

| | | 2019 | | 2018 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net loss | $ | (3,930,221) | $ | (13,189,122) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | | 995,228 | | 500,622 |
| Stock option expense | | - | | 904,468 |
| Common stock issued for services | | - | | 3,460,000 |
| Amortization of debt discounts | | 39,922 | | 4,460,931 |
| Gain on disposal of assets | | - | | (17,360) |
| Impairment of leased assets | | - | | 2,388,000 |
| Loss on the settlement of debt | | 252,900 | | - |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | | (59,331) | | - |
| Prepaid expenses | | (674,000) | | (95,494) |
| Other assets | | (200,000) | | - |
| Accounts payable | | (174,132) | | 673,836 |
| Accrued expenses | | 333,411 | | 489,963 |
| Net cash used in operating activities | | (3,416,223) | | (424,156) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Purchase of equipment | | - | | (2,840) |
| Purchase of vehicles | | (225,000) | | - |
| Deposit for vehicles | | (164,080) | | - |
| Net cash used in investing activities | | (389,080) | | (2,840) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Proceeds from sale of common stock | | 10,500,000 | | 307,924 |
| Offering costs paid | | (1,565,155) | | - |
| Proceeds from notes payable | | 2,009,300 | | 7,746,378 |
| Repayment of notes payable | | (4,379,814) | | (6,111,263) |
| Payment for debt issuance costs | | - | | (178,228) |
| Repayment of finance lease obligations | | (1,780,043) | | (1,369,109) |
| Net cash provided by (used in) financing activities | | 4,784,288 | | 395,702 |
| | | | | |
| **NET INCREASE (DECREASE) IN CASH** | | 978,985 | | (31,294) |
| | | | | |
| **CASH, BEGINNING OF PERIOD** | | 277,444 | | 308,738 |
| | | | | |
| **CASH, END OF PERIOD** | $ | 1,256,429 | $ | 277,444 |
| | | | | |
| **CASH PAID FOR:** | | | | |
| Interest | $ | 1,105,049 | $ | 139,825 |
| Income taxes | $ | - | $ | - |
| | | | | |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Payment of accounts payable/accrued expenses with common stock | $ | 421,500 | $ | 119,274 |
| Value of equity recorded as debt discounts | $ | - | $ | 4,134,297 |
| Finance lease obligations | $ | 1,159,470 | $ | 3,700,674 |

The accompanying footnotes are an integral part of these consolidated financial statements.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

**Note 1 - Organization and Basis of Presentation**

<u>Organization and Line of Business</u>

YayYo, Inc. ("YayYo" or the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents cars to Uber and Lyft drivers.

<u>Basis of Presentation</u>

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

Risk and Uncertainties

In December 2019, a novel strain of coronavirus surfaced in China, which has and is continuing to spread throughout the world, including the United States. On January 30, 2020, the World Health Organization declared the outbreak of the coronavirus disease (COVID-19) a "Public Health Emergency of International Concern," and on March 11, 2020, the World Health Organization characterized the outbreak as a "pandemic". The governors of New York, California and several other states, as well as mayors on many cities, have <u>ordered their residents</u> to cease traveling to non-essential jobs and to curtail all unnecessary travel, and to stay in their homes as much as possible in the coming weeks, as the nation confronts the escalating coronavirus outbreak, and similar restrictions have been recommended by the federal authorities and authorities in many other states and cities. Since the beginning of 2020 and the spread of COVID-19, rideshare companies have increasingly been negatively impacted. As Americans practice social distancing and self-isolation, Uber, Lyft, and other rideshare companies have seen a steep decline in ridership and revenue, as a result. Given that rideshare drivers are both at risk themselves and of risk to the public, and in addition to decreased demand overall, less people are even still driving. Over the past few weeks, the Company has seen a decline in revenue of approximately 20% and is having a negative impact on the cash flows of the business. The Company is not able to predict the ultimate impact that COVID -19 will have on its business; however, if the current economic conditions continue, the Company will be forced to significantly scale back its business operations and its growth plans, and could ultimately have a significant negative impact on the Company. The Company cannot at this time estimate the long term effect of this unprecedented situation on the rideshare market in general or the Company in particular.

**Note 2 – Summary of Significant Accounting Policies**

<u>Principles of Consolidation</u>

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC, RideShare Car Rentals, LLC, RideYayYo, LLC and Savy, LLC. All significant intercompany transactions and balances have been eliminated.

<u>Use of Estimates</u>

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

Cash Equivalents

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

Equipment and Rental Vehicles

Equipment and Rental Vehicles are stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment and rental vehicles is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at December 31, 2019, the Company determined that no impairment charge was necessary.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to Uber and Lyft drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 1,500,000 warrants and 300,000 options outstanding as of December 31, 2019.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There were 1,800,000 potentially dilutive securities outstanding at December 31, 2019.

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the years ended December 31, 2019 and 2018 were $765,441 and $482,811, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Research and developments costs for the years ended December 31, 2019 and 2018 were $13,500 and $9,699, respectively.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

At December 31, 2019 and 2018, the Company did not identify any liabilities that are required to be presented on the balance sheet at fair value.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

Recent Accounting Pronouncements

In June 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") ASU 2018-07, *Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for share-based payments granted to nonemployees for goods and services and aligns most of the guidance on such payments to nonemployees with the requirements for share-based payments granted to employees. ASU 2018-07 is effective on January 1, 2019. Early adoption is permitted. The adoption of this ASU did not have an impact on its financial statements.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under current U.S. GAAP and replace it with a principle-based approach for determining revenue recognition. The ASU also will require that companies recognize revenue based on the value of transferred goods or services as they occur in the contract. The ASU also will require additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. ASU 2014-09 is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted only in annual reporting periods beginning after December 15, 2016, including interim periods therein. Entities will be able to transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption. The Company adopted this ASU beginning on January 1, 2018 and used the modified retrospective method of adoption. The adoption of this ASU did not have a material impact on the Company's financial statements and disclosures.

In December 2019, the FASB issued ASU 2019-12, *Simplifying the Accounting for Income Taxes* which amends ASC 740 *Income Taxes* (ASC 740). This update is intended to simplify accounting for income taxes by removing certain exceptions to the general principles in ASC 740 and amending existing guidance to improve consistent application of ASC 740. This update is effective for fiscal years beginning after December 15, 2021. The guidance in this update has various elements, some of which are applied on a prospective basis and others on a retrospective basis with earlier application permitted. The Company is currently evaluating the effect of this ASU on the Company's consolidated financial statements and related disclosures.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**Note 3 – Equipment**

At December 31, 2019 and 2018 equipment consisted of the following:

|                              | 2019    | 2018    |
| ---------------------------- | ------- | ------- |
| Computer equipment           | $    6,046 | $    6,046 |
|                              | 6,046   | 6,046   |
| Less accumulated depreciation | (2,651) | (954)   |
| Equipment, net               | $    3,395 | $    5,092 |

Depreciation expense for equipment for the years ended December 31, 2019 and 2018 was $1,697 and $636, respectively.

**Note 4 – Rental Vehicles**

At December 31, 2019 and 2018 all of the Company's rental vehicles consisted of the following:

|                              | 2019        | 2018        |
| ---------------------------- | ----------- | ----------- |
| Rental vehicles              | $    6,284,211 | $    5,661,749 |
|                              | 6,284,211   | 5,661,749   |
| Less accumulated depreciation | (1,547,164) | (546,632)   |
| Rental vehicles assets, net  | $    4,737,047 | $    5,115,117 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

The Company's rental vehicles are depreciated over their estimated useful life of five years. Depreciation expense for leased assets for the years ended December 31, 2019 and 2018 was $933,531 and $499,986, respectively. A majority of the rental vehicles are leased with terms are generally for 30 to 36 months and the Company has the right to purchase the vehicles for $1 each at the end of the lease terms.

**Note 5 – Notes Payable**

Notes payable at December 31, 2019 and 2018 consisted of the following:

|  | 2019 | 2018 |
|---|---|---|
| Note payable to investor; accrue interest at 5% per annum; due December 31, 2019; unsecured | $        - | $   790,000 |
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 of original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to March 26, 2021; unsecured (A) | 319,667 | 319,667 |
| Note payable to investor; accrue interest at 6% per annum; due November 30, 2018; unsecured (B) | - | 222,222 |
| Note payable to investor; original issue discount of $117,828; due he earlier of November 30, 2019 or closing of a public offering; secured by assets of the Company (C) | - | 1,296,018 |
| Note payable to merchant bank; accrues interest at 15% per annum; daily payments of $813 | - | 37,308 |
| Line of credit; $65,000 limit; accrues interest at 15% per annum; weekly payments of $3,038 | - | 24,966 |
| Total notes payable | 319,667 | 2,690,181 |
| Unamortized debt discount | (32,289) | (72,211) |
| Notes payable, net discount | 287,378 | 2,617,970 |
| Less current portion | (287,378) | (2,617,970) |
| Long-term portion | $        - | $        - |

(A) In connection with the issuance of these notes payable in 2018 and 2017, the Company also issued an aggregate of 24,050 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $119,875 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $119,875 is being amortized over the term of the notes payable. During the years ended December 31, 2019 and 2018, $39,922 and $37,949, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $32,289 at December 31, 2019.

79

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

(B) This note payable was issued with an original issuance discount of $22,222 which is being amortized over the term of the notes payable. During the years ended December 31, 2019 and 2018, $0 and $21,505, respectively, was charged to interest expense as amortization of the discount, with an unamortized balance of $0 at December 31, 2019.

(C) On March 8, 2018, the Company issued a note payable for $6,000,000. The note accrues interest at LIBOR plus 100 basis points and is due five years from the date of issuance. The note payable is secured by the restricted cash balance. In addition, the Company issued to the note holder 150,000 shares of the Company's common stock and 1,500,000 warrants to purchase shares of the Company's common stock for $4.00 per shares. The warrants expire five years from the date of issuance. The Company also paid $178,228 of issuance costs associated with this note. The relative fair value of the 150,000 shares of common stock was $378,916 and the relative fair value of the 1,500,000 warrants was $3,726,506 and both were recorded as a discount on the note payable and as additional paid in capital. In addition, the issuance costs of $178,228 have also been recorded as a debt discount. The debt discount of $4,283,650 is being amortized over the term of the note payable. On September 12, 2018, the Company entered into a new note payable agreement with this investor whereby, the Company repaid $4,821,810 of the original $6,000,000 note payable and with the balance of $1,178,190 plus an original issue discount of $117,828 being rolled into the September 12, 2018 note payable for $1,296,018. The original issue discount of $117,828 is being amortized to interest expense over the term of the new note payable. As a result of the $6,000,000 note payable being repaid in September 2018, the Company amortized to interest expense the remaining debt discount associated with the note payable of $4,018,560. During the years ended December 31, 2019 and 2018, $0 and $4,401,477, respectively, was charged to interest expense as amortization of the debt discounts associated with the notes payable to this investor, with an unamortized balance of $0 at December 31, 2019.

A rollforward of notes payable from December 31, 2017 to December 31, 2019 is below:

| | |
|---|---:|
| Notes payable, December 31, 2017 | $ 807,099 |
| Issued for cash | 7,746,378 |
| Repayments | (6,111,263) |
| Accrued interest converted to note payable | 27,350 |
| Debt discount related to notes payable | (4,312,525) |
| Amortization of debt discounts | 4,460,931 |
| Notes payable, December 31, 2018 | 2,617,970 |
| Issued for cash | 2,009,300 |
| Repayments | (4,379,814) |
| Amortization of debt discounts | 39,922 |
| Notes payable, December 31, 2019 | $ 287,378 |

**Note 6 – Lease Obligations**

Lease obligations at December 31, 2019 and 2018 consisted of the following:

| | 2019 | 2018 |
|---|---:|---:|
| Lease obligations | $ 2,400,565 | $ 3,790,147 |
| Less current portion | (1,416,446) | (1,562,651) |
| Long-term portion | $ 984,119 | $ 2,227,496 |

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

A rollforward of lease obligations from December 31, 2017 to December 31, 2019 is below:

| | | |
|---|---|---:|
| Lease obligations, December 31, 2017 | $ | 1,593,291 |
| New lease obligations | | 3,700,674 |
| Disposal of leased vehicles | | (134,709) |
| Payments on lease obligations | | (1,369,109) |
| Lease obligations, December 31, 2018 | | 3,790,147 |
| New lease obligations | | 1,159,470 |
| Disposal of leased vehicles | | (769,009) |
| Payments on lease obligations | | (1,780,043) |
| Lease obligations, December 31, 2019 | $ | 2,400,565 |

Future payments under lease obligations are as follows:

| Twelve months ending December 31, | | |
|---|---|---:|
| 2020 | $ | 1,511,672 |
| 2021 | | 857,353 |
| 2020 | | 163,630 |
| Total payments | | 2,532,655 |
| Amount representing interest | | (132,090) |
| Lease obligation, net | $ | 2,400,565 |

**Note 7 – Stockholders' Equity**

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

<u>Common Stock</u>

During the years ended December 31, 2019, the Company:

- issued 84,300 shares of common stock to vendors in satisfaction of $421,500 of accounts payable and accrued expenses. The 84,300 shares were valued at $674,000; therefore the Company took a charge to earnings of $252,900 related to the settlement of debt during the years ended December 31, 2019;

- issued 2,625,000 shares of common shares in connection with its initial public offering at $4.00 per share. Total gross proceeds from the offering were $10,500,000, before deducting underwriting discounts and commissions and other offering expenses.

During the years ended from December 31, 2018, the Company:

- sold 46,330 shares of common stock to investors for gross cash proceeds of $307,924;

- issued 155,850 shares of common stock in connection with the issuance of notes payable;

- issued 91,500 shares of common stock in connection with lease obligations;

- issued 432,500 shares of common stock for services rendered valued at $3,460,000. The value was determined based on the shares price for recent sales of the Company's common stock; and

- issued 14,945 shares of common stock for payment of accounts payable of $119,274.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

Stock Options

The following is a summary of stock option activity:

| | Options Outstanding | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Life | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2017 | 750,000 | $ | 3.80 | 1.80 | $ | 3,150,000 |
| Granted | - | $ | | | | |
| Forfeited | (450,000) | | 1.00 | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2018 | 300,000 | $ | 8.00 | 2.00 | $ | - |
| Granted | - | $ | | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2019 | 300,000 | $ | 8.00 | 1.00 | $ | - |
| Exercisable, December 31, 2019 | 300,000 | $ | 8.00 | 1.00 | $ | - |

The exercise price for options outstanding and exercisable at December 31, 2019:

| Outstanding | | | Exercisable | | |
|---|---|---|---|---|---|
| Number of Options | | Exercise Price | Number of Options | | Exercise Price |
| 300,000 | $ | 8.00 | $ | 300,000 | 8.00 |
| 300,000 | | | | 300,000 | |

The following is a summary of warrant activity:

| | Warrants Outstanding | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Life | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2017 | - | | | | | |
| Granted | 1,500,000 | $ | 4.00 | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2018 | 1,500,000 | $ | 4.00 | 4.44 | $ | 6,000,000 |
| Granted | 131,250 | | 5.00 | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2019 | 1,631,250 | $ | 4.08 | 3.38 | $ | - |
| Exercisable, December 31, 2019 | 1,631,250 | $ | 4.08 | 3.38 | $ | - |

82

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

The exercise price for warrants outstanding at December 31, 2019:

| Outstanding and Exerciseable | |
| --- | --- |
| Number of Warrants | Exercise Price |
| 1,500,000 | $ 4.00 |
| 131,250 | 5.00 |
| 1,631,250 | |

In connection with the Company's initial public offering, the Company issued the underwriters a total of 131,250 warrants to purchase shares of the Company's common stock for $5.00 per share. The warrants expire in November 2024.

**Note 8 – Related Party Transactions**

During the years ended December 31, 2018, the Company paid management fees of $205,000, to a company that is owned by the Company's Chief Executive Officer and director. Beginning on February 1, 2019, the Company entered into a consulting agreement with this individual and paid $167,000 under the consulting agreement. The consulting agreement was terminated effective September 1, 2019.

During the years ended December 31, 2019 and 2018, the Company expensed $587,261 and $334,471, respectively, in advertising expense from a company whose CEO was also a former director of the Company. At December 31, 2019 and 2018, $394,183 and $334,471, respectively, was owed to this company and is included in accounts payable in the accompanying consolidated balance sheets.

During the years ended December 31, 2019 and 2018, the Company expensed $2,214,985 and $1,069,163, respectively, in insurance expense related to insuring the Company fleet of vehicles from an insurance brokerage firm whose owner is also a stockholder of the Company. At December 31, 2019 and 2018, $171,665 and $419,593, respectively, was owed to this insurance brokerage from and is included in accrued expenses in the accompanying consolidated balance sheets.

At December 31, 2019 and 2018, the Company had a note payable to a stockholder for $0 and $790,000, respectively.

**Note 9 – Income Taxes**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A full valuation allowance is established against all net deferred tax assets as of December 31, 2019 and 2018 based on estimates of recoverability. While the Company has optimistic plans for its business strategy, it determined that such a valuation allowance was necessary given the current and expected near term losses and the uncertainty with respect to its ability to generate sufficient profits from its business model. Because of the impacts of the valuation allowance, there was no income tax expense or benefit for the years ended December 31, 2019 and 2018.

**YAYYO, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
For Year Ended December 31, 2019 and 2018

A reconciliation of the differences between the effective and statutory income tax rates for the years ended December 31, 2019 and 2018:

|  | 2019 | | 2018 | |
|---|---|---|---|---|
|  | Amount | Percent | Amount | Percent |
| Federal statutory rates | $ (825,346) | 21.0% | $ (2,769,716) | 21.0% |
| State income taxes | (275,115) | 7.0% | (923,239) | 7.0% |
| Permanent differences | (69,409) | 1.8% | 3,144,503 | -23.8% |
| Valuation allowance against net deferred tax assets | 1,169,870 | -29.8% | 548,452 | -4.2% |
| Effective rate | $ - | 0.0% | $ - | 0.0% |

At December 31, 2019 and 2018, the significant components of the deferred tax assets are summarized below:

|  | 2019 | 2018 |
|---|---|---|
| Deferred income tax asset |  |  |
| Net operation loss carryforwards | 2,419,531 | 1,497,497 |
| Accrued expenses | 159,887 | - |
| Total deferred income tax asset | 2,579,418 | 1,497,497 |
| Less: valuation allowance | (2,579,418) | (1,497,497) |
| Total deferred income tax asset | $ - | $ - |

The valuation allowance increased by $1,081,921 in 2019 as a result of the Company generating additional net operating losses. The valuation allowance increased by $175,612 in 2018 of which $548,452 was a result of the Company generating additional net operating losses offset by $372,840 as a result of the change in the corporate tax rate from 34% to 21%.

The Company has recorded as of December 31, 2019 and 2018 a valuation allowance of $2,549,418 and $1,497,497, respectively, as it believes that it is more likely than not that the deferred tax assets will not be realized in future years. Management has based its assessment on the Company's lack of profitable operating history.

The Company conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2019 and 2018.

The Company has net operating loss carry-forwards of approximately $8,600,000. Such amounts are subject to IRS code section 382 limitations and expire in 2031. The 2017, 2018 and 2019 tax year is still subject to audit.

**Note 10 - Contingencies**

*Legal Proceedings*

From time to time, the Company may become involved in lawsuits and other legal proceedings that arise in the course of business. Litigation is subject to inherent uncertainties, and it is not possible to predict the outcome of litigation with total confidence. The Company is currently not aware of any legal proceedings or potential claims against it whose outcome would be likely, individually or in the aggregate, to have a material adverse effect on the Company's business, financial condition, operating results, or cash flows.

*Social Reality Inc. v. YayYo, Inc.*

This action was filed on February 11, 2020, in the Superior Court of the State of California for the County of Los Angeles. Plaintiff Social Reality Inc. is a media company that claims to have provided media services to the Company. Plaintiff has sued the Company for breach of contract and related causes of action, arising from its claims that we have failed to pay for past outstanding invoices for services rendered. The plaintiff has also filed a motion for prejudgment attachment which is set for a hearing on April 28, 2020. The Company believes that it has valid defenses to the lawsuit, and expects to file counterclaims that will offset or negate any monies owed to plaintiff; it will vigorously defend both the lawsuit and plaintiff's application for attachment.

*Anthony Davis v. YayYo, Inc., and Ramy El-Batrawi*

This action was filed on March 5, 2020, in the Superior Court of the State of California for the County of Los Angeles. Plaintiff Anthony Davis was hired by the Company as its Chief Executive Officer in or about December 2016.  Mr. El-Batrawi is the founder of the Company and our current Chief Executive Officer and director, and was involved, the complaint alleges, in Plaintiff's hiring.  As part of his compensation, Mr. Davis claims that he expected to receive stock options in the Company.  He has alleged that "after several months of unsuccessfully attempting to persuade the Company's founder to implement certain protocols and procedures" he resigned from his executive officer and director positions, and entered into a written agreement with the Company for services to be rendered as a consultant.  Mr. Davis claims that the Company breached its agreement to award him certain stock options and includes a claim for wage and hour violations. The lawsuit also includes a request for declaratory and injunctive relief.  He also included a claim under California Unfair Practices Act.  The Company denies liability and asserts that it has paid Davis all amounts due to him under the contract.  It intends to vigorously defend the lawsuit, by, *inter alia*, removing the case to binding arbitration pursuant to the contract the plaintiff alleges.

**Note 11 – Subsequent Events**

Subsequent to December 31, 2019, the Company issued 166,00 stock options with an exercise price of $4.00 per share that expire on December 31, 2022 to its former Chief Executive Officer and issued 250,000 stock options to its former President.

84

## Exhibits

Certain of the agreements filed as exhibits to this Report contain representations and warranties by the parties to the agreements that have been made solely for the benefit of the parties to the agreement. These representations and warranties:

- may have been qualified by disclosures that were made to the other parties in connection with the negotiation of the agreements, which disclosures are not necessarily reflected in the agreements;

- may apply standards of materiality that differ from those of a reasonable investor; and

- were made only as of specified dates contained in the agreements and are subject to subsequent developments and changed circumstances.

Accordingly, these representations and warranties may not describe the actual state of affairs as of the date that these representations and warranties were made or at any other time. Investors should not rely on them as statements of fact.

### EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 1.1 | Form of Underwriting Agreement (incorporated by reference to Exhibit 1.1 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 3.1 | Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.2 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.2 | Amended and Restated Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.4 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.3 | Bylaws of YayYo, Inc. (incorporated by reference to Exhibit 2.3 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.4 | Amended and Restated Bylaws of YayYo, Inc. (incorporated by reference to Exhibit 3.4 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 3.5 | Certificate of Conversion of YayYo, LLC (incorporated by reference to Exhibit 2.1 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 3.6 | Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock (incorporated by reference to Exhibit 2.5 contained in the Registrant's Form 1-A filed on December 15, 2016). |
| 4.1 | Secured Convertible Note to Chase Financing Inc., dated January 6, 2017 (incorporated by reference to Exhibit 6.6 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 4.2 | Promissory Note with X, LLC, dated January 15, 2017 (incorporated by reference to Exhibit 6.8 contained in the Registrant's Form 1-A filed on February 3, 2017). |
| 4.3* | Warrant dated March 2, 2018. |

| 4.4 | Senior Secured Note, dated March 8, 2018 (incorporated by reference to Exhibit 4.4 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 4.5 | Form of Secured Promissory Note (incorporated by reference to Exhibit 6.14 contained in the Registrant's Form 1-U filed on March 26, 2018). |
| 4.6 | Secured Promissory Note, dated December 27, 2017 (incorporated by reference to Exhibit 6.16 contained in the Registrant's Form 1-A filed on March 26, 2018). |
| 4.7 | Form of Underwriter Warrant (incorporated by reference to Exhibit 4.7 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 10.1 | Form of Subscription Agreement (incorporated by reference to Exhibit 4.1 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 10.2 | Product Management Proposal (incorporated by reference to Exhibit 10.2 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.3+ | Executive Employment Offer (incorporated by reference to Exhibit 10.3 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.4+ | 2016 Equity Incentive Plan (incorporated by reference to Exhibit 10.4 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.5 | Agreement with Chase Financing Inc., dated January 1, 2017 (incorporated by reference to Exhibit 10.5 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.6 | Limited Recourse Guaranty and Pledge with X, LLC, dated January 6, 2017 (incorporated by reference to Exhibit 6.5 contained in the Registrant's Form 1-A filed on January 19, 2017). |
| 10.7 | Common Stock Purchase Agreement, dated January 6, 2017 (incorporated by reference to Exhibit 10.7 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.8 | Form of SAFE Agreement (incorporated by reference to Exhibit 6.9 contained in the Registrant's Form 1-A filed on February 3, 2017). |
| 10.9 | Securities Purchase Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.9 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.10 | Side Agreement, dated July 15, 2017 (incorporated by reference to Exhibit 6.13 contained in the Registrant's Form 1-A filed on March 28, 2018). |
| 10.11 | Deposit Account Control Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.11 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.12 | Security Agreement, dated December 27, 2017 (incorporated by reference to Exhibit 6.28 contained in the Registrant's Form 1-A filed on March 26, 2018). |
| 10.13 | Registration Rights Agreement, dated March 8, 2018 (incorporated by reference to Exhibit 10.13 contained in the Registrant's Form S-1/A filed on June 7, 2018). |

| 10.14 | Patent and Trademark Security Agreement, dated December 27, 2017 (incorporated by reference to Exhibit 10.14 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
|---|---|
| 10.15+ | Incentive Agreement For Grant of Stock, dated April 1, 2018 (incorporated by reference to Exhibit 10.15 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.16 | Form of Open End Lease Agreement and Disclosure Statement (incorporated by reference to Exhibit 10.16 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.17+ | Non-Qualified Stock Option Agreement, dated June 9, 2017 (incorporated by reference to Exhibit 10.17 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.18 | Independent Director Agreement, dated November 27, 2017 (incorporated by reference to Exhibit 10.18 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.19 | Independent Director Agreement, dated November 8, 2017 (incorporated by reference to Exhibit 10.19 contained in the Registrant's Form S-1/A filed on June 7, 2018). |
| 10.20 | Voting Trust Agreement, dated October 11, 2018, by and among YayYo, Inc., X, LLC, and each Trustee (incorporated by reference to Exhibit 10.20 contained in the Registrant's Form S-1/A filed on October 11, 2018). |
| 10.21 | Amendment and Exchange Agreement with Note, dated September 12, 2018 (incorporated by reference to Exhibit 10.21 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 10.21.1 | Amendment to Note Payable Agreement (incorporated by reference to Exhibit 10.21.1 contained in the Registrant's Form S-1/A filed on November 5, 2019). |
| 10.22 | Consulting Agreement with Ramy El-Batrawi, dated February 1, 2019 (incorporated by reference to Exhibit 10.22 contained in the Registrant's Form S-1/A filed on October 7, 2019). |
| 10.23 | Promissory Note to Stockholder (incorporated by reference to Exhibit 10.21.1 contained in the Registrant's Form S-1/A filed on November 5, 2019) |
| 10.24 | Employment Agreement between the Registrant and Boyd Bishop (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 10, 2020) |
| 10.25 | Employment Agreement between the Registrant and Jonathan Rosen (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 13, 2020) |
| 21.1 | List of Subsidiaries of the Registrant (incorporated by reference to Exhibit 21.1 contained in the Registrant's Form S-1/A filed on April 30, 2018). |
| 31.1* | Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Schema |
| 101.CAL* | XBRL Taxonomy Calculation Linkbase |
| 101.DEF* | XBRL Taxonomy Definition Linkbase |
| 101.LAB* | XBRL Taxonomy Label Linkbase |

101.PRE*    XBRL Taxonomy Presentation Linkbase

* Filed or furnished herewith.
+ Indicates a management contract or compensatory plan, contract or arrangement in which directors or executive officers participate.

87

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following person on behalf of the Registrant.

Dated: March 31, 2020                                   **YAYYO, INC.**

                                                        By: */s/ Ramy El-Batrawi*
                                                        Ramy El-Batrawi
                                                        Chief Executive Officer, Officer, and Director

                                                        By: */s/ Kevin F. Pickard*
                                                        Kevin F. Pickard
                                                        Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following person on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| */s/ Ramy El-Batrawi*<br>Ramy El-Batrawi | Chief Executive Officer, Officer, and Director | March 31, 2020 |
| */s/ Kevin F. Pickard*<br>Kevin F. Pickard | Chief Financial Officer | March 31, 2020 |
| */s/ Laurie DiGiovanni*<br>Laurie DiGiovanni | Chief Operating Officer | March 31, 2020 |
| */s/ Stephen M. Sanchez*<br>Stephen M. Sanchez | Director | March 31, 2020 |
| */s/ Harbant S. Sidhu*<br>Harbant S. Sidhu | Director | March 31, 2020 |
| */s/ Douglas M. Mox*<br>Douglas M. Mox | Director | March 31, 2020 |
| */s/ John P. O'Neill*<br>John P. O'Neill | Director | March 31, 2020 |

EX-4.3 2 ex4-3.htm

**Exhibit 4.3**

**[FORM OF WARRANT]**

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL TO THE HOLDER (IF REQUESTED BY THE COMPANY), IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. THE NUMBER OF SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 1(a) OF THIS WARRANT.**

**YAYYO, INC.**

**WARRANT TO PURCHASE COMMON STOCK**

Warrant No.: W-1

Date of Issuance: March 2nd, 2018 ("**Issuance Date**")

Yayyo, Inc., a Delaware corporation (the "**Company**"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, BELLRIDGE CAPITAL, LP, the registered holder hereof or its permitted assigns (the "**Holder**"), is entitled, subject to the terms set forth below, to purchase from the Company, at the Exercise Price (as defined below) then in effect, upon exercise of this Warrant to Purchase Common Stock (including any Warrants to Purchase Common Stock issued in exchange, transfer or replacement hereof, the "**Warrant**"), at any time or times on or after the Issuance Date, but not after 11:59 p.m., New York time, on the Expiration Date (as defined below), 1,500,000 (subject to adjustment as provided herein) fully paid and non-assessable shares of Common Stock (as defined below) (the "**Warrant Shares**", and such number of Warrant Shares, the "**Warrant Number**"). Except as otherwise defined herein, capitalized terms in this Warrant shall have the meanings set forth in Section 19. This Warrant is one of the Warrants to Purchase Common Stock (the "**SPA Warrants**") issued pursuant to Section 1 of that certain Securities Purchase Agreement, dated as of March 2, 2018 (the "**Subscription Date**"), by and among the Company and the investors (the "**Buyers**") referred to therein, as amended from time to time (the "**Securities Purchase Agreement**").

## 1. EXERCISE OF WARRANT.

(a) Mechanics of Exercise. Subject to the terms and conditions hereof (including, without limitation, the limitations set forth in Section 1(f)), this Warrant may be exercised by the Holder on any day on or after the Issuance Date (an "**Exercise Date**"), in whole or in part, by delivery (whether via facsimile or otherwise) of a written notice, in the form attached hereto as **Exhibit A** (the "**Exercise Notice**"), of the Holder's election to exercise this Warrant. Within one (1) Trading Day following an exercise of this Warrant as aforesaid, the Holder shall deliver payment to the Company of an amount equal to the Exercise Price in effect on the date of such exercise multiplied by the number of Warrant Shares as to which this Warrant was so exercised (the "**Aggregate Exercise Price**") in cash or via wire transfer of immediately available funds if the Holder did not notify the Company in such Exercise Notice that such exercise was made pursuant to a Cashless Exercise (as defined in Section 1(d)). The Holder shall not be required to deliver the original of this Warrant in order to effect an exercise hereunder. Execution and delivery of an Exercise Notice with respect to less than all of the Warrant Shares shall have the same effect as cancellation of the original of this Warrant and issuance of a new Warrant evidencing the right to purchase the remaining number of Warrant Shares. Execution and delivery of an Exercise Notice for all of the then-remaining Warrant Shares shall have the same effect as cancellation of the original of this Warrant after delivery of the Warrant Shares in accordance with the terms hereof. On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by facsimile or electronic mail an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as **Exhibit B**, to the Holder and, if after the Public Company Date, the Company's transfer agent (the "**Transfer Agent**"), which confirmation shall, if after the Public Company Date, constitute an instruction to the Transfer Agent to process such Exercise Notice in accordance with the terms herein. On or before the second (2nd) Trading Day following the date on which the Company has received such Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date), the Company shall (X) if on or after the Public Company Date, provided that the Transfer Agent is participating in The Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal at Custodian system, or (Y) if either (x) prior to the Public Company Date or (y) on or after the Public Company Date if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, upon the request of the Holder, issue and deliver (via reputable overnight courier) to the address as specified in the Exercise Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled pursuant to such exercise. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of delivery of the certificates evidencing such Warrant Shares (as the case may be). If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant submitted for exercise is greater than the number of Warrant Shares being acquired upon an exercise and upon surrender of this Warrant to the Company by the Holder, then, at the request of the Holder, the Company shall as soon as practicable and in no event later than two (2) Business Days after any exercise and at its own expense, issue and deliver to the Holder (or its designee) a new Warrant (in accordance with Section 7(d)) representing the right to purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number. The Company shall pay any and all transfer, stamp, issuance and similar taxes, costs and expenses (including, without limitation, fees and expenses of the Transfer Agent) that may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant. Notwithstanding the foregoing, except in the case where an exercise of this Warrant is validly made pursuant to a Cashless Exercise), the Company's failure to deliver Warrant Shares to the Holder on or prior to the later of ((i) two (2) Trading Days after receipt of the applicable Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date) and (ii) one (1) Trading Day after the Company's receipt of the Aggregate Exercise Price (or valid notice of a Cashless Exercise (such later date, the "**Share Delivery Date**") shall not be deemed to be a breach of this Warrant. Notwithstanding anything to the contrary contained in this Warrant or the Registration Rights Agreement, after the effective date of the Registration Statement (as defined in the Registration Rights Agreement) and prior to the Holder's receipt of the notice of a Grace Period (as defined in the Registration Rights Agreement), the Company shall cause the Transfer Agent to deliver unlegended shares of Common Stock to the Holder (or its designee) in connection with any sale of Registrable Securities (as defined in the Registration Rights Agreement) with respect to which the Holder has entered into a contract for sale, and delivered a copy of the prospectus included as part of the particular Registration Statement to the extent applicable, and for which the Holder has not yet settled. From the Issuance Date through and including the Expiration Date, the Company shall maintain a transfer agent that participates in the DTC's Fast Automated Securities Transfer Program. Notwithstanding any provision of this Warrant to the contrary, at any time prior to the Listing Date, no more than the Pre-Listing Maximum Eligibility Number of Warrant Shares shall be exercisable hereunder.

(b) <u>Exercise Price</u>. For purposes of this Warrant, "**Exercise Price**" means $4.00, subject to adjustment as provided herein.

(c)      <u>Company's Failure to Timely Deliver Securities</u>.

(i) <u>General</u>. The Company shall in all cases use its reasonable best efforts to comply with the delivery requirements set forth herein and shall do all things and take all actions reasonably requested by the Holder in furtherance thereof.

(ii)      Intentionally omitted

(d) <u>Cashless Exercise</u>. Notwithstanding anything contained herein to the contrary (other than Section 1(f) below), if at the time of exercise hereof a registration statement is not effective (or the prospectus contained therein is not available for use) for the issuance of all of the Warrant Shares being exercised pursuant to the applicable Exercise Notice, but not prior to the earlier to occur of (x) such initial time the Common Stock of the Company is listed on an Eligible Market and (y) August 31, 2018, then the Holder may, in its sole discretion, exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of Warrant Shares determined according to the following formula (a "**Cashless Exercise**"):

$$\text{Net Number} = \frac{(A \times B) - (A \times C)}{D}$$

For purposes of the foregoing formula:

A= the total number of shares with respect to which this Warrant is then being exercised.

B = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders; and (ii) on or after the Public Company Date, the greater of (I) the Spot Price and (II) the quotient of (A) the sum of the VWAP of the Common Stock of each of the twenty (20) Trading Days ending at the close of business on the Principal Market immediately prior to the time of exercise as set forth in the applicable Exercise Notice, divided by (B) twenty (20).

C = the Exercise Price then in effect for the applicable Warrant Shares at the time of such exercise.

D = (i) prior to the Public Company Date, the greatest of (w) the last purchase price at which the Company issued or sold Common Stock preceding the date of the Exercise Notice, (x) the initial conversion price of the last Convertible Securities issued or sold by the Company preceding the date of the Exercise Notice, (y) the initial exercise price of the last Options issued or sold by the Company preceding the date of the Exercise Notice and (z) the fair market value of the Common Stock as mutually determined by the Company and the Required Holders and (ii) after the Public Company Date, the Spot Price.

For purposes of Rule 144(d) promulgated under the 1933 Act, as in effect on the Subscription Date, it is intended that the Warrant Shares issued in a Cashless Exercise shall be deemed to have been acquired by the Holder, and the holding period for the Warrant Shares shall be deemed to have commenced, on the date this Warrant was originally issued pursuant to the Securities Purchase Agreement.

(e) <u>Disputes</u>. In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the number of Warrant Shares to be issued pursuant to the terms hereof, the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed and resolve such dispute in accordance with Section 13.

(f) <u>Limitations on Exercises</u>. From and after the Public Company Date, the Company shall not effect the exercise of any portion of this Warrant, and the Holder shall not have the right to exercise any portion of this Warrant, pursuant to the terms and conditions of this Warrant and any such exercise shall be null and void and treated as if never made, to the extent that after giving effect to such exercise, the Holder together with the other Attribution Parties collectively would beneficially own in excess of 4.99% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such exercise. For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by the Holder and the other Attribution Parties shall include the number of shares of Common Stock held by the Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (A) exercise of the remaining, unexercised portion of this Warrant beneficially owned by the Holder or any of the other Attribution Parties and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including other SPA Warrants) beneficially owned by the Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 1(f). For purposes of this Section 1(f), beneficial ownership shall be calculated in accordance with Section 13(d) of the 1934 Act. For purposes of determining the number of outstanding shares of Common Stock the Holder may acquire upon the exercise of this Warrant without exceeding the Maximum Percentage, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (y) a more recent public announcement by the Company or (z) any other written notice by the Company or the Transfer Agent, if any, setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**"). If the Company receives an Exercise Notice from the Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall (i) notify the Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Exercise Notice would otherwise cause the Holder's beneficial ownership, as determined pursuant to this Section 1(f), to exceed the Maximum Percentage, the Holder must notify the Company of a reduced number of Warrant Shares to be acquired pursuant to such Exercise Notice (the number of shares by which such purchase is reduced, the "**Reduction Shares**") and (ii) as soon as reasonably practicable, the Company shall return to the Holder any exercise price paid by the Holder for the Reduction Shares. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing or by electronic mail to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Holder and any other Attribution Party since the date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to the Holder upon exercise of this Warrant results in the Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the 1934 Act), the number of shares so issued by which the Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and the Holder shall not have the power to vote or to transfer the Excess Shares. As soon as reasonably practicable after the issuance of the Excess Shares has been deemed null and void, the Company shall return to the Holder the exercise price paid by the Holder for the Excess Shares. Upon delivery of a written notice to the Company, the Holder may from time to time increase (with such increase not effective until the sixty-first (61st) day after delivery of such notice) or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to the Holder and the other Attribution Parties and not to any other holder of SPA Warrants that is not an Attribution Party of the Holder. For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Warrant in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the 1934 Act. No prior inability to exercise this Warrant pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of exercisability. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 1(f) to the extent necessary to correct this paragraph or any portion of this paragraph which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 1(f) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of this Warrant.

(g)     Reservation of Shares.

(i) Required Reserve Amount. So long as this Warrant remains outstanding, the Company shall at all times keep reserved for issuance under this Warrant a number of shares of Common Stock at least equal to 200% of the maximum number of shares of Common Stock as shall be necessary to satisfy the Company's obligation to issue shares of Common Stock under the SPA Warrants then outstanding (without regard to any limitations on exercise) (the "**Required Reserve Amount**"); provided that at no time shall the number of shares of Common Stock reserved pursuant to this Section 1(g)(i) be reduced other than proportionally in connection with any exercise or redemption of SPA Warrants or such other event covered by Section 2(i) below. The Required Reserve Amount (including, without limitation, each increase in the number of shares so reserved) shall be allocated pro rata among the holders of the SPA Warrants based on number of shares of Common Stock issuable upon exercise of SPA Warrants held by each holder on the Closing Date (without regard to any limitations on exercise) or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**"). In the event that a holder shall sell or otherwise transfer any of such holder's SPA Warrants, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any SPA Warrants shall be allocated to the remaining holders of SPA Warrants, pro rata based on the number of shares of Common Stock issuable upon exercise of the SPA Warrants then held by such holders (without regard to any limitations on exercise).

(ii) Insufficient Authorized Shares. If, notwithstanding Section 1(g)(i) above, and not in limitation thereof, at any time while any of the SPA Warrants remain outstanding, the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve the Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for all the SPA Warrants then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its board of directors to recommend to the stockholders that they approve such proposal. In the event that the Company is prohibited from issuing shares of Common Stock upon an exercise of this Warrant due to the failure by the Company to have sufficient shares of Common Stock available out of the authorized but unissued shares of Common Stock (such unavailable number of shares of Common Stock, the "**Authorization Failure Shares**"), in lieu of delivering such Authorization Failure Shares to the Holder, the Company shall pay cash in exchange for the cancellation of such portion of this Warrant exercisable into such Authorization Failure Shares at a price equal to the sum of (i) the product of (x) such number of Authorization Failure Shares and (y) the greatest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date the Holder delivers the applicable Exercise Notice with respect to such Authorization Failure Shares to the Company and ending on the date of such issuance and payment under this Section 1(f); and (ii) to the extent the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of Authorization Failure Shares, any Buy-In Payment Amount, brokerage commissions and other out-of-pocket expenses, if any, of the Holder incurred in connection therewith. Nothing contained in this Section 1(g) shall limit any obligations of the Company under any provision of the Securities Purchase Agreement.

5

2. <u>ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES</u>. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.

(a) <u>Stock Dividends and Splits</u>. Without limiting any provision of Section 2(c) or Section 4, if the Company, at any time on or after the Subscription Date, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in shares of Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

(b) Intentionally omitted

(c) <u>Number of Warrant Shares</u>. Simultaneously with any adjustment to the Exercise Price pursuant to this Section 2, the number of Warrant Shares that may be purchased upon exercise of this Warrant shall be increased or decreased proportionately, so that after such adjustment the aggregate Exercise Price payable hereunder for the adjusted number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment (without regard to any limitations on exercise contained herein).

(d) Intentionally omitted

(e) Intentionally omitted

(f) Intentionally omitted

(g) <u>Calculations</u>. All calculations under this Section 2 shall be made by rounding to the nearest cent or the nearest 1/100th of a share, as applicable. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issuance or sale of Common Stock.

(h) <u>Voluntary Adjustment By Company</u>. The Company may at any time during the term of this Warrant, with the prior written consent of the Required Holders (as defined in the Securities Purchase Agreement), reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the board of directors of the Company.

(i) <u>Dollar-Value Adjustment</u>. At any time the Dollar Value of this Warrant is less than $6 million, the number of Warrant Shares that may be purchased upon exercise of this Warrant (without regard to any limitations on exercise set forth herein) shall automatically be increased such that, after giving effect to such increase, the Dollar Value of this Warrant equals $6 million.

6

3. <u>RIGHTS UPON DISTRIBUTION OF ASSETS</u>. In addition to any adjustments pursuant to Section 2 above, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property, options, evidence of indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "**Distribution**"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations or restrictions on exercise of this Warrant, including without limitation, the Maximum Percentage) immediately before the date on which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution (provided, however, that, on or after the Public Company Date, to the extent that the Holder's right to participate in any such Distribution would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to the extent of the Maximum Percentage (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Distribution (and beneficial ownership) to the extent of any such excess) and the portion of such Distribution shall be held in abeyance for the benefit of the Holder until such time or times, if ever, as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such Distribution (and any Distributions declared or made on such initial Distribution or on any subsequent Distribution held similarly in abeyance) to the same extent as if there had been no such limitation).

4. INTENTIONALLY OMITTED

5. <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation (as defined in the Securities Purchase Agreement), Bylaws (as defined in the Securities Purchase Agreement) or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issuance or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (a) shall not increase the par value of any shares of Common Stock receivable upon the exercise of this Warrant above the Exercise Price then in effect, and (b) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the exercise of this Warrant. Notwithstanding anything herein to the contrary, if after the sixty (60) calendar day anniversary of the Issuance Date, the Holder is not permitted to exercise this Warrant in full for any reason (other than pursuant to restrictions set forth in Section 1(f) hereof), the Company shall use its best efforts to promptly remedy such failure, including, without limitation, obtaining such consents or approvals as necessary to permit such exercise into shares of Common Stock.

6. <u>WARRANT HOLDER NOT DEEMED A STOCKHOLDER</u>. Except as otherwise specifically provided herein, the Holder, solely in its capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in its capacity as the Holder of this Warrant, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which it is then entitled to receive upon the due exercise of this Warrant. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 6, the Company shall provide the Holder with copies of the same notices and other information given to the stockholders of the Company generally, contemporaneously with the giving thereof to the stockholders.

7. <u>REISSUANCE OF WARRANTS.</u>

(a) <u>Transfer of Warrant</u>. If this Warrant is to be transferred, the Holder shall surrender this Warrant to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Warrant (in accordance with Section 7(d)), registered as the Holder may request, representing the right to purchase the number of Warrant Shares being transferred by the Holder and, if less than the total number of Warrant Shares then underlying this Warrant is being transferred, a new Warrant (in accordance with Section 7(d)) to the Holder representing the right to purchase the number of Warrant Shares not being transferred.

(b)<u>Lost, Stolen or Mutilated Warrant</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of this Warrant, the Company shall execute and deliver to the Holder a new Warrant (in accordance with Section 7(d)) representing the right to purchase the Warrant Shares then underlying this Warrant.

(c)<u>Exchangeable for Multiple Warrants</u>. This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Warrant or Warrants (in accordance with Section 7(d)) representing in the aggregate the right to purchase the number of Warrant Shares then underlying this Warrant, and each such new Warrant will represent the right to purchase such portion of such Warrant Shares as is designated by the Holder at the time of such surrender; provided, however, no warrants for fractional shares of Common Stock shall be given.

(d)<u>Issuance of New Warrants</u>. Whenever the Company is required to issue a new Warrant pursuant to the terms of this Warrant, such new Warrant (i) shall be of like tenor with this Warrant, (ii) shall represent, as indicated on the face of such new Warrant, the right to purchase the Warrant Shares then underlying this Warrant (or in the case of a new Warrant being issued pursuant to Section 7(a) or Section 7(c), the Warrant Shares designated by the Holder which, when added to the number of shares of Common Stock underlying the other new Warrants issued in connection with such issuance, does not exceed the number of Warrant Shares then underlying this Warrant), (iii) shall have an issuance date, as indicated on the face of such new Warrant which is the same as the Issuance Date, and (iv) shall have the same rights and conditions as this Warrant.

8. <u>NOTICES</u>. Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant (other than the issuance of shares of Common Stock upon exercise in accordance with the terms hereof), including in reasonable detail a description of such action and the reason therefor. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) immediately upon each adjustment of the Exercise Price and the number of Warrant Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s), (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the shares of Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property to holders of shares of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder, (iii) at least ten (10) Trading Days prior to the consummation of any Fundamental Transaction and (iv) within one (1) Business Day of the occurrence of an Event of Default (as defined in the Notes), setting forth in reasonable detail any material events with respect to such Event of Default and any efforts by the Company to cure such Event of Default. To the extent that any notice provided hereunder constitutes, or contains, material, non-public information regarding the Company or any of its Subsidiaries, the Company shall simultaneously file such notice with the SEC (as defined in the Securities Purchase Agreement) pursuant to a Current Report on Form 8-K. If the Company or any of its Subsidiaries provides material non- public information to the Holder that is not simultaneously filed in a Current Report on Form 8- K and the Holder has not agreed to receive such material non-public information, the Company hereby covenants and agrees that the Holder shall not have any duty of confidentiality to the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents with respect to, or a duty to any of the foregoing not to trade on the basis of, such material non-public information. It is expressly understood and agreed that the time of execution specified by the Holder in each Exercise Notice shall be definitive and may not be disputed or challenged by the Company.

9. <u>AMENDMENT AND WAIVER</u>. Except as otherwise provided herein, the provisions of this Warrant (other than Section 1(f)) may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Holder. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

10. <u>SEVERABILITY</u>. If any provision of this Warrant is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Warrant so long as this Warrant as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

**11.** <u>GOVERNING LAW</u>. This Warrant shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to the Company at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS WARRANT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

12. <u>CONSTRUCTION; HEADINGS</u>. This Warrant shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any Person as the drafter hereof. The headings of this Warrant are for convenience of reference and shall not form part of, or affect the interpretation of, this Warrant. Terms used in this Warrant but defined in the other Transaction Documents shall have the meanings ascribed to such terms on the Closing Date (as defined in the Securities Purchase Agreement) in such other Transaction Documents unless otherwise consented to in writing by the Holder.

13. <u>DISPUTE RESOLUTION</u>.

      (a)     <u>Submission to Dispute Resolution</u>.

      (i) In the case of a dispute relating to the Exercise Price, the Closing Sale Price, the Bid Price, Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or fair market value or the arithmetic calculation of the number of Warrant Shares (as the case may be) (including, without limitation, a dispute relating to the determination of any of the foregoing), the Company or the Holder (as the case may be) shall submit the dispute to the other party via facsimile (A) if by the Company, within two (2) Business Days after the occurrence of the circumstances giving rise to such dispute or (B) if by the Holder, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Company are unable to promptly resolve such dispute relating to such Exercise Price, such Closing Sale Price, such Bid Price, such Black Scholes Consideration Value, Event of Default Black Scholes Value, Black Scholes Value or such fair market value or such arithmetic calculation of the number of Warrant Shares (as the case may be), at any time after the second (2nd) Business Day following such initial notice by the Company or the Holder (as the case may be) of such dispute to the Company or the Holder (as the case may be), then the Holder may, at its sole option, select an independent, reputable investment bank to resolve such dispute.

      (ii)     The Holder and the Company shall each deliver to such investment bank (A) a copy of the initial dispute submission so delivered in accordance with the first sentence of this Section 13 and (B) written documentation supporting its position with respect to such dispute, in each case, no later than 5:00 p.m. (New York time) by the fifth (5th) Business Day immediately following the date on which the Holder selected such investment bank (the "**Dispute Submission Deadline**") (the documents referred to in the immediately preceding clauses (A) and (B) are collectively referred to herein as the "**Required Dispute Documentation**") (it being understood and agreed that if either the Holder or the Company fails to so deliver all of the Required Dispute Documentation by the Dispute Submission Deadline, then the party who fails to so submit all of the Required Dispute Documentation shall no longer be entitled to (and hereby waives its right to) deliver or submit any written documentation or other support to such investment bank with respect to such dispute and such investment bank shall resolve such dispute based solely on the Required Dispute Documentation that was delivered to such investment bank prior to the Dispute Submission Deadline). Unless otherwise agreed to in writing by both the Company and the Holder or otherwise requested by such investment bank, neither the Company nor the Holder shall be entitled to deliver or submit any written documentation or other support to such investment bank in connection with such dispute (other than the Required Dispute Documentation).

      (iii) The Company and the Holder shall cause such investment bank to determine the resolution of such dispute and notify the Company and the Holder of such resolution no later than ten (10) Business Days immediately following the Dispute Submission Deadline. The fees and expenses of such investment bank shall be borne solely by the Company, and such investment bank's resolution of such dispute shall be final and binding upon all parties absent manifest error.

      (b)<u>Miscellaneous</u>. The Company expressly acknowledges and agrees that (i) this Section 13 constitutes an agreement to arbitrate between the Company and the Holder (and constitutes an arbitration agreement) under the rules then in effect under § 7501, et seq. of the New York Civil Practice Law and Rules ("**CPLR**") and that the Holder is authorized to apply for an order to compel arbitration pursuant to CPLR § 7503(a) in order to compel compliance with this Section 13, (ii) a dispute relating to the Exercise Price includes, without limitation, disputes as to (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(c), (B) the consideration per share at which an issuance or deemed issuance of Common Stock occurred, (C) whether any issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred, (iii) the terms of this Warrant and each other applicable Transaction Document shall serve as the basis for the selected investment bank's resolution of the applicable dispute, such investment bank shall be entitled (and is hereby expressly authorized) to make all findings, determinations and the like that such investment bank determines are required to be made by such investment bank in connection with its resolution of such dispute (including, without limitation, determining (A) whether an issuance or sale or deemed issuance or sale of Common Stock occurred under Section 2(c), (B) the consideration per share at which an issuance or deemed issuance of Common Stock occurred, (C) whether any issuance or sale or deemed issuance or sale of Common Stock was an issuance or sale or deemed issuance or sale of Excluded Securities, (D) whether an agreement, instrument, security or

the like constitutes and Option or Convertible Security and (E) whether a Dilutive Issuance occurred) and in resolving such dispute such investment bank shall apply such findings, determinations and the like to the terms of this Warrant and any other applicable Transaction Documents, (iv) the Holder (and only the Holder), in its sole discretion, shall have the right to submit any dispute described in this Section 13 to any state or federal court sitting in The City of New York, Borough of Manhattan in lieu of utilizing the procedures set forth in this Section 13 and (v) nothing in this Section 13 shall limit the Holder from obtaining any injunctive relief or other equitable remedies (including, without limitation, with respect to any matters described in this Section 13).

10

14. <u>REMEDIES, CHARACTERIZATION, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Warrant shall be cumulative and in addition to all other remedies available under this Warrant and the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the right of the Holder to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Warrant. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, exercises and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holder of this Warrant shall be entitled, in addition to all other available remedies, to specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving actual damages and without posting a bond or other security. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Warrant (including, without limitation, compliance with Section 2 hereof). The issuance of shares and certificates for shares as contemplated hereby upon the exercise of this Warrant shall be made without charge to the Holder or such shares for any issuance tax or other costs in respect thereof, provided that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the Holder or its agent on its behalf.

15. <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>. If (a) this Warrant is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the holder otherwise takes action to collect amounts due under this Warrant or to enforce the provisions of this Warrant or (b) there occurs any bankruptcy, reorganization, receivership of the company or other proceedings affecting company creditors' rights and involving a claim under this Warrant, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, without limitation, attorneys' fees and disbursements.

16. <u>TRANSFER</u>. This Warrant may be offered for sale, sold, transferred or assigned without the consent of the Company, except as may otherwise be required by Section 2(g) of the Securities Purchase Agreement.

17. <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Warrant, from and after the Public Company Date, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-k or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its subsidiaries.

19. <u>CERTAIN DEFINITIONS</u>. For purposes of this Warrant, the following terms shall have the following meanings:

    (a)"**1933 Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

    (b)"**1934 Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(c)**"Adjustment Right"** means any right granted with respect to any securities issued in connection with, or with respect to, any issuance or sale (or deemed issuance or sale in accordance with Section 2) of shares of Common Stock (other than rights of the type described in Section 2(c) and 4 hereof) that could result in a decrease in the net consideration received by the Company in connection with, or with respect to, such securities (including, without limitation, any cash settlement rights, cash adjustment or other similar rights).

(d)**"Affiliate"** means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(e)**"Approved Stock Plan"** means any employee benefit plan which has been approved by the board of directors of the Company prior to or subsequent to the date hereof pursuant to which shares of Common Stock and standard options to purchase Common Stock may be issued to any employee, officer or director for services provided to the Company in their capacity as such.

(f)**"Attribution Parties"** means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Section 13(d) of the 1934 Act. For clarity, the purpose of the foregoing is to subject collectively the Holder and all other Attribution Parties to the Maximum Percentage.

(g)**"Bid Price"** means, for any security as of the particular time of determination, the bid price for such security on the Principal Market as reported by Bloomberg as of such time of determination, or, if the Principal Market is not the principal securities exchange or trading market for such security, the bid price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg as of such time of determination, or if the foregoing does not apply, the bid price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg as of such time of determination, or, if no bid price is reported for such security by Bloomberg as of such time of determination, the average of the bid prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC) as of such time of determination. If the Bid Price cannot be calculated for a security as of the particular time of determination on any of the foregoing bases, the Bid Price of such security as of such time of determination shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(h)**"Black Scholes Consideration Value"** means (x) prior to the Public Company Date, the fair market value of the applicable Option, Convertible Security or Adjustment Right (as the case may be) as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the applicable Option, Convertible Security or Adjustment Right (as the case may be) as of the date of issuance thereof calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the public announcement of the execution of definitive documents with respect to the issuance of such Option or Convertible Security (as the case may be), (ii) a risk- free interest rate corresponding to the U.S. Treasury rate for a period equal to the remaining term of such Option, Convertible Security or Adjustment Right (as the case may be) as of the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be), (iii) a zero cost of borrow and (iv) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the date of issuance of such Option, Convertible Security or Adjustment Right (as the case may be).

(i)**"Black Scholes Value"** means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(i), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the greater of (1) the highest Closing Sale Price of the Common Stock during the period beginning on the Trading Day immediately preceding the announcement of the applicable Fundamental Transaction (or the consummation of the applicable Fundamental Transaction, if earlier) and ending on the Trading Day of the Holder's request pursuant to Section 4(c)(i) and (2) the sum of the price per share being offered in cash in the applicable Fundamental Transaction (if any) plus the value of the non-

cash consideration being offered in the applicable Fundamental Transaction (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(i), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(i) and (2) the remaining term of this Warrant as of the date of consummation of the applicable Fundamental Transaction or as of the date of the Holder's request pursuant to Section 4(c)(i) if such request is prior to the date of the consummation of the applicable Fundamental Transaction, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the earliest to occur of (A) the public disclosure of the applicable Fundamental Transaction, (B) the consummation of the applicable Fundamental Transaction and (C) the date on which the Holder first became aware of the applicable Fundamental Transaction.

(j)     "**Bloomberg**" means Bloomberg, L.P.

(k)    "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(l)     "**Closing Sale Price**" means, for any security as of any date, the last closing trade price for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing trade price, then the last trade price of such security prior to 4:00:00 p.m., New York time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing does not apply, the last trade price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no last trade price is reported for such security by Bloomberg, the average of the ask prices of any market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Sale Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(m)   "**Common Stock**" means (i) the Company's shares of common stock, $0.000001 par value per share, and (ii) any capital stock into which such common stock shall have been changed or any share capital resulting from a reclassification of such common stock.

(n)    "**Convertible Securities**" means any stock or other security (other than Options) that is at any time and under any circumstances, directly or indirectly, convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any shares of Common Stock.

(o)    "**Dollar Value**" means, as of any given time, the sum of (x) the sum of each Aggregate Exercise Price of each exercise of this Warrant (assuming solely for such purpose that each such exercise was a cash exercise of this Warrant) that occurred prior to such given time and (y) the Aggregate Exercise Price of a cash exercise of the unexercised portion of this Warrant as of such given time.

12

(p)"**Eligible Market**" means The New York Stock Exchange, the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Select Market, the Nasdaq Global Market, the OTCQB, the OTCQX or the Principal Market.

(q)"**Event Market Price**" means, with respect to any Stock Combination Event Date, the quotient determined by dividing (x) the sum of the VWAP of the Common Stock for each of the five (5) lowest Trading Days during the twenty (20) consecutive Trading Day period ending and including the Trading Day immediately preceding the sixteenth (16th) Trading Day after such Stock Combination Event Date, divided by (y) five (5).

(r)"**Event of Default Black Scholes Value**" means (x) prior to the Public Company Date, the fair market value of the unexercised portion of this Warrant as determined in good faith by the Required Holders, and (y) on or after the Public Company Date, the value of the unexercised portion of this Warrant remaining on the date of the Holder's request pursuant to Section 4(c)(ii), which value is calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the highest Closing Sale Price of the Common Stock during the period beginning on the date of the occurrence of the Event of Default through the date all Events of Default have been cured (assuming for such purpose that the Notes remain outstanding) or, if earlier, the Trading Day of the Holder's request pursuant to Section 4(c)(ii), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's request pursuant to Section 4(c)(ii), (iii) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the greater of (1) the remaining term of this Warrant as of the date of the Holder's request pursuant to Section 4(c)(ii) and (2) the remaining term of this Warrant as of the date of the occurrence of such Event of Default, (iv) a zero cost of borrow and (v) an expected volatility equal to the greater of 100% and the 30 day volatility obtained from the "HVT" function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following later of (x) the date of the occurrence of such Event of Default and (y) the date of the public announcement of such Event of Default.

(s)"**Excluded Securities**" means (i) shares of Common Stock or standard options to purchase Common Stock issued to directors, officers or employees of the Company for services rendered to the Company in their capacity as such pursuant to an Approved Stock Plan (as defined above), provided that (A) all such issuances (taking into account the shares of Common Stock issuable upon exercise of such options) after the Subscription Date pursuant to this clause (i) do not, in the aggregate, exceed more than 5% of the Common Stock issued and outstanding immediately prior to the Subscription Date and (B) the exercise price of any such options is not lowered, none of such options are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such options are otherwise materially changed in any manner that adversely affects any of the Buyers; (ii) shares of Common Stock issued upon the conversion or exercise of Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) issued prior to the Subscription Date, provided that the conversion price of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) is not lowered, none of such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are amended to increase the number of shares issuable thereunder and none of the terms or conditions of any such Convertible Securities (other than standard options to purchase Common Stock issued pursuant to an Approved Stock Plan that are covered by clause (i) above) are otherwise materially changed in any manner that adversely affects any of the Buyers; and (iii) the shares of Common Stock issuable upon exercise of the SPA Warrants; provided, that the terms of the SPA Warrant are not amended, modified or changed on or after the Subscription Date (other than antidilution adjustments pursuant to the terms thereof in effect as of the Subscription Date).

(t)"**Expiration Date**" means the date that is the fifth (5th) anniversary of the Issuance Date or, if such date falls on a day other than a Trading Day or on which trading does not take place on the Principal Market (a "**Holiday**"), the next date that is not a Holiday.

13

(u) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby all such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the 1934 Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Warrant calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other shareholders of the Company to surrender their shares of Common Stock without approval of the shareholders of the Company or (C) directly or indirectly, including through subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(v) "**Group**" means a "group" as that term is used in Section 13(d) of the 1934 Act and as defined in Rule 13d-5 thereunder.

(w) "**Listing Date**" means the earlier to occur of (x) May 31, 2018 (solely if the Company fails to use its reasonably best efforts to effect this listing of the Common Stock on an Eligible Market (other than the OTCQB or the OTCQX) on or prior thereto) or (y) the initial date any security of the Company (including, without limitation, the Common Stock) is listed on an Eligible Market (other than the OTCQB or the OTCQX).

(x) "**Notes**" has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all notes issued in exchange therefor or replacement thereof.

(y) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(z) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(aa) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity or a government or any department or agency thereof.

(bb) "**Pre-Listing Maximum Eligibility Number**" means 100,000 Warrant Shares (as adjusted for stock splits, stock dividends, recapitalizations and similar events).

14

(cc) "**Public Company Date**" means the date on which the shares of Common Stock of the Company (or its direct or indirect successor, subsidiary or parent company, whose securities are issued or issuable to holders of Common Stock), whether as a result of a public offering, merger, recapitalization, reorganization or otherwise, are registered under the 1934 Act.

(dd) "**Principal Market**" means, as of any date of determination, the Eligible Market that is the principal securities exchange market for the Common Stock as of such date of determination.

(ee) "**Registration Rights Agreement**" means that certain registration rights agreement, dated as of the Closing Date, by and among the Company and the initial holders of the Notes relating to, among other things, the registration of the resale of the Common Stock issued pursuant to the Securities Purchase Agreement and issuable upon exercise of the SPA Warrants, as may be amended from time to time.

(ff) "**SEC**" means the United States Securities and Exchange Commission or the successor thereto.

(gg) "**Spot Price**" means, with respect to any given Exercise Notice, as applicable:
(A) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the date of the applicable Exercise Notice if such Exercise Notice is (1) both executed and delivered pursuant to Section 1(a) hereof on a day that is not a Trading Day or (2) both executed and delivered pursuant to Section 1(a) hereof on a Trading Day prior to the opening of "regular trading hours" (as defined in Rule 600(b)(64) of Regulation NMS promulgated under the federal securities laws) on such Trading Day, (B) the Bid Price of the Common Stock as of the time of the Holder's execution of the applicable Exercise Notice if such Exercise Notice is executed during "regular trading hours" on a Trading Day and is delivered within two (2) hours thereafter pursuant to Section 1(a) hereof, or (C) the Closing Sale Price of the Common Stock on the date of the applicable Exercise Notice if the date of such Exercise Notice is a Trading Day and such Exercise Notice is both executed and delivered pursuant to Section 1(a) hereof after the close of "regular trading hours" on such Trading Day

(hh) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(ii) "**Successor Entity**" means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(jj) "**Trading Day**" means, as applicable, (i) prior to the Public Company Date, any Business Day, and (ii) from and after the Public Company Date, (x) with respect to all price or trading volume determinations relating to the Common Stock, any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded, provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Holder or (y) with respect to all determinations other than price or trading volume determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

(kk) "**VWAP**" means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market (or, if the Principal Market is not the principal trading market for such security, then on the principal securities exchange or securities market on which such security is then traded) during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "HP" function (set to weighted average) or, if the foregoing does not apply, the dollar volume- weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported in the "pink sheets" by OTC Markets Group Inc. (formerly Pink Sheets LLC). If the VWAP cannot be calculated for such security on such date on any of the foregoing bases, the VWAP of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 13. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination, recapitalization or other similar transaction during such period.

[*signature page follows*]

15

**IN WITNESS WHEREOF,** the Company has caused this Warrant to Purchase Common Stock to be duly executed as of the Issuance Date set out above.

**YAYYO, INC.**

By:

Name: Ramy El-Batrawi
Title:  CEO

16

**EXHIBIT A**

**EXERCISE NOTICE**

**TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS
WARRANT TO PURCHASE COMMON STOCK**

**YAYYO, INC.**

The undersigned holder hereby elects to exercise the Warrant to Purchase Common Stock
No. (the "**Warrant**") of Yayyo, Inc., a Delaware corporation (the "**Company**") as specified below. Capitalized terms used herein and
not otherwise defined shall have the respective meanings set forth in the Warrant.

1. Form of Exercise Price. The Holder intends that payment of the Aggregate Exercise Price shall be made as:

[  ] a "Cash Exercise" with respect to and/or
_____ Warrant Shares;

[  ] a "Cashless Exercise" with respect to_____ Warrant Shares.

In the event that the Holder has elected a Cashless Exercise with respect to some or all of the Warrant Shares to be issued
pursuant hereto, the Holder hereby represents and warrants that (i) this Exercise Notice was executed by the Holder
at_____[a.m.][p.m.] on the date set forth below
and (ii) if applicable, the Bid Price as of such time of execution of this Exercise Notice was
$_____.

2. Payment of Exercise Price. In the event that the Holder has elected a Cash Exercise with respect to some or all of the
Warrant Shares to be issued pursuant hereto, the Holder shall pay the Aggregate Exercise Price in the sum of
$_____ to the Company in accordance with the terms of the Warrant.

4. Delivery of Warrant Shares. The Company shall deliver to Holder, or its designee or agent as specified
below,_____ shares of Common Stock in accordance with the terms of the
Warrant. Delivery shall be made to Holder, or for its benefit, as follows:

[  ] Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to:_____

[  ] Check here if (x) after the Public Company Day and (y) requesting delivery by Deposit/Withdrawal at Custodian
as follows:

DTC Participant: **_____** DTC Number: **_____** Account Number: **___**

Date: **_____,** ____

Name of Registered Holder

By:_____
Name:
Title:

Tax ID: **_____**
Facsimile:**_____**
E-mail Address: **_____**

**EXHIBIT B**

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Exercise Notice and hereby directs _____ to issue the above indicated number of shares of Common Stock from the Company and acknowledged and agreed to by_____ _.

**YAYYO, INC.**

By: _____
Name: Title:

# EXHIBIT G

10-K 1 form10-k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

[X] ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the year ended December 31, 2020

[ ] TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number: 001-39132

# EVmo, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 81-3028414 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**433 N. Camden Drive, Suite 600**
**Beverly Hills, California 90210**
(Address of principal executive offices) (Zip Code)

+1-310-926-2643
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **None** | **N/A** | **N/A** |

Securities registered pursuant to section 12(g) of the Act:

**Common Stock, $0.000001 par value per share**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes [ ] No [X]

Indicate by checkmark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | [ ] | Accelerated filer | [ ] |

Non-accelerated filer                          [X]    Smaller reporting company              [X]
Emerging Growth Company                        [X]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter.

As of June 30, 2020, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $4,136,945 based on the closing price as reported on the OTC.

As of March 29, 2021, there were 35,127,524 shares of common stock, $0.000001 par value per share, outstanding.

**TABLE OF CONTENTS**

| Item Number and Caption | Page |
|---|---|
| Cautionary Note Regarding Forward-Looking Statements | ii |
| **PART I** | |
| 1. Business | 1 |
| 1A. Risk Factors | 8 |
| 1B. Unresolved Staff Comments | 8 |
| 2. Properties | 8 |
| 3. Legal Proceedings | 8 |
| 4. Mine Safety Disclosures | 9 |
| **PART II** | |
| 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 10 |
| 6. Selected Financial Data | 11 |
| 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 11 |
| 7A. Quantitative and Qualitative Disclosures about Market Risk | 16 |
| 8. Financial Statements and Supplementary Data | 16 |
| 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 17 |
| 9A. Controls and Procedures | 17 |
| 9B. Other Information | 18 |
| **PART III** | |
| 10. Directors, Executive Officers, and Corporate Governance | 19 |
| 11. Executive Compensation | 25 |
| 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 27 |
| 13. Certain Relationships and Related Transactions, and Director Independence | 30 |
| 14. Principal Accountant Fees and Services | 31 |
| **PART IV** | |
| 15. Exhibits, Financial Statement Schedules | 32 |
| 16. Form 10-K Summary | 32 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K (this "Report") contains forward-looking statements within the meaning of the Securities Exchange Act of 1934 (the "Exchange Act"). These statements are based on our management's beliefs and assumptions, and on information currently available to management. Forward-looking statements include the information concerning our possible or assumed future results of operations set forth under the headings "Business" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements also include statements in which words such as "expect," "anticipate," "intend," "plan," "believe," "estimate," "consider" or similar expressions are used.

Forward-looking statements are not guarantees of future performance. They involve risks, uncertainties and assumptions. Our future results may differ materially from those expressed in these forward-looking statements. Readers are cautioned not to put undue reliance on any forward-looking statements.

*All brand names or trademarks appearing in this Report are the property of their respective holders. Unless the context requires otherwise, references in this Report to "EVmo," the "Company," "we," "us," and "our" refer to EVmo, Inc., a Delaware corporation, and its consolidated subsidiaries.*

ii

# PART I

## ITEM 1. BUSINESS

### Corporate History

EVmo, Inc., a Delaware corporation, was formed on June 21, 2016 under the name "YayYo, LLC." The Company was subsequently converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). Pursuant to the Conversion, the members of YayYo, LLC have assigned, transferred, exchanged and converted their respective limited liability company membership interests of YayYo, LLC, into shares of common stock, par value $0.000001 per share, of the Company (the "Common Stock"). All of YayYo, LLC's liabilities and assets were automatically transferred to the Company and the Company assumed ownership of such assets and liabilities upon the filing of the "Certificate of Conversion from a Delaware Limited Liability Company to a Delaware Corporation" with the State of Delaware pursuant to Section 265 of the Delaware General Corporation Law. The Company now operates as a "C" corporation formed under the laws of the State of Delaware.

On August 12, 2017, we announced that we were shifting our primary corporate focus in the transportation/ridesharing industry from being an exclusive provider of transportation networks systems towards a more diversified operating company with a direct focus on the vehicle rental business and a related transportation network system.

Prior to March 2017, the Company's operating expenses were covered almost entirely by start-up capital provided by its founder and financing from private investors. In March 2017, the Company launched a best-efforts offering pursuant to "Regulation A+" of the Securities Act of 1933, as amended (the "Securities Act"). The offering was for up to 6,250,000 shares of Common Stock at $8.00 per share when a Form 1-A relating to this offering was qualified by the Securities & Exchange Commission (the "SEC"). Then, on November 15, 2019, the Company completed its initial public offering of 2,625,000 shares of Common Stock, at $4.00 per share, for gross proceeds, before underwriting discounts and commissions and expenses, of $10.5 million and the shares became listed on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "YAYO."

On February 10, 2020, the Company notified Nasdaq of its intent to voluntarily delist its Common Stock. In connection therewith, the Company filed a Form 25 with the SEC on or about February 20, 2020. The Company elected to effect the voluntary delisting of its common stock after discussions with Nasdaq's staff, and based on the determination of the Company's board of directors that voluntarily delisting the Common Stock from Nasdaq was in the best interests of the Company and its stockholders at that time. Since delisting from Nasdaq, our Common Stock has traded on the OTC Markets under the same ticker symbol.

In September 2020, we changed our name from YayYo, Inc. to Rideshare Rental, Inc., in order for our corporate brand to better reflect our principal businesses, ridesharing and vehicle rentals. In March 2021, we decided to change our name again, this time to EVmo, Inc., to underscore our commitment to making a full transition to electric vehicles over the next several years.

**Overview**

EVmo is a holding company operating principally through two wholly-owned subsidiaries: (i) Rideshare Car Rentals LLC, a Delaware limited liability company ("Rideshare"), and (ii) Distinct Cars, LLC, a Delaware limited liability company ("Distinct Cars"). Rideshare offers an online bookings platform to service the ridesharing and delivery gig industries (the "Rideshare Platform"). Distinct Cars maintains a fleet of passenger vehicles and transit vans for the last-mile logistical space for rent to our customers. Through Rideshare and Distinct Cars, the Company seeks to become the leading provider of rental vehicles to drivers in the ridesharing and delivery gig spaces, and an industry leader in supplying transit vans for last-mile logistics. In March 2021, we formed another wholly-owned subsidiary, EV Vehicles LLC, a Delaware limited liability company, which we intend to utilize as the corporate platform to execute our electric vehicles strategy.

**The Rideshare Platform**

On October 31, 2017, the Company created Rideshare to incubate the concept of the Rideshare Platform, which is a proprietary, peer-to-peer booking platform, intended to rent passenger vehicles to self-employed ridesharing drivers. The Company has since deployed and launched the Rideshare Platform on the Company's e-commerce website, http://www.ridesharerental.com. The Rideshare Platform also commercially markets the Company's own fleet of cars as well as those of other fleet owners and selected individual car owners, providing them with an opportunity to monetize their vehicles by renting them out to ridesharing drivers. Our business strategy with our Rideshare Platform is to further develop and expand our brand equity and establish ourselves as the premier peer-to-peer Transportation Network Company ("TNC") vehicle rental business for the ridesharing and delivery gig industries that matches the owners and/or operators of passenger vehicles (including the Company's fleet of maintained vehicles) to existing or prospective ridesharing and delivery gig drivers. The Company initially launched the Rideshare Platform in Los Angeles, CA and has since expanded it into multiple other markets, including Oakland, CA; Las Vegas, NV; Chicago, IL; Newark, NJ; Baltimore, MD; and Dallas, TX.

The Rideshare Platform's functionality provides drivers with access to certain data emitted from their respective Company rental vehicle(s) through a personal Rideshare dashboard. Vehicle owners can also access and manage data emitted from their personal vehicle(s) under rental to a third-party from the Rideshare Platform inventory dashboard and can further manage the other aspects of the vehicle rental transaction through the Rideshare Platform, including rental extension options. All transactional aspects of the rental vehicle(s) (including, but not limited to, background checks, terms, deposits and insurance costs) are run securely through the Rideshare Platform. In addition, our Rideshare website not only effectively monetizes Company-owned vehicle fleets, made available through Distinct Cars, but also generates revenue by charging transactional fees to other vehicle owners and ridesharing and delivery gig drivers for all rental transactions consummated on the Rideshare Platform. The Rideshare Platform is available on desktop, iOS and Android devices. The development and functionality of our mobile applications are a material component to our business as drivers are more likely to transact via mobile devices.

Most importantly, all passenger vehicles and transit vans made available on the Rideshare Platform are fully qualified by the Company and guaranteed to meet the necessary qualification requirements.

The Company believes that due to the rapid development of the ridesharing and delivery gig economies and their anticipated growth trajectories, these markets will continue to reward the Company as an early entrant to the third-party vehicle rental business. Under the Rideshare Platform we intend to become the go-to booking destination and brand for ridesharing and delivery gig vehicle rentals in a TNC marketplace that connects owners and/or operators of standard and, increasingly, electric passenger vehicles and transit vans for the last-mile logistical space, with ridesharing and delivery gig economy drivers. We believe that our product and service offerings on the Rideshare Platform will continue to be an attractive proposition for all ridesharing and delivery gig economy drivers either simply requiring a standard passenger vehicle to operate, or preferring an electric vehicle, or struggling to qualify their personal vehicles under vehicle inspection requirements. While the Company will require additional capital investment to continue funding Rideshare and the Rideshare Platform, including furthering our technology, facilitating payments to us, and advertising, we believe there is a strong opportunity to grow and scale the Rideshare Platform in both existing and new geographical territories for purposes of developing and strengthening the Company's brand and competitive advantage in the ridesharing and delivery gig vehicle rental markets.

*Insurance*

As of the date of this Report, the Company, together with our managing general underwriter, American Business Insurance Services, Inc. (the "MGU"), maintains an insurance policy on behalf of the Company. Under the policy the MGU handles all back-end insurance generation and processing through an application programming interface (API) connection with the Company's databases. We believe that this MGU insurance policy has made it possible for us to maintain our Rideshare Platform, which allows the Company to have other third-party fleet owners supply vehicles to drivers through our platform and have them covered under the terms of our insurance policy. Our insurance policy provides physical damage and liability coverage to all rideshare drivers under the Rideshare Platform. Under the terms of our policy, both Rideshare Platform drivers acquiring vehicles through Fleet Management (as defined below) as well as owners of their own vehicles are provided with an insurance ID card that lists each party's name and the vehicle VIN number. Our Rideshare Platform customers pay daily (for the duration of the rental period) to become designated as a supplemental insured party under the Company's insurance policy. Under the terms of our policy, insurance coverage is valid from the date of commencement of the rental period up until the date that the vehicle is returned.

Further, the Company's car liability and physical damage insurance policies cover both third-party vehicle owners as well as ridesharing and delivery gig drivers under rental contract. These policies provide insurance on all listed vehicles, provided that the coverage is suspended during periods when the ridesharing driver under rental contract with the Company is actively operating on either the Uber or Lyft platform.

**Distinct Cars Fleet Management Business**

On June 10, 2017, the Company formed Distinct Cars for the purpose of developing a fleet management business ("Fleet Management"). Fleet Management maintains a fleet of new standard and, increasingly, electric passenger vehicles and transit vans for the logistical space to be rented directly to drivers in the ridesharing and delivery gig economies through the Rideshare Platform. The Company's fleet of vehicles, under lease contract and maintained by Distinct Cars, as well as other third-party vehicles have been made commercially available for rental bookings on the Rideshare Platform. The Company seeks to provide drivers in the ridesharing and delivery gig markets with full-service vehicle rentals and fleet contract maintenance solutions for commercial standard and electric passenger vehicles, as well as transit vans in the logistical space. As a provider of comprehensive, integrated vehicle rental and management solutions, Fleet Management markets and manages short and long-term vehicle rentals to ridesharing and delivery gig economy drivers. As of the date of this Report, approximately half of these drivers are located in greater Los Angeles while the other half are located in the other six cities where we have operations.

The Company is focused on operating, developing and investing in its vehicle rental business with a focus on marketing directly to the peer-to-peer car sharing and ridesharing industry professionals. The Company is capable of meeting customers' needs, including but not limited to a guaranty that all vehicles maintained under Fleet Management will comply with and pass the Ridesharing Qualification Requirements. Fleet Management product and service offering includes full-service vehicle rental(s) and contract maintenance, along with distribution center management and transportation management service. As of the date of this Report, the Company's customer base is primarily ridesharing and delivery gig drivers located within our markets that are operating and performing driving services on behalf of a host of the private ridesharing and delivery TNCs (primarily Lyft and Uber in ridesharing, and DoorDash and GrubHub for delivery). The Company hopes to aggressively expand our Fleet Management services and product offerings nationally.

In August 2017, following our announcement that we were shifting our primary corporate operations, we entered into a leasing arrangement for an initial group of twelve (12) vehicles, with the intent of testing our Fleet Management concept within the ridesharing industry. Following the Company's proof of concept period, we expanded our Fleet Management business in December 2017 by adding an additional 135 vehicles to our fleet. As of March 24, 2021, Fleet Management includes a fleet of approximately 626 vehicles-including standard and electric passenger vehicles as well as transit vans for the last-mile logistical space- under lease contract. Generally, professional ridesharing and delivery gig economy drivers contract with private ridesharing TNCs for vehicle rental periods generally ranging from less than three days to six months. The rental vehicles made available to customers by the Company are configured and guaranteed to be compliant with the same vehicle inspection requirements imposed on ridesharing (not delivery) vehicles by the largest private ridesharing TNCs (specifically, Uber and Lyft).

The Company believes that customers will rent vehicles offered by our Fleet Management business in order to reduce the complexity, cost and total capital associated with vehicle ownership. Further, we believe that due to our market focus on the ridesharing industry and the additional imposition of the ridesharing qualification requirements imposed on ridesharing vehicles by the dominant private ridesharing TNCs, our customers will be further incentivized to rent our Fleet Management vehicles to guarantee compliance with those requirements.

Under a full-service rental agreement, the Company provides and fully maintains the vehicle, which is generally specifically configured to meet the ridesharing qualification requirements. The services provided under full-service rental and contract maintenance agreements generally include preventive and regular maintenance, advanced diagnostics, emergency road service, fleet services, and safety programs, through our company-operated facilities.

*Fleet Management Software*

The Company has been an early adopter of technologies to leverage the Fleet Management business. To ensure that the Company's fleet of vehicles meet and comply with the standard ridesharing qualification requirements and transmit relevant data to our customers, the Company has fit its Fleet Management vehicles with our proprietary fleet management GPS solution software, providing open platform fleet management solutions to businesses of all sizes. These full-featured solutions help the Company manage its drivers and vehicles by extracting accurate and actionable intelligence from real-time and historical location trip data. The telematics solutions for fleet optimization provide our Fleet Management vehicles with fitted software analytics and data involving (i) fuel efficiency; (ii) management of vehicle maintenance and (iii) prevention of vehicle wear and tear.

**Commercial Partnership Programs**

In June 2017, the Company entered into a strategic partnership arrangement with Hyundai USA, a subsidiary of the Hyundai Motor Group ("Hyundai") for purposes of entering into a fleet purchase program. The Hyundai program has provided the Company with competitive pricing options (or best available pricing) below manufacturer suggested retail prices on all purchases for brand-new Hyundai vehicles and priority status on the availability and delivery of all Hyundai vehicles under contract with the Company. The vehicle purchases are currently financed by ACME Auto Leasing and LMP Financial Services, with title to the vehicles held by the Company under liens held by the financiers.

The Company has entered into a similar partnership program with Hyundai's affiliate, Kia Motors America, Inc., and in March 2021 we entered into a separate partnership with Tesla, Inc., which is intended to facilitate our strategy to transition to all-electric vehicles.

**Our Business Model and Our Future Opportunities**

We have developed what we believe is an innovative business model in which we not only provide ridesharing and delivery gig drivers with the necessary technology to operate, through the Rideshare Platform, but also the vehicles themselves, via Fleet Management, should the driver not have a qualified vehicle to use. Our two principal operating subsidiaries have a rare corporate synergy that enables us to both diversify and create complementary revenue streams. Further, as we continue our transition to all-electric vehicles, we believe we are in the vanguard of a new era in commercial transportation and that our early presence in this industry will further distinguish us from a competitive standpoint.

While we cannot at this time assess the ultimate effect of COVID-19 and its resulting restrictions on our Company, as of the date of this Report these restrictions appear to be slowly abating. We believe that consumer options in ridesharing will continue to expand to an even larger audience, such as carpooling and private bus services. The expansion of consumer options has also attracted mass transit customers to more expensive luxury options. Our Fleet Management business is designed to put more certified ridesharing vehicles on the roadways to meet the increasing consumer demand of the availability of ridesharing services.

Moreover, our entry during 2020 into the delivery gig space has provided us with another form of service diversity, one with fewer barriers to entry, as the requirements for vehicles operated by delivery gig drivers are significantly less onerous than those operated by rideshare drivers, as delivery gig drivers are not transporting people. The increasing demand for ridesharing and delivery gig services has produced an increase in demand by TNC businesses for more ridesharing and delivery gig drivers and vehicles on the road at any given time. The growing demographic of ridesharing and delivery gig drivers, as determined on a global basis, has drawn drivers to these industries to perform services for a host of private TNC businesses, such as Uber, Lyft, DoorDash, and GrubHub. The Company estimates that private TNC businesses are hiring more than 50,000 drivers a month to keep pace with the current commercial demand for ridesharing and delivery gig services.

**Vehicle and Driver Requirements**

We believe that many potential ridesharing drivers are deterred from applying for or are turned away from employment by certain TNCs on account of the fact that their personal vehicles would fail or are failing to meet the qualification requirements imposed by those TNCs. We address this directly by enabling such drivers to rent vehicles from us, through Fleet Management. Each of our vehicles meets if not exceeds the qualification requirements we impose on privately-owned vehicles operated by prospective rideshare drivers.

*Ridesharing and Delivery Gig Qualification Requirements*

Before initiating employment of a driver using his or her own vehicle, we screen and evaluate the prospective driver and we obtain a Motor Vehicle Report ("MVR") for his or her vehicle, if the driver does not intend to rent a vehicle from our fleet. We obtain a new MVR for a vehicle not from our fleet that utilizes the Rideshare Platform every six months.

We, and other TNCs, generally impose the following requirements on potential ridesharing and delivery gig driver applicants seeking employment:

- The driver must have reached a minimum age of 21 years old;

- The ridesharing driver must have in-state auto insurance with the driver's name on the policy;

- The ridesharing driver must have an in-state driver's license, and been licensed in the U.S. for at least one year;

- The ridesharing driver must have in-state plates with a current registration (commercial plates are acceptable as well);

- The ridesharing driver must have a clean driving record; and

- The ridesharing driver must pass a background check; and

- The ridesharing driver's vehicle must pass certain qualification requirements, such as the following:

  - The vehicle must be a four-door car whose year of manufacture is not earlier than the designated cut-off year;

  - The vehicle must be in good physical condition with no cosmetic damage;

  - No marketing or commercial branding is being outwardly displayed on the vehicle; and

  - The vehicle must receive a passing score on a 19-point vehicle inspection.

As mentioned above, certain cosmetic features may prevent a potential ridesharing driver's vehicle from qualifying under the vehicle inspection on account of the following: (i) the vehicle includes a full-body wrap containing advertisements, or any large ads; (ii) the vehicle has holes or damage to the exterior; (iii) the vehicle has taxi decals or taxi-style paint; (iv) the vehicle has significant damage to the interior (including any torn seats, large permanent stains, strong permanent odors); (v) the vehicle has paint oxidation; or (vi) the vehicle has different colored hoods/doors; and (vii) the vehicle has objectionable aftermarket modification.

As also noted above, we, as well as other private ridesharing companies, also require all potential ridesharing drivers to undergo a vehicle inspection test on all personal driver vehicles to be used by the potential ridesharing driver to perform ridesharing services on behalf of the private ridesharing company. A 19-point inspection is a standard vehicle inspection procedure to check a car in 19 specific areas to ensure that it conforms to safety and operational requirements. While the 19 points are typically the same for different companies, their procedures differ slightly. The process also varies based on the geographical location where the inspection is performed. The 19 points of the vehicle checked for inspection include headlights, tail-lights, indicator lights, stop lights, foot brakes, emergency/parking brake, steering mechanism, windshield, heat and air conditioning, front, rear and side windows, front seat adjustment mechanism, door controls (open, close, lock), horn, speedometer, body condition/ damage, muffler and exhaust system, condition or tires, interior and exterior rear-view mirrors and safety belts for driver and passengers. Any vehicle having a problem or issue with any of the inspection points will generally not pass the vehicle inspection and we will refuse the opportunity to become a ridesharing driver for us.

**Company Growth Strategy**

Our long-term strategy is focused on four priorities: expanding and diversifying our revenues; improving our operating effectiveness; enhancing the customer experience; and disciplined capital management.

*Expand and Diversify Revenues*—Our strategy to achieve ongoing growth is driven by initiatives that expand and diversify our revenues through customer- and market-focused initiatives. We are actively working to expand our Fleet Management business and use of the Rideshare Platform and we intend to convert our entire fleet inventory over to electric vehicles. We will continue to offer a comprehensive equipment rental fleet to maintain and hopefully grow our market position. We plan to continue to expand our footprint in North America, with a focus on increasing the following: (i) the number of major geographical markets served on our Rideshare Platform; (ii) the number of vehicles maintained and managed under the Company's Fleet Management business, with a strong focus on adding electric vehicles, which will eventually constitute our entire fleet population; and (iii) to continue to reinforce our existing locations with additional fleet and enhance our expertise tailored to local markets. Our footprint expansion will include new locations served under our Rideshare Platform and Fleet Management operations to better support our growing ridesharing rental business. We will continue to pursue initiatives that allow us to drive sales through our existing locations and geographical territories.

*Improve Operating Effectiveness*—We are focused on generating continuous improvement across our operations, with an emphasis on building a strong safety culture, fleet management business, e-commerce bookings website, fleet availability and improving margins. We are continuing to build a highly professional and technology-enabled sales force and to optimize our sales territories to support our revenue growth objectives. We will continue to improve the effectiveness of our sales team with focused training, strong customer relationship management capabilities, and ongoing technology enhancements.

*Enhance the Customer Experience*—We seek to differentiate our business by delivering a superior customer experience through the variety and quality of the vehicles and services we offer, the ease of doing business with us and the added value we offer through services, products and technologies. Our focus on quality vehicle brands tailored to meet the qualification requirements of the ridesharing industry is intended to meet the needs and preferences of ridesharing drivers, including the expectations for reliable, safe, efficient and effective maintained vehicles. We expect to add more expertise across our team to help our customers achieve the best results for their projects. In developing and providing vehicle rental related technologies, we are focused on meeting customer expectations related to convenience and on-demand access to data and information.

*Disciplined Asset Management*—We manage our vehicle rental fleet to optimize the timing of fleet rentals, repairs and maintenance, while at the same time satisfying our customers' needs. Through continued use and development of our disciplined approach to efficient fleet management, we seek to maximize our utilization and return on investment.

## Intellectual Property

As of the date of this Report, we have two registered trademarks "YayYo®" and the service mark for a stylized design representing an automobile that is present in our web sites and our marketing materials. We have no applications for other trademarks as of the date of this Report. We have no patents or copyrights.

## Human Capital

As of the date of this Report, we had approximately 35 full-time employees, all of which are based at our offices. None of our employees are subject to a collective bargaining agreement, and we believe that our relations with our employees generally are good.

## Regulation

We are subject to a number of U.S. federal and state and foreign laws and regulations that involve matters central to our business. These laws and regulations may involve privacy, data protection, intellectual property, competition, consumer protection, export taxation or other subjects. Many of the laws and regulations to which we are subject are still evolving and being tested in courts and could be interpreted in ways that could harm our business. In addition, the application and interpretation of these laws and regulations often are uncertain, particularly in the new and rapidly evolving industry in which we operate. Because laws and regulations have continued to develop and evolve rapidly, it is possible that we may not be, or may not have been, compliant with each such applicable law or regulation. In addition to the foregoing, we are also subject to the following:

- Governmental regulations affect almost every aspect of our business, including the fair treatment of our employees, wage and hour issues, and our financing activities with customers. We could also be susceptible to claims or related actions if we fail to operate our business in accordance with applicable laws;

- Federal and state governments in our markets have increasingly placed restrictions and limitations on the vehicles sold in the market in an effort to combat perceived negative environmental effects. For example, in the U.S., vehicle manufacturers are subject to federally mandated corporate average fuel economy standards which will increase substantially through 2025. Furthermore, numerous states, including California, have adopted or are considering requiring the sale of specified numbers of zero-emission vehicles. Significant increases in fuel economy requirements and new federal or state restrictions on emissions on vehicles and automobile fuels in the U.S. could adversely affect prices of and demand for the new vehicles that we rent;

- We are subject to a wide range of environmental laws and regulations, including those governing: discharges into the air and water; the operation and removal of storage tanks; and the use, storage and disposal of hazardous substances. In the normal course of our operations we use, generate and dispose of materials covered by these laws and regulations. We face potentially significant costs relating to claims, penalties and remediation efforts in the event of non-compliance with existing and future laws and regulations; and

- The Financial Accounting Standards Board is currently evaluating several significant changes to generally accepted accounting standards in the U.S., including the rules governing the accounting for leases. Any such changes could significantly affect our reported financial position, earnings and cash flows.

While we are actively working to mitigate the impact of vehicle-related regulations through our strategy of transitioning our vehicle fleet to all-electric, until such time as at least the majority of our fleet has switched, we will remain subject to such regulations.

Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, licensing and franchising, automotive retail sales, cost and fee recovery and the banking and financing industry could disrupt our business, increase our expenses or otherwise have a material adverse effect on our results of operations, financial condition, liquidity and cash flows.

## Competition

We believe our principal competitors to be HyreCar, a publicly-traded company that also rents vehicles for use by drivers who work for Uber, Lyft, and food delivery platforms, and Lyft Express, which makes rental vehicles available to Lyft drivers. National car rental companies such as Hertz and Avis also have programs directed at ridesharing and delivery drivers.

## Additional Information

Our website address is www.evmo.com. This site includes a link to the Rideshare Platform site, located at www.ridesharerental.com. It also includes all of the press releases we have issued since our formation and an investor relations page. Our investor relations page includes a link to all of our registration statements and periodic reports posted on the SEC's EDGAR site, including but not limited to our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to reports filed or furnished pursuant to Sections 13(a) and 15(d) of the Exchange Act. These reports are available free of charge and may be accessed via our investor relations website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

## ITEM 1A. RISK FACTORS

Under current SEC rules and regulations, as a smaller reporting company, we are not required to provide risk factor disclosure in this Report or in any of our periodic reports until such time as we no longer qualify as a smaller reporting company. If and when we next file a registration statement on Form S-1 in connection with an offering of securities, we will include risk factor disclosure as part of that filing.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2. PROPERTIES

We lease and maintain our principal offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. We also lease and maintain other offices at 195 South Robertson Drive, Beverly Hills, CA 90210, which is where the majority of our operational staff conducts its activities on a day-to-day basis. We do not currently own any real estate.

## ITEM 3. LEGAL PROCEEDINGS

From time to time, the Company may become involved in lawsuits and other legal proceedings that arise in the course of business. Litigation is subject to inherent uncertainties, and it is not possible to predict the outcome of litigation with total confidence. Except as described below, as of the date of this Report the Company is currently not aware of any legal proceedings or potential claims against it whose outcome would be likely, individually or in the aggregate, to have a material adverse effect on the Company's business, financial condition, operating results, or cash flows.

*Anthony Davis v. EVmo, Inc. (formerly YayYo, Inc.), and Ramy El-Batrawi*

This action was filed on March 5, 2020, in the Superior Court of the State of California for the County of Los Angeles. Plaintiff Anthony Davis acted as the Company's Chief Executive Officer from approximately December 2016 through April 2017. Mr. El-Batrawi is the founder of the Company and its former Chief Executive Officer and director, and was involved, the complaint alleges, in Mr. Davis's hiring and termination after a brief tenure as CEO. As part of his severance compensation, Mr. Davis was granted stock options to purchase shares of Common Stock. Mr. Davis claims that the Company breached its agreement to award him these stock options and includes a claim for wage and hour violations. The lawsuit also seeks declaratory and injunctive relief. Mr. Davis also included a claim under the California Unfair Practices Act. The Company has denied all liability, asserts that it has paid Mr. Davis all amounts due to him under his separation agreement with the Company, and has vigorously defended this lawsuit. The Company has filed a demurrer in connection with this litigation and that demurrer is expected to be resolved at a hearing in May 2021. If the case is not dismissed at that time, the Company will conduct discovery and file a motion for summary judgment.

*In Re YayYo Securities Litigation*

Two actions styled as securities class actions were filed in the United States District Court for the Central District of California, on September 9, 2020 (*Hamlin v. YayYo*) and September 18, 2020, respectively (*Koch v. YayYo et al*). The plaintiffs to each action individually alleged misrepresentations and material omissions in the registration statement on Form S-1 that the Company filed with the SEC in connection with its initial public offering, which was declared effective on November 13, 2019, claiming violations of Sections 11 and 15 of the Securities Act. Each purported action involved securities class action claims. The district court consolidated the two actions, and the Hamlin action was since dismissed. The district court indicated in its order consolidating the actions that the new caption for the case would be "In Re YayYo Securities Litigation." The Company filed an answer, denying liability and asserted that it accurately and completely disclosed all material facts and occurrences, including adverse ones, in its registration statement, related public filings and other public statements, and further asserted that the alleged violations of Sections 11 and 15 of the Securities Act are baseless. Each of the parties to this litigation has mutually agreed to request a stay of the proceedings pending a mediation that is tentatively scheduled for April 29, 2021 in which a global settlement, also involving the plaintiff class representative identified in the case described immediately below,

*Michael Vanbecelaere v. YayYo, Inc, et al.*

Two actions styled as securities class actions were filed in the Superior Court of the State of California for the County of Los Angeles, on July 22, 2020 and July 23, 2020, respectively. The plaintiffs to each action individually alleged misrepresentations and material omissions in the registration statement on Form S-1 that the Company filed with the SEC in connection with its initial public offering, which was declared effective on November 13, 2019, claiming violations of Sections 11 and 15 of the Securities Act. Each action purported to bring a securities class action against the Company; one of the two lawsuits was dismissed on the basis that the lead plaintiff in one of the actions was not a suitable class representative, and that plaintiff later joined the lawsuit brought by the other one. In its answer, the Company denied liability and asserted that it accurately and completely disclosed all material facts and occurrences, including adverse ones, in its registration statement, related public filings and other public statements, and further asserted that the alleged violations of Sections 11 and 15 of the Securities Act are baseless. Each of the parties to this litigation has mutually agreed to request a stay of the proceedings pending a mediation that is tentatively scheduled for April 29, 2021, which will also include the parties to the action described immediately above.

*Uptick Capital, LLC v. EVmo, Inc. (formerly YayYo, Inc.)*

On March 5, 2021, Uptick Capital, LLC ("Uptick"), filed an arbitration demand with the American Arbitration Association ("AAA") alleging breach of contract with respect to an Advisory Agreement that Uptick asserts it entered into with the Company on August 7, 2017. The claim filed with the AAA alleges that "pursuant to the terms of the Advisory Agreement, Uptick was entitled to receive $2,500.00 per month for three months" plus "an issuance of restricted shares of $50,000.00 worth of YayYo common stock in exchange for providing certain consulting services to YayYo." The agreement, according to the demand, was renewed once. The Company has not yet formally responded to the arbitration claim but denies liability and intends to vigorously defend this arbitration on the basis that Uptick failed to comply with the contract. It is unknown what the potential liabilities are but, as of the date of this Report, the Company believes they should not exceed $10,000 in cash and $100,000 worth of stock.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

The Common Stock is currently quoted on the OTC Markets, also known as the "Pink Sheets." The ticker symbol remains "YAYO," which is based on our original name. From the date of our initial public offering in November 2019 until February 10, 2020, the Common Stock was traded on the Nasdaq Capital Market, but we voluntarily delisted from that exchange as of that date.

**Holders**

As of March 29, 2021, there were approximately 1,077 holders of record of the Common Stock.

**Dividends**

To date, we have not paid any dividends to the holders of Common Stock and do not anticipate doing so for the foreseeable future.

**Securities Authorized for Issuance under Equity Compensation Plans**

Pursuant to outstanding SEC guidance, we have disclosed this information in Part III of this Report, under "Item 12- SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT- Equity Compensation Plan Information."

**Stock Performance Graph**

As a smaller reporting company, we are not required to provide a stock performance graph in this Report.

**Unregistered Sales of Equity Securities**

We engaged in three unregistered sales of Common Stock to select investors during fiscal 2020. The sales are as follows:

- On April 2, 2020, we sold an aggregate of 1,428,571 shares to ACME Auto Leasing, one of the companies that finances our vehicle purchases, in a negotiated transaction for $0.07 per share, or aggregate cash consideration of $100,000.

- On June 8, 2020, we sold 1,000,000 shares to Acuitas Group Holdings, LLC, which is now the Company's largest shareholder, in a negotiated transaction for $0.15 per share, or aggregate cash consideration of $150,000.

- On June 9, 2020, we sold 125,0000 shares to John P. O'Neill, a member of our Board of Directors, in a negotiated transaction for $0.20 per share, or aggregate cash consideration of $25,000.

Each of these sales was made pursuant to the exemption from registration under Section 4(a)(2) of the Securities Act, i.e. a private transaction by an issuer not involving a public offering.

10

**Stock Repurchases**

We did not make any repurchases of the Common Stock in the fourth quarter of 2020, or in any other quarterly period, since our initial public offering in November 2019.

**ITEM 6. SELECTED FINANCIAL DATA**

Pursuant to recent SEC rule amendments, this item has been removed and reserved and, as a smaller reporting company, we were not required to provide this information in any case.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION**

**Our Corporate History and Background**

The Company was formed on June 21, 2016 under the name "YayYo, LLC," which was converted into a Delaware corporation pursuant to the unanimous written consent of our former manager and members in a transaction intended to be tax-free under the Internal Revenue Code (the "Conversion"). All of YayYo, LLC's liabilities and assets, including its intellectual property, were automatically transferred to the Company and the Company has assumed ownership of such assets and liabilities. The Company now operates as a "C" corporation formed under the laws of the State of Delaware. On September 11, 2020, YayYo, Inc. changed its name to Rideshare Rental, Inc. On March 1, 2021, the Company changed its name from Rideshare Rental, Inc. to EVmo, Inc.

The Company is a holding company operating through its wholly-owned subsidiaries, Distinct Cars, LLC and Rideshare Car Rentals, LLC.

The Company's operating business divisions include (i) an online rideshare vehicle booking platform to service the ridesharing economy through Rideshare Car Rentals, i.e. the Rideshare Platform, and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through Distinct Cars, i.e. Fleet Management. The Company seeks to become the leading provider of a standard rental vehicles to drivers in the ridesharing economy.

On March 16, 2018, we completed an offering under Regulation A+ of the Securities Act, which was qualified by the SEC on March 15, 2017. We sold a total of 365,306 shares of Common Stock. We received cash proceeds of $1.8 million, net of commissions and other costs associated with the gross offering proceeds or payable by us.

On November 15, 2019, the Company closed its initial public offering of 2,625,000 common shares at $4.00 per share, for gross proceeds, before underwriting discounts and commissions and expenses, of $10.5 million, and the shares became listed on the Nasdaq Capital Market ("Nasdaq") under the symbol "YAYO."

On February 10, 2020, the Company notified Nasdaq of its intent to voluntarily delist its Common Stock from Nasdaq. In connection therewith, the Company notified Nasdaq of the Company's intention to file a Form 25 with the SEC on or about February 20, 2020. The Company elected to effect the voluntary delisting of its Common Stock after discussions with Nasdaq's staff, and based on the determination of the Company's board of directors that voluntarily delisting the Common Stock from Nasdaq was in the best interests of the Company and its stockholders. Following delisting from Nasdaq, the Common Stock now trades on the OTC Markets, still under the trading symbol, "YAYO."

*Impact of COVID-19 on our business*

In December 2019, a novel strain of coronavirus surfaced in China, which has and is continuing to spread throughout the world, including the United States. On January 30, 2020, the World Health Organization declared the outbreak of the coronavirus disease (COVID-19) a "Public Health Emergency of International Concern," and on March 11, 2020, the World Health Organization characterized the outbreak as a "pandemic." The governors of New York, California and several other states, as well as mayors on many cities, ordered their residents to cease traveling to non-essential jobs and to curtail all unnecessary travel, and to stay in their homes as much as possible in the coming weeks, as the nation confronts the escalating coronavirus outbreak, and similar restrictions have been recommended by the federal authorities and authorities in many other states and cities. From the first quarter of 2020 and the initial rapid spread of COVID-19, rideshare companies were negatively impacted. As Americans began to practice social distancing and self-isolation, Uber, Lyft, and other rideshare companies experienced a steep decline in ridership and revenue. As a result, the Company saw a decline in revenue during the first half of 2020, which had a negative impact on our cash flows, but we then saw a positive upward movement in revenue during the second half of 2020. This has continued in the early months of 2021. As of the date of this Report, several vaccinations for COVID-19 have received emergency-use authorization from the Food and Drug Administration and many of the lockdown restrictions imposed by state and local governments, including those of the markets in which we operate, appear to be abating. Still, the pandemic has not yet ended, and there have been multiple waves where infections, hospitalizations, and deaths have sharply increased. The Company therefore cannot predict the ultimate impact that COVID -19 may have on its business this year. If another lockdown, even a partial one, were to occur in any of our markets, the Company could be forced to scale back its operations and its expansion plans, which could ultimately have a significant negative impact on us.

*Principles of consolidation*

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC and RideShare Car Rentals, LLC. All significant intercompany transactions and balances have been eliminated.

**Consolidated Results of Operations—Year ended December 31, 2020, Compared to Year ended December 31, 2019.**

**Total Revenues**

Revenue for the year ended December 31, 2020 was $7,621,180, an increase of $706,270 or 10.2% compared to revenue for the year ended December 31, 2019 of $6,914,910. The increase is principally due to an increase in our rental fleet offset by a decrease in our average weekly rental income levels throughout the year ended December 31, 2020 due to the COVID-19 outbreak. During the year ended December 31, 2020, the average weekly rental income per vehicle placed in service was $308 compared to $335 for the same period in 2019. Our revenues declined in March and April due to COVID -19 and began to recover in May and June 2020. Our revenue since June is back to pre-COVID-19 levels, but there is no assurance that this trend will continue.

**Cost of Revenues**

Cost of revenues for the year ended December 31, 2020 were $5,263,474, an increase of $589,604 or 12.6% compared to cost of revenues for the year ended December 31, 2019 of $4,673,870. The increase is due to higher depreciation expense due to an increase in fleet size and higher repairs and maintenance due to the age of the fleet. For the year ended December 31, 2020 and 2019 our cost of revenue was 69.1% and 67.6% of our revenue, respectively. The increase in the cost of revenue as a percentage of revenue is due to the decrease in average weekly rental income due to the COVID – 19 outbreak.

**Selling and Marketing Expenses**

Selling and marketing expenses for the year ended December 31, 2020 were $490,403, representing a decrease of $275,038 or 35.9% over the year ended December 31, 2019 of $765,441. The decrease is due to better management of media placements for our advertising and a change in the vendor we used to spearhead our marketing efforts to ridesharing and delivery gig drivers.

**General and Administrative Expenses**

General and administrative expenses for the year ended December 31, 2020 were $5,288,316, representing an increase of $1,264,395 or 31.4% over the year ended December 31, 2019 of $4,023,921. The increase is principally due to higher payroll costs (including stock option expense of $739,973) as we hired additional personnel for our expanding operations and higher management salaries; and higher occupancy costs.

**Loss on the Settlement of Debt**

Loss on the settlement of debt for the year ended December 31, 2020 was $0 as compared to $252,900 for the same period in 2019. During the year ended December 31, 2019, we settled outstanding debt of $421,500 with 84,300 shares of common stock valued at $674,400.

**Total Operating Expenses**

Total operating expenses for the year ended December 31, 2020 were $5,779,719, representing an increase of $722,957 or 14.3% compared to the year ended December 31, 2019 of $5,055,762. The increase is due to the reasons described above.

**Interest Expense, Net**

Interest and financing expenses for the year ended December 31, 2020 were $265,839 compared to $1,115,499 for the year ended December 31, 2019. The decrease in interest and financing cost for the year ended December 31, 2020 due to a decrease in outstanding debt.

**Gain on Forgiveness of Debt**

Gain on forgiveness of debt for the year ended December 31, 2020 was $184,775 as compared to $0 for the same period in 2019, as, during the year ended December 31, 2020, the entire loan of that amount we received under the Paycheck Protection Program of the Coronavirus Aid, Relief and Economic Security Act was forgiven.

**Net Loss**

The net loss for the year ended December 31, 2020 was $3,502,077, representing a decrease of $428,144 or 10.9% compared to the year ended December 31, 2019 of $3,930,221. The decrease is due to the reasons described above.

**Liquidity, Capital Resources and Plan of Operations**

On November 15, 2019, we completed our initial public offering of Common Stock, after our registration statement on Form S-1 under the Securities Act was declared effective by the SEC on November 13, 2019. We sold a total of 2,625,000 common shares at a price of $4.00 per share. Total gross proceeds from the offering were $10,500,000, before deducting underwriting discounts and commissions and other offering expenses.

During the year ended December 31, 2020, we sold an aggregate of 2,553,571 shares of Common Stock to three investors for cash proceeds of $275,000, of which 125,000 shares was sold to a member of our Board of Directors for cash consideration of $25,000.

On January 8, 2021, we received $500,000 from a convertible note from one of our stockholders. The note is convertible into shares of Common Stock at $0.50 per share. The note was converted into 1,000,000 shares of Common Stock in February 2021.

*Current Assets, Liabilities and Working Capital*

At December 31, 2020, the Company's current assets totaled $215,990, current liabilities totaled $4,461,560, and working capital was a deficit of $4,245,570. At December 31, 2019, the Company's current assets totaled $2,098,660, current liabilities totaled $2,655,055, and working capital was a deficit of $556,395.

Regarding current liabilities, the amounts categorized as accounts payable and accrued expenses totaled $2,119,003 and $951,231 as of December 31, 2020 and 2019, respectively, an increase of $1,167,772 or 123%.

Since inception, our principal sources of operating funds have been proceeds from equity financing including the sale of our Common Stock to initial investors known to management and principal shareholders of the Company. We do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter. If the Company is unable to raise sufficient additional funds, it will have to execute a slower than planned growth path, reduce overhead and scale back its business plan until sufficient additional capital is raised to support further operational expansion and growth. As of December 31, 2020, the Company had $72,890 in cash. The Company generated $536,723 of cash for operating activities for the year ended December 31, 2020. The Company is seeking to raise additional capital. If the Company is not successful in raising additional capital it will be forced to significantly scale back its business operations and it growth plans. In addition, the COVID-19 virus and the related impact it is having on the U.S. economy is currently having a negative impact on the cash flows of our business. However, we were able to obtain two loans totaling $342,675 related to new legislation passed as a result of COVID-19, of which $184,775 was forgiven in 2020.

*Capital Expenditures*

During the year ended December 31, 2020, the Company had capital expenditures of $3,705,417 in leased vehicles. At December 31, 2020, most of the Company's vehicles were finance with leases. At December 31, 2020 the Company had $9,067,885 of rental vehicles, net of accumulated depreciation in the amount of $2,871,452, totaling $6,196,433 in net rental vehicles. At December 31, 2019 the Company had $6,284,211 of rental vehicles, net of accumulated depreciation in the amount of $1,547,164, totaling $4,737,047 in net rental vehicles. The Company's rental vehicles are depreciated over their estimated useful life of five years. The lease terms for those rental vehicles that are leased are generally for one to three years and the Company has the right to purchase the leased vehicle at the end of the lease terms.

*Statement of Cash Flows*

*Cash Flows from Operating Activities*

Net cash generated by operating activities for the year ended December 31, 2020 totaled $536,723, which was an increase of $3,952,946 from the net cash expended in operating activities of $3,416,223 for the same period in 2019. The increase is principally due to the change in prepaid expenses, other assets, accounts payable and accrued expenses, and non-cash expense items.

*Cash Flows from Financing Activities*

Net cash expended in financing activities for the year ended December 31, 2020 totaled $1,720,262, which was a change of $6,504,550 from the net cash generated by financing activities of $4,784,288 for the same period in 2019. The change is principally due to the IPO proceeds received in 2019, increase in payments on financing lease obligations in 2020 and repayments of notes payable in 2019.

*Current Plan of Operations*

Our plan of operations is currently focused on the growth and ongoing development of our operating businesses: (i) the Rideshare Platform, offered through Rideshare, and (ii) Fleet Management, made commercially available through Distinct Cars. We expect to incur substantial expenditures in the foreseeable future for the enhanced operations of our businesses and related, ongoing, internal research and development. Moreover, we have embarked on "EV strategy" in which we intend to replace our entire fleet of vehicles with all electric vehicles within a relatively short period of time. At this time, we cannot reliably estimate the nature, timing or aggregate amount of all of the costs associated with these.

The continuation of our current plan of operations may require us to raise significant additional capital within a short period of time. If we are successful in raising capital, we believe that the Company will have sufficient cash resources to fund its plan of operations. The cash flow from our Rideshare Platform and, especially, Fleet Management businesses and our existing capital resources are sufficient for us to continue our current operations, but for us to fully execute our business plan we will likely require significant additional capital.

We continually evaluate our plan of operations discussed above to determine the manner in which we can most effectively utilize our limited cash resources. The timing of completion of any aspect of our plan of operations is highly dependent upon the availability of cash to implement that aspect of the plan and other factors beyond our control. There is no assurance that we will successfully obtain the required capital or revenues, or, if obtained, that the amounts will be sufficient to fund our ongoing operations. The inability to secure additional capital would have a material adverse effect on us, including the possibility that we would have to sell or forego a portion or all of our assets or cease operations. If we discontinue our operations, we will not have sufficient funds to pay any amounts to our stockholders.

Even if we raise additional capital in the near future, if our operating businesses fail to achieve anticipated financial results, our ability to raise additional capital in the future to fund our operations would likely be seriously impaired. If in the future we are not able to demonstrate favorable financial results or projections from our operating businesses, we will not be able to raise the capital we need to continue our then current business operations and business activities, and we will likely not have sufficient liquidity or cash resources to continue operating.

Because our working capital requirements depend upon numerous factors there can be no assurance that our current cash resources will be sufficient to fund our operations. At present, we have no committed external sources of capital, and do not expect any significant product revenues for the foreseeable future. Thus, we will require immediate additional financing to fund future operations. There can be no assurance, however, that we will be able to obtain funds on acceptable terms, if at all.

### Contractual Obligations, Commitments and Contingencies

The Company has entered into a series of monthly vehicle leasing agreements with ACME Auto Leasing and LMP Financial Services, each with an approximate lease term of 12 to 36 months. As of December 31, 2020 and December 31, 2019, the Company had total lease obligations in the amount of $2,352,878 and $2,400,565, respectively. The Company owes monthly payments under each Lease Agreement ranging from approximately $285 per month to $621 per month. At the end of the term of the Lease Agreement, lessee has the right to purchase ownership and title of the subject vehicle for a nominal payment. In addition, the Lease Agreements are subject to and secured by a grant of a purchase money security interest on each leased vehicle.

We lease and maintain our principal offices at 433 North Camden Drive, Suite 600, Beverly Hills, California 90210. We also lease and maintain other offices at 195 South Robertson Drive, Beverly Hills, CA 90210, where the majority of our operational staff conducts its activities on a day-to-day basis. We do not currently own any real estate.

### Off-Balance Sheet Arrangements

The Company has no off-balance sheet arrangements.

### *Quantitative and Qualitative Disclosures about Market Risk*

In the ordinary course of our business, we are not exposed to market risk of the sort that may arise from changes in interest rates or foreign currency exchange rates, or that may otherwise arise from transactions in derivatives.

15

*Critical Accounting Policies and Estimates*

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. Preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable. In many instances, we could have reasonably used different accounting estimates and in other instances changes in the accounting estimates are reasonably likely to occur from period to period. This applies in particular to useful lives of non-current assets and valuation allowance for deferred tax assets. Actual results could differ significantly from our estimates. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving our judgments and estimates.

<u>*Equipment and Rental Vehicles*</u>

Equipment and Rental Vehicles are stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment and rental vehicles is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

The Company has not changed its estimate for the useful lives of its equipment and rental vehicles, but would expect that a decrease in the estimated useful lives of equipment and rental vehicles of one year would result in an annual increase to depreciation expense of approximately $450,000, and an increase in the estimated useful lives of equipment and rental vehicles of one year would result in an annual decrease to depreciation expense of approximately $300,000.

<u>*Income Taxes*</u>

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. The Company has not changed it methodology for estimating the valuation allowance. A change in valuation allowance affect earnings in the period the adjustments are made and could be significant due to the large valuation allowance currently established.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

*Revenue Recognition*

The Company recognizes revenue from renting its fleet of cars to ridesharing and delivery gig drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

We consider a signed contract or other similar documentation reflecting the terms and conditions under which products will be provided to be persuasive evidence of an arrangement. Collectability is assessed based on a number of factors, including payment history and the creditworthiness of a customer. If it is determined that collection is not reasonably assured, revenue is not recognized until collection becomes reasonably assured, which is generally upon receipt of cash.

*Stock-Based Compensation*

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees.

**Contingencies**

Certain conditions may exist as of the date the financial statements are issued, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company's management, in consultation with its legal counsel as appropriate, assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company, in consultation with legal counsel, evaluates the perceived merits of any legal proceedings or unasserted claims, as well as the perceived merits of the amount of relief sought or expected to be sought therein. If the assessment of a contingency indicates it is probable that a material loss has been incurred and the amount of the liability can be estimated, then the estimated liability would be accrued in the Company's financial statements. If the assessment indicates a potentially material loss contingency is not probable, but is reasonably possible, or is probable, but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss, if determinable and material, would be disclosed. Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

As a smaller reporting company, we are not required to provide this information.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

See "Index to Consolidated Financial Statements" which appears on page F-1 of this Annual Report on Form 10-K.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We maintain a set of disclosure controls and procedures (as that term is defined in Rule 13a-15(e) under the Exchange Act). Disclosure controls and procedures are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC. Disclosure controls and procedures are, without limitation, also intended to ensure that such information is gathered and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), or persons performing similar functions, as appropriate, to facilitate timely decisions regarding required disclosure.

In accordance with Rule 13a-15(b) under the Exchange Act, as of the end of the period covered by this Report, an evaluation was carried out under the supervision and with the participation of our management, including our CEO and CFO, to assess the effectiveness of our disclosure controls and procedures as of December 31, 2020. Based on that evaluation, our CEO and CFO have concluded that, at December 31, 2020, such disclosure controls and procedures were not effective. We elaborate on the basis for this conclusion in the discussion contained in our "Management's Report on Internal Control over Financial Reporting" below.

**Changes in Internal Controls over Financial Reporting**

There were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

17

**Limitations on the Effectiveness of Controls**

Our disclosure controls and procedures are designed to provide reasonable, not absolute, assurance that the objectives of our disclosure control system are met. Because of inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within a company have been detected. Our CEO and CFO have concluded, based on their evaluation as of the end of the fiscal year covered by this Report, that our disclosure controls and procedures were not effective as a result of a control issue described herein; however, it is possible that this evaluation failed to identify other control issues that would have reinforced this conclusion, and for which we have not yet initiated any remedial action.

**Management's Report on Internal Control over Financial Reporting**

As required by SEC rules and regulations for the implementation of Section 404 of the Sarbanes-Oxley Act, our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external reporting purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that:

(1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of our company;

(2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

(3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect errors or misstatements in our consolidated financial statements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree or compliance with the policies or procedures may deteriorate. Management assessed the effectiveness of our internal control over financial reporting at December 31, 2020. In making these assessments, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission COSO (2013 framework). Based on our assessments and those criteria, management determined that we did not maintain effective internal control over financial reporting at December 31, 2020.

Our management has determined that our internal control over financial reporting contains a material weakness. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

We do not have sufficient segregation of duties within our accounting functions, which is a basic internal control. Due to our size and nature, segregation of all conflicting duties may not always be possible and may not be economically feasible. However, to the extent possible, the initiation of transactions, the custody of assets, and the recording of transactions should be performed by separate individuals. Management weighed the impact of our failure to have a proper segregation of duties on our assessment of our disclosure controls and procedures and has concluded that the resulting control deficiency represented a material weakness.

To address this material weakness, management has performed procedures to ensure that the financial statements balances included herein fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented. In 2021, the Company plans to continue to hire additional accounting and finance staff to further address the material weakness identified herein. However, as of the date of this Report, this material weakness still exists and is the basis for our conclusion that our disclosure controls and procedures were, at December 31, 2020, and remain, not effective.

**ITEM 9B. OTHER INFORMATION**

None.

# PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

The following sets forth information about our directors and executive officers as of the date of this Report:

| Name | Age | Position |
|------|-----|----------|
| Stephen M. Sanchez | 55 | Chief Executive Officer and Director |
| Ryan Saathoff | 47 | Chief Financial Officer |
| Laurie DiGiovanni* | 60 | Chief Operating Officer |
| Terren S. Peizer | 61 | Executive Chairman of the Board of Directors |
| Harbant S. Sidhu | 62 | Director |
| Douglas M. Mox | 54 | Director |
| John P. O'Neill | 63 | Director |

*-Ms. DiGiovanni resigned as the Company's Chief Operating Officer effective at the end of the first quarter of fiscal 2021. Her successor in that role has not yet been appointed.

**Executive Officers**

**Stephen M. Sanchez** has been one of our directors since January 2020 and was appointed as the Company's Chief Executive Officer in February 2021. Mr. Sanchez has over 30 years of experience in the logistics industry, particularly in the design, implementation and operation of last-mile delivery services. Since November 2019, Mr. Sanchez has served as the Chief Executive Officer of PDQ Pickup LLC, a moving and logistics company, or PDQ Pickup. From August 2019 until November 2019, Mr. Sanchez was the Chief Operating Officer of PDQ pickup. PDQ Pickup. From January 2018 until August 2019, Mr. Sanchez was Senior Vice President of Operations and Business Development for Boxbot, Inc., a robotics company focusing on the development and sale of autonomous last-mile delivery vehicles. From November 2015 until January 2018, Mr. Sanchez was Senior Manager of Final Mile Process Engineering for Amazon, Inc. From September 2014 until November 2015, Mr. Sanchez served as Vice President/Director of Supply Chain – Hub and Network Planning, for LaserShip Inc., a regional provider of same-day and next-day delivery services. Mr. Sanchez, who is a veteran of the U.S. Navy, also has held positions of increasing responsibility with affiliates of DHL International GmbH, as well as with National Express Corporation and United Parcel Service. We believe that Mr. Sanchez is qualified to serve as a director of our company as a result of his extensive leadership experience in logistics and business development.

**Ryan Saathoff** has served as the Company's Chief Financial Officer since April 2020. In addition, Mr. Saathoff is the founder, chief executive officer, and managing partner at RG Alliance, a privately-held full back office solutions company, with over 50 employees and 10% of its business outside the U.S. He has served as CEO of RG Alliance since 2012, and is responsible for all strategic outcome planning, financial strategy, process optimization, and leveraging business intelligence from key metrics. In that role, he has been significantly involved in supporting his clients through multiple large public and private financial acquisitions and has guided several client executive teams in taking their companies public. He also serves on the boards of several non-profit companies and is affiliated with numerous professional and industry associations. Mr. Saathoff holds a Bachelor of Arts degree from California State University, San Marcos.

**Laurie DiGiovanni** served as the Company's Chief Operating Officer since May 2016. In addition, Ms. DiGiovanni served as interim Chief Executive Officer of the Company from October 4, 2018 to November 17, 2018. Since 2012, Ms. DiGiovanni has held marketing and operating executive positions at Beverly Hills Rent a Car and Executive Transportation pursuant to which Ms. DiGiovanni managed national corporate expansions and activation of transportation industry leading brands and was executive producer for a range of marketing campaigns at auto shows and transportation industry live events. Ms. DiGiovanni manages all business operations of the Company and its subsidiaries including driver training and the Fleet Management business. Ms. DiGiovanni is the founder of the Association for Finance and Insurance Professionals (AFIP), an association that has certified tens of thousands for more ethical car buying practices, and mandatory for auto industry employees and implemented in leading global automotive markets. She also played key roles in the launch of many automotive initiatives, including managing new divisions and brands for Beverly Hills Travel and Lifestyle and American Dream Classics; serving as Director of Training for CarsDirect.com; and leading marketing and customer experience campaigns for Barrett-Jackson Car Auction. Ms. DiGiovanni also has direct brand experience within the automotive industry, including project management and training positions with Toyota, Mazda, and Nissan. Ms. DiGiovanni has a Bachelor of Arts degree from California State University, Fullerton.

As noted above, Ms. DiGiovanni has resigned as Chief Operating Officer, with such resignation to be effective at the end of the first quarter of fiscal 2021. Her successor has not yet been appointed.

**Board of Directors**

**Terren S. Peizer** has been Executive Chairman of the Board of Directors since February 2021. He is a highly successful entrepreneur and investor, having founded and commercialized several public and private companies. Mr. Peizer is the founder, Board Chairman, Chief Executive Officer and majority stockholder of OnWrak Inc., a leading AI and telehealth-enabled, virtualized healthcare treatment company. Mr. Peizer is also the Board Chairman, Chief Executive Officer and majority shareholder of BioVie, Inc., which is the industry leader in the development of two orphan drug candidates for the treatment of rare liver diseases. In addition, Mr. Peizer is founder, Chairman and CEO and majority shareholder of four privately-held companies. He was Chairman of Cray, Inc., which he bought from Silicon Graphics for assumption of debt and recently sold to Hewlett Packard for approximately $1.4 billion. Mr. Peizer is chairman and sole shareholder of Acuitas Group Holdings, LLC, his personal investment holding company. In addition, Mr. Peizer has held senior executive positions at Goldman, Sachs & Co., First Boston, and Drexel Burnham Lambert. We believe that Mr. Peizer's vast experience as a corporate executive, particularly with several public companies, qualifies him to serve on and chair our Board of Directors.

**Harbant S. Sidhu** has served as a director of the Company since January 2020. Mr. Sidhu is a design engineer and founder of Advanced Tek Group, Inc. (formerly Magnaspec, Inc.), a private aerospace manufacturing business. Since 2012, Mr. Sidhu has operated Advanced Tek Group, Inc., managing all aspects of the operating business. Mr. Sidhu has experience in personnel management and oversite, aerospace and defense engineering, sales, manufacturing, accounting and operational experience in the aerospace and defense manufacturing industry. Mr. Sidhu has performed unclassified contracting work in components production in Mexico. Mr. Sidhu graduated as an electrical engineer in 1980 from Punjab University, India. Mr. Sidhu's experience in human resources coupled with his business experience qualifies him to serve on our Board of Directors.

**Douglas M. Mox** has been one of our directors since January 2020. Mr. Mox has extensive experience in financial management and strategic planning, as well as logistics, engineering and operations. Since January 2013, Mr. Mox has been the Chief Operating Officer of Grace Thomas Investment, a private equity firm. Prior thereto, Mr. Mox, who has a B.S. degree in aviation management/logistics, worked as a senior manager at DHL Worldwide Express, an affiliate of DHL International GmbH, and as an industrial engineering manager for United Parcel Service. The Company believes that Mr. Mox is qualified to serve as a director of the Company as a result of his financial expertise and his extensive experience in the private equity and logistics industries.

**John P. O'Neill** has been our Director since January 2020. Mr. O'Neill is a 45-year veteran of the logistics industry and has worked both in the U.S. and internationally over the course of his career. Since 1990, Mr. O'Neill has been employed by affiliates of DHL International GmbH in positions of increasing responsibility in the U.S. and throughout Asia. Since March 2013, Mr. O'Neill has been the Deputy Managing Director of DHL-Sinotrans International Air Courier, in Beijing. The Company believes that Mr. O'Neill is qualified to serve as a director of the Company as a result of his extensive leadership experience in the logistics industry.

## CORPORATE GOVERNANCE

**Board of Directors**

The Company's Board of Directors (the "Board of Directors" or the "Board") oversees our business affairs and monitors the performance of management. In accordance with our corporate governance principles, the Board of Directors does not involve itself in day-to-day operations of the Company. The directors keep themselves informed through discussions with the Chief Executive Officer, other key executives and by reading the reports and other materials that we send them and by participating in Board of Directors and committee meetings.

*Term of Office*

Each of our current directors, with the exception of our Executive Chairman Terren S. Peizer, was elected to the Board in January 2020 in accordance with Section 3 of the Company's By-Laws. Mr. Peizer was appointed to the Board by a unanimous vote of the directors in connection with an expansion of the Board that was authorized in February 2021. Since the current term of office for each director is one year, and the Board has not yet scheduled an annual meeting of Company shareholders or arranged to take action by unanimous written consent of a majority of Company shareholders, each director other than Mr. Peizer may, as of the date of this Report, be considered a "holdover director."

The Board size was recently expanded from five to seven members and the Board is currently working to fill the vacancies in its membership. Once the Board has been fully constituted, it intends to take action to elect its membership either at a meeting of Company shareholders or by unanimous written consent of a majority of Company shareholders.

*Director Independence*

Our Board of Directors is comprised of a majority of "independent directors" as defined under the rules of Nasdaq. Although we are not currently listed on Nasdaq or any other exchange, we use the definition of "independence" of Nasdaq to make this determination. Nasdaq Listing Rule 5605(a)(2) provides that an "independent director" is a person other than an officer or employee of the company or any other individual having a relationship which, in the opinion of the Company's Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. The Nasdaq listing rules provide that a director cannot be considered independent if:

- the director is, or at any time during the past three (3) years was, an employee of the company;

- the director or a family member of the director accepted any compensation from the company in excess of $120,000 during any period of twelve (12) consecutive months within the three (3) years preceding the independence determination (subject to certain exemptions, including, among other things, compensation for board or board committee service);

- the director or a family member of the director is a partner in, controlling shareholder of, or an executive officer of an entity to which the company made, or from which the company received, payments in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenue for that year or $200,000, whichever is greater (subject to certain exemptions);

- the director or a family member of the director is employed as an executive officer of an entity where, at any time during the past three (3) years, any of the executive officers of the company served on the compensation committee of such other entity; or

- the director or a family member of the director is a current partner of the company's outside auditor, or at any time during the past three (3) years was a partner or employee of the company's outside auditor, and who worked on the company's audit.

Under such definitions, our Board has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment and affiliations, our Board has determined that Douglas M. Mox, John P. O'Neill and Harbant S. Sidhu are all independent directors of the Company. However, our Common Stock is not currently quoted or listed on any national exchange or interdealer quotation system with a requirement that a majority of our Board be independent and, therefore, the Company is not subject to any director independence requirements.

**Board Leadership Structure and Risk Oversight**

The Board oversees our business and considers the risks associated with our business strategy and decisions. The Board currently implements its risk oversight function as a whole. Each of the Board committees, as set forth below, will also provide risk oversight in respect of its areas of concentration and reports material risks to the board for further consideration.

**Board of Directors Meetings and Attendance**

During the fiscal year ended December 31, 2020, the Board of Directors held 12 meetings. Each director attended all of these Board meetings.

**Code of Ethics**

Although we are not required to do so, as the Common Stock is not listed on a national securities exchange in which an adopted Code of Ethics would be a listing requirement, our Board plans at some point to adopt a written code of business conduct and ethics ("Code") that applies to our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer or controller, or persons performing similar functions. We intend to post on our website a current copy of the Code and all disclosures that are required by law in regard to any amendments to, or waivers from, any provision of the Code.

**Committees of the Board of Directors**

Our Board has established an audit committee and a compensation committee. The composition and responsibilities of each of the committees of our Board is described below. Members serve on these committees until their resignation or until as otherwise determined by our board of directors.

**Audit Committee**

We have established an audit committee consisting of Douglas M. Mox and John P. O'Neill (the "Audit Committee"). The Audit Committee's duties, which are specified in our Audit Committee Charter, include, but are not limited to:

- reviewing and discussing with management and the independent auditor the annual audited financial statements, and recommending to the board whether the audited financial statements should be included in our annual disclosure report;

- discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of our financial statements;

- discussing with management major risk assessment and risk management policies;

- monitoring the independence of the independent auditor;

- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law;

- reviewing and approving all related-party transactions;

- inquiring and discussing with management our compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by our independent auditor, including the fees and terms of the services to be performed;

- appointing or replacing the independent auditor;

- determining the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies; and

- approving reimbursement of expenses incurred by our management team in identifying potential target businesses.

The Audit Committee is composed exclusively of "independent directors" who are "financially literate" as defined under the Nasdaq listing standards we needed to comply with at the time of our initial public offering. The Nasdaq listing standards define "financially literate" as being able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement. However, neither of Messrs. Mox or O'Neill qualifies as an "Audit Committee financial expert," as that term is defined in current SEC regulations. The Board size has recently been expanded and we expect that one if not more than one of our new directors to be added to the Board will so qualify. For now, the committee has, and will continue to have, at least one member who has past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background that results in the individual's financial sophistication.

During the fiscal year ended December 31, 2020, the Audit Committee held one meeting.

**Compensation Committee**

We have established a compensation committee of the Board of Directors, which consists of Harbant S. Sidhu and Stephen M. Sanchez, the former of whom is an independent director. Mr. Sidhu is also a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act, or Rule 16b-3, and an outside director, as defined pursuant to Section 162(m) of the Internal Revenue Code, or Section 162(m). Mr. Sanchez is the chairman of the compensation committee. The compensation committee's duties, which are specified in our Compensation Committee Charter, include, but are not limited to:

- reviews, approves and determines, or makes recommendations to our board of directors regarding, the compensation of our executive officers;

- administers our equity compensation plans;

- reviews and approves, or makes recommendations to our board of directors, regarding incentive compensation and equity compensation plans; and

- establishes and reviews general policies relating to compensation and benefits of our employees.

During the fiscal year ended December 31, 2020, the Compensation Committee held one meetings.

**Nominating Committee**

We do not currently have a nominating committee. Instead of having such a committee, our Board of Directors historically has searched for and evaluated qualified individuals to become nominees for membership on our Board of Directors. The directors recommend candidates for nomination for election or reelection and, as necessary, to fill vacancies and newly created directorships.

We do not have a policy regarding the consideration of any director candidates which may be recommended by our stockholders, including the minimum qualifications for director candidates, nor has our Board of Directors established a process for identifying and evaluating director nominees. We have not adopted a policy regarding the handling of any potential recommendation of director candidates by our stockholders, including the procedures to be followed. In the event such a proposal is made, all members of our Board will participate in the consideration of director nominees.

**Non-Employee Director Compensation**

Directors do not currently receive compensation for their services on the Board or on any Board committees.

**Family Relationships**

There are no family relationships among any of our officers or directors.

**Involvement in Certain Legal Proceedings**

To our knowledge, none of our current directors or executive officers has, during the past ten years:

- been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

- had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two years prior to that time;

- been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in any type of business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;

- been found by a court of competent jurisdiction in a civil action or by the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

Except as set forth above and in our discussion below in "Certain Relationships and Related Transactions," none of our directors or executive officers has been involved in any transactions with us or any of our directors, executive officers, affiliates or associates which are required to be disclosed pursuant to the rules and regulations of the SEC.

**Shareholder Communications**

Currently, we do not have a process for shareholders to send communications to the Board of Directors. To date, no shareholders have made any recommendations to us to adopt such a policy.

**Delinquent Section 16(a) Reports**

Based solely upon a review of copies of such forms filed on Forms 3, 4, and 5, and amendments thereto furnished to us, except as noted in the table below, we believe as of the date of this Report that our executive officers, directors and greater than 10 percent beneficial owners have filed on a timely basis all Section 16(a) reports required to be filed during the year ended December 31, 2020. To our knowledge, the failure to timely file each such report listed below was the result of an administrative error by the filer.

| Name | Number of Late Reports | Number of Transactions Not Reported on a Timely Basis | Known Failure to File a Required Form |
|---|---|---|---|
| Boyd Bishop | 1 | 1 | No |
| Ryan Saathoff | 1 | 0 | No |
| John P. O'Neill | 1 | 1 | No |
| Stephen M. Sanchez | 2 | 2 | No |
| Harbant Sidhu | 1 | 1 | No |
| Terren S. Peizer | 2 | 5 | No |
| Gray Mars Venus Trust, | 1 | 1 | No |

## ITEM 11. EXECUTIVE COMPENSATION

The following table provides information regarding the compensation earned for the years ended December 31, 2020 and 2019, for (i) all individuals serving as our principal executive officer or acting in a similar capacity during 2019 ("PEO"), and (ii) our two most highly compensated executive officers other than the PEO who were serving as executive officers at the end of 2020:

| Name and principal Position | Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Ramy El-Batrawi *Chief Executive Officer (1)* | 2020 | $ 0 | $ 0 | $ 0 | $ 132,007 | $ 0 | $ 0 | $ 0 | $ 132,007 |
| | 2019 | $ 167,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 167,000 |
| Ryan Saathoff *Chief Financial Officer (4)* | 2020 | $ 25,615 | $ 0 | $ 0 | $ 8,800 | $ 0 | $ 0 | $ 0 | $ 34,415 |
| | 2019 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Laurie DiGiovanni *Chief Operating Officer (2)* | 2020 | $ 199,472 | $ 0 | $ 0 | $ 79,204 | $ 0 | $ 0 | $ 0 | $ 278,676 |
| | 2019 | $ 147,250 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 147,250 |
| Jonathan Rosen *Former Chief Executive Officer (3)* | 2020 | $ 12,942 | $ 0 | $ 0 | $ 167,761 | $ 0 | $ 0 | $ 0 | $ 180,703 |
| | 2019 | $ 275,000 | $25,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 300,000 |
| Kevin Pickard *Former Chief Financial Officer (4)* | 2020 | $ 29,054 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 29,054 |
| | 2019 | $ 125,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 125,000 |
| Boyd Bishop *Former President (5)* | 2020 | $ 68,823 | $ 0 | $ 0 | $ 289,481 | $ 0 | $ 0 | $ 0 | $ 358,304 |
| | 2019 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |

(1)  On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer upon the appointment of Jonathan Rosen as Chief Executive Officer. In addition, Mr. El-Batrawi resigned as one of our directors effective as of September 1, 2019. Mr. El-Batrawi was reappointed as our Chief Executive Officer and a director in February 2020 but resigned from both those positions in February 2021.

(2)  Ms. DiGiovanni has resigned as Chief Operating Officer, effective as of the end of the first quarter of 2021.

(3)  Mr. Rosen was appointed Chief Executive Officer on February 1, 2019, and served until January 26, 2020.

(4)  Mr. Pickard served as Chief Financial Officer until April 2020. Upon his resignation, Ryan Saathoff was appointed to succeed him.

(5)  Mr. Bishop served as President of the Company between January and March 2020.

**Bonuses**

Mr. Rosen was paid a bonus of $25,000 upon completion of the Company's initial public offering in November 2019. No other bonuses were paid that year and none were paid in 2020.

**Employment Agreements**

The Company had entered into an oral agreement with its former Chief Executive Officer, Jonathan Rosen, for an annual salary of $300,000, retroactive to his start date of February 1, 2019. The Company and Mr. Rosen entered into an Executive Employment Agreement on January 10, 2020, pursuant to which Mr. Rosen would serve as Chief Executive Officer of the Company. Pursuant to the agreement, Mr. Bishop was to receive a base annual salary at a rate of $300,000 per annum. Additional performance-based incentive compensation was to be negotiated by the Company and the Mr. Rosen in good faith. Mr. Rosen was also granted an option to purchase up to 500,000 shares of our common stock at a price of $4.00 per share, with 166,000 shares vesting on the date of the agreement and thereafter 13,917 shares vesting in each succeeding month of his employment, except in the 24th month the number of shares to vest would be 13,909. On January 26, 2020, Mr. Rosen resigned from his position as the Company's Chief Executive Officer.

The Company and Boyd Bishop entered into an Executive Employment Agreement on December 23, 2019, pursuant to which Mr. Bishop would serve as President of the Company effective January 6, 2020. Pursuant to the agreement, Mr. Bishop was to receive a base annual salary at a rate of $350,000 per annum. Mr. Bishop was to receive a signing bonus of $100,000 with $50,000 payable upon his first day of employment and $50,000 payable on the three-month anniversary of his first day of employment if he was still employed by the Company. Future bonuses, up to the amount of his annual salary, were to be based on the number of vehicles rented, location openings and other metrics. The fiscal year 2020 bonus was to be a minimum of $40,000 for each 1,000 additional cars placed in service during 2020 over the number of cars in service on December 31, 2019, and other criteria as mutually established by the executive and the Board in good faith within 180 days after the effective date of the agreement. Mr. Bishop was also granted an option to purchase up to 1,000,000 shares of our common stock at a price to be determined by the Board within 30 days of the execution of the Agreement. The 1,000,000 options were to vest upon the following schedule: (a) 250,000 shares at the rate of 1/60th per day during the 60 days following the date of the agreement, and (b) 22,058 shares on each subsequent monthly anniversary of the date of the agreement, with 22,086 on the last monthly anniversary until the 1,000,000 shares have all vested. On March 1, 2020, Boyd Bishop resigned from his position as President of the Company, and future bonus payments and unvested options were cancelled.

26

Laurie DiGiovanni, who serves as Chief Operating Officer, entered into a written employment agreement with the Company as of June 30, 2020. This agreement provided for Ms. DiGiovanni to continue to serve as Chief Operating Officer for a three-year term, in which Ms. DiGiovanni would be paid a base salary of $200,000 per annum and would receive up to 750,000 in incentive stock options, with 250,000 to be granted upon execution of the agreement and the remainder to be granted on a quarterly basis for the life of the agreement, Ms. DiGiovanni was not entitled to any guaranteed bonus payments under the agreement, although it provides that the Company's Board of Directors may award her a discretionary bonus. Her employment under the agreement was mutually considered by her and the Company to be "at-will," terminable by either party at its discretion, and Ms. DiGiovanni is subject to non-competition and non-solicitation provisions for up to twelve (12) months after termination of her employment. Ms. DiGiovanni has tendered her resignation as Chief Operating Officer, such resignation to be effective as of the end of the first quarter of fiscal 2021. Under the terms of her agreement, she is entitled to severance pay totaling three months of her base salary.

No other current executive officer of the Company has, as of the date of this Report, entered into an employment agreement with the Company. Upon the entry into any such employment agreement, the Company will file it with a future periodic report.

**Director Compensation**

| Name | Year | Fees Earned or Paid | Stock Awards | Option Awards | Non-Equity Incentive | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Stephen M. Sanchez | 2020 | $ 0 | $ 0 | $ 1,056 | $ 0 | $ 0 | $ 1,056 |
| | 2019 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Douglas M. Mox | 2020 | $ 0 | $ 0 | $ 1,056 | $ 0 | $ 0 | $ 1,056 |
| | 2019 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| John P. O'Neill | 2020 | $ 0 | $ 0 | $ 1,056 | $ 0 | $ 0 | $ 1,056 |
| | 2019 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Harbant S. Sidhu | 2020 | $ 0 | $ 0 | $ 1,056 | $ 0 | $ 0 | $ 1,056 |
| | 2019 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Jeffrey J. Guzy | 2020 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| former director | 2019 | $ 10,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 10,000 |
| Paul Richter | 2020 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| former director | 2019 | $ 10,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 10,000 |
| Christopher Miglino | 2020 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | 0 |
| former director | 2019 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | 0 |

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table shows the beneficial ownership of our Common Stock (our only outstanding calls of voting securities) as of March 29, 2021, of (i) each person known to us to be the beneficial owner of at least five percent (5%) of our outstanding Common Stock; (ii) each director; (iii) each executive officer; and (iv) all directors and executive officers as a group.

Beneficial ownership is determined in accordance with the rules of the SEC, and generally includes voting power and/or investment power with respect to the securities held. Shares of Common Stock subject to options and warrants currently exercisable or exercisable within 60 days as of March 29, 2021, are deemed outstanding and beneficially owned by the person holding such options or warrants for purposes of computing the number of shares and percentage beneficially owned by such person, but are not deemed outstanding for purposes of computing the percentage beneficially owned by any other person. Except as indicated in the footnotes to this table, the persons or entities named have sole voting and investment power with respect to all shares of our Common Stock shown as beneficially owned by them.

The percentages in the table below are based on 35,127,524 outstanding shares of Common Stock. Unless otherwise indicated, the principal mailing address of each of the persons below is c/o EVmo, Inc., 433 N. Camden Drive, Suite 600, Beverly Hills, California, 90210. The Company's executive office is also located at 433 N. Camden Drive, Suite 600, Beverly Hills, California, 90210.

| Name of Beneficial Owner | Title | Amount Beneficially Owned | Total Percentage |
|---|---|---|---|
| **Officers and Directors (1)** | | | |
| Terren S. Peizer (2) | Executive Chairman | 10,055,512 | 28.63% |
| Ryan Saathoff | Chief Financial Officer | 98,050 (3) | 0.28% |
| Laurie DiGiovanni (4) | Chief Operating Officer | 437,500 (4) | 1.23% |
| Stephen M. Sanchez | Chief Executive Officer and Director | 37,214 (5) | 0.11% |
| Douglas M. Mox | Director | 15,000 (6) | 0.04% |
| John P. O'Neill | Director | 267,100 (7) | 0.76% |
| Harbant S. Sidhu | Director | 65,000 (8) | 0.18% |
| All Officers and Directors as a Group | | 10,975,376 | 30.73% |
| **Greater than 5% Stockholders** | | | |
| X, LLC (9) | | 3,157,745 | 8.99% |
| Gray Mars Venus Trust, Arizona 2015 (10) | | 6,292,690 | 17.91% |
| Bellridge Capital, L.P. (11) | | 2,526,122 | 6.90% |
| Acuitas Group Holdings, LLC (2) | | 10,055,512 | 28.63% |
| Acme Auto Leasing, LLC (12) | | 2,137,278 | 6.08% |

(1) Unless otherwise indicated, the principal address of the named directors and officers of the Company is c/o YayYo, Inc., 433 N Camden Dr., # 600 Beverly Hills, CA, 90210.

(2) Mr. Peizer is the sole member of Acuitas Group Holdings, LLC. He has sole voting and investment power over these shares.

(3) This total includes non-qualified stock options to purchase up to an aggregate of 93,750 shares of Common Stock.

(4) Ms. DiGiovanni has tendered her resignation as Chief Operating Officer, which will be effective at the end of the first quarter of fiscal 2021. Her entire beneficial ownership at present consists of non-qualified stock options.

(5) This total includes non-qualified stock options to purchase up to an aggregate of 15,000 shares of Common Stock.

(6) Mr. Mox's entire beneficial ownership at present consists of non-qualified stock options.

(7) This total includes non-qualified stock options to purchase up to an aggregate of 15,000 shares of Common Stock.

(8) This total includes non-qualified stock options to purchase up to an aggregate of 15,000 shares of Common Stock.

(9) Ramy El-Batrawi, our former chief executive officer and director, is the sole member of X, LLC. He has sole voting and investment power over these shares. X LLC's address is 2635 Astral Dr., Los Angeles, CA 90046.

(10) John Gray has direct beneficial ownership of 1,517,690 shares of Common Stock. The Gray Mars Venus Trust, Arizona 2015, an entity controlled by Mr. Gray (the "Gray Trust"), beneficially owns the remainder of these shares and Mr. Gray has voting and investment power over them. The Gray Trust's address is 75 Avon Ave, Mill Valley, CA 94941.

(11) Bellridge Capital LLC ("BC LLC") is the investment manager of Bellridge Capital, L.P., Boris Klimov (a.k.a Robert Klimov) is the managing partner and controlling person of BC LLC and he and BC LLC may be deemed to share beneficial ownership of the position reported above, although BC LLC and Mr. Klimov each disclaims beneficial ownership of the securities with respect to which indirect beneficial ownership is described. The total beneficial ownership reported above includes 1,026,122 shares of Common Stock and a warrant to purchase an additional 1,500,000 shares of Common Stock, which is exercisable at any time. Mr. Klimov has voting and investment power over these securities. Bellridge Capital. L.P.'s address is 515 E. Las Olas Boulevard, #120A, Fort Lauderdale, FL 33301 #120A, Fort Lauderdale, FL 33301.

(12) Acme Auto Leasing LLC ("Acme")'s address is 440 Washington Avenue, North Haven, CT 06473. Christopher Cullen, the managing member of Acme, has voting and investment power over these shares.

**Equity Compensation Plan Information**

On November 30, 2016, the Board of Directors of the Company adopted the 2016 Equity Incentive Plan (the "2016 Plan") that governs equity awards to our employees, directors, officers, consultants and other eligible participants. Under the 2016 Plan there are 10,000,000 shares of common stock reserved for issuance.

The types of awards permitted under the 2016 Plan include qualified incentive stock options and non-qualified stock options. Each option shall be exercisable at such times and subject to such terms and conditions as the Board may specify.

The Board of Directors has the power to amend, suspend or terminate the 2016 Plan without stockholder approval or ratification at any time or from time to time. No change may be made that increases the total number of shares of our common stock reserved for issuance pursuant to incentive awards or reduces the minimum exercise price for options or exchange of options for other incentive awards, unless such change is authorized by our stockholders within one year.

**Outstanding Equity Awards at Fiscal Year-End Table**

**OUTSTANDING EQUITY AWARDS AT DECEMBER 31, 2020**

The following table sets forth all unexercised options and unvested restricted stock that have been awarded to our named executives by the Company and were outstanding as of December 31, 2020.

| Name and principal Position | Number of securities underlying unexercised options exercisable (#) | Number of securities underlying unexercised options unexercisable (#) | Equity incentive plan awards: Number of securities underlying unexercised unearned options (#) | Option exercise price ($) | Option expiration date | Number of shares or units of stock that have not vested (#) | Market value of shares or units of stock that have not vested | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested (#) | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested ($) |
|---|---|---|---|---|---|---|---|---|---|
| Ramy El-Batrawi (1) | 562,500 | 437,500 | 0 | 0.22 | July 25, 2025 | 0 | 0 | 0 | 0 |
| Ryan Saathoff | 31,250 | 218,750 | 0 | 0.22 | July 25, 2025 | 0 | 0 | 0 | 0 |
| Laurie DiGiovanni | 312,500 | 437,500 | 0 | 0.22 | July 25, 2025 | 0 | 0 | 0 | 0 |
| Stephen M. Sanchez | 5,000 | 0 | 0 | 0.22 | July 25, 2025 | 0 | 0 | 0 | 0 |
| Douglas M. Mox | 5,000 | 0 | 0 | 0.22 | July 25, 2025 | 0 | 0 | 0 | 0 |
| John P. O'Neill | 5,000 | 0 | 0 | 0.22 | July 25, 2025 | 0 | 0 | 0 | 0 |
| Harbant S. Sidhu | 5,000 | 0 | 0 | 0.22 | July 25, 2025 | 0 | 0 | 0 | 0 |

(1)   Mr. El-Batrawi resigned as both Chief Executive Officer and a member of the Board in February 2021. Upon his resignation, the Board of Directors voted to accelerate the vesting of all of his options. Mr. El-Batrawi has since exercised these options and received shares of Common Stock.

**Indemnification of Directors and Officers**

We have agreed to indemnify the underwriters against specified liabilities, including liabilities under the Securities Act, and to contribute to payments the underwriters may be required to make in respect thereof.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

In addition to the arrangements, discussed in the sections titled "Directors, Executive Officers and Corporate Governance" and "Executive Compensation" the following is a description of each transaction since January 1, 2019 and each currently proposed transaction in which:

- we have been or are to be a participant; and

- the amount involved exceeded or exceeds the lesser of $120,000 or one percent of our total assets at the end of our last two completed fiscal years; and

- any of our directors, executive officers or holders of more than 5% of our outstanding capital stock, or any immediate family member of, or person sharing the household with, any of these individuals or entities, had or will have a direct or indirect material interest.

*X, LLC and Ramy El-Batrawi*

During the fiscal year ended December 31, 2019, the Company paid management fees of $167,000 to X, LLC, a Delaware limited liability company ("XLLC"), the sole member of which is Ramy El-Batrawi, who in parts of both 2019 and 2020 served as either Chief Executive Officer or Acting Chief Executive Officer, or was one of the Company's directors. XLLC was and remains a greater than 5% stockholder.

In December 2020, Mr. El-Batrawi extended an interest-free personal loan to the Company, which was applied to working capital. This loan was repaid in whole in January 2021.

*SRAX, Inc. and Christopher Miglino*

During the fiscal year ended December 31, 2019, the Company engaged SRAX, Inc., a publicly-traded Delaware corporation ("SRAX"), to provide digital marketing and data-related services. Christopher Miglino, chief executive officer of SRAX, served as a member of our Board of Directors during 2019 but resigned in January 2020.

SRAX billed the Company $324,919.71 for services rendered during fiscal 2019. These fees were the subject of a legal dispute between SRAX and the Company, which was initiated by SRAX in February 2020. In February 2021, the parties entered into a confidential settlement of this litigation.

*American Business Insurance Services, Inc. and David Haley*

Since 2018, the Company has engaged American Business Insurance Services, Inc. ("ABI") as its managing general underwriter. David Haley is the chief executive officer of ABI and was, for part of 2019, a member of the Company's Board of Directors and, for part of 2020, a greater than 5% stockholder. In fiscal 2020 and fiscal 2019 the Company paid $1,800,000 and $1,375,000, respectively, to ABI in connection with its underwriting services. As of December 31, 2020, the Company owed ABI an additional $265,256.57 in fees.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

AJ Robbins CPA, LLC ("AJ Robbins") served as the Company's independent registered public accounting firm for the fiscal years ended December 31, 2020 and 2019.

The Audit Committee of the Board has appointed AJ Robbins as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021.

Aggregate fees billed by the Company's independent registered public accounting firm are set forth below:

|  | **2020** | | **2019** | |
|---|---|---|---|---|
| Audit fees and quarterly reviews (1) | $ | 123,000 | $ | 117,500 |
| Audit related fees | | - | | 62,500 |
| Tax fees | | - | | - |
| All other fees | | - | | - |

(1)     Audit fees include fees for audit or review services in accordance with generally accepted auditing standards, such as statutory audits and services rendered for compliance with Section 404 of the Sarbanes-Oxley Act.

**Pre-Approval of Services**

Our Audit Committee has not adopted policies and procedures for pre-approval of audit or non-audit services to be performed by the independent registered public accounting firm The Audit Committee pre-approved the engagements for all services performed by the independent registered public accounting firm referred to above.

31

PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES

**Financial Statement Schedules**

Our consolidated financial statements are listed on the Index to Financial Statements on this annual report on Form 10-K beginning on page F-1.

All financial statement schedules are omitted because they are not applicable or the required information is shown in the financial statements or notes thereto.

**Exhibits**

The documents listed in the Exhibit Index of this Annual Report on Form 10-K have each been incorporated by reference to this annual report on Form 10-K, in each case as indicated therein (and are numbered in accordance with Item 601 of Regulation S-K).

Certain of the agreements filed as exhibits to this Report contain representations and warranties by the parties to the agreements that have been made solely for the benefit of the parties to the agreement. These representations and warranties:

- may have been qualified by disclosures that were made to the other parties in connection with the negotiation of the agreements, which disclosures are not necessarily reflected in the agreements;

- may apply standards of materiality that differ from those of a reasonable investor; and

- were made only as of specified dates contained in the agreements and are subject to subsequent developments and changed circumstances.

Accordingly, these representations and warranties may not describe the actual state of affairs as of the date that these representations and warranties were made or at any other time. Investors should not rely on them as statements of fact.

## ITEM 16. FORM 10-K SUMMARY

None.

**EVmo, Inc.**
**Consolidated Financial Statements**
**December 31, 2020 and 2019**

**Contents**

|  | Page |
|---|---|
| **Financial Statements:** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2020 and 2019 | F-4 |
| Consolidated Statement of Stockholders' Equity for the years ended December 31, 2020 and 2019 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2020 and 2019 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

AJ Robbins CPA, LLC
Certified Public Accountants

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and
Stockholders of EVmo, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of EVmo, Inc. (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the years in the two year period then ended and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of EVmo, Inc. as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the years in the two year period then ended, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United Sates) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we were required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. According we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluation of the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of a Matter-Risks and Uncertainties**

As describe in Note 1, the COVID-19 virus could ultimately have a significant negative impact on the Company. The Company cannot at this time estimate the long-term effect of this unprecedented situation

*/s/ AJ Robbins CPA LLC*
We have served as the Company's auditor since 2016
Denver, Colorado
March 29, 2021

**aj@ajrobbins.com**
400 South Colorado Blvd, Suite 870, Denver, Colorado 80246
(B)303-537-5898 (M)720-339-5566 (F)303-586-6261

F-2

**EVmo, Inc.**
**Consolidated Balance Sheets**
**As of December 31, 2020 and 2019**

|  | | 2020 | | 2019 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 72,890 | $ | 1,256,429 |
| Accounts receivable | | 119,239 | | 59,331 |
| Prepaid expenses | | 23,861 | | 782,900 |
| Total current assets | | 215,990 | | 2,098,660 |
| Equipment, net | | 1,908 | | 3,395 |
| Rental vehicles, net | | 6,196,433 | | 4,737,047 |
| Deposit on vehicles | | - | | 164,080 |
| Other assets | | 200,000 | | 200,000 |
| **TOTAL ASSETS** | $ | 6,614,331 | $ | 7,203,182 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current Liabilities: | | | | |
| Accounts payable (including $590,176 and $394,183 to related party) | $ | 1,157,299 | $ | 545,254 |
| Accrued expenses (including $0 and $171,665 to related party) | | 961,704 | | 405,977 |
| Notes payables, current (net of discount of $1,973 and $32,289) | | 666,132 | | 287,378 |
| Customer deposit - related party | | 150,000 | | |
| Advance from related party | | 100,000 | | - |
| Finance lease obligations, current | | 1,426,425 | | 1,416,446 |
| Total current liabilities | | 4,461,560 | | 2,655,055 |
| Note payable, net of current portion | | 149,414 | | - |
| Finance lease obligations, net of current portion | | 926,453 | | 984,119 |
| **TOTAL LIABILITIES** | | 5,537,427 | | 3,639,174 |
| Commitments and contingencies | | - | | - |
| **STOCKHOLDERS' EQUITY** | | | | |
| Preferred stock, $0.000001 par value; 10,000,000 shares authorized; nil shares issued and outstanding | | - | | - |
| Common stock, $0.000001 par value; 90,000,000 shares authorized; 31,981,374 and 29,427,803 shares issued and outstanding | | 32 | | 29 |
| Additional paid-in capital | | 29,750,864 | | 28,735,894 |
| Accumulated deficit | | (28,673,992) | | (25,171,915) |
| Total stockholders' equity | | 1,076,904 | | 3,564,008 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ | 6,614,331 | $ | 7,203,182 |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-3

**EVmo, Inc.**
**Consolidated Statements of Operations**
**For the Years Ended December 31, 2020 and 2019**

| | | 2020 | | 2019 |
|---|---|---|---|---|
| **Revenue** | $ | 7,621,180 | $ | 6,914,910 |
| **Cost of revenue** | | 5,263,474 | | 4,673,870 |
| **Gross profit** | | 2,357,706 | | 2,241,040 |
| **Operating expenses:** | | | | |
| Selling and marketing expenses | | 490,403 | | 765,441 |
| Product development | | - | | 13,500 |
| General and administrative expenses | | 5,288,316 | | 4,023,921 |
| Loss on the settlement of debt | | - | | 252,900 |
| Total operating expenses | | 5,778,719 | | 5,055,762 |
| **Loss from operations** | | (3,421,013) | | (2,814,722) |
| **Other income (expense):** | | | | |
| Interest and financing costs | | (265,839) | | (1,115,499) |
| Gain on forgiveness of debt | | 184,775 | | - |
| Total other income (expense) | | (81,064) | | (1,115,499) |
| **Net loss** | $ | (3,502,077) | $ | (3,930,221) |
| **Weighted average shares outstanding :** | | | | |
| Basic | | 31,118,425 | | 27,112,557 |
| Diluted | | 31,118,425 | | 27,112,557 |
| **Loss per share** | | | | |
| Basic | $ | (0.11) | $ | (0.14) |
| Diluted | $ | (0.11) | $ | (0.14) |

The accompanying footnotes are an integral part of these consolidated financial statements.

**EVmo, Inc.**
**Consolidated Statements of Stockholders' Equity**
**For the Years Ended December 31, 2020 and 2019**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
| | Shares | Amount | Capital | Deficit | Equity (Deficit) |
|---|---|---|---|---|---|
| **Balance, December 31, 2018** | 26,718,676 | $ 27 | $ 19,193,151 | $ (21,241,694) | $ (2,048,516) |
| Correction to outstanding shares | (173) | - | - | - | - |
| Proceeds from the sale of common stock | 2,625,000 | 2 | 10,499,998 | - | 10,500,000 |
| Offering costs | - | - | (1,631,655) | - | (1,631,655) |
| Issuance of common stock for settlement of debt | 84,300 | - | 674,400 | - | 674,400 |
| Net loss | - | - | | (3,930,221) | (3,930,221) |
| **Balance, December 31, 2019** | 29,427,803 | 29 | 28,735,894 | $ (25,171,915) | 3,564,008 |
| Issuance of common stock for cash | 2,553,571 | 3 | 274,997 | - | 275,000 |
| Stock option expense | - | - | 739,973 | - | 739,973 |
| Net loss | - | - | - | (3,502,077) | (3,502,077) |
| **Balance, December 31, 2020** | 31,981,374 | $ 32 | $ 29,750,864 | $ (28,673,992) | $ 1,076,904 |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-5

**EVmo, Inc.**
**Consolidated Statements of Cash Flows**
**For the Years Ended December 31, 2020 and 2019**

|  | 2020 | 2019 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** |  |  |
| Net loss | $ (3,502,077) | $ (3,930,221) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: |  |  |
| Depreciation and amortization | 1,436,383 | 995,228 |
| Stock option expense | 739,973 | - |
| Common stock issued for services | - | - |
| Amortization of debt discounts | 30,316 | 39,922 |
| Loss on the settlement of debt | - | 252,900 |
| Gain on forgiveness of debt | (184,775) |  |
| Changes in operating assets and liabilities: |  |  |
| Accounts receivable | (59,908) | (59,331) |
| Prepaid expenses | 759,039 | (674,000) |
| Other assets | - | (200,000) |
| Accounts payable | 612,045 | (174,132) |
| Accrued expenses | 555,727 | 333,411 |
| Customer deposit - related party | 150,000 | - |
| Net cash provided by (used in) operating activities | 536,723 | (3,416,223) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** |  |  |
| Purchase of vehicles | - | (225,000) |
| Deposit for vehicles | - | (164,080) |
| Net cash used in investing activities | - | (389,080) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** |  |  |
| Proceeds from sale of common stock | 275,000 | 10,500,000 |
| Offering costs paid | - | (1,565,155) |
| Proceeds from advance from related party | 250,000 | - |
| Repayment of advance from related party | (150,000) | - |
| Proceeds from notes payable | 342,675 | 2,009,300 |
| Repayment of notes payable | (15,486) | (4,379,814) |
| Repayment of finance lease obligations | (2,422,451) | (1,780,043) |
| Net cash provided by (used in) financing activities | (1,720,262) | 4,784,288 |
| **NET INCREASE (DECREASE) IN CASH** | (1,183,539) | 978,985 |
| **CASH, BEGINNING OF YEAR** | 1,256,429 | 277,444 |
| **CASH, END OF YEAR** | $ 72,890 | $ 1,256,429 |
| **CASH PAID FOR:** |  |  |
| Interest | $ 185,224 | $ 1,105,049 |
| Income taxes | $ - | $ - |
| **SUPPLEMENTAL NON-CASH INVESTING AND FINANCING ACTIVITIES** |  |  |
| Payment of accounts payable/accrued expenses with common stock | $ - | $ 421,500 |
| Finance lease obligations | $ 3,705,417 | $ 1,159,470 |

The accompanying footnotes are an integral part of these consolidated financial statements.

F-6

EVmo, Inc.
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

**Note 1 - Organization and Basis of Presentation**

<u>Organization and Line of Business</u>

EVmo, Inc. (the "Company") was incorporated on June 21, 2016 under the laws of the state of Delaware originally as a limited liability company and subsequently changed to a C corporation. The Company was originally incorporated under the name of YayYo, Inc. and changed its name to Rideshare Rental, Inc. on September 11, 2020. On March 1, 2021, the Company changed its name from Rideshare Rental, Inc. to EVmo, Inc. The accompanying financial statements are retroactively restated to present the Company as a C corporation from June 21, 2016. The Company rents vehicles to Uber and Lyft drivers and drivers in the gig-economy.

<u>Basis of Presentation</u>

The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America (GAAP).

<u>Risk and Uncertainties</u>

In December 2019, a novel strain of coronavirus surfaced in China, which has and is continuing to spread throughout the world, including the United States. On January 30, 2020, the World Health Organization declared the outbreak of the coronavirus disease (COVID-19) a "Public Health Emergency of International Concern," and on March 11, 2020, the World Health Organization characterized the outbreak as a "pandemic". The governors of New York, California and several other states, as well as mayors on many cities, have ordered their residents to cease traveling to non-essential jobs and to curtail all unnecessary travel, and to stay in their homes as much as possible in the coming weeks, as the nation confronts the escalating coronavirus outbreak, and similar restrictions have been recommended by the federal authorities and authorities in many other states and cities. Since the beginning of 2020 and the spread of COVID-19, rideshare companies have increasingly been negatively impacted. As Americans practice social distancing and self-isolation, Uber, Lyft, and other rideshare companies have seen a steep decline in ridership and revenue, as a result. Given that rideshare drivers are both at risk themselves and of risk to the public, and in addition to decreased demand overall, less people are even still driving. The Company has seen a decline in revenue during the first half of 2020 which is having a negative impact on the cash flows of the business, but saw a positive upward movement in revenue during the second half of 2020. The Company has seen increased demand from drivers wanting to rent cars for ridesharing purposes and new drivers renting cars for both rideshare and delivery gig economy. The Company is not able to predict the ultimate impact that COVID -19 will have on its business. If another lockdown were to occur, the Company could be forced to significantly scale back its business operations and its growth plans, and could ultimately have a significant negative impact on the Company. The Company cannot at this time estimate the long term effect of this unprecedented situation on the rideshare market or delivery gig economy in general or the Company in particular.

**Note 2 – Summary of Significant Accounting Policies**

<u>Principles of Consolidation</u>

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Distinct Cars, LLC and RideShare Car Rentals, LLC. All significant intercompany transactions and balances have been eliminated.

<u>Use of Estimates</u>

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. It is possible that accounting estimates and assumptions may be material to the Company due to the levels of subjectivity and judgment involved.

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

Cash Equivalents

For the purpose of the statement of cash flows, cash equivalents include time deposits, certificate of deposits, and all highly liquid debt instruments with original maturities of three months or less.

Equipment and Rental Vehicles

Equipment and Rental Vehicles are stated at cost. Expenditures for maintenance and repairs are charged to earnings as incurred; additions, renewals and betterments are capitalized. When equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts, and any gain or loss is included in operations. Depreciation of equipment and rental vehicles is provided using the straight-line method for substantially all assets with estimated lives as follows:

| | |
|---|---|
| Computer equipment | 5 years |
| Vehicles | 5 years |

Long-Lived Assets

The Company applies the provisions of ASC Topic 360, *Property, Plant, and Equipment*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. ASC 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair values are reduced for the cost of disposal. Based on its review at December 31, 2020 and 2019, the Company determined that no impairment charge was necessary.

Revenue Recognition

The Company recognizes revenue from renting its fleet of cars to ridesharing and delivery gig drivers. Revenue is recognized based on the rental agreements which are generally on a weekly basis. The Company recognizes revenue in accordance with FASB ASC 606, *Revenue From Contracts with Customers*.

Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

Stock-Based Compensation

The Company records stock-based compensation in accordance with FASB ASC Topic 718, *Compensation – Stock Compensation*. FASB ASC Topic 718 requires companies to measure compensation cost for stock-based employee compensation at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees and non-employees. There were 1,631,250 warrants and 2,540,000 options outstanding as of December 31, 2020 and 1,631,250 warrants and 300,000 options outstanding as of December 31, 2019.

Basic and Diluted Earnings Per Share

Earnings per share is calculated in accordance with ASC Topic 260, *Earnings Per Share*. Basic earnings per share ("EPS") is based on the weighted average number of common shares outstanding. Diluted EPS is based on the assumption that all dilutive securities are converted. Dilution is computed by applying the treasury stock method. Under this method, options and warrants are assumed to be exercised at the beginning of the period (or at the time of issuance, if later), and as if funds obtained thereby were used to purchase common stock at the average market price during the period. There were 4,171,250 and 1,931,250 potentially dilutive securities outstanding at December 31, 2020 and 2019, respectively.

Advertising Costs

The Company expenses the cost of advertising as incurred. Advertising costs for the years ended December 31, 2020 and 2019 were $490,403 and $765,441, respectively.

Research and Development Costs

The Company expenses its research and development costs as incurred. Research and developments costs for the years ended December 31, 2020 and 2019 were $0 and $13,500, respectively.

Fair Value Measurements

The Company applies the provisions of ASC 820-10, *"Fair Value Measurements and Disclosures."* ASC 820-10 defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets.

- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

For certain financial instruments, the carrying amounts reported in the balance sheets for cash and current liabilities, including convertible notes payable, each qualify as financial instruments and are a reasonable estimate of their fair values because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

At December 31, 2020 and 2019, the Company did not identify any liabilities that are required to be presented on the balance sheet at fair value.

<u>Recent Accounting Pronouncements</u>

In June 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") ASU 2018-07, *Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for share-based payments granted to nonemployees for goods and services and aligns most of the guidance on such payments to nonemployees with the requirements for share-based payments granted to employees. ASU 2018-07 is effective on January 1, 2019. Early adoption is permitted. The adoption of this ASU did not have an impact on its financial statements.

In December 2019, the FASB issued ASU 2019-12, *Simplifying the Accounting for Income Taxes* which amends ASC 740 *Income Taxes* (ASC 740). This update is intended to simplify accounting for income taxes by removing certain exceptions to the general principles in ASC 740 and amending existing guidance to improve consistent application of ASC 740. This update is effective for fiscal years beginning after December 15, 2021. The guidance in this update has various elements, some of which are applied on a prospective basis and others on a retrospective basis with earlier application permitted. The Company is currently evaluating the effect of this ASU on the Company's consolidated financial statements and related disclosures.

In August 2020, the FASB issued ASU 2020-06, *Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40)—Accounting for Convertible Instruments and Contracts in an Entity's Own Equity.* ASU 2020-06 reduces the number of accounting models for convertible debt instruments and convertible preferred stock. For convertible instruments with conversion features that are not required to be accounted for as derivatives under Topic 815, *Derivatives and Hedging*, or that do not result in substantial premiums accounted for as paid-in capital, the embedded conversion features no longer are separated from the host contract. ASU 2020-06 also removes certain conditions that should be considered in the derivatives scope exception evaluation under Subtopic 815-40, *Derivatives and Hedging—Contracts in Entity's Own Equity*, and clarify the scope and certain requirements under Subtopic 815-40. In addition, ASU 2020-06 improves the guidance related to the disclosures and earnings-per-share (EPS) for convertible instruments and contract in entity's own equity. ASU 2020-06 is effective for public business entities that meet the definition of a Securities and Exchange Commission (SEC) filer, excluding entities eligible to be smaller reporting companies as defined by the SEC, for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. For all other entities, the amendments are effective for fiscal years beginning after December 15, 2023, including interim periods within those fiscal years. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The Board specified that an entity should adopt the guidance as of the beginning of its annual fiscal year. The Company is currently evaluation the impact this ASU will have on its consolidated financial statements.

Management does not believe that any recently issued, but not yet effective, accounting standards could have a material effect on the accompanying financial statements. As new accounting pronouncements are issued, we will adopt those that are applicable under the circumstances.

**Note 3 – Equipment**

At December 31, 2020 and 2019 equipment consisted of the following:

|  | 2020 | 2019 |
|---|---|---|
| Computer equipment | $ 6,046 | $ 6,046 |
|  | 6,046 | 6,046 |
| Less accumulated depreciation | (4,138) | (2,651) |
| Equipment, net | $ 1,908 | $ 3,395 |

Depreciation expense for equipment for the years ended December 31, 2020 and 2019 was $1,487 and $1,697, respectively.

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

**Note 4 – Rental Vehicles**

At December 31, 2020 and 2019 all of the Company's rental vehicles consisted of the following:

|  | 2020 | 2019 |
|---|---|---|
| Rental vehicles | $ 9,067,885 | $ 6,284,211 |
|  | 9,067,885 | 6,284,211 |
| Less accumulated depreciation | (2,871,452) | (1,547,164) |
| Rental vehicles, net | $ 6,196,433 | $ 4,737,047 |

The Company's rental vehicles are depreciated over their estimated useful life of five years. Depreciation expense for leased assets for the years ended December 31, 2020 and 2019 was $1,434,896 and $993,531, respectively. A majority of the rental vehicles are leased with terms are generally for 12 to 36 months and the Company has the right to purchase the vehicles at the end of the lease terms.

**Note 5 – Notes Payable**

Notes payable at December 31, 2020 and 2019 consisted of the following:

|  | 2020 | 2019 |
|---|---|---|
| Notes payable to individual investors; accrue interest at 8% per annum; principal payments equal to 1/12 of original balance plus interest due quarterly; due from dates ranging from August 9, 2020 to March 26, 2021; unsecured (A) | $ 304,667 | 319,667 |
| Note payable to the Small Business Administration. The note bears interest at 3.75% per annum, requires monthly payments of $731 after 12 months from funding and is due 30 years from the date of issuance. | 149,414 | - |
| Note payable issued under the Paycheck Protection Program of the Coronavirus Aid, Relief and Economic Security ("CARES") Act in the amount of $192,775. The loan has terms of 24 months and accrues interest at 1% per annum. During the year ended December 31, 2020, $184,775 of this loan has been forgiven as provided for in the CARES Act. | 8,000 | - |
| Notes payable to a finance company, default interest at 14% per annum; monthly principal payments ranging from $10,000 to $40,000 with unpaid principal due on December 15, 2021 | 355,438 | - |
| Total notes payable | 817,519 | 319,667 |
| Unamortized debt discount | (1,973) | (32,289) |
| Notes payable, net discount | 815,546 | 287,378 |
| Less current portion | (666,132) | (287,378) |
| Long-term portion | $ 149,414 | $ - |

F-11

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

(A) In connection with the issuance of these notes payable in 2018 and 2017, the Company also issued an aggregate of 24,050 shares of its common stock to these note holders as additional incentive to make the loans. The aggregate relative fair value of these shares of common stock was $119,875 and was recorded as a discount on the note payable and as additional paid in capital. The discount of $119,875 is being amortized over the term of the notes payable. During the years ended December 31, 2020 and 2019, $30,316 and $39,922, respectively, was charged to interest expense as amortization of the discounts, with an unamortized balance of $1,93 at December 31, 2020.

A rollforward of notes payable from December 31, 2018 to December 31, 2020 is below:

| | | |
|---|---|---:|
| Notes payable, December 31, 2018 | $ | 2,617,970 |
| Issued for cash | | 2,009,300 |
| Repayments | | (4,379,814) |
| Amortization of debt discounts | | 39,922 |
| Notes payable, December 31, 2019 | | 287,378 |
| Issued for cash | | 342,675 |
| Lease obligation converted to note payable | | 355,438 |
| Forgiveness of note payable | | (184,775) |
| Repayments | | (15,486) |
| Amortization of debt discounts | | 30,316 |
| Notes payable, December 31, 2020 | $ | 815,546 |

Future payments under note payable obligations are as follows:

| Years ending December 31, | | |
|---|---|---:|
| 2021 | $ | 668,105 |
| 2022 | | 3,104 |
| 2023 | | 3,175 |
| 2024 | | 3,296 |
| 2025 | | 3,422 |
| Thereafter | | 136,417 |
| | $ | 817,519 |

**Note 6 – Lease Obligations**

Lease obligations at December 31, 2020 and 2019 consisted of the following:

| | | 2020 | | 2019 |
|---|---|---:|---|---:|
| Lease obligations | $ | 2,352,878 | $ | 2,400,565 |
| Less current portion | | (1,426,425) | | (1,416,446) |
| Long-term portion | $ | 926,453 | $ | 984,119 |

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

A rollforward of lease obligations from December 31, 2018 to December 31, 2020 is below:

| | | |
|---|---|---:|
| Lease obligations, December 31, 2018 | $ | 3,790,147 |
| New lease obligations | | 1,159,470 |
| Disposal of leased vehicles | | (769,009) |
| Payments on lease obligations | | (1,780,043) |
| Lease obligations, December 31, 2019 | | 2,400,565 |
| New lease obligations | | 3,705,417 |
| Disposal of leased vehicles | | (975,215) |
| Lease obligation converted to note payable | | (355,438) |
| Payments on lease obligations | | (2,422,451) |
| Lease obligations, December 31, 2020 | $ | 2,352,878 |

Future payments under lease obligations are as follows:

| Years ending December 31, | | |
|---|---|---:|
| 2021 | $ | 1,531,108 |
| 2022 | | 769,619 |
| 2023 | | 210,219 |
| Total payments | | 2,510,946 |
| Amount representing interest | | (158,068) |
| Lease obligation, net | $ | 2,352,878 |

**Note 7 – Stockholders' Equity**

The Company authorized 100,000,000 shares of capital stock with consists of 90,000,000 shares of common stock, $0.000001 par value per share and 10,000,000 shares of preferred stock, $0.000001 par value per share.

<u>Common Stock</u>

During the year ended December 31, 2020, the Company sold an aggregate of 2,553,571 shares of common stock to three investors for cash proceeds of $275,000, of which 125,000 shares and $25,000 was to a member of the Company's board of directors.

During the years ended December 31, 2019, the Company:

- issued 84,300 shares of common stock to vendors in satisfaction of $421,500 of accounts payable and accrued expenses. The 84,300 shares were valued at $674,000; therefore the Company took a charge to earnings of $252,900 related to the settlement of debt during the years ended December 31, 2019;

- issued 2,625,000 shares of common shares in connection with its initial public offering at $4.00 per share. Total gross proceeds from the offering were $10,500,000, before deducting underwriting discounts and commissions and other offering expenses.

F-13

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

Stock Options

The following is a summary of stock option activity:

| | Options Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | 300,000 | $ | 8.00 | 2.00 | $ | - |
| Granted | - | $ | | | | |
| Forfeited | - | | | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2019 | 300,000 | $ | 8.00 | 1.00 | $ | - |
| Granted | 4,040,000 | | 1.62 | | | |
| Forfeited | (1,800,000) | | 4.67 | | | |
| Exercised | - | | | | | |
| Outstanding, December 31, 2020 | 2,540,000 | $ | 0.22 | 4.52 | $ | 1,074,245 |
| Exercisable, December 31, 2020 | 1,162,875 | $ | 0.22 | 4.52 | $ | 491,821 |

The exercise price for options outstanding and exercisable at December 31, 2020:

| Outstanding | | | Exercisable | | |
|---|---|---|---|---|---|
| Number of Options | | Exercise Price | Number of Options | | Exercise Price |
| 2,505,000 | $ | 0.215 | 1,147,875 | $ | 0.215 |
| 35,000 | | 0.220 | 15,000 | | 0.220 |
| 2,540,000 | | | 1,162,875 | | |

For options granted during the year ended December 31, 2020 where the exercise price equaled the stock price at the date of the grant, the weighted-average fair value of such options was $0.211 and the weighted-average exercise price of such options was $0.215. For options granted during the year ended December 31, 2020 where the exercise price was greater than the stock price at the date of the grant, the weighted-average fair value of such options was $1.11 and the weighted-average exercise price of such options was $4.00. No options were granted during the year ended December 31, 2020 where the exercise price was less than the stock price at the date of grant.

The fair value of the stock options is being amortized to stock option expense over the vesting period. The Company recorded stock option expense of $739,973 and $0 during the years ended December 31, 2020 and 2019, respectively. At December 31, 2020, the unamortized stock option expense was $253,830.

The assumptions used during the year ended December 31, 2020 in calculating the fair value of options granted using the Black-Scholes option-pricing model for options granted are as follows:

| | |
|---|---|
| Risk-free interest rate | 0.28% - 1.59% |
| Expected life of the options | 5.0 years |
| Expected volatility | 195%-212% |
| Expected dividend yield | 0% |

F-14

EVmo, Inc.
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

The following is a summary of warrant activity:

| | Warrants Outstanding | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | 1,500,000 | $ | 4.00 | | 4.44 | $ | 6,000,000 |
| Granted | 131,250 | | 5.00 | | | | |
| Forfeited | - | | | | | | |
| Exercised | - | | | | | | |
| Outstanding, December 31, 2019 | 1,631,250 | $ | 4.08 | | 3.38 | $ | - |
| Granted | - | | | | | | |
| Forfeited | - | | | | | | |
| Exercised | - | | | | | | |
| Outstanding, December 31, 2020 | 1,631,250 | $ | 4.08 | | 2.38 | $ | - |
| Exercisable, December 31, 2020 | 1,631,250 | $ | 4.08 | | 2.38 | $ | - |

The exercise price for warrants outstanding at December 31, 2020:

| Outstanding and Exerciseable | |
|---|---|
| Number of Warrants | Exercise Price |
| 1,500,000 | $ 4.00 |
| 131,250 | 5.00 |
| 1,631,250 | |

In connection with the Company's initial public offering, the Company issued the underwriters a total of 131,250 warrants to purchase shares of the Company's common stock for $5.00 per share. The warrants expire in November 2024.

**Note 8 – Related Party Transactions**

During the years ended December 31, 2020 and 2019, the Company paid management fees of $0 and $0, respectively, to a company that is owned by the Company's Chief Executive Officer and director. Beginning on February 1, 2019, the Company entered into a consulting agreement with this individual and paid $167,000 under the consulting agreement. The consulting agreement was terminated effective September 1, 2019. Also during the years ended December 31, 2020, the Company's CEO and director advanced the Company $250,000 and the Company repaid $150,000. At December 31, 2020, $100,000 was owed to the Company's CEO and director related to this advance.

During the years ended December 31, 2020 and 2019, the Company expensed $32,173 and $587,261, respectively, in advertising expenses from a company whose CEO was also a former director of the Company. At December 31, 2020 and 2019, $324,920 and $394,183, respectively, was owed to this company and is included in accounts payable in the accompanying consolidated balance sheets.

During the years ended December 31, 2020 and 2019, the Company expensed $2,321,186 and $2,214,985, respectively, in insurance expense related to insuring the Company fleet of vehicles from an insurance brokerage firm whose owner is also a stockholder of the Company. At December 31, 2020 and 2019, $265,257 and $171,665, respectively, was owed to this insurance brokerage from and is included in accounts payable and accrued expenses in the accompanying consolidated balance sheets.

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

**Note 9 – Income Taxes**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A full valuation allowance is established against all net deferred tax assets as of December 31, 2020 and 2019 based on estimates of recoverability. While the Company has optimistic plans for its business strategy, it determined that such a valuation allowance was necessary given the current and expected near term losses and the uncertainty with respect to its ability to generate sufficient profits from its business model. Because of the impacts of the valuation allowance, there was no income tax expense or benefit for the years ended December 31, 2020 and 2019.

A reconciliation of the differences between the effective and statutory income tax rates for the years ended December 31, 2020 and 2019:

|  | 2020 | | 2019 | |
|  | Amount | Percent | Amount | Percent |
|---|---|---|---|---|
| Federal statutory rates | $ (735,436) | 21.0% | $ (825,346) | 21.0% |
| State income taxes | (245,145) | 7.0% | (275,115) | 7.0% |
| Permanent differences | 335,916 | -9.6% | (69,409) | 1.8% |
| Valuation allowance against net deferred tax assets | 644,665 | -18.4% | 1,169,870 | -29.8% |
| Effective rate | $ - | 0.0% | $ - | 0.0% |

At December 31, 2020 and 2019, the significant components of the deferred tax assets are summarized below:

|  | 2020 | 2019 |
|---|---|---|
| Deferred income tax asset |  |  |
| Net operation loss carryforwards | 3,173,878 | 2,419,531 |
| Accrued expenses | 50,205 | 159,887 |
| Total deferred income tax asset | 3,224,084 | 2,579,418 |
| Less: valuation allowance | (3,224,084) | (2,579,418) |
| Total deferred income tax asset | $ - | $ - |

The valuation allowance increased by $644,665 and $1,081,921 in 2020 and 2019, respectively, as a result of the Company generating additional net operating losses.

The Company has recorded as of December 31, 2020 and 2019 a valuation allowance of $3,224,084 and $2,549,418, respectively, as it believes that it is more likely than not that the deferred tax assets will not be realized in future years. Management has based its assessment on the Company's lack of profitable operating history.

The Company conducts an analysis of its tax positions and has concluded that it has no uncertain tax positions as of December 31, 2020 and 2019.

The Company has net operating loss carry-forwards of approximately $11,300,000. Such amounts are subject to IRS code section 382 limitations and expire in 2031. The 2018, 2019 and 2020 tax year is still subject to audit.

**Note 10 - Contingencies**

*Legal Proceedings*

From time to time, the Company may become involved in lawsuits and other legal proceedings that arise in the course of business. Litigation is subject to inherent uncertainties, and it is not possible to predict the outcome of litigation with total confidence. The Company is currently not aware of any legal proceedings or potential claims against it whose outcome would be likely, individually or in the aggregate, to have a material adverse effect on the Company's business, financial condition, operating results, or cash flows.

EVmo, Inc.
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

*Anthony Davis v. EVmo, Inc. (formerly YayYo, Inc.), and Ramy El-Batrawi*

This action was filed on March 5, 2020, in the Superior Court of the State of California for the County of Los Angeles. Plaintiff Anthony Davis acted as the Company's Chief Executive Officer from approximately December 2016 through April 2017. Mr. El-Batrawi is the founder of the Company and its former Chief Executive Officer and director, and was involved, the complaint alleges, in Mr. Davis's hiring and termination after a brief tenure as CEO. As part of his severance compensation, Mr. Davis was granted stock options to purchase shares of Common Stock. Mr. Davis claims that the Company breached its agreement to award him these stock options and includes a claim for wage and hour violations. The lawsuit also seeks declaratory and injunctive relief. Mr. Davis also included a claim under the California Unfair Practices Act. The Company has denied all liability, asserts that it has paid Mr. Davis all amounts due to him under his separation agreement with the Company, and has vigorously defended this lawsuit. The Company has filed a demurrer in connection with this litigation and that demurrer is expected to be resolved at a hearing in May 2021. If the case is not dismissed at that time, the Company will conduct discovery and file a motion for summary judgment.

*In Re YayYo Securities Litigation*

Two actions styled as securities class actions were filed in the United States District Court for the Central District of California, on September 9, 2020 (*Hamlin v. YayYo*) and September 18, 2020, respectively (*Koch v. YayYo et al*). The plaintiffs to each action individually alleged misrepresentations and material omissions in the registration statement on Form S-1 that the Company filed with the SEC in connection with its initial public offering, which was declared effective on November 13, 2019, claiming violations of Sections 11 and 15 of the Securities Act. Each purported action involved securities class action claims. The district court consolidated the two actions, and the Hamlin action was since dismissed. The district court indicated in its order consolidating the actions that the new caption for the case would be "In Re YayYo Securities Litigation." The Company filed an answer, denying liability and asserted that it accurately and completely disclosed all material facts and occurrences, including adverse ones, in its registration statement, related public filings and other public statements, and further asserted that the alleged violations of Sections 11 and 15 of the Securities Act are baseless. Each of the parties to this litigation has mutually agreed to request a stay of the proceedings pending a mediation that is tentatively scheduled for April 29, 2021 in which a global settlement, also involving the plaintiff class representative identified in the case described immediately below,

*Michael Vanbecelaere v. YayYo, Inc, et al.*

Two actions styled as securities class actions were filed in the Superior Court of the State of California for the County of Los Angeles, on July 22, 2020 and July 23, 2020, respectively. The plaintiffs to each action individually alleged misrepresentations and material omissions in the registration statement on Form S-1 that the Company filed with the SEC in connection with its initial public offering, which was declared effective on November 13, 2019, claiming violations of Sections 11 and 15 of the Securities Act. Each action purported to bring a securities class action against the Company; one of the two lawsuits was dismissed on the basis that the lead plaintiff in one of the actions was not a suitable class representative, and that plaintiff later joined the lawsuit brought by the other one. In its answer, the Company denied liability and asserted that it accurately and completely disclosed all material facts and occurrences, including adverse ones, in its registration statement, related public filings and other public statements, and further asserted that the alleged violations of Sections 11 and 15 of the Securities Act are baseless. Each of the parties to this litigation has mutually agreed to request a stay of the proceedings pending a mediation that is tentatively scheduled for April 29, 2021, which will also include the parties to the action described immediately above.

EVmo, Inc.
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

*Uptick Capital, LLC v. EVmo, Inc. (formerly YayYo, Inc.)*

On March 5, 2021, Uptick Capital, LLC ("Uptick"), filed an arbitration demand with the American Arbitration Association ("AAA") alleging breach of contract with respect to an Advisory Agreement that Uptick asserts it entered into with the Company on August 7, 2017. The claim filed with the AAA alleges that "pursuant to the terms of the Advisory Agreement, Uptick was entitled to receive $2,500 per month for three months" plus "an issuance of restricted shares of $50,000 worth of YayYo common stock in exchange for providing certain consulting services to YayYo." The agreement, according to the demand, was renewed once. The Company has not yet formally responded to the arbitration claim but denies liability and intends to vigorously defend this arbitration on the basis that Uptick failed to comply with the contract. It is unknown what the potential liabilities are but, as of the date of this Report, the Company believes they should not exceed $10,000 in cash and $100,000 worth of stock.

**Note 11 – Subsequent Events**

*Convertible promissory note*

On January 8, 2021, the Company, issued a stand-alone $500,000 convertible promissory note (the "Note") to Mr. John Gray, principal of one of the Company's largest stockholders, the Gray Mars Venus Trust, Arizona 2015, an Arizona asset management limited partnership (the "Gray Trust"), in return for a loan extended by Mr. Gray to the Company in the principal amount of the Note.

The Note will accrue interest at a fixed rate of 6% and will mature on January 6, 2022. Any unpaid principal balance on the Note may be converted at any time, at the option of Mr. Gray, into shares of the Company's Common Stock, par value $0.000001 per share (the "Common Stock"), at a price of $0.50 per share. Upon conversion, the common shares Mr. Gray receives will have registration rights, as specified in the Note. On February 12, 2021, Mr. Gray converted the full amount of the convertible promissory note into 1,000,000 shares of the Company's common stock.

*FirstFire Settlement*

On February 11, 2021, the Company, entered into a settlement agreement and mutual release (the "Settlement Agreement") with FirstFire Global Opportunities Fund, LLC, a Delaware limited liability company ("FirstFire"), relating to a pending action in the U.S. District Court in the Southern District of New York, *FirstFire Global Opportunities Fund, LLC v. WestPark Capital, Inc. et. al.*, No. 1:20-cv-03327-LLS (the "Litigation"). The other parties to the Settlement Agreement are the Company's co-defendants in the Litigation, WestPark Capital, Inc. a Colorado corporation ("WestPark"), Mr. Richard A. Rappaport and Mr. Ramy El-Batrawi, chief executive officer of the Company.

The Litigation was commenced by FirstFire in April 2020 and subsequently amended in December 2020. FirstFire was a subscriber to the Company's initial public offering of common stock, par value $0.000001 (the "Common Stock"), in November 2019 (the "IPO"). It alleged in the Litigation that the Company and the other named defendants had, in connection with the IPO and the registration statement on Form S-1 filed thereto, committed violations of Sections 11, 12(a) and 15 of the Securities Act of 1933, as amended (the "Act"), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 10b-5 promulgated under the Exchange Act. Each of the Company, WestPark, Mr. Rappaport and Mr. El-Batrawi vigorously denied and disputed these allegations.

**EVmo, Inc.**
**Notes to Consolidated Financial Statements**
**For Year Ended December 31, 2020 and 2019**

In consideration of the releases, covenants, terms and conditions set forth in the Settlement Agreement, FirstFire has agreed to dismiss the Litigation with prejudice, to not file any further litigation relating to the IPO, and to waive and relinquish any and all claims on shares of Common Stock other than as specified in the Settlement Agreement. The Company has agreed to sell to FirstFire one hundred fifty thousand (150,000) shares of Common Stock (the "Settlement Shares") on or around February 15, 2021, with such shares to be issued pursuant to the exemption from registration under Rule 506(b) of the Act. The purchase price of the Settlement Shares will be $0.066667 per share, or an aggregate of $10,000. Any resale of the Settlement Shares by FirstFire shall be subject to the conditions of Rule 144 of the Act. None of WestPark, Mr. Rappaport or Mr. El-Batrawi are contributing to the Settlement Shares or any other consideration under the Settlement Agreement.

*Social Reality Settlement*

On February 19, 2021, Rideshare Rental, Inc., a Delaware corporation formerly known as YayYo, Inc. (the "Company"), entered into a confidential settlement agreement and mutual release (the "Agreement") with SRAX, Inc., a Delaware corporation formerly known as Social Reality, Inc. ("SRAX"), relating to an action brought by SRAX against the Company in Los Angeles Superior Court on or around February 11, 2020 (the "Litigation"). A description of the Litigation has been included by the Company in its prior filings, most recently in its quarterly report on Form 10-Q for the quarterly period ended September 30, 2020, filed on November 12, 2020.

The Company and SRAX have mutually agreed to keep the material terms of the Agreement confidential, subject to disclosure as required by applicable law or regulation.

*Common stock issuances*

In addition to the above issuance of common stock subsequent to December 31, 2020, the Company has issued the following shares of common stock:

- 100,000 shares to a member of the Company's board of directors for cash proceeds of $50,000;
- 960,550 shares to the Company's former Chief Executive Officer for the cashless exercise of 1,000,000 stock options;
- 35,000 shares for the exercise of stock options for cash proceeds of $15,450; and
- 825,000 shares to our Executive Chairman in connection with an anti-dilutive agreement.

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation of YayYo, Inc. (incorporated by reference to Exhibit 2.4 contained in the Company's Form 1-A filed on December 15, 2016). |
| 3.2 | Amended and Restated By-laws of YayYo, Inc. (incorporated by reference to Exhibit 3.4 contained in the Company's Form S-1/A filed on June 7, 2018). |
| 3.3 | Certificate of Designation, Preferences and Rights of Series A Convertible Preferred Stock (incorporated by reference to Exhibit 2.5 contained in the Company's Form 1-A filed on December 15, 2016). |
| 4.1* | Description of Securities |
| 4.2 | Warrant, dated March 8, 2018 (incorporated by reference to Exhibit 4.3 contained in the Company's Form S-1/A filed on June 7, 2018). |
| 10.1+ | 2016 Equity Incentive Plan (incorporated by reference to Exhibit 10.4 contained in the Company's Form S-1/A filed on June 7, 2018). |
| 10.2+ | Employment Agreement between the Company and Boyd Bishop (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on January 10, 2020) |
| 10.3+ | Employment Agreement between the Company and Jonathan Rosen (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on January 13, 2020) |
| 10.4+* | Employment Agreement between the Company and Laurie DiGiovanni |
| 10.5 | Settlement Agreement and Mutual Release by, between, and among Rideshare Rental, Inc., FirstFire Global Opportunities Fund, LLC, WestPark Capital, Inc., Mr. Richard A. Rappaport and Mr. Ramy El-Batrawi, dated as of February 11, 2021 (incorporated by reference to the Company's current report on Form 8-K filed on February 18, 2021) |

| 21.1* | [List of Subsidiaries of the Company](#) |
|---|---|
| 31.1* | [Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.](#) |
| 31.2* | [Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.](#) |
| 32.1* | [Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.](#) |
| 32.2* | [Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.](#) |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Schema |
| 101.CAL* | XBRL Taxonomy Calculation Linkbase |
| 101.DEF* | XBRL Taxonomy Definition Linkbase |
| 101.LAB* | XBRL Taxonomy Label Linkbase |
| 101.PRE* | XBRL Taxonomy Presentation Linkbase |

\* Filed or furnished herewith.

\+ Indicates a management contract or compensatory plan, contract or arrangement in which directors or executive officers participate.

34

## SIGNATURES

Pursuant to the requirements of Section 3 or 15(d) of the Securities Exchange Act of 1934, this registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: March 31, 2021

EVmo, Inc.

By: */s/ Stephen M. Sanchez*
_____
Stephen M. Sanchez
Chief Executive Officer and Director

By: */s/ Ryan Saathoff*
_____
Ryan Saathoff
Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| */s/ Stephen M. Sanchez*<br>Stephen M. Sanchez | Chief Executive Officer and Director (Principal Executive Officer) | March 31, 2021 |
| */s/ Ryan Saathoff*<br>Ryan Saathoff | Chief Financial Officer (Principal Financial Officer) | March 31, 2021 |
| */s/ Terren S. Peizer*<br>Stephen M. Sanchez | Executive Chairman, Board of Directors | March 31, 2021 |
| */s/ Harbant S. Sidhu*<br>Harbant S. Sidhu | Director | March 31, 2021 |
| */s/ Douglas M. Mox*<br>Douglas M. Mox | Director | March 31, 2021 |
| */s/ John P. O'Neill*<br>John P. O'Neill | Director | March 31, 2021 |

35

**Exhibit 4.1**

## DESCRIPTION OF SECURITIES

The following description of our securities is only a summary and is qualified in its entirety by reference to the actual terms and provisions of the capital stock contained in our amended and restated certificate of incorporation and our amended and restated by-laws.

### General

EVmo, Inc. (the "Company," "we," "our," and "us") is authorized to issue two classes of stock. The total number of shares of stock which the Company is authorized to issue is 100,000,000 shares of capital stock, consisting of 90,000,000 shares of common stock, $0.000001 par value per share, and 10,000,000 shares of preferred stock, $0.000001 par value per share.

### Common stock

The holders of our common stock are entitled to the following rights:

#### *Voting Rights*

Each share of our common stock entitles its holder to one vote per share on all matters to be voted or consented upon by the stockholders. Holders of our common stock are not entitled to cumulative voting rights with respect to the election of directors.

#### *Dividend Rights*

Subject to limitations under Delaware law and preferences that may apply to any shares of preferred stock that we may decide to issue in the future, holders of our common stock are entitled to receive ratably such dividends or other distributions, if any, as may be declared by our Board out of funds legally available therefor.

#### *Liquidation Rights*

In the event of the liquidation, dissolution or winding up of our business, the holders of our common stock are entitled to share ratably in the assets available for distribution after the payment of all of our debts and other liabilities, subject to the prior rights of the holders of our preferred stock.

#### *Other Matters*

The holders of our common stock have no subscription, redemption or conversion privileges. Our common stock does not entitle its holders to preemptive rights. All of the outstanding shares of our common stock are fully paid and non-assessable. The rights, preferences and privileges of the holders of our common stock are subject to the rights of the holders of shares of any series of preferred stock which we may issue in the future.

### Preferred Stock

Our authorized preferred stock consists of 10,000,000 shares of preferred stock, par value $0.000001 per share. As of the date of this filing, 2,000,000 shares of preferred stock have been designated as Series A non-voting convertible preferred stock, none of which have been issued. Our Board has the authority to issue preferred stock in one or more classes or series and to fix the designations, powers, preferences, and rights, and the qualifications, limitations or restrictions thereof including dividend rights, dividend rates, conversion rights, voting rights, terms of redemption, redemption prices, liquidation preferences and the number of shares constituting any class or series, without further vote or action by the stockholders. The Certificate of Designation, Preferences and Rights of our Series A Convertible Preferred Stock has been filed with this annual report on Form 10-K as Exhibit 3.3.

While we do not currently have any plans for the issuance of any preferred stock, the issuance of preferred stock could adversely affect the rights of the holders of common stock and, therefore, reduce the value of the common stock. It is not possible to state the actual effect of the issuance of any shares of preferred stock on the rights of holders of the common stock until the Board of Directors determines the specific rights of the holders of the preferred stock; however, these effects may include:

- Restricting dividends on the common stock;
- Diluting the voting power of the common stock;
- Impairing the liquidation rights of the common stock; or
- Delaying or preventing a change-in-control of the Company without further action by the stockholders.

**Warrant**

On March 8, 2018, the Company issued a warrant to purchase a total of 1,500,000 shares of Company common stock at the exercise price of $4.00 per share. The shares of Company common stock underlying this warrant were registered as part of our initial public offering. The warrant has been filed with this annual report on Form 10-K as Exhibit 4.2

**Options**

*2016 Equity Incentive Plan*

On November 30, 2016, we adopted our 2016 Equity Incentive Plan (the "Plan") to reward and provide incentives to our officers, directors, employees, consultants and other eligible participants. We set aside options to purchase up to 10,000,000 shares of common stock for issuance under the Plan, which may be granted in the form of either incentive stock options or non-qualified stock options. Our Board of Directors administers the Plan and has the authority: (i) to select the Plan recipients, the time or times at which awards may be granted, the number of shares to be subject to each option awarded, the vesting schedule of the options, and the price at which the options may be exercised, and (ii) to amend the Plan.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
   BELLRIDGE CAPITAL LLP,               :
                                        :
          Plaintiff,                    :
                                        :
       -- against --                    :        CASE NO. 1:21-CV-07091-JGG
                                        :
   EVMO, INC. f/k/a YAYYO, INC. and     :        **ANSWER AND AFFIRMATIVE
   RIDESHARE RENTALS, INC.,             :        DEFENSES**
                                        :
          Defendant                     :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

Defendant, EVmo, Inc. f/k/a both Yayyo, Inc. and Rideshare Rentals, Inc. ("EVmo" or the "Defendant") hereby answers the complaint of Plaintiff Bellridge Capital LLP (the "Plaintiff" or "Bellridge") dated August 23, 2021 (the "Complaint") as follows:

<u>A**NSWER**</u>

## I.      <u>NATURE OF THE ACTION</u>

1.      Admits that a warrant was issued to Bellridge, the terms of which speak for itself, but except as expressly so admitted denies the remainder of paragraph 1 of the Complaint.

2.      Admits that Mr. El-Batrawi was a defendant in litigation filed by the United States Securities & Exchange Commission (the "SEC") and that to resolve the litigation he accepted a five-year bar from serving as an officer and director of a public company, which bar had long since expired by the events that are the subject of the Complaint but, except as expressly so admitted, denies the remainder of paragraph 2 of the Complaint.

3.      Admits that Bellridge agreed to provide up to $6 million in financing to Defendant, which consisted of debt, equity, and a common stock purchase warrant and, except as

expressly so admitted, Defendant denies the remainder of the allegations of paragraph 3 of the Complaint.

4.     Admits that EVmo issued a written warrant to purchase up to 1,5000,000 shares of its common stock, par value, $0.000001 per share (the "Warrant"), to Bellridge in March 2018 and respectfully refers the Court to the Warrant for its complete terms and legal effect, if any. Except as expressly so admitted, Defendants deny the remainder of the allegations of paragraph 4 of the Complaint.

5.     Admits that the Warrant, upon its initial issuance in March 2018, contained price protection provisions substantially similar to those described in paragraph 5 of the Complaint, and respectfully refers the Court to the Warrant for its complete terms and legal effect, if any.

6.     Denies knowledge or information sufficient to admit or deny the truth of the allegations of paragraph 6 of the Complaint and leave Plaintiff to its proof.

7.     Admits that in March 2021 the Company disclosed that a year earlier it had sold 1.4 million shares of common stock to an investor for $0.07 per share.   Except as expressly so admitted, Defendant denies the remainder of the allegations of paragraph 7 of the Complaint.

8.     Admits that on or about May 28, 2021 the Plaintiff forwarded a communication to the Company stating its intent to exercise the Warrant at a price of $0.0088 for 1.5 million EVmo shares, with Bellridge citing the price protection provisions addressed in paragraph 5 herein as a basis for reducing the Warrant exercise price down from $4.00, and respectfully refers the Court to Bellridge's demand correspondence for its complete terms.

9.     Admits that the Company rejected Bellridge's attempted exercise of the Warrant on May 28, 2021 utilizing the pricing provisions of Section 2(b) of the Warrant on the grounds that Bellridge had previously agreed to amend the warrant to delete Section 2(b) and, therefore,

the $4.00 exercise price set forth in the Warrant controlled.   Except as expressly so admitted, Defendant denies the remainder of paragraph 9 of the Complaint.

10.     Denies the allegations of paragraph 10 of the Complaint.

11.     Denies the allegations of paragraph 11 of the Complaint.

12.     Denies the allegations of paragraph 12 of the Complaint.

13.     Denies the allegations of paragraph 13 of the Complaint.

## II.     JURISDICTION AND VENUE.

14.     Admits that EVmo is incorporated in Delaware,  has its principal place of business in California and that the amount in controversy exceeds $75,000, exclusive of interest and costs.   Except as expressly so admitted, Defendant denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 14 of the Complaint and respectfully leaves Plaintiff to its proof.

15.     Admits that the there is a New York forum selection clause in the Warrant and respectfully refers the Court to the Warrant and associated contractual agreements for their complete terms and legal effect, but except as expressly admitted leaves Plaintiff to its proof as to venue with respect to the allegations of paragraph 15 of the Complaint.

## III.     THE PARTIES.

### A.     The Plaintiffs.

16.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 16 of the Complaint and respectfully leaves Plaintiff to its proof.

17.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 17 of the Complaint and respectfully leaves Plaintiff to its proof.

18.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 18 of the Complaint and respectfully leaves Plaintiff to its proof.

**B.     Defendants.**

19.     Admits the allegations of paragraph 19 of the Complaint.

20.     Admits the allegations of paragraph 20 of the Complaint.

## IV.     FACTUAL BACKGROUND

**A.     The Company's Business Operations**

21.     Admits the allegations of paragraph 21 of the Complaint.

22.     Admits the allegations of paragraph 22 of the Complaint.

23.     Admits the allegations of paragraph 23 of the Complaint.

24.     Admits the allegations of paragraph 24 of the Complaint.

25.     Admits the allegations of paragraph 25 of the Complaint.

26.     Admits the allegations of paragraph 26 of the Complaint.

27.     Admits the allegations of paragraph 27 of the Complaint.

28.     Denies the allegations of paragraph 28 as argumentatively characterized.

29.     Denies the allegations of paragraph 29 as argumentatively characterized.

30.     Respectfully refers the Court to the Company's financial statements for the referenced period ending June 30, 2017 as concerns the so-called financial condition of the Defendant but except as affirmatively stated denies the allegations of paragraph 30 as argumentatively characterized.

31.     Denies the allegations of paragraph 31 of the Complaint as argumentatively characterized.

**B.** **The Company's Founder, Ramy El-Batrawi**

32.     Admit that developing and maintaining a substantial fleet of rental vehicles requires capital and that Defendant, like any other enterprise in similar business lines, faced and overcame challenges to such capital raising, but except as expressly so admitted denies the remainder of the allegations of paragraph 32 of the Complaint.

33.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 33 of the Complaint and respectfully leaves Plaintiff to its proof.

34.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 34 of the Complaint and respectfully leaves Plaintiff to its proof.

35.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 35 of the Complaint and respectfully leaves Plaintiff to its proof.

36.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 36 of the Complaint and respectfully leaves Plaintiff to its proof.

37.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 37 of the Complaint and respectfully leaves Plaintiff to its proof.

38.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 38 of the Complaint and respectfully leaves Plaintiff to its proof.

39.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 39 of the Complaint and respectfully leaves Plaintiff to its proof.

40.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 40 of the Complaint and respectfully leaves Plaintiff to its  proof.

**C.** **Bellridge Capital Invests $6 Million in the Company's Struggling Business.**

41.     Admits that the Company was desirous of obtaining additional capital to fund its

business but, except as expressly admitted, denies the allegations of paragraph 41 of the Complaint.

42.     Admits that in December 2017 Bellridge made a $222,222 loan to Yay Yo pursuant to the terms of a senior secured promissory maturing on March 31, 2018 and respectfully refers the Court to the First Note for its complete terms and legal effect. Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 42 of the Complaint.

43.     Admits that the loan was important to the Company's business plan and that some of it would be used as a down payment for cars for rideshare drivers but, except as expressly so admitted, denies the remainder of the allegations of paragraph 43 of the Complaint.

44.     Admits that the Company granted Bellridge a security interest in the Company's assets, and respectfully refers the Court to the security agreement for its complete terms and legal effect. Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 44 of the Complaint.

45.     Admits paragraph 45 of the Complaint.

46.     Admits that in early 2018 Bellridge agreed to make a $6 million capital investment in the Company but, except as expressly so admitted, denies the remainder of the allegations of paragraph 46 of the Complaint.

1.      **The Purchase Agreement**

47.     Admits paragraph 47 of the Complaint except respectfully refers the  Court to the SPA for its complete terms and legal effect.

48.     Admits paragraph 48 of the Complaint except respectfully refers the Court to the SPA for its complete terms and legal effect.

49.      Admits that Plaintiff has provided a partial recitation of Section 9(e) of the SPA (as defined in the Complaint) and respectfully refer the Court to Section 9(e) and the rest of the SPA for its complete terms and legal effect.   Except as expressly so admitted, Defendant denies the remainder of the allegations of paragraph 49 of the Complaint.

**2.      The Second Note.**

50.      Admits paragraph 50, except refers the Court to the Second Note for its complete terms and legal effect.

51.      Admits that the Plaintiff has provided a partial recitation of a portion of the terms of the Second Note and respectfully refers the Court to the Second Note for its complete terms and legal effect.

**3.      The Warrant.**

52.      Admits the allegations of paragraph 52 of the Complaint, except respectfully refers the Court to the Warrant for its complete terms and legal effect.

53.      Paragraph 53 is a pure legal conclusion to which no response is required.

54.      Admits the allegations of paragraph 54 of the Complaint, except respectfully refers the Court to the Warrant for its complete terms and legal effect.

55.      Admits that, upon the initial issuance of the Warrant, its Section 2 contained certain price protection provisions and respectfully refers the Court to the Warrant for its complete terms and legal effect.   Except as expressly so admitted, Defendant denies the remainder of the allegations of paragraph 55 of the Complaint.

56.      Respectfully refers the Court to Section 2(b) of the Warrant , as of the date of its initial issuance, and the remainder of the Warrant for their applicable complete terms, which

speaks for itself, and legal effect. Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 56 of the Complaint.

57. Respectfully refers the Court to Section 2(b) of the Warrant, as of its date of its issuance, and the remainder of the Warrant for their applicable complete terms, which speaks for itself, and legal effect. Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 57 of the Complaint.

58. Respectfully refers the Court to Section 2(c) of the Warrant, as of its date of its issuance, and the remainder of the Warrant for their applicable complete terms, which speaks for itself, and legal effect. Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 58 of the Complaint.

59. Respectfully refers the Court to Section 2(f) of the Warrant, as of its date of its issuance, and the remainder of the Warrant for their applicable complete terms, which speaks for itself, and legal effect. Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 59 of the Complaint.

60. Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 60 of the Complaint and respectfully leave Plaintiff to its proof.

61. Respectfully refers the Court to Section 9 of the Warrant and the remainder of the Warrant for their applicable complete terms, which speaks for itself, and legal effect. Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 61 of the Complaint.

62. Respectfully refers the Court to Section 15 of the Warrant and the remainder of the Warrant for their applicable complete terms, which speaks for itself, and legal effect. Except

as expressly admitted, Defendant denies the remainder of the allegations of paragraph 62 of the Complaint.

63.     Respectfully refers the Court to Section 11 of the Warrant and the remainder of the Warrant for their applicable complete terms, which speaks for itself, and legal effect.  Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 63 of the Complaint.

64.     Respectfully refers the Court to Section 11 of the Warrant and the remainder of the Warrant for their applicable complete terms, which speaks for itself, and legal effect.  Except as expressly admitted, Defendant denies the remainder of the allegations of paragraph 64 of the Complaint.

**D.      The IPO**

65.     Denies the first sentence of paragraph 65 and admits the remaining sentences thereafter.

66.     Denies paragraph 66 of the Complaint.

67.     Admits the allegations of paragraph 67 of the Complaint, except refers the Court to the Registration Statement (as defined in the Complaint) for its complete terms and legal effect.

68.     Denies paragraph 68 of the Complaint insofar as the Registration Statement was amended that number of times before the Company requested that the SEC declare it effective.

69.     Admits that the Company filed a Form S-1/A on June 26, 2018 with the SEC and that a true and correct copy of this form and Exhibit 4.3 thereof is attached to Plaintiff's complaint as Exhibit B and respectfully refers the Court to the form for its true and complete contents as of that date.   Except as expressly so admitted, Defendant denies the remainder of the

allegations of paragraph 69 of the Complaint.

70.     Admits paragraph 70 of the Complaint, except respectfully refer the Court to the new note payable agreement for its complete content and legal effect.

71.     Admits the allegations of paragraph 71 of the Complaint.

72.     Denies present knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 72 of the Complaint and respectfully leaves Plaintiff to its proof.

73.     Denies present knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 73 of the Complaint and respectfully leaves Plaintiff to its proof.

74.     Denies present knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 74 of the Complaint and respectfully leaves Plaintiff to its proof.

75.     Admits the allegations of paragraph 75 except refers the Court to the Form S-1/A dated November 5, 2019 and the written Amendment to the Note Payable Agreement dated effective November 1, 2019 for their complete terms and legal effect.

76.     Admit the allegations of paragraph 76.

77.     Admits the allegations of paragraph 77, except refers the Court to the Form S-1/A dated November 6, 2019 for its complete terms and legal effect.

78.     Admits the allegations of paragraph 78, except refers the Court to the Form S-1/A dated November 6, 2019 for its complete terms and legal effect.

79.     Admits the allegations of paragraph 79 of the Complaint.

80.    Admits that the Company's common stock began trading on NASDAQ under the symbol "YAYO" on or about November 12, 2019 but, except as expressly so admitted, denies knowledge or information sufficient to admit or deny the truth or falsity of the remainder of the allegations in paragraph 80 of the Complaint.

81.    Admits paragraph 81 of the Complaint.

82.    Admits paragraph 82 of the Complaint.

83.    Denies the allegations of paragraph 83 of the Complaint.

**E.    Post-IPO Litigation Shines a Spotlight on Grossly
Improper Conduct at the Company**

84.    Denies paragraph 84 of the Complaint.

85.    Admits paragraph 85 of the Complaint, while noting that the allegations contained in paragraph 85 contradict those of paragraph 83 of the Complaint and are further irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the pleadings in the California state court action for their true and complete contents.

86.    Admits paragraph 86 of the Complaint, while noting that the allegations contained in paragraph 86 contradict those of paragraph 83 of the Complaint and are further irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the pleadings in the California state court action for their true and complete contents.

87.    Admits paragraph 87 of the Complaint, while noting that the allegations contained in paragraph 87  contradict those of paragraph 83 of the Complaint and are further irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the pleadings in the California state court action for their true and complete contents.

88.    Admits paragraph 88 of the Complaint, while noting that the allegations contained in paragraph 88 contradict those of paragraph 83 of the Complaint and are further irrelevant to

the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the pleadings in the California state court action for their true and complete contents.

89.     Admits paragraph 89 of the Complaint, while noting that the allegations contained in paragraph 89 contradict those of paragraph 83 of the Complaint and are further irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the pleadings in the California state court action for their true and complete contents.

90.     Admits paragraph 90 of the Complaint as a partial recitation from the Rosen Declaration, while noting that the allegations contained in paragraph 90 contradict those of paragraph 83 of the Complaint and are irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the Rosen Declaration in the California state court action for its true and complete contents.

91.     Admits paragraph 91 of the Complaint as a partial recitation from the Rosen Declaration, while noting that the allegations are irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the Rosen Declaration in the California state court action for its true and complete contents.

92.     Admits paragraph 92 of the Complaint as a partial recitation from the Rosen Declaration, while noting that the allegations are irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the Rosen Declaration in the California state court action for its true and complete contents.

93.     Admits paragraph 93 of the Complaint as partial recitation from the Rosen Declaration while noting that the allegations are irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refer the Court to the Rosen Declaration in the California state court action for its true and complete contents.

94.     Admits paragraph 94 of the Complaint, insofar as acknowledging that Jonathan Rosen resigned as the Company's chief executive officer in January 2020 and that several new directors were appointed to the Company's board of directors that same month (while noting that this is irrelevant to the Plaintiff's claim of breach of contract as it relates to the Warrant), while denying the remaining allegations included in the paragraph, including the one that states that infers that Mr. El-Batrawi was reinstated as the Company's chief executive officer immediately after Mr. Rosen's resignation.

95.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 95 of the Complaint and respectfully leaves Plaintiff to its proof.

96.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the allegations of paragraph 96 of the Complaint and respectfully leaves Plaintiff to its proof.

97.     Admits the allegations of paragraph 97 of the Complaint, while noting their irrelevance to the Plaintiff's claim of breach of contract as it relates to the Warrant.

98.     Admits the allegations of paragraph 98 of the Complaint, while noting their irrelevance to the Plaintiff's claim of breach of contract as it relates to the Warrant.

99.     Denies the first sentence of paragraph 99 of the Complaint, while admitting the allegations contained in the second sentence of paragraph 99 of the Complaint and noting their irrelevance to the Plaintiff's claim of breach of contract as it relates to the Warrant.

100.     Admits the allegations of paragraph 100 of the Complaint as a partial statement from the California state court complaint, while noting their irrelevance to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refers the Court to the

California state court pleadings for their complete contents and legal effect.

101.    Admits the allegations of paragraph 101 of the Complaint as a partial statement from the California state court complaint, while noting their irrelevance to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refers the Court to the California state court pleadings for their complete contents and legal effect.

102.    Admits the allegations of paragraph 102 of the Complaint as a partial statement from the California state court complaint, while noting their irrelevance to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refers the Court to the California state court pleadings for their complete contents and legal effect.

103.    Admits the allegations of paragraph 103 of the Complaint as a partial statement from the California state court complaint, while noting their irrelevance to the Plaintiff's claim of breach of contract as it relates to the Warrant, except respectfully refers the Court to the California state court pleadings for their complete contents and legal effect.

104.    Admits that on or about April 28, 2020, FirstFire Global Opportunities Fund, LLC ("FirstFire") filed an action captioned <u>FirstFire Global Opportunities Fund, LLC v. West Park Capital, Inc.</u>, Case No. 1-20-CV-03327-LLS, in the United States District Court for the Southern District of New York and Defendant respectfully refers the Court to the pleadings filed by the plaintiffs in that action for their complete terms and legal effect.   Except as expressly so admitted, Defendants denies the remainder of the allegations of paragraph 104 of the Complaint.

105.    Defendant respectfully refers the Court to the plaintiffs' operative pleadings in the <u>FirstFire</u> case for their complete terms and legal effect.  Except as expressly so admitted, Defendant denies the remainder of the allegations of paragraph 105 of the Complaint.

106.    Defendant respectfully refers the Court to the plaintiffs' operative pleadings in the

FirstFire case for their complete terms and legal effect.  Except as expressly so admitted, Defendant denies the remainder of the allegations of paragraph 106 of the Complaint.

107.    Admits that more than one putative securities class action cases was commenced against the Company during the second half of 2020 on behalf of persons who purchased or otherwise acquired stock through the IPO but except as expressly so admitted denies the remainder of the allegations of paragraph 107 of the Complaint.

108.    Denies sufficient knowledge or information to admit or deny the truth of the vague allegations of paragraph 108 of the Complaint and respectfully refers the Court to any applicable pleadings within any of the actions referenced for their true and complete contents.

109.    Denies sufficient knowledge or information to admit or deny the truth of the vague allegations of paragraph 109 of the Complaint and respectfully refers the Court to any applicable pleadings within any of the actions referenced for their true and complete contents.

**F.      El-Batrawi Is Ousted from the Company for Good**

110.    Admits that Mr. El-Batrawi was appointed as the Company's chief executive officer on or about February 28, 2020 but except as expressly so admitted denies the remainder of the allegations of paragraph 110 of the Complaint.

111.    Admits paragraph 111 of the Complaint.

112.    Admits paragraph 112 of the Complaint.

113.    Admits paragraph 113 of the Complaint.

114.    Admits paragraph 114 of the Complaint.

115.    Denies paragraph 115 of the Complaint.

116.    Admits paragraph 116 of the Complaint.

117.    Admits that the Company suffered a net loss for the three months ended March

31, 2021 in the approximate amount of $4.4 million dollars, but except as expressly so admitted denies the remainder of the allegations of paragraph 117.

118.    Defendant respectfully refers the Court to its SEC Form 10-Q for the quarter ending March 31, 2021 for its complete terms and legal effect.

**G.    The Company Refuses to Honor Bellridge Capital's Exercise of Its Rights Under    the Warrant**

119.    Admits paragraph 119 of the Complaint except respectfully refers the Court to the Form 10-Q for its complete terms.

120.    Denies paragraph 120 of the Complaint.

121.    Admits that on or about May 28, 2021, then-counsel for the Plaintiff forwarded to EVmo an Exercise Notice (as defined in the Complaint) to purchase 1.5 million shares of the Company's common stock at a purported adjusted Exercise Price of $0.0088 per share and that a true and correct copy of the Exercise Notice is attached to the Complaint as Exhibit E.   Except as expressly so admitted, Defendants deny the remainder of paragraph 121 of the Complaint.

122.    Admits that the Company (appropriately) rejected  this Exercise Notice but denies knowledge or information sufficient to form a belief in the truth or falsity of the Plaintiff's purported emotional reaction to the denial of its Exercise Notice.   Except as expressly so admitted, Defendant denies the remainder of the allegations of paragraph 122 of the Complaint.

123.     Denies knowledge or information sufficient to form a belief in the truth or falsity of the Plaintiff's assertion that it was "gobsmacked" in terms of the Plaintiff's purported reaction to the Company's denial of the Exercise Notice under the Warrant and denies the remainder of the allegations of paragraph 123 of the Complaint.

124.    Denies paragraph 124 of the Complaint.

125.    Denies paragraph 125 of the Complaint.

126.    Denies paragraph 126 of the Complaint.

127.    Paragraph 127 is a legal conclusion to which no response is required.  To the extent a response is deemed required, Section 9 of the Warrant says what it says and Defendant respectfully refers the Court to the Warrant for its complete terms and legal effect.   Except as specifically admitted, Defendants deny the remainder of the allegations of paragraph 127 of the Complaint.

128.    Denies paragraph 128 of the Complaint.

129.    Denies paragraph 129 as argumentatively characterized by Plaintiffs and respectfully refers the Court to the Company's 2019 Annual Report and Exhibit 4.3 thereto for their complete terms, while noting that this exhibit intentionally omits the price protection provisions previously contained in Section 2 of the Warrant that the Plaintiff is relying upon for its claim of breach of contract. Defendant admits that a true and correct copy of the Company's 2019 Annual Report as filed with the SEC is attached to Plaintiff's Complaint as Exhibit F.

130.     Admits the allegations of paragraph 130 and respectfully refers the Court to the applicable documents for their complete terms and legal effect.

131.    Denies paragraph 131 of the Complaint.

132.    Denies paragraph 132 of the Complaint.

133.    Admits that Bellridge's signature is not affixed to the Form of Warrant attached as Exhibit 4.3 to the 2019 Annual Report, but except as expressly so admitted denies the remainder of the allegations of paragraph 133 of the Complaint.

134.    Denies paragraph 134 of the Complaint.

135.    Denies paragraph 135 of the Complaint as argumentatively characterized by Plaintiff including any hyperbole contained therein.

136.     Denies paragraph 136 of the Complaint as argumentatively characterized by Plaintiff including any hyperbole contained therein.

137.     Admits paragraph 137 of the Complaint except respectfully refers the Court to the Company's 2019 Annual Report for its complete terms and legal effect.

138.     Denies paragraph 138 of the Complaint.

139.     Denies paragraph 139 of the Complaint as argumentatively characterized by Plaintiff including any of the confusing hyperbole contained therein.

140.     Admits paragraph 140 of the Complaint.

141.     Denies paragraph 141 of the Complaint as argumentatively characterized by Plaintiff including any confusing hyperbole contained therein.

142.     Denies paragraph 142 of the Complaint as argumentatively characterized by Plaintiff including any confusing hyperbole contained therein.

143.     Denies paragraph 143 of the Complaint as argumentatively characterized by Plaintiff including any confusing hyperbole contained therein.

144.     Denies paragraph 144 of the Complaint as argumentatively characterized by Plaintiff including any confusing hyperbole contained therein.

145.     Denies paragraph 145 of the Complaint as argumentatively characterized by Plaintiff including any confusing hyperbole contained therein.

146.     Denies paragraph 146 of the Complaint.

147.     Denies paragraph 147 of the Complaint.

148.     Denies knowledge or information concerning Bellridge's purported mental state or intentions and respectfully leaves Plaintiffs to their proof concerning paragraph 148 of the Complaint.

149.     Admits paragraph 149 of the Complaint insofar as it relates to sales of common stock made by the Company to a third-party entity, while denying that these sales triggered any price protection provisions of the Warrant, which had been removed by written amendment in 2019 in conformity with the provisions of Section 9 of the Warrant.

150.     Admits paragraph 150 of the Complaint.

151.     Denies paragraph 151 of the Complaint.

152.     Denies paragraph 152 of the Complaint.

## COUNT I
### (Breach of Contract)

153.     Defendant repeats and realleges its responses to paragraphs 1-152 as their response to paragraph 153 as if fully set forth herein.

154.     Admits that the Warrant, <u>as amended</u>, constitutes an enforceable contact between the parties but except as expressly so admitted denies the remainder of the allegations of paragraph 154 of the Complaint.

155.     Denies paragraph 155 of the Complaint.

156.      Denies paragraph 156 of the Complaint.

157.     Denies paragraph 157 of the Complaint.

158.     Denies paragraph 158 of the Complaint.

159.     Denies paragraph 159 of the Complaint.

160.     Denies paragraph 160 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs' Complaint fails to state a legally sufficient claim upon which relief may be granted.

## Second Affirmative Defense

The relevant terms of the Warrant upon which Plaintiff's entire breach of contract claim in this action are predicated were deleted and waived by a written amendment to the Warrant dated May 4, 2019 executed by the Plaintiff (the "Warrant Amendment"), a copy of which Warrant Amendment is attached hereto as <u>Exhibit 1</u>.

## Third Affirmative Defense

Plaintiff's purported claim is barred by operation of the doctrines of estoppel and waiver.

## PRAYER FOR RELIEF

Defendant respectfully prays that the Court enter judgment denying and dismissing on the merits all of Plaintiff's claims for relief, and awarding Defendant its costs to the extent allowed under applicable law, along with such other, further and different relief as the Court may deem just, equitable and proper.

Dated:  New York, New York
      February 3, 2022

THE DEFENDANT

EVMO, INC. f/k/a YAYYO, INC. and RIDESHARE RENTAL, INC.

By: _____
James Nealon
WITHERS BERGMAN LLP
430 Park Avenue
New York, New York 10022
Phone: (212) 848-9800
Fax:  (212) 848-9888
James.nealon@withersworldwide.com

*Attorney for Defendants*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a copy of the foregoing Answer and Affirmative Defenses was

served upon all counsel of record on February 3, 2022 via ECF.

_____
James Nealon

EVMO ANSWER – EXHIBIT 1

# AMENDMENT TO YAYYO, INC WARRANT TO PURCHASE COMMON STOCK

This Amendment, dated as of May 4, 2019 (this "Amendment"), made and entered into by and between YayYo, Inc., a Delaware corporation with its principal office located at 433 N. Camden Drive, Suite 600, Beverly Hills, California 90210 (hereinafter referred to as the "Company") and Bellridge Capital, LLC located at 515 E. Las Olas Boulevard, Suite 120A, Fort Lauderdale, Florida 33301 (hereinafter referred to as "Bellridge"), with reference to the following:

          **WHEREAS,** Prior to the date hereof, the Company duly authorized and validly issued a warrant to purchase common stock, dated Dated March 2nd, 2018 (the "**Warrant**").

    **WHEREAS,** the Company and Bellridge have determined that it is necessary, desirable, and in the best interest of the Company and Bellridge to amend the warrant as set forth in this Amendment; and

    **NOW THEREFORE,** in consideration of the foregoing and the representations, warranties, covenants and agreements herein contained, the Company and Bellridge hereby agree as follows:

    1. Effective Date. This Amendment is effective as of March 2nd 2018 (the "Effective Date"), and all references to the warrant from and after such time will be deemed to be references to the warrant as amended hereby.

    2. Amendments to the Warrant: In consideration of good and valuable consideration, as of Effective Date, the The provisions in 1(c) (ii), 2 (b), 2(d), 2 (e), 2(f) and 4 shall be waived and removed

    3. Except as set forth in this Amendment, the Warrant is unaffected and shall continue in full force and effect in accordance with its terms. If there is conflict between this Amendment and the Warrant the terms of this Amendment will prevail.

    4. This Amendment shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to the choice of law principles thereof. Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the courts of the State of Delaware for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Amendment and the transactions contemplated hereby. Service of process in connection with any such suit, action or proceeding may be served on each party hereto anywhere in the world by the same methods as are specified for the giving of notices under this Amendment. Each of the parties hereto irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. Each party hereto irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

    5. This Amendment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument. A signature to this Amendment transmitted electronically shall have the same authority, effect, and enforceability as an original signature.

    6. If any term, provision, covenant or restriction of this Amendment or applicable to this Amendment is held by a court of competent jurisdiction or other authority to be invalid, null and void or unenforceable, the remainder of the

terms, provisions, covenants and restrictions of this Amendment shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

IN WITNESS WHEREOF, the undersigned have caused this Amendment to the warrant to be duly executed as of the date first above written.

YAYYO, INC.

By

Name: Ramy El-Batrawi
Title:  Chief Executive Officer

BELLRIDGE CAPITAL, L.P.

By:

Name:  Robert Klimov
Title:  Managing Partner

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------x
                                 :
BELLRIDGE CAPITAL LLP,           :
                                 :
            Plaintiff,           :
                                 :
    -- against --                :        CASE NO. 1:21-CV-07091-JGG
                                 :
EVMO, INC. f/k/a YAYYO, INC. and :
RIDESHARE RENTALS, INC.,         :
                                 :
            Defendant            :
                                 :
--------------------------------x
```

## DECLARATION OF RAMY EL-BATWARI

Pursuant to 28 U.S.C. § 1746, I hereby declare, state and affirm that the following statements are true and correct based on my personal knowledge under penalty of perjury:

1.    I am the founder and a former Chief Executive Officer, President and Director of Defendant Yayyo, Inc. f/k/a Evmo, Inc. and Rideshare Rentals (collectively "Defendant" or "EVMO").

2.    At all times herein relevant, I was authorized to act on behalf of EVMO.

3.    During May 2019, Robert Klimov, the Managing Partner of Plaintiff Bellridge Capital LLP ("Bellridge") delivered to me a fully executed, copy of the attached Amendment to Yayyo, Inc. Warrant to Purchase Common Stock dated as of May 4, 2019 ("Amendment to Warrant"), which amended a certain Warrant previously granted by EVMO to Bellridge dated as of March 18, 2019.

4.    A true and correct copy of the above referenced Amendment to Warrant as executed by Bellridge is attached hereto as Exhibit A.

1

Dated:   December 10, 2021
        Los Angeles, California

RAMY EL-BATWARI

2

**EXHIBIT A**

**AMENDMENT TO WARRANT DATED MAY 4, 2019**

## AMENDMENT TO YAYYO, INC WARRANT TO PURCHASE COMMON STOCK

This Amendment, dated as of May 4, 2019 (this "Amendment"), made and entered into by and between YayYo, Inc., a Delaware corporation with its principal office located at 433 N. Camden Drive, Suite 600, Beverly Hills, California 90210 (hereinafter referred to as the "Company") and Bellridge Capital, LLC located at 515 E. Las Olas Boulevard, Suite 120A, Fort Lauderdale, Florida 33301 (hereinafter referred to as "Bellridge"), with reference to the following:

WHEREAS, Prior to the date hereof, the Company duly authorized and validly issued a warrant to purchase common stock, dated Dated March 2nd, 2018 (the "Warrant").

WHEREAS, the Company and Bellridge have determined that it is necessary, desirable, and in the best interest of the Company and Bellridge to amend the warrant as set forth in this Amendment; and

NOW THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements herein contained, the Company and Bellridge hereby agree as follows:

1. Effective Date. This Amendment is effective as of March 2nd 2018 (the "Effective Date"), and all references to the warrant from and after such time will be deemed to be references to the warrant as amended hereby.

2. Amendments to the Warrant: In consideration of good and valuable consideration, as of Effective Date, the The provisions in 1(c) (ii), 2 (b), 2(d), 2 (e), 2(f) and 4 shall be waived and removed

3. Except as set forth in this Amendment, the Warrant is unaffected and shall continue in full force and effect in accordance with its terms. If there is conflict between this Amendment and the Warrant the terms of this Amendment will prevail.

4. This Amendment shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to the choice of law principles thereof. Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the courts of the State of Delaware for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Amendment and the transactions contemplated hereby. Service of process in connection with any such suit, action or proceeding may be served on each party hereto anywhere in the world by the same methods as are specified for the giving of notices under this Amendment. Each of the parties hereto irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. Each party hereto irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

5. This Amendment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument. A signature to this Amendment transmitted electronically shall have the same authority, effect, and enforceability as an original signature.

6. If any term, provision, covenant or restriction of this Amendment or applicable to this Amendment is held by a court of competent jurisdiction or other authority to be invalid, null and void or unenforceable, the remainder of the

terms, provisions, covenants and restrictions of this Amendment shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

IN WITNESS WHEREOF, the undersigned have caused this Amendment to the warrant to be duly executed as of the date first above written.

YAYYO, INC.

By

Name: Ramy El-Batrawi
Title:   Chief Executive Officer

BELLRIDGE CAPITAL, L.P.

By:

Name:  Robert Klimov
Title:  Managing Partner

# EXHIBIT 2

## MorrisonJr., Randall L.

| | |
|---|---|
| **From:** | MorrisonJr., Randall L. |
| **Sent:** | Wednesday, April 27, 2022 8:15 AM |
| **To:** | 'George B. Newhouse, Jr.'; Gyves, William |
| **Cc:** | Nealon, James |
| **Subject:** | RE: Bellridge Capital, LP v. EvMo, Inc. |
| **Attachments:** | Document subpoena to El-Batrawi.pdf; Deposition subpoena to El-Batrawi.pdf |
| | |
| **Categories:** | Copy QuickFiled |

George:  I've attached the subpoenas.  We propose a call at 3 PM Eastern this afternoon.  If that works for you, I will send around a dial-in.  Randall

RANDALL L. MORRISON JR.

**Kelley Drye & Warren LLP**
Tel: (212) 808-7544
Cell: (917) 716-0340

**From:** George B. Newhouse, Jr. <george@richardscarrington.com>
**Sent:** Tuesday, April 26, 2022 7:53 PM
**To:** Gyves, William <WGyves@KelleyDrye.com>
**Cc:** Nealon, James <James.Nealon@withersworldwide.com>; MorrisonJr., Randall L. <RMorrison@KelleyDrye.com>
**Subject:** RE: Bellridge Capital, LP v. EvMo, Inc.

**CAUTION: This message originated outside of Kelley Drye and was sent by: george@richardscarrington.com**

Bill.

Yes, I am in the process of being engaged by Mr. El-Batrawi for purposes of his being a witness in this case.  Can you go ahead and forward any subpoenas directly to me?  We are also working on collecting (or reviewing the work done) with respect to Ramy's responsive documents.  A supplemental review may be necessary, I am looking into that now.

We can talk tomorrow morning after I review the subpoenas.

Thanks

George B. Newhouse, Jr.
**RICHARDS CARRINGTON, LLC**
545 S. Figueroa Street, Seventh Floor
Los Angeles, California 90012
P. 213-348-9016
M. 213-709-6387

www.richardscarrington.com



Confidentiality Notice and Disclaimer: The information contained in this email may contain privileged and/or confidential information intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this email is strictly prohibited. If you have received it in error, please immediately inform the sender and delete this message. Although this email and any attachments are believed to be free of any virus or other defect that might adversely affect the recipient computer system, it is the responsibility of the recipient to ensure it is virus free and no responsibility is accepted by Richards Carrington LLC for any loss or damage arising in any way from its use.

**From:** Gyves, William <WGyves@KelleyDrye.com>
**Sent:** Tuesday, April 26, 2022 5:33 AM
**To:** George B. Newhouse, Jr. <george@richardscarrington.com>
**Cc:** Nealon, James <James.Nealon@withersworldwide.com>; MorrisonJr., Randall L. <RMorrison@KelleyDrye.com>
**Subject:** Bellridge Capital, LP v. EVmo, Inc.

Good morning, George.  Hope you have been well.  Counsel for EVmo, Inc. advised this morning that you now represent Ramy El-Batrawi in the referenced matter.  EVmo's counsel previously accepted service of two subpoenas on Mr. El-Batrawi's behalf, stating that he was expressly authorized to do so.  EVmo's counsel also informed us this morning that, although EVmo initially had advised that it was collecting Mr. El-Batrawi's responsive documents so it could run a privilege check prior to producing them, you now will be handling that task.  If what EVmo's counsel is telling us is correct, do you have a moment today to discuss the status of Mr. El-Batrawi's production (which is now overdue) and the scheduling of his deposition?  I'll look forward to hearing from you.  Thanks.  Bill

**WILLIAM GYVES**
Partner

**Kelley Drye & Warren LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7640
Cell: (917) 929-7272

wgyves@kelleydrye.com

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

# EXHIBIT 3



**Glenn T. Graham**

Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007

Tel:   (212) 808-7800
Fax:   (212) 808-7897
GGraham@KelleyDrye.com

June 29, 2022

**VIA EMAIL**
George B. Newhouse, Jr., Esq.
Richards Carrington, LLC
545 S. Figueroa Street, Seventh Floor
Lost Angeles, California 90012

      Re:    Bellridge Capital, LP v. EVmo, Inc.
            21-cv-07091-PGG-SLC (SDNY)

Counsel:

We represent plaintiff Bellridge Capital, LP ("Bellridge Capital") in the referenced matter. Pursuant to Local Rules 37-1 and 45-1 of the United States District Court for the Central District of California, we write to address the failure of your client, Ramy El-Batrawi, to produce documents in response to the subpoena served upon him (the "Subpoena"). A copy of the Subpoena (without the voluminous exhibits) is attached hereto as Exhibit A. El-Batrawi is not in compliance with his obligations under the Subpoena. See Fed. R. Civ. P. 45. In accordance with Local Rule 37-1, we write to request a telephonic meet-and-confer by no later than July 11, 2022 to discuss and hopefully resolve El-Batrawi's noncompliance.

El-Batrawi is the former Chief Executive Officer of defendant EVmo, Inc. ("EVmo"). On March 21, 2022, after having advised that he was authorized to do so, EVmo's counsel accepted service of the Subpoena on El-Batrawi's behalf. On April 26, 2022, EVmo's counsel informed us that he no longer represented El-Batrawi in connection with the Subpoena and advised that you represented El-Batrawi. After you advised that El-Batrawi denied having authorized EVmo's counsel to accept service on his behalf, on April 27, 2022 we sent you the Subpoena. You accepted service thereof. El-Batrawi was required to serve written objections, if any, to the Subpoena by May 11, 2022. See Moon v. SCP Pool Corp., 232 F.R.D. 633, 636 (C.D. Cal. 2005) ("A nonparty's failure to timely make objections to a Rule 45 subpoena ... generally requires the court to find that any objections have been waived."). To date, El-Batrawi has neither produced any documents in response to the Subpoena nor served any written objections to the Subpoena.

The paper trail reflects that we have attempted in good faith to work with you in terms of securing El-Batrawi's compliance. The paper trail also reflects El-Batrawi's blatant failure to meet his obligations in responding to the Subpoena:

NEW YORK    WASHINGTON, DC    CHICAGO    HOUSTON    LOS ANGELES    SAN DIEGO    PARSIPPANY    STAMFORD

George B. Newhouse, Jr.
June 29, 2022

- As early as **April 26, 2022**, you advised, "We are … working on collecting (or reviewing the work done) with respect to Ramy's responsive documents.  A supplemental review may be necessary, I am looking into that now."

- On **April 27, 2022**, you advised, "We will initiate a search for all responsive documents and advise as to when we will be in a position to produce any additional documents that the company has not already provided -- or is in the process of providing."

- On **May 9, 2022**, we attempted without success to contact you by telephone to discuss the status of El-Batrawi's production.  We then emailed you inquiring, "Checking in with you re the status of Ramy's production in response to the subpoena.  Please advise."

- On **May 12, 2022**, you advised that it would be "a matter of weeks" before El-Batrawi commenced his production.  When we inquired if the production would commence within a month, you responded that it was premature to respond to even that relaxed schedule.

- On **May 19, 2022**, we emailed you inquiring, "Any updates re the status of Ramy's production?"  We further advised that "the delays re Ramy's production essentially have brought the deposition phase of this matter to a stand-still" and that the Court had been advised of this fact.  You responded, "We're meeting with the vendor tomorrow to discuss the review and recovery process and I should have a better idea after that as [to] the timing."  To that we requested clarification:  "the review process is not yet underway as of today?"  You did not respond.

- On **June 2, 2022**, we emailed you and inquired, "Any update re the status of Ramy's production?"  You responded, "We are still working on it.  The Vendor did the download session today with respect to Ramy's relevant email accounts, and Disco is currently working on the search and retrieval process.  I don't have a timetable for production at present but you may assure the Court that our vendor is working on it.  We will produce responsive, non-privileged documents as quickly as possible."  We responded, "Do you anticipate producing documents this month?"  You replied, "That is certainly our expectation but I can't really say until I get a report back from the vendor."

- On **June 14, 2022**, we emailed you, "Please advise as of the status of Ramy's production."  In response, you stated, "I asked the team at Disco

**KELLEY DRYE & WARREN LLP**                                                                  2

George B. Newhouse, Jr.
June 29, 2022

(the vendor doing the work) to update me.  I will get back to you when they respond."  We did not hear back from you with any update.

- On **June 24, 2022**, we emailed you and stated, "Any news, George?  We need to get some resolution in the very near term (i.e., next week) or we'll do what we have to do in terms of looping in the magistrate judge. Would like to avoid that but we are on the verge of having no alternative."  You did not respond to our inquiry.

Absent El-Batrawi's immediate compliance with the Subpoena, we will seek the appropriate judicial relief.  Please advise of your availability to meet-and-confer issue no later than July 11, 2022. Bellridge Capital reserves all of its rights in connection with the Subpoena.

Thank you in advance for your anticipated cooperation.

Very truly yours,

Glenn T. Graham

Exhibit

cc:  James Nealon, Esq.

# EXHIBIT A

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

| | |
|---|---|
| Bellridge Capital, LP | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:21-cv-07091-PGG |
| EVmo, Inc., f/k/a YayYo, Inc. and Rideshare Rental, Inc. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Ramy El-Batrawi, c/o PDQ Pickup LLC, 433 N. Camden Drive, #600, Beverly Hills, CA 90210

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:    See Appendix A

| Place: Kelley Drye & Warren LLP | Date and Time: |
|---|---|
| 350 South Grand Avenue, Suite 3800 Los Angeles, CA 90071 | 4/5/2022 at 5:00 P.M. |

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ William S. Gyves |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Bellridge Capital
_____ , who issues or requests this subpoena, are:
William S. Gyves, Kelley Drye & Warren LLP, 3 World Trade Center, 175 Greenwich St., New York, New York 10007; Tel: (212) 808-7800; wgyves@kelleydrye.com

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:21-cv-07091-PGG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                              *Server's signature*

                                                      _____
                                                              *Printed name and title*

                                                      _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## APPENDIX A

### Definitions

1.       Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York is incorporated herein by reference.

2.       "Bellridge Capital" means plaintiff Bellridge Capital, LP and any and all of its current and former officers, directors, employees, agents, representatives, predecessors, successors, parents, subsidiaries, attorneys, affiliates and assigns, and any other person acting or purporting to act on their behalf.

3.       "EVmo" means defendant EVmo, Inc., as well as Yay Yo, Inc. and Rideshare Rental, Inc., and any and all of its or their current and former officers, directors, employees, agents, representatives, predecessors, successors, parents, subsidiaries, attorneys, affiliates and assigns, and any other person acting or purporting to act on its or their behalf.

4.       "Complaint" means the Complaint (Docket No. 1) filed in this action on August 23, 2021 and attached hereto as **Exhibit A**.

5.       "Answer" means the Answer (Docket No. 38) filed in this action on February 3, 2022 and attached hereto as **Exhibit B**.

6.       "Warrant" means the Warrant to Purchase Common Stock dated March 8, 2018 (Docket No. 1-1) and attached as Exhibit A to the Complaint.

7.       "Warrant Amendment" means the Amendment to Yay Yo, Inc. Warrant to Purchase Common Stock (Docket No. 38-1) dated as of May 4, 2019 and attached as Exhibit 1 to the Answer.

8.       "Klimov" means Boris (Robert) Klimov, Bellridge Capital's Managing Partner.

9.       "El-Batrawi" means Ramy El-Batrawi, EVmo's founder and former Chief Executive Officer.

10.      "SEC" means the United States Securities and Exchange Commission.

11.       "El-Batrawi Declaration" means the "Declaration of Ramy El-Batwari" (Docket No. 28) dated December 10, 2021 and filed in this action on January 11, 2022 and attached hereto as **Exhibit C**.

12.      "You" or "Your" means El-Batrawi.

<u>**Document Requests**</u>

1.       If the Warrant Amendment reflects Klimov's manual signature, the document reflecting Klimov's original manual signature for inspection and copying.

2.       If the Warrant Amendment reflects Klimov's electronic signature, a copy of that document as received by you.

3.       If You received the Warrant Amendment reflecting Klimov's signature by email, any and all documents referring, reflecting or relating to, or otherwise constituting, any such email(s).

4.       If You received the Warrant Amendment reflecting Klimov's signature by some means other than email, any and all documents referring, reflecting or relating to the conveyance of that document to You by that other means.

5.       If Klimov or any other person emailed Klimov's electronic signature to You separately from the Warrant Amendment, any and all documents referring, reflecting or relating to, or otherwise constituting any such email(s).

6.       Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications at any time between EVmo and You (or your counsel, if any)

relating in any way to the Warrant Amendment.

       7.     Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications at any time between EVmo's outside counsel and You (or your counsel, if any) relating in any way to the Warrant Amendment.

       8.     Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications at any time between EVmo's counsel at Carmel, Milazzo & Feil LLP and You (or your counsel, if any) relating in any way to the Warrant Amendment.

       9.     Any and all documents referring, reflecting or relating to the circumstances in which Klimov signed the Warrant Amendment.

       10.     Any and all documents referring, reflecting or relating to the circumstances in which You received the Warrant Amendment signed by Klimov.

       11.     Any and all documents referring, reflecting or relating to the circumstances in which You located the Warrant Amendment after the commencement of this litigation, captioned Bellridge Capital, LP v. EVmo, Inc., f/k/a Yayo, Inc. and Rideshare Rental, Inc., No. 1:21-cv-07091-PGG (S.D.N.Y.), on August 23, 2021.

       12.     Any and all documents referring, reflecting or relating to the circumstances in which the Warrant Amendment was first forwarded to EVmo.

       13.     Any and all documents referring, reflecting or relating to the circumstances in which the Warrant Amendment was first forwarded to Withers Bergman.

       14.     Any and all documents referring, reflecting or relating to, or otherwise constituting, all drafts or versions of the Warrant Amendment.

       15.     Any and all documents referring, reflecting or relating to the drafting of the Warrant Amendment.

16.     Any and all documents referring, reflecting or relating to, or which otherwise are sufficient to establish, when the initial draft or version of the Warrant Amendment was first created.

17.     Any and all documents referring, reflecting or relating to, or which otherwise are sufficient to identify, the computer or computer system on which the initial draft or version of the Warrant Amendment was first created.

18.     Any and all documents referring, reflecting or relating to, or otherwise constituting, any steps taken by You to amend or modify the Warrant other than through the Warrant Amendment.

19.     Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications between EVmo (or its outside counsel) and you (or your counsel, if any) regarding the El-Batrawi Declaration.

20.     Any and all documents referring, reflecting or relating to, or which otherwise are sufficient to identify, the person(s) who drafted the El-Batrawi Declaration.

21.     Any and all drafts or versions of the El-Batrawi Declaration exchanged between You (or your counsel, if any) and EVmo (or its outside counsel).

22.     Any and all documents referring, reflecting or relating to Bellridge Capital's notice on or about May 28, 2021 of its intention to exercise its rights under the Warrant.

23.     Any and all documents referring, reflecting or relating to EVmo's evaluation of Bellridge Capital's May 28, 2021 notice of its intention to exercise its rights under the Warrant.

24.     Any and all documents referring, reflecting or relating to EVmo's response to Bellridge Capital's May 28, 2021 notice of its intention to exercise its rights under the Warrant.

25.     Any and all documents referring, reflecting or relating to any oral agreement

between EVmo and Bellridge Capital to amend or otherwise modify the Warrant.

26.    Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications between EVmo (or its outside counsel) and you (or your counsel, if any) concerning any oral agreement to amend or otherwise modify the Warrant.

27.    Any and all documents referring, reflecting or relating to the "Form of Warrant" attached as Exhibit 4.3 to EVmo's 2019 Annual Report submitted to the SEC on or about March 31, 2020 on Form 10-K.

28.    Any and all documents referring, reflecting, or relating to the circumstances in which the "Form of Warrant" came to be attached as Exhibit 4.3 to EVmo's 2019 Annual Report submitted to the SEC on or about March 31, 2020 on Form 10-K.

29.    Any and all documents referring, reflecting or relating to, or otherwise constituting, any communications between EVmo (or its outside counsel) and you (or your counsel, if any) relating in any way to this litigation, captioned Bellridge Capital, LP v. EVmo, Inc., f/k/a Yayo, Inc. and Rideshare Rental, Inc., No. 1:21-cv-07091-PGG (S.D.N.Y.).